232

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2

3     ------------------------------X
      ROCHELLE RAMOS,
4                                  :  CV-07-1250
                                      (ADS)
5             Plaintiff,
                                   :  United States Courthouse
6        -against-                   Central Islip, New York

7     COUNTY OF SUFFOLK, et al.,
                                   :  November 12, 2009
8             Defendants.             9:40 a.m.
      ------------------------------X
9
                       TRANSCRIPT OF TRIAL
10          BEFORE THE HONORABLE ARTHUR D. SPATT
          UNITED STATES DISTRICT COURT JUDGE, and a jury.
11

12    APPEARANCES:

13    For the Plaintiff:      JON L. NORINSBERG, ESQ.
                              BENNITTA JOSEPH, ESQ.
14                            225 Broadway, Suite 2700
                              New York, New York 10007
15

16
      For the Defendant:      CHRISTINE MALAFI, ESQ.
17                            Suffolk County Attorney
                              BY:  SUSAN A. FLYNN, ESQ.
18                                 ARLENE S. ZWILLING, ESQ.
                              H. Lee Dennison Building
19                            100 Veterans Memorial Highway
                              Hauppauge, New York 11788
20

21    Official Court Reporter:   Paul J. Lombardi, RMR, FCRR
      Ph. (631) 712-6106         100 Federal Plaza - Suite 1180
22    Fax (631) 712-6122         Central Islip, New York 11722

23

24
                 Proceedings recorded by mechanical stenography.
25                     Transcript produced by CAT.


                    Paul J. Lombardi, RMR, FCRR
                       Official Court Reporter

233

1           (Trial resumes.)

2

3           THE CLERK:  Jury entering.

4           (Jury enters the courtroom.)

5           THE COURT:  Good morning, members of the jury.

6           ALL JURORS:  Good morning, your Honor.

7           THE COURT:  Please be seated.

8           I want to thank you, again, for your dedication,

9    sense of responsibility and one more thing, punctuality.

10   Very good.

11          You may proceed.  Where's the witness?

12          (Whereupon, there was a pause in the

13   proceedings.)

14

15          THE CLERK:  Please stand and raise your right

16   hand.

17   **VINCENT GERACI**,

18          having been duly sworn, was examined

19          and testified as follows:

20          THE CLERK:  Please state your name and spell

21   your last name slowly for the record.

22          THE WITNESS:  Vincent Geraci, G-E-R-A-C-I.

23          THE COURT:  Have a seat, doctor.

24          THE WITNESS:  Thank you.

25          THE COURT:  You may proceed.

Geraci - Direct/Norinsberg

234

1          MR. NORINSBERG:  Thank you, your Honor.

2    DIRECT EXAMINATION

3    BY MR. NORINSBERG:

4    Q.   Good morning, Dr. Geraci.

5    A.   Good morning, sir.

6    Q.   When we left off last time, I was starting to ask you

7    about the grievance form of Linda Kennedy.

8          Do you recall that, sir?

9    A.   I recall we talked about a grievance form.

10          Yes.

11   Q.   Okay.

12          At some point you learned that a grievance form

13   had been filed by Linda Kennedy.

14          Correct?

15   A.   From Richard Kaufman, yes.

16   Q.   And a grievance form is a complaint filed by an

17   inmate.

18          Is that correct?

19   A.   Correct.

20   Q.   And you wanted to see this written complaint that

21   Linda Kennedy had filed.

22          Correct?

23   A.   That she alleged to have filed.

24          Correct.

25   Q.   Did you want to see the written complaint that Linda

Geraci - Direct/Norinsberg

235

1    Kennedy had filed?

2    A.    I did.

3    Q.    You wanted to see how Linda Kennedy described this

4    incident in her own words.

5          Correct?

6    A.    Correct.

7    Q.    You believed that this was potentially important

8    information.

9          Correct?

10   A.    Yes.

11   Q.    And so you felt it was important enough for you

12   personally to investigate further to the point of actually

13   requesting to see the grievance form.

14         Correct?

15   A.    I'm not an investigator.

16         I just wanted to see what the complaint was.

17   Q.    Referring to your deposition page 68, line 18:

18         Question:  And you felt that it was important

19   enough to investigate this further to the point where you

20   wanted to see the grievance complaint, correct?

21         Answer:  Correct.

22         Do you recall giving that testimony at your

23   deposition?

24   A.    Yes.

25         I wanted to see her grievance form.

Geraci - Direct/Norinsberg

236

1    Q.    So even though you don't consider yourself an

2    investigator, you thought that this form was important

3    enough to investigate and see it.

4          Correct?

5    A.    I just wanted to know what she was complaining about.

6    Q.    You wanted to see the grievance form because it was

7    directly from Linda Kennedy in her own words.

8          Correct?

9    A.    Yes.

10   Q.    Everything up to that point you had heard from other

11   people.

12         Correct?

13   A.    Correct.

14   Q.    So you wanted to see the form she wrote, but you

15   didn't want to actually interview her.

16         Correct?

17   A.    Correct.

18   Q.    So in your mind, when you were looking to get the

19   form, that wasn't investigating this complaint, whereas,

20   if you spoke to her in person, that would be investigating

21   the complaint.

22         Correct?

23   A.    Well, if I had the form I would know what the

24   complaint was, and I would channel it accordingly.

25   Q.    Now, when you spoke to Sergeant Campo the same day

Geraci - Direct/Norinsberg

237

1    that you learned about Ms. Kennedy's allegations.

2         Correct?

3    A.   Yes.

4    Q.   And you told Sergeant Campo that there were

5    allegations made by an inmate and this inmate claimed she

6    made a grievance and you wanted to see the grievance.

7         Correct?

8    A.   Yes, that's correct.

9    Q.   And Sergeant Campo said he would look into it for

10   you.

11        Correct?

12   A.   Correct.

13   Q.   Dr. Geraci, apart from requesting a copy of the

14   grievance form from Sergeant Campo, did you make any other

15   requests of this person?

16   A.   I don't recall.

17   Q.   Did you request that Sergeant Campo investigate this

18   matter further?

19   A.   I don't recall.

20   Q.   Did you request that Sergeant Campo report this

21   matter to his superiors in internal security?

22   A.   I don't recall.

23   Q.   So you have no memory, as you sit here today, of

24   making those requests.

25        Correct?

Geraci - Direct/Norinsberg

238

1          MS. FLYNN:  Objection.

2          THE COURT:  Overruled.

3     A.    I don't recall the exact content of our discussion.

4     Q.    Well, you saw Sergeant Campo the very next day,

5     correct?

6     A.    I believe so, yes.

7     Q.    You learned about Linda Kennedy's allegation on

8     January 18, 2006, and the very next day you saw

9     Sergeant Campo again.

10          Correct?

11    A.    I believe so, yes.

12    Q.    And when you saw him the next day, you asked him

13    whether he found the grievance form.

14          Correct?

15    A.    I asked him -- yes, if there was a grievance form.

16          He said no.

17    Q.    Referring to your deposition, page 56, line 23:

18          Question:  --

19          MS. FLYNN:  I'm sorry.

20          Could you give me a minute.

21          MR. NORINSBERG:  56, line 23.

22          MS. FLYNN:  Thank you.

23    BY MR. NORINSBERG:

24    Q.    Question:  What did you say to Sergeant Campo when

25    you saw him the next day?

Geraci - Direct/Norinsberg

239

1          Answer:  I said, did you find the grievance?

2          Question:  What did Sergeant Campo say in

3    response?

4          Answer:  He said he did not find the grievance.

5          MS. FLYNN:  Objection.

6          THE COURT:  Sustained.

7          Strike out the question and answer.  They were

8    not inconsistent with the witness's present testimony.

9    BY MR. NORINSBERG:

10   Q.   He didn't tell you at that point that he couldn't

11   find the grievance, did he?

12   A.   He just said he didn't have the grievance.

13   Q.   But you continued to check with Sergeant Campo on a

14   daily basis to see where this grievance form was.

15         Correct?

16   A.   For several days, yes.

17   Q.   Would you tell the jury, how many times did you go to

18   Sergeant Campo and ask him to find this grievance form?

19   A.   It was several days.

20         About five times or, perhaps, more.  Every day I

21   was inquiring about that.

22   Q.   So at least five times you made inquiries of

23   Sergeant Campo as to where this form was.

24         Correct?

25   A.   On a daily basis, yes.

Geraci - Direct/Norinsberg

240

1   Q.   But never once during those five times did you ever

2   ask Sergeant Campo to make an investigation into this

3   matter, did you?

4   A.   I don't recall.

5   Q.   And you were never provided with a grievance form.

6        Is that correct?

7   A.   I never saw the grievance form.

8   Q.   To this day, do you have any idea what happened to

9   that grievance form?

10       MS. FLYNN:  Objection.

11       THE COURT:  Overruled.

12  A.   As I said in my deposition, I don't even know if

13  there ever was a grievance form.

14       But, no.  I never saw a grievance form.

15  Q.   Doctor, you certainly believed there was a grievance

16  form at the time, didn't you?

17       MS. FLYNN:  Objection.

18       THE COURT:  Sustained.

19  BY MR. NORINSBERG:

20  Q.   When you kept going back each day to ask

21  Sergeant Campo for the form, you were under the impression

22  that that form existed.

23       Correct?

24       MS. FLYNN:  Objection.

25       THE COURT:  Sustained.

Geraci - Direct/Norinsberg

241

1   BY MR. NORINSBERG:

2   Q.   Why did you keep going back to Sergeant Campo day,

3   after day, after day?

4   A.   As I said, I didn't speak to any of the -- I didn't

5   speak to Linda Kennedy directly.

6        And I wanted to see what she had written about

7   in her complaint, which is often how I get information

8   about what inmates complain about.

9   Q.   Now, you had testified before that you are not an

10  investigator.

11       Correct?

12  A.   I don't investigate nonmedical issues, sir.

13  Q.   And, yet, you were trying to get your hands on this

14  grievance form, weren't you?

15  A.   Because I didn't know what the content was.

16       Yes, sir.

17  Q.   Now, you also spoke to Lieutenant Nolan in internal

18  security at some point, correct?

19       THE COURT:  Lieutenant who?

20       MR. NORINSBERG:  Nolan, N-O-L-A-N.

21  A.   I recall speaking to Lieutenant Nolan at some point

22  before Gary Feinberg's arrest.

23  Q.   Who is Lieutenant Nolan?

24  A.   At the time I believe he was the director of internal

25  security.

Geraci - Direct/Norinsberg

242

1   Q.   Can you tell the members of the jury when, exactly,

2   did you speak to Lieutenant Nolan for the very first time

3   regarding this case?

4   A.   I can't recall.

5   Q.   Well, Gary Feinberg was arrested February 8, 2006.

6        Correct?

7   A.   Yes.

8        THE COURT:  I'm sorry.

9        What date was that?

10       MR. NORINSBERG:  February 8th, your Honor, 2006.

11  BY MR. NORINSBERG:

12  Q.   When in relation to February 8, 2006, did you speak

13  to Lieutenant Nolan?

14  A.   I really can't recall.

15  Q.   So it could have been February 7th?

16       It could have been February 8th?

17  A.   It could have been the beginning of February.

18  Q.   Do you know as you sit here?

19  A.   I don't know exactly, no.

20  Q.   Where did that conversation take place, Dr. Geraci?

21  A.   I can't recall that either.

22  Q.   Tell the members of the jury, how long did the

23  conversation last with Lieutenant Nolan?

24  A.   I just told him what I knew.

25       It was relatively brief.

Geraci - Direct/Norinsberg

243

1    Q.    Would it be fair to say you can't recall how long

2    that conversation lasted?

3              MS. FLYNN:  Objection.

4              THE COURT:  Overruled.

5    A.    I can't recall.

6    Q.    Did you ask Lieutenant Nolan to investigate this

7    matter further?

8    A.    No.  I didn't ask him.

9    Q.    So you don't recall asking Sergeant Campo to

10   investigate this matter, and you definitely didn't ask

11   Lieutenant Nolan to investigate the matter.

12             Correct?

13   A.    He was the director of internal security.

14             I didn't ask him.

15   Q.    Well, you thought it was important enough to tell

16   Lieutenant Nolan everything you knew up to that point.

17             Correct?

18   A.    Which was hearsay.

19             Correct.

20   Q.    Whatever it was, you thought it was important enough

21   to share with Lieutenant Nolan.

22             Correct?

23   A.    Correct.

24   Q.    Why didn't you ask him at that point to investigate

25   this matter?

Geraci - Direct/Norinsberg

244

1    A.    I believed an investigation was already underway.

2    Q.    You believed an investigation was underway?

3    A.    Yes.

4    Q.    Who was conducting this investigation, to your

5    knowledge?

6    A.    I don't know.

7    Q.    What division of Suffolk County was conducting the

8    investigation at that point, as far as you know?

9    A.    I don't know.

10   Q.    So where did you get the notion that this matter was

11   already being investigated?

12   A.    I don't recall.

13         But I do remember that there was mention of an

14   investigation underway.

15   Q.    Who mentioned this investigation to you?

16   A.    I'm sorry.  I don't know.

17   Q.    When did you first learn there was an investigation

18   underway, Dr. Geraci?

19   A.    I don't know, exactly.

20   Q.    Was it before or after Gary Feinberg's arrest when

21   you first learned that?

22   A.    It was before his arrest.

23   Q.    How far before the arrest did you learn that there

24   was an investigation underway?

25   A.    To the best of my recollection, the week of the 23rd

Geraci - Direct/Norinsberg

245

1    of January.

2    Q.   So --

3    A.   But I didn't know who was investigating.

4    Q.   So you don't know who told you there was an

5    investigation.  You don't know who was doing the

6    investigation.

7              But somehow you learned that there was an

8    investigation underway.

9    A.   I had that impression, yes.

10   Q.   You had that impression.

11             Did you report the allegations of

12   Ms. Rickenbacker and the allegations of Ms. Kennedy to the

13   entity who was conducting this investigation?

14   A.   Sir, I work for the health department.

15             We are a separate division from the sheriff's

16   office.

17   Q.   Is that a yes or a no, sir?

18   A.   I told you that I don't know under what circumstances

19   I found out about an investigation.

20             I just heard about one.

21   Q.   Now, you previously testified that you were given

22   specific instructions not to investigate matters that were

23   not of a medical nature.

24             Is that correct?

25   A.   If it was a nonmedical issue, yes.

**Geraci - Direct/Norinsberg**

246

1    Q.    Who gave you those instructions?

2    A.    Lieutenant Nolan.

3    Q.    When did Lieutenant Nolan give you those instructions

4    for the first time?

5    A.    It was shortly after I had gotten to the jail

6    facility.

7              MS. FLYNN:  Your Honor, may we approach?

8              THE COURT:  Okay.

9              (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Geraci - Direct/Norinsberg

247

1              (Sidebar.)

2              MS. FLYNN:  I don't know who those people are in

3      the back of the courtroom.

4              THE COURT:  Probably just visitors.

5              MS. FLYNN:  I just wanted to check that they

6      weren't witnesses.

7              THE COURT:  I'm not going to go over and ask

8      them.

9              MS. ZWILLING:  Are they plaintiffs in the other

10     cases?

11             MR. NORINSBERG:  No.

12             THE COURT:  They probably just came in to see

13     how you are doing.

14             MS. FLYNN:  Thank you.

15             THE COURT:  They know how Ms. Zwilling's doing.

16             MS. FLYNN:  Thank you, your Honor.

17             (Sidebar concluded.)

18             (Continued on next page.)

19

20

21

22

23

24

25

Geraci - Direct/Norinsberg

248

1                    (In open court.)

2        BY MR. NORINSBERG:

3        Q.    You joined the jail in September of 2004.

4              Is that correct?

5        A.    September 18, 2004.

6              At the time I was also running the Riverhead

7        health center of Suffolk County.

8        Q.    Is it your testimony, sir, that some point after you

9        joined the jail in September of 2004, Lieutenant Nolan

10       gave you specific instructions that you, Dr. Geraci, are

11       not to investigate matters of a nonmedical nature?

12             Is that your testimony?

13       A.    Lieutenant Nolan told me that nonmedical issues

14       should not be investigated by myself.

15       Q.    And did Lieutenant Nolan tell you who those

16       nonmedical issues should be investigated by?

17       A.    I believe he said the sheriff's office.

18       Q.    Did he tell you that if you had an issue involving a

19       nonmedical claim you should report it to internal security

20       for investigation?

21       A.    I don't recall who he specifically told me to report

22       it to.

23             I report to Sergeant Campo, who is in charge of

24       the medical unit.

25       Q.    And Sergeant Campo, what's his position?

Geraci - Direct/Norinsberg

249

1    A.    He's a sergeant in charge of the medical unit as a

2    correction officer.

3    Q.    So he's the highest ranking correction officer in the

4    medical unit?

5    A.    He's --

6              MS. FLYNN:  Objection.

7              THE COURT:  Overruled.

8    A.    He is stationed in the medical unit, and he's the

9    highest stationed officer in the medical unit.

10   Q.    To your knowledge, what action, if any, did

11   Sergeant Campo take with respect to investigating these

12   allegations?

13   A.    I don't know.

14   Q.    Did you ever ask him?

15   A.    I only asked him about the grievance form.

16   Q.    So you were interested in the grievance form, but not

17   any investigation that he might be conducting.

18              Correct?

19   A.    Regarding that, I don't know what he was doing, sir.

20   Q.    Now, there came a time where you learned that

21   Gary Feinberg had been arrested.

22              Is that correct?

23   A.    Correct.

24   Q.    And that came as a surprise to you that Mr. Feinberg

25   was arrested.

Geraci - Direct/Norinsberg

250

1          Correct?

2    A.    I was shocked.

3    Q.    So you were shocked when you first heard the

4    allegation made by Linda Kennedy.

5          You were shocked again when you heard the

6    allegations by Ms. Rickenbacker.

7          And then you were shocked for a third time when

8    you learned that Mr. Feinberg was actually arrested on

9    these charges.

10         Correct?

11         MS. FLYNN:  Objection.

12         THE COURT:  Sustained as to form.

13   BY MR. NORINSBERG:

14   Q.    Dr. Geraci, you knew, with your own personal

15   knowledge, that at least two separate inmates had made

16   allegations of sexual misconduct against Mr. Feinberg.

17         Correct?

18   A.    One made an allegation of inappropriate touching

19   during an exam.

20         And the other one made an allegation of

21   consensual relationship.

22   Q.    Is that of your understanding, that as recently as

23   January of 2006 it was still a consensual relationship?

24         Is that your understanding, sir?

25   A.    Repeat the question, sir.

Geraci - Direct/Norinsberg

251

1   Q.   Is it your understanding that one of the inmates was

2   still having a consensual relationship up to January of

3   2006?

4   A.   It was my understanding on January 20th, for the

5   first time I heard about the allegations, of a consensual

6   relationship, which I didn't understand.

7   Q.   You are referring to Ms. Rickenbacker?

8   A.   I believe so.

9   Q.   Who gave you this information that it was a

10  consensual relationship?

11            MS. FLYNN:  Objection.

12            THE COURT:  Overruled.

13  A.   I heard it from Nancy Kugler and Carol Manderino

14  during a meeting.

15  Q.   So Nancy Kugler and Carol Manderino were the ones who

16  told you it was a consensual relationship.

17            Is that what your testimony is?

18            MS. FLYNN:  Objection.

19            THE COURT:  Overruled.

20  A.   That's where I first heard about the allegations of

21  consensual relationship.

22  Q.   Now, when you first heard about Ms. Kennedy's

23  allegations there was no question in your mind about

24  whether this was consensual or not.

25            Was there?

1    A.    There were allegations of mis -- of inappropriate

2    touching during an exam.

3    Q.    And because of those allegations involving

4    Ms. Kennedy, you decided to speak with Mr. Feinberg.

5          Correct?

6    A.    Yes.

7    Q.    And you spoke to Mr. Feinberg for five to ten minutes

8    regarding Ms. Kennedy's allegations.

9          Correct?

10   A.    I had a conversation with him.

11   Q.    And after you heard Mr. Feinberg tell you what he

12   told you, did you form any opinion as to whether or not

13   Mr. Feinberg was telling the truth?

14   A.    I never formed an opinion either way.

15   Q.    So you asked Mr. Feinberg what happened.

16         Correct?

17   A.    No.

18         I asked him if the allegations that were made

19   were true, and he denied it.

20   Q.    And even when that meeting ended, you were still open

21   to the possibility that Mr. Feinberg had, in fact,

22   improperly touched Linda Kennedy.

23         Correct?

24   A.    Sir, I always had to be neutral.  I'm a medical

25   director of a medical unit.

1          I have to consider the inmates and the patients

2     and I have to consider my staff.

3     Q.   Were you still open to the possibility, even after

4     Mr. Feinberg had made that denial?

5     A.   Yes, sir.

6          I was open to the possibility.

7     Q.   So you were still open to the possibility that there

8     had, in fact, been improper touching going on.

9          Correct?

10    A.   That one circumstance, yes.

11         I was open to it, which is why I acted on it.

12    Q.   And after you learned about Ms. Rickenbacker's

13    allegations, you spoke to Mr. Feinberg again.

14         Is that correct?

15    A.   Correct.

16    Q.   That second conversation was just two days later,

17    January 20, 2006.

18         Correct?

19    A.   Correct.

20    Q.   Mr. Feinberg denied these allegations too.

21         Correct?

22    A.   Correct.

23    Q.   But even after this second conversation with

24    Mr. Feinberg, you still weren't sure what had happened.

25         Correct?

1    A.   Again, everything that I knew of was hearsay.

2         So I spoke to Mr. Feinberg.  He denied it.  And

3    I told him he couldn't see those patients.

4    Q.   My question is, sir, did you form any opinion after

5    those two conversations with Mr. Feinberg as to whether or

6    not he was telling the truth?

7    A.   I never formed an opinion, one way or another.

8         I don't know what the truth was in this case.

9    Q.   At some point you spoke to Mr. Feinberg after his

10   arrest.

11        Is that correct?

12   A.   Very briefly, either the day after his arrest or the

13   day of, about supplies in his desk that he needed and he

14   needed his keys from his jacket so his wife could pick up

15   his car.

16        That was the only conversation I had.

17   Q.   Did Mr. Feinberg make any type of denial at all

18   during that conversation with you?

19   A.   I don't --

20        MS. FLYNN:  Objection.

21        THE COURT:  Overruled.

22   A.   I don't recall.

23   Q.   Did Mr. Feinberg protest his innocence during that

24   conversation with you?

25        MS. FLYNN:  Objection.

Geraci - Direct/Norinsberg

255

1              THE COURT:  Sustained.

2     BY MR. NORINSBERG:

3     Q.   Now, there were approximately seven team leaders in

4     the jail medical unit in 2005.

5              Is that correct?

6     A.   Yes.

7              THE COURT:  17 what?

8              MR. NORINSBERG:  The number seven, team leaders.

9              THE COURT:  Team leaders?

10             MR. NORINSBERG:  Yes.

11    A.   That's correct.

12             THE COURT:  What's a team leader?

13             THE WITNESS:  Sir, it's something that I created

14    in the jail medical unit when I got there, or shortly

15    after I had gotten there to improve communication among

16    the different units within the medical unit.

17             For example, we had a pharmacy, a nursing staff,

18    a practitioner's staff, a mental health staff.

19             THE COURT:  They were employees of --

20             THE WITNESS:  They were all employees.

21             But it was a way for us to talk about problems

22    where one problem might affect another part of the unit.

23             THE COURT:  I just want to know what they are.

24             They are not inmates?

25             THE WITNESS:  No.

Geraci - Direct/Norinsberg

256

1            They are supervisors, for the most part.

2            THE COURT:  All right.

3            THE WITNESS:  It was just a way of

4    communicating.

5    BY MR. NORINSBERG:

6    Q.   Now, the team leaders in the jail medical unit would

7    get together from time to time and talk about operations

8    within the jail medical unit.

9            Correct?

10   A.   Correct.

11   Q.   And as the medical director, you were concerned that

12   something like this had happened in your unit.

13           Correct?

14   A.   Something like what, sir?

15   Q.   The fact that there had been allegations made of

16   sexual abuse and that Mr. Feinberg had, in fact, been

17   arrested.

18           You were concerned about this, correct?

19   A.   I was concerned.

20   Q.   And you wanted to make sure that something like this

21   would never happen again in the jail medical unit.

22           Correct?

23           MS. FLYNN:  Objection.

24           THE COURT:  Sustained.

25

Geraci - Direct/Norinsberg

257

1    BY MR. NORINSBERG:

2    Q.    After Mr. Feinberg was arrested, did you ever discuss

3    this issue during any of the team meetings that you held

4    with the leaders in the jail medical unit?

5              MS. FLYNN:  Objection, your Honor.

6              THE COURT:  Overruled.

7    A.    I don't recall.

8    Q.    Was the subject of Gary Feinberg ever addressed in

9    any team leader meetings?

10             MS. FLYNN:  Objection.

11             THE COURT:  Overruled.

12   A.    I don't recall, sir.

13   Q.    You are not aware of any, correct, sir?

14   A.    I just don't recall.

15   Q.    Referring to your deposition, page 35, line 21:

16             Question:  Was the subject of Gary Feinberg ever

17   addressed during any team leader meetings?

18             Answer:  Not that I'm aware of.

19             Do you recall giving that testimony, sir?

20             MS. FLYNN:  Objection.

21             THE COURT:  Overruled.

22             I'll allow it.

23   A.    Not that I'm aware of.

24   Q.    Now, you testified earlier that you had taken

25   precautions once you learned about the information

Geraci - Direct/Norinsberg

258

1    regarding Ms. Rickenbacker.

2              Is that correct?

3    A.    I spoke with Gary Feinberg.

4    Q.    In --

5    A.    And I told him not to see Ms. Rickenbacker anymore.

6    Q.    But, in fact, he continued seeing Ms. Rickenbacker

7    after that alleged order that you issued.

8              True?

9    A.    I don't know that to be true.

10   Q.    I'd like to show you a document.

11             THE COURT:  A document with what number for

12   identification?

13             MR. NORINSBERG:  It would be 56, your Honor.

14             (Whereupon, there was a pause in the

15   proceedings.)

16

17   BY MR. NORINSBERG:

18   Q.    Do you recognize this document, Dr. Geraci?

19   A.    It's a progress note.

20   Q.    Can you tell the members of the jury what's the date

21   of this progress note?

22   A.    It says January 29, 2006.

23   Q.    And it pertains to Lowrita Rickenbacker.

24             Correct?

25   A.    Correct.

Geraci - Direct/Norinsberg

259

1  Q.   You learned about Ms. Rickenbacker's allegations on

2  January 20th, 2006.

3            Correct?

4  A.   Correct.

5  Q.   You spoke to Gary Feinberg on January 20th relating

6  to Lowrita Rickenbacker.

7            Correct?

8  A.   Correct.

9  Q.   You ordered him on January 20th to never see

10 Ms. Rickenbacker again.

11           Correct?

12 A.   Correct.

13 Q.   And, yet, just nine days later here he is treating

14 Ms. Rickenbacker.

15           Correct?

16 A.   He made a notation in the chart.

17           I don't know if this means he saw the patient or

18 not.

19 Q.   You mean he just made a notation in the chart without

20 examining the patient?

21           MS. FLYNN:  Objection.

22           THE COURT:  Overruled.

23 A.   There are times we make notations in the chart

24 without examining a patient.

25           MR. NORINSBERG:  I offer Plaintiff Exhibit 56

Geraci - Direct/Norinsberg

260

1   into evidence.

2            THE COURT:  Any objection?

3            MS. FLYNN:  No, your Honor.

4            THE COURT:  Plaintiff Exhibit 56 in evidence.

5            (Whereupon, Plaintiff Exhibit 56 was received in

6   evidence, as of this date.)

7   BY MR. NORINSBERG:

8   Q.   Can you please read that record.

9   A.   Patient having significant weight gain since arriving

10  at the Suffolk County Correctional Facility on 6/2 of

11  2005.

12           Patient denies significant amount of --

13           THE COURT:  Wait a minute, now.

14           I lost you in the first line.

15           THE WITNESS:  I'm sorry, sir.

16           THE COURT:  Slow down.  Read slowly.

17           Let's start all over again.

18           THE WITNESS:  Yes.

19  A.   Patient having significant weight gain since arriving

20  at Suffolk County Correctional Facility 6/2, 2005.

21           Patient denies significant amount of eating,

22  although it is unlikely.  Will check thyroid function test

23  for underactive thyroid.

24  Q.   And is there a notation as to who made this entry?

25  A.   Gary Feinberg.

Geraci - Direct/Norinsberg

261

1   Q.   Is there any question in your mind that Gary Feinberg

2   made this entry?

3            MS. FLYNN:  Objection.

4            THE COURT:  Overruled.

5   A.   The only question I have is whether he actually saw

6   the patient.

7   Q.   The fact is, Dr. Geraci, you never really issued that

8   order to stop him from seeing Lowrita Rickenbacker.

9            Isn't that true?

10            MS. FLYNN:  Objection.

11            THE COURT:  Overruled.

12   A.   I did tell him not to see the patient.

13   Q.   And if you did tell him that, he disobeyed your

14   order, didn't he?

15   A.   Not --

16            MS. FLYNN:  Objection.

17            THE COURT:  Overruled.

18   A.   Not necessarily.

19   Q.   Did you ever ask Mr. Feinberg whether he was still

20   seeing Lowrita Rickenbacker as a patient?

21   A.   I don't recall.

22   Q.   Did you ever ask Mr. Feinberg whether he was still

23   seeing Linda Kennedy as a patient?

24   A.   I don't recall.

25   Q.   Now, you, yourself, had a supervisor at the

Geraci - Direct/Norinsberg

262

1    Suffolk County health department in 2005.

2             Is that correct?

3    A.   Correct.

4    Q.   You had a supervisor named Dr. Shaheda,

5    S-H-A-H-E-D-A?

6             THE COURT:  S-H what?

7             MR. NORINSBERG:  A-H-E-D-A.

8    BY MR. NORINSBERG:

9    Q.   Iftikhar, I-F-T-I-K-H-A-R.

10            Is that correct, sir?

11   A.   Yes.

12            That was my supervisor.

13   Q.   And when you first learned about Ms. Rickenbacker's

14   allegations, you spoke to Dr. Iftikhar on January 20th.

15            Correct?

16   A.   On or about, yes.

17   Q.   And you told Dr. Iftikhar what you knew at the

18   moment.

19            Correct?

20   A.   About everything I knew at that moment.

21            Yes.

22   Q.   And you told -- Dr. Iftikhar told you to keep her

23   posted on the developments.

24            Is that correct?

25   A.   She wanted me to keep her informed about the

Geraci - Direct/Norinsberg

263

1   grievance, if there was one.

2   Q.   Did she ask you to keep her informed?

3   A.   We talked about keeping communication open.

4        Yes.

5   Q.   From the time you first spoke to Dr. Iftikhar on

6   January 20th, until the time when Gary Feinberg was

7   arrested on February 8, did you ever speak to Dr. Iftikhar

8   again?

9   A.   I don't recall.

10  Q.   Did you ever prepare any type of memorandum or a

11  report for Dr. Iftikhar relating to Gary Feinberg?

12  A.   No.

13  Q.   Did you ever have a meeting with your supervisor

14  relating to the subject of Gary Feinberg?

15  A.   After he was arrested or before?

16  Q.   At any time.

17  A.   After he was arrested.

18  Q.   You had a meeting with Dr. Iftikhar relating to

19  Gary Feinberg after he was arrested?

20  A.   It was -- I believe it was sometime in 2006.

21  Q.   Referring to your deposition, page 127, line 9:

22       Question:  Did you have any meeting with

23  Dr. Iftikhar relating to Gary Feinberg?

24       Answer:  I can't recall.

25       Do you recall being asked that question and

Geraci - Direct/Norinsberg

264

1    giving that answer in your deposition?

2    A.    Yes, I do.

3    Q.    And that deposition was less than one month ago.

4          Correct, sir?

5    A.    Correct.

6    Q.    So at your deposition you couldn't recall having any

7    meeting with Dr. Iftikhar.

8          Correct?

9    A.    Correct.

10   Q.    But now, three and a half weeks later, you remember a

11   meeting that you had.

12         Is that correct?

13   A.    Vaguely, yes.

14   Q.    Where did that meeting take place?

15   A.    I believe it was in Riverhead jail.

16   Q.    What month of the year did that meeting take place?

17   A.    Sometime after Gary was arrested.

18   Q.    Can you narrow it down any further than sometime

19   after February 8, 2006?

20   A.    I believe it was the first couple of months after

21   that.

22   Q.    Did Dr. Iftikhar ever ask you, as the medical

23   director, how this could have happened in the jail medical

24   unit?

25   A.    I don't recall.

Geraci - Direct/Norinsberg

265

1    Q.   Now, apart from Dr. Iftikhar, did any other

2    supervisors at the health department ever ask you how it

3    was possible that this happened at the jail medical unit?

4    A.   I don't recall, sir.

5    Q.   Did any of the supervisors that you had at the health

6    department ever ask you for a report regarding the

7    allegations against Gary Feinberg?

8    A.   Not a report.

9         No.

10   Q.   Did anyone ever ask you for a written summary or any

11   type of memorandum relating to what had happened at the

12   jail medical unit with Gary Feinberg?

13   A.   I had spoken to people, but, no.

14        No written summary.

15   Q.   So you never prepared any type of report or

16   memorandum for anybody relating to Gary Feinberg's

17   allegations.

18        Correct?

19   A.   Correct.

20   Q.   Now, you occasionally had contact with the warden in

21   the jail.

22        Correct?

23   A.   Well, he was a new warden.

24        The administration turned over January 1, 2006,

25   and eventually I got to know the new warden.

Geraci - Direct/Norinsberg

266

1    Q.    You would have contact with him occasionally.

2          Correct?

3    A.    As time went on, correct.

4    Q.    Did the warden ever speak to you regarding the

5    allegations against Gary Feinberg?

6    A.    I don't recall.

7    Q.    Did the warden ever ask you any questions about what

8    had happened with Gary Feinberg?

9    A.    I don't recall, sir.

10   Q.    Did the warden ever ask you for an explanation of how

11   this could have happened in your jail medical unit?

12   A.    I don't recall.

13   Q.    Did you ever prepare any type of report or memorandum

14   for the warden?

15   A.    No.

16   Q.    You testified earlier that there were two doctors

17   that worked underneath you in the jail medical unit at

18   that time.

19         Correct?

20   A.    They worked the local hospital, and while they were

21   at the jail, I supervised them.

22         Correct.

23   Q.    And you identified two of them.

24         One was Dr. Roginsky?

25         THE COURT:  How do you spell that?

Geraci - Direct/Norinsberg

267

1          MR. NORINSBERG:  R-O-G-I-N-S-K-Y.

2   A.   I believe so.

3   Q.   And you testified earlier that he was the one male

4   doctor at the jail medical unit besides yourself.

5          Correct?

6   A.   Correct.

7   Q.   And he shared an office with Gary Feinberg, didn't

8   he?

9   A.   Yes, he did.

10  Q.   Did you ever ask Dr. Roginsky what he knew about the

11  Feinberg allegations?

12  A.   Long after the arrest.

13  Q.   How much longer after the arrest?

14  A.   I don't recall, exactly.

15  Q.   Let's go back to the time period of January 18th

16  through January 20th of 2006.

17          At that moment in time you knew, now, there were

18  two separate inmates who had made allegations concerning

19  Gary Feinberg.

20          Correct?

21  A.   Two separate allegations of different nature.

22          Yes.

23  Q.   Did you at that point in time speak to Dr. Roginsky

24  and ask him whether he knew anything about what was going

25  on?

Geraci - Direct/Norinsberg

268

1    A.    No, I didn't.

2    Q.    Well, he shared the same office with Mr. Feinberg.

3          Correct?

4    A.    Correct.

5    Q.    So wouldn't he be in the best position to know what

6    was going on at that time?

7              MS. FLYNN:  Objection.

8              Judge, may we have a sidebar?

9              THE COURT:  All right.

10             Come up.

11             (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Geraci - Direct/Norinsberg

269

1              (Sidebar.)

2              MS. FLYNN:  We are just getting completely far

3       afield of the case here at this point, Judge.

4              This entire case is getting consumed with all

5       these post-incident actions by Dr. Geraci and the complete

6       focus of the case is gone.

7              He's trying to build a case to make the jury

8       think that Dr. Geraci acted, I hate the say the word,

9       negligently, and that's not the focus of the case.

10             THE COURT:  I think this is all relevant in

11      connection with my decision to admit the post-incident

12      events with Linda Kennedy.

13             This is all relatively near the incident.  It

14      all has to do with custom, policy, failure to train, all

15      the things that Monell stands for in my opinion.

16             So I'm overruling your objection.

17             MS. FLYNN:  Thank you.

18             (Sidebar concluded.)

19             (Continued on next page.)

20

21

22

23

24

25

Geraci - Direct/Norinsberg

270

1              (In open court.)

2    BY MR. NORINSBERG:

3    Q.   Why didn't you ask Dr. Roginsky what he knew, if

4    anything, about these allegations?

5    A.   I don't know.

6    Q.   You were his direct supervisor, weren't you?

7    A.   Yes, I was.

8    Q.   Did it occur to you at any time to speak with

9    Dr. Roginsky about what was going on with Gary Feinberg?

10   A.   I don't recall.

11   Q.   There's a supervisor in the jail medical unit named

12   Mike Vallone.

13              Is that correct?

14              THE COURT:  I'm sorry.

15              I didn't hear your question.

16   BY MR. NORINSBERG:

17   Q.   There's a supervisor in the jail medical unit named

18   Mike Vallone, V-A-L-L-O-N-E.

19              Correct?

20   A.   He's a nurse supervisor.

21   Q.   And he was also one of the team leaders in the jail

22   medical unit.

23              Correct?

24   A.   Correct.

25   Q.   Did you ever ask Mr. Vallone about the allegations

Geraci - Direct/Norinsberg

271

 1    against Mr. Feinberg?

 2    A.    I don't recall.

 3    Q.    There was another supervisor in the jail medical unit

 4    named David White.

 5          Correct?

 6          THE COURT:  David?

 7          MR. NORINSBERG:  Yes, White, W-H-I-T-E.

 8    A.    Correct.

 9    Q.    And Mr. White is also a team leader in the jail

10    medical unit.

11          Correct?

12    A.    Correct.

13    Q.    Did you ever ask Mr. White about what he knew about

14    the allegations against Gary Feinberg?

15    A.    I don't recall.

16    Q.    Now, as you sit here today, you are aware of the fact

17    that there was an ongoing investigation by internal

18    affairs into Gary Feinberg in January of 2006.

19          Correct?

20    A.    As I sit here today?

21    Q.    Yes.

22    A.    That's my understanding.

23    Q.    At the time, however, you were not aware of the fact

24    that there was any type of internal affairs investigation

25    going on.

Geraci - Direct/Norinsberg

272

1          Correct?

2     A.   I wasn't aware of what type of investigation was

3     going on.

4     Q.   You were not aware of the fact that internal affairs

5     was conducting an investigation.

6          Yes or no?

7     A.   I wasn't aware of who was conducting an

8     investigation.

9     Q.   Referring to your deposition, page 79, line 18:

10         Question:  Were you aware of the fact that as of

11    January 3, 2006, internal affairs was conducting an

12    investigation into Mr. Feinberg?

13         Answer:  No.

14         Do you recall giving that testimony, sir?

15    A.   Yes, I do.

16    Q.   So at your deposition you were not aware of the fact

17    that internal affairs was conducting an investigation.

18         Is that correct?

19    A.   At that time, correct.

20    Q.   Were you ever interviewed by internal affairs as part

21    of their investigation?

22    A.   I don't recall.

23    Q.   Did anyone from internal affairs attempt to speak to

24    you regarding Gary Feinberg?

25         MS. FLYNN:  Objection.

Geraci - Direct/Norinsberg

273

 1              THE COURT:  Overruled.

 2    A.   Sir, I don't recall.

 3    Q.   You testified earlier that it was your impression

 4    that at least one of the inmates was involved in a

 5    consensual relationship.

 6              Is that correct?

 7    A.   Based on hearsay, it was believed she had stated that

 8    she was involved in a consensual relationship.

 9    Q.   Would you agree, Dr. Geraci, that it's never

10    permissible for a staff member to have a sexual

11    relationship with an inmate?

12              MS. FLYNN:  Objection.

13              THE COURT:  Overruled.

14    A.   It's unethical, and it would never be permissible.

15    Q.   And that would include any type of sexual contact.

16              Correct?

17    A.   Correct.

18    Q.   So you would agree, Dr. Geraci, that there's no such

19    thing as a consensual relationship with a patient.

20    A.   In my mind, no.

21    Q.   You agree, correct?

22    A.   Yes.

23    Q.   Now, after Mr. Feinberg was arrested you heard of

24    another inmate making allegations.

25              Correct?

Geraci - Direct/Norinsberg

274

1           MS. FLYNN:  Objection.

2           THE COURT:  Overruled.

3    A.    The day after he was arrested, I heard about one

4    other case.

5    Q.    But you have no memory of what that inmate's

6    allegations were.

7           Correct?

8    A.    I don't believe I was told.

9    Q.    Do you recall any of the allegations made by that

10   other inmate?

11   A.    I don't believe I was told.

12          So I can't recall it.

13   Q.    And now, after everything you know up to this point,

14   doctor, as you sit here today, you still don't have any

15   opinion at all about whether Mr. Feinberg did these

16   things.

17          Correct?

18          MS. FLYNN:  Objection.

19          THE COURT:  Sustained.

20   BY MR. NORINSBERG:

21   Q.    Did you ever learn of any other inmates who had come

22   forward and made complaints besides the one right after

23   Gary Feinberg's arrest?

24          MS. FLYNN:  Objection.

25          THE COURT:  Sustained.

Geraci - Direct/Norinsberg

275

1    BY MR. NORINSBERG:

2    Q.   Did you have an opportunity, before you came here

3    today, to go back through your deposition, doctor?

4            MS. FLYNN:  Objection.

5            THE COURT:  Sustained.

6            He was asked that yesterday.

7    BY MR. NORINSBERG:

8    Q.   Doctor, who is Linda Mermelstein?

9    A.   Right now she's the acting commissioner.

10           She's the division of compliance which has to do

11   with credentialing and risk management.  She's the

12   director.

13           THE COURT:  She's the director of the division

14   of compliance?

15           THE WITNESS:  Yes, sir.

16           THE COURT:  Of what municipality?

17           THE WITNESS:  Suffolk County Department of

18   Health.

19   BY MR. NORINSBERG:

20   Q.   And risk management sometimes gets involved with

21   litigation.

22           Correct?

23           MS. FLYNN:  Objection.

24           THE COURT:  Overruled.

25   A.   Correct.

Geraci - Direct/Norinsberg

276

1   Q.   And Ms. Mermelstein, Dr. Mermelstein called you to

2   talk about the Feinberg case.

3        Correct?

4   A.   She didn't call me.

5        I called her.

6   Q.   Referring to your deposition, page 130, line 10:

7        Question:  You weren't sure whether you

8   initiated or Dr. Mermelstein initiated.  Correct?

9        Answer:  Correct.

10  A.   Okay.

11       Correct.

12  Q.   Do you recall giving that testimony?

13  A.   Yes, I do.

14  Q.   As you sit here today, do you know whether

15  Dr. Mermelstein initiated that conversation or you?

16  A.   I don't know why I would have initiated, but I'm not

17  sure.

18       Either way.

19  Q.   And the purpose of that conversation was to discuss

20  potential legal ramifications of the Feinberg case.

21       Correct?

22       MS. FLYNN:  Objection.

23       THE COURT:  Overruled.

24       Just yes or no.

25  A.   Not specifically, no.

**Geraci - Cross/Flynn**

277

1             MR. NORINSBERG:  Nothing further.

2             THE COURT:  Cross-examination.

3    CROSS-EXAMINATION

4    BY MS. FLYNN:

5    Q.   Good morning, doctor.

6    A.   Good morning.

7    Q.   You and I have met before, right?

8    A.   Yes, ma'am.

9    Q.   Just a few preliminary things from the other day.

10            Were you ever personally served with a subpoena

11   in this case?

12   A.   Not personally, ma'am.

13   Q.   Did Mr. Norinsberg ever pay you a subpoena fee to

14   appear here?

15   A.   No, ma'am.

16            MR. NORINSBERG:  Objection.

17            Counsel agreed to accept service on behalf of

18   the doctor.

19            I don't understand that question at all.

20            MS. FLYNN:  I did agree, your Honor --

21            THE COURT:  Excuse me.

22            Is that an objection?

23            MR. NORINSBERG:  It's an objection, your Honor.

24            THE COURT:  Overruled.

25            MS. FLYNN:  Thank you.

Geraci - Cross/Flynn

278

1    BY MS. FLYNN:

2    Q.    And you have been advised by my office when to be

3    available to testify.

4            Correct?

5    A.    Correct.

6    Q.    And, as a matter of fact, you have been available

7    since last week, haven't you?

8    A.    Yes, ma'am.

9    Q.    And you were advised that you needed to be available

10   for when Mr. Norinsberg wanted you to testify.

11           Correct?

12   A.    Correct.

13   Q.    I'm going to take Judge Spatt's suggestion from the

14   other day and start off by going over with you some of the

15   deposition questions that Mr. Norinsberg questioned you

16   about the other day.

17           Starting at page 19, line 24.

18           By the way, Mr. Norinsberg was the attorney that

19   was at the deposition and he was the attorney questioning

20   you.

21           Correct?

22   A.    Yes, ma'am.

23   Q.    And he asked you yesterday or -- sorry -- Tuesday

24   about a question how long it took you to get from your

25   office to Mr. Feinberg's office.

Geraci - Cross/Flynn

279

1          Do you remember being asked that question by

2     Mr. Norinsberg?

3     A.    Yes, ma'am.

4     Q.    And at trial the answer that you gave was seconds.

5          Correct?

6     A.    Seconds.

7     Q.    And then Mr. Norinsberg asked you this question, page

8     19, line 24, and he's asking you these questions:

9          How long would it take you to walk from your

10    office to Mr. Feinberg's examination room?

11         Answer:  A second.

12         And do you recall Mr. Norinsberg then

13    immediately asking you this question:

14         So Mr. Feinberg's examination room was located

15    seconds away from where your office was, correct?

16         Answer:  Yes.

17         Do you remember being asked those questions at

18    your deposition?

19    A.    Yes, I do.

20    Q.    And Mr. Norinsberg on Tuesday also asked you

21    questions, going to page 85, line 10, also asked you

22    questions about whether you had found out any details

23    regarding Ms. Rickenbacker's allegations when you spoke to

24    Carol Manderino.

25         Do you remember him asking you those questions?

Geraci - Cross/Flynn

280

1   A.   Yes, ma'am.

2   Q.   And he read for you this question and answer starting

3   at line 10:

4        Question:  Did you ever learn any details

5   regarding --

6        THE COURT:  You have to slow down when you read.

7        MS. FLYNN:  I'm sorry.

8   BY MS. FLYNN:

9   Q.   Question:  Did you ever learn any details regarding

10  Ms. Rickenbacker's allegations?

11       Answer:  No.

12       But then did Mr. Norinsberg ask you these

13  questions:

14       Question:  Did Carol Manderino ever tell you

15  anything about the nature of those allegations?

16       Answer:  Specifically details?  No.

17       Question:  Did Ms. Manderino ever leave you any

18  information about the allegations being made by

19  Ms. Rickenbacker?

20       Answer:  On January 20th, in Rick's office, she

21  made some comments and I don't recall exactly what the

22  comments were.

23       Question:  In sum and substance, what did she

24  tell you about Ms. Rickenbacker's allegations?

25       Answer:  They were allegations of sexual nature,

Geraci - Cross/Flynn

281

1   misconduct again against Gary Feinberg, and perhaps

2   inappropriate relationships, which I didn't understand.

3          Do you remember being asked those questions and

4   giving those answers?

5   A.   Yes, ma'am.

6   Q.   And just one more, page 74, line 9, Mr. Norinsberg

7   read to you from your deposition this question regarding

8   who would be responsible for doing an investigation

9   regarding Ms. Rickenbacker's allegations and he asked you

10   the question:

11          Who in your mind -- I am sorry -- line 14:

12          Question:  To your knowledge who would be

13   responsible for actually investigating allegations similar

14   to those made by Ms. Rickenbacker and Ms. Kennedy?

15          And you answered at that point, I'm not sure.

16          Do you remember being asked this question just

17   prior to that question, again page 74, line 4:

18          Question:  What was the reason you didn't

19   interview Ms. Rickenbacker?

20          Answer:  Because I'm not an investigator.  And I

21   believed it was up to the correctional facility to do

22   that.

23          Did you give that answer to that question at

24   your deposition?

25   A.   Yes, ma'am.

Geraci - Cross/Flynn

282

1    Q.    Dr. Geraci, do you know Rochelle Ramos?

2    A.    No, ma'am.

3    Q.    Have you ever met her?

4    A.    No, ma'am.

5    Q.    And if she had been here in court on Tuesday or

6    today --

7              MR. NORINSBERG:  Objection.

8              THE COURT:  Excuse me.

9              Please don't interrupt the question, no matter

10   how egregious you may think it will be.  That's my

11   direction.

12             MR. NORINSBERG:  Yes, sir.

13             THE COURT:  Wait until the question is over and

14   then you make your objection.  Don't interrupt.

15             Go ahead.

16   BY MS. FLYNN:

17   Q.    If she was in court today or had she been in court on

18   Tuesday, would you have recognized her?

19             MR. NORINSBERG:  Objection.

20             THE COURT:  Overruled.

21   A.    No, ma'am.

22   Q.    Prior to your coming in today to testify, did you

23   review, briefly, Rochelle Ramos' medical records from the

24   Suffolk County Correctional Facility?

25   A.    Briefly.

**Geraci - Cross/Flynn**

283

1    Q.    It's Defense Exhibit B.

2              THE COURT:  For identification?

3              MS. FLYNN:  Yes.

4              THE COURT:  Always say for identification if

5    it's not in evidence, so we all know it's not yet in

6    evidence.

7              And if you don't say for identification, we will

8    all know it's in evidence.

9              MS. FLYNN:  Yes, Judge.

10             THE COURT:  That's one of my peculiar

11   procedures.

12             Also, you will notice that I slow down everybody

13   from reading fast.  Now I'm going to tell you why

14   everybody reads faster than they speak.

15             Everybody reads faster than they speak.  People

16   who speak in very well-modulated tones, when they start

17   reading, they are off to the races.  And why is that?

18   Well this is my theory.  I may write a book about this.

19             My theory is that we learn how to read, well I

20   did, anyway, in the first grade, in my case it was called

21   1 A.  And if you want a good mark, you have to read fast.

22             How, did, the, chicken, cross, the, street.

23   That's not good.  Howdidthechickencrossthestreet, fast.

24   Then you get an A.

25             Well, we take that with us all the way through

**Geraci - Cross/Flynn**

284

1    our lives, at least when I went to school.  So that when

2    we read, we read very quickly, and you will see every

3    person does that with one exception, me.

4              All right.  Go ahead.

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Geraci  -  Cross/Flynn

285

```
 1               MS. FLYNN:  Thank you, Judge.

 2   BY MS. FLYNN:

 3   Q.   I would ask you to look at defendant's exhibit B

 4   and --

 5               THE COURT:  For identification?

 6               MS. FLYNN:  I'm sorry?

 7               THE COURT:  For identification?

 8               MS. FLYNN:  For identification.

 9   BY MS. FLYNN:

10   Q.   And ask you if you recognize what these documents

11   are?

12   A.   These are medical records.

13               THE COURT:  I can't hear you.

14               THE WITNESS:  These are the medical records of

15   Rochelle Ramos.

16   BY MS. FLYNN:

17   Q.   These are records from the Suffolk County

18   correctional facility?

19   A.   Yes, ma'am.

20               MS. FLYNN:  Your Honor, I would like to move

21   defendant's exhibit B into evidence.

22               THE COURT:  Any objection?

23               MR. NORINSBERG:  Objection.

24               THE COURT:  On what ground?

25               MR. NORINSBERG:  There are multiple issues or
```

Geraci  -  Cross/Flynn

286

1    entries that I think have nothing to do with the case.

2                THE COURT:  Can I see the records?

3                There's a number of records here.  I'll have to

4    take some time to read it.

5                MS. FLYNN:  My intention is to just ask him

6    about the first couple of pages, your Honor.

7                THE COURT:  Show me the first couple of pages.

8    Show it to counsel.  Just this page?

9                MS. FLYNN:  Yes, your Honor.

10               THE COURT:  Okay.

11               (Pause in proceedings.)

12               THE COURT:  Let's go to the sidebar.

13               (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Geraci - Cross/Flynn

287

1          (The following takes place at sidebar.)

2          THE COURT:  Now, you're offering in evidence one

3    page from defendant's exhibit B, for baker, for

4    identification.  This one page says medication?

5          MS. FLYNN:  Yes.

6          THE COURT:  Administration record, medication

7    administration record.

8          What's the relevance of that?

9          MS. FLYNN:  The plaintiff at her deposition

10   testified that when she was transferred from the Nassau

11   County correctional facility to the Suffolk County

12   correctional facility that the people at the Suffolk

13   County facility did not give her her medication and she

14   was put in a cell and she got very sick because she wasn't

15   given her medication and she was going through withdrawal.

16         I would like to put that in to show she did in

17   fact receive her medication.  What I'm trying to avoid is

18   having the doctor come back on rebuttal if Ms. Ramos comes

19   in and says she didn't receive her medication, she was

20   sick.

21         THE COURT:  Did she say that at her deposition?

22         MS. FLYNN:  Yes.

23         MR. NORINSBERG:  There's another note just a few

24   pages later that confirms she wasn't given her

25   medications.

Geraci  -  Cross/Flynn

288

1          THE COURT:  Then if you want to put that in, we

2    will put that in too.

3          MR. NORINSBERG:  This issue has nothing to do

4    with the allegation in this case at all whether she was

5    given medications or not.

6          THE COURT:  It has to do with credibility.

7          MR. NORINSBERG:  This should verify that

8    Ms. Ramos did not receive her medication.  It's in their

9    own records and I think it's collateral.

10          THE COURT:  It says that she did not receive

11    this medication this day.

12          MS. FLYNN:  Yes.

13          MR. NORINSBERG:  That's the day.

14          THE COURT:  Do you want to put that in on

15    cross-examination, I'll let you do it.  Meanwhile, I'm

16    overruling your objection and allowing it in.

17          MR. NORINSBERG:  That one page.

18          MS. FLYNN:  I will put the sticker on it.

19          Thank you, Judge.

20          THE COURT:  Okay.

21          (Continued on next page.)

22

23

24

25

Geraci  -  Cross/Flynn

289

1              (The following takes place in open court.)

2              THE COURT:  That's defendant's exhibit B for

3      baker, one page.  What's it called, medication?

4              THE WITNESS:  Sir, this is the medication

5      administration record.

6              THE COURT:  Administration record.  In evidence.

7              (Defendant's Exhibit B in evidence.)

8              MS. FLYNN:  Thank you.

9      BY MS. FLYNN:

10     Q.    Doctor, does that record show that Rochelle Ramos was

11     prescribed medications while she was at the Suffolk County

12     correctional facility?

13     A.    Yes, it does.

14     Q.    And can you tell the jury what medications she was

15     prescribed?

16     A.    Seroquel.

17             THE COURT:  How do you spell it?

18             THE WITNESS:  S-E-R-O-Q-U-E-L.

19     A.    Clonazepam, C-L-O-N-A-Z-E-P-A-M, Prilosec.

20             THE COURT:  How do you spell it?

21             THE WITNESS:  P-R-I-L-O-S-E-C.

22             THE COURT:  And Bentyl.

23             THE COURT:  How do you spell it?  I'm not a

24     pharmacist.  How do you spell these things?

25             THE WITNESS:  B-E-N-T-Y-L.

Geraci  -  Cross/Flynn

290

1           MR. NORINSBERG:  Your Honor, I'm sorry, I would

2      request a sidebar for a moment.

3           THE COURT:  Okay.

4           (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Geraci  -  Cross/Flynn

291

1           (The following takes place at sidebar.)

2           MR. NORINSBERG:  I anticipate that the next

3    question is going to be what are these medications for.  I

4    object to that type of line of questioning.

5           There's no relevance whatsoever to this case.

6    This doctor is a fact witness.  He's not here to testify

7    about expert stuff and what affect medications have on

8    people.

9           If they want to use him in that capacity, they

10   should have given an expert disclosure.  He's strictly a

11   fact witness and shouldn't be allowed to talk about these

12   medications, what affect they could have on people.

13          I feel it's going away far afield.  Ms. Flynn

14   represented to the Court it would be introduced for

15   credibility.  This record reflects she was given

16   medication and Ms. Ramos indicates she wasn't.  We should

17   close the door on that and not allow this to go any

18   further.

19          THE COURT: First of all, what he's being asked

20   doesn't make him an expert.  He's a doctor.  He knows what

21   medications are.  He's not being asked any opinion that

22   would call for experts beyond the fact.

23          Secondly, I'm going to allow him to talk about

24   what she's taking.  Maybe these medications made her

25   deranged or something.  Who knows.  Overruled.

Geraci - Cross/Flynn

292

1          (The following takes place in open court.)

2     BY MS. FLYNN:

3     Q.    The last medication that you mentioned, doctor,

4     Bentyl?

5     A.    Yes.

6     Q.    What is that prescribed for?

7     A.    For gastrointestinal problems like upset stomach.

8     Q.    How about Prilosec?

9     A.    For acid reflux.

10    Q.    Now, the others that you mentioned, the first one was

11    Seroquel?

12    A.    Yes, ma'am.

13    Q.    What is that prescribed for?

14    A.    It's a mental health medication that's prescribed

15    for -- it's an anti-psychotic, a typical anti-psychotic.

16    Q.    What does that mean?

17    A.    It's a mental health drug for psychosis.

18    Q.    And according to Ms. Ramos's prescription, how many

19    times a day was she prescribed that Seroquel?

20    A.    Generally it could be a once a day drug.  It was one

21    time once daily at bedtime.

22    Q.    And does that prescription chart show the days on

23    which Ms. Ramos was given that prescription for Seroquel?

24    A.    Yes, ma'am.

25    Q.    What days are those?

Geraci  -  Cross/Flynn

293

1    A.    The order starts on the 23rd of December and the

2    medication was administered the same day, the 23rd of

3    December, 2005.

4    Q.    And how many days after that was it also

5    administered?

6    A.    Counting the administration box that the nurses sign

7    for, there's six days.

8    Q.    Does it indicate the last day on which she was given

9    her prescription for Seroquel?

10   A.    Yes, ma'am.

11   Q.    What day is that?

12   A.    December 28, 2005.

13   Q.    The other medication that you mentioned was

14   Clonazepam?

15   A.    Yes.

16   Q.    What is that prescribed for?

17   A.    It's multiple purposes, but this was prescribed by

18   the psychiatrist so this is used for anxiety disorders.

19   Q.    And when was she given that prescription?

20   A.    That also started the same time and at bedtime once a

21   night on the 23rd.

22   Q.    And how many days following the 23rd was Ms. Ramos

23   given this prescription for Clonazepam?

24   A.    Also six nights, six days total.

25   Q.    Thank you, doctor.

Geraci  -  Cross/Flynn

294

1          Can you tell the jury please a little bit about

2      your -- withdrawn.

3          Do you have any employment in addition to your

4      position at the Suffolk County correctional facility?

5      A.   Yes, ma'am.

6      Q.   What is that?

7      A.   I'm an officer with the United States Air Force, Air

8      National Guard, and I'm a flight surgeon up in Newburgh.

9      Q.   Can you tell the jury a little bit about your

10     educational background?

11     A.   Starting from when, ma'am?

12     Q.   Starting from college.

13     A.   I attended Nassau Community College after finishing

14     an associates in liberal arts.

15          I went on to earn a Bachelor's Degree in life

16     sciences at New York Institute of Technology, and on the

17     same campus I attended the New York College of Osteopathic

18     Medicine and earned a doctor of osteopathic medicine

19     degree, and I went on to residency.  It was one year

20     internship, two years residency in family medicine.  So

21     I'm a family physician.

22     Q.   Now back in 2005-2006, did the jail medical unit have

23     something that was called a privacy policy?

24          THE COURT:  A what?

25          MS. FLYNN:  Privacy policy.

Mary Ann Steiger, CSR
Official Court Reporter

Geraci  -  Cross/Flynn

295

1    A.   Yes, ma'am.

2    Q.   Generally what was that privacy policy?

3    A.   Based on national standards the goal was in the

4    policies we had, especially the privacy policy, was to

5    protect the privacy of the patient whenever possible.

6            In other words, when patients are examined it

7    would be very uncomfortable for them to have a

8    correctional officer in the exam room with the doctor.

9            So the privacy policy was to try to respect the

10   dignity of the patient whenever they're examined.

11   Q.   So that privacy policy which was written, correct?

12   A.   Yes, ma'am.

13   Q.   And that directed that the inmates at the jail should

14   be treated with dignity, correct?

15   A.   Yes, ma'am.

16   Q.   Back in 2005 and 2006, what were the general daily

17   procedures in place regarding whether or not the

18   examination room doors would be closed during an inmate's

19   examination?

20   A.   In general all exams or most of them under exception

21   the exam would be conducted with the exam room open.

22   Q.   Were there any circumstances where an exam room door

23   would be closed?

24   A.   If there was a need for privacy during a sensitive

25   type of exam.

296

1    Q.    In those situations where there was a sensitive exam

2    going on, would there always be two practitioners in the

3    room with the inmate?

4    A.    In general the standard is if you're doing a

5    sensitive exam, you should have another person in the room

6    with you.  That's the standard.

7    Q.    This procedure regarding generally not closing the

8    doors to the exam rooms when an examination is being done,

9    what are some of the concerns that led to this policy?

10   A.    Well, there are safety issues and security issues.

11          Again, the exams that are conducted, they're not

12   sensitive exams.  When the exam rooms are open and

13   patients who come in that are examined, most of the time

14   we don't conduct a sensitive type of exam.

15   Q.    You also mentioned in your answer that there is

16   security concerns?

17   A.    Yes.

18   Q.    Can you tell the jury what those security concerns

19   would be?

20   A.    When I first got to the jail I attended a security

21   meeting.  It was a briefing and it covered the security

22   issues that we have to watch out for in a correctional

23   facility, things like paper clips and tongue blades and

24   any kind of glass.

25          These are prohibited items because they could be

297

1    used and made into weapons.  Even a coke can, the

2    sharpness of a coke can, if it was bent, it could be used

3    as a razor blade.

4         So we were warned about these kind of things and

5    from what I understood historically there had been

6    incidents where inmates had lashed out at some of the

7    practitioners in the room.

8         So, again, there's security issues that we have

9    to deal with on a daily basis.

10   Q.   So if a door was closed with an inmate and a

11   practitioner behind the closed door, there would be

12   security concerns for the practitioner's sake, correct?

13   A.   Yes, ma'am.

14   Q.   And there are corrections officers stationed in the

15   medical unit?

16   A.   Yes, ma'am.

17   Q.   Plaintiff's counsel asked you today about Linda

18   Kennedy's grievance.

19        Do you have any personal knowledge as to whether

20   or not Linda Kennedy actually filed a grievance as she

21   said she did?

22   A.   No, ma'am.

23   Q.   And plaintiff's attorney also asked you whether you

24   questioned Sergeant Campo about whether he was doing an

25   investigation regarding what you had discussed with him.

Geraci  -  Cross/Flynn

298

1          In the jail setting, doctor, was it your place

2     to ask Sergeant Campo what the corrections department was

3     doing in terms of an investigation?

4     A.    I work for the health department.  I'm a medical

5     director and I have been.  I don't tell corrections

6     officers what to do.

7     Q.    And plaintiff's counsel also asked you whether or not

8     you asked Lieutenant Nolan to conduct an investigation.

9          Again, is it your place in the Suffolk County

10    correctional facility to direct internal security of the

11    jail what to investigate?

12    A.    No, ma'am.

13    Q.    I would like to talk to you a little bit about

14    Gary Feinberg.

15          At the jail medical unit he shared an office?

16    A.    Yes, ma'am.

17    Q.    And who was the person he shared the office with?

18    A.    Dr. Roginsky.

19    Q.    And were you friends with Gary Feinberg on a social

20    basis outside the jail?

21    A.    No, ma'am.

22    Q.    And what kind of an employee did you find him to be?

23    A.    He was a very good employee.

24    Q.    Did you ever do an evaluation of Gary Feinberg?

25    A.    I believe so, yes.

Geraci  -  Cross/Flynn

299

1    Q.    Generally what's your recollection of what kind of

2    evaluation you gave him?

3    A.    He had an outstanding evaluation.

4    Q.    In addition to Gary Feinberg's responsibilities

5    within the jail medical unit, was he given any other

6    responsibilities?

7    A.    One of his responsibilities in the medical unit was

8    to represent us in writ court which is every Wednesday.

9          It's another mechanism that inmates have to

10   complain about things that they feel they have the right

11   to complain about.

12         And many times they would complain about

13   something on an corrections end.  If their time in the

14   jail was too long, they would try and see if they could

15   calculate it so maybe they're staying a day or two extra

16   and they shouldn't be.  Sometimes they would bring the

17   medical unit to writ court.

18              THE COURT:  To what court?

19              THE WITNESS:  Writ of habeas corpus, sir.

20              THE COURT:  W-R-I-T?

21              THE WITNESS:  Yes.  We call it writ court and

22   that's a forum where they could complain about any kind of

23   grievance they have and the justice in the writ court is a

24   New York State Supreme Court Justice.

25

Geraci   -   Cross/Flynn

300

1    BY MS. FLYNN:

2    Q.    By the way, you mentioned a grievance.

3          The inmates were allowed to file grievances if

4    they had complaints about how they were treated in the

5    medical unit, correct?

6    A.    They filed complaints about anything they wanted to.

7    Q.    But they could also file it about what happened to

8    them in the medical unit?

9    A.    Yes, ma'am.

10   Q.    Now, just to focus a little bit, Ms. Ramos's claim in

11   this case is that she was allegedly assaulted by

12   Gary Feinberg on December 29, 2005.

13         Prior to that date did you have any knowledge of

14   any complaints by any inmates against Gary Feinberg?

15   A.    No, ma'am.

16   Q.    And prior to January 18, 2006, had you heard any

17   allegations against Gary Feinberg specifically about a

18   sexual nature?

19   A.    No, ma'am.

20   Q.    Now, as of January 18, 2006, you worked with

21   Gary Feinberg for approximately 16 months?

22   A.    Approximately.

23   Q.    And during that time he was seeing female patients on

24   a daily basis; is that right?

25   A.    All the practitioners see female and male patients on

Geraci  -  Cross/Flynn

301

1   a daily basis.

2       Yes, ma'am.

3   Q.   So during that time Gary Feinberg saw female

4   patients?

5   A.   Yes, ma'am.

6   Q.   Prior to January -- withdrawn.

7       Can you estimate how many examinations of female

8   patients he did during that 16 months?

9   A.   Hundreds.

10  Q.   As a matter of fact, he was there before you got to

11  the medical unit?

12  A.   Yes, ma'am.

13  Q.   Do you know when he was employed?

14  A.   Sometime before 2003.  I'm not sure of the exact

15  date.

16  Q.   It's fair to say before inmate Rickenbacker and

17  inmate Kennedy's complaints came to your attention, you

18  had not heard of any other inmates making any other

19  complaints about Gary Feinberg?

20       MR. NORINSBERG:  Objection to leading.

21       THE COURT:  Yes, sustained as to form.  Please

22  don't lead the witness.

23  BY MS. FLYNN:

24  Q.   Before you were made aware of the complaints of

25  inmate Rickenbacker and inmate Kennedy, had you become

Geraci  -  Cross/Flynn

302

1   aware of any complaints by any inmates against

2   Gary Feinberg?

3   A.    No, ma'am.

4   Q.    When you became aware of inmate Kennedy's complaint,

5   did you know her?

6   A.    No.

7   Q.    And did you have any -- did you have any information

8   regarding her credibility or lack of credibility?

9   A.    No.

10  Q.    You knew she was an inmate at the Suffolk County

11  correctional facility?

12  A.    Correct.

13  Q.    And at that time you did know Gary Feinberg?

14  A.    Yes.

15  Q.    Now, according to what you were told, how many

16  instances of conduct was Linda Kennedy complaining about?

17  A.    One.

18  Q.    And what were you told about inmate Rickenbacker's

19  allegation about Mr. Feinberg?

20  A.    That she was having a consensual adult relationship

21  and I think she wanted to keep it secret.

22  Q.    In terms of inmates going down to the medical unit

23  for medical treatment, are they permitted to refuse

24  medical treatment?

25  A.    Yes, ma'am.

Geraci  -  Cross/Flynn

303

1    Q.    And is there a written policy about that?

2    A.    We have a refusal form, but there's no written

3    policy.  It's just their right.

4    Q.    And it's their right to refuse treatment, correct?

5    A.    Yes, ma'am.

6    Q.    Would it be feasible to force inmates to come down to

7    the medical unit for treatment?

8    A.    We're not allowed to force inmates to do stuff like

9    that.

10   Q.    You were asked by plaintiff's attorney why you didn't

11   suspend Gary Feinberg when you found out about these two

12   allegations.

13         Can you explain to the jury why you did not do

14   that?

15   A.    Well, again, there were two separate allegations of a

16   separate kind of bases.

17         But, first of all, I don't have the authority to

18   suspend somebody directly.

19         And, secondly, I didn't think it was warranted

20   at that point.

21   Q.    Plaintiff's counsel also asked you about why you

22   didn't go out when you found out about those two

23   allegations from two inmates and basically tell everybody

24   in the medical unit about it.

25         Why didn't you do that?

Geraci  -  Cross/Flynn

304

1          MR. NORINSBERG:  Objection.

2          THE COURT:  Sustained.

3   BY MS. FLYNN:

4   Q.   Did you, after you found out about those two

5   allegations by two inmates against Gary Feinberg, did you

6   go out and tell everybody in the medical unit about it?

7          MR. NORINSBERG:  Objection.

8          THE COURT:  Overruled.

9   A.   No.

10  Q.   Why not?

11  A.   Well, again, they were allegations and Gary Feinberg

12  was an outstanding clinician.

13         I had to be neutral and I had to look at every

14  factor and I had to respect his position also.

15  Q.   And you were aware back in 2005 and 2006 that inmates

16  sometimes made false allegations against staff members,

17  correct?

18  A.   Yes, ma'am.

19  Q.   Doctor, being a military man, you're familiar with

20  the term chain of command?

21  A.   Yes, ma'am.

22  Q.   I would like to ask you a little bit about the chain

23  of command in the health department.

24         You're employed by the health department?

25  A.   Yes, ma'am.

Geraci  -  Cross/Flynn

305

1   Q.   And you are responsible for what?

2   A.   I'm responsible for at this point in my career making

3   sure that the medical needs of the inmates are met and

4   that the providers and practitioners of those needs are

5   providing those services appropriately.

6   Q.   And you are in charge of what portion of the health

7   department or what section?

8   A.   The jail medical unit and the medical division of the

9   jail medical unit.

10   Q.   Do you have authority outside the jail medical unit?

11   A.   No, ma'am.

12   Q.   And who is your supervisor?

13   A.   Doctor Iftikhar.

14   Q.   Do you know what her title is?

15   A.   She's acting division director of patient care.

16   Q.   So she's the person who supervises your work?

17   A.   Among other places, yes.

18   Q.   By the way, this is also true back in 2005 and 2006?

19   A.   Yes, ma'am.

20   Q.   And back during that same time who was Dr. Iftikhar's

21   supervisor?

22   A.   It would have been the deputy commissioner of the

23   health department.

24   Q.   And do you remember back in 2005-2006 who that deputy

25   commissioner was?

Geraci  -  Cross/Flynn

306

1   A.   No, ma'am.  I'm sorry.

2   Q.   That would be the person who would then supervise

3   Dr. Iftikhar?

4   A.   Correct.

5   Q.   After that deputy commissioner was there someone

6   above the deputy commissioner in the chain of command?

7   A.   There's a chief deputy commissioner who is the senior

8   deputy commissioner.

9   Q.   And do you remember back in 2005-2006 who the chief

10  deputy commissioner was?

11  A.   No, ma'am.

12  Q.   And back in 2005-2006 who was the next person in the

13  chain of command?

14  A.   The next person was the commissioner.

15  Q.   And insofar as the health department is concerned no

16  one in the health department reviews the commissioner's

17  decisions, correct?

18        MR. NORINSBERG:  Objection.

19        THE COURT:  Sustained as to form.

20        MS. FLYNN:  I'll rephrase it, Judge.

21  BY MS. FLYNN:

22  Q.   Within the health department does anyone review the

23  commissioner's decisions?

24  A.   The commissioner has the final decision-making

25  ability.

Geraci  -  Cross/Flynn

307

1   Q.    And do you set the policy for the Department of

2   Health?

3             MR. NORINSBERG:  Objection.

4             THE COURT:  Overruled.

5   A.    No, I don't set the policy for the Department of

6   Health.

7   Q.    Who does set the policy for the Department of Health?

8   A.    The commissioner of the health department.

9             MS. FLYNN:  Judge, at this time I have

10  photographs that I would like to publish to the jury.

11            THE COURT:  First show them to counsel.

12            We're going to take a 10 minute recess.  Please

13  don't discuss the case.  Keep an open mind.  Please recess

14  yourselves.

15            (The jury is excused.)

16            THE COURT:  Have you seen these photographs?

17            MR. NORINSBERG:  I have not and I do object.

18            Ms. Flynn had exchanged photographs during

19  discovery and I indicated to her that if these were

20  blowups of those photographs, I would have no objection to

21  having them introduced into evidence.  But there's at

22  least two new pictures that I'm looking at.

23            THE COURT:  Which pictures do you object to?

24            MR. NORINSBERG:  I object to these two pictures.

25  I object to any picture that we were not given during

Geraci - Cross/Flynn

308

1    discovery basically.  That's my objection.

2            THE COURT:  Well, I don't know what pictures you

3    were given during discovery, so you have to tell me.

4            Do you consent to any pictures?

5            MR. NORINSBERG:  Yes, I consent to any picture

6    that was exchanged during discovery and that is listed as

7    an exhibit and is a blowup of that.

8            MS. FLYNN:  And that is Exhibit DD.

9            THE COURT:  DD, dog, dog.

10           MS. FLYNN:  Dog, dog.

11           THE COURT:  It's a photo of what?

12           MS. FLYNN:  It's the jail medical unit.

13           THE COURT:  All right.  What else?

14           MS. FLYNN:  Exhibit --

15           THE COURT:  The ones you have shown him before.

16           MS. FLYNN:  Yes, Z as in zebra.

17           THE COURT:  What's that?

18           MS. FLYNN:  That's also the jail medical unit.

19           THE COURT:  All right.

20           MS. FLYNN:  And Exhibit C as in cat, C as in

21   cat.

22           THE COURT:  What's that?

23           MS. FLYNN:  That's the jail medical unit.

24           THE COURT:  These were all shown to him?

25           MS. FLYNN:  Yes, he has them.

Geraci  -  Cross/Flynn

309

1        THE COURT:  Any objection to those three?

2        MR. NORINSBERG:  I have no objection to those

3    three.

4        THE COURT:  So that's defendant's exhibit DD,

5    dog, dog; Z for zebra; and C for Charlie in evidence.

6        MS. FLYNN:  CC.

7        THE COURT:  CC?

8        MS. FLYNN:  Two Cs.

9        THE COURT:  Charlie, Charlie.

10       What else do you have?

11       MS. FLYNN:  Judge, these are pictures of the

12   jail medical unit.

13       THE COURT:  Excuse me.  What letter.

14       MS. FLYNN:  This is B as in boy, B as in boy.

15       THE COURT:  What is it a photo of?

16       MS. FLYNN:  It's a photo of the jail medical

17   unit.

18       THE COURT:  Okay.

19       MS. FLYNN:  Which depicts the same area of the

20   jail medical unit in the photographs given to the

21   plaintiff's counsel.

22       The only difference is for demonstrative

23   purposes this picture has people in them.  The one that he

24   has does not have people.

25       THE COURT:  Why is that important?

Geraci   -   Cross/Flynn

1          MS. FLYNN:  Because I wanted to do this to

2    illustrate to the jury, to demonstrate to them, where the

3    inmates line up when they're in the jail medical unit.

4    And that's really it, to show where the inmates are.

5          THE COURT:  Are you objecting to this?

6          MR. NORINSBERG:  Yes, I am.

7          THE COURT:  Overruled.  I'll allow it.

8    Defendant's exhibit BB, baker, baker, in evidence.

9          MS. FLYNN:  And, your Honor it's the same with

10   defendant's exhibit AA, apple, apple.

11          It's a photograph of the jail medical unit

12   depicting an area in the jail medical unit that was

13   depicted in the pictures given to the plaintiff's counsel

14   except it has people.

15          THE COURT:  With people in it?

16          MS. FLYNN:  Right.

17          THE COURT:  Okay.

18          You object to it?

19          MR. NORINSBERG:  What's the purpose of the

20   second picture with people?

21          MS. FLYNN:  Also to show the movement throughout

22   the jail medical unit, where people are stationed.

23          THE COURT:  Can I see it again.

24          MS. FLYNN:  Where the inmates line up.

25          THE COURT:  It also shows there's plenty of

Geraci - Cross/Flynn

311

1    guards around too, right?  You didn't know that?

2              MS. FLYNN:  There are corrections personnel in

3    the picture.  Yes, Judge.

4              THE COURT:  Are you objecting to this?

5              MR. NORINSBERG:  Yes.

6              THE COURT:  Overruled.  Defendant's exhibit AA,

7    able, able, in evidence.

8              What else?

9              MS. FLYNN:  That's it.

10             THE COURT:  That's it.  10 minute recess.

11             (Recess taken.)

12             (After recess.)

13             THE CLERK:  Jury entering.

14             (The jury is present.)

15             THE COURT:  Please be seated, members of the

16   jury.

17             You may proceed, Ms. Flynn.

18             MS. FLYNN:  Thank you.

19             Your Honor, with your permission, at this point

20   I would like to show photographs to the jury.

21             THE COURT:  I'm going to tell the jury what is

22   in evidence now.

23             In evidence are the following defendant's

24   exhibits.  They're all photographs.  DD, dog dog; Z for

25   zebra; CC, for Charlie, Charlie; BB, baker, baker, and AA,

Geraci  -  Cross/Flynn

312

1    able, able.

2         (Defendant's Exhibits DD, Z, CC, BB and AA in

3    evidence.)

4         THE COURT:  You can show them.

5         MS. FLYNN:  Thank you.

6         May I have Dr. Geraci come down?

7         THE COURT:  Sure.

8         (The witness steps down.)

9         THE COURT:  You can move around, Mr. Norinsberg,

10   if you can't see.

11        MR. NORINSBERG:  Thank you, your Honor.

12   BY MS. FLYNN:

13   Q.   Dr. Geraci, I'm going to show you what's been marked

14   as defendant's exhibit BB and ask you to take a look at

15   it.

16        Do you recognize what's in that picture?

17   A.   Yes.

18   Q.   What is that in the picture generally?

19   A.   This is the hallway where the patients --

20        THE COURT:  Keep your voice up.

21   A.   This is the hallway where the patients come off the

22   waiting room and wait against this wall here, backs to the

23   wall.

24        And this is the officer who is posted here at

25   all times.

Geraci  -  Cross/Flynn

313

1     And to the right here is the nurses station and

2  down this haul is where some of the exam rooms are.

3  Q.   And in this photograph it shows four inmates against

4  the wall.

5     Is that where the inmates wait when they're

6  waiting to be called for an exam of some kind?

7     MR. NORINSBERG:  Objection.

8     THE COURT:  Overruled.

9  A.   Yes, ma'am.

10  Q.   I'm going to ask you to look at what's been marked as

11  defendant's exhibit A for apple, A for apple.

12     I ask you if you recognize what's in this

13  photograph?

14  A.   Okay.  Different perspective.

15     This is a view from the exam rooms, stepping out

16  of the exam rooms down the hall.

17     This area here is the nurses station and this is

18  the wall that the patients line up against and the post

19  for the officer.

20     And down the hall to the right here by the

21  mirror is near my office, and that room all the way down

22  the hall is the dental suite.

23  Q.   Just to clarify, this area here, there's a woman with

24  blonde hair, that's the nurses station?

25  A.   Yes.

Geraci  -  Cross/Flynn

314

1    Q.    I'm going to show you what's been marked as

2    defendant's exhibit Z for zebra.

3          I ask you if you recognize what's in this

4    photograph?

5    A.    Again, it's the same view down the hall from the exam

6    rooms stepping out, and this is the wall where the

7    patients line up.  This is the nurses station.  The dental

8    suite is down here.  And, again, right near this mirror is

9    my office.

10   Q.    In the foreground of the picture there's also a door.

11         Can you tell the jury what that door is?

12   A.    This door here, this is a pharmacy and that's where

13   we process our medication.

14   Q.    And during the course of the day is the pharmacy room

15   staffed?

16   A.    Yes, ma'am.

17   Q.    And that was true back in 2005-2006?

18   A.    Yes.

19   Q.    And generally during the day was the door to that

20   pharmacy room opened or closed?

21   A.    By law the pharmacy door has to be closed.  It's

22   regulation, DEA regulation.

23   Q.    I'm going to show you, doctor, what's been marked as

24   defendant's exhibit D for dog, D for dog.

25         I ask you if you can identify what's in this

Geraci  -  Cross/Flynn

315

1    picture?

2    A.    Okay.

3          This is the view from going down towards the

4    exam rooms right where the officers are stationed.   It

5    looks like that perspective.

6          This is the nurses station.   This is the

7    pharmacy door.   This is an exam room.

8          We numbered them afterwards.   This is the first

9    exam room, exam room three, and the second exam room is

10   exam room two, and then exam room one is down the hall

11   here.

12         This door here is the door to our nursery.   We

13   take care up to four mothers and their babies during their

14   incarceration.

15         This is a bathroom that the females use, the

16   staff females only.

17   Q.    Now, during the time that Gary Feinberg was working

18   in the jail medical unit, in which of these exam rooms was

19   he working?

20   A.    Gary Feinberg was working in this room here, number

21   three.

22   Q.    So the room that's designated in this photograph as

23   number three was where Gary Feinberg saw patients?

24   A.    Yes, ma'am.

25   Q.    Just so the jury is clear, back when he was at the

Geraci   -   Cross/Flynn

316

1    jail medical unit it was not designated room number three

2    at that time?

3    A.    It was room 87 because that was the phone extension.

4    We transferred phone calls, so it was best to remember the

5    extension.

6    Q.    Is it fair to say, doctor, that the exam room where

7    Gary Feinberg was, was the one closest to the nurses

8    station?

9    A.    Yes, ma'am, it is the closest to the nurses station

10   and it's right across from the pharmacy.

11   Q.    Any inmate or any practitioner who was going to

12   either exam room two or exam room one would be walking

13   passed Gary Feinberg's examination room?

14   A.    Any traffic that went down this hall, had any

15   business down here, has to pass that room.

16   Q.    And, in addition, the corrections officers that were

17   assigned to the jail medical unit, what would they do in

18   the course of their day?

19   A.    During the course of their day they would control the

20   hall, go up and down to the dental area and all the way

21   down to the nurses area and of course checking patients.

22   Q.    You mentioned before there's a women's room down this

23   hallway?

24   A.    Yes.

25   Q.    That is for the women staff members in the jail

Geraci  -  Cross/Flynn

317

1    medical unit?

2    A.    Yes.  All the staff members would use that bathroom.

3    Q.    For them to go to use the ladies room, they would

4    necessarily have to walk passed Gary Feinberg's exam room?

5    A.    They would actually have to cross all of the exam

6    rooms because this bathroom is across from exam room one,

7    so they have to pass all of the exam rooms.

8    Q.    The photograph that we showed to the jury before,

9    exhibit AA where it shows the inmates lined up, that would

10   be male and female inmates would line up there?

11   A.    We generally try to keep them separate because of

12   gender issues.

13          And so, yeah, if we were calling females down,

14   for example, it would just be females lined up here and we

15   would try to keep them as separate as possible.

16   Q.    When the practitioner was ready to see the inmate,

17   would the practitioner call out the inmate's name?

18   A.    Yes.

19          Often times the practitioner would either step

20   out of the room.  We have a chart in the rack here.

21   There's a rack over here.  They would look at the name on

22   the chart and then call the patient into the room.

23          Sometimes, depending if the patient is down the

24   hallway further, we just call the patient and ask them to

25   come this way.

Geraci  -  Cross/Flynn

318

1    Q.    So the inmates, before they went into the examination

2    rooms, would know what practitioner they were going to be

3    treated by that day?

4    A.    Just by being called by that practitioner.

5              THE COURT:  Do you object?

6              MR. NORINSBERG:  Yes.

7              THE COURT:  Sustained.  Strike out the answer.

8    Please don't lead the answer.

9    BY MS. FLYNN:

10   Q.    When the practitioner would call the inmate's name,

11   where would the inmate be standing at that point?

12   A.    Anywhere along this wall or there's a waiting area

13   further down.  We would make eye contact with a patient

14   and bring that patient into the room.

15             MS. FLYNN:  Thank you, doctor.  You can go back

16   to the witness stand.

17             (The witness resumes the stand.)

18   BY MS. FLYNN:

19   Q.    Dr. Geraci, does the Department of Health have a

20   written policy that medical staff should not make false

21   entries on an inmate's medical chart?

22             MR. NORINSBERG:  Objection.

23             THE COURT:  Sustained as to form.

24   BY MS. FLYNN:

25   Q.    Is there any policy, written policy, in the health

Geraci  -  Cross/Flynn

319

1    department that specifically prohibits medical staff from

2    making false entries on inmates' charts?

3    A.    No, ma'am.

4    Q.    Is there a specific written policy in the health

5    department that says that medical staff should not

6    prescribe poisonous medications to the inmates?

7            MR. NORINSBERG:  Objection.

8            THE COURT:  Overruled.

9    A.    No, ma'am.

10   Q.    Is there a written policy at the jail that says that

11   medical staff should not physically beat the inmates?

12   A.    No, ma'am.

13           MS. FLYNN:  I have no questions.

14           Thank you, Judge.

15           THE COURT:  Redirect.

16

17   REDIRECT EXAMINATION

18   BY MR. NORINSBERG:

19   Q.    Dr. Geraci, you testified earlier that you didn't

20   have any authority to suspend Gary Feinberg; is that

21   correct?

22   A.    I couldn't suspend him, that's correct.

23   Q.    You didn't feel it was warranted anyway, that's what

24   you testified to before, correct?

25   A.    At that point from what I knew it wasn't warranted.

320

1   Q.   So even if you had the authority to suspend him you

2   wouldn't have done that, correct, doctor?

3   A.   At that point with what I knew, no.

4   Q.   At that point meaning after January 20 with two

5   separate allegations, correct?

6   A.   Two different separate allegations, correct.

7   Q.   Now, you did have the authority to change or to order

8   Gary Feinberg to not see certain patients, correct?

9   A.   Correct.

10   Q.   So you could have ordered him to not see female

11   patient without supervision, correct?

12   A.   There was a problem with that.

13        And the reason why I couldn't say that he

14   couldn't see female patients is because if there was an

15   emergency in the jail, I couldn't order him not to see

16   female patients.

17        We have emergencies very frequently in the jail

18   so it wouldn't be proper to order him not to see female

19   patients.

20   Q.   Could you have ordered him to not see female patients

21   in non-emergency situations?

22   A.   Yes.

23   Q.   Could you have ordered him to make sure that any

24   exams that he conducted would have to be conducted with

25   another staff member present?

Geraci  -  Redirect/Norinsberg

321

1    A.    I could have.

2    Q.    But you chose not to, correct?

3    A.    I didn't think it was warranted.

4    Q.    You thought he was a valuable employee, correct?

5    A.    He was a very good employee.

6    Q.    Now, you testified earlier that you didn't want to

7    tell other people in the jail medical unit about these

8    allegations, correct?

9    A.    I didn't.  I don't believe I told anybody.  I don't

10   know what kind of conversations I had, but I don't believe

11   I told anybody.

12   Q.    But if you had ordered Gary Feinberg not to see Linda

13   Kennedy and not to see Lowrita Rickenbacker, how would the

14   rest of the staff know if Gary Feinberg was violating that

15   order?

16   A.    I don't know.

17   Q.    Now, you testified earlier that an inmate can refuse

18   medical treatment if they want to; is that correct?

19   A.    That's correct.

20   Q.    When you were standing before the jury you showed the

21   jury the area where the pharmacy is; is that correct?

22   A.    Yes.

23   Q.    The pharmacy contains the medications that are used

24   to treat the inmates, correct?

25   A.    Correct.

322

1   Q.   One of the reasons inmates come to the jail medical

2   unit is to get medication for whatever illnesses they

3   have, correct?

4   A.   Most medications are administered in their housing

5   area, 90 percent of them.  So some medications, very few,

6   are administered in the medical unit.

7   Q.   Would you agree that when inmates come to the jail

8   medical unit they're seeking medical treatment of some

9   sort?

10   A.   Yes.

11   Q.   They have a medical problem of some sort, correct?

12   A.   They believe they have a medical problem.

13   Q.   And it's the job of the jail medical unit to treat

14   that problem, correct?

15   A.   We take care of medical problems, yes.

16   Q.   So if an inmate refused to come down to the jail

17   medical unit, that inmate would not be getting the medical

18   treatment that he or she needed, correct?

19   A.   Correct.

20   Q.   And, doctor, you testified earlier about some medical

21   records relating to Rochelle Ramos; is that correct?

22   A.   Yes.

23   Q.   Have you ever seen the medical records from the day

24   that Ms. Ramos was examined by Gary Feinberg?

25   A.   I don't recall.

Geraci  -  Redirect/Norinsberg

323

1   Q.   So from the time that you first learned about Gary

2   Feinberg's arrest until today --

3              MS. FLYNN:  Objection.

4              THE COURT:  You have to let him complete the

5   question.

6              MS. FLYNN:  I'm sorry.

7   BY MR. NORINSBERG:

8   Q.   Do you have any recollection of ever looking at

9   Rochelle Ramos's record?

10             MS. FLYNN:  Objection.

11             THE COURT:  Overruled.

12  A.   I don't recall.

13  Q.   When was the first time that you looked at Rochelle

14  Ramos's hospital records from Suffolk County?

15  A.   Hospital records?

16  Q.   The records you testified to before with the jury?

17  A.   Okay.  These aren't hospital records, but I don't

18  recall.  I don't recall ever looking at these records.

19  Q.   What are the records that you testified about, sir?

20  A.   These are the records of mainly the jail medical

21  unit.

22             Actually there are some records from the

23  hospital here but they would have been incorporated in our

24  medical chart.

25  Q.   When was the very first time that you looked at those

**Geraci   -   Redirect/Norinsberg**

324

1    records that are in front of you?

2    A.    I don't recall ever looking at them.

3    Q.    Prior to today, sir, did you ever look at them?

4    A.    I don't recall.

5    Q.    Would today be the very first time you've seen them?

6    A.    Sir, I looked at thousands of records and I don't

7    recall.

8    Q.    I would like to show you what's been marked as

9    plaintiff's 48.

10            THE COURT:  For identification?

11            MR. NORINSBERG:  For identification.

12            (Exhibit handed.)

13            (Pause in proceedings.)

14   A.    Okay.

15   Q.    Do you recognize the document in front of you?

16   A.    This is a progress note.

17   Q.    Is that progress note written by Gary Feinberg?

18   A.    Yes.

19   Q.    Can you tell the members of the jury the date of the

20   progress note?

21   A.    It's cut off.

22   Q.    Do you see 12/29/05?

23   A.    It's actually cut off, but it probably is 12/29/05.

24   Q.    Does this pertain to Rochelle Ramos?

25   A.    Yes, it does.

Geraci  -  Redirect/Norinsberg

325

1   Q.   You see her name on the chart, correct, sir?

2   A.   Yes, I do.

3   Q.   Before coming here today in Court did you ever once

4   look at that document, plaintiff's 48?

5   A.   I don't recall.

6   Q.   Can you please read to the members of the jury that

7   entry in its entirety?

8        THE COURT:  That document is not in evidence.

9   He can't read it.

10       MR. NORINSBERG:  I offer plaintiff's 48 into

11  evidence.

12       THE COURT:  Any objection?

13       MS. FLYNN:  No objection, your Honor, and I

14  would offer the entire medical record if counsel wants to

15  put it into evidence at this point.

16       THE COURT:  Well, that's up to him and that's up

17  to you later on.

18       Do you want to put that one record in at this

19  time?

20       MR. NORINSBERG:  At this time I'm putting in

21  just plaintiff's 48.

22       Any objection?

23       MS. FLYNN:  No, your Honor.

24       THE COURT:  Plaintiff's exhibit 48 in evidence.

25       (Plaintiff's Exhibit 48 in evidence.)

Geraci  -  Redirect/Norinsberg

326

1   A.   Okay.

2   Q.   Can you please read to the jury the entry for

3   Rochelle Ramos that was written by Gary Feinberg on

4   December 29, 2005?

5   A.   Patient returned from evaluation at Central Suffolk

6   Hospital emergency room to rule out obstruction,

7   diverticulitis.

8   Q.   Can you please spell that for the record?

9   A.   D-I-V-E-R-T-I-C-U-L-I-T-I-S.

10          Patient is no longer vomiting or in pain.

11          The ultrasound -- which I'm assuming they had

12   done at the hospital -- was within normal limits.

13          And there's a physical exam of the abdomen noted

14   that the bowel sounds were positive, meaning the bowel is

15   moving.  No rebound tenderness, no masses.

16          Patient was afebrile, no fever, no costal

17   vertebral angle tenderness, which would be the sides here,

18   both sides.

19   Q.   The sides where?

20   A.   On the flank.

21   Q.   How would the physician's assistant make that

22   determination?

23          MS. FLYNN:  Objection.

24          THE COURT:  Overruled.

25   A.   If it's talking about tenderness, you would palpate

Geraci  -  Redirect/Norinsberg

327

1   both areas here where the rib margin meets the diaphragm,

2   and often times that's a sign of possible kidney

3   infection.

4   Q.   When you say palpate, you mean touch with the hands?

5   A.   Yes.

6   Q.   Continue, please.

7   A.   And then there's an assessment which is cut off.

8        It looks like diverticulitis questionable, ulcer

9   questionable, irritable bowel, and then there's other

10  parts that are cut off.

11       It says bland diet, Bentyl, and it's not

12  readable.

13       (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Geraci - Redirect/Norinsberg

328

1          BY MR. NORINSBERG:

2     Q.    What is the medical term for the diverticulitis?

3     Whatever you had mentioned a minute ago, what is that?

4     A.    Diverticulitis is a colon problem where there's a

5     pouch that comes off the normal lining of the colon that

6     could get inflamed and infected.

7     Q.    And Mr. Feinberg was considering that as a part of a

8     possible diagnosis?

9          MS. FLYNN:  Objection.

10          THE COURT:  Overruled.

11    A.    It's -- possibly he got that from the hospital.  I

12    don't know where he got that information from.

13    Q.    Is it listed down as possible diagnosis?

14    A.    Well, coming back from the hospital to rule out

15    obstruction diverticulitis, so it was entertained as a

16    diagnosis.

17    Q.    Did doctor -- did Mr. Feinberg prescribe medication?

18    A.    It's cut off a little bit, but it looks like some

19    medication was prescribed.

20    Q.    What medication does it appear to be?

21    A.    The only medication that I see here is Bentyl.  He

22    may have gotten another medication -- may have prescribed

23    another medication, but the medication that I see here is

24    Bentyl, B-E-N-T-Y-L.

25    Q.    Tell us again what Bentyl is for, Doctor?

Geraci - Redirect/Norinsberg

329

1   A.   Sometimes used for irritable bowel and sometimes

2   gastrointestinal discomfort.

3   Q.   When it says ulcer question mark, it means it's a

4   possible diagnosis but he's not sure.

5        Correct?

6   A.   Correct.

7        It's a differential diagnosis.

8   Q.   Meaning it may be an ulcer, it may not be an ulcer,

9   he does not know at that point, correct?

10  A.   At that point it's an uncertain diagnosis, correct.

11  Q.   What was the other medication that you had a question

12  mark next to?

13  A.   I'm sorry.

14  Q.   What else was part of his differ rings diagnosis?

15  A.   It says diverticulitis.

16  Q.   Was there anything else?

17  A.   Except for diverticulitis, ulcer and irritable bowel,

18  oh, obstruction at the top, but that may have come from

19  the hospital, I don't know.

20       But they would have ruled out obstruction if

21  that was the case.  Obstruction probably would have been

22  in the hospital admission.

23  Q.   Okay.  So there were at least three potential

24  diagnoses that Mr. Feinberg himself made that had not yet

25  been ruled out; is that correct?

Geraci - Redirect/Norinsberg

330

1    A.   That he was working with, correct.

2    Q.   Now, I'd like to show you Plaintiff's Exhibit 58.

3              THE COURT:  For identification?

4              MR. NORINSBERG:  For identification.

5    Q.   Do you recognize that document, Dr. Geraci?

6    A.   This is a progress note.

7    Q.   And does that progress note relate to Rochelle Ramos?

8    A.   Yes, it does.

9    Q.   And is that progress note dated December 30th of

10   2005?

11   A.   Yes, it is.

12   Q.   That would be the day following the exam with

13   Mr. Feinberg; is that correct?

14   A.   Yes.

15   Q.   And can you tell us, Doctor --

16             MR. NORINSBERG:  I offer plaintiff's 58 into

17   evidence.

18             THE COURT:  Any objection?

19             MS. FLYNN:  I have no objection to the entire

20   medical records going in, your Honor.

21             THE COURT:  As of now there is an offer of one

22   page.

23             MS. FLYNN:  I have no objection, your Honor.

24             THE COURT:  Plaintiff's Exhibit 58 in evidence.

25             (Plaintiff's Exhibit 58 in evidence.)

Geraci - Redirect/Norinsberg

331

1   Q.   Can you please read to the jury the contents of the
2   entry that you have in front of you?
3   A.   Okay.  This entry was made 8:35 p.m. on December 30,
4   2005 for -- on behalf of Rochelle Ramos, written by, it
5   looks like it was signed by David White, who is the RN
6   supervisor at night.  This should verify that Ramos
7   Rochelle did not receive any medication this day,
8   12/30/05.  She presently has Paxil, 40 milligrams once a
9   day prescribed, Seroquil, S-E-R-O-Q-U-I-L, and that was
10  100 milligrams by mouth at bedtime and Klonopin, one
11  milligram by mouth.
12          THE COURT:  How do you spell that.
13  A.   Klonopin it's the same thing as Clonazepam, it's
14  K-L-O-N-O-P-I-N.  One milligram by mouth, at bedtime.
15  Q.   This note was written by David White, correct?
16  A.   Correct.
17  Q.   David White is a nursing supervisor, correct?
18  A.   Correct.
19  Q.   David White was one of the seven team leaders in the
20  jail medical unit, correct?
21  A.   Correct.
22  Q.   You never spoke to David White about Mr. Feinberg's
23  allegations, correct?
24          MS. FLYNN:  Objection.
25          THE COURT:  Sustained.

Geraci - Redirect/Norinsberg

332

1   Q.   Did you ever speak to Mr. White about the allegation

2   against Mr. Feinberg?

3              MS. FLYNN:  Objection.

4              THE COURT:  Sustained.  Improper redirect.

5   Q.   Did you ever speak to Mr. White about his note on

6   December 30, 2005?

7              MS. FLYNN:  Objection.

8              THE COURT:  Sustained.

9   Q.   According to the note in front of you, Ms. Ramos was

10  not given her medications on December 30, 2005.  Is that

11  correct?

12             MS. FLYNN:  Objection.

13             THE COURT:  Overruled.

14  A.   I can't tell that from this note.

15  Q.   That's what it says though, doesn't it?

16  A.   Yes, but she may have gotten the medication

17  afterwards, I don't know for sure.

18  Q.   But up until 8:30 on December 30, 2005, this note

19  says that she hadn't gotten medications, correct?

20  A.   That's correct.

21  Q.   I'd like to show you plaintiff's 57 for

22  identification.  (Handing.)

23             Do you recognize that document?

24  A.   I do.

25  Q.   What is that document, doctor?

Geraci - Redirect/Norinsberg

333

1    A.    It's a general discharge paperwork from the hospital,

2    Central Suffolk Hospital.

3    Q.    Does it relate to Rochelle Ramos?

4    A.    Yes, it does.

5    Q.    What's the date of that document?

6    A.    12/29/05.

7    Q.    Does it list the diagnosis of a hernia?

8               MS. FLYNN:  Objection.

9               THE COURT:  Sustained.

10              MR. NORINSBERG:  I offer plaintiff's 57 into

11   evidence.

12              THE COURT:  Any objection?

13              MS. FLYNN:  I object, your Honor, for several

14   reasons, yes.  I object.

15              THE COURT:  Can I see it, please.  You don't

16   have to come up.  I just want to see it.

17              (Document handed to the Court.)

18              THE COURT:  Is this a record of the Suffolk

19   correctional facility medical office?

20              THE WITNESS:  No, your Honor.

21              THE COURT:  It's a record of the Central Suffolk

22   Hospital?

23              THE WITNESS:  Yes, your Honor.

24              THE COURT:  Sustained.

25   Q.    Did that record enter into the chart of the Suffolk

Geraci - Redirect/Norinsberg

334

1    County jail medical unit?

2            MS. FLYNN:  Objection.

3            THE COURT:  I'm sorry, did it what?

4    Q.   Did you keep that record as part of the jail medical

5    unit records?

6    A.   I don't know.

7            By law, the records from the hospital are

8    records from the hospital.  So we have our own records.

9    Q.   But you testified a few moments ago that there are

10   hospital records in the records that you were looking at

11   earlier.

12           Correct?

13   A.   Yes, there are hospital records here.

14   Q.   So hospital records do get sent back to the jail

15   medical unit to be put part of the inmate's medical file,

16   correct?

17   A.   They become part of the chart but they're technically

18   not part of the copy.  We copy them legally.

19   Q.   My only question is, the document that you just

20   looked like Plaintiff's Exhibit 57, was that part of

21   Rochelle Ramos' chart in the jail medical unit, to the

22   best of your knowledge?

23   A.   I can't answer that, I don't know.  I didn't review

24   the chart.

25   Q.   Now, you testified earlier regarding the photographs

Geraci - Redirect/Norinsberg

335

1    that were shown to the jury; is that correct?

2    A.    Yes.

3    Q.    Before today did you ever see those photographs?

4    A.    No.

5    Q.    When were those photographs taken?

6    A.    I don't know.

7    Q.    Who took the photographs?

8    A.    I don't know.

9    Q.    Did you have any idea what the purpose was of you

10   looking at these photographs?

11             MS. FLYNN:  Objection.

12             THE COURT:  Sustained.

13   Q.    In those photographs there are a few correction

14   officers that are shown to be on duty.  Is that correct?

15   A.    It appears that there's a couple of correction

16   officers there.

17   Q.    Are you familiar with a correction officer named Gary

18   Tatrault, T-A-T-R-A-U-L-T?

19   A.    Yes.

20   Q.    Do you know whether Gary Tatrault was on duty at the

21   time that Ms. Ramos had her exam with Mr. Feinberg?

22   A.    I don't know.

23   Q.    Did you ever speak to CO Tatrault?

24             MS. FLYNN:  Objection.

25             MR. NORINSBERG:  May I finish the question?

336

1          MS. FLYNN:  I thought that you were finished.  I

2     apologize.

3     Q.   Did you ever speak to CO Tatrault regarding the

4     allegations  which Ms. Ramos had made about what it taken

5     place on that exam on 12/29.05?

6          MS. FLYNN:  Objection.

7          THE COURT:  Overruled.

8     A.   I don't believe so.

9     Q.   Why didn't you speak to CO Tatrault about that?

10         MS. FLYNN:  Objection, your Honor.

11         THE COURT:  Sustained.

12    Q.   Now, you testified earlier that to your knowledge

13    Mr. Feinberg had conducted hundreds of exams in the 16

14    months that you had been at the facility; is that correct?

15    A.   Correct.

16    Q.   And after January 20th, when you learned about the

17    second inmate making allegations, how many additional

18    exams did Gary Feinberg conduct up until the point of

19    February 8th, when Mr. Feinberg was arrested?

20    A.   In total, male, female or --

21    Q.   How many female patients did Mr. Feinberg see from

22    January 20th to February 8th?

23    A.   I don't know.

24    Q.   You have no idea, correct, sir?

25    A.   I have no idea.

Geraci - Redirect/Norinsberg

337

1   Q.   Now, you testified earlier that there's a certain

2   chain of command that you follow; is that correct?

3   A.   Yes.

4   Q.   And you testified about Dr. Iftikhar; is that

5   correct?

6   A.   Yes.

7   Q.   Who is immediately above Dr. Iftikhar?

8   A.   The Deputy Commissioner.

9   Q.   Did the Deputy Commissioner ever ask you about what

10  you knew about the Gary Feinberg allegations?

11          MS. FLYNN:  Objection.

12          THE COURT:  Sustained.

13  Q.   Did you ever have any discussion with the Deputy

14  Commissioner relating to Gary Feinberg?

15          MS. FLYNN:  Objection.

16          THE COURT:  Relating to?

17          MR. NORINSBERG:  The allegations against

18  Mr. Feinberg.

19          MS. FLYNN:  Objection.

20          THE COURT:  Overruled.

21  A.   I don't recall.

22  Q.   Now, did you ever have discussions with anybody in

23  that chain of command at any point in time relating to

24  Gary Feinberg?

25  A.   Other than my supervisor, I can't recall.

Geraci - Redirect/Norinsberg

338

1        MR. NORINSBERG:  Thank you, Doctor.  I have

2   nothing further.

3        MS. FLYNN:  Your Honor, at this point I would

4   ask to move the medical records of plaintiff Rochelle

5   Ramos into evidence.

6        MR. NORINSBERG:  And the same objection as

7   before.

8        Any records that relate to the issues in this

9   case, I'm happy to allow into evidence.

10       If it doesn't relate to this case, I object.

11       THE COURT:  I'd have to go over it.

12       MS. FLYNN:  May I go over it with the doctor?

13       THE COURT:  Sure.

14       Take out the records that you want to offer.  If

15   you want to offer all of them, you'll have to do it one by

16   one.

17       MR. NORINSBERG:  Would it be possible,

18   your Honor, to address this at the sidebar?

19       THE COURT:  Okay.  Come on up.

20       (Continued on next page.)

21

22

23

24

25

Geraci - Redirect/Norinsberg

339

 1                (Whereupon, the following occurred at sidebar.)

 2                THE COURT:  Here is your 57.

 3                MR. NORINSBERG:  Earlier when I had objected

 4      earlier to the chart coming in, Ms. Flynn represented to

 5      the Court that she only intended on putting in one record

 6      relating to medications.  Now we're talking about going

 7      back and going into all of her medical treatment at the

 8      hospital, none of which is relevant to the issues in this

 9      case.

10                THE COURT:  Might be.  Did she have any damages?

11                MR. NORINSBERG:  There's no --

12                THE COURT:  Excuse me.  Does she have any

13      damages.

14                MR. NORINSBERG:  There's not any medical

15      treatment for her damages at that hospital.

16                THE COURT:  Excuse me.  I didn't ask that.  Is

17      she going to claim any damages in this case?

18                MR. NORINSBERG:  She will claim damages, but

19      there were no entries.

20                THE COURT:  What damages is she claiming.

21                MR. NORINSBERG:  She's claiming there are severe

22      emotional distress and there's physical pain to her

23      vaginal region which was treated at the Nassau County

24      Medical Center.

25                THE COURT:  When anyone makes a claim of

Geraci - Redirect/Norinsberg

1    emotional distress, all of the events that could have

2    caused emotional distress in her life are fair game.

3           MR. NORINSBERG:  I completely agree and I

4    understand.  All I'm saying is I would like an offer of

5    proof of what these records go to establish.

6           THE COURT:  We're going to find out.

7           What records do you want to put in, Ms. Flynn?

8    Do you want to go over this at the lunch hour with

9    counsel?  What do you want to do?

10          MS. FLYNN:  That would be fine, Judge.  We can

11   do that.

12          THE COURT:  And anything that's objected to, I

13   can rule on it later.

14          MS. FLYNN:  I'll just ask my other questions

15   that don't have to do with these records and then we can

16   discuss it.

17          THE COURT:  You'd better ask the doctor to stay

18   after lunch.

19          MS. FLYNN:  All right.

20          (Continued on next page.)

21

22

23

24

25

**Geraci - Recross/Flynn**

341

1           (Whereupon, the following occurred in open

2      court.)

3

4      RECROSS-EXAMINATION

5      BY MS. FLYNN:

6      Q.    Doctor, plaintiff's counsel asked you about an

7      inmate's right to refuse medical treatment.  Is it true

8      that an inmate could refuse to see a specific

9      practitioner?

10     A.    Yes.

11     Q.    He also questioned you about why you didn't tell

12     other people in the medical unit about the allegations

13     against Gary Feinberg.  Did you know if those allegations

14     were true?

15     A.    No, I didn't.

16     Q.    And had you had instances, personal instances in your

17     dealings with inmates where something they told you was

18     not true?

19              MR. NORINSBERG:  Objection.

20              THE COURT:  Yes.  Sustained.

21     Q.    Had you ever had an instance prior to January 18,

22     2006 when an inmate told you something that you found out

23     was not true?

24              MR. NORINSBERG:  Objection.

25              THE COURT:  Sustained.

Geraci - Recross/Flynn

342

1    Q.    Was there any reason that you thought what you were

2    being told about the allegations about inmate

3    Rickenbacker -- made by inmate Rickenbacker and inmate

4    Kennedy's might not be true?

5    A.    There have been times where inmates have lied to me

6    about getting something.  One case in particular --

7              MR. NORINSBERG:  I'm going to object and move to

8    strike his whole testimony.

9              THE COURT:  I'm not going to strike it.  I'm

10   just going to stop him.

11   A.    An inmate had complained --

12             THE COURT:  No.  I'm going to stop it.

13             THE WITNESS:  Oh, yes, your Honor.

14             MS. FLYNN:  Judge, may we approach.

15             THE COURT:  Okay.

16             (Continued on next page.)

17

18

19

20

21

22

23

24

25

Geraci - Recross/Flynn

343

1              (Whereupon, the following occurred at sidebar.)

2              MS. FLYNN:  Their whole attack on this doctor is

3      that he didn't immediately do something when there were

4      these two allegations by two inmates, and they've been

5      going into his state of mind, as to why he didn't do this,

6      why didn't he do this.  I think he has a right to show his

7      past experience dealing with these inmates as to why he

8      didn't believe what they said.

9              THE COURT:  You almost convinced me.  Almost.

10             I'm going to allow you to ask him without

11     getting into specific instances did you have experiences

12     which you did not convey this information because you had

13     past experiences where the information given to you was

14     not true.

15             MS. FLYNN:  All right.

16             THE COURT:  Then I'll let you ask him.

17             MS. FLYNN:  Thank you.

18             (Continued on next page.)

19

20

21

22

23

24

25

Geraci - Recross/Flynn

344

1          (Whereupon, the following occurred in open

2    court.)

3    BY MS. FLYNN:

4    Q.   Doctor, is part of the reason that you didn't

5    immediately tell people in the medical unit about the

6    allegations of inmate Rickenbacker and inmate Kennedy

7    because you had in the past been given information by

8    inmates that you found out later was not true?

9    A.   Yes, ma'am.

10   Q.   Plaintiff's counsel had you read into evidence a

11   medical notation in the medical records regarding the date

12   of 12/30/06?

13   A.   '05?

14   Q.   '05, I'm sorry.  '05.

15          An indication that Ms. Ramos did not receive her

16   medication that day from the Suffolk County correctional

17   facility.

18          Is that what that notation said as of 8:30?

19   A.   That's what it says here as of 8:35.

20   Q.   Are you aware that Rochelle Ramos was not in the

21   Suffolk County jail on December 30, 2005?

22   A.   No, ma'am.

23          MS. FLYNN:  Thank you.

24

25

Geraci - Redirect/Norinsberg

345

1   REDIRECT EXAMINATION

2   BY MR. NORINSBERG:

3   Q.   You mentioned just a moment ago about receiving

4   information on occasion that turned out not to be true

5   from an inmate; is that correct?

6   A.   I have received information from inmates that has not

7   been true.

8   Q.   Did any inmate ever tell you that a staff member was

9   sexually assaulting them?

10  A.   No.

11  Q.   So that would be a much different situation than

12  anything that you had dealt with in the past, wouldn't it

13  be, doctor?

14  A.   It would be a different situation.

15           MR. NORINSBERG:  Thank you, Doctor.  Nothing

16  further.

17           THE COURT:  Anything else?

18           MS. FLYNN:  No, your Honor.  Thank you.

19           THE COURT:  All right.  You'll have to stay

20  around for a little while until after lunch.

21           THE WITNESS:  Yes, sir.

22           THE COURT:  Okay.

23           THE WITNESS:  Yes, sir.

24           THE COURT:  Thank you.  Please call your next

25  witness.

Kaufman - Direct/Norinsberg

346

1          MR. NORINSBERG:  Plaintiff calls Richard Kaufman

2     to the stand.

3

4     **RICHARD KAUFMAN**,

5               called as a witness, having been first

6               duly sworn, was examined and testified

7               as follows:

8          THE COURT:  Please state your name and spell

9     your last name slowly for the record.

10         THE WITNESS:  Richard Kaufman, K-A-U-F-M-A-N.

11         THE COURT:  You may proceed.

12

13

14    DIRECT EXAMINATION

15    BY MR. NORINSBERG:

16    Q.   Good afternoon, Mr. Kaufman.  You and I have met

17    before once before, correct, sir?

18    A.   Yes.

19    Q.   We met a few weeks back, October 9th, 2009?

20    A.   Yes.

21    Q.   We met at your deposition, is that correct, sir?

22    A.   Yes.

23    Q.   And at your deposition you gave sworn testimony under

24    oath, correct?

25         MS. FLYNN:  Objection.

Kaufman - Direct/Norinsberg

347

| 1 | THE COURT:  Overruled. |
| 2 | A.    Yes. |
| 3 | Q.    And you were represented by an attorney at that |
| 4 | deposition, correct? |
| 5 | A.    Yes. |
| 6 | Q.    Ms. Flynn was there, correct? |
| 7 | A.    Yes. |
| 8 | Q.    And since your deposition, you've had a chance to |
| 9 | look at your testimony; is that correct? |
| 10 | MS. FLYNN:  Objection, Judge. |
| 11 | THE COURT:  Overruled. |
| 12 | A.    Yes. |
| 13 | Q.    You're currently employed at the Suffolk County |
| 14 | Health Department; is that correct? |
| 15 | A.    Yes. |
| 16 | Q.    And you've been employed there since January of 1979, |
| 17 | correct? |
| 18 | A.    Correct. |
| 19 | Q.    And you're assigned to the jail in Riverhead; is that |
| 20 | correct? |
| 21 | A.    Yes. |
| 22 | Q.    And you worked at the jail medical unit since May of |
| 23 | 2004; is that correct? |
| 24 | A.    Correct. |
| 25 | Q.    So over five years that you worked at the jail |

Kaufman - Direct/Norinsberg

348

1    medical unit; is that correct?

2    A.    Yes.

3    Q.    Your title at the jail medical unit is clinic

4    coordinator, correct?

5    A.    Yes.

6    Q.    And you supervise people at the jail.

7          Correct?

8    A.    Yes.

9    Q.    You supervise drug counselors at the jail.

10         Correct?

11   A.    Yes.

12   Q.    And in total there are four drug counselors that work

13   underneath you that answer to you.

14         Correct?

15   A.    Yes.

16   Q.    Do you know who Dr. Geraci is?

17   A.    Yes.

18   Q.    Dr. Geraci is the medical director of the jail

19   medical unit, correct?

20   A.    Yes.

21   Q.    And as far as you know, is there anybody above

22   Dr. Geraci in the jail medical unit?

23   A.    In the jail medical unit?

24   Q.    Yes.

25   A.    No.

Kaufman - Direct/Norinsberg

349

1  Q.   Dr. Geraci is your immediate supervisor; is that

2  correct?

3  A.   Yes.

4  Q.   And you report to Dr. Geraci on a regular basis,

5  correct?

6  A.   Yes.

7  Q.   In fact, Mr. Kaufman, you report to Dr. Geraci

8  continuously throughout the day; is that correct?

9  A.   Yes.

10  Q.   And there's a rough estimate would you estimate

11  there's approximately 59 people employed at the jail

12  medical unit now?

13  A.   Yes.

14  Q.   And there are seven team leaders; is that correct?

15  A.   Yes.

16  Q.   And that was the way it was back in January of 2005

17  through 2006, correct?

18  A.   Correct.

19        THE COURT:  There are 17 what?

20        MR. NORINSBERG:  I'm sorry, the number seven

21  team leaders.

22        THE COURT:  Seven team leaders?

23        MR. NORINSBERG:  Yes.

24  Q.   Now, one of the team leaders reported to

25  Mr. Bloomberg; is that correct?

350

1    A.    Yes.

2    Q.    But all the other team leaders report to Dr. Geraci,

3    correct?

4    A.    Correct.

5    Q.    And that would include you, correct?

6    A.    Can yes.

7    Q.    Are you familiar with an individual named Gary

8    Feinberg?

9    A.    Yes.

10   Q.    Mr. Feinberg was a physician assistant at the jail

11   medical unit, correct?

12   A.    Yes.

13   Q.    And you worked in the same area of the jail as Gary

14   Feinberg, correct?

15   A.    I worked in the medical unit.

16   Q.    Did you work in the same area of the jail medical

17   unit as Gary Feinberg?

18   A.    No.

19   Q.    Referring to your deposition, page nine, line 18:

20         "Question:  Did you work in the same area of the

21   jail as Gary Feinberg.

22         "Answer:  Yes."

23         Do you recall being asked that question and

24   giving that answer?

25   A.    Yes.

Kaufman - Direct/Norinsberg

351

1    Q.   So --

2    A.   I'm sorry.

3    Q.   At your deposition you indicated that you were

4    working the same area of the jail.

5              Is that correct?

6    A.   Yes.

7    Q.   And you're in the same unit as well, correct?

8    A.   Yes.

9    Q.   And you actually are just 25 to 50 feet away from

10   where Gary Feinberg was; is that correct?

11   A.   I worked around the corner down a different corridor.

12   Q.   Your best approximation would be from 25 to 50 feet

13   away, correct?

14   A.   Yes.

15   Q.   Now, did there come a time, sir, that you learned

16   that certain allegations were being made against

17   Mr. Feinberg?

18   A.   Yes.

19   Q.   And you first heard those allegations on January 18,

20   2006; is that correct?

21   A.   Yes.

22   Q.   A drug counselor named Sara Velasquez informed you of

23   the allegations, correct?

24              THE COURT:  Sara who.

25              MR. NORINSBERG:  V-E-L-A-S-Q-U-E-Z.

Kaufman - Direct/Norinsberg

352

1   Q.   Is that correct, sir?

2   A.   Yes.

3   Q.   And Ms. Velasquez was a drug counselor that worked

4   underneath you in the jail medical unit.

5        Correct?

6   A.   Yes.

7   Q.   And to the best of your memory, what did

8   Ms. Velasquez tell you relating to Gary Feinberg?

9   A.   Ms. Velasquez came to me with some specific concerns

10  that an inmate had said to her regarding her encounter

11  with Gary Feinberg.

12  Q.   Well, besides talking about any concerns, did she

13  tell you anything about the allegations that the person

14  had made?

15  A.   She had alleged that there were some inappropriate

16  physical contact.

17  Q.   And when you say she, did you learn the name of that

18  inmate was Linda Kennedy?

19  A.   Yes.

20  Q.   Now, once you heard that information, you went to get

21  Dr. Geraci, correct?

22  A.   Correct.

23  Q.   And then you, Dr. Geraci and Ms. Velasquez had a

24  conversation; is that correct?

25  A.   Yes.

Kaufman - Direct/Norinsberg

353

1    Q.    And in that conversation, Ms. Velasquez related to

2    you and to Dr. Geraci what she had learned from Linda

3    Kennedy, correct?

4    A.    Yes.

5    Q.    Now, you were present during the entire conversation;

6    is that correct?

7    A.    Yes.

8    Q.    Can you please tell the members of the jury what did

9    Dr. Geraci say in response to these allegations when he

10   first heard them?

11   A.    I don't recall what Dr. Geraci said directly.

12   Q.    Can you tell the members of the jury a single word

13   that Dr. Geraci said during this conversation?

14   A.    I don't recall what Dr. Geraci said directly.

15   Q.    So the answer to my question would be no, you can't

16   relate a single word that he said; is that correct?

17   A.    I don't remember that -- what he said.  So yes.  I

18   don't recall.

19   Q.    Do you recall in sum and substance what Dr. Geraci

20   said?

21   A.    I recall that we were listening.

22   Q.    My question, Mr. Kaufman, is do you recall in sum and

23   substance what Dr. Geraci said in response?

24   A.    No.

25   Q.    Can you please describe to the jury what was

**Kaufman - Direct/Norinsberg**

354

1   Dr. Geraci's reaction when he first heard the information

2   relating to Linda Kennedy?

3   A.   When he first heard the information from me?

4   Q.   When he first heard the information from

5   Ms. Velasquez during this conversation, can you describe

6   Dr. Geraci's reaction?

7            MS. FLYNN:  Objection.

8            THE COURT:  Overruled.

9   A.   I can't interpret his reaction.

10  Q.   So you can't give the jury any description at all

11  about how he reacted.  Is that your testimony, sir?

12  A.   Yes.

13  Q.   What about you, sir?  Were you shocked at the

14  allegation?

15  A.   It was a shocking allegation, yes.

16  Q.   Referring to your deposition, page 22 line 20?

17           "Question:  Were you shocked at the allegation?

18           "Answer:  I don't -- I don't recall being

19  shocked."

20           Do you recall giving that testimony at your

21  deposition?

22  A.   Yes, I do.

23  Q.   You gave that a just a few weeks ago, is that

24  correct, Mr. Kaufman?

25  A.   Yes, correct.

Kaufman - Direct/Norinsberg

355

1   Q.   Now, can you tell the members of the jury what steps

2   if any did Dr. Geraci take with respect to these

3   allegations, to your knowledge?

4   A.   I don't know what Dr. Geraci did directly.

5   Q.   Well, did Dr. Geraci ever tell you that he took any

6   action with respect to these allegations?

7   A.   Yes.

8   Q.   Referring to your deposition, page 31 line 15:

9        "Question:  Did Dr. Geraci tell you that he took

10  any action in response to this complaint?

11       "Answer:  At this time I don't recall."

12       MS. FLYNN:  Objection.

13  Q.   Do you recall being asked that question and giving

14  that answer?

15       THE COURT:  Overruled.

16  A.   Yes.

17  Q.   So three weeks ago you couldn't remember whether or

18  not he told you that he had done anything, correct?

19  A.   That's correct.

20  Q.   Is your memory better now today, Mr. Kaufman?

21  A.   Yes, it is.

22  Q.   It's better now today than it was three weeks ago

23  when you testified under oath at your deposition; is that

24  correct?

25  A.   Yes, it is.

Kaufman - Direct/Norinsberg

356

1   Q.   And how did your memory improve during that time,

2   sir?

3   A.   Because I've been thinking about in exclusively for

4   the last three weeks.

5   Q.   This particular case has been on your mind for the

6   last three weeks?

7   A.   Yes.

8   Q.   Now, did you ever learn from any third-party what

9   action Dr. Geraci took, if any, in response to Linda

10  Kennedy's allegation?

11  A.   I'm sorry, could you rephrase the question?

12  Q.   Sure.

13  A.   Thank you.

14  Q.   Did you ever learn from anybody else --

15  A.   Other than?

16  Q.   Other than Dr. Geraci himself, about what actions

17  Dr. Geraci took in response to the Linda Kennedy

18  allegations?

19  A.   I don't think so, no.

20  Q.   Now, at some point you decided to interview

21  Ms. Kennedy yourself; is that correct?

22  A.   Yes.

23  Q.   Even though you're not an investigator, you thought

24  that it was important to interview her, correct?

25  A.   Yes.

Kaufman - Direct/Norinsberg

357

1   Q.   You wanted to find out what allegations she was

2   making, correct?

3   A.   Yes.

4   Q.   You wanted to hear directly what it was that she was

5   claiming, correct?

6   A.   Yes.

7   Q.   And so you interviewed Ms. Kennedy that same day,

8   correct?

9   A.   Yes.

10  Q.   And the interview took place in your office; is that

11  correct?

12  A.   Yes.

13  Q.   And Ms. Kennedy was crying during this interview,

14  correct?

15  A.   Yes.

16  Q.   In fact she was crying loudly during this interview,

17  correct?

18  A.   Yes.

19  Q.   And you understood from Ms. Velasquez that Linda

20  Kennedy was crying very hard during her interview with

21  Ms. Velasquez as well, correct?

22          MS. FLYNN:  Objection.

23          THE COURT:  Overruled.

24  A.   Yes.

25  Q.   So in both of her interview with Ms. Velasquez and

**Kaufman - Direct/Norinsberg**

358

 1   her interview with you, Ms. Kennedy was crying hard.  Is

 2   that correct?

 3            MS. FLYNN:  Objection.

 4            THE COURT:  Overruled.

 5   A.   I understood that she was crying with Ms. Velasquez

 6   and yes, she was crying very hard with me.

 7   Q.   And yet, even after you met with Ms. Kennedy and you

 8   saw that she was crying very hard, you didn't form any

 9   opinion as to whether or not Ms. Kennedy was telling the

10   truth.  Correct?

11   A.   That's correct.

12   Q.   So as far as you were concerned, Ms. Kennedy could be

13   telling the truth or she could be make up the whole thing,

14   correct?

15   A.   I suppose, yes.

16   Q.   Now, two days after interviewing Ms. Kennedy you

17   learned that another inmate was make similar allegations

18   to Ms. Kennedy, correct?

19   A.   Yes.

20   Q.   And that inmate was Lowrita Rickenbacker.

21        Correct?

22   A.   Yes.

23   Q.   And you learned about Ms. Rickenbacker during a

24   meeting which was held on January 20, 2006, correct?

25   A.   Yes.

Kaufman - Direct/Norinsberg

359

1   Q.   There were four people who attended in meeting,

2   correct?

3   A.   Yes.

4   Q.   Dr. Geraci was there?

5           THE COURT:  You want to slow down.  You're going

6   very rapidly.

7           MR. NORINSBERG:  Going at flank speed.

8           THE COURT:  My mind can't keep up with you.

9           I'm sure the jurors have no trouble at all

10  faking notes or anything.

11          MR. NORINSBERG:  I was just building up to that

12  flank speed again, you know.

13          THE COURT:  Slow down.

14          MR. NORINSBERG:  We will slow it down.

15  Q.   There were four people who attended this meeting,

16  correct?

17  A.   Yes.

18  Q.   Dr. Geraci was there, correct?

19  A.   Yes.

20  Q.   Nancy Kugler was there, correct?

21  A.   Yes.

22  Q.   Carol Manderino was there, correct?

23  A.   Yes.

24  Q.   And you, Rick Kaufman, were there, correct?

25  A.   Yes.

Kaufman - Direct/Norinsberg

360

1    Q.   This meeting lasted for about one hour, correct?

2    A.   Yes.

3    Q.   Can you tell the members of the jury, please, what

4    did Dr. Geraci say during this meeting?

5    A.   I don't recall.

6    Q.   You don't recall anything he said, correct, sir?

7    A.   Correct.

8    Q.   Can you tell the members of the jury what did

9    Ms. Kugler say during this meeting?

10   A.   No.

11   Q.   Do you recall a single word Ms. Kugler said?

12   A.   Precisely, no.

13   Q.   Can you tell the jury what was the reason why this

14   meeting was held in the first place?

15   A.   To discuss what, what had happened with this other

16   inmate.

17   Q.   So at this point on January 20th, you knew that there

18   were two separate women make similar allegation against

19   Mr. Feinberg, correct?

20   A.   Yes.

21   Q.   But even at that point you still had no opinion as to

22   whether or not these women were telling the truth,

23   correct?

24   A.   Correct.

25   Q.   As far as you were concerned, they might be make the

**Kaufman - Direct/Norinsberg**

361

1    whole thing up, right, Mr. Kaufman?

2    A.    I have no opinion, that is correct.

3    Q.    After this meeting was held, you met with

4    Mr. Feinberg; is that correct?

5    A.    Yes.

6    Q.    You were there and Dr. Geraci was there and

7    Mr. Feinberg was there, correct?

8    A.    Yes.

9    Q.    And that meeting took place in your office, correct?

10   A.    Yes.

11   Q.    That meeting took place on or around January 20th,

12   correct?

13   A.    Yes.

14   Q.    That was two days after you learned about Linda

15   Kennedy, correct?

16   A.    Yes.

17   Q.    And it was the same day you learned about Lowrita

18   Rickenbacker, correct?

19   A.    Yes.

20   Q.    Can you tell the members of the jury what questions

21   did Dr. Geraci ask Mr. Feinberg during this meeting?

22   A.    I can't tell what direct questions he asked, no, I

23   can't.

24   Q.    Can you describe to the jury the tone that Dr. Geraci

25   used when he was asking questions at the meeting?

1   A.   I don't understand the tone?  I don't understand what

2   you mean by --

3   Q.   Was it an angry tone, it was a suspicious tone, it

4   was a supportive tone?  Do you have any recollection?

5   A.   It wasn't angry, suspicious or supportive that I can

6   recall.  I can't recall exactly what tone he used, sorry.

7   Q.   During this meeting Mr. Feinberg was asked some

8   questions about Linda Kennedy's allegations.

9        Correct?

10  A.   Yes.

11  Q.   But he was not asked any questions about

12  Ms. Rickenbacker, was he?

13  A.   I didn't bring up Ms. Rickenbacker, no.

14  Q.   In fact, Ms. Rickenbacker's allegations were never

15  mentioned during this meeting, were they?

16  A.   Correct.

17  Q.   And the name Lowrita Rickenbacker was never mentioned

18  to Gary Feinberg during this meeting, correct?

19  A.   Not by me, no.

20  Q.   Can you tell the jury why was Lowrita Rickenbacker's

21  name not mentioned during this meeting with Gary Feinberg?

22       MS. FLYNN:  Objection.

23       THE COURT:  Overruled.

24  A.   I didn't mention that individual's name because the

25  person who had come to me originally, who was under my

**Kaufman - Direct/Norinsberg**

363

1    supervision, was not talking about that individual.

2            THE COURT:  Was what?

3    A.   Was not speaking about that individual.

4            So I didn't believe it was in my purview to

5    explore that.

6    Q.   Somebody came to you directly about Linda Kennedy,

7    correct?

8    A.   Correct.

9    Q.   But then two days later you learned about another

10   inmate make similar allegation against Mr. Feinberg.

11   Correct?

12   A.   Correct.

13   Q.   You were at a meeting sitting there with

14   Mr. Feinberg.

15           Correct?

16   A.   Correct.

17   Q.   And you yourself asked questions during this meeting,

18   didn't you?

19   A.   No.

20   Q.   Referring to your deposition page 68, line 15:

21           "Question:  Did you ask any questions during

22   this meeting at all?

23           "Answer:  I have to say yes."

24           Do you recall giving that testimony three weeks

25   ago at your deposition?

**Kaufman - Direct/Norinsberg**

1   A.   Yes.  May correct myself?

2   Q.   When you gave that testimony, you swore to tell the

3   truth, correct?

4   A.   Yes.

5   Q.   And you were telling the truth?

6   A.   And I was telling the truth.

7   Q.   So during this meeting you did in fact ask some

8   questions of Mr. Feinberg?

9   A.   Yes.

10   Q.   Even if whether you felt it was your place to or not,

11   you actually did ask him some questions during the

12   meeting.

13         Correct?

14   A.   Correct.

15   Q.   But you never once asked him about the second

16   inmate's allegations, right?

17   A.   That's correct.

18   Q.   And as you sit here today, you have no memory of any

19   of the questions that you did ask him during that meeting;

20   is that correct?

21   A.   That's correct a.

22   Q.   Now, you remember Mr. Feinberg adamantly denying

23   these charges though, you remember that?

24   A.   Yes.

25   Q.   So that stands out in your memory from that meeting,

Kaufman - Direct/Norinsberg

365

1    correct?

2    A.    Yes.

3    Q.    That's the only thing that you remember, correct?

4    A.    That stands out significantly in my mind.

5    Q.    And this meeting lasted twenty to thirty minutes,

6    correct?

7    A.    Correct.

8    Q.    But the only single thing that you can recall is

9    Mr. Feinberg adamantly denying the allegations, true?

10                MS. FLYNN:  Objection.

11                THE COURT:  Overruled.

12   A.    That's the only thing that I clearly recall in

13   specific detail.

14   Q.    Now, after this meeting, you had a chance to speak to

15   Ms. Kennedy in an interview, you had a chance to speak

16   with Mr. Feinberg, did you form any opinion at that point

17   in time as to whether or not something improper had

18   happened?

19   A.    No.

20   Q.    Did you form any opinion that something improper had

21   not happened?

22   A.    No.

23   Q.    So even after speaking to both of these people you

24   still had no idea; is that correct, sir?

25   A.    Yes.

Kaufman - Direct/Norinsberg

366

1    Q.    In fact you felt that it was not your responsibility

2    to make a determination that anything had happened.

3    Correct?

4    A.    That's correct.

5    Q.    And as far as you were concerned, whoever was going

6    to have to make that decision, it wasn't your

7    responsibility?

8    A.    It was not my responsibility to decide on who had

9    done what.

10   Q.    Whose responsibility would it be to decide whether or

11   not something improper had happened as far as you know?

12   A.    My responsibility was to tell my direct supervisor

13   what I knew.  And that's, that's where I took it.  That's

14   what I was thinking about.  This was brought to my

15   attention, I brought it to my supervisor and that's where

16   I went with it.

17   Q.    My question is, Mr. Kaufman, who in your mind would

18   be the individual responsible for resolving this issue, if

19   anybody?

20   A.    The -- just state -- which issue are you talking

21   about?

22   Q.    Who in your mind would be the individual responsible

23   for resolving the question of whether or not something

24   improper had happened?

25   A.    Either the -- whomever was charged with investigating

Kaufman - Direct/Norinsberg

367

1    the case or the jury if it got that far.

2    Q.   The jury is sitting here now.  We're talking about

3    what happened three years ago, correct?

4    A.   Yes.

5    Q.   Would it be fair to say, Mr. Kaufman, that you have

6    no idea who would be responsible for making that

7    determination?

8            MS. FLYNN:  Objection.

9            THE COURT:  Overruled.

10   A.   No.  That wouldn't be fair to say.

11   Q.   Referring to your deposition, page 73 line 7:

12           "Question:  Who in your mind would be the

13   individual responsible for resolving this issue if

14   anybody?

15           "Answer:  I have no idea."

16           Do you recall being asked that question and

17   giving that answer?

18   A.   Yes.

19   Q.   So at your deposition three weeks ago, you had no

20   idea who would be responsible for deciding if something

21   improper had happened.

22           Correct?

23   A.   Yes.

24   Q.   And you've been working at the Health Department for

25   30 years; is that correct?

Kaufman - Direct/Norinsberg

368

1    A.   That's correct.

2    Q.   And you were working at this jail for five years,

3    correct?

4    A.   That's correct.

5    Q.   But you still have no idea who would be responsible

6    for making that determination, correct?

7    A.   Precisely, correct.

8    Q.   Would it be fair to say, Mr. Kaufman, that you never

9    received any type of training as to what steps you were

10   supposed to follow if an inmate alleges a claim of sexual

11   assault?

12   A.   Precisely, correct.

13   Q.   Now, the jail has a unit known as internal security.

14   Is that correct?

15   A.   Yes.

16   Q.   And there are a group of officers who, in internal

17   security, who are there to ensure the security of the

18   facility and to investigate issues that need

19   investigation.

20        Correct?

21   A.   Yes.

22   Q.   But you did not report these allegations do internal

23   security, did you?

24   A.   No.

25   Q.   Now, you're familiar with the Internal Affairs

**Kaufman - Direct/Norinsberg**

369

1    Bureau, correct?

2    A.    Yes.

3    Q.    The Internal Affairs Bureau investigates issues

4    internal to the officers or employees of the jail,

5    correct?

6    A.    Yes.

7    Q.    Did you ever contact the Internal Affairs Bureau

8    relating to these allegations?

9    A.    No.

10   Q.    Did you ever contact anybody from the sheriff's

11   department relating to the allegations against

12   Mr. Feinberg?

13   A.    No.

14   Q.    So you didn't report them to internal security, you

15   didn't report them to Internal Affairs, and you didn't

16   report them to anybody in the sheriff's department,

17   correct?

18   A.    Correct.

19   Q.    Apart from Dr. Geraci, you didn't report these

20   allegations to anybody in the jail, correct?

21   A.    Correct.

22   Q.    Because as far as you were concerned it wasn't your

23   responsibility to do so, correct?

24   A.    Correct.

25   Q.    Even though you're a clinic coordinator, correct?

Kaufman - Direct/Norinsberg

370

1    A.   Yes.

2    Q.   Even though you're one of the seven team leaders in

3    the jail medical unit, correct?

4    A.   Yes.

5    Q.   Now, you're familiar with what's known as the jail

6    medical unit manual; is that correct?

7    A.   Yes.

8    Q.   And it's called the jail medical unit policy and

9    procedure manual?

10   A.   Yes.

11   Q.   It existed in 2005; is that correct?

12   A.   Yes.

13   Q.   And to your knowledge, sir, is there any guidelines

14   in there that instructs staff members about what steps to

15   take if an inmate makes a complaint about sexual abuse?

16   A.   No.

17   Q.   There are no such guidelines, correct, sir?

18   A.   Right.

19   Q.   Now, you talked a little earlier about Nancy Kugler;

20   is that correct?

21   A.   Yes.

22   Q.   Her name came up when we were talking about that

23   meeting?

24   A.   Yes.

25   Q.   Is that correct?

Kaufman - Direct/Norinsberg

371

1    A.    Yes.

2    Q.    Nancy Kugler was the senior psychiatric social

3    worker, correct?

4    A.    Yes.

5    Q.    She was also a team leader, correct?

6    A.    Yes.

7    Q.    And on February 9, Ms. Kugler told you that another

8    inmate had come forward and was making similar allegations

9    against Mr. Feinberg; is that correct?

10   A.    Yes.

11   Q.    And at that point you told Ms. Kugler to go to

12   security; is that correct?

13   A.    Yes.

14   Q.    You meant internal security, correct?

15   A.    Yes.

16   Q.    Dr. Geraci was present when you made this

17   recommendation, correct?

18   A.    Yes.

19   Q.    But you yourself never considered going to internal

20   security relating to these allegations, correct?

21   A.    Yes.

22   Q.    When you learned about Ms. Kennedy's allegations you

23   didn't go to security, correct?

24   A.    Correct.

25   Q.    When you learned about Ms. Rickenbacker's allegations

Kaufman - Direct/Norinsberg

372

1    you didn't go to security.

2              Correct?

3    A.   Correct.

4    Q.   But when Ms. Kugler told you about another inmate,

5    you told her to go to security.

6              Correct?

7    A.   Yes.

8    Q.   So you told Ms. Kugler to do something that you

9    yourself had not done.

10             Correct?

11   A.   Yes.

12   Q.   And you were both team leaders in the jail medical

13   unity, correct?

14   A.   Yes.

15   Q.   Now, to your knowledge, Mr. Kaufman, was Mr. Feinberg

16   ever suspended as a result of these allegations?

17   A.   Suspended?

18   Q.   From his work.

19             THE COURT:  Was who suspended?

20             MR. NORINSBERG:  Mr. Feinberg.

21   A.   Not to my knowledge.

22             THE COURT:  All right.

23             We're going to take a break at this time.

24   Members of the jury, we're going to take a recess for

25   lunch.

Kaufman - Direct/Norinsberg

373

1              In the meantime, please don't discuss this case

2       either among yourselves or with anybody else, keep a open

3       mind, come to no conclusions until you're in that jury

4       room deliberating after all the evidence has been present.

5       We will take a recess until 1:30.  Have a nice lunch.

6              (Whereupon, the jury retired from the

7       courtroom.)

8              (Luncheon recess taken at this point.)

9              (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

374

1                        **AFTERNOON SESSION**

2

3               (In open court; jury not present.)

4               THE COURT:  Ms. Flynn, did you want to speak to

5       me?

6               MS. FLYNN:  Yes, Judge.

7               Regarding the plaintiff's medical records,

8       regarding the issue about the plaintiff's medical records.

9               THE COURT:  Yes.

10              MS. FLYNN:  From the Suffolk County Correctional

11      Facility.

12              The plaintiff's counsel has advised me that he

13      cannot consent to them going into evidence.  I would renew

14      my application to put them into evidence on the grounds

15      that it contains information regarding plaintiff's mental

16      and physical condition when she entered the Suffolk County

17      jail prior to any incident with Gary Feinberg.

18              THE COURT:  What's the objection?

19              MR. NORINSBERG:  We might be able to resolve

20      this.

21              The only thing is, we want to be able to look

22      through each one of those records that Ms. Flynn is trying

23      to offer, and we don't want to do it under rushed

24      circumstances.

25              We might well be able to consent.  I just don't

PAUL J. LOMBARDI, RMR, FCRR
Official Court Reporter

375

1    want to do that without us having had a chance to go

2    through it carefully and seeing if we have any particular

3    objections to any entries.

4              MS. FLYNN:  I offered to show them this at the

5    beginning --

6              THE COURT:  Do you need that now with this

7    witness?

8              MS. FLYNN:  If I don't get it in through

9    Dr. Geraci, no.

10             I can always bring him back if I need to bring

11   him back.

12             THE COURT:  So give him an opportunity to look

13   at it.

14             MS. FLYNN:  Okay.

15             One other issue, Judge.  I have learned that

16   Lowrita Rickenbacker has an outstanding warrant for her

17   arrest.  It's issued by -- she has a violation of

18   probation.  There's an outstanding warrant for her.

19             And Nassau County indicates that they would be

20   interested in taking her into custody.

21             MR. NORINSBERG:  Do we have a copy of the

22   warrant?

23             Can we see it?

24             MS. FLYNN:  I'm getting a copy of the warrant.

25             THE COURT:  I have nothing to do with that.

Kaufman - Direct/Norinsberg

376

1          MS. FLYNN:  I understand.

2          I just did not want to surprise the court or

3    counsel with that.

4          THE COURT:  I have only one comment.

5          Such as life.

6          MS. FLYNN:  Yes, Judge.

7          Thank you.

8          THE COURT:  Let's bring in the jury.

9          (Whereupon, there was a pause in the

10   proceedings.)

11

12         THE CLERK:  Jury entering.

13         (Jury enters the courtroom.)

14         THE COURT:  Please be seated, members of the

15   jury.

16         You may proceed.

17         MR. NORINSBERG:  Thank you, your Honor.

18   BY MR. NORINSBERG:

19   Q.   Good afternoon, Mr. Kaufman.

20   A.   Good afternoon.

21   Q.   So you had testified earlier about the meeting that

22   you had with Dr. Geraci and Mr. Feinberg on January 20th.

23         Is that correct?

24   A.   Yes.

25   Q.   After this meeting, did Dr. Geraci ever tell you that

1   Mr. Feinberg could no longer see Ms. Kennedy?

2   A.   Not after that meeting.

3        No.

4   Q.   And after this meeting, did Dr. Geraci ever tell you

5   that Mr. Feinberg could no longer see

6   Lowrita Rickenbacker?

7   A.   No.

8   Q.   During this meeting, did you ever hear Dr. Geraci

9   tell Gary Feinberg that he could not see

10  Lowrita Rickenbacker anymore?

11  A.   Not that I recall.

12  Q.   During this meeting, did you ever hear Dr. Geraci say

13  or tell Gary Feinberg that he couldn't see Linda Kennedy

14  anymore?

15  A.   Not that I recall.

16  Q.   Now, at some point in time you learned that

17  Mr. Feinberg had been arrested.

18       Correct?

19  A.   Correct.

20  Q.   Were you surprised that Mr. Feinberg was arrested?

21  A.   Could you rephrase that question?

22       It's hard to answer like that in a yes or no

23  form.

24  Q.   When you heard that Mr. Feinberg had been arrested,

25  did it surprise you?

Kaufman - Direct/Norinsberg

378

1    A.    I don't recall being surprised --

2            THE COURT:  Mr. Kaufman, if you can't answer a

3    question, you can say I can't answer that question yes or

4    no.

5    A.    I can't answer that question.

6            THE COURT:  If that's your wish.

7    BY MR. NORINSBERG:

8    Q.    You can't answer that question?

9            Referring to your deposition at page 80, line 8:

10           Question:  Were you surprised?

11           Answer:  Yes.

12           Do you recall giving that testimony at your

13   deposition?

14   A.    In that context, yes.

15   Q.    So three weeks ago at your deposition you could

16   answer the question.

17           Correct?

18   A.    Yes.

19   Q.    And you were surprised when you learned about this,

20   according to your deposition testimony --

21   A.    Correct.

22   Q.    Correct?

23   A.    Correct.

24   Q.    But in court now, here today, you have some

25   difficulty answering that question.

Kaufman - Direct/Norinsberg

379

1              Correct?

2    A.    Yes.

3    Q.    Now, you discussed Mr. Feinberg's arrest with

4    Dr. Geraci.

5              Correct?

6    A.    Yes.

7    Q.    You discussed it when he was arrested.

8              Correct?

9    A.    Yes.

10   Q.    Where did that conversation take place, sir?

11   A.    In the medical unit.

12             THE COURT:  You have to get closer to the

13   microphone and keep your voice up.

14             THE WITNESS:  I'm sorry.

15   A.    In the medical unit of the jail.

16   Q.    Can you tell the members of the jury, what did

17   Dr. Geraci say to you at that time after Mr. Feinberg had

18   been arrested?

19   A.    I don't recall.

20   Q.    Did Dr. Geraci express any disbelief during this

21   conversation?

22   A.    I don't recall.

23   Q.    Did Dr. Geraci hold any type of meeting in the jail

24   medical unit to discuss what had happened with

25   Gary Feinberg?

Kaufman - Direct/Norinsberg

380

1   A.   There was a meeting subsequent to his arrest.

2   Q.   Referring to your deposition, page 86, line 6:

3        Question:  After Mr. Feinberg was arrested, did

4   Dr. Geraci hold any type of meeting with the jail medical

5   unit to discuss what about had happened?

6        Answer:  I don't recall.

7        Do you recall being asked that question and

8   giving that answer?

9   A.   Yes, I do.

10  Q.   So at your deposition three weeks ago, you couldn't

11  remember any meeting that was held in the jail medical

12  unit after Mr. Feinberg's arrest.

13       Correct?

14  A.   Correct.

15  Q.   And now is it your testimony to this jury that there

16  was, in fact, some type of meeting held?

17  A.   Subsequent to his arrest.

18       Yes.

19  Q.   So your memory improved from the time you gave your

20  deposition three weeks ago.

21       Is that correct?

22  A.   I have been thinking about it over the last however

23  long a time it's been since the deposition.

24       Yes.

25  Q.   When, exactly, was that meeting held?

Kaufman - Direct/Norinsberg

381

1   A.   That, I don't recall.

2   Q.   What, exactly, was discussed at that meeting?

3   A.   To the best of my recollection, just acknowledging

4   the arrest, and no other -- and I don't recall the

5   details.

6   Q.   Well, were there any questions asked during the

7   meeting about how this type of thing could have happened

8   in the jail medical unit?

9   A.   Not to my knowledge.

10  Q.   Did Dr. Geraci circulate any type of memo after the

11  arrest talking about what had happened and what could be

12  done in the future to prevent this type of thing?

13  A.   Not to my knowledge.

14  Q.   Now, I'd like to go back to when you were first

15  informed about Ms. Kennedy's allegations by Sara

16  Velasquez.

17       After that conversation you prepared some

18  personal notes.

19       Is that correct?

20  A.   Yes.

21  Q.   I'd like to show you what has been marked as

22  Plaintiff Exhibit 30 A for identification.

23       THE COURT:  That's 3-8?

24       MR. NORINSBERG:  3-0-A.

25       THE COURT:  30 A?

Kaufman - Direct/Norinsberg

382

1        MR. NORINSBERG:  Yes.

2        30 A and there's going to be a 30 B.

3   BY MR. NORINSBERG:

4   Q.   Can you please take a look at that, sir.

5   A.   Yes.

6        (Whereupon, there was a pause in the

7   proceedings.)

8

9   BY MR. NORINSBERG:

10  Q.   Do you recognize that document?

11  A.   Yes, I do.

12  Q.   You typed those notes yourself?

13  A.   Yes, I did.

14  Q.   Is your signature on that page?

15  A.   Yes, it is.

16        MR. NORINSBERG:  I offer 30 A into evidence.

17        THE COURT:  Any objection?

18        MS. FLYNN:  No objection.

19        THE COURT:  Plaintiff Exhibit 30 A, for able, in

20  evidence.

21        (Whereupon, Plaintiff Exhibit 30 A was received

22  in evidence, as of this date.)

23  BY MR. NORINSBERG:

24  Q.   Can you describe to the jury what is the document

25  that you have in front of you?

Kaufman - Direct/Norinsberg

383

1   A.   My personal notes regarding my meeting with Sara

2   Velasquez.

3   Q.   And what was the reason why you wrote these notes,

4   Mr. Kaufman?

5   A.   Well, I wanted to be sure if, you know, if

6   anything -- if there was anything in the future that I had

7   to recall about this, I would be able to recall it.

8   Q.   And these notes are a fair and accurate reflection of

9   the information Ms. Velasquez gave you.

10          Correct?

11  A.   Yes.

12  Q.   As far as you remember, there's nothing that she told

13  you that's not reflected in these notes.

14          Correct?

15  A.   Nothing that Sara told me?

16  Q.   Yes.

17  A.   Correct.

18  Q.   I'd like to read from this document, sir, then I'll

19  ask you a question.

20          It says, quote, she then spoke about an incident

21  with Gary Feinberg, staff PA, but it was difficult to

22  understand as she was crying very hard.  Finally, she

23  explained that he was being so touchy when he examined her

24  arm and that he recommended exercises for her shoulders

25  which he started to demonstrate.

Kaufman - Direct/Norinsberg

384

1          He had her stand up, and he had also stood up.

2    An inmate reported that he went behind her --

3          And he is referring to Mr. Feinberg, correct?

4    A.    Yes.

5    Q.    And her is referring to Ms. Kennedy, correct?

6    A.    Yes.

7    Q.    And told her to bend over the exam table.

8          At which point he continued to touch her in an

9    unspecified manner, and he remained behind her.  She

10   stated that he had an erection and she thought he might

11   have ejaculated while rubbing up against her.

12         She stated that she felt him, quote, so erect

13   and so hot, inmate was crying hysterically during

14   discussion of this incident.

15         Did I read that accurately, sir?

16   A.    Yes, you did.

17   Q.    So that is information that you were given through

18   your drug counselor, Sara Velasquez, correct?

19   A.    Correct.

20   Q.    She spoke to Ms. Kennedy.

21         She provided you with the information, and you

22   recorded it in these notes.

23         Correct?

24   A.    Yes.

25   Q.    And that was done on January 18th of 2006.

**Kaufman - Direct/Norinsberg**

385

 1          Correct?

 2   A.    Correct.

 3   Q.    The same day that Ms. Kennedy spoke to Ms. Velasquez.

 4          Correct?

 5   A.    Correct.

 6   Q.    Then, as you testified earlier, you, yourself, spoke

 7   with Ms. Kennedy.

 8          Correct?

 9   A.    Yes.

10   Q.    And you generated a set of notes related to that

11   interview as well.

12          Correct?

13   A.    Yes.

14   Q.    I'd like to show you what has been marked as 30 B for

15   identification.

16          (Whereupon, there was a pause in the

17   proceedings.)

18

19   BY MR. NORINSBERG:

20   Q.    Do you recognize that document, sir?

21   A.    Yes.

22   Q.    You didn't take notes during the interview with

23   Mrs. Kennedy.

24          Is that correct?

25   A.    During the interview, correct.

386

1   Q.   But afterwards you generated this report.

2            Is that correct?

3   A.   Yes.

4   Q.   And do you recognize the notes in front of you to be

5   the report that you wrote after Linda Kennedy's interview?

6   A.   Yes.

7            These are my personal notes.

8   Q.   And this, again, took place on the same day, January

9   18th.

10           Is that correct?

11  A.   Correct.

12  Q.   And there's a signature line on there at the bottom

13  of this report.

14           Is that correct?

15  A.   Yes.

16  Q.   And your signature is imprinted on there.

17           Correct?

18  A.   Yes.

19  Q.   Now, on 30 A, which goes back to the first interview

20  that Ms. Velasquez covered, you have Dr. Geraci's

21  signature on that, on 30 A.

22           Is that correct?

23  A.   Yes.

24  Q.   So that indicates that that information on 30 A was

25  presented to Dr. Geraci as well.

**Kaufman - Direct/Norinsberg**

387

1            Correct?

2    A.    Yes.

3    Q.    And he actually signed it after reading it.

4            Correct?

5    A.    Yes.

6    Q.    But on 30 B, Dr. Geraci's name is not listed on that

7    note, is it?

8    A.    No.

9    Q.    And you never asked him to sign that note, did you?

10    A.    No.

11            I never asked him.

12    Q.    Now, this note, you were the one who prepared the

13    entire note, is that correct, on 30 B?

14    A.    Yes.

15            MR. NORINSBERG:  I offer 30 B in evidence.

16            THE COURT:  Any objection?

17            MS. FLYNN:  No objection, your Honor.

18            THE COURT:  Plaintiff Exhibit 30 B, for baker,

19    in evidence.

20            (Whereupon, Plaintiff Exhibit 30 B was received

21    in evidence, as of this date.)

22    BY MR. NORINSBERG:

23    Q.    Now, you testified earlier that you were completely

24    neutral as to what had happened in this situation.

25            Correct?

Kaufman - Direct/Norinsberg

388

1    A.   Yes.

2    Q.   You weren't going to take sides, whether

3    Ms. Kennedy's side, or Mr. Feinberg's side.

4         Correct?

5    A.   Correct.

6    Q.   At the bottom of 30 B there are a bunch of bullet

7    points listed.

8         Correct?

9    A.   Yes.

10   Q.   And those bullet points represent what you consider

11   to be inconsistencies in Ms. Kennedy's account.

12        Is that correct?

13   A.   Differences, yes, in the two accounts.

14   Q.   So differences as to what was told to Ms. Velasquez

15   and what was told to you.

16        Is that correct?

17   A.   Differences between what was told to me and what was

18   reported to me by Ms. Velasquez.

19        Yes.

20   Q.   And you thought it was important to document these

21   inconsistencies in your report.

22        Correct?

23   A.   Yes.

24   Q.   Now, did you take into account that Ms. Kennedy was

25   crying hysterically in the first interview with

Kaufman - Direct/Norinsberg

389

1    Ms. Velasquez?

2            MS. FLYNN:  Objection.

3            THE COURT:  Overruled.

4    A.   I don't understand what you mean by take into

5    account.

6    Q.   When you highlighted the differences between what she

7    told Ms. Velasquez and what you were told by her, did you

8    consider the fact that she was crying hysterically during

9    the interview with Ms. Velasquez?

10   A.   No.

11           I was just taking -- I was just writing down

12   what I recognized as the differences between the two

13   reports.

14   Q.   Did you consider that she was crying very hard during

15   your interview?

16   A.   I'm not sure I understand what you mean by did I

17   consider.

18   Q.   When you decided to list the differences in the two

19   accounts, did you consider the fact that she was extremely

20   upset when she was giving both accounts?

21           MS. FLYNN:  Objection.

22           THE COURT:  Sustained.

23   BY MR. NORINSBERG:

24   Q.   Did you ever discuss these inconsistencies that you

25   noted with Dr. Geraci?

## Kaufman - Direct/Norinsberg

390

1    A.   I don't believe I ever discussed them specifically

2    with him.

3    Q.   And even after you wrote this report, you still

4    hadn't formed any opinion as to whether or not

5    Ms. Kennedy's account was credible.

6             Is that correct?

7    A.   Yes.

8    Q.   Now, on this report you also note in the middle,

9    quote, additionally, inmate states that she filed a formal

10   grievance with the floor sergeant on Saturday, January

11   14th, '06.

12            Do you see that, sir?

13   A.   Yes.

14   Q.   So you were aware from your interview with

15   Ms. Kennedy that she told you that she filed a formal

16   grievance.

17            Correct?

18   A.   Yes.

19   Q.   And she told you who she filed the formal grievance

20   with.

21            Correct?

22   A.   Yes.

23   Q.   She told you it was the floor sergeant.

24            Correct?

25   A.   Correct.

Kaufman - Direct/Norinsberg

391

1  Q.   And you could have found out who that floor sergeant

2  was in a matter of minutes.

3       Correct?

4  A.   I have no idea how long it would take to find out who

5  the floor sergeant was.

6  Q.   Did you ever try to find out who the floor sergeant

7  was?

8  A.   No.

9  Q.   To your knowledge, did Dr. Geraci ever try to find

10  out who the floor sergeant was?

11  A.   I have no knowledge of that.

12  Q.   Now, you testified earlier about the meeting that you

13  had had on January 20th with Dr. Geraci, Ms. Kugler and

14  Ms. Manderino?

15  A.   Yes.

16  Q.   You also made notes following that meeting as well.

17       Is that correct?

18  A.   Yes.

19  Q.   And what was the purpose of making notes following

20  that meeting that you had?

21  A.   So that I would have an accurate recollection of what

22  took place.

23  Q.   I'd like to show you what has been marked as

24  Plaintiff Exhibit 31 for identification and ask you to

25  please take a look.

Kaufman - Direct/Norinsberg

392

1    A.    Okay.

2          (Whereupon, there was a pause in the

3    proceedings.)

4

5    BY MR. NORINSBERG:

6    Q.    Did you prepare these notes, sir?

7    A.    Yes.

8    Q.    That's your handwriting, correct?

9    A.    Correct.

10         MR. NORINSBERG:  I offer Plaintiff Exhibit 31

11   into evidence.

12         THE COURT:  Any objection?

13         MS. FLYNN:  No objection, your Honor.

14         THE COURT:  Plaintiff Exhibit 31 in evidence.

15         (Whereupon, Plaintiff Exhibit 31 was received in

16   evidence, as of this date.)

17   BY MR. NORINSBERG:

18   Q.    Now, directing your attention to the top left-hand

19   margin of this document, do you see that, sir, where it

20   says date?

21   A.    Yes.

22   Q.    And then it says 1/20/06, and then there's a question

23   mark.

24         Correct?

25   A.    Yes.

Kaufman - Direct/Norinsberg

393

1    Q.    You wrote that question mark there, correct?

2    A.    Yes.

3    Q.    And the reason you put a question mark was because

4    you weren't sure what date this conversation actually took

5    place.

6          Correct?

7    A.    Yes.

8    Q.    When, exactly, did you prepare Plaintiff Exhibit 31?

9    A.    I wrote this on the 24th of -- January 24th, 2006.

10   Q.    So the meeting took place on January 20th, but you

11   waited until January 24th to make this entry.

12         Is that correct?

13   A.    Yes.

14   Q.    Why did you wait four days before making notes about

15   the meeting that took place on January 20th?

16   A.    I have no idea.

17   Q.    In this note you wrote, quote, met with Nancy, Carol,

18   and Dr. Geraci to discuss allegations brought forth by

19   Lowrita Rickenbacker, end quote.

20         Do you see that, sir?

21   A.    Yes.

22   Q.    So the purpose of the meeting was to discuss the

23   allegations made by Ms. Rickenbacker.

24         Correct?

25   A.    Correct.

**Kaufman - Direct/Norinsberg**

394

1    Q.    And these allegations were similar to those that had

2    been made by Ms. Kennedy.

3          Correct?

4    A.    Yes.

5    Q.    And, in fact, you noted that in your notes.

6          Correct?

7    A.    Yes, I did.

8    Q.    You also noted in this entry that, quote, now the

9    inmate feels scorned and wants to bring the issue to the

10   forefront, end quote.

11         Do you see that, sir?

12   A.    Yes, I do.

13   Q.    When you say the inmate, are you referring to

14   Ms. Rickenbacker?

15   A.    Yes.

16   Q.    Who told you that Ms. Rickenbacker feels scorned?

17   A.    Carol Manderino.

18   Q.    And after Ms. Manderino told you this, did you reach

19   the impression that Ms. Rickenbacker was in some way

20   scorned?

21         Did you believe that?

22         MS. FLYNN:  Objection.

23         THE COURT:  Sustained.

24   BY MR. NORINSBERG:

25   Q.    You also wrote down there that as of January 20th,

Kaufman - Direct/Norinsberg

395

1    Ms. Rickenbacker wanted to, quote, bring the issue to the

2    forefront, end quote.

3              Is that correct?

4    A.   Yes.

5              I wrote that.

6    Q.   And did Ms. Manderino tell you that as well?

7    A.   Yes.

8    Q.   Now, referring to the same page, you described the

9    meeting that you had after with Mr. Feinberg.

10             Is that correct?

11   A.   Yes.

12   Q.   So first you have the meeting with the four of you,

13   and then afterwards you have a meeting with you,

14   Dr. Geraci and Mr. Feinberg.

15             Correct?

16   A.   Yes.

17   Q.   The same day, January 20th.

18             Correct?

19   A.   Yes.

20   Q.   And then in your notation about the second meeting on

21   January 20th, you wrote, quote, Lowrita was not mentioned

22   at this point, end quote.

23             Is that correct, sir?

24   A.   Yes.

25             (Continued on next page.)

Kaufman  -  Direct/Norinsberg

396

1  BY MR. NORINSBERG:

2  Q.   So even though during the first meeting you

3  understood that Ms. Rickenbacker wanted to bring the issue

4  to the forefront, you didn't mention this when you were

5  having a meeting with Mr. Feinberg, correct?

6  A.   Yes.

7  Q.   And you never mentioned any allegation of

8  Ms. Rickenbacker to Mr. Feinberg, correct?

9  A.   Yes.

10  Q.   Now, after that January 20 meeting, was there any

11  discussion as to what needed to be done to bring this

12  issue to the forefront?

13  A.   Ms. Rickenbacker?

14  Q.   Yes.

15  A.   Not to my recollection.

16  Q.   Was there any decision made as to what needed to be

17  done to handle this situation with Mr. Feinberg?

18  A.   Could you rephrase that please for me.

19  Q.   Was there any decision reached after this meeting

20  with the four of you as to what needed to be done to

21  handle the situation with Mr. Feinberg?

22  A.   Yes.

23       At some point after that meeting there was

24  conversation about what needed to be done, yes.

25  Q.   But there's nothing about that in your notes, is

Kaufman  -  Direct/Norinsberg

397

1    there, sir?

2    A.    No.

3    Q.    Is there any mention in your notes about the plan of

4    action that you agreed upon in that meeting?

5    A.    I didn't say we agreed upon a plan of action in that

6    meeting.

7    Q.    Well, you wrote your notes four days later, didn't

8    you?

9    A.    Yes.

10   Q.    So during that four day period did the four of you

11   reach any type of conclusions as to what you were going to

12   do with regard to the Gary Feinberg situation?

13            MS. FLYNN:  Objection.

14            THE COURT:  Overruled.

15   A.    I don't make policy and, therefore, I don't decide on

16   issues like that.

17   BY MR. NORINSBERG:

18   Q.    To your knowledge, was any decision ever made with

19   respect to what was going to be done regarding

20   Gary Feinberg?

21   A.    A decision, yes, was made about what was going to be

22   done with Gary Feinberg.

23   Q.    Who made that decision?

24   A.    I guess the sheriff.

25   Q.    That was February 8th, is that what you're referring

1    to, when he was arrested?

2    A.    When he was arrested.

3    Q.    Well, I'm referring to the four people in the meeting

4    in the jail medical review.  The meeting is held on

5    January 20.  You write the note on January 24th.

6          Was there any other time before Mr. Feinberg's

7    arrest that you learned of any plan of action as to how

8    you were going to handle this situation with Mr. Feinberg?

9    A.    I was not involved in any plan of action regarding

10   what was going to be done with Mr. Feinberg.

11   Q.    And Dr. Geraci never told you about any plan of

12   action as to what was going to be done with Mr. Feinberg,

13   correct?

14   A.    Correct.

15   Q.    Did you ever ask Dr. Geraci, say, you know what's

16   going on, what are we going to do here about this

17   situation, did you ever ask him that?

18   A.    No, I did not.

19   Q.    As far as you're concerned you really weren't

20   responsible for that issue, correct?

21   A.    The medical staff does not answer to me.  That's

22   correct.

23   Q.    So you didn't consider this to be your responsibility

24   to find out what was going to happen with Mr. Feinberg,

25   correct?

Kaufman  -  Direct/Norinsberg

399

1   A.   Correct.

2   Q.   Now, were you aware that at the same time this

3   meeting was taking place on January 20, 2006, that

4   internal affairs had already opened an investigation into

5   Mr. Feinberg?

6   A.   No.

7   Q.   Did anybody from internal affairs ever contact you

8   regarding your knowledge of these allegations?

9   A.   No.

10  Q.   Were you ever interviewed by anybody from internal

11  affairs regarding Mr. Feinberg at any time?

12  A.   No.

13  Q.   To your knowledge did internal affairs interview

14  anybody from the jail medical unit during their

15  investigation?

16  A.   I don't really know.

17  Q.   Were you ever interviewed by anybody from CIB?

18  A.   No.

19  Q.   What is CIB, Mr. Kaufman?

20  A.   I believe it's the criminal investigation bureau.

21  Q.   To your knowledge, did CIB ever interview anyone from

22  the jail medical unit?

23  A.   I don't know for sure.

24  Q.   Now, at some point after Mr. Feinberg's arrest, you

25  learned that at least one other inmate had made similar

Kaufman - Direct/Norinsberg

400

1    allegations, correct?

2              MS. FLYNN:  Objection.

3              THE COURT:  I'm sorry, I didn't hear your

4    question.

5    BY MR. NORINSBERG:

6    Q.    You learned that at least one other inmate had made

7    allegations after Mr. Feinberg's arrest, correct?

8              MS. FLYNN:  Objection.

9              THE COURT:  Overruled.

10   A.    Yes.

11   Q.    As you sit here today, you have no idea how many

12   inmates made complaints, correct?

13             MS. FLYNN:  Objection.

14             THE COURT:  Overruled.

15   A.    Yes, correct, I actually don't know how many made

16   allegations.

17   Q.    You have no idea, correct?

18   A.    That's correct.

19             MR. NORINSBERG:  Thank you.

20             Nothing further.

21             THE COURT:  Cross-examination.

22

23   CROSS-EXAMINATION

24   BY MS. FLYNN:

25   Q.    Good afternoon.

Kaufman  -  Cross/Flynn

401

1   A.   Hi.

2   Q.   Do you know who Rochelle Ramos is?

3        THE COURT:  I'm sorry?

4   BY MS. FLYNN:

5   Q.   Do you know who Rochelle Ramos is?

6   A.   Not outside of the scope of this case.

7   Q.   Had you ever met her?

8   A.   No.

9   Q.   If she was here in court today would you recognize

10  her?

11  A.   No.

12  Q.   Are you aware that she alleges that the incident that

13  occurred between her and Gary Feinberg occurred on

14  December 29, 2005?

15  A.   No.

16  Q.   Is it fair to say that prior to December 29, 2005,

17  you had never heard of any allegations of misconduct being

18  made against Gary Feinberg?

19  A.   Yes.

20  Q.   Can you tell the jury again what your position is at

21  the jail?

22  A.   I'm a clinical coordinator.

23       I'm responsible for the substance abuse

24  treatment staff at Riverhead and Yaphank.

25       THE COURT:  I'm sorry, you're responsible for

Kaufman  -  Cross/Flynn

402

1   what?

2            THE WITNESS:  Substance abuse treatment staff.

3   BY MS. FLYNN:

4   Q.   And back in 2005 how many -- how much staff were you

5   supervising?

6   A.   Four drug counselors.

7   Q.   Who was your direct supervisor?

8   A.   Dr. Geraci.

9   Q.   And you're employed by the department of health?

10  A.   Suffolk County Department of Health Services, yes.

11  Q.   When did you start working for the County of Suffolk?

12  A.   My anniversary date is January 1, 1979.

13  Q.   And can you just tell the jury what positions you've

14  held during your employment with the County?

15  A.   I initially started out as a substance abuse

16  treatment counselor.  Then I was promoted to clinic

17  manager, then clinic coordinator in the methadone program,

18  and then transferred to the clinical coordinator of the

19  intake unit.

20  Q.   How long have you been working at the jail?

21  A.   Since January -- at the jail since May of 2004.

22  Q.   Could you tell the jury a little bit about your

23  educational background?

24  A.   I have a Bachelor's Degree in psychology, I have a

25  Master's Degree in community mental health, and I'm a

Kaufman  -  Cross/Flynn

403

1    credentialed alcohol and substance abuse counselor and New

2    York State licensed mental health counselor.

3    Q.    In addition to your employment at the jail, do you

4    have any other employment?

5    A.    I have a private therapy practice, psychotherapy.

6    Q.    You were asked about whether Linda Kennedy was crying

7    when you were speaking to her.

8          Did the fact that she was crying have anything

9    to do with your evaluation of her credibility?

10   A.    No.

11   Q.    When you were speaking to inmate Kennedy about her

12   allegations, did you have any idea about whether what she

13   was saying was true or not true?

14   A.    No.

15   Q.    In your experience working at the jail, have there

16   been instances where inmates have told you things that you

17   have later found out are not true?

18         MR. NORINSBERG:  Objection.

19         THE COURT:  Overruled.  I'll allow it.

20   A.    Yes.

21   Q.    Plaintiff's attorney was asking you about the meeting

22   that you had with Carol Manderino, Nancy Kugler and

23   Dr. Geraci.

24         You don't remember specifically what was said at

25   that meeting?

Kaufman - Cross/Flynn

404

1   A.   Correct.

2   Q.   And just to be clear, this meeting took place about

3   three years ago?

4   A.   Correct.

5   Q.   But you do remember generally what was discussed at

6   that meeting?

7   A.   Yes.

8   Q.   And as a matter of fact you made a record of that

9   meeting?

10  A.   Yes.

11  Q.   When you and Dr. Geraci met with Gary Feinberg on or

12  about January 20, your note indicated that Lowrita

13  Rickenbacker was not discussed at that point?

14  A.   Correct.

15  Q.   Do you know if Dr. Geraci had a separate meeting with

16  Gary Feinberg?

17  A.   I have no direct knowledge of that.

18  Q.   And were you in any way back in January of 2006,

19  Mr. Feinberg's supervisor?

20  A.   No.

21  Q.   So when you were in this meeting with Dr. Geraci and

22  Mr. Feinberg, Mr. Feinberg's supervisor was there who was

23  Dr. Geraci?

24  A.   Correct.

25  Q.   By the way, your job at the jail, what services do

Kaufman - Cross/Flynn

405

1    you provide to the inmates?

2    A.   At this point in time I don't provide a direct

3    service to the inmates.

4         I supervise the alcohol and substance abuse

5    treatment staff and I help Dr. Geraci for any projects

6    that he might need some help on.

7    Q.   And your counselors are involved in counseling the

8    inmates?

9    A.   Correct.

10   Q.   Are you in any way involved with maintaining the

11   security of the jail?

12   A.   No.

13   Q.   Plaintiff's counsel asked you before whether there

14   are any specific rules at the jail regarding what steps

15   you're to take when someone makes an allegation to you

16   that there's been sexual abuse or sexual contact by a

17   staff member on an inmate, and I believe you answered no?

18   A.   Correct.

19   Q.   Are there rules at the jail about what you are to do

20   if you're made aware of this conduct by a staff member?

21   A.   Yes.

22   Q.   And what do those rules say?

23   A.   You go and tell your supervisor as quickly as

24   possible what's going on.

25   Q.   And what you were told the allegations were being

Kaufman  -  Cross/Flynn

1  made by inmate Kennedy, you felt those were allegations of

2  misconduct?

3  A.    Correct.

4  Q.    And you told your supervisor?

5  A.    Correct.

6  Q.    Is it part of your job responsibilities at the jail

7  to go and see if internal affairs has started an

8  investigation?

9  A.    No.

10  Q.    Is it part of your job to question your supervisor as

11  to what they have done with information that you've given

12  to them?

13  A.    No.

14  Q.    On February 8th, 2006, there was an indication that

15  Nancy Kugler came to you and told you of another inmate

16  that was making allegations and you told her to go to

17  internal security?

18  A.    Correct.

19  Q.    Did you know on February 8th, 2006, that

20  Gary Feinberg had already been arrested -- I'm sorry.  Let

21  me withdraw that question.

22          The notes indicate that on February 9th Nancy

23  Kugler said to you that there was another inmate who was

24  making a complaint?

25  A.    Yes.

Kaufman  -  Cross/Flynn

407

1    Q.   Were you aware that Gary Feinberg was arrested on

2    February 8th, the day before?

3    A.   Yes.

4    Q.   The issue of the grievance that inmate Kennedy said

5    that she filed, do you know if she filed that grievance or

6    not?

7    A.   No.

8    Q.   Is it part of your job to investigate whether or not

9    she had filed a grievance?

10   A.   No.

11   Q.   Plaintiff's counsel asked you to look at what's been

12   marked exhibit 30 A which are your notes from January 18,

13   2006.

14            He pointed out to you that on the bottom of that

15   Dr. Geraci had signed that document?

16   A.   Yes.

17   Q.   And this document are your notes regarding the

18   meeting between yourself, Sara Velasquez and Dr. Geraci?

19   A.   Yes.

20   Q.   So Dr. Geraci was at the meeting and you had him sign

21   those notes?

22   A.   Correct.

23   Q.   But then plaintiff's counsel questioned you about

24   exhibit 30 B and asked you why Dr. Geraci had not signed

25   that document?

Kaufman   -   Cross/Flynn

408

1    A.    Correct.

2    Q.    And that document is your notes from your interview

3    or your discussion with inmate Kennedy and Sara Velasquez?

4    A.    Correct.

5    Q.    And Dr. Geraci wasn't there?

6    A.    Correct.

7    Q.    Going back to 30 B which are the notes not signed by

8    the doctor, I want to read you something you wrote in here

9    about what Linda Kennedy told you.

10            As an afterthought the inmate noted that while

11   waiting to see the clinician, another inmate, number

12   199889, stated that PA Feinberg could be very

13   touchy-feely.

14            Do you see that?

15   A.    Yes.

16   Q.    Did you ever learn who the other inmate was?

17   A.    Yes.

18   Q.    That was having a conversation with Linda Kennedy on

19   that day?

20   A.    Yes.

21   Q.    Who was that?

22   A.    Lowrita Rickenbacker.

23   Q.    In terms of the chain of command for yourself,

24   Mr. Kaufman, your immediate supervisor is Dr. Geraci?

25   A.    Correct.

Kaufman  -  Cross/Flynn

409

1   Q.   And that is going back to 2005-2006.

2        Who was his supervisor?

3   A.   Doctor Iftikhar.

4   Q.   Who was her supervisor?

5   A.   She would answer to the deputy commissioner.

6   Q.   Who would the deputy commissioner answer to?

7   A.   To the chief deputy commissioner.

8   Q.   Who would the chief deputy commissioner answer to?

9   A.   To the commissioner.

10  Q.   Does the commissioner make the policy for the

11  Department of Health?

12  A.   Yes.

13  Q.   Do you make the policy for the department of health?

14  A.   No.

15  Q.   Do you make the policy for the jail medical unit?

16  A.   No.

17  Q.   Can you give the jury an example of the limitation of

18  your ability to influence policy at the medical unit?

19       MR. NORINSBERG:  Objection.

20       THE COURT:  Overruled.

21  A.   Yes.

22       For example, there's a general policy about the

23  way professionals are supposed to dress when they come to

24  work in the jail medical unit.

25       And generally speaking it's clean, professional

Kaufman  -  Cross/Flynn

410

1    attire, no T-shirts.

2            It's not within my scope to decide what a

3    T-shirt is or is not.

4            So is a T-shirt just a plain ordinary colored

5    shirt or something with rips.

6            If that comes up as an issue, I have to go to my

7    supervisor with it who goes to his who goes to their's and

8    up the ladder until it's decided by the commissioner I

9    supposed.

10   Q.   Do you have the power to hire and fire employees?

11   A.   No.

12   Q.   How about suspend employees?

13   A.   No.

14           MS. FLYNN:  Thank you.

15           I have no further questions.

16

17   REDIRECT EXAMINATION

18   BY MR. NORINSBERG:

19   Q.   You just testified a moment ago that it's not within

20   your power to decide what is a T-shirt and what's not a

21   T-shirt; is that correct?

22   A.   Correct.

23   Q.   It was within your power to actually decide to

24   interview inmate Kennedy; is that correct?

25   A.   Yes.

Kaufman  -  Redirect/Norinsberg

411

1   Q.   You took that role upon yourself, correct?

2   A.   Yes.

3   Q.   No one asked you to do that, correct?

4   A.   Correct.

5   Q.   And Mr. Feinberg didn't work directly under you,

6   correct?

7   A.   Did not answer to me at all.

8   Q.   But you still felt it was important to find out what

9   Ms. Kennedy had to say, correct?

10  A.   Yes.

11  Q.   And, yet, once you found that information out, you

12  didn't report it to anybody in the jail except Dr. Geraci,

13  correct?

14  A.   That's correct.

15  Q.   And you said at some point you learned that the other

16  inmate that Ms. Kennedy was referring to was Lowrita

17  Rickenbacker?

18  A.   Yes.

19  Q.   And at would point in time did you learn that,

20  Mr. Kaufman?

21  A.   I don't remember exactly.  Sometime after the fact.

22  Q.   Well, we're in 2009 now.

23       Did you learn it at some point in 2006?

24  A.   I can't speculate as to when I learned it.

25  Q.   Did you learn it in some point in 2007-2008?

Kaufman  -  Redirect/Norinsberg

412

1   A.   I learned it at some point after that meeting.

2   Q.   When did -- who actually gave you that information,

3   sir?

4   A.   I don't know.

5   Q.   Well, the inmate's only identified by a number; is

6   that correct?

7   A.   The inmates in the medical unit are down by their

8   name.

9   Q.   In the report you have the other inmate is identified

10  by number, correct?

11  A.   Correct.

12  Q.   How did you make the determination that the person

13  with that number is Lowrita Rickenbacker?

14  A.   I made the determination that the person with the

15  name Lowrita Rickenbacker was that number.

16  Q.   And how did you make that determination, sir?

17  A.   Once I got the name, I wrote down the number.

18  Q.   And when did you do that?

19  A.   At some point after the meeting and prior to writing

20  this I suppose.

21  Q.   That's not in your note that you wrote on January

22  24th, is it?

23  A.   What exactly is it that's not in my note?

24  Q.   That you identified the other inmate that was

25  referenced by Ms. Kennedy as being Lowrita Rickenbacker?

Kaufman  -  Redirect/Norinsberg

413

1   A.   In my note of January 24th?

2   Q.   Yes.

3   A.   At the bottom of the note I mentioned her name.

4   Q.   But you were directly informed about Lowrita

5   Rickenbacker during that meeting on January 20, correct?

6   A.   I'm getting very confused.

7   Q.   You knew Lowrita Rickenbacker's name from the

8   meeting, correct?

9   A.   Which meeting?

10  Q.   On January 20, with the four of you?

11  A.   Yes.

12  Q.   My question is:

13          When did you connect the name with that

14  particular pin number, the number that's in there?

15  A.   I can't tell you specifically when I did that.

16  Q.   Would it be fairly --

17  A.   When I got the name, I probably looked up the number

18  so that I could write it in the note without identifying

19  the name at this point.

20  Q.   But you never mentioned that in your note, did you?

21  A.   I guess not, no.

22  Q.   In fact, today is the first time you ever made that

23  statement; isn't it, sir?

24          MS. FLYNN:  Objection.

25          THE COURT:  Sustained.

Kaufman  -  Redirect/Norinsberg

414

1   BY MR. NORINSBERG:

2   Q.    Now, you testified earlier regarding your knowledge

3   or lack of knowledge of Rochelle Ramos; is that correct?

4   A.    Yes.

5   Q.    Before coming here today, had you ever heard the name

6   Rochelle Ramos?

7   A.    Yes.

8   Q.    And when did you first hear Ms. Ramos's name?

9   A.    I guess prior to the deposition.

10  Q.    That was just a few weeks ago, correct, sir?

11  A.    Yes.

12  Q.    So from the time that the incident took place in

13  December of 2005, until your deposition in October 2009,

14  you had never once heard the name Rochelle Ramos, correct?

15  A.    Not to my recollection.

16          MR. NORINSBERG:  Thank you.

17          I have nothing further.

18          MS. FLYNN:  Nothing further, Judge.

19          THE COURT:  You may step down.

20          (The witness steps down.)

21          THE COURT:  Please call your next witness.

22          MR. NORINSBERG:  At this time plaintiff calls

23  Carol Manderino.

24          THE COURT:  Please remain standing.  Put down

25  your pocketbook.  Raise you right hand.

Mandarino  -  Direct/Norinsberg

415

1

2     CAROL MANDERINO,

3                 called as a witness, having been first

4                 duly sworn, was examined and testified

5                 as follows:

6

7                 THE COURT:  Please be seated.

8                 Please state your full name and spell your name

9     slowly for the record.

10                THE WITNESS:  Carol E. Manderino,

11    M-A-N-D-A-R-I-N-O.

12                THE COURT:  How do you spell your first name?

13                THE WITNESS:  C-A-R-O-L.

14                THE COURT:  You may proceed.

15                MR. NORINSBERG:  Thank you, your Honor.

16

17    DIRECT EXAMINATION

18    BY MR. NORINSBERG:

19    Q.   Good afternoon, Ms. Manderino.

20    A.   Good afternoon.

21    Q.   Are you currently employed?

22    A.   Yes.

23    Q.   Where are you employed?

24    A.   Suffolk County Health Services in Riverhead

25    Correctional facility.

Mandarino  -  Direct/Norinsberg

416

1  Q.    What is your position there?

2  A.    Psychiatric social worker.

3  Q.    Could you tell the jury what are your duties and

4  responsibilities?

5  A.    To counsel, crisis intervention, the inmates as they

6  come in and get them along while they're incarcerated and

7  suicidal ideation and that's it.

8  Q.    How long have you been so employed?

9  A.    Since June 2000.

10  Q.    Are you what's referred to as a psychiatric social

11  worker?

12  A.    Could you repeat that?

13  Q.    A psychiatric social worker?

14  A.    Yes.

15  Q.    How is that different from a social worker?

16  A.    Well, I'm technically a licensed clinical social

17  worker.

18        I'm also certified in substance abuse and

19  alcohol counseling.

20  Q.    Now, did there come a time when a patient named

21  Lowrita Rickenbacker came under your care and treatment?

22  A.    Yes.

23  Q.    When did Ms. Rickenbacker first come under your care

24  and treatment?

25  A.    March of '05.

417

1   Q.   Were you her therapist at the Suffolk County

2   correctional facility?

3   A.   Yes.

4           THE COURT:  Were you what?

5           MR. NORINSBERG:  Her therapist.

6   BY MR. NORINSBERG:

7   Q.   How often would you be meeting with Ms. Rickenbacker?

8   A.   Approximately one time a week.

9   Q.   And did your treatment continue for the better part

10  of the year 2005?

11  A.   Well, she was released in April and then

12  re-incarcerated in June of '05.

13  Q.   So there was a gap in between and then you resumed

14  the treatment in June '05?

15  A.   Yes.

16  Q.   Would it be fair to say, Ms. Manderino, from the time

17  you resumed treatment of Ms. Rickenbacker in June of '05,

18  that you continuously treated her throughout the rest of

19  the year 2005?

20  A.   Correct.

21  Q.   And, in fact, you continued to treat her at least

22  through January and February of 2006, correct?

23  A.   Yes.

24  Q.   Now, directing your attention to June 13, 2005, at

25  that time, Ms. Rickenbacker told you that she engaged in

418

1    consensual physical contact with a medical staff member,

2    correct?

3    A.    Correct.

4    Q.    That was the first time that you had heard this

5    particular allegation, correct?

6    A.    Correct.

7    Q.    And as soon as you heard this allegation, you

8    reported it to your supervisor, correct?

9    A.    Correct.

10   Q.    Because you thought this was important information

11   that your supervisor needed to know, correct?

12   A.    Yes.

13   Q.    It's not everyday that an inmate reports sexual

14   contact with a staff member, correct?

15   A.    Yes.

16   Q.    And your supervisor at that time was Nancy Kugler,

17   correct?

18   A.    Correct.

19         THE COURT:  I'm sorry, you said she reported

20   this consensual sexual activity with whom?  Who did she

21   say she had it with?

22         THE WITNESS:  Gary Feinberg.

23   BY MR. NORINSBERG:

24   Q.    So she identified Mr. Feinberg, correct?

25   A.    Yes, she did.

**Mandarino  -  Direct/Norinsberg**

419

1    Q.    So would it be fair to say that as of June 13, 2005,

2    there were at least two people in the jail medical unit

3    who knew about the allegations of Ms. Rickenbacker, you

4    and Ms. Kugler, correct?

5    A.    Correct.

6    Q.    And as of June 13, 2005, both of you knew that these

7    allegations concerned a staff member in the jail medical

8    unit, correct?

9    A.    Correct.

10   Q.    And you knew that that staff member's name was

11   Gary Feinberg, correct?

12   A.    Yes.

13         Can I add anything?  Excuse me.  Can I add

14   anything to that?

15   Q.    I'm sure you'll have plenty of opportunity to do that

16   when Ms. Flynn questions you.

17         In November 2005 Ms. Rickenbacker, once again,

18   told you about the sexual contact between Mr. Feinberg and

19   herself; is that correct?

20   A.    Correct.

21   Q.    And you made a note about that conversation as well;

22   is that correct?

23   A.    Yes.

24   Q.    And you reported to your supervisor, Nancy Kugler, as

25   well, correct?

Mandarino  -  Direct/Norinsberg

420

1   A.   Correct.

2   Q.   And on January 20, 2006, Ms. Rickenbacker complained

3   again to you about sexual contact between herself and

4   Mr. Feinberg, correct?

5   A.   I don't remember the exact date.

6   Q.   I would like to show you what's been marked as

7   Plaintiff's 3 for identification.

8              (Exhibit handed.)

9   A.   Yes.

10  Q.   Do you recognize that document, Ms. Manderino?

11  A.   Yes.

12  Q.   What do you recognize that document to be?

13  A.   A progress note that I had written after I seen

14  Lowrita.

15  Q.   Did you prepare that note on or about January 20,

16  2006?

17  A.   On January 20.

18  Q.   It was exactly on January 20, correct?

19  A.   Correct.

20  Q.   And you prepared that note and you wrote the note

21  yourself; is that correct?

22  A.   Correct.

23             MR. NORINSBERG:  I offer Plaintiff's 3 into

24  evidence.

25             THE COURT:  Any objection?

Mandarino  -  Direct/Norinsberg

421

1          MS. FLYNN:  No objection.

2          THE COURT:  Plaintiff's Exhibit 3 in evidence.

3          (Plaintiff's Exhibit 3 in evidence.)

4    BY MR. NORINSBERG:

5    Q.   Now, directing your attention, Ms. Manderino, to the

6    bottom of that entry.  It says:

7          "Inmate claims that she has been abused sexually

8    for years."

9          Do you see that?

10   A.   Yes.

11   Q.   Then it says:

12         "She also claims there has been inappropriate

13   sexual touching in medical department."

14         Do you see that?

15   A.   Yes.

16   Q.   Did I read that correctly?

17   A.   Yes.

18   Q.   So on January 20, Ms. Rickenbacker told you that

19   there had been inappropriate sexual touching in the

20   medical department, correct?

21   A.   Yes.

22   Q.   You wouldn't consider that to be consensual, would

23   you?

24   A.   She told me it was consensual.

25   Q.   But the way you wrote your note, you said it was

Mandarino  -  Direct/Norinsberg

422

1    inappropriate sexual touching, correct?

2    A.   Yes, but that's open to interpretation.

3    Q.   But the words you used when you described this entry

4    were inappropriate sexual touching in the medical

5    department, correct?

6    A.   Yes.

7    Q.   You didn't say anything about a consensual

8    relationship in this note, did you?

9    A.   Not in this note, no.

10   Q.   Now, Ms. Rickenbacker told you this again the

11   following week on January 25th, correct?

12   A.   I'm not sure.

13   Q.   After Ms. Rickenbacker told you on January 20 that

14   there was, quote, inappropriate sexual touching in medical

15   department, end quote, did you report that to Ms. Kugler?

16   A.   I don't remember.

17   Q.   Well, there's no reference in your note to reporting

18   it to Ms. Kugler, is there?

19   A.   I don't remember.

20   Q.   Did you report that to Dr. Geraci?

21   A.   No.

22   Q.   Now, I would like to show you another document,

23   another progress note.

24             Take a look at Plaintiff's 4 for identification.

25             (Exhibit handed.)

**Mandarino  -  Direct/Norinsberg**

423

1   A.   Yes.

2   Q.   Did you prepare that note, Ms. Manderino?

3   A.   Yes.

4   Q.   Was that a progress note that you prepared based on a

5   counseling session with Ms. Rickenbacker?

6   A.   Yes.

7   Q.   Is that your handwriting?

8   A.   Yes.

9            MR. NORINSBERG:  I offer Plaintiff's 4 into

10   evidence.

11           MS. FLYNN:  No objection.

12           THE COURT:  Any objection?

13           MS. FLYNN:  No objection.

14           THE COURT:  Plaintiff's Exhibit 4 in evidence.

15           Is there a date on that?

16           MR. NORINSBERG:  Yes.

17           THE COURT:  Can I have the date please.

18           THE WITNESS:  January 25th, '05.

19           (Plaintiff's Exhibit 4 in evidence.)

20           THE COURT:  '05?

21           THE WITNESS:  '06.  I'm sorry.

22   BY MR. NORINSBERG:

23   Q.   I would like to read from the entry that you wrote on

24   this date, Ms. Manderino.

25           It says: "Inmate claims she had been touched and

Mandarino  -  Direct/Norinsberg

424

1    fondled numerous times in the medical department by the

2    same worker."

3              Do you see that?

4    A.   Yes.

5    Q.   She also claims she has heard other females on the

6    tier discussing the same sexual experience.

7              Do you see that?

8    A.   Yes.

9    Q.   Now, referring to the part where it says that the

10   inmate claims that she had been touched and fondled

11   numerous times in the medical department, did you

12   understand that to be consensual touching?

13   A.   Yes.

14   Q.   And did you also understand that what

15   Ms. Rickenbacker heard from other females discussing the

16   same sexual contact, that that was consensual also?

17   A.   I can't speak for them.

18   Q.   So if I understand your testimony correctly,

19   Ms. Rickenbacker mentioned Mr. Feinberg in June 2005,

20   mentioned it again in November 2000, mentioned him again

21   on January 20, 2006, and yet again on January 25th, 2006,

22   correct?

23   A.   Correct.

24             But she never really seemed to be bothered by

25   it.  That wasn't her main issue in the session.

425

1    Q.    But she was bothered enough by it to mention it to

2    you?

3    A.    She mentioned it, but she used to laugh about it.

4    Q.    And it was important enough for you to write down in

5    your notes, correct?

6    A.    Correct.

7    Q.    And you say she laughed about it but you took it

8    seriously, didn't you?

9    A.    Well, the first time she told me, yes, I did take it

10   seriously.

11   Q.    When Ms. Rickenbacker told you the second time in

12   November you also took it seriously then, didn't you?

13   A.    Yes, I did.

14         But, again, she always laughed and it didn't

15   bother me.

16         She told me it was consensual.  She begged me in

17   the beginning not to say a word.  She didn't want anybody

18   to know.

19         And the only thing that bothered her was that

20   she heard the other females talking.

21   Q.    You thought it was serious enough that you reported

22   it to your supervisor, didn't you?

23   A.    Yes.

24   Q.    So you didn't take this as a laughing matter.

25         You thought this was something that you needed

426

1    to discuss with your supervisor, correct?

2    A.    Yes.

3    Q.    And when you discussed it with your supervisor, she

4    told you that she was going to bring this issue to

5    Dr. Geraci's attention, correct?

6    A.    Correct.

7    Q.    Did you think that it was a laughing matter at that

8    point?

9                MS. FLYNN:  Objection.

10               THE COURT:  Overruled.

11   A.    Again, it's open to interpretation.

12   Q.    Well, you wrote in your November 23rd note:

13               "She joked about it.  However, she mentions she

14   may obtain legal counsel concerning this matter."

15               Correct?

16   A.    Correct.

17   Q.    You also wrote that she claims she had spoken with

18   security on this matter, correct?

19   A.    Correct.

20   Q.    And then you wrote:  I reported same to my

21   supervisor, Nancy Kugler, correct?

22   A.    Correct.

23   Q.    So regardless of whether Ms. Rickenbacker was

24   laughing at all when she described this, you understood

25   this to be a serious allegation, correct?

427

1    A.    Yes.

2    Q.    It was serious enough that you reported it to your

3    supervisor and your supervisor in turn told you that she

4    was going to report it to Dr. Geraci, correct?

5    A.    Correct.

6    Q.    And at that point in time you didn't say to

7    Ms. Kugler; no, you don't need to report this to

8    Dr. Geraci.  It's just a joke.

9          Did you?

10   A.    I didn't say those words.  I told her it was

11   consensual.

12         I did explain to her that she was joking and

13   laughing about it, that it didn't really bother her in the

14   least.

15   Q.    Is there such a thing in your mind as a consensual

16   sexual relationship between a staff member and an inmate?

17         MS. FLYNN:  Objection.

18         THE COURT:  Overruled.

19   A.    Repeat that.

20   Q.    Is there such a thing in your mind as a consensual

21   sexual relationship between a staff member and an inmate?

22   A.    I'm sorry.  Say that again.

23   Q.    In your mind is it permissible for a staff member to

24   engage in sexual contact with an inmate under any

25   circumstances?

Mandarino  -  Direct/Norinsberg

428

1          MS. FLYNN:  Objection.

2          THE COURT:  That's not -- you changed the

3    question.

4          MR. NORINSBERG:  She didn't understand the

5    question.

6          THE COURT:  Okay.  I'm going to overrule it.

7    You can answer that.

8          Is it permissible?

9          THE WITNESS:  Is it permissible?

10          THE COURT:  Yes.

11   A.   No, but it's not my opinion.  It has nothing to do

12   with my opinion.

13   Q.   Well, you would agree that under no circumstance

14   would it ever been permissible for a member of the medical

15   unit to be having sexual contact of any type with an

16   inmate, correct?

17   A.   Can you say that again.  I'm sorry.

18   Q.   Would you agree that it would never be permissible

19   for a member of the medical unit to have any type of

20   sexual contact with an inmate?

21   A.   Permissible?  No.

22   Q.   It would be a violation of jail rules, wouldn't it?

23   A.   Yes.

24   Q.   So wouldn't that by itself dictate that this type of

25   thing would have to be reported?

1   A.   Yes.

2        And I did.

3   Q.   And, to your knowledge, did Nancy Kugler speak to

4   Dr. Geraci?

5   A.   I don't know.

6   Q.   I would like to read from the same entry which

7   Ms. Kugler identified as her handwriting.

8        It says: 11/23/06.  Above staff member reports

9   above issue to me.  Advised I will take this matter to

10  Dr. Geraci.

11       Do you recall seeing that in your notes?

12  A.   Yes.

13       I expected her to do that, yes.

14  Q.   You expected her to go to Dr. Geraci?

15  A.   Yes.

16  Q.   That's what you thought was going to happen when you

17  mentioned this to her, correct?

18  A.   Right.

19  Q.   That's what she told you was going to happen.

20       Did you ever ask Ms. Kugler whether or not in

21  fact she had reported these allegations?

22  A.   At what time period are you talking about?

23  Q.   Any time after November 23rd, '05, did you ever ask

24  her whether she reported these allegations?

25  A.   I don't recall.

Mandarino  -  Direct/Norinsberg

430

1   Q.   And when Ms. Rickenbacker told you about

2   inappropriate sexual touching going on at the January 20th

3   counseling session, did you ever report that to

4   Ms. Kugler?

5   A.   I don't recall.

6   Q.   When she told you again on the 25th that there was

7   inappropriate sexual contact, did you report that to

8   Ms. Kugler?

9   A.   I don't recall.

10  Q.   Can you think of any reason why you wouldn't have

11  mentioned what Ms. Rickenbacker told you on those two

12  dates to Ms. Kugler?

13  A.   I can't say positively if I did or I didn't.

14        But if I didn't, it wasn't the main problem in

15  that session.

16  Q.   It wasn't the main problem in the session?

17  A.   No.

18  Q.   But it was important enough for you to actually write

19  down in your description of the session, correct?

20  A.   Correct.

21  Q.   If it was not important, then you wouldn't have put

22  it in your notes, correct?

23  A.   Okay, yes.

24  Q.   Now, did there come a time when you had a meeting in

25  January of 2006 with Dr. Geraci, Ms. Kugler and

Mandarino  -  Direct/Norinsberg

431

1    Mr. Kaufman?

2    A.    Yes.

3    Q.    And can you tell us what was discussed during that

4    meeting?

5    A.    What happened with Lowrita Rickenbacker.

6    Q.    What was the purpose of having that meeting?

7    A.    To inform Dr. Geraci and Rick Kaufman what happened.

8    Q.    Why was it important to tell them what had happened?

9    A.    Well, Nancy had brought it to them.

10   Q.    You were present at the meeting too, correct?

11   A.    Correct.

12   Q.    What was your understanding of why it was important

13   to tell the other two staff members about

14   Ms. Rickenbacker's allegations?

15   A.    I don't know.  They wanted to know.

16   Q.    Did you also learn at that time about Linda Kennedy,

17   another inmate making similar allegations?

18   A.    No.

19   Q.    During this January meeting between you, Dr. Geraci

20   and Ms. Kugler and Mr. Kaufman, is it your testimony that

21   the subject of Linda Kennedy never came up?

22   A.    No.

23   Q.    Did you ever learn about Linda Kennedy at some point?

24   A.    I don't recall, no.

25   Q.    Whose idea was it to hold a meeting in January 2006?

Mandarino  -  Direct/Norinsberg

432

1    A.   I don't know.

2    Q.   Now, I would like to direct your attention back to

3    the November 23rd note where it says: "Also claims she had

4    spoken to security."

5              THE COURT:  What are you reading from?

6              THE WITNESS:  I don't have that.

7              MR. NORINSBERG:  Plaintiff's 2.

8              THE COURT:  Plaintiff's 2?

9              MR. NORINSBERG:  Yes.  Do you have Plaintiff's

10   2?

11             THE WITNESS:  No.

12             THE COURT:  Plaintiff's 2 is not in evidence.

13             THE WITNESS:  No, I don't have it.  I only have

14   these two.

15   BY MR. NORINSBERG:

16   Q.   I show you now what's been marked as Plaintiff's 2.

17             MR. NORINSBERG:  I offer it.  That's actually in

18   evidence already, your Honor.

19             THE COURT:  Not according to my unofficial list.

20             MR. NORINSBERG:  Through Ms. Kugler yesterday.

21             THE COURT:  You are correct.  I stand revised.

22   It is in evidence.

23   A.   Okay.

24   Q.   Do you see the part where it says:

25             "Also claims she had spoken to security on this

Mandarino  -  Direct/Norinsberg

433

1    matter."

2            Do you see that?

3    A.    Yes.

4    Q.    So Ms. Rickenbacker told you in November of 2005 that

5    she had previously spoken to security on this matter,

6    correct?

7    A.    She told me that.

8    Q.    And whenever that conversation with security took

9    place, it had to have taken place at some point in the

10   year 2005, correct?

11   A.    I don't know that for sure.

12   Q.    Well, she told you about it in the year 2005 when she

13   was talking about a meeting that had occurred in the past,

14   correct?

15   A.    It may say a lot of things.  I don't know that for

16   sure.

17   Q.    But that's what you were told at that time, correct?

18   A.    That's what I was told.

19   Q.    I would like you to assume there would be evidence in

20   this case that Ms. Rickenbacker spoke to three persons in

21   internal security regarding Mr. Feinberg in August 2005;

22   Sergeant Lunquist, Investigator Olivencia, and

23   Investigator McCarrick.

24           Did you ever speak with any of these individuals

25   regarding Ms. Rickenbacker's allegations?

Mandarino  -  Direct/Norinsberg

434

1              MS. FLYNN:  Objection.

2              THE COURT:  Sustained as to form.

3    BY MR. NORINSBERG:

4    Q.   To your knowledge, did any of the three individuals I

5    just mentioned ever recommend to you, in August 2005, that

6    Ms. Rickenbacker should be placed on suicide watch?

7    A.   Did they consult me?

8    Q.   Did they ever recommend to you that Ms. Rickenbacker

9    should be placed on suicide watch?

10   A.   No.

11   Q.   Did you ever receive a referral form indicating that

12   Ms. Rickenbacker was considered to be potentially

13   suicidal?

14   A.   Yes.

15   Q.   That was given to you by CO McCarrick, one of the

16   three people I just mentioned, correct?

17              THE COURT:  By who?

18              MR. NORINSBERG:  CO McCarrick,

19   M-C-C-A-R-R-I-C-K.

20   A.   Those referrals aren't directly given to me.

21   Q.   Did there come a time where you saw the referral?

22   A.   Probably, yes.

23   Q.   I would like to show you what's been marked as

24   plaintiff's 5 for identification.

25              (Exhibit handed.)

435

1   A.   Yes.

2   Q.   Do you recognize that document?

3   A.   Probably, yes.

4   Q.   What do you recognize that document to be, to the

5   best of your knowledge?

6   A.   When people are put on suicide watch corrections will

7   refer them to mental health.  The referral goes to the

8   office and we have to see her on suicide watch.

9   Q.   Does this document indicate what date the report was

10  made?

11  A.   Yes.

12  Q.   The date is August 21, '05; is that correct?

13  A.   Correct.

14  Q.   And it's prepared by a CO McCarrick, correct?

15  A.   I guess.  I can barely see the writing.  Okay.

16  Q.   And this document recommends that Ms. --

17           THE COURT:  Is it in evidence?

18           MR. NORINSBERG:  I offer plaintiff's 5 into

19  evidence.

20           THE COURT:  Any objection?

21           MS. FLYNN:  No objection.

22           THE COURT:  Plaintiff's Exhibit 5 in evidence.

23           (Plaintiff's Exhibit 5 in evidence.)

24  BY MR. NORINSBERG:

25  Q.   Do you see, directing your attention, Ms. Manderino,

**Mandarino  -  Direct/Norinsberg**

436

1    to the last line in that first paragraph.  It says:

2             "In my opinion this inmate may be suicidal and

3    should be seen by mental health."

4             Do you see that?

5    A.   Yes.

6    Q.   And is that the information that you were given with

7    respect to Lowrita Rickenbacker in August of '05?

8    A.   Yes.

9    Q.   But, in fact, you knew from your counseling sessions

10   with Ms. Rickenbacker that she was not suicidal, correct?

11   A.   Correct.

12             MS. FLYNN:  Objection.

13   BY MR. NORINSBERG:

14   Q.   And, in fact, you noted in your records that

15   Ms. Rickenbacker did not have any suicidal ideation at

16   all, correct?

17   A.   Correct.

18   Q.   You noted that on August 22nd, the day after this

19   form was submitted, and you noted that again a week later

20   on August 29; is that correct?

21   A.   Correct.

22             But if she was crying, they have to.  They're

23   not trained personnel to know if she's suicidal or not.

24   They have to take precautions.

25   Q.   So if an inmate starts crying, they can be put under

Mandarino  -  Direct/Norinsberg

437

1    suicide watch?

2    A.    Yes.

3    Q.    Is that your understanding?

4    A.    Yeah.  If they seem distraught, yes.

5    Q.    Do you know the circumstances that led up to this

6    suicide referral form being submitted?

7    A.    If I read this, it says she was crying.

8    Q.    But then you spoke to Ms. Rickenbacker afterwards,

9    correct, and she told you that she absolutely did not have

10   any suicide ideation, correct?

11   A.    Correct.

12   Q.    And you believed her, correct?

13   A.    Yes.

14   Q.    And you put her right back into general population,

15   correct?

16   A.    Yes.

17   Q.    And then you wrote that again in your note the next

18   week; she strongly denies any suicidal ideation, correct?

19   A.    Correct.

20   Q.    Did you ever speak to CO McCarrick to see why she had

21   requested this referral to you?

22   A.    Not personally, no.

23   Q.    I would like to show you what's been marked as

24   plaintiff's 7 for identification.

25            (Exhibit handed.)

Mandarino  -  Direct/Norinsberg

438

1   A.   Okay.

2   Q.   Do you recognize that document?

3   A.   Yes.

4   Q.   What do you recognize that document to be?

5   A.   My handwriting.

6   Q.   Did you prepare that progress note?

7   A.   Yes.

8   Q.   What's the name on that program note?

9        I'm sorry, what's the date on the progress note?

10  A.   8/25 -- 8/29/05.

11  Q.   I show you what's been marked as plaintiff's 6 for

12  identification.

13       (Exhibit handed.)

14  A.   Okay.

15  Q.   Do you recognize that document?

16  A.   Yes.

17  Q.   Did you prepare that document as well?

18  A.   Yes.

19  Q.   Is that your progress note for August 22nd, '05?

20  A.   Yes.

21       MR. NORINSBERG:  I offer plaintiff's 6 and

22  plaintiff's 7 into evidence.

23       THE COURT:  Any objection?

24       MS. FLYNN:  No objection.

25       THE COURT:  Plaintiff's exhibits 6 and 7 in

**Mandarino  -  Direct/Norinsberg**

439

1    evidence.

2            (Plaintiff's Exhibits 6 and 7 in evidence.)

3    BY MR. NORINSBERG:

4    Q.    You had indicated in exhibit 6 that Ms. Rickenbacker,

5    quote, strongly denies any suicide ideation, correct?

6    A.    Correct.

7    Q.    Now, there come a time that you learned that

8    Ms. Rickenbacker had spoken with internal affairs

9    regarding Gary Feinberg?

10   A.    Could you repeat that.

11   Q.    Did there come a time when you learned

12   Ms. Rickenbacker spoke with internal affairs regarding

13   Gary Feinberg?

14   A.    I'm not sure.

15   Q.    To your knowledge, was Ms. Rickenbacker placed in

16   administrative segregation on February 6, 2006?

17   A.    I don't know the exact date, but I know she was put

18   in administrative segregation.

19   Q.    That could be the same date that she made the

20   complaint to internal affairs; is that correct?

21            MS. FLYNN:  Objection.

22            THE COURT:  Overruled.

23   A.    I don't know.  I don't remember.

24   Q.    Were you the one who had decided that she should be

25   placed into administrative segregation?

440

1    A.    No.

2    Q.    Whose decision was it to do that?

3    A.    I think it was Lowrita Rickenbacker herself.

4    Q.    Did you get any documents relating to this decision?

5    A.    I don't remember.

6    Q.    I would like to show you what's been marked as

7    plaintiff's 8 for identification.

8              (Exhibit handed.)

9              Do you recognize that document?

10   A.    Yes.

11   Q.    What do you recognize that document to be?

12   A.    A standard form if someone does go to administrative

13   segregation.

14   Q.    Did you have any involvement in the process that led

15   to Ms. Rickenbacker being placed into that administrative

16   segregation?

17   A.    No.

18             THE COURT:  Is there a date on that document?

19             THE WITNESS:  Yes.  February 6, '06.

20             THE COURT:  '06?

21             THE WITNESS:  Yes.

22   BY MR. NORINSBERG:

23   Q.    Now, this document was actually part of your file for

24   Lowrita Rickenbacker, wasn't it?

25   A.    Could you say that again.

Mandarino  -  Direct/Norinsberg

441

1    Q.    This document was actually part of your file for

2    Lowrita Rickenbacker, correct?

3    A.    Yes.

4    Q.    How did that document get into your file?

5    A.    Corrections probably sent it to mental health.

6    Q.    At some point you learned that she had been placed

7    into administrative segregation, correct?

8    A.    Yes.

9    Q.    It's your testimony that she was placed into

10   administrative segregation because she wanted to be there,

11   that's your testimony?

12   A.    Yes.

13   Q.    Now, you've treated victims of sexual abuse before;

14   is that correct?

15   A.    Yes.

16         MS. FLYNN:  Objection.

17         THE COURT:  I'm sorry, I didn't hear the

18   question.

19         MS. FLYNN:  I'm sorry.  Objection.

20         THE COURT:  What's the question?

21         MR. NORINSBERG:  You've treated victims of

22   sexual abuse before; is that correct?

23         MS. FLYNN:  Objection.

24         THE COURT:  Overruled.

25   A.    Yes.

442

1   Q.    In your experience, are victims of sexual abuse

2   sometimes reluctant to come forward with their

3   allegations?

4   A.    Yes.

5   Q.    Why is that, Ms. Manderino?

6   A.    Shame.

7   Q.    Shame?

8   A.    Shame.

9   Q.    Are there other reasons that you have come across why

10  people might be reluctant, if they're victims of sexual

11  abuse, to come forward?

12  A.    Not at this time.  I don't remember.

13  Q.    Now, are you familiar with what's known as a coping

14  mechanism?

15  A.    Yes.

16        THE COURT:  A what?

17        MR. NORINSBERG:  Coping mechanism.

18        THE COURT:  Coping method?

19        MR. NORINSBERG:  Mechanism.

20        MS. FLYNN:  Objection.

21        THE COURT:  Let's hear what it is.  Overruled.

22  A.    Yes.

23  Q.    What is a coping mechanism?

24  A.    It's a behavior that an individual will use to help

25  them get through a stressful period.

Mandarino  -  Direct/Norinsberg

443

1   Q.   Do victims of sexual abuse employ coping mechanisms

2   to deal with their situations?

3   A.   Yes.

4   Q.   Are you familiar with what is known as a defense

5   mechanism?

6   A.   Yes.

7   Q.   What is a defense mechanism?

8   A.   A defense mechanism is to protect them from stressful

9   situations also of behavior.

10  Q.   Is a defense mechanism different than a coping

11  mechanism?

12  A.   Very similar.

13  Q.   Do victims of sexual abuse sometimes employ defense

14  mechanisms to deal with their situations?

15  A.   No.

16  Q.   You've never seen that in your career?

17  A.   No.

18  Q.   You've seen coping mechanisms but not defense

19  mechanisms, correct?

20  A.   Not in sexual abuse.

21  Q.   What would be some examples of coping mechanisms?

22  A.   Coping mechanisms, it's how they make themselves feel

23  better and they'll tell themselves a story.

24  Q.   Now, from your treatment of Ms. Rickenbacker, you

25  learned about her personal history; is that correct?

444

1    A.    Correct.

2    Q.    And you learned that she had been repeatedly sexually

3    abused as a child, correct?

4    A.    Yes.

5    Q.    You learned that she had been sexually abused by her

6    father and uncles, correct?

7    A.    Yes.

8    Q.    Did you take into account Ms. Rickenbacker's history

9    of sexual abuse when she was telling you about the

10   situation with Gary Feinberg?

11   A.    Did I take it into account?  I don't know what you

12   mean by that.

13   Q.    When she was relaying to you this allegedly

14   consensual relationship with Mr. Feinberg, did you take

15   into accounting that she had a long history of sexual

16   abuse with her father and uncle?

17   A.    That was separate.

18   Q.    Did you consider the possibility that

19   Ms. Rickenbacker's history of abuse made her more

20   vulnerable to Mr. Feinberg?

21   A.    Knowing Lowrita Rickenbacker, no.

22   Q.    So you didn't take that into account at all; is that

23   correct?

24   A.    I'm not going to say at all.  Somewhat.

25   Q.    The same summer after you learned about these

**Mandarino  -  Direct/Norinsberg**

445

1    allegations you actually wrote a letter for

2    Ms. Rickenbacker to this Court, correct?

3    A.    Correct.

4    Q.    In your letter you wrote, quote, Ms. Rickenbacker --

5              MS. FLYNN:  Objection.

6              THE COURT:  Sustained.

7    BY MR. NORINSBERG:

8    Q.    I show you what's been marked for identification as

9    plaintiff's exhibit 55.

10             (Exhibit handed.)

11             Do you recognize that document?

12   A.    Absolutely, yes.

13   Q.    What do you recognize that document to be?

14   A.    I wrote to the Honorable Judge Spatt on behalf of

15   Lowrita Rickenbacker.

16   Q.    When did you write that letter?

17   A.    July 25th, '05.

18   Q.    That would be roughly six weeks after

19   Ms. Rickenbacker first told you about Gary Feinberg,

20   correct?

21   A.    Correct.

22             MR. NORINSBERG:  If I could have the document

23   back for a minute, please.

24             I offer 55 into evidence, your Honor.

25             THE COURT:  Any objection?

Mandarino  -  Direct/Norinsberg

446

1          MS. FLYNN:  No objection, your Honor.

2          THE COURT:  Plaintiff's exhibit 55 in evidence.

3          (Plaintiff's Exhibit 55 in evidence.)

4     BY MR. NORINSBERG:

5     Q.   In your letter that you wrote on July 25th, 2005, you

6     wrote:

7          "Ms. Rickenbacker has been exploited and

8     sexually abused all her life which still continues to this

9     day."

10          Did you write that, Ms. Manderino?

11     A.   Yes.

12          (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Manderino - Direct/Norinsberg

447

1   BY MR. NORINSBERG:

2   Q.    And when you said continues to this day, when you

3   wrote this letter, she was still in jail, correct?

4   A.    Correct.

5   Q.    And you were referring to the sexual abuse that was

6   taking place in jail which she had mentioned, correct?

7   A.    No.

8   Q.    Isn't it true that when you wrote this letter, you

9   were aware of the fact that Ms. Rickenbacker had made

10  allegations against Mr. Feinberg?

11  A.    Yes.

12  Q.    And when you wrote this letter, you wrote "she had

13  been sexually abused her whole life."

14        Correct?

15  A.    Correct.

16  Q.    And when you said "still continues to this day"?

17  A.    Correct.

18  Q.    You wrote those words just six weeks after you first

19  learned about Ms. Rickenbacker's Feinberg allegations,

20  correct?

21  A.    Correct.  But she didn't consider that abuse.  I

22  was --

23  Q.    And you never considered the possibility there was

24  abuse.

25        Correct?

Manderino - Direct/Norinsberg

448

1    A.    No.

2    Q.    So even though to your knowledge Ms. Rickenbacker had

3    been exploited and sexually abused her whole life, you

4    never entertained the possibility that she was actually

5    being exploited by Mr. Feinberg as well?

6    A.    No.

7    Q.    Is that correct?

8    A.    Correct.

9    Q.    You never took that into account.

10         Correct?

11   A.    No.

12         Not when I wrote that, no.

13         MR. NORINSBERG:   Thank you.   I have nothing

14   further.

15         THE COURT:   We're going it to take a 15 minute

16   recess.

17         Please don't discuss the case either among

18   yourselves or with anyone else, keep an open mind, come to

19   no conclusion.

20         Please recess yourselves.

21         (Whereupon, the jury retired from the

22   courtroom.)

23         (Recess taken.)

24         (After recess.)

25         THE CLERK:   Jury entering.

Manderino - Direct/Norinsberg

449

1            (Whereupon, the jury entered the courtroom.)

2            THE COURT:  Please be seated, members of the

3     jury.  You may proceed.

4            MS. FLYNN:  Your Honor, before I begin, may we

5     have a sidebar?

6            (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Manderino - Direct/Norinsberg

450

1           (Whereupon, the following occurred at sidebar.)

2           MS. FLYNN:  I wanted to discuss this with the

3    Court.  The letter that plaintiff's counsel just put in

4    that Ms. Manderino wrote to your Honor makes reference,

5    heavy reference to the fact that Lowrita Rickenbacker has

6    drug and alcohol problems, and had drug treatment.

7           I know that you had said I couldn't go into it.

8    I think they opened the door and now I can get into that.

9           THE COURT:  Yes.

10          MS. FLYNN:  Thank you.

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Manderino - Cross/Flynn

451

1          (Whereupon, the following occurred in open

2     court.)

3

4     CROSS-EXAMINATION

5     BY MS. FLYNN:

6     Q.    Good afternoon.

7     A.    Good afternoon.

8     Q.    Can you tell the jury a little bit, Ms. Manderino,

9     about your educational background?

10    A.    I have a two year degree, business degree from

11    Briarcliff in '92.  I have a Bachelor's in science from

12    Dowling with a concentration of psychology.  And my

13    Master's degree is from Adelphi University and I graduated

14    in '96, 1996.

15    Q.    And do you have any certifications?

16    A.    Well, I'm a certified, licensed clinical, certified

17    social worker.  I'm also certified in substance abuse and

18    alcohol counseling.

19    Q.    And are you licensed?

20    A.    Yes.

21    Q.    What is your license in?

22    A.    In social work.

23    Q.    When did you start working at the Suffolk County

24    jail?

25    A.    June of 2000.

1    Q.   And before you started working at the jail, did you

2    get any kind of security training?

3    A.   Yes.

4    Q.   And can you tell the jury a little bit what that was

5    about?

6    A.   Well, we went to a training that was run by

7    corrections, and they inform you of any dangers in the

8    jail.  For example, you have to put the inmate on the far

9    side of the room so that you can get out first, you have

10   to be very careful about what's on your desk, right down

11   to paper clips, any hole punchers, any staplers, anything

12   personal, you can't have any magazines with anything with

13   your home address, anything like that.  And no personal

14   photographs of your family or anything, you know.

15        And also we had training on gangs, when you

16   leave the facility there's a hot dog truck outside, and

17   you have to be very aware of your surroundings because you

18   could be followed home.  And they explain that right by --

19   it's right directly from the facility, there's a hot dog

20   truck and there's always cars around the hot dog truck, so

21   you have to be aware if anybody is following you on the

22   way home.

23   Q.   What were you told to do if you noticed something

24   along the lines of a paper clip was missing from your

25   desk?

Manderino - Cross/Flynn

453

1      MR. NORINSBERG:  Objection on relevancy.

2      THE COURT:  Overruled.

3  A.   Well, it's also any kind of pens also could be made a

4  shank, they call it, or toothbrushes or anything like

5  that, but you have to notify security immediately.

6  Q.   Now, is there a social worker code of ethics?

7  A.   Yes.

8  Q.   And is there a confidentiality component to that?

9  A.   Yes.

10  Q.   And are there times when you don't keep the

11  confidentiality of a client?

12  A.   Yes.

13  Q.   And under the social worker code of ethics, when is

14  that?

15  A.   Suicidal ideations and homicidal ideations.

16  Q.   You have told the jury on June 13, 2005 when

17  Ms. Rickenbacker told you that she was having some

18  consensual physical relationship you did tell Nancy Kugler

19  your supervisor?

20  A.   Yes, correct.

21  Q.   So you did feel it was something that you should pass

22  on it your supervisor?

23  A.   Yes.

24  Q.   Were you trained that if you heard something unusual

25  when you were giving inmates therapy, you should pass it

Manderino - Cross/Flynn

454

1    on to your supervisor?

2    A.    Yes.

3    Q.    Now, your job at the jail, what are you there for?

4    What are you there to provide the inmates with?

5    A.    Supportive counseling and crisis intervention and to

6    get them through their incarceration.

7    Q.    You're there to help them?

8    A.    Yes.

9    Q.    Do you have anything to do with the security in the

10   jail?

11   A.    Not really.  Only except to report whatever I see

12   fit.

13   Q.    Okay.  Now, Lowrita Rickenbacker.  The plaintiff's

14   counsel has shown you three or four notes with three or

15   four of the counseling sessions that you had with her, can

16   you estimate for the jury how many times altogether you

17   counseled Ms. Rickenbacker?

18   A.    I would say approximately 30, 35 sessions.

19   Q.    And the first time that she mentioned the name of

20   Gary Feinberg to you in June of 2005, what did she tell

21   you?

22   A.    Well, we were talking -- first of all we were talking

23   about her doing this writing class inside the facility,

24   and they were exploring like my story, they have you write

25   a story about yourself and go through issues in your life,

Manderino - Cross/Flynn

455

1   and that's where the abuse came in, like family abuse,

2   incest, things like that.

3           And she, you know, she got emotional over that,

4   but yet she, she told me about Gary, she said, she told me

5   that she had heard some girls talking on the bench and

6   that, she told me that they had consensual physical

7   relationship.  And she did cry, but she cried not because

8   she was being abused, but because she felt he really cared

9   about her.  And she was really upset that it was possible

10  he was paying attention to other women in the facility.

11  Q.   Was this in June of 2005?

12  A.   Yes.

13  Q.   And did she ask you not to tell anyone?

14  A.   Oh, she begged me.  She begged me please don't, she

15  said I never, never would have told you hadn't I heard

16  these other girls talking.

17  Q.   And at any time while you were counseling Lowrita

18  Rickenbacker, did she ever tell you that she was being

19  sexually abused by Gary Feinberg?

20  A.   No.

21  Q.   Did she ever tell you she was being sexually

22  assaulted?

23  A.   No.

24  Q.   Now, you were counseling Lowrita Rickenbacker from

25  June of 2005 until approximately February of 2006,

Manderino - Cross/Flynn

456

1    correct?

2    A.    Correct.

3    Q.    And during this time were you aware that inmate

4    Rickenbacker had various criminal charges pending against

5    her?

6    A.    Oh, yes.  That's what we spoke about mostly.

7    Q.    And were you aware that she had attorneys who were

8    representing her on those charges?

9    A.    Yes.

10   Q.    Did she also mention to you that she had meetings

11   with the FBI?

12   A.    Yes.

13   Q.    Now, did you also know that during the period of time

14   that you were counseling Ms. Rickenbacker, that she was

15   appearing in court?

16   A.    Oh, yes.

17   Q.    In front of State Supreme Court judges?

18   A.    Yes.

19   Q.    And in front of Judge Spatt?

20   A.    Yes.  Um-hmm.

21   Q.    During the time that you were counseling

22   Ms. Rickenbacker, did she ever mention that anyone was

23   sexually abusing her?

24   A.    Family members.

25   Q.    And do you recall what family member specifically

Manderino - Cross/Flynn

457

1    that was?

2    A.   Well, the current one was her uncle because of

3    housing, she performed oral sex for housing.

4    Q.   And plaintiff's counsel had asked you before in your

5    letter to Judge Spatt of July 25, 2005, where you

6    indicated that issues of abuse continued to this very day,

7    was that who you were talking about?

8    A.   That's who I was referring about because if she was

9    going to be released she was worrying about housing and

10   where she was going to go and what she was going to do

11   after, after care.

12   Q.   Let's talk about the letters that you wrote on behalf

13   of Lowrita Rickenbacker.  In 2005, was it your habit to

14   write letters on behalf of your patients?

15   A.   No.

16   Q.   And you did that for Lowrita Rickenbacker?

17   A.   Yes.

18   Q.   You did that to help her?

19   A.   Yes.

20   Q.   And how many letters did you write to Judge Spatt?

21   A.   Two.

22   Q.   And in those letters did you mention the issues and

23   problems that you were counseling Ms. Rickenbacker about?

24   A.   Absolutely.

25   Q.   And what were those issues that you were counseling

Manderino - Cross/Flynn

458

1    inmate Rickenbacker about?

2    A.   Well, we were talking about substance abuse and

3    treatment, because she had told me that she had no prior

4    formal treatment, and I thought that she should at least

5    have that, because many inmates come into the facility and

6    the first thing they want is a program.  But not that they

7    really want a program, but they just want to get out of

8    jail.  So I felt she was sincere about seeking treatment

9    for her substance abuse.

10   Q.   What did inmate Rickenbacker tell you about her drug

11   history?

12   A.   Oh, it's extensive.

13   Q.   Did she tell you what kind of drugs she abused?

14   A.   Yes.  Crack.

15   Q.   Did she tell you when she had begun abusing crack?

16   A.   I know it was early on, but I don't know exactly.

17   Q.   During the time that you were counseling

18   Ms. Rickenbacker, did she tell you that on the occasions

19   when she was not incarcerated she was abusing crack?

20   A.   Oh, definitely.  Yes.

21   Q.   Did you write any other letters on behalf of inmate

22   Rickenbacker?

23   A.   Yes, I did.  I wrote to federal probation for her.

24   Q.   And would it be --

25   A.   And I think another one also.  I forgot.  To Clare

Manderino - Cross/Flynn

459

1    Kennedy, I think.

2    Q.    And who was that?

3    A.    I think that was also federal probation.

4    Q.    And these letters that you wrote for

5    Ms. Rickenbacker, why were you writing them?

6    A.    Because I truly felt that she needed help.  I really

7    did.  I felt that she deserved a chance to get therapy and

8    drug treatment.

9    Q.    Now, in August of 2005, you saw Ms. Rickenbacker

10   because she was referred to mental health to see if she

11   should be placed on a suicide watch; is that right?

12   A.    Well, she was already on suicide watch.

13   Q.    Do the inmates have to be cleared by mental health in

14   order to stay on a suicide watch?

15   A.    Yes, and to get off they need to be seen by a

16   psychiatrist and a social worker, otherwise they're not

17   taken off.

18   Q.    If a corrections officer feels that an inmate should

19   go on suicide watch, and there are practitioners down in

20   the mental health facility, would the inmate be directly

21   sent to see the practitioners in the mental health

22   facility?

23   A.    Can you repeat that?

24   Q.    Yes.

25         What I'm asking is, if a corrections officer

Manderino - Cross/Flynn

460

1   feels that an inmate should go on suicide watch, they fill

2   out a referral form; is that right?

3   A.   Um-hmm.

4   Q.   You have to say --

5   A.   Yes.

6   Q.   And the inmate is then sent to mental health for

7   evaluation?

8   A.   If the staff is there they will see mental health

9   first.  If not, the corrections will take initiative and

10  put them on suicide watch for their own safety and then

11  mental health will evaluate as soon as possible.

12  Q.   And the ultimate decision is made by mental health?

13  A.   Yes.

14  Q.   In August of 2005, did inmate Rickenbacker tell you

15  what the circumstances were that led to her being placed

16  on suicide watch?

17  A.   Yeah.  Yes.  She told me that she had a fight with

18  her boyfriend and she was all upset and she felt insecure

19  and she was crying about it.

20  Q.   Did inmate Rickenbacker ever tell you at that time

21  that she had been placed in suicide watch by the

22  corrections officer in some form of retaliation by the

23  corrections officer?

24  A.   No.

25  Q.   During the time that you counseled inmate

Manderino - Cross/Flynn

461

1    Rickenbacker, did she ever make telephone calls from your

2    office?

3    A.    Yes.

4    Q.    Who would she make these telephone calls to?

5    A.    She would make them to lawyers.

6    Q.    And --

7    A.    And I think she also once made a phone call to a drug

8    treatment facility.

9    Q.    And while she was on the telephone, did you ever hear

10   her talk to anyone about Gary Feinberg?

11   A.    No.

12   Q.    And are you aware that during the time that you were

13   counseling inmate Rickenbacker, she had a boyfriend who

14   was not in jail, who was on the outside?

15   A.    Yes.

16   Q.    Did you ever refer Ms. Rickenbacker to any other

17   counselors for treatment?

18   A.    Yes, I did, because basically we're mental health and

19   there is a drug and alcohol department, so I sent her to

20   drug and alcohol to set up a program for her.

21   Q.    Now, in November of 2005, inmate Rickenbacker told

22   you that she had spoken to internal security about Gary

23   Feinberg.

24         Did you know if that was in fact true?

25   A.    Inmates tell you a lot of things.  You don't know if

Manderino - Cross/Flynn

462

1    they're true or not.

2    Q.    So it's fair to say that inmate Rickenbacker told you

3    this but you don't know if this is true?

4    A.    Correct.

5    Q.    And plaintiff's counsel showed you a document where

6    Ms. Rickenbacker had been referred to administrative

7    segregation in February of 2006?

8    A.    Correct.

9    Q.    And to your knowledge was that the first time that

10   Ms. Rickenbacker had been disciplined by being sent to

11   administrative segregation?

12            MR. NORINSBERG:  Objection.

13            THE COURT:  Overruled.

14   A.    That's not a discipline.  It's not a disciplinary

15   action.  She herself at the time, she placed herself

16   there.

17   Q.    To your knowledge, what was inmate Rickenbacker's

18   disciplinary history at the Suffolk County correctional

19   facility?

20            MR. NORINSBERG:  Objection.

21            THE COURT:  Sustained.

22   Q.    After inmate Rickenbacker was released from custody,

23   did you ever have conversations with her?

24   A.    Yes.

25   Q.    And how did those conversations take place?

Manderino - Cross/Flynn

463

1    A.    She called me up at the facility and wanted to see me

2    because I have a private practice on the outside and she

3    wanted to continue counseling.

4    Q.    And it's fair to say that this conversation took

5    place after February of 2006?

6    A.    Yes, after she was released.

7    Q.    And you have your own practice on the outside?

8    A.    Yes, I do.

9    Q.    And inmate Rickenbacker knew about that?

10   A.    Yes, she did.

11   Q.    And she called you to continue treatment?

12   A.    Yes.  As a matter of fact, I think that she had spoke

13   to some professionals to encourage that I continue

14   counseling on the outside.

15   Q.    Your notation, you have notes from a therapy session

16   that you had with Ms. Rickenbacker on January 20, 2006.

17   And in those notes she mentions the situation with Gary

18   Feinberg.

19   A.    Do I have that?

20   Q.    Exhibit 31.

21         MS. FLYNN:  Counsel, do you have exhibit 31?

22         MR. NORINSBERG:  31 is written on and exhibit 4

23   and I think exhibit 3 relate to the January sessions.

24         MS. FLYNN:  I'm sorry, exhibit 3.

25   Q.    And you discussed Gary Feinberg with Ms. Rickenbacker

Manderino - Cross/Flynn

464

1    on that day?

2    A.   Yes.

3    Q.   And do you recall that on January 20, 2006, you had a

4    meeting with Nancy Kugler and Dr. Geraci and Rick Kaufman

5    at which time you told them about what Ms. Rickenbacker

6    had been telling you?

7    A.   Correct.

8    Q.   And during that meeting, did you advise them that

9    inmate Rickenbacker felt scorned?

10   A.   Yes.

11   Q.   By what did you mean by that?

12   A.   What I meant by that was that she didn't say that she

13   was being sexually abused, that she was just hurt and

14   upset, it was kind of like he was cheating on her.

15        MS. FLYNN:   Thank you.

16

17   REDIRECT EXAMINATION

18   BY MR. NORINSBERG:

19   Q.   Your testimony, Ms. Manderino is that

20   Ms. Rickenbacker never said she was sexually abused; is

21   that correct?

22   A.   No, she never used that word, no.

23   Q.   But she did say that she has been inappropriately

24   touched in the medical department.

25        Correct?

Manderino - Cross/Flynn

465

1    A.    Those are my words.

2    Q.    But you wrote those words after speaking with her,

3    correct?

4    A.    Correct.

5    Q.    That was your impression that you had.

6          Correct?

7    A.    That was an impression, yes.

8    Q.    You didn't mention anything about her being jealous

9    about Mr. Feinberg seeing other women, did you?

10   A.    I didn't note it, but that was the truth.

11   Q.    You didn't note it in your note of June of 2005, did

12   you?

13   A.    No.

14   Q.    You didn't note it in your note of November of '05,

15   did you?

16   A.    No.

17   Q.    You never mention that in your note of January 20th

18   of '06, did you?

19   A.    No.

20   Q.    You never mention that in your January 25 note, did

21   you?

22   A.    No.

23   Q.    In fact, you never once mentioned that anywhere in

24   the notes, did you?

25   A.    No, not in my notes, but it's customary that you

Manderino - Cross/Flynn

466

1    don't put everything in the notes.

2    Q.    My question is, Ms. Manderino, in any of your notes

3    throughout the 30 counseling sessions that you had with

4    Ms. Rickenbacker, did you ever once mention that fact that

5    Ms. Rickenbacker was jealous because Mr. Feinberg was

6    seeing other women?

7    A.    No.  But --

8    Q.    That's a yes or no.  The answer is no, correct?

9    A.    No, correct.

10   Q.    Now, when Ms. Rickenbacker told you on January 25th

11   that she had been quote fondled and touched numerous times

12   in the medical department by the same worker, did you

13   understand that to be consensual?

14   A.    Yes.

15   Q.    And when she told you that the same thing was

16   happening to other girls, did you believe that to be

17   consensual, too?

18   A.    That wasn't for me to make a --

19   Q.    Did it occur to you as a psychiatric social worker

20   that Mr. Feinberg might be possibly sexually abusing other

21   girls in the jail?

22         MS. FLYNN:  Objection.

23   Q.    Did that occur to you?

24         THE COURT:  Sustained.

25         Strike out the answer.  The jury is instructed

Manderino - Cross/Flynn

467

1    to disregard it.

2    Q.    When you first heard this information in June of '05,

3    Ms. Rickenbacker mentioned some other girls on the bench;

4    is that correct?

5    A.    Yes.

6    Q.    And tell us what did Ms. Rickenbacker say about the

7    other girls?

8    A.    She said she heard them talking.

9    Q.    Talking about having sexual contact with

10   Mr. Feinberg?

11   A.    She didn't say exactly what kind of contact.  She

12   just said she heard them talking on the bench about it.

13   About Gary, yes.

14   Q.    About having some type of contact with Gary, correct?

15   A.    Yes.  She didn't say specifically though.

16   Q.    What did you understand Ms. Rickenbacker to mean when

17   she was talking to you about the other girls, mentioning

18   Gary?

19   A.    I don't know.  We were just dealing with her

20   feelings.

21   Q.    Would it be fair to say that as of June of 2005, you

22   never considered the possibility that Mr. Feinberg was

23   actually doing this to other women?

24            MS. FLYNN:  Objection.

25            THE COURT:  Can you repeat that question,

Manderino - Cross/Flynn

468

1    please.

2    Q.   Would it be fair to say after that first time when

3    you learned about these allegations in June of 2005 you

4    never once considered the possibility that Mr. Feinberg

5    might be sexually abusing other women in jail?

6                MS. FLYNN:  Objection.

7                THE COURT:  Overruled.

8    A.   I work in a jail and I sit with rapists, murderers,

9    child molesters, I don't make any decisions on anyone.

10               MR. NORINSBERG:  Move to strike the answer as

11   nonresponsive.

12               THE COURT:  Yes.  Motion is granted.  The answer

13   is stricken as not being responsive.  The jury is

14   instructed to disregard it.  Listen to the questions.

15   Most of them are going to call for a yes or no answer,

16   please try to answer yes or no.  If there's some question

17   that you're not going to be answer yes or no, in that

18   event instead of making an explanation just say I can't

19   answer that question can yes or no.  That shifts the

20   burden back to Mr. Norinsberg.  Do you understand our

21   procedure?

22               THE WITNESS:  Yes.

23   Q.   After Ms. Rickenbacker mentioned the other girls in

24   June of 2005, did you ever consider the possibility that

25   Mr. Feinberg might be sexually abusing other women in the

469

1   jail?

2          MS. FLYNN:  Objection.

3          THE COURT:  Yes.  I'm going to sustain it.

4   Q.   Now, you told us the first time Ms. Rickenbacker

5   mentioned this to you, she was crying.  Is that correct?

6   A.   Correct.

7   Q.   And you also told us that when she got emotional when

8   she was talking about her history of family abuse,

9   correct?

10  A.   Yes.

11  Q.   And her history of family incest.  Correct?

12  A.   Correct.

13  Q.   Did you consider that the fact that

14  Ms. Rickenbacker's background made her particularly

15  vulnerable to sexual abuse by Gary Feinberg?

16         MS. FLYNN:  Objection.

17         THE COURT:  Sustained.

18  Q.   Now, you testified earlier that you were specifically

19  trained that if an inmate so much as removes a pen from

20  your desk you're to notify security immediately; is that

21  correct?

22  A.   Correct.

23  Q.   And if an inmate so much as removes a paper clip from

24  your desk, you're to notify security immediately.

25  Correct?

Manderino - Cross/Flynn

470

1    A.    Correct.

2    Q.    Were you ever claims if an inmate claims they were

3    sexually abused you were to notify security immediately as

4    well?

5    A.    I notified my supervisor.

6    Q.    My question is, Ms. Manderino, were you ever given

7    training that if an inmate claims she has been sexually

8    abused, you need to notify security immediately?

9    A.    No.

10                MR. NORINSBERG:  Nothing further, thank you.

11                MS. FLYNN:  No further questions.

12                THE COURT:  You may step down.  Please call your

13   next witness.

14                MR. NORINSBERG:  At this time plaintiff calls

15   investigator James Wright to the stand.

16

17   **JAMES WRIGHT**,

18                call ed as a witness, having been first

19                duly sworn, was examined and testified

20                as follows:

21                THE COURT:  Please state your full name and

22   spell your last name slowly for the record.

23                THE WITNESS:  James Wright, W-R-I-G-H-T.

24                THE COURT:  You may proceed.

25                MR. NORINSBERG:  Thank you, your Honor.

1

2    DIRECT EXAMINATION

3    BY MR. NORINSBERG:

4    Q.    Good afternoon, Mr. Wright.

5    A.    Good afternoon.

6    Q.    You're here pursuant to a subpoena; is that correct,

7    sir?

8    A.    Yes.

9    Q.    And you and I have met once before, have we?

10   A.    Yes.

11   Q.    We met at your deposition, correct?

12   A.    Correct.

13   Q.    And at your deposition you gave sworn testimony

14   relating to your involvement in an investigation in this

15   case, correct?

16   A.    Correct.

17   Q.    And you were represented by an attorney, Ms. Flynn,

18   at that deposition, correct?

19   A.    Yes.

20   Q.    Have you reviewed your deposition before coming here

21   today?

22   A.    Yes, I have.

23   Q.    So you're familiar with the testimony that you gave

24   in that deposition, correct?

25   A.    Yes, I am.

Wright - Direct/Norinsberg

472

1   Q.   Are you currently employed, sir?

2   A.   Yes, I am.

3   Q.   Where are you employed?

4   A.   I'm employed by the Suffolk County Sheriff's office.

5   Q.   What is your position at the Suffolk County Sheriff's

6   office?

7   A.   My title deputy sheriff investigator.

8   Q.   And what are your duties and responsibilities as a

9   deputy sheriff investigator?

10  A.   I'm assigned to the Internal Affairs section of the

11  Sheriff's office.

12  Q.   And Internal Affairs investigates allegations of

13  misconduct; is that correct?

14  A.   Yes, as it relates to employees of the Suffolk County

15  sheriff's office.

16  Q.   And that would include employees at the jail,

17  correct?

18  A.   Yes.

19  Q.   And how long have you been working in Internal

20  Affairs?

21  A.   Since January of 1999.

22  Q.   So that would be almost 11 years; is that correct?

23  A.   11 and a half years.

24  Q.   Now, directing your attention to December of 2005,

25  did you become involved in an investigation of Rochelle

473

1    Ramos?

2    A.    I had taken a telephone complaint involving a

3    Rochelle Ramos, yes.

4    Q.    And you first got involved with the investigation of

5    Ms. Ramos on December 30, 2005.

6          Correct?

7    A.    You're referring to it as an investigation.  It

8    wasn't an investigation at that point.  It was a telephone

9    complaint to the Internal Affairs section.

10   Q.    Referring to your deposition, page nine, line 20:

11         "Question:  When did you first get involved with

12   the investigation of Ms. Ramos?

13         "Answer:  December 30, 2005."

14         Do you recall being asked that question and

15   giving that answer, sir?

16   A.    If that's the answer that I gave at the time, that's

17   the answer that I gave at time, but I'm just clarifying if

18   you're speaking overall, at that point it was not an

19   official Internal Affairs investigation involving Rochelle

20   Ramos.

21   Q.    Okay.  But your first involvement with what

22   eventually would become the investigation started on

23   December 30, 2005, correct?

24   A.    Yes, that is correct.

25   Q.    And you received a telephone call from the Nassau

1    County Sheriff's office regarding Rochelle Ramos, correct?

2    A.    Yes.

3    Q.    And you spoke with investigator Terry-Clarke at that

4    time; is that correct?

5    A.    No.

6              THE COURT:  Who?

7    A.    No, that is not correct.

8              MR. NORINSBERG:  It's investigator Terry

9    T-E-R-R-Y - C-L-A-R-K-E.

10   Q.    Your testimony is that's not correct?

11   A.    No.  I believe the initial telephone complaint came

12   from investigator Garcia of the Nassau County Sheriff's

13   office.

14   Q.    Referring to your deposition, page 10, line 6:

15             "Question:  Who did you speak with from the

16   Nassau County Sheriff's office?

17             "Answer:  I believe it was investigator

18   Terry-Clarke.

19             MS. FLYNN:  Objection.

20             THE COURT:  On what ground?

21             MS. FLYNN:  That's not contradictory.

22             THE COURT:  Well, it's tangentially

23   inconsistent, at least, it's up to the jury to determine

24   whether it's inconsistent or not.  Not me.  If there's any

25   shadow of a doubt, I let it go in and it's up to you to

Wright - Direct/Norinsberg

475

1    decide whether it's inconsistent and you decide that

2    because you decide the credibility of all the witnesses.

3    Q.    Now, did you speak to investigator Terry-Clarke from

4    the Nassau County Sheriff's office?

5    A.    Yes.

6    Q.    And you received the phone call on December 30th at

7    1622 hours; is that correct?

8    A.    For the purposes of clarification, I want to state

9    again that that initial phone call did not come from

10   investigator Terry-Clarke.  It came from investigator

11   Garcia.

12   Q.    Did you receive a phone call from investigator Garcia

13   on December 30th, at 1622 hours?

14   A.    Yes.

15   Q.    And 1622 means 4:22 in the afternoon, correct?

16   A.    Correct.

17   Q.    So as of 4:22 in the afternoon on December 30th,

18   2005, you were aware of the allegations of Rochelle Ramos,

19   correct?

20   A.    I was aware that there had been a problem with

21   Rochelle Ramos.  I wasn't aware of the full extent of the

22   allegations at that point.

23   Q.    You received a complaint regarding Rochelle Ramos,

24   correct?

25   A.    Correct.

476

1   Q.   And if that complaint you were advised that Ms. Ramos

2   had alleged that she had been sexually assaulted in the

3   jail medical unity, correct?

4   A.   Correct.

5   Q.   And you learned that it was a male member of the jail

6   medical unit, correct?

7   A.   Correct.

8   Q.   You learned that Ms. Ramos had said that this member

9   of the jail medical staff had placed his fingers in her

10  vagina, correct?

11  A.   Correct.

12  Q.   So you understood in essence there was a claim of

13  some type of sexual assaults taking place.

14       Correct?

15  A.   Correct.

16  Q.   And you knew that as early as December 2005, December

17  30, 2005, correct?

18  A.   Correct.

19  Q.   Now, you were also provided a copy of a sworn

20  complaint that Ms. Ramos filled out; is that correct?

21  A.   Correct.

22  Q.   I'd like to show you what's been marked as

23  plaintiff's 21.

24       THE COURT:  For identification?

25       MR. NORINSBERG:  For identification.

Wright - Direct/Norinsberg

477

1              (Document handed to the witness.)

2    Q.    Please take a look at that document, sir.

3              Do you recognize that document?

4    A.    Yes.

5    Q.    What do you recognize that document to be?

6    A.    A supporting deposition from the police department

7    county of Nassau.

8    Q.    And is that a sworn complaint from Rochelle Ramos?

9    A.    Yes.

10   Q.    What's the date on that complaint?

11   A.    12/30 of '05.

12   Q.    And you received that complaint the same day that you

13   spoke to investigators from the Nassau County Sheriff's

14   office, correct?

15   A.    No, that's not correct.

16   Q.    Referring to your deposition, page 24, line 7:

17             "Question:  When did you receive the sworn

18   complaint that you're holding in your hands right now,

19   plaintiff's 3?

20             "Answer:  I don't recall.

21             "Question:  Would it have been on the same --

22   would it have been on the day where you received the call

23   from Nassau County investigator Terry-Clarke?

24             "Answer:  It might have been."

25             Do you recall giving that testimony at your

Wright - Direct/Norinsberg

478

1    deposition?

2    A.    Yes, I do.

3    Q.    So at your deposition you said you might have

4    received the sworn complaint on December 30th, correct?

5    A.    Correct.

6            MR. NORINSBERG:  I offer plaintiff's 21 into

7    evidence.

8            THE COURT:  Any objection?

9            MS. FLYNN:  No objection.

10           THE COURT:  Plaintiff's Exhibit 21 in evidence.

11           (Plaintiff's Exhibit 21 in evidence.)

12   Q.    Now, once you received the complaint, you made a

13   notification to Deputy Sergeant Investigator Meyer; is

14   that correct?

15   A.    Correct.

16   Q.    And who was that, sir?

17           THE COURT:  Of investigator?

18           MR. NORINSBERG:  Deputy Sergeant Investigator

19   Meyer, M-E-Y-E-R.

20   A.    At the time he was the commanding officer of the

21   Internal Affairs section.

22   Q.    And then the sheriff made his decision to investigate

23   the allegations of Ms. Ramos; is that correct?

24   A.    At some point he did.

25   Q.    Well, the case was officially opened on January 2,

479

1    2006, correct?

2    A.    Yes, which was not when I -- it sounded like you were

3    saying that I notified the sergeant and then the sheriff

4    opened the case.  That was not how it happened.

5         I notified the sergeant on December 30th of the

6    allegation that was being made.

7    Q.    Right.

8         We can agree though as of January 2nd, a few

9    days later, an official case file was opened.  Correct?

10   A.    Yes.

11   Q.    Now, in the course of your investigation into this

12   matter, you prepared a case log; is that correct?

13   A.    I'm not sure what you're talking about.

14   Q.    You prepared a series of notes detailing whatever

15   work, whatever steps you took during this investigation,

16   correct?

17   A.    Yes, investigator notes.

18   Q.    I'd like to show you what has been marked as

19   plaintiff's 22 for identification.  (Handing.)

20        Do you recognize that document, sir?

21   A.    Yes.

22   Q.    What do you recognize that document to be?

23   A.    They're copies of the investigator notes from the

24   case file.

25   Q.    Did you prepare those notes?

Wright - Direct/Norinsberg

480

1   A.   Yes, I did.

2   Q.   And did you do so in the regular course of your

3   duties as an investigator in Internal Affairs?

4   A.   Yes, I did.

5        MR. NORINSBERG:  I offer plaintiff's 22 into

6   evidence.

7        THE COURT:  Any objection?

8        MS. FLYNN:  No, your Honor.

9        THE COURT:  Plaintiff's Exhibit 22 in evidence.

10       (Plaintiff's Exhibit 22 in evidence.)

11  Q.   Now, did you have a chance to review that, your case

12  notes before you came here today?

13  A.   Yes, I did.

14  Q.   So you're familiar with those notes, correct?

15  A.   Yes, I am.

16  Q.   Now, one of the first things that you wanted to do

17  was to look at the medical records of Ms. Ramos; is that

18  correct?

19  A.   Correct.

20  Q.   And you wanted to confirm that Ms. Ramos had in fact

21  been examined by the jail medical unit on December 29th,

22  2005, correct?

23  A.   Correct.

24  Q.   And a you received a copy of the medical records on

25  January 5th, 2006, correct?

481

1    A.    Yes.

2    Q.    So we can agree that as of January 5, 2005 -- 2006,

3    you had Ms. Ramos' medical records from the jail medical

4    unit, correct?

5    A.    Correct.

6    Q.    And those records indicated that Ms. Ramos had in

7    fact been treated by a physician assistant named Gary

8    Feinberg on December 29th, 2005, correct?

9    A.    Correct.

10   Q.    So you knew just three days after an investigation

11   had opened that Ms. Ramos had made a claim that she had

12   been sexually abused by somebody in the jail medical unit,

13   you now had medical records showing that she had been

14   treated on the date she said and you had the name of the

15   person who had treated her, correct?

16   A.    Correct.

17   Q.    And you knew the name of that person was Gary

18   Feinberg, correct?

19   A.    Correct.

20   Q.    And would you consider allegations of sexual abuse by

21   jail medical unit staff member to be a serious allegation?

22   A.    Absolutely.

23   Q.    Would you consider an allegation of sexual abuse to

24   be an allegation that needs to be followed up immediately?

25   A.    Yes, I would.

482

1   Q.   But you didn't interview Gary Feinberg on January

2   5th, did you, sir?

3   A.   No, I did not.

4   Q.   In fact, you didn't interview Gary Feinberg at any

5   time during the entire month of January 2006, did you?

6   A.   No, I did not.

7   Q.   You didn't interview Gary Feinberg at any time in the

8   month of February 2006, correct?

9   A.   No, I did not.

10  Q.   As far as you were concerned, Mr. Wright, there was

11  no need to interview Gary Feinberg, correct?

12  A.   No, that's not correct.

13  Q.   Referring to your deposition, a page 22, line 15.

14  With?

15       "Question:  After you received the name of Gary

16  Feinberg on January 5, 2006, why didn't you attempt to

17  interview him at that time?

18       "Answer:  There was no need at that point."

19       MS. FLYNN:  Objection.

20  Q.   Do you recall being asked that question and giving

21  that answer?

22       MS. FLYNN:  Objection.

23       THE COURT:  Overruled.

24  A.   Yes, I do.

25       You were being specific to at that time.  At

Wright - Direct/Norinsberg

483

1    that particular moment I felt it was not necessary to rush

2    in and interview Mr. Feinberg on the fifth of January.

3    Q.    As it turned out, Mr. Wright, you never interviewed

4    Mr. Feinberg; is that correct?

5    A.    No, I did not.

6    Q.    Now, you first considered the possibility of

7    interviewing Mr. Feinberg as early as January 4, 2006,

8    correct?

9    A.    We considered interviewing who we eventually

10   identified as Mr. Feinberg on January 4, 2006, yes.

11   Q.    So the answer to my question is yes, that's when you

12   first considered interviewing Mr. Feinberg, January 4th,

13   correct?

14   A.    Yes.

15   Q.    You could have spoken to Mr. Feinberg at any time

16   that you wanted to in January 2006; is that correct?

17   A.    In theory.

18   Q.    Referring to your deposition, page 69 line 10.

19            "Question:  And you could have spoken to PA

20   Feinberg at any time that you wanted to in January 2006?

21            "Answer:  Yes."

22   A.    Yes.

23   Q.    You had the power to summon Mr. Feinberg to come to

24   your office if you wanted to, correct?

25   A.    Yes, I did.

Wright - Direct/Norinsberg

484

1    Q.    So you wouldn't even have to go out to the facility

2    and interview him.  You can have him come to you.

3    Correct?

4    A.    Yes, I could.

5    Q.    And there were no restrictions or limitations in

6    terms of your ability to reach out and ask him to come to

7    the office to discuss these allegations, correct?

8    A.    Correct.

9    Q.    Now, besides Mr. Feinberg, another person that you

10   wanted to interview was Ms. Ramos, correct?

11   A.    Correct.

12   Q.    You certainly wanted to hear what Ms. Ramos had to

13   say about these allegations, correct?

14   A.    Correct.

15   Q.    That would be an important part of your

16   investigation, correct?

17   A.    Correct.

18   Q.    And on January 12th, you spoke to a man who

19   identified himself as brother-in-law of Ms. Ramos; is that

20   correct?

21   A.    Yes.

22   Q.    And this individual told you that Ms. Ramos was at

23   the Jericho motel at that time, correct?

24   A.    Yes.

25   Q.    And he told you she's in room 121, correct?

## Wright - Direct/Norinsberg

485

1  A.   Correct.

2  Q.   And he actually gave you a phone number where you

3  could reach Ms. Ramos at that motel, correct?

4  A.   Correct.

5  Q.   But you didn't call Ms. Ramos at the Jericho motel,

6  did you, sir?

7  A.   Not that I recall.

8  Q.   The answer would be no, correct, sir?

9  A.   No.

10  Q.   And you didn't visit Ms. Ramos at the Jericho motel,

11  correct?

12  A.   Correct.

13  Q.   So if I understand your testimony correctly, you

14  thought it was important to speak to Ms. Ramos, somebody

15  gave you her phone number, her address and her room number

16  and you never bothered calling or visiting her, correct?

17  A.   At that location, yes, that's correct.

18  Q.   You see on your log the next entry after that January

19  12th is January 25th; is that correct?

20  A.   Yes.

21  Q.   So there's a 13 day gap from January 12th until

22  January 25th, correct?

23  A.   Correct.

24  Q.   Can you tell the members of this jury what

25  investigation if any did you do during that 13 day gap?

Wright - Direct/Norinsberg

486

1   A.   I carry a case load of approximately 25 cases, I

2   could have been working on any number of those cases at

3   that time while I was waiting for Ms. Ramos to get back to

4   me.

5   Q.   Referring to your deposition page 57, line 17.

6        "Question:  What investigation, if any, did you

7   do during those 13 days relative to Ms. Ramos' complaint?

8        "Answer:  Apparently none."

9        Would that be a fair statement, sir?

10  A.   As that's phrased, yes.

11  Q.   Can we agree, sir, that other than speaking to

12  Ms. Ramos' brother-in-law on January 12th, for the next

13  two weeks you did virtually nothing on this case?

14  A.   Correct.

15  Q.   If you had done any work on this case, you would have

16  put it down on your work notes.

17       Correct?

18  A.   Correct.

19  Q.   So the fact that there are no entries during that 13

20  day period tells us that you did not do any work on in

21  case.

22       Correct?

23  A.   Nothing that I felt needed to be reported.

24  Q.   Now, during this 13 day period, did you ever attempt

25  to call Ms. Ramos?

487

1   A.   Not that I recall.

2   Q.   The answer would be no, wouldn't it be, sir?

3   A.   The way you just phrased the question.

4   Q.   Referring to your deposition, page 58 line 3.

5        "Question:  Did you attempt to call Ms. Ramos

6   again at the Jericho motel at any time during that two

7   week time period?

8        "Answer:  No."

9        Do you recall giving that testimony, sir?

10  A.   Yes, I do.

11  Q.   So according to you are deposition testimony, you

12  didn't make any effort to call Ms. Ramos during that two

13  week time period.

14       Correct?

15  A.   Correct.

16  Q.   And can you explain to the members of the jury why

17  didn't you attempt to call Ms. Ramos during that two week

18  time period from January 12, 2006 to January 25, 2006?

19  A.   I had already placed messages for Ms. Ramos to

20  contact my unit, she had gotten in touch with me, I had

21  other cases to work on at the time and I knew that she

22  would turn up sooner or later if she was interested in

23  pursuing the matter.

24  Q.   Referring to your deposition, page 58 line 12.

25       "Question:  Why didn't you attempt to call

Wright - Direct/Norinsberg

488

1    Ms. Ramos during that two week time period from January

2    12, 2006 to January 25, 2006?

3              "Answer:  I can't say for sure."

4         Do you recall giving that testimony under oath,

5    sir?

6    A.   At that time, yes.

7    Q.   You swore to tell the truth, correct?

8    A.   At that time I didn't recall.

9    Q.   You were telling the truth, correct?

10   A.   Yes.

11   Q.   No, you didn't say "I couldn't call," you said "I

12   can't say for sure," correct?

13   A.   I misunderstood what you said.

14   Q.   Would it be fair to say that at the time of your

15   deposition you had no idea why you didn't try to reach

16   Ms. Ramos during that two week period?

17             MS. FLYNN:  Objection.

18             THE COURT:  Overruled.

19   A.   I'm sorry, can you repeat that.

20   Q.   Would it be fair to say that at the time of your

21   deposition you had no idea why you hadn't tried to reach

22   out to Ms. Ramos during that two week time period?

23   A.   At the time of the deposition, yes, that would be

24   fair to say.

25   Q.   And that deposition was held in April of 2009,

Wright - Direct/Norinsberg

489

1    correct, sir?

2    A.    Correct.

3    Q.    So we're talking just five months ago, correct?

4    A.    Approximately.

5    Q.    Now, during that two week time period, did you ever

6    once go out to the Jericho motel to try to speak with

7    Ms. Ramos?

8    A.    No.

9    Q.    Now, on January 12th, you learned that Ms. Ramos was

10   going to make a court appearance on January 19, before

11   Judge Raskin; is that correct?

12   A.    Yes.

13          THE COURT:  Before judge.

14          MR. NORINSBERG:  Raskin.  R-A-S-K-I-N.

15   Q.    Is that correct, sir?

16   A.    If that's what I spelled it in the notes.

17          THE COURT:  When was that?

18          MR. NORINSBERG:  On January 12th there's an

19   entry your Honor, that Mr. Wright knew that Ms. Ramos was

20   going to make a court appearance the following week on

21   January 19th.

22   Q.    Now, Mr. Wright, did you in fact go to the Court

23   appearance on January 19th to speak to Ms. Ramos?

24   A.    No.

25   Q.    Can you tell the members of the jury why didn't you

**Wright - Direct/Norinsberg**

490

1   go to the Court appearance that Ms. Ramos was scheduled to

2   attend on January 19?

3   A.    Because I didn't feel it would be the proper venue to

4   interview her if she had in fact shown up for the Court

5   appearance.

6            (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Wright - Direct/Norinsberg

491

1  BY MR. NORINSBERG (Cont'd):

2  Q.  Referring to your deposition, page 73, line 22:

3       Question:  Why didn't you go to the court

4  appearance that Ms. Ramos was scheduled to attend January

5  19, 2006?

6       Answer:  I don't know.

7       Do you recall giving that testimony, sir?

8  A.  Yes.

9  Q.  Again, you gave that testimony under oath.

10      Correct, sir?

11  A.  Correct.

12  Q.  You swore to tell the truth and you were telling the

13  truth.

14      Correct, sir?

15  A.  Yes, I was.

16  Q.  So at your deposition you had no reason, no

17  explanation as for why you didn't go to the court

18  appearance or visit Ms. Ramos.

19      Correct?

20  A.  Correct.

21  Q.  Now, did you ever attempt to see Ms. Ramos in any of

22  her other court appearance dates?

23  A.  No, I did not.

24  Q.  Now, you learned the gentleman that you had spoken to

25  on January 12th, who had identified himself as a

492

1   brother-in-law, his name was Tony.

2            Is that correct?

3   A.   Correct.

4   Q.   And you called Tony back on January 25th.

5            Is that correct?

6   A.   Yes.

7   Q.   You called Tony back because he wanted to see if he

8   had delivered the message to Rochelle Ramos that you were

9   looking to speak to her.

10           Is that correct?

11  A.   Correct.

12  Q.   Did you ask specifically whether or not he had

13  delivered the message to Ms. Ramos?

14  A.   I don't recall.

15  Q.   You asked Tony if he had heard from Ms. Ramos and

16  knew her whereabouts.

17           Correct?

18  A.   Yes.

19  Q.   You asked him that on January 25th.

20           Correct?

21  A.   Correct.

22  Q.   And on January 25th, he told you that she was at

23  Long Island Jewish Hospital in Manhasset.

24           Is that correct?

25  A.   Yes, that's correct.

Wright - Direct/Norinsberg

493

1    Q.   But you never visited LIJ Manhasset, did you?

2    A.   No, I did not.

3    Q.   So, if I understand your testimony correctly,

4    Mr. Wright, you never visited Ms. Ramos while she was at

5    the Jericho Hotel.

6         You never visited Ms. Ramos at her court

7    appearance on January 19th.

8         And you never visited Ms. Ramos while she was at

9    LIJ Manhasset.

10        Correct?

11   A.   That's correct.

12   Q.   Now, after your investigation concluded you prepared

13   a case status report.

14        Is that correct?

15   A.   Yes.

16   Q.   What is a case status report?

17   A.   It's a brief synopsis of things that have been done

18   relevant to a case at that time.

19        It can either be in the form of just providing

20   an update for the reader, or it can be used as a mechanism

21   to close out the case if there's not going to be any

22   further action taken on the case.

23   Q.   And this report went to your supervisor.

24        Is that correct?

25   A.   Yes.

Wright - Direct/Norinsberg

494

1    Q.   I'd like you to please take a look at

2    Plaintiff Exhibit 23 for identification.

3             (Whereupon, there was a pause in the

4    proceedings.)

5    BY MR. NORINSBERG:

6    Q.   Did you prepare the report, sir?

7    A.   Yes, I did.

8    Q.   Is that your case status report?

9    A.   Yes, it is.

10   Q.   What date did you report that report on?

11   A.   February 15, 2006.

12   Q.   Did you report that in the regular course of your

13   business as an internal affairs investigator?

14   A.   Yes, I did.

15            MR. NORINSBERG:   I offer Plaintiff Exhibit 23

16   into evidence.

17            THE COURT:   Any objection?

18            MS. FLYNN:   No objection.

19            THE COURT:   Plaintiff Exhibit 23 in evidence.

20            (Whereupon, Plaintiff Exhibit 23 was received in

21   evidence, as of this date.)

22   BY MR. NORINSBERG:

23   Q.   Now, according to your case status report, HIPAA

24   restrictions complicated your efforts to contact and

25   interview Ms. Ramos.

1           Is that correct?

2    A.    Correct.

3    Q.    And by HIPAA restrictions we are talking the federal

4    privacy laws for patients.

5           Correct?

6    A.    Correct.

7    Q.    So you represented to your boss that HIPAA's

8    restrictions was the reason that you were not able to

9    speak to Ms. Ramos.

10          Correct?

11   A.    Not entirely.

12   Q.    Well, you wrote that the HIPAA restrictions

13   complicated your efforts to contact and interview

14   Ms. Ramos.

15          Correct?

16   A.    In the context of how this was written in that line,

17   immediately upon her release from the Nassau County

18   Correctional Facility the attempts to contact her were

19   complicated by HIPAA restrictions.

20   Q.    Well, did HIPAA restrictions stop you from visiting

21   Jericho Motel --

22   A.    No.

23   Q.    -- on January 12, 2006?

24   A.    No.

25   Q.    Did HIPAA restrictions prevent you from calling

Wright - Direct/Norinsberg

496

1    Ms. Ramos at the Jericho Motel?

2    A.    No.

3    Q.    Did HIPAA restrictions prevent you from calling

4    Ms. Ramos at any time during that two-week period at the

5    Jericho Motel?

6    A.    No.

7    Q.    Did HIPAA restrictions prevent you from visiting the

8    Jericho Motel from January 12th to January 25th?

9    A.    No.

10   Q.    Did HIPAA restrictions prevent you from meeting

11   Ms. Ramos outside of court on January 19th, 2006?

12   A.    No.

13   Q.    The fact is, Mr. Wright, the HIPAA restrictions had

14   nothing to do with your failure to interview Ms. Ramos.

15         Did they?

16   A.    My failure to interview her?

17   Q.    Yes.

18   A.    I didn't fail to interview her.

19   Q.    You never interviewed Ms. Ramos regarding her

20   allegations in this case, did you, sir?

21   A.    I eventually obtained an appointment with Ms. Ramos

22   to interview her regarding this matter.

23   Q.    I didn't ask whether you obtained an appointment,

24   sir.

25         I asked you whether or not you ever interviewed

Wright - Direct/Norinsberg

497

1   her.

2   A.   I had in place an interview set up for her.

3   Q.   Did you ever speak to Ms. Ramos regarding her

4   allegations in this incident?

5   A.   No.

6        The interview was canceled.

7   Q.   The interview was canceled because the investigation

8   was removed from you and put into the hands of the

9   Criminal Investigation Bureau.

10       Correct?

11  A.   I don't recall.

12  Q.   Well, you do recall that the investigation was turned

13  over to CIB.

14       Correct?

15  A.   Yes, that's correct.

16  Q.   And can we agree that before --

17       MR. NORINSBERG:  Strike that.

18  BY MR. NORINSBERG:

19  Q.   The investigation was turned over on February 7th of

20  2006.

21       Is that correct?

22  A.   Correct.

23  Q.   Now, the first time you actually spoke to Ms. Ramos

24  was on February 3, 2006.

25       Is that correct?

Wright - Direct/Norinsberg

498

1    A.    Yes, that's correct.

2    Q.    And at that time you asked Ms. Ramos if it would be

3    okay to talk about the incident.

4          Correct?

5    A.    No, I did not.

6    Q.    Referring to your deposition, page 65, line 2:

7          Question:  Did you ask Ms. Ramos whether it

8    would be okay to talk to her about the incident at that

9    time?

10         Answer:  Yes.

11         Do you recall being asked that question and

12   giving that answer at your deposition?

13   A.    Yes, I do.

14   Q.    So at your deposition you said, yes.

15         You asked Ms. Ramos if it was okay to talk to

16   her at that time.

17         Correct?

18         MR. NORINSBERG:  Objection.

19         THE COURT:  Overruled.

20   A.    I took that in context of would she be willing to

21   speak to me regarding the matter.

22   Q.    And she told you she'd be willing to speak to you.

23         Correct?

24   A.    Correct.

25   Q.    But you didn't ask her what happened, did you?

499

1    A.    No, I did not.

2    Q.    And you didn't ask her what happened because you felt

3    it was not the appropriate time to ask her that question.

4          Correct?

5    A.    Correct.

6    Q.    But you had asked Ms. Ramos if it would be okay to

7    talk to her about the incident at that time.

8          Correct?

9    A.    I asked her if it would be -- if she would be willing

10   to speak to me if I set up an appointment to come and meet

11   with her.

12   Q.    Did Ms. Ramos ever tell you during that phone

13   conversation that she couldn't talk to you on the phone

14   about this incident?

15   A.    She was willing to speak to me, but she was in a day

16   area in a health facility.

17         And I didn't want to speak to her in that type

18   of context.

19   Q.    My question to you is, Mr. Wright, did Ms. Ramos tell

20   you during that phone conversation that she couldn't talk

21   to you on the phone about this incident?

22   A.    No.

23   Q.    Would you agree the conversation with Ms. Ramos was

24   brief?

25   A.    Yes.

500

1    Q.    And other than this brief phone conversation, you

2    never spoke to Ms. Ramos again during your investigation.

3          Correct?

4    A.    Correct.

5    Q.    And that phone conversation lasted approximately 30

6    seconds.

7          Correct?

8    A.    I wouldn't say.

9    Q.    Exactly how long did it last, Mr. Wright?

10   A.    I couldn't put a time on it.

11   Q.    So from the time that you first learned of

12   Ms. Ramos's complaint on December 30, 2005, until the time

13   when your investigation finished, on February 7, 2006, you

14   spoke only one time to the complainant, Rochelle Ramos, on

15   the phone.

16         Correct?

17   A.    Until the time the investigation was turned over to

18   another department of the sheriff's office, yes.

19         I only spoke to her one time.

20   Q.    And you never once spoke to Mr. Feinberg about the

21   incident.

22         Correct?

23   A.    Correct.

24   Q.    So the two main people who were involved in this

25   incident, Ms. Ramos and Mr. Feinberg, you never got around

501

1     to interviewing either one of them during your

2     investigation.

3            Correct?

4            MS. FLYNN:  Objection.

5            THE COURT:  Overruled.

6     A.   I never interviewed either one of them.

7     Q.   But one thing you did learn on February 3rd from

8     Ms. Ramos, she told you that she wanted to pursue criminal

9     charges.

10           Correct?

11    A.   Correct.

12    Q.   Now, on February 3rd, 2006, you learned that another

13    inmate was making similar allegations to Ms. Ramos.

14           Correct?

15    A.   That -- correct.

16    Q.   On that day, internal affairs received a phone call

17    from someone named Chris Dudley.

18           Correct?

19    A.   Correct.

20    Q.   And that came in approximately 9:20 in the morning on

21    February 3rd.

22           Is that correct?

23    A.   Yes.

24    Q.   Was that before or after you spoke to Ms. Ramos on

25    February 3rd?

502

1  A.   I don't recall.

2  Q.   And you were actually physically present when that

3  call came in on February 3rd.

4        Is that correct?

5  A.   Yes, I was.

6  Q.   You actually overheard another investigator,

7  Investigator Middleton, speaking to Mr. Dudley about this

8  complaint.

9        Correct?

10  A.   Yes.

11  Q.   And you heard from that conversation that this call

12  involved an allegation of possible sexual abuse in the

13  jail medical unit.

14        Correct?

15  A.   Correct.

16  Q.   So at that point in time, you reminded your

17  commanding officer that you had an open case.

18        Correct?

19  A.   Correct.

20  Q.   And after the call you were given a copy of the

21  complaint by Mr. Dudley.

22        Correct?

23  A.   Yes.

24        I was given a copy of the complaint.  It wasn't

25  given to me by Mr. Dudley.

Wright - Direct/Norinsberg

503

1   Q.   You were given a copy of the complaint which

2   Mr. Dudley had made to internal affairs.

3           Correct?

4   A.   Correct.

5   Q.   The complaint which specifically referred to

6   Lowrita Rickenbacker.

7           Correct?

8   A.   Correct.

9   Q.   I'd like to show you what's been marked

10  Plaintiff Exhibit 24 for identification.

11          (Whereupon, there was a pause in the

12  proceedings.)

13

14  BY MR. NORINSBERG:

15  Q.   Do you recognize this document, sir?

16  A.   Yes.

17  Q.   What do you recognize this document to be?

18  A.   A copy of an internal affairs sexual telephone

19  complaint.

20  Q.   Was that the complaint made by Mr. Dudley on February

21  3rd, 2006?

22  A.   Yes.

23  Q.   Was that the complaint referring to another inmate,

24  Lowrita Rickenbacker?

25  A.   Yes.

Wright - Direct/Norinsberg

504

1   Q.   And you received that complaint on February 3rd.

2        Is that correct?

3   A.   Yes.

4        MR. NORINSBERG:  I offer that exhibit into

5   evidence.

6        THE COURT:  Any objection?

7        MS. FLYNN:  No objection, your Honor.

8        THE COURT:  Plaintiff Exhibit 24 in evidence.

9        (Whereupon, Plaintiff Exhibit 24 was received in

10  evidence, as of this date.)

11       THE COURT:  Who's Mr. Dudley?

12       THE WITNESS:  Someone from the outside, your

13  Honor.

14  BY MR. NORINSBERG:

15  Q.   Mr. Dudley identified himself as somebody calling on

16  behalf of inmate Lowrita Rickenbacker.

17       Is that correct?

18  A.   Correct.

19  Q.   And can you tell us, sir, what does it say regarding

20  this complaint?

21  A.   Would you like me to read --

22  Q.   Please read it to the jury.

23  A.   Under nature of complaint it says, the complainant is

24  calling on behalf of inmate Lowrita Rickenbacker, and

25  alleges that a staff member of the jail medical unit is

Wright - Direct/Norinsberg

505

1    sexually abusing inmates.

2            This includes inmate Rickenbacker.

3    Q.   Can you continue reading, sir?

4    A.   Yeah, I just --

5            THE COURT:  By the way, he reads very well.

6            So now we are going to have two people that read

7    slow.  That's good.  I mean the volume, I'm not talking

8    about the content.

9            THE WITNESS:  Thank you, your Honor.

10           THE COURT:  Okay.

11   A.   This includes inmate Rickenbacker.

12           Said someone needs to talk with her and that she

13   is in court today.

14   Q.   So now, as of February 3rd, you have two women

15   complaining about sexual abuse by a staff member in the

16   jail medical unit.

17           Correct?

18   A.   Correct.

19   Q.   You were already aware that as of December 29th,

20   2005, an inmate had claimed that she had been sexually

21   assaulted by a member of the jail medical unit.

22           Correct?

23   A.   As of December 30th.

24   Q.   The complaint came in.

25           But you were aware that an incident had

506

1  occurred, according to that inmate --

2  A.   It was an allegation of an incident on December 29th.

3        Yes.

4  Q.   So you are aware of the December 29th allegation.

5        Now you are aware of another allegation being

6  made on February 3rd.

7        Is that correct?

8  A.   Correct.

9  Q.   Now, at that point, did you put two and two together

10  and conclude that possibly this could be the same person

11  in the jail medical unit involved in both cases?

12  A.   No.

13  Q.   It didn't occur to you that these two women were

14  talking about being sexually abused by somebody in the

15  jail medical unit might be describing the same person?

16  A.   I hadn't spoken to anyone specifically about it.

17        I have no idea who they might be referring to.

18  There's a lot of people in the jail medical unit.

19  Q.   Did you even entertain the possibility that maybe

20  this was the same person both women were talking about?

21        MS. FLYNN:  Objection.

22        THE COURT:  Sustained.

23  BY MR. NORINSBERG:

24  Q.   Can we agree that even after you received

25  Mr. Dudley's call, you still did not attempt to speak to

507

1    Mr. Feinberg?

2    A.    Correct.

3    Q.    As far as you were concerned, even at that point,

4    even after a second complaint, you didn't see any reason

5    to talk to Mr. Feinberg.

6          Correct?

7    A.    At that point, I had no reason to believe that

8    Mr. Feinberg was in any way associated with the complaint

9    being made by Mr. Dudley.

10   Q.    And after you received this phone call, did you

11   attempt to speak to anybody in the jail medical unit

12   regarding these claims?

13   A.    No.

14   Q.    Well, that would be one way to find out if, perhaps,

15   the call coming in from Mr. Dudley, and the complaint that

16   was referenced, was connected to Ms. Ramos's complaint.

17   A.    Not at all.

18   Q.    Do you mean to tell me it wouldn't have occurred to

19   you to go to the jail medical unit to interview some of

20   the employees?

21   A.    Not at that point.

22   Q.    As it turned out, you never went to the jail medical

23   unit, did you?

24   A.    Specific to this incident?

25   Q.    Specific to either one of these claims.

Wright - Direct/Norinsberg

508

1   A.   No.

2   Q.   You know who Dr. Geraci is, correct?

3   A.   Correct.

4   Q.   He's the medical director in the jail medical unit.

5        Correct?

6   A.   Correct.

7   Q.   At any point in January of 2006, did you ever speak

8   to Dr. Geraci regarding the allegations made by Ms. Ramos?

9   A.   No.

10  Q.   Did you ever speak to Dr. Geraci at any point in your

11  investigation, even after you learned about the second

12  complaint?

13  A.   No.

14  Q.   As far as you were concerned, it wasn't necessary to

15  speak to the director of the jail medical unit.

16       Correct?

17  A.   No.

18  Q.   Even though the employee clearly worked in the jail

19  medical unit, and clearly was part of the medical staff,

20  you didn't feel it was necessary to speak to anybody in

21  the jail medical unit.

22       Correct?

23  A.   Correct.

24  Q.   Now --

25       THE COURT:  I think we better take a recess at

Wright - Direct/Norinsberg

509

1     this time.

2          Members of the jury, we are going to recess, as

3     you know, until Monday, November 16th.  Tomorrow I have

4     other matters I take care of.  We will recess until

5     Monday, November 16th at 9:30 a.m.

6          In the meantime, please do not discuss this

7     case, either among yourselves or with anyone else.  Keep

8     an open mind.  Come to no conclusions.  Do not read

9     Newsday.  Do not watch Channel 12.

10          Those of you who are employed, I think it's a

11    good time to go to work and catch up with all the work you

12    are missing.  There may be some unkind, unpleasant people

13    in your place of employment that might come up to you and

14    say, how come you couldn't get out of jury duty?  I always

15    get out of jury duty.  You know there are people like

16    that.

17          And I would suggest that, if they say that, that

18    you respond that sitting on a jury in a federal court is

19    not a burden.  It is not even an obligation.  It is a

20    privilege.  In my view, the second highest privilege of

21    American citizenship.

22          And when this case is over I'm going to tell you

23    what the highest privilege of American citizenship is.  So

24    now you have three things to look forward to.  One, what's

25    the highest privilege of American citizenship?  Two, where

510

1    is it we all have to wait?  And, three, the case is over.

2            We are going to recess until Monday, November

3    16th, at 9:30 a.m.  Have a nice weekend.

4            ALL JURORS:  You too.

5            THE COURT:  Please recess yourselves.

6            (Jury leaves the courtroom.)

7

8            THE COURT:  9:30 Monday morning.

9            MS. FLYNN:  Judge, may I ask if we could be

10   provided with an update from plaintiff's counsel as to the

11   whereabouts of his client?

12           THE COURT:  As to the whereabouts of his client?

13           Why.  Do you want to subpoena her?

14           MS. FLYNN:  I would like to know if and when

15   she's going to appear in court now that we are on the

16   second day of trial and there's still no appearance by

17   her.

18           THE COURT:  That's what makes this case so

19   interesting.  We wait in eager anticipation to see the

20   plaintiff, maybe.  I don't know.

21           I assume plaintiff's counsel, who seems to know

22   what he's doing, will bring her in or make other

23   arrangements.

24           I assume.

25           MR. NORINSBERG:  Fair assumption, your Honor.

511

1          THE COURT:  Okay.

2          We will see you on Monday, November 16th, at

3     9:30 a.m. as the drama unfolds.  You have to be back at

4     that time.

5          THE WITNESS:  Yes, your Honor.

6          MR. NORINSBERG:  Your Honor, just a request

7     before we go off the record that we'd like to be provided

8     with a copy of this warrant for Ms. Rickenbacker that

9     Ms. Flynn had referred to earlier.

10         THE COURT:  There's a warrant outstanding for

11    Ms. Rickenbacker?

12         MR. NORINSBERG:  That's what Ms. Flynn

13    represented.

14         MS. FLYNN:  Yes.

15         MR. NORINSBERG:  We'd just like to get a copy of

16    it.

17         THE COURT:  Sure.

18         MS. FLYNN:  Would you like a copy, Judge?

19         THE COURT:  Yes.

20         MS. FLYNN:  If I may also, Judge, we have the

21    defendant's requests to charge.

22         THE COURT:  Good.

23         MS. FLYNN:  May I give you those?

24         THE COURT:  Sure.

25         Did you give a copy to counsel?

512

1          MS. FLYNN:  I will.

2          Here's the warrant.

3          THE COURT:  Good.

4          I can use all the help I can get.

5          MS. FLYNN:  Thank you.

6          THE COURT:  All right.

7          We'll see you Monday morning.

8          (Whereupon, the trial was adjourned until

9     Monday, November 16th, 2009, at 9:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           I N D E X

2

3    Witnesses                                          Page

4

5

6    **VINCENT GERACI**                                  233

7    DIRECT EXAMINATION

8    BY MR. NORINSBERG                                  234

9    CROSS-EXAMINATION

10   BY MS. FLYNN                                       277

11   REDIRECT EXAMINATION

12   BY MR. NORINSBERG                                  319

13   RECROSS-EXAMINATION

14   BY MS. FLYNN                                       341

15   REDIRECT EXAMINATION

16   BY MR. NORINSBERG                                  345

17   **RICHARD KAUFMAN**                                346

18   DIRECT EXAMINATION

19   BY MR. NORINSBERG                                  346

20

21   CROSS-EXAMINATION

22   BY MS. FLYNN                                       400

23   REDIRECT EXAMINATION

24   BY MR. NORINSBERG                                  410

25   **CAROL MANDERINO**                                415

1

2    DIRECT EXAMINATION

3    BY MR. NORINSBERG                          415

4    CROSS-EXAMINATION

5    BY MS. FLYNN                               451

6    REDIRECT EXAMINATION

7    BY MR. NORINSBERG                          464

8    **JAMES WRIGHT**                            470

9    DIRECT EXAMINATION

10   BY MR. NORINSBERG                          471

11

12                       E X H I B I T S

13                                          Page

14

15

16   Plaintiff Exhibit 56 was received in evidence    260

17   Plaintiff Exhibit 30 A was received in evidence   382

18   Plaintiff Exhibit 30 B was received in evidence   387

19   Plaintiff Exhibit 31 was received in evidence    392

20   Plaintiff Exhibit 23 was received in evidence    494

21   Plaintiff Exhibit 24 was received in evidence    504

22   Plaintiff's Exhibit 48 in evidence            325

23   Plaintiff's Exhibit 58 in evidence            330

24   Plaintiff's Exhibit 3 in evidence             421

25   Plaintiff's Exhibit 4 in evidence             423

1    Plaintiff's Exhibit 5 in evidence                          435

2    Plaintiff's Exhibits 6 and 7 in evidence                   439

3    Plaintiff's Exhibit 55 in evidence                         446

4    Plaintiff's Exhibit 21 in evidence                         478

5    Plaintiff's Exhibit 22 in evidence                         480

6    Defendant's Exhibit B in evidence                          289

7    Defendant's Exhibits DD, Z, CC, BB and AA in evidence      312

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

'05 [17] - 344:13; 416:25; 417:12, 14, 17; 423:18, 20; 429:23; 435:12; 436:7; 438:19; 445:17; 465:14; 467:2; 477:11

'06 [5] - 390:11; 423:21; 440:19; 465:18

'92 [1] - 451:11

'96 [1] - 451:14

---

**1**

1 [3] - 265:24; 283:21; 402:12

1/20/06 [1] - 392:22

10 [7] - 276:6; 279:21; 280:3; 307:12; 311:10; 474:14; 483:18

100 [3] - 232:19, 21; 331:10

10007 [1] - 232:14

11 [2] - 472:22

11/23/06 [1] - 429:8

11722 [1] - 232:22

11788 [1] - 232:19

1180 [1] - 232:21

12 [6] - 232:7; 487:18, 24; 488:2; 495:23; 509:9

12/29.05 [1] - 336:5

12/29/05 [3] - 324:22; 333:6

12/30 [1] - 477:11

12/30/05 [1] - 331:8

12/30/06 [1] - 344:12

121 [1] - 484:25

127 [1] - 263:21

12th [8] - 484:18; 485:19, 21; 486:12; 489:9, 18; 491:25; 496:8

13 [9] - 417:24; 419:1, 6; 453:16; 485:21, 25; 486:7, 19, 24

130 [1] - 276:6

14 [1] - 281:11

14th [1] - 390:11

15 [5] - 355:8; 363:20; 448:15; 482:13; 494:11

16 [3] - 300:21; 301:8; 336:13

1622 [3] - 475:7, 13, 15

16th [5] - 509:3, 5; 510:3; 511:2; 512:9

17 [3] - 255:7; 349:19; 486:5

18 [10] - 235:17; 238:8; 248:5; 272:9; 300:16, 20; 341:21; 350:19; 351:19; 407:12

18th [3] - 267:15; 384:25; 386:9

19 [5] - 278:17; 279:8; 489:10; 490:2; 491:5

1979 [2] - 347:16; 402:12

1996 [1] - 451:14

199889 [1] - 408:12

1999 [1] - 472:21

19th [4] - 489:21, 23; 493:7; 496:11

1:30 [1] - 373:5

---

**2**

2 [7] - 432:7, 10, 12, 16; 478:25; 498:6

20 [20] - 253:17; 320:4; 354:16; 358:24; 396:10; 398:5; 399:3; 404:12; 413:5, 10; 420:2, 15, 17-18; 421:18; 422:13; 424:21; 463:16; 464:3; 473:10

2000 [3] - 416:9; 424:20; 451:25

2003 [1] - 301:14

2004 [5] - 248:3, 5, 9; 347:23; 402:21

2005 [61] - 255:4; 260:11, 20; 262:1; 293:3, 12; 295:16; 300:12; 304:15; 305:18; 326:4; 330:10; 331:4; 332:6, 10, 18; 344:21; 349:16; 370:11; 401:14, 16; 402:4; 414:13; 417:10, 19, 24; 419:1, 6, 17; 424:19; 433:4, 10, 12, 21; 434:5; 446:5; 453:16; 454:20; 455:11, 25; 457:5, 13; 459:9; 460:14; 461:21; 465:11; 467:21; 468:3, 24; 472:24; 473:5, 13, 23; 475:18; 476:16; 480:22; 481:2, 8; 500:12; 505:20

2005-2006 [6] -

294:22; 305:24; 306:9, 12; 314:17; 409:1

2006 [69] - 238:8; 242:5, 10, 12; 250:23; 251:3; 253:17; 258:22; 259:2; 263:20; 264:19; 265:24; 267:16; 271:18; 272:11; 295:16; 300:16, 20; 304:15; 305:18; 341:22; 349:17; 351:20; 358:24; 384:25; 393:9; 399:3; 404:18; 406:14, 19; 407:13; 411:23; 417:22; 420:2, 16; 424:21; 430:25; 431:25; 439:16; 455:25; 462:7; 463:5, 16; 464:3; 479:1; 480:25; 481:2; 482:5, 8, 16; 483:7, 10, 16, 20; 487:18; 488:2; 491:5; 494:11; 495:23; 496:11; 497:20, 24; 500:13; 501:12; 503:21; 508:7

2007-2008 [1] - 411:25

2009 [6] - 232:7; 346:19; 411:22; 414:13; 488:25; 512:9

20th [21] - 251:4; 259:2, 5, 9; 262:14; 263:6; 267:16; 280:20; 336:16, 22; 360:17; 361:11; 376:22; 391:13; 393:10, 15; 394:25; 395:17, 21; 430:2; 465:17

21 [7] - 257:15; 435:12; 476:23; 478:6, 10-11; 515:4

22 [8] - 354:16; 479:19; 480:5, 9-10; 482:13; 491:2; 515:5

225 [1] - 232:14

22nd [2] - 436:18; 438:19

23 [7] - 238:17, 21; 494:2, 15, 19-20; 514:20

233 [1] - 513:6

234 [1] - 513:8

23rd [8] - 244:25; 293:1, 21-22; 426:12; 429:23; 432:3

24 [7] - 278:17; 279:8; 477:16; 503:10; 504:8; 514:21

24th [6] - 393:9, 11; 398:5; 412:22; 413:1

25 [7] - 351:9, 12; 457:5; 465:20; 486:1; 487:18; 488:2

25th [13] - 422:11; 423:18; 424:21; 430:6; 445:17; 446:5; 466:10; 485:19, 22; 492:4, 19, 22; 496:8

260 [1] - 514:16

2700 [1] - 232:14

277 [1] - 513:10

28 [1] - 293:12

289 [1] - 515:6

29 [6] - 258:22; 300:12; 326:4; 401:14, 16; 436:20

29th [5] - 480:21; 481:8; 505:19; 506:2, 4

2nd [1] - 479:8

---

**3**

3 [11] - 272:11; 420:7, 23; 421:22; 463:23; 477:19; 487:4; 497:24; 514:24

3-0-A [1] - 381:24

3-8 [1] - 381:23

30 [36] - 331:3; 332:6, 10, 18; 344:21; 367:25; 381:22, 25; 382:2, 16, 19, 21; 385:14; 386:19, 21, 24; 387:6, 13, 15, 18, 20; 388:6; 407:12, 24; 408:7; 454:18; 466:3; 473:5, 13, 23; 476:17; 500:5, 12; 514:17

30th [7] - 330:9; 475:6, 13, 17; 478:4; 479:5; 505:23

31 [10] - 355:8; 391:24; 392:10, 14-15; 393:8; 463:20-22; 514:19

312 [1] - 515:7

319 [1] - 513:12

325 [1] - 514:22

330 [1] - 514:23

341 [1] - 513:14

345 [1] - 513:16

346 [2] - 513:17, 19

35 [2] - 257:15; 454:18

382 [1] - 514:17

**387** [1] - 514:18

**392** [1] - 514:19

**3rd** [9] - 501:7, 12, 21, 25; 502:3; 503:21; 504:1; 505:14; 506:6

**4**

**4** [9] - 281:17; 422:24; 423:9, 14, 19; 463:22; 483:7, 10; 514:25

**40** [1] - 331:8

**400** [1] - 513:22

**410** [1] - 513:24

**415** [2] - 513:25; 514:3

**421** [1] - 514:24

**423** [1] - 514:25

**435** [1] - 515:1

**439** [1] - 515:2

**446** [1] - 515:3

**451** [1] - 514:5

**464** [1] - 514:7

**470** [1] - 514:8

**471** [1] - 514:10

**478** [1] - 515:4

**48** [7] - 324:9; 325:4, 10, 21, 24-25; 514:22

**480** [1] - 515:5

**494** [1] - 514:20

**4:22** [2] - 475:15, 17

**4th** [1] - 483:12

**5**

**5** [7] - 434:24; 435:18, 22-23; 481:2; 482:16; 515:1

**50** [2] - 351:9, 12

**504** [1] - 514:21

**55** [5] - 445:9, 24; 446:2; 515:3

**56** [7] - 238:17, 21; 258:13; 259:25; 260:4; 514:16

**57** [5] - 332:21; 333:10; 334:20; 339:2; 486:5

**58** [7] - 330:2, 16, 24-25; 487:4, 24; 514:23

**59** [1] - 349:11

**5th** [2] - 480:25; 482:2

**6**

**6** [10] - 380:2; 438:11, 21, 25; 439:2, 4, 16;

**440:19; 474:14; 515:2**

**6/2** [2] - 260:10, 20

**631** [2] - 232:21

**65** [1] - 498:6

**68** [2] - 235:17; 363:20

**69** [1] - 483:18

**7**

**7** [8] - 367:11; 437:24; 438:22, 25; 439:2; 477:16; 500:13; 515:2

**712-6106** [1] - 232:21

**712-6122** [1] - 232:22

**73** [2] - 367:11; 491:2

**74** [2] - 281:6, 17

**79** [1] - 272:9

**7th** [2] - 242:15; 497:19

**8**

**8** [6] - 242:5, 12; 263:7; 264:19; 378:9; 440:7

**8/25** [1] - 438:10

**8/29/05** [1] - 438:10

**80** [1] - 378:9

**85** [1] - 279:21

**86** [1] - 380:2

**87** [1] - 316:3

**8:30** [2] - 332:18; 344:18

**8:35** [2] - 331:3; 344:19

**8th** [8] - 242:10, 16; 336:19, 22; 397:25; 406:14, 19; 407:2

**9**

**9** [3] - 263:21; 281:6; 371:7

**90** [1] - 322:5

**9:20** [1] - 501:20

**9:30** [5] - 509:5; 510:3, 8; 511:3; 512:9

**9:40** [1] - 232:8

**9th** [2] - 346:19; 406:22

**A**

**A-H-E-D-A** [1] - 262:7

**a.m** [5] - 232:8; 509:5; 510:3; 511:3; 512:9

**AA** [6] - 310:10; 311:6, 25; 312:2; 317:9; 515:7

**abdomen** [1] - 326:13

**ability** [3] - 306:25; 409:18; 484:6

**able** [10] - 311:7; 312:1; 374:19, 21, 25; 382:19; 383:7; 495:8

**Absolutely** [3] - 445:12; 457:24; 481:22

**absolutely** [1] - 437:9

**abuse** [34] - 256:16; 370:15; 401:23; 402:2, 15; 403:1; 405:4, 16; 416:18; 441:13, 22; 442:1, 11; 443:1, 13, 20; 444:9, 16, 19; 447:5, 21, 24; 451:17; 455:1; 457:6; 458:2, 9; 469:8, 15; 481:20, 23; 502:12; 505:15

**abused** [15] - 421:7; 444:3, 5; 446:8; 447:13; 448:3; 455:8, 19; 458:13; 464:13, 20; 470:3, 8; 481:12; 506:14

**abusing** [7] - 456:23; 458:15, 19; 466:20; 468:5, 25; 505:1

**accept** [1] - 277:17

**According** [1] - 332:9

**according** [7] - 292:18; 302:15; 378:20; 432:19; 487:11; 494:23; 506:1

**accordingly** [1] - 236:24

**account** [8] - 388:11, 24; 389:5; 390:5; 444:8, 11, 22; 448:9

**accounting** [1] - 444:15

**accounts** [3] - 388:13; 389:19

**accurate** [2] - 383:8; 391:21

**accurately** [1] - 384:15

**acid** [1] - 292:9

**acknowledging** [1] - 381:3

**acted** [2] - 253:11; 269:8

**acting** [2] - 275:9; 305:15

**action** [11] - 249:10;

**355:6, 10; 356:9; 397:4; 398:7, 9, 12; 462:15; 493:22**

**actions** [2] - 269:5; 356:16

**activity** [1] - 418:20

**adamantly** [2] - 364:22; 365:9

**add** [2] - 419:13

**addition** [4] - 294:3; 299:4; 316:16; 403:3

**additional** [1] - 336:17

**additionally** [1] - 390:9

**address** [3] - 338:18; 452:13; 485:15

**addressed** [2] - 257:8, 17

**Adelphi** [1] - 451:13

**adjourned** [1] - 512:8

**administered** [4] - 293:2, 5; 322:4, 6

**administration** [4] - 265:24; 287:7; 289:5; 293:6

**Administration** [2] - 287:6; 289:6

**administrative** [9] - 439:16, 18, 25; 440:12, 15; 441:7, 10; 462:6, 11

**admission** [1] - 329:22

**admit** [1] - 269:11

**ADS** [1] - 232:4

**adult** [1] - 302:20

**advise** [1] - 464:8

**advised** [4] - 278:2, 9; 374:12; 476:1

**Advised** [1] - 429:9

**afebrile** [1] - 326:16

**Affairs** [11] - 368:25; 369:3, 7, 15; 472:10, 12, 20; 473:9, 19; 478:21; 480:3

**affairs** [19] - 271:18, 24; 272:4, 11, 17, 20, 23; 399:4, 7, 11, 13; 406:7; 439:8, 12, 20; 494:13; 501:16; 503:2, 18

**affect** [3] - 255:22; 291:7, 12

**afield** [2] - 269:3; 291:13

2

**afternoon** [12] - 346:16; 376:19; 400:25; 415:19; 451:6; 471:4; 475:15, 17

**AFTERNOON** [1] - 374:1

**afterthought** [1] - 408:10

**afterwards** [5] - 315:8; 332:17; 386:1; 395:13; 437:8

**ago** [17] - 264:3; 328:3; 334:9; 345:3; 354:23; 355:17, 22; 363:25; 367:3, 19; 378:15; 380:10, 20; 404:3; 410:19; 414:10; 489:3

**agree** [14] - 273:9, 18, 21; 277:20; 322:7; 340:3; 428:13, 18; 479:8; 481:2; 486:11; 497:16; 499:23; 506:24

**agreed** [3] - 277:17; 397:4

**ahead** [2] - 282:15; 284:4

**Air** [2] - 294:7

**al** [1] - 232:7

**alcohol** [7] - 403:1; 405:4; 416:19; 450:6; 451:18; 461:19

**ALL** [2] - 233:6; 510:4

**allegation** [26] - 238:7; 250:4, 18, 20; 288:4; 302:19; 332:1; 354:14, 17; 356:10; 360:18; 363:10; 396:7; 405:15; 418:5, 7; 426:25; 479:6; 481:21, 23-24; 502:12; 506:2, 4

**allegations** [118] - 237:1, 5; 245:11; 249:12; 250:6, 16; 251:5, 20, 23; 252:1, 3, 8, 18; 253:13, 20; 256:15; 259:1; 262:14; 265:7, 17; 266:5; 267:11, 18, 21; 270:4, 25; 271:14; 273:24; 274:6, 9; 279:23; 280:10, 15, 18, 24-25; 281:9, 13; 300:17; 303:12, 15, 23; 304:5, 11, 16; 320:5; 321:8; 331:23; 336:4, 17; 337:10, 17; 341:12;

342:2; 343:4; 344:6; 351:16, 19, 23; 352:13; 353:9; 355:3, 6; 356:18; 357:1; 358:17; 362:8, 14; 364:16; 365:9; 368:22; 369:8, 11, 20; 371:8, 20, 22, 25; 372:16; 381:15; 393:18, 23; 394:1; 399:8; 400:1, 7, 16; 401:17; 403:12; 405:25; 406:1, 16; 419:3, 7; 429:21, 24; 431:14, 17; 433:25; 442:3; 445:1; 447:10, 19; 468:3; 472:12; 475:18, 22; 478:23; 481:20; 484:7, 13; 496:20; 497:4; 501:13; 508:8

**alleged** [4] - 234:23; 258:7; 352:15; 476:2

**allegedly** [2] - 300:11; 444:13

**alleges** [3] - 368:10; 401:12; 504:25

**allow** [7] - 257:22; 291:17, 23; 310:7; 338:9; 343:10; 403:19

**allowed** [3] - 291:11; 300:3; 303:8

**allowing** [1] - 288:16

**almost** [2] - 343:9; 472:22

**Almost** [1] - 343:9

**altogether** [1] - 454:16

**American** [3] - 509:21, 23, 25

**amount** [2] - 260:12, 21

**angle** [1] - 326:17

**angry** [2] - 362:3, 5

**anniversary** [1] - 402:12

**Answer** [32] - 235:21; 239:1, 4; 257:18; 263:24; 272:13; 276:9; 279:11, 16; 280:11, 16, 20, 25; 281:20; 350:22; 354:18; 355:11; 363:23; 367:15; 378:11; 380:6; 473:13; 474:17; 477:20, 24; 482:18; 483:21; 486:8; 487:8; 488:3; 491:6; 498:10

**answer** [43] - 239:7; 264:1; 279:4; 280:2;

281:23; 296:15; 318:7; 334:23; 348:13; 350:24; 353:15; 355:14; 367:17; 377:22; 378:2, 5, 8, 16; 380:8; 398:21; 409:5, 8; 411:7; 428:7; 466:8, 25; 468:10, 12, 15-17, 19; 473:15-17; 482:21; 483:11; 485:8; 487:2; 498:12

**answered** [2] - 281:15; 405:17

**answering** [1] - 378:25

**answers** [1] - 281:4

**anti** [2] - 292:15

**anti-psychotic** [2] - 292:15

**anticipate** [1] - 291:2

**anticipation** [1] - 510:19

**anxiety** [1] - 293:18

**anyway** [2] - 283:20; 319:23

**Apart** [1] - 369:19

**apart** [2] - 237:13; 265:1

**apologize** [1] - 336:2

**appear** [3] - 277:14; 328:20; 510:15

**appearance** [10] - 489:10, 20, 23; 490:1, 5; 491:4, 18, 22; 493:7; 510:16

**APPEARANCES** [1] - 232:12

**appearing** [1] - 456:15

**apple** [4] - 310:10; 313:11

**application** [1] - 374:14

**appointment** [3] - 496:21, 23; 499:10

**approach** [2] - 246:7; 342:14

**appropriate** [1] - 499:3

**appropriately** [1] - 305:5

**approximation** [1] - 351:12

**April** [2] - 417:11; 488:25

**area** [14] - 309:19; 310:12; 313:17, 23; 316:20; 318:12; 321:21;

322:5; 350:13, 16, 20; 351:4; 499:16

**areas** [1] - 327:1

**ARLENE** [1] - 232:18

**arm** [1] - 383:24

**arrangements** [1] - 510:23

**arrest** [20] - 241:22; 244:20, 22-23; 254:10, 12; 267:12; 274:23; 323:2; 375:17; 379:3; 380:1, 12, 17; 381:4, 11; 398:7; 399:24; 400:7

**arrested** [24] - 242:5; 249:21, 25; 250:8; 256:17; 257:2; 263:7, 15, 17, 19; 264:17; 273:23; 274:3; 336:19; 377:17, 20, 24; 379:7, 18; 380:3; 398:1; 406:20; 407:1

**arriving** [2] - 260:9, 19

**ARTHUR** [1] - 232:10

**arts** [1] - 294:14

**assault** [1] - 368:11

**assaulted** [4] - 300:11; 455:22; 476:2; 505:21

**assaulting** [1] - 345:9

**assaults** [1] - 476:13

**assessment** [1] - 327:7

**assigned** [3] - 316:17; 347:19; 472:10

**assistant** [3] - 326:21; 350:10; 481:7

**associated** [1] - 507:8

**associates** [1] - 294:14

**assume** [3] - 433:19; 510:21, 24

**assuming** [1] - 326:11

**assumption** [1] - 510:25

**attack** [1] - 343:2

**attempt** [9] - 272:23; 482:16; 486:24; 487:5, 17, 25; 491:21; 506:25; 507:11

**attempts** [1] - 495:18

**attend** [2] - 490:2; 491:4

**attended** [5] - 294:13, 17; 296:20; 359:1, 15

4

**attention** [10] - 301:17; 366:15; 392:18; 417:24; 421:5; 426:5; 432:2; 435:25; 455:10; 472:24
**attire** [1] - 410:1
**Attorney** [1] - 232:17
**attorney** [7] - 278:18; 297:23; 303:10; 347:3; 403:21; 471:17
**attorneys** [1] - 456:7
**August** [9] - 433:21; 434:5; 435:12; 436:7, 18, 20; 438:19; 459:9; 460:14
**authority** [5] - 303:17; 305:10; 319:20; 320:1, 7
**available** [3] - 278:3, 6, 9
**avoid** [1] - 287:17
**aware** [33] - 257:13, 18, 23; 271:16, 23; 272:2, 4, 7, 10, 16; 301:24; 302:1, 4; 304:15; 344:20; 390:14; 399:2; 401:12; 405:20; 407:1; 447:9; 452:17, 21; 456:3, 7; 461:12; 475:18, 20-21; 505:19, 25; 506:4

## B

**B-E-N-T-Y-L** [2] - 289:25; 328:24
**babies** [1] - 315:13
**Bachelor's** [3] - 294:15; 402:24; 451:11
**background** [4] - 294:10; 402:23; 451:9; 469:14
**backs** [1] - 312:22
**baker** [7] - 287:3; 289:3; 310:8; 311:25; 387:18
**barely** [1] - 435:15
**based** [1] - 423:4
**Based** [2] - 273:7; 295:3
**bases** [1] - 303:16
**basis** [7] - 239:14, 25; 297:9; 298:20; 300:24; 301:1; 349:4
**bathroom** [3] - 315:15; 317:2, 6

**BB** [5] - 310:8; 311:25; 312:2, 14; 515:7
**beat** [1] - 319:11
**became** [1] - 302:4
**become** [4] - 301:25; 334:17; 472:25; 473:22
**bedtime** [4] - 292:21; 293:20; 331:10, 14
**BEFORE** [1] - 232:10
**begged** [3] - 425:16; 455:14
**begin** [1] - 449:4
**beginning** [3] - 242:17; 375:5; 425:17
**begun** [1] - 458:15
**behalf** [8] - 277:17; 331:4; 445:14; 457:12, 14; 458:21; 504:16, 24
**behavior** [2] - 442:24; 443:9
**behind** [3] - 297:11; 384:2, 9
**bench** [3] - 455:5; 467:3, 12
**bend** [1] - 384:7
**BENNITTA** [1] - 232:13
**bent** [1] - 297:2
**Bentyl** [6] - 289:22; 292:4; 327:11; 328:21, 24
**best** [8] - 244:25; 268:5; 316:4; 334:22; 351:12; 352:7; 381:3; 435:5
**better** [6] - 340:17; 355:20, 22; 417:9; 443:23; 508:25
**between** [11] - 388:17; 389:6, 12; 401:13; 407:18; 417:13; 419:18; 420:3; 427:16, 21; 431:19
**beyond** [1] - 291:22
**bit** [9] - 294:1, 9; 298:13; 300:10; 304:22; 328:18; 402:22; 451:8; 452:4
**blade** [1] - 297:3
**blades** [1] - 296:23
**bland** [1] - 327:11
**blonde** [1] - 313:24
**Bloomberg** [1] - 349:25
**blowup** [1] - 308:7
**blowups** [1] - 307:20

**book** [1] - 283:18
**boss** [1] - 495:7
**bother** [2] - 425:15; 427:13
**bothered** [4] - 424:24; 425:1, 19; 485:16
**bottom** [5] - 386:12; 388:6; 407:14; 413:3; 421:6
**bowel** [5] - 326:14; 327:9; 329:1, 17
**box** [1] - 293:6
**boy** [2] - 309:14
**boyfriend** [2] - 460:18; 461:13
**break** [1] - 372:23
**Briarcliff** [1] - 451:11
**brief** [4] - 242:25; 493:17; 499:24; 500:1
**briefing** [1] - 296:21
**Briefly** [1] - 282:25
**briefly** [2] - 254:12; 282:23
**bring** [12] - 299:16; 318:14; 362:13; 375:10; 376:8; 394:9; 395:1; 396:3, 11; 426:4; 510:22
**Broadway** [1] - 232:14
**brother** [3] - 484:19; 486:12; 492:1
**brother-in-law** [3] - 484:19; 486:12; 492:1
**brought** [4] - 366:14; 393:18; 431:9
**build** [1] - 269:7
**building** [1] - 359:11
**Building** [1] - 232:18
**bullet** [2] - 388:6, 10
**bunch** [1] - 388:6
**burden** [2] - 468:20; 509:19
**bureau** [1] - 399:20
**Bureau** [4] - 369:1, 3, 7; 497:9
**business** [3] - 316:15; 451:10; 494:13
**BY** [100] - 232:17; 234:3; 238:23; 239:9; 240:19; 241:1; 242:11; 248:2; 250:13; 255:2; 256:5; 257:1; 258:17; 260:7; 262:8; 270:2,

16; 274:20; 275:1, 7, 19; 277:4; 278:1; 280:8; 282:16; 285:2, 9, 16; 289:9; 292:2; 300:1; 301:23; 304:3; 306:21; 312:12; 318:9, 18, 24; 319:18; 323:7; 328:1; 341:5; 344:3; 345:2; 346:15; 376:18; 378:7; 382:3, 9, 23; 385:19; 387:22; 389:23; 392:5, 17; 394:24; 396:1; 397:17; 400:5, 24; 401:4; 402:3; 410:18; 414:1; 415:18; 417:6; 418:23; 421:4; 423:22; 432:15; 434:3; 435:24; 436:13; 439:3; 440:22; 445:7; 446:4; 447:1; 451:5; 464:18; 471:3; 491:1; 494:5, 22; 497:18; 503:14; 504:14; 506:23; 513:8, 10, 12, 14, 16, 19, 22, 24; 514:3, 5, 7, 10

## C

**C-A-R-O-L** [1] - 415:13
**C-L-A-R-K-E** [1] - 474:9
**calculate** [1] - 299:15
**Campo** [22] - 236:25; 237:4, 9, 14, 17, 20; 238:4, 9, 24; 239:2, 13, 18, 23; 240:2, 21; 241:2; 243:9; 248:23, 25; 249:11; 297:24; 298:2
**campus** [1] - 294:17
**canceled** [2] - 497:6
**cannot** [1] - 374:13
**capacity** [1] - 291:9
**car** [1] - 254:15
**care** [7] - 305:15; 315:13; 322:15; 416:21, 23; 457:11; 509:4
**cared** [1] - 455:8
**career** [2] - 305:2; 443:16
**careful** [1] - 452:10
**carefully** [1] - 375:2
**CAROL** [2] - 415:2; 513:25
**Carol** [10] - 251:13, 15; 279:24; 280:14; 359:22; 393:17; 394:17;

5

403:22; 414:23; 415:10
**carry** [1] - 486:1
**cars** [1] - 452:20
**case** [53] - 242:3; 254:8; 269:3, 6-7, 9; 274:4; 276:2, 20; 277:11; 283:20; 286:1; 288:4; 291:5; 300:11; 307:13; 329:21; 338:9; 339:9, 17; 342:6; 356:5; 367:1; 373:1; 401:6; 433:20; 448:17; 471:15; 478:25; 479:4, 9, 12, 24; 480:11; 486:1, 13, 15, 21; 493:13, 16, 18, 21-22; 494:8, 23; 496:20; 502:17; 509:7, 22; 510:1, 18
**cases** [5] - 247:10; 486:1; 487:21; 506:11
**CAT** [1] - 232:25
**cat** [2] - 308:20
**catch** [1] - 509:11
**caused** [1] - 340:2
**CC** [5] - 309:6; 311:25; 312:2; 515:7
**cell** [1] - 287:14
**Center** [1] - 339:24
**center** [1] - 248:7
**Central** [5] - 232:6, 22; 326:5; 333:2, 21
**certain** [3] - 320:8; 337:1; 351:16
**certainly** [2] - 240:15; 484:12
**certifications** [1] - 451:15
**certified** [4] - 416:18; 451:16
**chain** [7] - 304:20, 22; 306:6, 13; 337:2, 23; 408:23
**chance** [6] - 347:8; 365:14; 375:1; 459:7; 480:11
**change** [1] - 320:7
**changed** [1] - 428:2
**Channel** [1] - 509:9
**channel** [1] - 236:24
**charge** [4] - 248:23; 249:1; 305:6; 511:21
**charged** [1] - 366:25
**charges** [5] - 250:9; 364:23; 456:4, 8; 501:9

**Charlie** [5] - 309:5, 9; 311:25
**chart** [14] - 259:16, 19, 23; 292:22; 317:20, 22; 318:21; 323:24; 325:1; 333:25; 334:17, 21, 24; 339:4
**charts** [1] - 319:2
**cheating** [1] - 464:14
**check** [3] - 239:13; 247:5; 260:22
**checking** [1] - 316:21
**chicken** [1] - 283:22
**chief** [4] - 306:7, 9; 409:7
**child** [2] - 444:3; 468:9
**chose** [1] - 321:2
**Chris** [1] - 501:17
**CHRISTINE** [1] - 232:16
**CIB** [4] - 399:17, 19, 21; 497:13
**circulate** [1] - 381:10
**circumstance** [2] - 253:10; 428:13
**circumstances** [6] - 245:18; 295:22; 374:24; 427:25; 437:5; 460:15
**citizenship** [3] - 509:21, 23, 25
**claim** [8] - 248:19; 300:10; 339:17, 25; 368:10; 476:12; 481:11
**claimed** [2] - 237:5; 505:20
**claiming** [3] - 339:20; 357:5
**claims** [13] - 421:7, 12; 423:25; 424:5, 10; 426:17; 432:3, 25; 470:2, 7; 507:12, 25
**Clare** [1] - 458:25
**clarification** [1] - 475:8
**clarify** [1] - 313:23
**clarifying** [1] - 473:17
**Clarke** [5] - 474:3, 18; 475:3, 10; 477:23
**class** [1] - 454:23
**clean** [1] - 409:25
**clear** [2] - 315:25; 404:2
**cleared** [1] - 459:13

**clearly** [3] - 365:12; 508:18
**CLERK** [6] - 233:3, 15, 20; 311:13; 376:12; 448:25
**client** [3] - 453:11; 510:11
**clinic** [4] - 348:3; 369:25; 402:16
**clinical** [4] - 401:22; 402:18; 416:16; 451:16
**clinician** [2] - 304:12; 408:11
**clip** [2] - 452:24; 469:23
**clips** [2] - 296:23; 452:11
**Clonazepam** [4] - 289:19; 293:14, 23; 331:13
**CLONAZEPAM** [1] - 289:19
**close** [2] - 291:17; 493:21
**closed** [6] - 295:18, 23; 297:10; 314:20
**closer** [1] - 379:12
**closest** [2] - 316:7, 9
**closing** [1] - 296:7
**CO** [7] - 335:23; 336:3, 9; 434:15, 18; 435:14; 437:20
**code** [2] - 453:6, 13
**coke** [2] - 297:1
**collateral** [1] - 288:9
**college** [1] - 294:12
**College** [2] - 294:13, 17
**colon** [2] - 328:4
**colored** [1] - 410:4
**coming** [7] - 282:22; 325:3; 328:14; 339:4; 414:5; 471:20; 507:15
**command** [7] - 304:20, 23; 306:6, 13; 337:2, 23; 408:23
**commanding** [2] - 478:20; 502:17
**comment** [1] - 376:4
**comments** [2] - 280:21
**commissioner** [18] - 275:9; 305:22, 25; 306:5-8, 10, 14, 24; 307:8; 409:5-10; 410:8

**Commissioner** [3] - 337:8, 14
**commissioner's** [2] - 306:16, 23
**communicating** [1] - 256:4
**communication** [2] - 255:15; 263:3
**Community** [1] - 294:13
**community** [1] - 402:25
**complain** [5] - 241:8; 299:10-12, 22
**complainant** [2] - 500:14; 504:23
**complained** [2] - 342:11; 420:2
**complaining** [3] - 236:5; 302:16; 505:15
**complaint** [45] - 234:16, 20, 25; 235:16, 20; 236:19, 21, 24; 241:7; 302:4; 355:10; 370:15; 406:24; 439:20; 473:2, 9; 474:11; 475:23; 476:1, 20; 477:8, 10, 12, 18; 478:4, 12; 486:7; 500:12; 502:8, 21, 24; 503:1, 5, 19-20, 23; 504:1, 20, 23; 505:24; 507:4, 8, 15-16; 508:12
**complaints** [9] - 274:22; 300:4, 6, 14; 301:17, 19, 24; 302:1; 400:12
**complete** [2] - 269:5; 323:4
**completely** [3] - 269:2; 340:3; 387:23
**compliance** [2] - 275:10, 14
**complicated** [3] - 494:24; 495:13, 19
**component** [1] - 453:8
**concentration** [1] - 451:12
**concerned** [13] - 256:11, 18-19; 306:15; 358:12; 360:25; 366:5; 369:22; 398:19; 419:7; 482:10; 507:3; 508:14
**concerning** [2] - 267:18; 426:14
**concerns** [6] - 296:9, 16, 18; 297:12; 352:9,

**conclude** [1] - 506:10
**concluded** [3] -
247:17; 269:18; 493:12
**conclusion** [1] -
448:19
**conclusions** [3] -
373:3; 397:11; 509:8
**condition** [1] - 374:16
**conduct** [5] - 296:14;
298:8; 302:16; 336:18;
405:20
**conducted** [5] -
295:21; 296:11; 320:24;
336:13
**conducting** [8] -
244:4, 7; 245:13;
249:17; 272:5, 7, 11,
17
**confidentiality** [2] -
453:8, 11
**confirm** [1] - 480:20
**confirms** [1] - 287:24
**confused** [1] - 413:6
**connect** [1] - 413:13
**connected** [1] - 507:16
**connection** [1] -
269:11
**consensual** [28] -
250:21, 23; 251:2, 5,
10, 16, 21, 24; 273:5,
8, 19; 302:20; 418:1,
20; 421:22, 24; 422:7;
424:12, 16; 425:16;
427:11, 15, 20; 444:14;
453:18; 455:6; 466:13,
17
**consent** [4] - 308:4;
374:13, 25
**consider** [16] - 236:1;
253:1; 388:10; 389:8,
14, 17, 19; 398:23;
421:22; 444:18; 447:21;
468:24; 469:13; 481:20,
23
**considered** [8] -
371:19; 434:12; 447:23;
467:22; 468:4; 483:6,
9, 12
**considering** [1] -
328:7
**consult** [1] - 434:7
**consumed** [1] - 269:4
**Cont'd** [1] - 491:1
**contact** [25] - 265:20;

266:1; 273:15; 318:13;
352:16; 369:7, 10;
399:7; 405:16; 418:1,
14; 419:18; 420:3;
424:16; 427:24; 428:15,
20; 430:7; 467:9, 11,
14; 487:20; 494:24;
495:13, 18
**contains** [2] - 321:23;
374:15
**content** [3] - 238:3;
241:15; 505:8
**contents** [1] - 331:1
**context** [4] - 378:14;
495:16; 498:20; 499:18
**Continue** [1] - 327:6
**continue** [5] - 417:9;
463:3, 11, 13; 505:3
**continued** [5] -
239:13; 258:6; 384:8;
417:21; 457:6
**Continued** [19] -
246:9; 247:18; 268:11;
269:19; 284:5; 286:13;
288:21; 290:4; 327:13;
338:20; 340:20; 342:16;
343:18; 373:9; 395:25;
446:12; 449:6; 450:11;
490:6
**continues** [3] - 446:8;
447:2, 16
**continuously** [2] -
349:8; 417:18
**contradictory** [1] -
474:21
**control** [1] - 316:19
**conversation** [31] -
242:20, 23; 243:2;
252:10; 253:16, 23;
254:16, 18, 24; 276:15,
19; 352:24; 353:1, 5,
13; 354:5; 379:10, 21;
381:17; 393:4; 396:24;
408:18; 419:21; 433:8;
463:4; 499:13, 20, 23;
500:1, 5; 502:11
**conversations** [4] -
254:5; 321:10; 462:23,
25
**convey** [1] - 343:12
**convinced** [1] - 343:9
**coordinator** [5] -
348:4; 369:25; 401:22;
402:17
**copies** [1] - 479:23
**coping** [6] - 442:13,

23; 443:1, 10, 18, 21
**Coping** [3] - 442:17;
443:22
**copy** [15] - 237:13;
334:18; 375:21, 24;
476:19; 480:24; 502:20,
24; 503:1, 18; 511:8,
15, 18, 25
**corner** [1] - 351:11
**corpus** [1] - 299:19
**Correct** [367] - 234:14,
19, 22, 24; 235:5, 9,
14, 21; 236:4, 8,
12-13, 16-17, 22;
237:2, 7, 11-12, 25;
238:10, 14; 239:15, 24;
240:23; 241:11; 242:6;
243:12, 17, 19, 22-23;
249:18, 23; 250:1, 10,
17; 252:5, 9, 16, 23;
253:9, 15, 18-19,
21-22, 25; 256:9, 13,
22; 258:24; 259:3, 7-8,
11-12, 15; 262:3, 15,
19; 264:4, 8-9; 265:18,
22; 266:2, 19, 22;
267:5, 20; 268:3;
270:19, 23-24; 271:5,
8, 11-12, 19; 272:1;
273:16, 25; 274:7, 17;
275:22, 25; 276:3, 8-9,
11, 21; 278:4, 11-12,
21; 279:5; 302:12;
306:4; 320:9; 321:25;
322:19; 329:5; 331:16,
18, 21; 334:12; 336:15;
347:18, 24; 348:7, 10,
14; 349:18; 350:4;
352:5, 22; 358:10, 21;
360:7, 24; 362:9, 16;
363:8, 11-12, 15-16;
364:13; 365:7; 366:3;
367:22; 368:20; 369:18,
21, 24; 371:24; 372:2,
6, 10; 377:18; 378:17,
21-23; 379:1, 5, 8;
380:13; 383:10, 14, 17;
384:19, 23; 385:1, 4-5,
8, 12; 386:11, 17;
387:1, 4, 25; 388:4, 8,
22; 390:17, 21, 24-25;
391:3; 392:9, 24;
393:6, 24-25; 394:3, 6;
395:15, 18; 398:14;
399:1; 404:1, 4, 14,
24; 405:9, 18; 406:3,
5, 18; 407:22; 408:1,

4, 6, 25; 410:22;
411:4; 412:11; 417:20;
418:3, 6, 9, 18; 419:5,
9, 20; 420:1, 19, 22;
424:23; 425:6; 426:6,
15-16, 19, 22; 427:5;
430:20; 431:11; 435:13;
436:11, 17, 21; 437:11,
19; 439:6; 444:1;
445:3, 21; 447:4,
14-15, 17, 21, 25;
448:8, 10; 456:2;
462:4, 8; 464:7, 25;
465:4, 6; 469:6, 11-12,
22, 25; 470:1; 471:12,
16; 473:6; 475:16, 25;
476:4, 7, 11, 14-15,
18, 21; 478:5, 15;
479:9; 480:19, 23;
481:5, 9, 16, 19;
484:3, 8, 11, 14, 17;
485:1, 4, 12, 23;
486:14, 17-18, 22;
487:14; 489:2; 491:10,
14, 19-20; 492:3, 11,
17, 20-21; 493:10;
495:2, 5-6, 10, 15;
497:10, 14, 22; 498:4,
17, 23-24; 499:4, 8;
500:3, 7, 16, 22-23;
501:3, 10-11, 14,
18-19; 502:9, 14-15,
18-19, 22; 503:3, 7-8;
504:18; 505:17, 22;
506:8; 507:2, 6; 508:3,
5-6, 16, 22
**correct** [404] - 234:18;
235:20; 237:8; 238:5;
240:6; 241:18; 245:24;
248:4; 249:22; 253:14;
254:11; 255:5, 11;
256:18; 257:13; 258:2;
262:2, 10, 24; 264:12;
266:3; 270:13; 272:18;
273:6, 21; 279:15;
295:11, 14; 297:12;
300:5; 303:4; 304:17;
306:17; 319:21, 24;
320:2, 5-6, 8, 11;
321:2, 4, 8, 18-19, 21,
24; 322:3, 11, 14, 18,
21; 325:1; 329:9, 25;
330:1, 13; 331:15, 17,
20, 23; 332:11, 19-20;
334:16; 335:1, 14;
336:14, 24; 337:2, 5;
345:5; 346:17, 21, 24;
347:4, 6, 9, 14, 17,

20, 23; 348:1, 4, 19; 349:2, 5, 8, 14, 17, 25; 350:3, 5, 11, 14; 351:5, 7, 10, 13, 20, 23; 352:1, 21, 24; 353:3, 6, 16; 354:24; 355:18, 24; 356:21, 24; 357:2, 5, 8, 11, 14, 17, 21; 358:2, 11, 14, 18, 24; 359:2, 16, 18, 20, 22, 24; 360:1, 6, 19, 23; 361:2, 4, 7, 9, 12, 15, 18; 362:18; 363:7; 364:1, 3, 17, 20-21; 365:1, 3, 6, 24; 366:4; 367:3, 25; 368:1, 3-4, 6-7, 12, 14; 369:1, 5, 17, 20, 23, 25; 370:3, 6, 11, 17, 20, 25; 371:3, 5, 9, 12, 14, 17, 20, 23; 372:13; 376:23; 380:21; 381:19; 384:3, 5, 18; 385:24; 386:2, 10, 14, 22; 387:13; 388:12, 16; 390:6; 391:17; 392:8; 393:1, 12; 395:3, 10, 23; 396:5, 8; 398:13, 20, 22, 25; 400:1, 7, 12, 15, 17-18; 410:21, 24; 411:1, 3, 6, 9, 13-14; 412:6, 10; 413:5, 8; 414:3, 10, 14; 417:22; 418:2, 5, 8, 11, 14, 17, 24; 419:4, 8, 11, 19, 22, 25; 420:4, 18, 21; 421:20; 422:1, 5, 11; 424:22; 425:5; 426:1, 5, 18, 21, 25; 427:4; 428:16; 429:17; 430:19, 22; 431:10; 432:21; 433:6, 10, 14, 17; 434:16; 435:12, 14; 436:10, 16, 20; 437:9, 12, 15, 18; 439:5, 20; 441:2, 7, 14, 22; 443:19, 25; 444:3, 6, 23; 445:2, 20; 447:3, 6, 20; 448:7; 453:20; 456:1; 464:21; 465:3; 466:8; 467:4, 14; 469:5, 9, 21; 471:6, 11, 15, 18, 24; 472:13, 17, 22; 473:23; 474:1, 4, 7, 10; 475:7, 15, 19, 24; 476:3, 6, 10, 17, 20; 477:14; 478:4,

14, 23; 479:1, 12, 16; 480:14, 18, 22, 25; 481:4, 8, 15, 18; 482:8, 11-12; 483:4, 8, 13, 16, 24; 484:7, 10, 13, 16, 20, 23, 25; 485:3, 8, 11, 16-17, 19, 22; 488:7, 9, 12; 489:1, 3, 11, 15; 492:2, 5, 10, 24-25; 493:11, 14, 24; 495:1; 497:15, 21, 25; 498:1; 501:15, 22; 502:4; 504:2, 17; 506:7; 508:2
**correction** [5] - 249:2; 335:13, 15, 17
**correctional** [14] - 281:21; 285:18; 287:11; 289:12; 294:4; 295:8; 296:22; 298:10; 302:11; 333:19; 344:16; 417:2; 462:18
**Correctional** [6] - 260:10, 20; 282:24; 374:10; 415:25; 495:18
**corrections** [13] - 297:14; 298:2, 5; 299:13; 311:2; 316:16; 435:6; 452:7; 459:18, 25; 460:9, 22
**Corrections** [1] - 441:5
**correctly** [4] - 421:16; 424:18; 485:13; 493:3
**corridor** [1] - 351:11
**costal** [1] - 326:16
**Counsel** [2] - 277:17; 463:21
**counsel** [25] - 286:8; 297:17; 298:7; 303:21; 307:11; 309:21; 310:13; 325:14; 340:9; 341:6; 344:10; 374:12; 376:3; 405:13; 407:11, 23; 416:5; 426:14; 450:3; 454:14; 457:4; 462:5; 510:10, 21; 511:25
**counseled** [2] - 454:17; 460:25
**counseling** [19] - 405:7; 416:19; 423:5; 430:3; 436:9; 451:18; 454:5, 15; 455:17, 24; 456:14, 21; 457:23, 25; 458:17; 461:13; 463:3, 14; 466:3

**counselor** [6] - 351:22; 352:3; 384:18; 402:16; 403:1
**counselors** [5] - 348:9, 12; 402:6; 405:7; 461:17
**Counting** [1] - 293:6
**county** [1] - 477:7
**COUNTY** [1] - 232:7
**County** [42] - 232:17; 244:7; 248:7; 260:10, 20; 262:1; 275:17; 282:24; 285:17; 287:11, 13; 289:11; 294:4; 298:9; 302:10; 323:14; 334:1; 339:23; 344:16, 21; 347:13; 374:10, 16; 375:19; 402:10, 14; 415:24; 417:1; 451:23; 462:18; 472:4, 14; 474:1, 12, 16; 475:4; 477:13, 23; 495:17
**couple** [4] - 264:20; 286:6; 335:15
**course** [7] - 314:14; 316:18, 21; 479:11; 480:2; 494:12
**Court** [12] - 232:21; 291:14; 299:24; 325:3; 333:17; 339:5; 445:2; 450:3; 456:17; 489:22; 490:1, 4
**COURT** [345] - 232:1, 10; 233:5, 7, 23, 25; 238:2; 239:6; 240:11, 18, 25; 241:19; 242:8; 243:4; 246:8; 247:4, 7, 12, 15; 249:7; 250:12; 251:12, 19; 254:21; 255:1, 7, 9, 12, 19, 23; 256:2, 24; 257:6, 11, 21; 258:11; 259:22; 260:2, 4, 13, 16; 261:4, 11, 17; 262:6; 266:25; 268:9; 269:10; 270:14; 271:6; 273:1, 13; 274:2, 19, 25; 275:5, 13, 16, 24; 276:23; 277:2, 21, 24; 280:6; 282:8, 13, 20; 283:2, 4, 10; 285:5, 7, 13, 22, 24; 286:2, 7, 10, 12; 287:2, 6, 21; 288:1, 6, 10, 14, 20; 289:2, 6, 17, 20, 22-23; 290:3; 291:19; 294:24; 299:18, 20;

301:21; 304:2, 8; 306:19; 307:4, 11, 16, 23; 308:2, 9, 11, 13, 15, 17, 19, 22, 24; 309:1, 4, 7, 9, 13, 15, 18, 25; 310:5, 7, 15, 17, 23, 25; 311:4, 6, 10, 15, 21; 312:4, 7, 9, 20; 313:8; 318:5, 7, 23; 319:8, 15; 323:4, 11; 324:10; 325:8, 12, 16, 24; 326:24; 328:10; 330:3, 18, 21, 24; 331:12, 25; 332:4, 8, 13; 333:9, 12, 15, 18, 21, 24; 334:3; 335:12; 336:7, 11; 337:12, 16, 20; 338:11, 13, 19; 339:2, 10, 12, 16, 20, 25; 340:6, 12, 17; 341:20, 25; 342:9, 12, 15; 343:9, 16; 345:17, 19, 22, 24; 346:8, 11; 347:1, 11; 349:19, 22; 351:24; 354:8; 355:15; 357:23; 358:4; 359:5, 8, 13; 362:23; 363:2; 365:11; 367:9; 372:19, 22; 374:4, 9, 18; 375:6, 12, 25; 376:4, 8, 14; 378:2, 6; 379:12; 381:23, 25; 382:17, 19; 387:16, 18; 389:3, 22; 392:12, 14; 394:23; 397:14; 400:3, 9, 14, 21; 401:3, 25; 403:19; 409:20; 413:25; 414:19, 21, 24; 415:7, 12, 14; 417:4; 418:19; 420:25; 421:2; 423:12, 14, 17, 20; 426:10; 427:18; 428:2, 6, 10; 432:5, 8, 12, 19, 21; 434:2, 17; 435:17, 20, 22; 438:23, 25; 439:22; 440:18, 20; 441:17, 20, 24; 442:16, 18, 23; 445:6, 25; 446:2; 448:15; 449:2; 450:9; 453:2; 462:13, 21; 466:24; 467:25; 468:7, 12; 469:3, 17; 470:12, 21, 24; 474:6, 20, 22; 476:24; 478:8, 10, 17; 480:7, 9; 482:23; 488:18; 489:13, 17; 494:17, 19; 498:19; 501:5; 504:6, 8, 11;

505:5, 10; 506:22; 508:25; 510:5, 8, 12, 18; 511:1, 10, 17, 19, 22, 24; 512:3, 6

**court** [30] - 248:1; 270:1; 282:5, 17; 289:1; 292:1; 299:8, 17-18, 21, 23; 341:2; 344:2; 374:3; 376:2; 378:24; 401:9; 451:2; 456:15; 489:10, 20; 491:3, 17, 22; 493:6; 496:11; 505:13; 509:18; 510:15

**Courthouse** [1] - 232:5

**courtroom** [7] - 233:4; 247:3; 373:7; 376:13; 448:22; 449:1; 510:6

**covered** [2] - 296:21; 386:20

**Crack** [1] - 458:14

**crack** [2] - 458:15, 19

**created** [1] - 255:13

**credentialed** [1] - 403:1

**credentialing** [1] - 275:11

**credibility** [6] - 288:6; 291:15; 302:8; 403:9; 475:2

**credible** [1] - 390:5

**cried** [1] - 455:7

**Criminal** [1] - 497:9

**criminal** [3] - 399:20; 456:4; 501:8

**crisis** [2] - 416:5; 454:5

**cross** [3] - 283:22; 288:15; 317:5

**Cross** [2] - 277:2; 400:21

**CROSS** [6] - 277:3; 400:23; 451:4; 513:9, 21; 514:4

**cross-examination** [1] - 288:15

**Cross-examination** [2] - 277:2; 400:21

**CROSS-EXAMINATION** [6] - 277:3; 400:23; 451:4; 513:9, 21; 514:4

**cry** [1] - 455:7

**crying** [19] - 357:13, 16, 20; 358:1, 5-6, 8; 383:22; 384:13; 388:25;

389:8, 14; 403:6, 8; 436:22, 25; 437:7; 460:19; 469:5

**Cs** [1] - 309:8

**current** [1] - 457:2

**custody** [2] - 375:20; 462:22

**custom** [1] - 269:14

**customary** [1] - 465:25

**cut** [5] - 324:21, 23; 327:7, 10; 328:18

**CV-07-1250** [1] - 232:4

---

**D**

**D-I-V-E-R-T-I-C-U-L-I -T-I-S** [1] - 326:9

**daily** [7] - 239:14, 25; 292:21; 295:16; 297:9; 300:24; 301:1

**damages** [6] - 339:10, 13, 15, 17-18, 20

**dangers** [1] - 452:7

**date** [29] - 242:9; 258:20; 260:6; 300:13; 301:15; 324:19; 333:5; 344:11; 382:22; 387:21; 392:16, 20; 393:4; 402:12; 420:5; 423:15, 17, 24; 435:9, 12; 438:9; 439:17, 19; 440:18; 477:10; 481:14; 494:10, 21; 504:10

**dated** [1] - 330:9

**dates** [2] - 430:12; 491:22

**David** [7] - 271:4, 6; 331:5, 15, 17, 19, 22

**days** [18] - 239:16, 19; 253:16; 259:13; 292:22, 25; 293:4, 7, 22, 24; 358:16; 361:14; 363:9; 393:14; 397:7; 479:9; 481:10; 486:7

**DD** [6] - 308:8; 309:4; 311:24; 312:2; 515:7

**DEA** [1] - 314:22

**deal** [3] - 297:9; 443:2, 14

**dealing** [2] - 343:7; 467:19

**dealings** [1] - 341:17

**dealt** [1] - 345:12

**December** [32] - 293:1, 3, 12; 300:12; 326:4; 330:9; 331:3; 332:6,

10, 18; 344:21; 401:14, 16; 414:13; 472:24; 473:5, 13, 23; 475:6, 13, 17; 476:16; 478:4; 479:5; 480:21; 481:8; 500:12; 505:19, 23; 506:2, 4

**decide** [9] - 366:8, 10; 397:15; 410:2, 20, 23; 475:1

**decided** [5] - 252:4; 356:20; 389:18; 410:8; 439:24

**deciding** [1] - 367:20

**decision** [12] - 269:11; 306:24; 366:6; 396:16, 19; 397:18, 21, 23; 440:2, 4; 460:12; 478:22

**decision-making** [1] - 306:24

**decisions** [3] - 306:17, 23; 468:9

**dedication** [1] - 233:8

**Defendant** [1] - 232:16

**defendant's** [12] - 285:3, 21; 287:3; 289:2; 309:4; 310:10; 311:23; 312:14; 313:11; 314:2, 24; 511:21

**Defendant's** [6] - 289:7; 310:8; 311:6; 312:2; 515:6

**Defendants** [1] - 232:8

**defense** [6] - 443:4, 7-8, 10, 13, 18

**Defense** [1] - 283:1

**definitely** [2] - 243:10; 458:20

**degree** [4] - 294:19; 451:10, 13

**Degree** [3] - 294:15; 402:24

**deliberating** [1] - 373:4

**delivered** [2] - 492:8, 13

**demonstrate** [2] - 310:2; 383:25

**demonstrative** [1] - 309:22

**denial** [2] - 253:4; 254:17

**denied** [3] - 252:19; 253:20; 254:2

**denies** [4] - 260:12, 21; 437:18; 439:5

**Dennison** [1] - 232:18

**dental** [3] - 313:22; 314:7; 316:20

**denying** [2] - 364:22; 365:9

**Department** [9] - 275:17; 307:1, 5, 7; 318:19; 347:14; 367:24; 402:10; 409:11

**department** [31] - 245:14; 262:1; 265:2, 6; 298:2, 4; 304:23; 305:7, 23; 306:15, 22; 307:8; 319:1, 5; 369:11, 16; 402:9; 409:13; 421:13, 20; 422:5, 15; 424:1, 11; 461:19; 464:24; 466:12; 477:6; 500:18

**depicted** [1] - 310:13

**depicting** [1] - 310:12

**depicts** [1] - 309:19

**deposition** [70] - 235:17, 23; 238:17; 240:12; 257:15; 263:21; 264:1, 3, 6; 272:9, 16; 275:3; 276:6; 278:15, 19; 279:18; 281:7, 24; 287:9, 21; 346:21, 23; 347:4, 8; 350:19; 351:3; 354:16, 21; 355:8, 23; 363:20, 25; 367:11, 19; 378:9, 13, 15, 20; 380:2, 10, 20, 23; 414:9, 13; 471:11, 13, 18, 20, 24; 473:10; 474:14; 477:6, 16; 478:1, 3; 482:13; 483:18; 486:5; 487:4, 11, 24; 488:15, 21, 23, 25; 491:2, 16; 498:6, 12, 14

**Deputy** [5] - 337:8, 13; 478:13, 18

**deputy** [13] - 305:22, 24; 306:5-8, 10; 409:5-8; 472:7, 9

**deranged** [1] - 291:25

**describe** [4] - 353:25; 354:5; 361:24; 382:24

**described** [4] - 235:3; 395:8; 422:3; 426:24

**describing** [1] - 506:15

**description** [2] - 354:10; 430:19
**deserved** [1] - 459:7
**designated** [2] - 315:22; 316:1
**desk** [5] - 254:13; 452:10, 25; 469:20, 24
**detail** [1] - 365:13
**detailing** [1] - 479:14
**details** [5] - 279:22; 280:4, 9, 16; 381:5
**determination** [7] - 326:22; 366:2; 367:7; 368:6; 412:12, 14, 16
**determine** [1] - 474:23
**developments** [1] - 262:23
**diagnoses** [1] - 329:24
**diagnosis** [8] - 328:8, 13, 16; 329:4, 7, 10, 14; 333:7
**diaphragm** [1] - 327:1
**dictate** [1] - 428:24
**diet** [1] - 327:11
**differ** [1] - 329:14
**difference** [1] - 309:22
**Differences** [2] - 388:13, 17
**differences** [4] - 388:14; 389:6, 12, 18
**different** [8] - 255:16; 267:21; 320:6; 345:11, 14; 351:11; 416:15; 443:10
**Different** [1] - 313:14
**differential** [1] - 329:7
**difficult** [1] - 383:21
**difficulty** [1] - 378:25
**dignity** [2] - 295:10, 14
**DIRECT** [8] - 234:2; 346:14; 415:17; 471:2; 513:7, 18; 514:2, 9
**direct** [8] - 270:6; 298:10; 361:22; 366:12; 402:7; 404:17; 405:2; 432:2
**directed** [1] - 295:13
**directing** [5] - 392:18; 417:24; 421:5; 435:25; 472:24

**direction** [1] - 282:11
**directly** [13] - 236:7; 241:5; 303:18; 353:11, 14; 355:4; 357:4; 363:6; 411:5; 413:4; 434:20; 452:19; 459:20
**director** [12] - 241:24; 243:13; 252:25; 256:11; 264:23; 275:12; 298:5; 305:15; 348:18; 508:4, 15
**disbelief** [1] - 379:20
**discharge** [1] - 333:1
**disciplinary** [2] - 462:14, 18
**discipline** [1] - 462:14
**disciplined** [1] - 462:10
**disclosure** [1] - 291:10
**discomfort** [1] - 329:2
**discovery** [4] - 307:19; 308:1, 3, 6
**discuss** [16] - 257:2; 276:19; 307:13; 340:16; 360:15; 373:1; 379:24; 380:5; 389:24; 393:18, 22; 426:1; 448:17; 450:2; 484:7; 509:6
**discussed** [10] - 297:25; 379:3, 7; 381:2; 390:1; 404:5, 13; 426:3; 431:3; 463:25
**discussing** [2] - 424:6, 15
**discussion** [5] - 238:3; 337:13; 384:14; 396:11; 408:3
**discussions** [1] - 337:22
**disobeyed** [1] - 261:13
**disorders** [1] - 293:18
**disregard** [2] - 467:1; 468:14
**distraught** [1] - 437:4
**distress** [3] - 339:22; 340:1
**DISTRICT** [3] - 232:1, 10
**Diverticulitis** [1] - 328:4
**diverticulitis** [6] - 326:7; 327:8; 328:2,

15; 329:15, 17
**division** [6] - 244:7; 245:15; 275:10, 13; 305:8, 15
**Doctor** [12] - 240:15; 275:8; 289:10; 304:19; 305:13; 328:25; 330:15; 338:1; 341:6; 344:4; 345:15; 409:3
**doctor** [26] - 233:23; 267:4; 274:14; 275:3; 277:5, 18; 287:18; 291:6, 20; 292:3; 293:25; 294:18; 295:8; 298:1; 314:23; 316:6; 318:15; 320:2; 322:20; 328:17; 332:25; 338:12; 340:17; 343:2; 345:13; 408:8
**doctors** [1] - 266:16
**document** [49] - 258:10, 18; 324:15; 325:4, 8; 330:5; 332:23, 25; 333:5; 334:19; 382:10, 24; 383:18; 385:20; 388:20; 392:19; 407:15, 17, 25; 408:2; 420:10, 12; 422:22; 435:2, 4, 9, 16; 438:2, 4, 15, 17; 440:9, 11, 18, 23; 441:1, 4; 445:11, 13, 22; 462:5; 477:2, 5; 479:20, 22; 503:15, 17
**Document** [2] - 333:17; 477:1
**documents** [2] - 285:10; 440:4
**dog** [12] - 308:9; 309:5; 311:24; 314:24; 452:16, 19
**Dog** [1] - 308:10
**done** [19] - 296:8; 320:2; 326:12; 355:18; 366:9; 372:9; 381:12; 384:25; 396:11, 17, 20, 24; 397:19, 22; 398:10, 12; 406:11; 486:15; 493:17
**door** [13] - 291:17; 295:22; 297:10; 314:10-12, 19, 21; 315:7, 12; 450:8
**doors** [2] - 295:18; 296:8
**doubt** [1] - 474:25

**Dowling** [1] - 451:12
**down** [43] - 260:16; 264:18; 280:6; 283:12; 302:22; 303:6; 312:6, 8; 313:2, 16, 20-21; 314:5, 8; 315:3, 10; 316:14, 20-22; 317:13, 23; 318:13; 322:16; 328:13; 351:11; 359:5, 13-14; 389:11; 394:25; 412:7, 17; 414:19, 24; 425:4; 430:19; 452:10; 459:19; 470:12; 486:16
**Dr** [126] - 234:4; 237:13; 242:20; 244:18; 248:10; 250:14; 258:18; 261:7; 262:4, 14, 17, 22; 263:5, 7, 11, 18, 23; 264:7, 22; 265:1; 266:24; 267:10, 23; 269:5, 8; 270:3, 9; 273:9, 18; 276:1, 8, 15; 282:1; 298:18; 305:20; 306:3; 312:6, 13; 318:19; 319:19; 330:5; 337:4, 7; 348:16, 18, 22; 349:1, 4, 7; 350:2; 352:21, 23; 353:2, 9, 11, 13-14, 19, 23; 354:1, 6; 355:2, 4-5, 9; 356:9, 16-17; 359:4, 18; 360:4; 361:6, 21, 24; 369:19; 371:16; 375:9; 376:22, 25; 377:4, 8, 12; 379:4, 17, 20, 23; 380:4; 381:10; 386:20, 25; 387:6; 389:25; 391:9, 13; 393:18; 395:14; 398:11, 15; 402:8; 403:23; 404:11, 15, 21, 23; 405:5; 407:15, 18, 20, 24; 408:5, 24; 411:12; 422:20; 426:5; 427:4, 8; 429:4, 10, 14; 430:25; 431:7, 19; 464:4; 508:2, 8, 10
**drama** [1] - 511:3
**dress** [1] - 409:23
**drug** [15] - 292:17, 20; 348:9, 12; 351:22; 352:3; 384:18; 402:6; 450:6; 458:10; 459:8; 461:7, 19
**drugs** [1] - 458:13
**Dudley** [10] - 501:17;

502:7, 21, 25; 503:2, 20; 504:11, 15; 507:9, 15
**Dudley's** [1] - 506:25
**duly** [4] - 233:18; 346:6; 415:4; 470:19
**During** [9] - 316:19; 362:7; 377:8, 12; 385:25; 431:19; 456:21; 458:17; 460:25
**during** [75] - 240:1; 250:19; 251:14; 252:2; 254:18, 23; 257:3, 17; 295:18, 24; 300:23; 301:3, 8; 305:20; 307:18, 25; 308:3, 6; 314:14, 19; 315:13, 17; 353:5, 13; 354:5; 356:1; 357:13, 16, 20; 358:23; 360:4, 9; 361:21; 362:15, 18, 21; 363:17, 21; 364:7, 11, 19; 379:20; 381:6; 384:13; 385:22; 389:8, 14; 396:2; 397:10; 399:14; 402:14; 413:5; 431:3; 456:3, 13; 461:12; 464:8; 479:15; 482:5; 485:25; 486:7, 19, 24; 487:6, 12, 17; 488:1, 16, 22; 489:5; 496:4; 499:12, 20; 500:2; 501:1
**duties** [3] - 416:3; 472:8; 480:3
**duty** [4] - 335:14, 20; 509:14

**E**

**eager** [1] - 510:19
**early** [3] - 458:16; 476:16; 483:7
**earn** [1] - 294:15
**earned** [1] - 294:18
**EASTERN** [1] - 232:1
**eating** [1] - 260:21
**educational** [3] - 294:10; 402:23; 451:9
**effort** [1] - 487:12
**efforts** [2] - 494:24; 495:13
**egregious** [1] - 282:10
**either** [12] - 242:21; 252:14; 254:12; 316:12; 317:19; 373:2; 448:17; 493:19; 501:1, 6;

507:25; 509:7
**Either** [2] - 276:18; 366:25
**ejaculated** [1] - 384:11
**emergencies** [1] - 320:17
**emergency** [3] - 320:15, 21; 326:6
**emotional** [5] - 339:22; 340:1; 455:3; 469:7
**employ** [2] - 443:1, 13
**employed** [13] - 301:13; 304:24; 347:13, 16; 349:11; 402:9; 415:21, 23; 416:8; 472:1, 3-4; 509:10
**employee** [5] - 298:22; 321:4; 508:18
**employees** [8] - 255:19; 369:4; 410:10, 12; 472:14, 16; 507:20
**employment** [5] - 294:3; 402:14; 403:3; 509:13
**encounter** [1] - 352:10
**encourage** [1] - 463:13
**end** [6] - 299:13; 393:19; 394:10; 395:2, 22; 422:15
**ended** [1] - 252:20
**engage** [1] - 427:24
**engaged** [1] - 417:25
**ensure** [1] - 368:17
**enter** [1] - 333:25
**entered** [2] - 374:16; 449:1
**entering** [4] - 233:3; 311:13; 376:12; 448:25
**enters** [2] - 233:4; 376:13
**entertain** [1] - 506:19
**entertained** [2] - 328:15; 448:4
**entire** [6] - 269:4; 325:14; 330:19; 353:5; 387:13; 482:5
**entirely** [1] - 495:11
**entirety** [1] - 325:7
**entity** [1] - 245:13
**entries** [6] - 286:1; 318:21; 319:2; 339:19; 375:3; 486:19

**entry** [14] - 260:24; 261:2; 325:7; 326:2; 331:2; 393:11; 394:8; 421:6; 422:3; 423:23; 429:6; 485:18; 489:19
**erect** [1] - 384:12
**erection** [1] - 384:10
**especially** [1] - 295:4
**ESQ** [5] - 232:13, 16
**essence** [1] - 476:12
**establish** [1] - 340:5
**estimate** [4] - 301:7; 349:10; 454:16
**et** [1] - 232:7
**ethics** [2] - 453:6, 13
**evaluate** [1] - 460:11
**evaluation** [6] - 298:24; 299:2; 326:5; 403:9; 460:7
**event** [1] - 468:18
**events** [2] - 269:12; 340:1
**eventually** [4] - 265:25; 473:22; 483:9; 496:21
**everyday** [1] - 418:13
**evidence** [90] - 260:1, 4, 6; 283:5, 8; 285:21; 287:2; 289:6; 307:21; 309:5; 310:8; 311:7, 22-23; 312:3; 325:8, 11, 15, 24-25; 330:17, 24-25; 333:11; 338:5, 9; 344:10; 373:4; 374:13; 382:16, 20, 22; 387:15, 19, 21; 392:11, 14, 16; 420:24; 421:2; 423:10, 14, 19; 432:12, 18, 22; 433:19; 435:17, 19, 22-23; 438:22; 439:1; 445:24; 446:2; 478:7, 10-11; 480:6, 9-10; 494:16, 19, 21; 504:5, 8, 10; 514:16-25; 515:1
**exact** [4] - 238:3; 301:14; 420:5; 439:17
**exactly** [14] - 242:1, 19; 244:19; 267:14; 280:21; 362:6; 380:25; 381:2; 393:8; 411:21; 412:23; 420:18; 458:16; 467:11
**Exactly** [1] - 500:9
**exam** [37] - 250:19;

252:2; 295:8, 21-22, 25; 296:1, 5, 8, 12, 14; 313:2, 6, 15-16; 314:5; 315:4, 7, 9-10, 18; 316:6, 12; 317:4-7; 326:13; 330:12; 335:21; 336:5; 384:7
**examination** [10] - 277:2; 279:10, 14; 288:15; 295:18; 296:8; 316:13; 318:1; 400:21
**EXAMINATION** [24] - 234:2; 277:3; 319:17; 341:4; 345:1; 346:14; 400:23; 410:17; 415:17; 451:4; 464:17; 471:2; 513:7, 9, 11, 13, 15, 18, 21, 23; 514:2, 4, 6, 9
**examinations** [1] - 301:7
**examined** [10] - 233:18; 295:6, 10; 296:13; 322:24; 346:6; 383:23; 415:4; 470:19; 480:21
**examining** [2] - 259:20, 24
**example** [5] - 255:17; 317:14; 409:17, 22; 452:8
**examples** [1] - 443:21
**exams** [6] - 295:20; 296:11; 320:24; 336:13, 18
**except** [3] - 310:14; 411:12; 454:11
**Except** [1] - 329:17
**exception** [2] - 284:3; 295:20
**exchanged** [2] - 307:18; 308:6
**exclusively** [1] - 356:3
**Excuse** [6] - 277:21; 282:8; 309:13; 339:12, 16; 419:13
**excused** [1] - 307:15
**exercises** [1] - 383:24
**exhibit** [25] - 285:3, 21; 287:3; 289:2; 308:7; 309:4; 310:8, 10; 311:6; 312:14; 313:11; 314:2, 24; 317:9; 325:24; 407:12, 24; 439:4; 445:9;

446:2; 463:21-24; 504:4

**Exhibit** [65] - 259:25; 260:4; 283:1; 289:7; 308:8, 14, 20; 324:12; 325:25; 330:2, 24-25; 334:20; 381:22; 382:19, 21; 387:18, 20; 391:24; 392:10, 14-15; 393:8; 420:8; 421:2; 422:25; 423:14, 19; 434:25; 435:22; 437:25; 438:13; 440:8; 445:10; 446:3; 463:20; 478:10; 480:9; 494:2, 15, 19-20; 503:10; 504:8; 514:16-25; 515:1, 3

**exhibits** [2] - 311:24; 438:25

**Exhibits** [4] - 312:2; 439:2; 515:2, 7

**existed** [2] - 240:22; 370:11

**expected** [2] - 429:13

**experience** [4] - 343:7; 403:15; 424:6; 442:1

**experiences** [2] - 343:11, 13

**expert** [3] - 291:7, 10, 20

**experts** [1] - 291:22

**explain** [4] - 303:13; 427:12; 452:18; 487:16

**explained** [1] - 383:23

**explanation** [3] - 266:10; 468:18; 491:17

**exploited** [3] - 446:7; 448:3, 5

**explore** [1] - 363:5

**exploring** [1] - 454:24

**express** [1] - 379:20

**extension** [2] - 316:3, 5

**extensive** [1] - 458:12

**extent** [1] - 475:21

**extra** [1] - 299:15

**extremely** [1] - 389:19

**eye** [1] - 318:13

---

**F**

**Facility** [5] - 260:10, 20; 282:24; 374:11; 495:18

**facility** [29] - 246:6; 281:21; 285:18;

287:11-13; 289:12; 294:4; 296:23; 298:10; 302:11; 333:19; 336:14; 344:17; 368:18; 415:25; 417:2; 452:16, 19; 454:23; 455:10; 458:5; 459:20, 22; 461:8; 462:19; 463:1; 484:1; 499:16

**fact** [48] - 252:21; 253:8; 256:15; 258:6; 261:7; 271:16, 23; 272:4, 10, 16; 278:6; 287:17; 291:6, 11, 22; 301:10; 349:7; 357:16; 362:14; 364:7; 366:1; 380:16; 389:8, 19; 394:5; 403:8; 404:8; 411:21; 413:22; 417:21; 429:21; 436:9, 14; 447:9; 450:5; 461:24; 463:12; 465:23; 466:4; 469:13; 480:20; 481:7; 482:4; 486:19; 489:22; 490:4; 496:13

**factor** [1] - 304:14

**fail** [1] - 496:18

**failure** [3] - 269:14; 496:14, 16

**Fair** [1] - 510:25

**fair** [19] - 243:1; 301:16; 316:6; 340:2; 367:5, 10; 368:8; 383:8; 401:16; 417:16; 419:1; 462:2; 463:4; 467:21; 468:2; 486:9; 488:14, 20, 24

**fairly** [1] - 413:16

**faking** [1] - 359:10

**false** [3] - 304:16; 318:20; 319:2

**familiar** [9] - 304:19; 335:17; 350:7; 368:25; 370:5; 442:13; 443:4; 471:23; 480:14

**family** [7] - 294:20; 452:14; 455:1; 456:25; 469:8, 11

**Family** [1] - 456:24

**far** [17] - 244:8, 23; 269:2; 291:13; 348:21; 358:12; 360:25; 366:5, 11; 367:1; 369:22; 383:12; 398:19; 452:8; 482:10; 507:3; 508:14

**fast** [3] - 283:13, 21,

23

**faster** [2] - 283:14

**father** [2] - 444:6, 16

**Fax** [1] - 232:22

**FBI** [1] - 456:11

**FCRR** [1] - 232:21

**feasible** [1] - 303:6

**February** [36] - 242:5, 10, 12, 15-17; 263:7; 264:19; 336:19, 22; 371:7; 397:25; 406:14, 19, 22; 407:2; 417:22; 439:16; 440:19; 455:25; 462:7; 463:5; 482:8; 494:11; 497:19, 24; 500:13; 501:7, 12, 21, 25; 502:3; 503:20; 504:1; 505:14; 506:6

**Federal** [1] - 232:21

**federal** [4] - 458:23; 459:3; 495:3; 509:18

**fee** [1] - 277:13

**feelings** [1] - 467:20

**feely** [1] - 408:13

**feet** [2] - 351:9, 12

**Feinberg** [210] - 242:5; 249:21, 24; 250:8, 16; 252:4, 7, 11, 13, 15, 21; 253:4, 13, 20, 24; 254:2, 5, 9, 17, 23; 256:16; 257:2, 8, 16; 258:3; 259:5; 260:25; 261:1, 19, 22; 263:6, 11, 14, 19, 23; 265:7, 12; 266:5, 8; 267:7, 11, 19; 268:2; 270:9; 271:1, 14, 18; 272:12, 24; 273:23; 274:15; 276:2, 20; 281:1; 298:14, 19, 24; 300:12, 14, 17, 21; 301:3, 19; 302:2, 13, 19; 303:11; 304:5, 11; 315:17, 20, 23; 316:7; 319:20; 320:8; 321:12, 14; 322:24; 324:17; 326:3; 328:7, 17; 329:24; 330:13; 332:2; 335:21; 336:13, 18-19, 21; 337:10, 14, 18, 24; 341:13; 350:8, 10, 14, 17, 21; 351:10, 17; 352:8, 11; 360:19; 361:4, 7, 21; 362:7, 18, 21; 363:10, 14;

364:8, 22; 365:9, 16; 369:12; 371:9; 372:15, 20; 374:17; 376:22; 377:1, 5, 9, 13, 17, 20, 24; 379:17, 25; 380:3; 383:21; 384:3; 395:9, 14; 396:5, 8, 17, 21; 397:12, 20, 22; 398:8, 10, 12, 24; 399:5, 11; 401:13, 18; 404:11, 16, 22; 406:20; 407:1; 408:12; 411:5; 418:22, 24; 419:11, 18; 420:4; 424:19; 433:21; 439:9, 13; 444:10, 14, 20; 445:19; 447:10, 19; 448:5; 454:20; 455:19; 461:10, 23; 463:18, 25; 465:9; 466:5, 20; 467:10, 22; 468:4, 25; 469:15; 481:8, 18; 482:1, 4, 7, 11, 16; 483:2, 4, 7, 10, 12, 15, 20, 23; 484:9; 500:20, 25; 507:1, 5, 8

**Feinberg's** [20] - 241:22; 244:20; 265:16; 274:23; 278:25; 279:10, 14; 299:4; 316:13; 317:4; 323:2; 331:22; 379:3; 380:12; 388:3; 398:6; 399:24; 400:7; 404:19, 22

**felt** [16] - 235:11, 18; 364:10; 366:1; 384:12; 406:1; 411:8; 455:8; 458:8; 459:6; 460:18; 464:9; 483:1; 486:23; 499:2

**female** [12] - 300:23, 25; 301:3, 7; 317:10; 320:10, 14, 16, 18, 20; 336:20

**females** [7] - 315:15; 317:13; 424:5, 15; 425:20

**fever** [1] - 326:16

**few** [9] - 277:9; 287:23; 322:5; 334:9; 335:13; 346:19; 354:23; 414:10; 479:8

**fifth** [1] - 483:2

**fight** [1] - 460:17

**file** [8] - 300:3, 7; 334:15; 440:23; 441:1, 4; 479:9, 24

**filed** [13] - 234:13,

16, 21, 23; 235:1; 297:20; 300:6; 390:9, 15, 19; 407:5, 9

**fill** [1] - 460:1

**filled** [1] - 476:20

**final** [1] - 306:24

**Finally** [1] - 383:22

**fine** [1] - 340:10

**fingers** [1] - 476:9

**finish** [1] - 335:25

**finished** [2] - 336:1; 500:13

**finishing** [1] - 294:13

**fire** [1] - 410:10

**First** [2] - 291:19; 307:11

**first** [63] - 242:2; 244:17, 21; 246:4; 250:3; 251:5, 20, 22; 260:14; 262:13; 263:5; 264:20; 283:20; 286:6; 292:10; 296:20; 303:17; 315:8; 323:1, 13, 25; 324:5; 346:5; 351:19; 353:10; 354:1, 3-4; 360:14; 381:14; 386:19; 388:25; 395:12; 396:2; 413:22; 414:8; 415:3, 12; 416:23; 418:4; 425:9; 436:1; 445:19; 447:18; 452:9; 454:19, 22; 458:6; 460:9; 462:9; 467:2; 468:2; 469:4; 470:18; 473:4, 11, 21; 480:16; 483:6, 12; 497:23; 500:11

**fit** [1] - 454:12

**five** [7] - 239:20, 22; 240:1; 252:7; 347:25; 368:2; 489:3

**flank** [3] - 326:20; 359:7, 12

**flight** [1] - 294:8

**floor** [6] - 390:10, 23; 391:1, 5-6, 10

**FLYNN** [226] - 232:17; 238:1, 19, 22; 239:5; 240:10, 17, 24; 243:3; 246:7; 247:2, 5, 14, 16; 249:6; 250:11; 251:11, 18; 254:20, 25; 256:23; 257:5, 10, 20; 259:21; 260:3; 261:3, 10, 16; 268:7; 269:2, 17; 272:25; 273:12; 274:1, 18, 24; 275:4,

23; 276:22; 277:4, 20, 25; 278:1; 280:7; 282:16; 283:3, 9; 285:1, 6, 8-9, 16, 20; 286:5, 9; 287:5, 9, 22; 288:12, 18; 289:8; 292:2; 294:25; 300:1; 301:23; 304:3; 306:20; 307:9; 308:8, 10, 12, 14, 16, 18, 20, 23, 25; 309:6, 8, 11, 14, 16, 19; 310:1, 9, 16, 21, 24; 311:2, 9, 18; 312:5, 12; 318:9, 15, 18, 24; 319:13; 323:3, 6, 10; 325:13, 23; 326:23; 328:9; 330:19, 23; 331:24; 332:3, 7, 12; 333:8, 13; 334:2; 335:11, 24; 336:1, 6, 10; 337:11, 15, 19; 338:3, 12; 340:10, 14, 19; 341:5; 342:14; 343:2, 15, 17; 344:3, 23; 345:18; 346:25; 347:10; 354:7; 355:12; 357:22; 358:3; 362:22; 365:10; 367:8; 374:6, 10; 375:4, 8, 14, 24; 376:1, 6; 382:18; 387:17; 389:2, 21; 392:13; 394:22; 397:13; 400:2, 8, 13, 24; 401:4; 402:3; 410:14; 413:24; 414:18; 421:1; 423:11, 13; 426:9; 427:17; 428:1; 434:1; 435:21; 436:12; 438:24; 439:21; 441:16, 19, 23; 442:20; 445:5; 446:1; 449:4; 450:2, 10; 451:5; 463:21, 24; 464:15; 466:22; 467:24; 468:6; 469:2, 16; 470:11; 474:19, 21; 478:9; 480:8; 482:19, 22; 488:17; 494:18; 501:4; 504:7; 506:21; 510:9, 14; 511:14, 18, 20, 23; 512:1, 5; 513:10, 14, 22; 514:5

**Flynn** [12] - 291:13; 307:18; 311:17; 339:4; 340:7; 347:6; 374:4, 22; 419:16; 471:17; 511:9, 12

**focus** [3] - 269:6, 9; 300:10

**follow** [2] - 337:2; 368:10

**followed** [2] - 452:18; 481:24

**following** [18] - 287:1; 289:1; 291:1; 292:1; 293:22; 311:23; 330:12; 339:1; 341:1; 343:1; 344:1; 391:16, 19; 422:11; 450:1; 451:1; 452:21; 489:20

**follows** [4] - 233:19; 346:7; 415:5; 470:20

**fondled** [3] - 424:1, 10; 466:11

**force** [2] - 303:6, 8

**Force** [1] - 294:7

**forefront** [4] - 394:10; 395:2; 396:4, 12

**foreground** [1] - 314:10

**forgot** [1] - 458:25

**form** [47] - 234:7, 9, 12, 16; 235:13, 25; 236:2, 6, 14, 19, 23; 237:14; 238:13, 15; 239:14, 18, 23; 240:5, 7, 9, 13-14, 16, 21-22; 241:14; 249:15; 250:12; 252:12; 254:4; 301:21; 303:2; 306:19; 318:23; 358:8; 365:16, 20; 377:23; 434:2, 11; 436:19; 437:6; 440:12; 460:2, 22; 493:19

**formal** [4] - 390:9, 15, 19; 458:4

**formed** [3] - 252:14; 254:7; 390:4

**forth** [1] - 393:18

**forum** [1] - 299:22

**forward** [5] - 274:22; 371:8; 442:2, 11; 509:24

**four** [15] - 313:3; 315:13; 348:12; 359:1, 15; 393:14; 395:12; 396:20; 397:7, 10; 398:3; 413:10; 454:14

**Four** [1] - 402:6

**frequently** [1] - 320:17

**friends** [1] - 298:19

**front** [8] - 324:1, 15;

331:2; 332:9; 382:25; 386:4; 456:17, 19

**full** [3] - 415:8; 470:21; 475:21

**function** [1] - 260:22

**future** [2] - 381:12; 383:6

---

### G

**G-E-R-A-C-I** [1] - 233:22

**gain** [2] - 260:9, 19

**game** [1] - 340:2

**gangs** [1] - 452:15

**gap** [3] - 417:13; 485:21, 25

**Garcia** [3] - 474:12; 475:11

**Gary** [112] - 241:22; 242:5; 244:20; 249:21; 257:8, 16; 258:3; 259:5; 260:25; 261:1; 263:6, 11, 14, 19, 23; 264:17; 265:7, 12, 16; 266:5, 8; 267:7, 19; 270:9; 271:14, 18; 272:24; 274:23; 281:1; 298:14, 19, 24; 299:4; 300:12, 14, 17, 21; 301:3, 19; 302:2, 13; 303:11; 304:5, 11; 315:17, 20, 23; 316:7, 13; 317:4; 319:20; 320:8; 321:12, 14; 322:24; 323:1; 324:17; 326:3; 335:17, 20; 336:18; 337:10, 14, 24; 341:13; 350:7, 13, 17, 21; 351:10; 352:8, 11; 362:18, 21; 374:17; 377:9, 13; 379:25; 383:21; 397:12, 20, 22; 401:13, 18; 404:11, 16; 406:20; 407:1; 418:22; 419:11; 439:9, 13; 444:10; 445:19; 454:20; 455:4, 19; 461:10, 22; 463:17, 25; 467:13, 18; 469:15; 481:7, 17; 482:1, 4, 7, 11, 15

**gastrointestinal** [2] - 292:7; 329:2

**gender** [1] - 317:12

**general** [6] - 295:16, 20; 296:4; 333:1; 409:22; 437:14

**Generally** [3] - 292:20; 295:2; 299:1

**generally** [6] - 296:7; 312:18; 314:19; 317:11; 404:5; 409:25

**generated** [2] - 385:10; 386:1

**gentleman** [1] - 491:24

**Geraci** [97] - 233:22; 234:4; 237:13; 242:20; 244:18; 248:10; 250:14; 258:18; 261:7; 269:5, 8; 273:9, 18; 282:1; 312:6, 13; 318:19; 319:19; 330:5; 348:16, 18, 22; 349:1, 4, 7; 350:2; 352:21, 23; 353:2, 9, 11, 13-14, 19, 23; 355:2, 4-5, 9; 356:9, 16-17; 359:4, 18; 360:4; 361:6, 21, 24; 369:19; 371:16; 375:9; 376:22, 25; 377:4, 8, 12; 379:4, 17, 20, 23; 380:4; 381:10; 386:25; 389:25; 391:9, 13; 393:18; 395:14; 398:11, 15; 402:8; 403:23; 404:11, 15, 21, 23; 405:5; 407:15, 18, 20, 24; 408:5, 24; 411:12; 422:20; 427:4, 8; 429:4, 10, 14; 430:25; 431:7, 19; 464:4; 508:2, 8, 10

**GERACI** [2] - 233:17; 513:6

**Geraci's** [5] - 354:1, 6; 386:20; 387:6; 426:5

**girls** [8] - 455:5, 16; 466:16, 21; 467:3, 7, 17; 468:23

**given** [28] - 245:21; 287:15, 24; 288:5; 291:10, 15; 292:23; 293:8, 19, 23; 299:5; 307:25; 308:3; 309:20; 310:13; 332:10; 343:13; 344:7; 384:17; 406:11; 434:15, 20; 436:6; 470:6; 502:20, 24-25; 503:1

**glass** [1] - 296:24

**goal** [1] - 295:3

**grade** [1] - 283:20

**graduated** [1] - 451:13

**granted** [1] - 468:12

**grievance** [39] - 234:7, 9, 12, 16; 235:13, 20, 25; 236:6; 237:6, 14; 238:13, 15; 239:1, 4, 11-12, 14, 18; 240:5, 7, 9, 13-15; 241:14; 249:15; 263:1; 297:18, 20; 299:23; 300:2; 390:10, 16, 19; 407:4, 9

**grievances** [1] - 300:3

**ground** [2] - 285:24; 474:20

**grounds** [1] - 374:14

**group** [1] - 368:16

**Guard** [1] - 294:8

**guards** [1] - 311:1

**guess** [4] - 397:24; 413:21; 414:9; 435:15

**guidelines** [2] - 370:13, 17

---

## H

**habeas** [1] - 299:19

**habit** [1] - 457:13

**hair** [1] - 313:24

**half** [2] - 264:10; 472:23

**hall** [7] - 313:16, 20, 22; 314:5; 315:10; 316:14, 20

**hallway** [4] - 312:19, 21; 316:23; 317:24

**hand** [2] - 233:16; 392:18; 414:25

**handed** [10] - 324:12; 333:17; 420:8; 422:25; 434:25; 437:25; 438:13; 440:8; 445:10; 477:1

**Handing** [2] - 332:22; 479:19

**handle** [3] - 396:17, 21; 398:8

**hands** [4] - 241:13; 327:4; 477:18; 497:8

**handwriting** [4] - 392:8; 423:7; 429:7; 438:5

**happy** [1] - 338:9

**hard** [7] - 357:20; 358:1, 6, 8; 377:22; 383:22; 389:14

**hate** [1] - 269:8

**haul** [1] - 313:2

**Hauppauge** [1] - 232:19

**Health** [10] - 275:18; 307:2, 6-7; 318:19; 347:14; 367:24; 402:10; 409:11; 415:24

**health** [36] - 245:14; 248:7; 255:18; 262:1; 265:2, 5; 292:14, 17; 298:4; 304:23; 305:6, 23; 306:15, 22; 307:8; 318:25; 319:4; 402:9, 25; 403:2; 409:13; 435:7; 436:3; 441:5; 459:10, 13, 20-21; 460:6, 8, 11-12; 461:18; 499:16

**hear** [11] - 270:15; 285:13; 357:4; 377:8, 12; 400:3; 414:8; 441:17; 442:21; 461:9; 484:12

**heard** [36] - 236:10; 245:20; 250:3, 5; 251:5, 13, 20, 22; 252:11; 273:23; 274:3; 300:16; 301:18; 351:19; 352:20; 353:10; 354:1, 3-4; 377:24; 401:17; 414:5, 14; 418:4, 7; 424:5, 15; 425:20; 453:24; 455:5, 15; 467:2, 8, 12; 492:15; 502:11

**hearsay** [3] - 243:18; 254:1; 273:7

**heavy** [1] - 450:5

**held** [10] - 257:3; 358:24; 360:14; 361:3; 380:11, 16, 25; 398:4; 402:14; 488:25

**help** [7] - 405:5; 442:24; 454:7; 457:18; 459:6; 512:4

**hernia** [1] - 333:7

**herself** [5] - 419:19; 420:3; 440:3; 462:15

**Hi** [1] - 401:1

**highest** [5] - 249:3, 9; 509:20, 23, 25

**highlighted** [1] - 389:6

**Highway** [1] - 232:19

**himself** [5] - 329:24; 356:16; 484:19; 491:25; 504:15

**HIPAA** [10] - 494:23; 495:3, 12, 19-20, 25; 496:3, 7, 10, 13

**HIPAA's** [1] - 495:7

**hire** [1] - 410:10

**historically** [1] - 297:5

**history** [8] - 443:25; 444:8, 15, 19; 458:11; 462:18; 469:8, 11

**hmm** [2] - 456:20; 460:3

**hold** [3] - 379:23; 380:4; 431:25

**holding** [1] - 477:18

**hole** [1] - 452:11

**home** [3] - 452:13, 18, 22

**homicidal** [1] - 453:15

**Honor** [47] - 233:6; 234:1; 242:10; 246:7; 247:16; 257:5; 258:13; 260:3; 277:20, 23; 285:20; 286:6, 9; 290:1; 310:9; 311:19; 312:11; 325:13, 23; 330:20, 23; 333:13, 20, 23; 336:10; 338:3, 18; 342:13; 345:18; 376:17; 387:17; 392:13; 415:15; 432:18; 445:24; 446:1; 449:4; 450:4; 470:25; 480:8; 489:19; 504:7, 13; 505:9; 510:25; 511:5

**Honorable** [1] - 445:14

**HONORABLE** [1] - 232:10

**Hospital** [5] - 323:15; 326:6; 333:2, 22; 492:23

**hospital** [17] - 266:20; 323:14, 17, 23; 326:12; 328:11, 14; 329:19, 22; 333:1; 334:7, 10, 13-14; 339:8, 15

**hot** [4] - 384:13; 452:16, 19

**Hotel** [1] - 493:5

**hour** [2] - 340:8; 360:1

**hours** [2] - 475:7, 13

**housing** [4] - 322:4; 457:3, 9

**Howdidthechickencross thestreet** [1] - 283:23

**hundreds** [1] - 336:13

**Hundreds** [1] - 301:9
**hurt** [1] - 464:13
**hysterically** [3] - 384:13; 388:25; 389:8

**I**

**I-F-T-I-K-H-A-R** [1] - 262:9
**idea** [18] - 240:8; 335:9; 336:24; 365:24; 367:6, 15, 20; 368:5; 391:4; 393:16; 400:11, 17; 403:12; 431:25; 488:15, 21; 506:17
**ideation** [5] - 416:7; 436:15; 437:10, 18; 439:5
**ideations** [2] - 453:15
**identification** [28] - 258:12; 283:2, 4, 7; 285:5, 7-8; 287:4; 324:10; 330:3; 332:22; 381:22; 385:15; 391:24; 420:7; 422:24; 434:24; 437:24; 438:12; 440:7; 445:8; 476:24; 479:19; 494:2; 503:10
**identified** [10] - 266:23; 412:5, 9, 24; 418:24; 429:7; 483:10; 484:19; 491:25; 504:15
**identify** [1] - 314:25
**identifying** [1] - 413:18
**Iftikhar** [17] - 262:9, 14, 17, 22; 263:5, 7, 11, 18, 23; 264:7, 22; 265:1; 305:13; 306:3; 337:4, 7; 409:3
**Iftikhar's** [1] - 305:20
**illnesses** [1] - 322:2
**illustrate** [1] - 310:2
**immediate** [2] - 349:1; 408:24
**immediately** [11] - 279:13; 337:7; 343:3; 344:5; 453:5; 469:20, 24; 470:3, 8; 481:24; 495:17
**important** [18] - 235:7, 11, 18; 236:2; 243:15, 20; 309:25; 356:24; 388:20; 411:8; 418:10; 425:4; 430:18, 21; 431:8, 12; 484:15;

485:14
**impression** [7] - 240:21; 245:9; 273:3; 394:19; 465:5, 7
**imprinted** [1] - 386:16
**Improper** [1] - 332:4
**improper** [6] - 253:8; 365:17, 20; 366:11, 24; 367:21
**improperly** [1] - 252:22
**improve** [2] - 255:15; 356:1
**improved** [1] - 380:19
**inappropriate** [11] - 250:18; 252:1; 281:2; 352:15; 421:12, 19; 422:1, 4, 14; 430:2, 7
**inappropriately** [1] - 464:23
**incarcerated** [3] - 416:6; 417:12; 458:19
**incarceration** [2] - 315:14; 454:6
**incest** [2] - 455:2; 469:11
**incident** [20] - 235:4; 269:5, 11, 13; 374:17; 383:20; 384:14; 401:12; 414:12; 497:4; 498:3, 8; 499:7, 14, 21; 500:21, 25; 505:25; 506:2; 507:24
**incidents** [1] - 297:6
**include** [3] - 273:15; 350:5; 472:16
**includes** [2] - 505:2, 11
**inconsistencies** [3] - 388:11, 21; 389:24
**inconsistent** [4] - 239:8; 474:23; 475:1
**incorporated** [1] - 323:23
**indicate** [3] - 293:8; 406:22; 435:9
**indicated** [6] - 307:19; 351:3; 404:12; 439:4; 457:6; 481:6
**indicates** [3] - 291:16; 375:19; 386:24
**indicating** [1] - 434:11
**indication** [2] - 344:15; 406:14

**individual** [8] - 350:7; 363:1, 3; 366:18, 22; 367:13; 442:24; 484:22
**individual's** [1] - 362:24
**individuals** [2] - 433:24; 434:4
**infected** [1] - 328:6
**infection** [1] - 327:3
**inflamed** [1] - 328:6
**influence** [1] - 409:18
**inform** [2] - 431:7; 452:7
**information** [27] - 235:8; 241:7; 251:9; 257:25; 280:18; 302:7; 328:12; 343:12; 344:7; 345:4, 6; 352:20; 354:1, 3-4; 374:15; 383:9; 384:17, 21; 386:24; 406:11; 411:11; 412:2; 418:10; 436:6; 467:2
**informed** [5] - 262:25; 263:2; 351:22; 381:15; 413:4
**initial** [2] - 474:11; 475:9
**initiated** [4] - 276:8, 15
**initiative** [1] - 460:9
**Inmate** [2] - 421:7; 423:25
**inmate** [104] - 234:17; 237:5; 273:11, 24; 274:10; 296:3; 297:10; 301:16, 25; 302:4, 10, 18; 316:11; 317:16; 318:11; 321:17; 322:16; 336:17; 341:8, 22; 342:2, 11; 344:6; 345:5, 8; 352:10, 18; 358:17, 20; 360:16; 363:10; 368:10; 370:15; 371:8; 372:4; 384:2, 13; 390:9; 394:9, 13; 399:25; 400:6; 403:11; 405:17; 406:1, 15, 23; 407:4; 408:3, 10-11, 16; 410:24; 411:16; 412:9, 24; 418:13; 424:10; 427:16, 21, 24; 428:16, 20; 431:17; 436:2, 25; 452:8; 456:3; 458:1, 10, 21;

459:18, 20; 460:1, 6, 14, 20, 25; 461:13, 21; 462:2, 17, 22; 463:9; 464:9; 469:19, 23; 470:2, 7; 501:13; 503:23; 504:16, 24; 505:2, 11, 20; 506:1
**inmate's** [9] - 274:5; 295:18; 317:17; 318:10, 21; 334:15; 341:7; 364:16; 412:5
**inmates** [53] - 241:8; 250:15; 251:1; 253:1; 255:24; 267:18; 273:4; 274:21; 295:13; 297:6; 299:9; 300:3, 14; 301:18; 302:1, 22; 303:6, 8, 23; 304:5, 15; 305:3; 310:3, 24; 313:3, 5; 317:9; 318:1; 319:6, 11; 321:24; 322:1, 7; 341:17; 342:5; 343:4, 7; 344:8; 345:6; 400:12; 403:16; 405:1, 3, 8; 412:7; 416:5; 453:25; 454:4; 458:5; 459:13; 505:1
**Inmates** [1] - 461:25
**inmates'** [1] - 319:2
**innocence** [1] - 254:23
**inquiries** [1] - 239:22
**inquiring** [1] - 239:21
**insecure** [1] - 460:18
**inside** [1] - 454:23
**insofar** [1] - 306:15
**instance** [1] - 341:21
**instances** [5] - 302:16; 341:16; 343:11; 403:16
**instead** [1] - 468:18
**Institute** [1] - 294:16
**instructed** [2] - 466:25; 468:14
**instructions** [4] - 245:22; 246:1, 3; 248:10
**instructs** [1] - 370:14
**intake** [1] - 402:19
**intended** [1] - 339:5
**intention** [1] - 286:5
**interested** [3] - 249:16; 375:20; 487:22
**interesting** [1] - 510:19
**internal** [35] -

237:21; 241:17, 24;
243:13; 248:19; 271:17,
24; 272:4, 11, 17, 20,
23; 298:10; 368:13, 16,
22; 369:4, 14; 371:14,
19; 399:4, 7, 10, 13;
406:7, 17; 433:21;
439:8, 12, 20; 461:22;
494:13; 501:16; 503:2,
18

**Internal** [11] -
368:25; 369:3, 7, 15;
472:10, 12, 19; 473:9,
19; 478:21; 480:3

**internship** [1] -
294:20

**interpret** [1] - 354:9

**interpretation** [2] -
422:2; 426:11

**interrupt** [2] - 282:9,
14

**intervention** [2] -
416:5; 454:5

**interview** [43] -
236:15; 281:19; 356:20,
24; 357:10, 13, 16, 20,
25; 358:1; 365:15;
385:11, 22, 25; 386:5,
19; 388:25; 389:9, 15;
390:14; 399:13, 21;
408:2; 410:24; 482:1,
4, 7, 11, 17; 483:2;
484:2, 10; 490:4;
494:25; 495:13; 496:14,
16, 18, 22; 497:2, 6-7;
507:19

**interviewed** [8] -
272:20; 357:7; 399:10,
17; 483:3; 496:19, 25;
501:6

**interviewing** [5] -
358:16; 483:7, 9, 12;
501:1

**introduced** [2] -
291:14; 307:21

**investigate** [15] -
235:12, 19; 236:3;
237:17; 241:12; 243:6,
10-11, 24; 245:22;
248:11; 298:11; 368:18;
407:8; 478:22

**investigated** [3] -
244:11; 248:14, 16

**investigates** [2] -
369:3; 472:12

**investigating** [6] -

236:19; 245:3; 249:11;
281:13; 366:25

**investigation** [56] -
240:2; 244:1, 4, 8,
14-15, 17, 24; 245:5,
8, 13, 19; 248:20;
249:17; 271:17, 24;
272:2, 5, 8, 12, 17,
21; 281:8; 297:25;
298:3, 8; 368:19;
399:4, 15, 20; 406:8;
471:14; 472:25; 473:4,
7-8, 12, 19, 22;
479:11, 15; 481:10;
484:16; 485:25; 486:6;
493:12; 497:7, 12, 19;
500:2, 13, 17; 501:2;
508:11

**Investigation** [1] -
497:9

**investigator** [23] -
235:15; 236:2; 241:10;
281:20; 356:23; 470:15;
472:7, 9; 474:3, 8, 12,
17; 475:3, 10, 12;
477:23; 478:17; 479:17,
23; 480:3; 494:13;
502:6

**Investigator** [5] -
433:22; 478:13, 18;
502:7

**investigators** [1] -
477:13

**involved** [12] - 273:4,
8; 275:20; 398:9;
405:7, 10; 472:25;
473:4, 11; 500:24;
502:12; 506:11

**involvement** [3] -
440:14; 471:14; 473:21

**involving** [4] -
248:18; 252:3; 473:2,
19

**irritable** [3] - 327:9;
329:1, 17

**Island** [1] - 492:23

**Islip** [2] - 232:6, 22

**issue** [19] - 245:25;
248:18; 257:3; 288:3;
366:18, 20; 367:13;
374:8; 375:15; 394:9;
395:1; 396:3, 12;
398:20; 407:4; 410:6;
424:25; 426:4; 429:9

**issued** [3] - 258:7;
261:7; 375:17

**issues** [18] - 241:12;
248:13, 16; 285:25;
296:10, 22; 297:8;
317:12; 338:8; 339:8;
368:18; 369:3; 397:16;
454:25; 457:6, 22, 25

**items** [1] - 296:25

**itself** [1] - 428:24

---

**J**

**jacket** [1] - 254:14

**jail** [148] - 246:5;
248:3, 9; 255:4, 14;
256:6, 8, 21; 257:4;
264:15, 23; 265:3, 12,
21; 266:11, 17, 21;
267:4; 270:11, 17, 21;
271:3, 9; 294:22;
295:13; 296:20; 298:1,
11, 15, 20; 299:5, 14;
305:8-10; 308:12, 18,
23; 309:12, 16, 20;
310:3, 11-12, 22;
315:18; 316:1, 17, 25;
319:10; 320:15, 17;
321:7; 322:1, 7, 13,
16; 323:20; 331:20;
334:1, 4, 14, 21;
344:21; 347:19, 22, 25;
348:3, 6, 9, 18, 22-23;
349:11; 350:10, 13, 16,
21; 351:4; 352:4;
368:2, 13; 369:4, 20;
370:3, 5, 8; 372:12;
374:17; 379:15, 23;
380:4, 11; 381:8;
398:4; 399:14, 22;
401:21; 402:20; 403:3,
15; 404:25; 405:11, 14,
19; 406:6; 409:15, 24;
411:12; 419:2, 7;
428:22; 447:3, 6;
451:24; 452:1, 8;
454:3, 10; 458:8;
461:14; 466:21; 468:5,
8; 469:1; 472:16;
476:3, 5, 9; 480:21;
481:3, 12, 21; 502:13;
504:25; 505:16, 21;
506:11, 15, 18; 507:11,
19, 22; 508:4, 15, 18,
21

**James** [2] - 470:15, 23

**JAMES** [2] - 470:17;
514:8

**January** [118] - 238:8;
245:1; 250:23; 251:2,

4; 253:17; 258:22;
259:2, 5, 9; 262:14;
263:6; 265:24; 267:15;
271:18; 272:11; 280:20;
300:16, 20; 301:6;
320:4; 336:16, 22;
341:21; 347:16; 349:16;
351:19; 358:24; 360:17;
361:11; 376:22; 384:25;
386:8; 390:10; 391:13;
393:9-11, 15; 394:25;
395:17, 21; 396:10;
398:5; 399:3; 402:12,
21; 404:12, 18; 407:12;
412:21; 413:1, 5, 10;
417:22; 420:2, 15,
17-18; 421:18; 422:11,
13; 423:18; 424:21;
430:2, 25; 431:19, 25;
463:16, 23; 464:3;
465:17, 20; 466:10;
472:21; 478:25; 479:8;
480:25; 481:2; 482:1,
5, 16; 483:2, 7, 10,
12, 16, 20; 484:18;
485:18, 21-22; 486:12;
487:18; 488:1; 489:9,
18, 21, 23; 490:2;
491:4, 25; 492:4, 19,
22; 493:7; 495:23;
496:8, 11; 508:7

**jealous** [2] - 465:8;
466:5

**Jericho** [10] - 484:23;
485:5, 10; 487:6;
489:6; 493:5; 495:21;
496:1, 5, 8

**Jewish** [1] - 492:23

**job** [6] - 322:13;
404:25; 406:6, 10;
407:8; 454:3

**joined** [2] - 248:3, 9

**joke** [1] - 427:8

**joked** [1] - 426:13

**joking** [1] - 427:12

**JON** [1] - 232:13

**JOSEPH** [1] - 232:13

**Judge** [26] - 268:8;
269:3; 278:13; 283:9;
285:1; 288:19; 306:20;
307:9; 309:11; 311:3;
319:14; 340:10; 342:14;
347:10; 374:6; 375:15;
376:6; 414:18; 445:14;
456:19; 457:5, 20;
489:11; 510:9; 511:18,
20

**judge** [1] - 489:13
**JUDGE** [1] - 232:10
**judges** [1] - 456:17
**July** [3] - 445:17; 446:5; 457:5
**June** [18] - 416:9; 417:12, 14, 17, 24; 419:1, 6; 424:19; 451:25; 453:16; 454:20; 455:11, 25; 465:11; 467:2, 21; 468:3, 24
**jurors** [1] - 359:9
**JURORS** [2] - 233:6; 510:4
**jury** [75] - 232:10; 233:5; 239:17; 242:1, 22; 258:20; 269:7; 289:14; 294:1, 9; 296:18; 303:13; 307:10, 15; 310:2; 311:14, 16, 20-21; 314:11; 315:25; 317:8; 321:20; 323:16; 324:19; 325:6; 326:2; 331:1; 335:1; 353:8, 12, 25; 354:10; 355:1; 360:3, 8, 13; 361:20, 24; 362:20; 367:1; 372:24; 373:3, 6; 374:3; 376:8, 15; 379:16; 380:15; 382:24; 401:20; 402:13, 22; 409:17; 416:3; 448:21; 449:1, 3; 451:8; 452:4; 453:16; 454:16; 466:25; 468:13; 474:23; 485:24; 487:16; 489:25; 504:22; 509:2, 14-15, 18
**Jury** [7] - 233:3; 311:13; 376:12; 448:25; 510:6
**justice** [1] - 299:23
**Justice** [1] - 299:24

---

**K**

**K-A-U-F-M-A-N** [1] - 346:10
**K-L-O-N-O-P-I-N** [1] - 331:14
**Kaufman** [24] - 234:15; 346:1, 10, 16; 349:7; 353:22; 354:24; 355:20; 359:24; 361:1; 366:17; 367:5; 368:8; 372:15; 376:19; 378:2; 383:4; 399:19; 408:24; 411:20; 431:1, 7, 20; 464:4

**KAUFMAN** [2] - 346:4; 513:17
**keep** [13] - 241:2; 262:22, 25; 263:2; 302:21; 317:11, 15; 334:4; 359:8; 373:2; 379:13; 448:18; 453:10
**Keep** [3] - 307:13; 312:20; 509:7
**keeping** [1] - 263:3
**Kennedy** [61] - 234:7, 13, 21; 235:1, 3; 236:7; 241:5; 245:12; 250:4; 252:4, 22; 261:23; 269:12; 281:14; 297:20; 301:25; 302:16; 321:13; 344:6; 352:18; 353:3; 354:2; 356:17, 21; 357:7, 13, 20; 358:1, 7, 9, 12, 16, 18; 361:15; 363:6; 365:15; 377:1, 13; 384:5, 20; 385:3, 7, 23; 388:24; 390:15; 394:2; 403:6, 11; 406:1; 407:4; 408:3, 9, 18; 410:24; 411:9, 16; 412:25; 431:16, 21, 23; 459:1
**Kennedy's** [16] - 237:1; 238:7; 251:22; 252:8; 297:18; 301:17; 302:4; 342:4; 356:10; 362:8; 371:22; 381:15; 386:5; 388:3, 11; 390:5
**kept** [1] - 240:20
**keys** [1] - 254:14
**kidney** [1] - 327:2
**kind** [13] - 296:24; 297:4; 298:22; 299:1, 22; 303:16; 313:6; 321:10; 452:2; 453:3; 458:13; 464:14; 467:11
**Klonopin** [2] - 331:10, 13
**Knowing** [1] - 444:21
**knowledge** [30] - 244:5; 249:10; 250:15; 281:12; 297:19; 300:13; 334:22; 336:12; 355:3; 370:13; 372:15, 21; 381:9, 13; 391:9, 11; 397:18; 399:8, 13, 21; 404:17; 414:2; 429:3; 434:4; 435:5; 439:15; 448:2; 462:9, 17

**known** [4] - 368:13; 370:5; 442:13; 443:4
**knows** [2] - 291:20, 25
**Kugler** [33] - 251:13, 15; 359:20; 360:9, 11; 370:19; 371:2, 7, 11; 372:4, 8; 391:13; 403:22; 406:15, 23; 418:16; 419:4, 24; 422:15, 18; 426:21; 427:7; 429:3, 7, 20; 430:4, 8, 12, 25; 431:20; 432:20; 453:18; 464:4

---

**L**

**lack** [2] - 302:8; 414:3
**ladder** [1] - 410:8
**ladies** [1] - 317:3
**lashed** [1] - 297:6
**last** [13] - 233:21; 234:6; 242:23; 278:7; 292:3; 293:8; 346:9; 356:4, 6; 380:22; 436:1; 470:22; 500:9
**lasted** [4] - 243:2; 360:1; 365:5; 500:5
**laugh** [1] - 425:3
**laughed** [2] - 425:7, 14
**laughing** [4] - 425:24; 426:7, 24; 427:13
**law** [5] - 314:21; 334:7; 484:19; 486:12; 492:1
**laws** [1] - 495:4
**lawyers** [1] - 461:5
**lead** [2] - 301:22; 318:8
**leader** [5] - 255:12; 257:9, 17; 271:9; 371:5
**leaders** [14] - 255:3, 8-9; 256:6; 257:4; 270:21; 331:19; 349:14, 21-22, 24; 350:2; 370:2; 372:12
**leading** [1] - 301:20
**learn** [16] - 244:17, 23; 274:21; 280:4, 9; 283:19; 352:17; 356:8, 14; 408:16; 411:19, 23, 25; 431:16, 23; 501:7
**learned** [47] - 234:12; 237:1; 238:7; 244:21; 245:7; 249:20; 250:8; 253:12; 257:25; 259:1;

**262:13; 323:1; 336:16; 351:15; 353:2; 358:17, 23; 361:14, 17; 363:9; 371:22, 25; 375:15; 377:16; 378:19; 398:7; 399:25; 400:6; 411:15, 24; 412:1; 439:7, 11; 441:6; 443:25; 444:2, 5, 25; 447:19; 468:3; 476:5, 8; 489:9; 491:24; 500:11; 501:12; 508:11
**least** [13] - 239:22; 250:15; 273:4; 284:1; 307:22; 329:23; 399:25; 400:6; 417:21; 419:2; 427:14; 458:4; 474:23
**leave** [2] - 280:17; 452:16
**leaves** [1] - 510:6
**led** [4] - 296:9; 437:5; 440:14; 460:15
**Lee** [1] - 232:18
**left** [2] - 234:6; 392:18
**left-hand** [1] - 392:18
**legal** [1] - 276:20; 426:14
**legally** [1] - 334:18
**less** [1] - 264:3
**letter** [10] - 309:13; 445:1, 4, 16; 446:5; 447:3, 8, 12; 450:3; 457:5
**letters** [6] - 457:12, 14, 20, 22; 458:21; 459:4
**liberal** [1] - 294:14
**license** [1] - 451:21
**licensed** [4] - 403:2; 416:16; 451:16, 19
**lied** [1] - 342:5
**Lieutenant** [17] - 241:17, 19, 21, 23; 242:2, 13, 23; 243:6, 11, 16, 21; 246:2; 248:9, 13, 15; 298:8
**life** [7] - 294:15; 340:2; 376:5; 446:8; 447:13; 448:3; 454:25
**LIJ** [2] - 493:1, 9
**limitation** [1] - 409:17
**limitations** [1] - 484:5

limits [1] - 326:12
Linda [34] - 234:7, 13, 21, 25; 235:3; 236:7; 238:7; 241:5; 250:4; 252:22; 261:23; 269:12; 275:8; 297:17, 20; 302:16; 321:12; 352:18; 353:2; 354:2; 356:9, 17; 357:19; 361:14; 362:8; 363:6; 377:13; 386:5; 403:6; 408:9, 18; 431:16, 21, 23
line [41] - 235:17; 238:17, 21; 257:15; 260:14; 263:21; 272:9; 276:6; 278:17; 279:8, 21; 280:3; 281:6, 11, 17; 291:4; 310:3, 24; 313:18; 314:7; 317:10; 350:19; 354:16; 355:8; 363:20; 367:11; 378:9; 380:2; 386:12; 436:1; 473:10; 474:14; 477:16; 482:13; 483:18; 486:5; 487:4, 24; 491:2; 495:16; 498:6
lined [2] - 317:9, 14
lines [1] - 452:24
lining [1] - 328:5
list [3] - 333:7; 389:18; 432:19
listed [4] - 308:6; 328:13; 387:6; 388:7
Listen [1] - 468:14
listening [1] - 353:21
litigation [1] - 275:21
lives [1] - 284:1
load [1] - 486:1
local [1] - 266:20
located [1] - 279:14
location [1] - 485:17
log [2] - 479:12; 485:18
Lombardi [1] - 232:21
look [19] - 237:9; 285:3; 304:13; 312:14; 313:10; 317:21; 324:3; 325:4; 347:9; 374:21; 375:12; 382:4; 391:25; 407:11; 422:24; 477:2; 480:17; 494:1; 509:24
looked [5] - 323:13, 25; 324:6; 334:20; 413:17

looking [8] - 236:18; 307:22; 323:8, 18; 324:2; 334:10; 335:10; 492:9
looks [4] - 315:5; 327:8; 328:18; 331:5
lost [1] - 260:14
loudly [1] - 357:16
Lowrita [41] - 258:23; 259:6; 261:8, 20; 321:13; 358:20; 361:17; 362:17, 20; 375:16; 377:6, 10; 393:19; 395:21; 404:12; 408:22; 411:16; 412:13, 15, 25; 413:4, 7; 416:21; 420:14; 431:5; 436:7; 440:3, 24; 441:2; 444:21; 445:15; 450:5; 454:13; 455:17, 24; 457:13, 16; 503:6, 24; 504:16, 24
lunch [5] - 340:8, 18; 345:20; 372:25; 373:5
Luncheon [1] - 373:8
Lunquist [1] - 433:22

**M**

M-A-N-D-A-R-I-N-O [1] - 415:11
M-C-C-A-R-R-I-C-K [1] - 434:19
M-E-Y-E-R [1] - 478:19
ma'am [52] - 277:8, 12, 15; 278:8, 22; 279:3; 280:1; 281:5, 25; 282:2, 4, 21; 285:19; 292:12, 24; 293:10; 294:5, 11; 295:1, 12, 15; 297:13, 16, 22; 298:12, 16, 21; 300:9, 15, 19; 301:2, 5, 12; 302:3, 25; 303:5; 304:18, 21, 25; 305:11, 19; 306:1, 11; 313:9; 314:16; 315:24; 316:9; 319:3, 9, 12; 344:9, 22
magazines [1] - 452:12
main [4] - 424:25; 430:14, 16; 500:24
maintaining [1] - 405:10
MALAFI [1] - 232:16
male [1] - 267:3; 300:25; 317:10; 336:20; 476:5

man [2] - 304:19; 484:18
management [2] - 275:11, 20
manager [1] - 402:17
MANDERINO [2] - 415:2; 513:25
Manderino [27] - 251:13, 15; 279:24; 280:14, 17; 359:22; 391:14; 394:17; 395:6; 403:22; 414:23; 415:10, 19; 417:16; 420:10; 421:5; 423:2, 24; 435:25; 442:5; 446:10; 450:4; 451:8; 464:19; 466:2; 470:6
Manhasset [3] - 492:23; 493:1, 9
manner [1] - 384:9
manual [2] - 370:6, 9
March [1] - 416:25
margin [2] - 327:1; 392:19
mark [6] - 283:21; 329:3, 12; 392:23; 393:1, 3
marked [19] - 312:13; 313:10; 314:1, 23; 324:8; 381:21; 385:14; 391:23; 407:12; 420:6; 432:16; 434:23; 437:23; 438:11; 440:6; 445:8; 476:22; 479:18; 503:9
masses [1] - 326:15
Master's [2] - 402:25; 451:13
matter [25] - 237:18, 21; 240:3; 243:7, 10-11, 25; 244:10; 278:6; 282:9; 301:10; 391:2; 404:8; 425:24; 426:7, 14, 18; 429:9; 433:1, 5; 463:12; 479:12; 487:23; 496:22; 498:21
matters [3] - 245:22; 248:11; 509:4
McCarrick [5] - 433:23; 434:15, 18; 435:14; 437:20
mean [11] - 259:19; 292:16; 327:4; 362:2; 389:4, 16; 444:12; 464:11; 467:16; 505:7; 507:18

meaning [2] - 320:4; 326:14
Meaning [1] - 329:8
means [3] - 259:17; 329:3; 475:15
meant [2] - 371:14; 464:12
meantime [2] - 373:1; 509:6
Meanwhile [1] - 288:15
mechanical [1] - 232:24
mechanism [10] - 299:9; 442:14, 17, 23; 443:5, 7-8, 10-11; 493:20
Mechanism [1] - 442:19
mechanisms [6] - 443:1, 14, 18-19, 21
Medical [1] - 339:24
medical [177] - 245:23; 248:24; 249:1, 4, 8-9; 252:24; 255:4, 14, 16; 256:6, 8, 11, 21; 257:4; 264:22; 265:3, 12; 266:11, 17; 267:4; 270:11, 17, 22; 271:3, 10; 282:23; 285:12, 14; 294:22; 297:15; 298:4, 15; 299:5, 7, 17; 300:5, 8; 301:11; 302:22-24; 303:7, 24; 304:6; 305:3, 8-10; 308:12, 18, 23; 309:12, 16, 20; 310:3, 11-12, 22; 315:18; 316:1, 17; 317:1; 318:20; 319:1, 5, 11; 321:7, 18; 322:1, 6, 8, 11-13, 15, 17, 20, 23; 323:20, 24; 325:14; 328:2; 330:20; 331:20; 333:19; 334:1, 4, 15, 21; 338:4; 339:7, 14; 341:7, 12; 344:5, 11; 347:22; 348:1, 3, 18-19, 22-23; 349:12; 350:11, 15-16; 352:4; 370:3, 6, 8; 372:12; 374:7; 379:11, 15, 24; 380:4, 11; 381:8; 398:4, 21; 399:14, 22; 409:15, 18, 24; 412:7; 418:1; 419:2, 7; 421:13, 20; 422:4, 14; 424:1, 11; 428:14, 19; 464:24; 466:12; 476:3, 6, 9;

480:17, 21, 24; 481:3, 12-13, 21; 502:13; 504:25; 505:16, 21; 506:11, 15, 18; 507:11, 19, 22; 508:4, 15, 19, 21

**medication** [28] - 287:4, 6, 13, 15, 17, 19; 288:8, 11; 289:3; 291:16; 292:3, 14; 293:2, 13; 314:13; 322:2; 328:17, 19-23; 329:11; 331:7; 332:16; 344:16

**medications** [16] - 287:25; 288:5; 289:11, 14; 291:3, 7, 12, 21, 24; 319:6; 321:23; 322:4; 332:10, 19; 339:6

**Medicine** [1] - 294:18

**medicine** [2] - 294:18, 20

**meet** [1] - 499:10

**meeting** [96] - 251:14; 252:20; 263:13, 18, 22; 264:7, 11, 14, 16; 296:21; 358:24; 359:1, 15; 360:1, 4, 9, 14; 361:3, 9, 11, 21, 25; 362:7, 15, 18, 21; 363:13, 17, 22; 364:7, 12, 19, 25; 365:5, 14; 370:23; 376:21, 25; 377:2, 4, 8, 12; 379:23; 380:1, 4, 11, 16, 25; 381:2, 7; 383:1; 391:12, 16, 20; 393:10, 15, 22; 395:9, 12-13, 20; 396:2, 5, 10, 19, 23; 397:4, 6; 398:3; 399:3; 403:21, 25; 404:2, 6, 9, 15, 21; 407:18, 20; 412:1, 19; 413:5, 8-9; 417:7; 430:24; 431:4, 6, 10, 19, 25; 433:13; 464:4, 8; 496:10

**meetings** [4] - 257:3, 9, 17; 456:10

**meets** [1] - 327:1

**member** [21] - 273:10; 320:25; 345:8; 405:17, 20; 418:14, 14; 419:7; 427:16, 21, 23; 428:14, 19; 429:8; 456:25; 476:5, 8; 481:21;

**member's** [1] - 419:10

**members** [25] - 233:5; 242:1, 22; 258:20; 304:16; 311:15; 316:25; 317:2; 324:19; 325:6; 353:8, 12; 355:1; 360:3, 8; 361:20; 370:14; 376:14; 379:16; 431:13; 449:2; 456:24; 485:24; 487:16; 489:25

**Members** [2] - 372:24; 509:2

**memo** [1] - 381:10

**memorandum** [4] - 263:10; 265:11, 16; 266:13

**Memorial** [1] - 232:19

**memory** [8] - 237:23; 274:5; 352:7; 355:20; 356:1; 364:18, 25; 380:19

**mental** [18] - 255:18; 292:14, 17; 374:15; 402:25; 403:2; 435:7; 436:3; 441:5; 459:10, 13, 20-21; 460:6, 8, 11-12; 461:18

**mention** [12] - 244:13; 362:24; 396:4; 397:3; 425:1; 456:10, 22; 457:22; 465:8, 17, 20; 466:4

**mentioned** [30] - 244:15; 292:3, 10; 293:13; 296:15; 300:2; 316:22; 328:3; 345:3; 362:15, 17, 21; 395:21; 396:7; 413:3, 20; 424:19; 425:3; 429:17; 430:11; 434:5, 16; 447:6; 454:19; 465:23; 467:3; 468:23; 469:5

**mentioning** [1] - 467:17

**mentions** [2] - 426:13; 463:17

**Mermelstein** [5] - 275:8; 276:1, 8, 15

**message** [2] - 492:8, 13

**messages** [1] - 487:19

**met** [13] - 277:7; 282:3; 305:3; 346:16, 19, 21; 358:7; 361:3; 393:17; 401:7; 404:11; 471:9, 11

**methadone** [1] - 402:17

**method** [1] - 442:18

**Meyer** [2] - 478:13, 19

**microphone** [1] - 379:13

**middle** [1] - 390:8

**Middleton** [1] - 502:7

**Might** [1] - 339:10

**might** [17] - 249:17; 255:22; 342:4; 360:25; 374:19, 25; 384:10; 405:6; 442:10; 466:20; 468:5, 25; 477:24; 478:3; 506:15, 17; 509:13

**Mike** [2] - 270:12, 18

**military** [1] - 304:19

**milligram** [2] - 331:11, 14

**milligrams** [2] - 331:8, 10

**mind** [19] - 236:18; 251:23; 261:1; 273:20; 281:11; 307:13; 343:5; 356:5; 359:8; 365:4; 366:17, 22; 367:12; 373:3; 427:15, 20, 23; 448:18; 509:8

**minute** [7] - 238:20; 260:13; 307:12; 311:10; 328:3; 445:23; 448:15

**minutes** [3] - 252:7; 365:5; 391:2

**mirror** [2] - 313:21; 314:8

**mis** [1] - 252:1

**misconduct** [5] - 250:16; 281:1; 401:17; 406:2; 472:13

**missing** [2] - 452:24; 509:12

**misunderstood** [1] - 488:13

**modulated** [1] - 283:16

**molesters** [1] - 468:9

**moment** [7] - 262:18, 20; 267:17; 290:2; 345:3; 410:19; 483:1

**moments** [1] - 334:9

**Monday** [7] - 509:3, 5; 510:2, 8; 511:2; 512:7, 9

**Monell** [1] - 269:15

**month** [4] - 264:3, 16; 482:5, 8

**months** [5] - 264:20; 300:21; 301:8; 336:14; 489:3

**morning** [9] - 233:5; 234:4; 277:5; 501:20; 510:8; 512:7

**most** [3] - 256:1; 295:20; 296:13

**Most** [2] - 322:4; 468:15

**mostly** [1] - 456:6

**motel** [6] - 484:23; 485:3, 5, 10; 487:6; 489:6

**Motel** [4] - 495:21; 496:1, 5, 8

**mothers** [1] - 315:13

**Motion** [1] - 468:12

**mouth** [3] - 331:10, 14

**move** [4] - 285:20; 312:9; 338:4; 342:7

**Move** [1] - 468:10

**movement** [1] - 310:21

**moving** [1] - 326:15

**MR** [199] - 234:1, 3; 238:21, 23; 239:9; 240:19; 241:1, 20; 242:10; 247:11; 248:2; 250:13; 255:2, 8, 10; 256:5; 257:1; 258:13, 17; 259:25; 260:7; 262:7; 267:1; 270:2, 16; 271:7; 274:20; 275:1, 7, 19; 277:1, 16, 23; 282:7, 12, 19; 285:23, 25; 287:23; 288:3, 7, 13, 17; 290:1; 291:2; 301:20; 304:1, 7; 306:18; 307:3, 17, 24; 308:5; 309:2; 310:6, 19; 311:5; 312:11; 313:7; 318:6, 22; 319:7, 18; 323:7; 324:11; 325:10, 20; 328:1; 330:4, 16; 333:10; 335:25; 337:17; 338:1, 6, 17; 339:3, 11, 14, 18, 21; 340:3; 341:19, 24; 342:7; 345:2, 15; 346:1, 15; 349:20, 23; 351:25; 359:7, 11, 14; 372:20; 374:19; 375:21; 376:17; 378:7; 381:24; 382:1, 3, 9, 16, 23; 385:19; 387:15, 22; 389:23;

392:5, 10, 17; 394:24; 396:1; 397:17; 400:5, 19; 403:18; 409:19; 410:18; 414:1, 16, 22; 415:15, 18; 417:5; 418:23; 420:23; 421:4; 423:9, 16, 22; 428:4; 432:7, 9, 15, 17, 20; 434:3, 18; 435:18, 24; 436:13; 438:21; 439:3; 440:22; 441:21; 442:17, 19; 445:7, 22; 446:4; 447:1; 448:13; 453:1; 462:12, 20; 463:22; 464:18; 468:10; 470:10, 14, 25; 471:3; 474:8; 476:25; 478:6, 18; 480:5; 489:14, 18; 491:1; 494:5, 15, 22; 497:17; 498:18; 503:14; 504:4, 14; 506:23; 510:25; 511:6, 12, 15; 513:8, 12, 16, 19, 24; 514:3, 7, 10

**MS** [226] - 238:1, 19, 22; 239:5; 240:10, 17, 24; 243:3; 246:7; 247:2, 5, 9, 14, 16; 249:6; 250:11; 251:11, 18; 254:20, 25; 256:23; 257:5, 10, 20; 259:21; 260:3; 261:3, 10, 16; 268:7; 269:2, 17; 272:25; 273:12; 274:1, 18, 24; 275:4, 23; 276:22; 277:4, 20, 25; 278:1; 280:7; 282:16; 283:3, 9; 285:1, 6, 8-9, 16, 20; 286:5, 9; 287:5, 9, 22; 288:12, 18; 289:8; 292:2; 294:25; 300:1; 301:23; 304:3; 306:20; 307:9; 308:8, 10, 12, 14, 16, 18, 20, 23, 25; 309:6, 8, 11, 14, 16, 19; 310:1, 9, 16, 21, 24; 311:2, 9, 18; 312:5, 12; 318:9, 15, 18, 24; 319:13; 323:3, 6, 10; 325:13, 23; 326:23; 328:9; 330:19, 23; 331:24; 332:3, 7, 12; 333:8, 13; 334:2; 335:11, 24; 336:1, 6, 10; 337:11, 15, 19; 338:3, 12; 340:10, 14, 19; 341:5; 342:14;

343:2, 15, 17; 344:3, 23; 345:18; 346:25; 347:10; 354:7; 355:12; 357:22; 358:3; 362:22; 365:10; 367:8; 374:6, 10; 375:4, 8, 14, 24; 376:1, 6; 382:18; 387:17; 389:2, 21; 392:13; 394:22; 397:13; 400:2, 8, 13, 24; 401:4; 402:3; 410:14; 413:24; 414:18; 421:1; 423:11, 13; 426:9; 427:17; 428:1; 434:1; 435:21; 436:12; 438:24; 439:21; 441:16, 19, 23; 442:20; 445:5; 446:1; 449:4; 450:2, 10; 451:5; 463:21, 24; 464:15; 466:22; 467:24; 468:6; 469:2, 16; 470:11; 474:19, 21; 478:9; 480:8; 482:19, 22; 488:17; 494:18; 501:4; 504:7; 506:21; 510:9, 14; 511:14, 18, 20, 23; 512:1, 5; 513:10, 14, 22; 514:5

**multiple** [2] - 285:25; 293:17

**municipality** [1] - 275:16

**murderers** [1] - 468:8

---

### N

**N-O-L-A-N** [1] - 241:20

**name** [37] - 233:20; 317:17, 21; 318:10; 325:1; 346:8; 352:17; 362:17, 21, 24; 370:22; 387:6; 412:8, 15, 17; 413:3, 7, 13, 17, 19; 414:5, 8, 14; 415:8, 12; 419:10; 438:8; 454:19; 470:21; 481:14, 17; 482:15; 492:1

**named** [10] - 262:4; 270:11, 17; 271:4; 335:17; 350:7; 351:22; 416:20; 481:7; 501:17

**Nancy** [16] - 251:13, 15; 359:20; 370:19; 371:2; 393:17; 403:22; 406:15, 22; 418:16; 419:24; 426:21; 429:3; 431:9; 453:18; 464:4

**narrow** [1] - 264:18

**Nassau** [12] - 287:10; 294:13; 339:23; 375:19; 473:25; 474:12, 16; 475:4; 477:7, 13, 23; 495:17

**National** [1] - 294:8

**national** [1] - 295:3

**nature** [7] - 245:23; 248:11; 267:21; 280:15, 25; 300:18; 504:23

**near** [3] - 269:13; 313:21; 314:8

**necessarily** [2] - 261:18; 317:4

**necessary** [3] - 483:1; 508:14, 20

**need** [10] - 295:24; 368:18; 375:6, 10; 405:6; 427:7; 459:15; 470:8; 482:11, 18

**needed** [12] - 254:13; 278:9; 322:18; 396:11, 16, 20, 24; 418:11; 425:25; 459:6; 486:23

**needs** [4] - 305:3; 481:24; 505:12

**negligently** [1] - 269:9

**neutral** [3] - 252:24; 304:13; 387:24

**never** [53] - 240:1, 5, 7, 14; 252:14; 254:7; 256:21; 259:9; 261:7; 265:15; 273:9, 14; 331:22; 362:14, 17; 364:15; 368:8; 371:19; 387:9, 11; 396:7; 398:11; 401:17; 413:20; 414:14; 424:24; 428:18; 431:21; 443:16; 447:23; 448:4, 9; 455:15; 464:20, 22; 465:17, 20, 23; 467:22; 468:4; 483:3; 485:16; 493:1, 4, 6, 8; 496:19; 500:2, 20, 25; 501:6; 507:22

**new** [3] - 265:23, 25; 307:22

**NEW** [1] - 232:1

**New** [9] - 232:6, 14, 19, 22; 294:16; 299:24; 403:1

**Newburgh** [1] - 294:8

**Newsday** [1] - 509:9

**next** [33] - 238:4, 8, 12, 25; 246:9; 247:18;

268:11; 269:19; 284:5; 286:13; 288:21; 290:4; 291:2; 306:12, 14; 327:13; 329:12; 338:20; 340:20; 342:16; 343:18; 345:24; 373:9; 395:25; 414:21; 437:17; 446:12; 449:6; 450:11; 470:13; 485:18; 486:12; 490:6

**nice** [2] - 373:5; 510:3

**night** [2] - 293:21; 331:6

**nights** [1] - 293:24

**nine** [3] - 259:13; 350:19; 473:10

**Nolan** [17] - 241:17, 20-21, 23; 242:2, 13, 23; 243:6, 11, 16, 21; 246:2; 248:9, 13, 15; 298:8

**non** [1] - 320:21

**non-emergency** [1] - 320:21

**none** [2] - 339:8; 486:8

**nonmedical** [6] - 241:12; 245:25; 248:11, 13, 16, 19

**nonresponsive** [1] - 468:11

**NORINSBERG** [200] - 232:13; 234:1, 3; 238:21, 23; 239:9; 240:19; 241:1, 20; 242:10; 247:11; 248:2; 250:13; 255:2, 8, 10; 256:5; 257:1; 258:13, 17; 259:25; 260:7; 262:7; 267:1; 270:2, 16; 271:7; 274:20; 275:1, 7, 19; 277:1, 16, 23; 282:7, 12, 19; 285:23, 25; 287:23; 288:3, 7, 13, 17; 290:1; 291:2; 301:20; 304:1, 7; 306:18; 307:3, 17, 24; 308:5; 309:2; 310:6, 19; 311:5; 312:11; 313:7; 318:6, 22; 319:7, 18; 323:7; 324:11; 325:10, 20; 328:1; 330:4, 16; 333:10; 335:25; 337:17; 338:1, 6, 17; 339:3, 11, 14, 18, 21; 340:3; 341:19, 24; 342:7; 345:2, 15; 346:1, 15; 349:20, 23; 351:25;

359:7, 11, 14; 372:20; 374:19; 375:21; 376:17; 378:7; 381:24; 382:1, 3, 9, 16, 23; 385:19; 387:15, 22; 389:23; 392:5, 10, 17; 394:24; 396:1; 397:17; 400:5, 19; 403:18; 409:19; 410:18; 414:1, 16, 22; 415:15, 18; 417:5; 418:23; 420:23; 421:4; 423:9, 16, 22; 428:4; 432:7, 9, 15, 17, 20; 434:3, 18; 435:18, 24; 436:13; 438:21; 439:3; 440:22; 441:21; 442:17, 19; 445:7, 22; 446:4; 447:1; 448:13; 453:1; 462:12, 20; 463:22; 464:18; 468:10; 470:10, 14, 25; 471:3; 474:8; 476:25; 478:6, 18; 480:5; 489:14, 18; 491:1; 494:5, 15, 22; 497:17; 498:18; 503:14; 504:4, 14; 506:23; 510:25; 511:6, 12, 15; 513:8, 12, 16, 19, 24; 514:3, 7, 10

**Norinsberg** [12] - 277:13; 278:10, 15, 18; 279:2, 7, 12, 20; 280:12; 281:6; 312:9; 468:20

**normal** [2] - 326:12; 328:5

**notation** [7] - 259:16, 19; 260:24; 344:11, 18; 395:20; 463:15

**notations** [1] - 259:23

**note** [54] - 258:19, 21; 287:23; 324:16, 20; 330:6, 9; 331:15; 332:5, 9, 14, 18; 387:7, 9, 12-13; 390:8; 393:17; 398:5; 404:12; 412:21, 23; 413:1, 3, 18, 20; 419:21; 420:13, 15, 20; 421:25; 422:8, 17, 23; 423:2, 4; 426:12; 432:3; 437:17; 438:6, 8-9, 19; 465:10, 14, 17, 20

**noted** [8] - 326:13; 389:25; 394:5, 8; 408:10; 436:14, 18

**notes** [44] - 359:10;

381:18; 382:12; 383:1, 3, 8, 13; 384:22; 385:10, 22; 386:4, 7; 391:16, 19; 392:6; 393:14; 394:5; 396:25; 397:3, 7; 406:22; 407:12, 17, 21; 408:2, 7; 425:5; 429:11; 430:22; 454:14; 463:15, 17; 465:24; 466:1; 479:14, 17, 23, 25; 480:12, 14; 486:16; 489:16

**nothing** [11] - 286:1; 288:3; 338:2; 375:25; 383:12; 396:25; 414:17; 428:11; 448:13; 486:13; 496:14

**Nothing** [7] - 277:1; 345:15; 383:15; 400:20; 414:18; 470:10; 486:23

**notice** [1] - 283:12

**noticed** [1] - 452:23

**notification** [1] - 478:13

**notified** [3] - 470:5; 479:3, 5

**notify** [5] - 453:5; 469:20, 24; 470:3, 8

**notion** [1] - 244:10

**November** [15] - 232:7; 419:17; 424:20; 425:12; 426:12; 429:23; 432:3; 433:4; 461:21; 465:14; 509:3, 5; 510:2; 511:2; 512:9

**number** [20] - 255:8; 258:11; 286:3; 315:20, 23; 316:1; 349:20; 408:11; 412:5, 10, 13, 15, 17; 413:14, 17; 485:2, 15; 486:2

**numbered** [1] - 315:8

**numerous** [3] - 424:1, 11; 466:11

**nurse** [1] - 270:20

**nursery** [1] - 315:12

**nurses** [9] - 293:6; 313:1, 17, 24; 314:7; 315:6; 316:7, 9, 21

**nursing** [2] - 255:17; 331:17

---

**O**

**oath** [4] - 346:24; 355:23; 488:4; 491:9

**object** [11] - 291:4; 307:17, 23-25; 310:18; 318:5; 333:13; 338:10; 342:7

**objected** [2] - 339:3; 340:12

**objecting** [2] - 310:5; 311:4

**objection** [44] - 260:2; 269:16; 277:22; 282:14; 285:22; 288:16; 307:20; 308:1; 309:1; 325:12, 22; 330:18, 23; 333:12; 338:6; 374:18; 382:17; 387:16; 392:12; 420:25; 421:1; 423:11-13; 435:20; 438:23; 445:25; 446:1; 478:8; 480:7; 494:17; 504:6

**Objection** [105] - 238:1; 239:5; 240:10, 17, 24; 243:3; 249:6; 250:11; 251:11, 18; 254:20, 25; 256:23; 257:5, 10, 20; 259:21; 261:3, 10, 16; 268:7; 272:25; 273:12; 274:1, 18, 24; 275:4, 23; 276:22; 277:16; 282:7, 19; 285:23; 301:20; 304:1, 7; 306:18; 307:3; 313:7; 318:22; 319:7; 323:3, 10; 326:23; 328:9; 331:24; 332:3, 7, 12; 333:8; 334:2; 335:11, 24; 336:6, 10; 337:11, 15, 19; 341:19, 24; 346:25; 347:10; 354:7; 355:12; 357:22; 358:3; 362:22; 365:10; 367:8; 389:2, 21; 394:22; 397:13; 400:2, 8, 13; 403:18; 409:19; 413:24; 426:9; 427:17; 428:1; 434:1; 436:12; 439:21; 441:16, 19, 23; 442:20; 445:5; 453:1; 462:12, 20; 466:22; 467:24; 468:6; 469:2, 16; 474:19; 482:19, 22; 488:17; 498:18; 501:4; 506:21

**objections** [1] - 375:3

**obligation** [1] - 509:19

**Obstruction** [1] -

**object** [11] - 291:4; 329:21

**obstruction** [4] - 326:6; 328:15; 329:18, 20

**obtain** [1] - 426:14

**obtained** [2] - 496:21, 23

**occasion** [1] - 345:4

**occasionally** [2] - 265:20; 266:1

**occasions** [1] - 458:18

**occur** [4] - 270:8; 466:19, 23; 506:13

**occurred** [11] - 339:1; 341:1; 343:1; 344:1; 401:13; 433:13; 450:1; 451:1; 506:1; 507:18

**October** [2] - 346:19; 414:13

**OF** [3] - 232:1, 7, 9

**offer** [23] - 259:25; 325:10, 14; 330:16, 21; 333:10; 338:14; 340:4; 374:23; 382:16; 387:15; 392:10; 420:23; 423:9; 432:17; 435:18; 438:21; 445:24; 478:6; 480:5; 494:15; 504:4

**offered** [1] - 375:4

**offering** [1] - 287:2

**office** [31] - 245:16; 248:17; 267:7; 268:2; 278:2, 25; 279:10, 15; 280:20; 298:15, 17; 313:21; 314:9; 333:19; 357:10; 361:9; 435:8; 461:2; 472:4, 6, 11, 15; 474:1, 13, 16; 475:4; 477:14; 483:24; 484:7; 500:18

**officer** [14] - 249:2, 9; 294:7; 295:8; 312:24; 313:19; 335:17; 459:18, 25; 460:22; 478:20; 502:17

**officers** [8] - 297:14; 298:6; 315:4; 316:16; 335:14, 16; 368:16; 369:4

**official** [2] - 473:19; 479:9

**Official** [1] - 232:21

**officially** [1] - 478:25

**often** [3] - 241:7; 327:2; 417:7

**Often** [1] - 317:19
**Olivencia** [1] - 433:22
**Once** [1] - 412:17
**once** [21] - 240:1; 257:25; 292:20; 293:20; 325:3; 331:8; 346:17; 352:20; 364:15; 411:11; 414:14; 419:17; 461:7; 465:23; 466:4; 468:4; 471:9; 478:12; 489:6; 500:20
**One** [9] - 250:18; 266:24; 299:7; 302:17; 322:1; 331:14; 342:6; 375:15; 509:24
**one** [59] - 233:9; 245:20; 250:20; 251:1; 253:10; 254:7; 255:22; 263:1; 264:3; 267:3; 270:21; 273:4; 274:3, 22; 281:6; 283:10; 284:3; 287:2, 4; 288:17; 289:3; 292:10, 20; 294:19; 306:16; 309:23; 315:10; 316:7, 12; 317:6; 325:18; 330:21; 331:10, 19; 338:15; 339:5; 349:24; 360:1; 370:2; 374:22; 376:4; 387:12; 399:25; 400:6; 411:3; 417:8; 434:15; 439:24; 457:2; 458:25; 480:16; 500:14, 19; 501:1, 6-7; 507:14, 25
**ones** [2] - 251:15; 308:15
**ongoing** [1] - 271:17
**open** [23] - 248:1; 252:20; 253:3, 6-7, 11; 263:3; 270:1; 289:1; 292:1; 295:21; 296:12; 307:13; 341:1; 344:1; 373:2; 374:3; 422:2; 426:11; 448:18; 451:1; 502:17; 509:8
**opened** [7] - 314:20; 399:4; 450:8; 478:25; 479:4, 9; 481:11
**operations** [1] - 256:7
**opinion** [16] - 252:12, 14; 254:4, 7; 269:15; 274:15; 291:21; 358:9; 360:21; 361:2; 365:16, 20; 390:4; 428:11; 436:2

**opportunity** [3] - 275:2; 375:12; 419:15
**oral** [1] - 457:3
**order** [9] - 258:7; 261:8, 14; 293:1; 320:7, 15, 18; 321:15; 459:14
**ordered** [5] - 259:9; 320:10, 20, 23; 321:12
**ordinary** [1] - 410:4
**originally** [1] - 362:25
**Osteopathic** [1] - 294:17
**osteopathic** [1] - 294:18
**otherwise** [1] - 459:16
**outside** [10] - 298:20; 305:10; 401:6; 452:16; 461:14; 463:2, 7, 14; 496:11; 504:12
**outstanding** [5] - 299:3; 304:12; 375:16, 18; 511:10
**overall** [1] - 473:18
**overheard** [1] - 502:6
**overrule** [1] - 428:6
**Overruled** [61] - 238:2; 240:11; 243:4; 249:7; 251:12, 19; 254:21; 257:6, 11, 21; 259:22; 261:4, 11, 17; 273:1, 13; 274:2; 275:24; 276:23; 277:24; 282:20; 291:25; 304:8; 307:4; 310:7; 311:6; 313:8; 319:8; 323:11; 326:24; 328:10; 332:13; 336:7; 337:20; 347:1, 11; 354:8; 355:15; 357:23; 358:4; 362:23; 365:11; 367:9; 389:3; 397:14; 400:9, 14; 403:19; 409:20; 426:10; 427:18; 439:22; 441:24; 442:21; 453:2; 462:13; 468:7; 482:23; 488:18; 498:19; 501:5
**overruling** [2] - 269:16; 288:16
**own** [7] - 235:4; 236:7; 250:14; 288:9; 334:8; 460:10; 463:7

---

**P**

**P-R-I-L-O-S-E-C** [1] -

289:21
**p.m** [1] - 331:3
**PA** [3] - 383:21; 408:12; 483:19
**Page** [2] - 513:3; 514:13
**page** [55] - 235:17; 238:17; 246:9; 247:18; 257:15; 263:21; 268:11; 269:19; 272:9; 276:6; 278:17; 279:7, 21; 281:6, 17; 284:5; 286:8, 13; 287:3; 288:17, 21; 289:3; 290:4; 327:13; 330:22; 338:20; 340:20; 342:6; 343:18; 350:19; 354:16; 355:8; 363:20; 367:11; 373:9; 378:9; 380:2; 382:14; 395:8, 25; 446:12; 449:6; 450:11; 473:10; 474:14; 477:16; 482:13; 483:18; 486:5; 487:4, 24; 490:6; 491:2; 498:6
**pages** [3] - 286:6; 287:24
**pain** [2] - 326:10; 339:22
**palpate** [2] - 326:25; 327:4
**paper** [4] - 296:23; 452:11, 24; 469:23
**paperwork** [1] - 333:1
**paragraph** [1] - 436:1
**part** [21] - 255:22; 256:1; 272:20; 328:7; 329:14; 334:4, 15, 17-18, 20; 344:4; 406:6, 10; 407:8; 417:9; 424:9; 432:24; 440:23; 441:1; 484:15; 508:19
**particular** [6] - 342:6; 356:5; 375:2; 413:14; 418:5; 483:1
**particularly** [1] - 469:14
**parts** [1] - 327:10
**party** [1] - 356:8
**pass** [4] - 316:15; 317:7; 453:21, 25
**passed** [2] - 316:13; 317:4
**past** [5] - 343:7, 13; 344:7; 345:12; 433:13

**patient** [18] - 259:17, 20, 24; 261:6, 12, 20, 23; 273:19; 295:5, 10; 305:15; 317:22-24; 318:13; 320:11; 416:20
**Patient** [7] - 260:9, 12, 19, 21; 326:5, 10, 16
**patients** [22] - 253:1; 254:3; 295:6; 296:13; 300:23, 25; 301:4, 8; 312:19, 21; 313:18; 314:7; 315:23; 316:21; 320:8, 14, 16, 19-20; 336:21; 457:14; 495:4
**Paul** [1] - 232:21
**Pause** [2] - 286:11; 324:13
**pause** [8] - 233:12; 258:14; 376:9; 382:6; 385:16; 392:2; 494:3; 503:11
**Paxil** [1] - 331:8
**pay** [1] - 277:13
**paying** [1] - 455:10
**peculiar** [1] - 283:10
**pen** [1] - 469:19
**pending** [1] - 456:4
**pens** [1] - 453:3
**people** [30] - 236:11; 247:2; 265:13; 287:12; 291:8, 12; 309:23; 310:14, 20, 22; 321:7; 341:12; 344:5; 348:6; 349:11; 359:1, 15; 365:23; 398:3; 419:2; 434:16; 435:6; 442:10; 500:24; 505:6; 506:18; 509:12, 15
**People** [1] - 283:15
**percent** [1] - 322:5
**performed** [1] - 457:3
**perhaps** [3] - 239:20; 281:1; 507:14
**period** [10] - 267:15; 397:10; 429:22; 442:25; 456:13; 486:20, 24; 487:7, 13, 18; 488:1, 16, 22; 489:5; 496:4
**Permissible** [1] - 428:21
**permissible** [7] - 273:10, 14; 427:23; 428:8, 14, 18
**permission** [1] -

**permitted** [1] - 302:23
**person** [19] - 236:20; 237:15; 284:3; 296:5; 298:17; 305:16; 306:2, 12, 14; 352:13; 362:25; 412:12, 14; 481:15, 17; 484:9; 506:10, 15, 20
**personal** [9] - 250:14; 297:19; 341:16; 381:18; 383:1; 386:7; 443:25; 452:12
**personally** [4] - 235:12; 277:10, 12; 437:22
**personnel** [2] - 311:2; 436:23
**persons** [1] - 433:20
**perspective** [2] - 313:14; 315:5
**pertain** [1] - 324:24
**pertains** [1] - 258:23
**Ph** [1] - 232:21
**pharmacist** [1] - 289:24
**pharmacy** [9] - 255:17; 314:12, 14, 20-21; 315:7; 316:10; 321:21, 23
**phone** [17] - 316:3; 461:7; 475:6, 9, 12; 485:2, 15; 499:12, 20-21; 500:1, 5, 15; 501:16; 507:10
**photo** [3] - 308:11; 309:15
**photograph** [6] - 310:11; 313:3, 13; 314:4; 315:22; 317:8
**photographs** [14] - 307:10, 16, 18, 20; 309:20; 311:20, 24; 334:25; 335:3, 5, 7, 10, 13; 452:14
**phrased** [2] - 486:10; 487:3
**physical** [7] - 326:13; 339:22; 352:16; 374:16; 418:1; 453:18; 455:6
**physically** [2] - 319:11; 502:2
**physician** [3] - 294:21; 350:10; 481:7
**physician's** [1] - 326:21

**pick** [1] - 254:14
**picture** [9] - 307:25; 308:5; 309:23; 310:20; 311:3; 312:16, 18; 314:10; 315:1
**pictures** [7] - 307:22-24; 308:2, 4; 309:11; 310:13
**pin** [1] - 413:14
**place** [33] - 242:20; 264:14, 16; 287:1; 289:1; 291:1; 292:1; 295:17; 298:1, 9; 336:5; 357:10; 360:14; 361:9, 11; 364:10; 379:10; 386:8; 391:22; 393:5, 10, 15; 399:3; 404:2; 414:12; 433:9; 447:6; 462:25; 463:5; 476:13; 497:2; 509:13
**placed** [13] - 434:6, 9; 439:15, 25; 440:15; 441:6, 9; 459:11; 460:15, 21; 462:15; 476:9; 487:19
**places** [1] - 305:17
**plain** [1] - 410:4
**plaintiff** [5] - 287:9; 338:4; 414:22; 470:14; 510:20
**Plaintiff** [29] - 232:5, 13; 259:25; 260:4; 346:1; 381:22; 382:19, 21; 387:18, 20; 391:24; 392:10, 14-15; 393:8; 494:2, 15, 19-20; 503:10; 504:8; 514:16
**Plaintiff's** [44] - 297:17; 303:21; 325:24; 330:2, 24-25; 334:20; 344:10; 403:21; 405:13; 407:11; 420:7, 23; 421:2; 422:24; 423:9, 14, 19; 432:7-9, 12, 16; 435:22; 438:25; 439:2; 446:2; 478:10; 480:9; 514:22-25; 515:1
**plaintiff's** [37] - 297:23; 298:7; 303:10; 309:21; 310:13; 324:9; 325:4, 10, 21; 330:16; 332:21; 333:10; 341:6; 347:7, 12, 15; 407:23; 434:24; 435:18; 437:24; 438:11, 21-22; 440:7; 445:9; 450:3; 454:13;

**457:4; 462:5; 476:23; 477:19; 478:6; 479:19; 480:5; 510:10, 21
**plaintiffs** [1] - 247:9
**plan** [5] - 397:3, 5; 398:7, 9, 11
**Plaza** [1] - 232:21
**plenty** [2] - 310:25; 419:15
**pocketbook** [1] - 414:25
**point** [66] - 234:12; 235:12, 19; 236:10; 239:10; 241:18, 21; 243:16, 24; 244:8; 248:8; 254:9; 267:23; 269:3; 274:13; 281:15; 303:20; 305:2; 311:19; 318:11; 319:25; 320:3; 325:15; 329:9; 336:18; 337:23; 338:3; 356:20; 360:17, 21; 365:16; 371:11; 373:8; 377:16; 384:8; 395:22; 396:23; 399:24; 404:13; 405:2; 411:15, 19, 23, 25; 412:1, 19; 413:19; 426:8; 427:6; 431:23; 433:9; 441:6; 473:8, 18; 475:22; 478:24; 482:18; 502:16; 506:9; 507:3, 7, 21; 508:7, 10
**pointed** [1] - 407:14
**points** [2] - 388:7, 10
**poisonous** [1] - 319:6
**police** [1] - 477:6
**policies** [1] - 295:4
**policy** [25] - 269:14; 294:23, 25; 295:2, 4, 9, 11; 296:9; 303:1, 3; 307:1, 5, 7; 318:20, 25; 319:4, 10; 370:8; 397:15; 409:10, 13, 15, 18, 22
**population** [1] - 437:14
**portion** [1] - 305:6
**position** [7] - 248:25; 268:5; 294:4; 304:14; 401:20; 416:1; 472:5
**positions** [1] - 402:13
**positive** [1] - 326:14
**positively** [1] - 430:13
**possibility** [12] - 252:21; 253:3, 6-7;

**444:18; 447:23; 448:4; 467:22; 468:4, 24; 483:6; 506:19
**possible** [12] - 265:3; 295:5; 317:15; 327:2; 328:8, 13; 329:4; 338:17; 405:24; 455:9; 460:11; 502:12
**possibly** [3] - 328:11; 466:20; 506:10
**post** [3] - 269:5, 11; 313:18
**post-incident** [2] - 269:5, 11
**posted** [2] - 262:23; 312:24
**potential** [2] - 276:20; 329:23
**potentially** [2] - 235:7; 434:12
**pouch** [1] - 328:5
**power** [4] - 410:10, 20, 23; 483:23
**practice** [3] - 403:5; 463:2, 7
**practitioner** [9] - 297:11; 316:11; 317:16, 19; 318:2, 4, 10; 341:9
**practitioner's** [2] - 255:18; 297:12
**practitioners** [6] - 296:2; 297:7; 300:25; 305:4; 459:19, 21
**precautions** [2] - 257:25; 436:24
**Precisely** [3] - 360:12; 368:7, 12
**preliminary** [1] - 277:9
**prepare** [10] - 263:10; 266:13; 392:6; 393:8; 420:15; 423:2; 438:6, 17; 479:25; 494:6
**prepared** [9] - 265:15; 381:17; 387:12; 420:20; 423:4; 435:14; 479:12, 14; 493:12
**prescribe** [2] - 319:6; 328:17
**prescribed** [11] - 289:11, 15; 292:6, 13-14, 19; 293:16; 328:19, 22; 331:9
**prescription** [6] - 292:18, 22-23; 293:9,

19, 23

**present** [9] - 239:8; 311:14; 320:25; 353:5; 371:16; 373:4; 374:3; 431:10; 502:2

**presented** [1] - 386:25

**presently** [1] - 331:8

**prevent** [5] - 381:12; 495:25; 496:3, 7, 10

**previously** [2] - 245:21; 433:5

**Prilosec** [2] - 289:19; 292:8

**privacy** [8] - 294:23; 295:2, 4-5, 9, 11, 24; 495:4

**Privacy** [1] - 294:25

**private** [2] - 403:5; 463:2

**privilege** [4] - 509:20, 23, 25

**probation** [3] - 375:18; 458:23; 459:3

**problem** [9] - 255:22; 320:12; 322:11, 14; 328:4; 430:14, 16; 475:20

**problems** [5] - 255:21; 292:7; 322:15; 450:6; 457:23

**procedure** [3] - 296:7; 370:9; 468:21

**procedures** [2] - 283:11; 295:17

**proceed** [8] - 233:11, 25; 311:17; 346:11; 376:16; 415:14; 449:3; 470:24

**Proceedings** [1] - 232:24

**proceedings** [10] - 233:13; 258:15; 286:11; 324:13; 376:10; 382:7; 385:17; 392:3; 494:4; 503:12

**process** [2] - 314:13; 440:14

**produced** [1] - 232:25

**professional** [1] - 409:25

**professionals** [2] - 409:23; 463:13

**program** [5] - 402:17; 438:8; 458:6; 461:20

**progress** [14] -

258:19, 21; 324:16, 20; 330:6, 9; 420:13; 422:23; 423:4; 438:6, 9, 19

**prohibited** [1] - 296:25

**prohibits** [1] - 319:1

**projects** [1] - 405:5

**promoted** [1] - 402:16

**proof** [1] - 340:5

**proper** [2] - 320:18; 490:3

**protect** [2] - 295:5; 443:8

**protest** [1] - 254:23

**provide** [3] - 405:1; 454:4

**provided** [5] - 240:5; 384:21; 476:19; 510:10; 511:7

**providers** [1] - 305:4

**providing** [2] - 305:5; 493:19

**psychiatric** [4] - 371:2; 416:10, 13; 466:19

**Psychiatric** [1] - 416:2

**psychiatrist** [2] - 293:18; 459:16

**psychology** [2] - 402:24; 451:12

**psychosis** [1] - 292:17

**psychotherapy** [1] - 403:5

**psychotic** [2] - 292:15

**publish** [1] - 307:10

**punchers** [1] - 452:11

**punctuality** [1] - 233:9

**purpose** [6] - 276:19; 310:19; 335:9; 391:19; 393:22; 431:6

**purposes** [3] - 293:17; 309:23; 475:8

**pursuant** [1] - 471:6

**pursue** [1] - 501:8

**pursuing** [1] - 487:23

**purview** [1] - 363:4

**put** [25] - 287:14, 16; 288:1, 14, 18; 325:15, 18; 334:15; 340:7; 374:14; 393:3; 430:21; 435:6; 436:25; 437:14;

439:17; 450:3; 452:8; 460:10; 466:1; 486:16; 497:8; 500:10; 506:9

**Put** [1] - 414:24

**putting** [2] - 325:20; 339:5

**Q**

**questionable** [2] - 327:8

**questioned** [4] - 278:15; 297:24; 341:11; 407:23

**questioning** [2] - 278:19; 291:4

**questions** [26] - 266:7; 278:15; 279:8, 17, 21-22, 25; 280:13; 281:3; 319:13; 340:14; 361:20, 22, 25; 362:8, 11; 363:17, 21; 364:8, 11, 19; 381:6; 410:15; 419:16; 468:14; 470:11

**quickly** [2] - 284:2; 405:23

**quote** [16] - 383:20; 384:12; 390:9; 393:17, 19; 394:8, 10; 395:1, 21-22; 422:14; 439:5; 445:4; 466:11

**R**

**R-A-S-K-I-N** [1] - 489:14

**R-O-G-I-N-S-K-Y** [1] - 267:1

**races** [1] - 283:17

**rack** [2] - 317:20

**raise** [1] - 233:15

**Raise** [1] - 414:25

**ramifications** [1] - 276:20

**Ramos** [101] - 282:1; 285:15; 287:18; 288:8; 289:10; 291:16; 292:23; 293:22; 322:21, 24; 324:24; 326:3; 330:7; 331:4, 6; 332:9; 333:3; 335:21; 336:4; 338:5; 344:15, 20; 401:2, 5; 414:3, 6, 14; 473:1, 3, 5, 12, 20; 474:1; 475:18, 21, 23; 476:1, 8, 20; 477:8; 478:23; 480:17, 20; 481:6, 11; 484:10, 12, 19, 22;

485:3, 5, 10, 14; 486:3, 25; 487:5, 12, 17, 19; 488:1, 16, 22; 489:7, 9, 19, 23; 490:1; 491:4, 18, 21; 492:8, 13, 15; 493:4, 6, 8; 494:25; 495:9, 14; 496:1, 4, 11, 14, 19, 21; 497:3, 23; 498:2, 7, 15; 499:6, 12, 19, 23; 500:2, 14, 25; 501:8, 13, 24; 508:8

**RAMOS** [1] - 232:3

**Ramos'** [5] - 282:23; 334:21; 481:3; 486:7, 12

**Ramos's** [7] - 292:18; 300:10; 323:9, 14; 414:8; 500:12; 507:16

**ranking** [1] - 249:3

**rapidly** [1] - 359:6

**rapists** [1] - 468:8

**Raskin** [2] - 489:11, 14

**razor** [1] - 297:3

**re** [1] - 417:12

**re-incarcerated** [1] - 417:12

**reach** [6] - 394:18; 397:11; 484:6; 485:3; 488:15, 21

**reached** [1] - 396:19

**reacted** [1] - 354:11

**reaction** [3] - 354:1, 6, 9

**read** [25] - 260:8; 280:2, 6; 281:7; 283:19, 21; 284:2; 286:4; 325:6, 9; 326:2; 331:1; 344:10; 383:18; 384:15; 408:8; 421:16; 423:23; 429:6; 437:7; 504:21; 505:6; 509:8

**Read** [1] - 260:16

**readable** [1] - 327:12

**reader** [1] - 493:20

**reading** [5] - 283:13, 17; 387:3; 432:5; 505:3

**reads** [3] - 283:14; 505:5

**ready** [1] - 317:16

**really** [12] - 242:14; 261:7; 310:4; 398:19; 399:16; 424:24; 427:13; 454:11; 455:8; 458:7;

459:6

**reason** [12] - 281:18; 320:13; 342:1; 344:4; 360:13; 383:3; 393:3; 430:10; 491:16; 495:8; 507:4, 7

**reasons** [3] - 322:1; 333:14; 442:9

**rebound** [1] - 326:15

**rebuttal** [1] - 287:18

**receive** [9] - 287:17, 19; 288:8, 10; 331:7; 344:15; 434:11; 475:12; 477:17

**received** [27] - 260:5; 345:6; 368:9; 382:21; 387:20; 392:15; 473:25; 475:6, 23; 477:12, 22; 478:4, 12; 480:24; 482:15; 494:20; 501:16; 504:1, 9; 506:24; 507:10; 514:16

**receiving** [1] - 345:3

**recently** [1] - 250:22

**recess** [15] - 307:12; 311:10, 12; 372:24; 373:5, 8; 448:16, 20, 24; 508:25; 509:2, 4; 510:2, 5

**Recess** [2] - 311:11; 448:23

**recognize** [29] - 258:18; 285:10; 312:16; 313:12; 314:3; 324:15; 330:5; 332:23; 382:10; 385:20; 386:4; 401:9; 420:10, 12; 435:2, 4; 438:2, 4, 15; 440:9, 11; 445:11, 13; 477:3, 5; 479:20, 22; 503:15, 17

**recognized** [2] - 282:18; 389:12

**recollection** [8] - 244:25; 299:1; 323:8; 362:4; 381:3; 391:21; 396:15; 414:15

**recommend** [2] - 434:5, 8

**recommendation** [1] - 371:17

**recommended** [1] - 383:24

**recommends** [1] - 435:16

**record** [22] - 233:21;

260:8; 287:6; 289:5, 10; 291:15; 323:9; 325:14, 18; 326:8; 333:18, 21, 25; 334:4; 339:5; 346:9; 404:8; 415:9; 470:22; 511:7

**recorded** [2] - 232:24; 384:22

**records** [44] - 282:23; 285:12, 14, 17; 286:2; 288:9; 322:21, 23; 323:14-20, 22; 324:1, 6; 330:20; 334:5, 7-8, 10, 13-14; 338:4, 8, 14; 340:5, 7, 15; 344:11; 374:7, 22; 436:14; 480:17, 24; 481:3, 6, 13

**RECROSS** [2] - 341:4; 513:13

**RECROSS-EXAMINATION** [2] - 341:4; 513:13

**redirect** [1] - 332:4

**Redirect** [1] - 319:15

**REDIRECT** [8] - 319:17; 345:1; 410:17; 464:17; 513:11, 15, 23; 514:6

**refer** [2] - 435:7; 461:16

**reference** [3] - 422:17; 450:4

**referenced** [2] - 412:25; 507:16

**referral** [6] - 434:11, 21; 435:7; 437:6, 21; 460:2

**referrals** [1] - 434:20

**referred** [5] - 416:10; 459:10; 462:6; 503:5; 511:9

**referring** [14] - 251:7; 384:3, 5; 394:13; 395:8; 397:25; 398:3; 411:16; 424:9; 447:5; 457:8; 473:7; 503:23; 506:17

**Referring** [23] - 235:17; 238:17; 257:15; 263:21; 272:9; 276:6; 350:19; 354:16; 355:8; 363:20; 367:11; 378:9; 380:2; 473:10; 474:14; 477:16; 482:13; 483:18; 486:5; 487:4, 24; 491:2; 498:6

**reflected** [1] - 383:13

**reflection** [1] - 383:8

**reflects** [1] - 291:15

**reflux** [1] - 292:9

**refusal** [1] - 303:2

**refuse** [5] - 302:23; 303:4; 321:17; 341:7

**refused** [1] - 322:16

**regard** [1] - 397:12

**regarding** [42] - 242:3; 252:8; 258:1; 265:6; 266:4; 272:24; 279:23; 280:5, 9; 281:7, 9; 295:17; 296:7; 297:25; 302:8; 334:25; 336:3; 344:11; 352:10; 374:8, 15; 383:1; 397:19; 398:9; 399:8, 11; 405:14; 407:17; 414:2; 433:21, 25; 439:9, 12; 474:1; 475:23; 496:19, 22; 497:3; 498:21; 504:19; 507:12; 508:8

**Regarding** [2] - 249:19; 374:7

**regardless** [1] - 426:23

**region** [1] - 339:23

**regular** [3] - 349:4; 480:2; 494:12

**regulation** [2] - 314:22

**relate** [6] - 330:7; 333:3; 338:8, 10; 353:16; 463:23

**related** [2] - 353:1; 385:10

**relates** [1] - 472:14

**relating** [18] - 259:5; 263:11, 14, 18, 23; 265:11, 16; 322:21; 337:14, 23; 339:6; 352:8; 354:2; 369:8, 11; 371:20; 440:4; 471:14

**Relating** [1] - 337:16

**relation** [1] - 242:12

**relationship** [18] - 250:21, 23; 251:2, 6, 10, 16, 21; 273:5, 8, 11, 19; 302:20; 422:8; 427:16, 21; 444:14; 453:18; 455:7

**relationships** [1] - 281:2

**relative** [1] - 486:7

**relatively** [2] - 242:25; 269:13

**relaying** [1] - 444:13

**release** [1] - 495:17

**released** [4] - 417:11; 457:9; 462:22; 463:6

**relevance** [2] - 287:8; 291:5

**relevancy** [1] - 453:1

**relevant** [3] - 269:10; 339:8; 493:18

**reluctant** [2] - 442:2, 10

**remain** [1] - 414:24

**remained** [1] - 384:9

**remember** [26] - 244:13; 264:10; 279:1, 17, 25; 281:3, 16; 305:24; 306:9; 316:4; 353:17; 355:17; 364:22; 365:3; 380:11; 383:12; 403:24; 404:5; 411:21; 420:5; 422:16, 19; 439:23; 440:5; 442:12

**reminded** [1] - 502:16

**removed** [1] - 497:8

**removes** [2] - 469:19, 23

**renew** [1] - 374:13

**Repeat** [2] - 250:25; 427:19

**repeat** [5] - 416:12; 439:10; 459:23; 467:25; 488:19

**repeatedly** [1] - 444:2

**rephrase** [4] - 306:20; 356:11; 377:21; 396:18

**report** [43] - 237:20; 245:11; 248:19, 21, 23; 263:11; 265:6, 8, 15; 266:13; 349:4, 7; 350:2; 368:22; 369:14-16, 19; 386:1, 5, 13; 388:21; 390:3, 8; 411:12; 412:9; 422:15, 20; 427:4, 7; 430:3, 7; 435:9; 454:11; 493:13, 16, 23; 494:6, 8, 10, 12, 23

**reported** [13] - 349:24; 384:2; 388:18; 418:8, 19; 419:24; 425:21; 426:20; 427:2; 428:25; 429:21, 24;

486:23

**Reporter** [1] - 232:21

**reporting** [1] - 422:17

**reports** [3] - 389:13; 418:13; 429:8

**represent** [2] - 299:8; 388:10

**represented** [6] - 291:14; 339:4; 347:3; 471:17; 495:7; 511:13

**representing** [1] - 456:8

**request** [4] - 237:17, 20; 290:2; 511:6

**requested** [1] - 437:21

**requesting** [2] - 235:13; 237:13

**requests** [3] - 237:15, 24; 511:21

**residency** [1] - 294:19

**resolve** [1] - 374:19

**resolving** [3] - 366:18, 23; 367:13

**respect** [7] - 249:11; 295:9; 304:14; 355:2, 6; 397:19; 436:7

**respond** [1] - 509:18

**response** [6] - 239:3; 353:9, 23; 355:10; 356:9, 17

**responsibilities** [6] - 299:4, 6-7; 406:6; 416:4; 472:8

**responsibility** [8] - 233:9; 366:1, 7-8, 10, 12; 369:23; 398:23

**responsible** [13] - 281:8, 13; 305:1; 366:18, 22; 367:6, 13, 20; 368:5; 398:20; 401:23, 25

**responsive** [1] - 468:13

**rest** [2] - 321:14; 417:18

**restrictions** [12] - 484:5; 494:24; 495:3, 8, 12, 19-20, 25; 496:3, 7, 10, 13

**result** [1] - 372:16

**resumed** [2] - 417:13, 17

**resumes** [2] - 233:1; 318:17

**retaliation** [1] -

460:22

**retired** [2] - 373:6; 448:21

**returned** [1] - 326:5

**review** [5] - 282:23; 306:22; 334:23; 398:4; 480:11

**reviewed** [1] - 471:20

**reviews** [1] - 306:16

**revised** [1] - 432:21

**rib** [1] - 327:1

**Richard** [3] - 234:15; 346:1, 10

**RICHARD** [2] - 346:4; 513:17

**Rick** [3] - 359:24; 431:7; 464:4

**Rick's** [1] - 280:20

**Rickenbacker** [141] - 245:12; 250:6; 251:7; 258:1, 5-6, 23; 259:6, 10, 14; 261:8, 20; 280:19; 281:14, 19; 301:16, 25; 321:13; 342:3; 344:6; 358:20, 23; 361:18; 362:12, 17; 375:16; 377:6, 10; 393:19, 23; 394:14, 16, 19; 395:1; 396:3, 8, 13; 404:13; 408:22; 411:17; 412:13, 15, 25; 413:5; 416:21, 23; 417:7, 17, 25; 419:3, 17; 420:2; 421:18; 422:10, 13; 423:5; 424:15, 19; 425:11; 426:23; 430:1, 11; 431:5; 433:4, 20; 434:6, 8, 12; 436:7, 10, 15; 437:8; 439:4, 8, 12, 15; 440:3, 15, 24; 441:2; 443:24; 444:21; 445:2, 4, 15, 19; 446:7; 447:9; 448:2; 450:5; 453:17; 454:13, 17; 455:18, 24; 456:4, 14, 22; 457:13, 16, 23; 458:1, 10, 18, 22; 459:5, 9; 460:14, 20; 461:1, 13, 16, 21; 462:2, 6, 10, 22; 463:9, 16, 25; 464:5, 9, 20; 466:4, 10; 467:3, 6, 16; 468:23; 469:4; 503:6, 24; 504:16, 24; 505:2, 11; 511:8, 11

**Rickenbacker's** [19] - 253:12; 259:1; 262:13; 279:23; 280:10, 24; 281:9; 302:18; 362:14, 20; 371:25; 413:7; 431:14; 433:25; 444:8, 19; 447:19; 462:17; 469:14

**rings** [1] - 329:14

**rips** [1] - 410:5

**risk** [2] - 275:11, 20

**Riverhead** [5] - 248:6; 264:15; 347:19; 401:24; 415:24

**RMR** [1] - 232:21

**RN** [1] - 331:5

**Rochelle** [31] - 282:1, 23; 285:15; 289:10; 322:21; 323:9, 13; 324:24; 326:3; 330:7; 331:4, 7; 333:3; 334:21; 338:4; 344:20; 401:2, 5; 414:3, 6, 14; 472:25; 473:3, 19; 474:1; 475:18, 21, 23; 477:8; 492:8; 500:14

**ROCHELLE** [1] - 232:3

**Roginsky** [6] - 266:24; 267:10, 23; 270:3, 9; 298:18

**role** [1] - 411:1

**room** [40] - 279:10, 14; 295:8, 18, 21-22; 296:3, 5; 297:7; 312:22; 313:21; 314:14, 20; 315:7, 9-10, 20, 22; 316:1, 3, 6, 12-13, 15, 22; 317:3, 6, 20, 22; 318:14; 326:6; 373:4; 452:9; 484:25; 485:15

**rooms** [11] - 296:8, 12; 313:2, 15-16; 314:6; 315:4, 18; 317:6; 318:2

**rough** [1] - 349:10

**roughly** [1] - 445:18

**rubbing** [1] - 384:11

**rule** [3] - 326:6; 328:14; 340:13

**ruled** [2] - 329:20, 25

**rules** [4] - 405:14, 19, 22; 428:22

**run** [1] - 452:6

**running** [1] - 248:6

**rush** [1] - 483:1

**rushed** [1] - 374:23

**S**

**S-E-R-O-Q-U-E-L** [1] - 289:18

**safety** [2] - 296:10; 460:10

**sake** [1] - 297:12

**Sara** [8] - 351:22, 24; 381:15; 383:1, 15; 384:18; 407:18; 408:3

**Saturday** [1] - 390:10

**saw** [13] - 238:4, 8, 12, 25; 240:7, 14; 259:17; 261:5; 301:3; 315:23; 358:8; 434:21; 459:9

**scheduled** [2] - 490:1; 491:4

**school** [1] - 284:1

**science** [1] - 451:11

**sciences** [1] - 294:16

**scope** [2] - 401:6; 410:2

**scorned** [4] - 394:9, 16, 20; 464:9

**seat** [1] - 233:23

**seated** [5] - 233:7; 311:15; 376:14; 415:7; 449:2

**second** [13] - 253:16, 23; 279:11; 310:20; 315:9; 336:17; 364:15; 395:20; 425:11; 507:4; 508:11; 509:20; 510:16

**secondly** [1] - 303:19

**Secondly** [1] - 291:23

**seconds** [3] - 279:4, 15; 500:6

**Seconds** [1] - 279:6

**secret** [1] - 302:21

**section** [4] - 305:7; 472:10; 473:9; 478:21

**security** [40] - 237:21; 241:18, 25; 243:13; 248:19; 296:10, 16, 18, 20-21; 297:8, 12; 298:10; 368:13, 17, 23; 369:14; 371:12, 14, 20, 23; 372:1, 5; 405:11; 406:17; 426:18; 432:4, 25; 433:5, 8, 21; 452:2; 453:5; 454:9; 461:22; 469:20, 24; 470:3, 8

**see** [77] - 234:20, 25; 235:3, 13, 16, 20, 25; 236:3, 6, 14; 237:6; 239:14; 241:6; 247:12; 254:3; 258:5; 259:9; 261:12; 284:2; 286:2; 299:14; 300:25; 310:23; 312:10; 317:16; 320:8, 10, 14-15, 18, 20; 321:12; 324:22; 325:1; 328:21, 23; 333:15; 335:3; 336:21; 341:8; 375:23; 377:1, 5, 9, 13; 390:12; 392:19; 393:20; 394:11; 406:7; 408:11, 14; 421:9, 14; 424:3, 7; 432:24; 433:2; 435:8, 15, 25; 436:4; 437:20; 454:11; 459:10, 21; 460:8; 463:1; 485:18; 491:21; 492:7; 507:4; 510:19; 511:2; 512:7

**seeing** [9] - 258:6; 261:8, 20, 23; 300:23; 375:2; 429:11; 465:9; 466:6

**seeking** [2] - 322:8; 458:8

**seem** [1] - 437:4

**segregation** [9] - 439:16, 18, 25; 440:13, 16; 441:7, 10; 462:7, 11

**senior** [2] - 306:7; 371:2

**sense** [1] - 233:9

**sensitive** [5] - 295:24; 296:1, 5, 12, 14

**sent** [6] - 334:14; 441:5; 459:21; 460:6; 461:19; 462:10

**separate** [13] - 245:15; 250:15; 267:18, 21; 303:15; 317:11, 15; 320:5; 360:18; 404:15; 444:17

**September** [3] - 248:3, 5, 9

**Sergeant** [25] - 236:25; 237:4, 9, 14, 17, 20; 238:4, 9, 24; 239:2, 13, 18, 23; 240:2, 21; 241:2; 243:9; 248:23, 25; 249:11; 297:24; 298:2;

**433**:22; 478:13, 18

**sergeant** [9] - 249:1; 390:10, 23; 391:1, 5-6, 10; 479:3, 5

**series** [1] - 479:14

**serious** [4] - 425:21; 426:25; 427:2; 481:21

**seriously** [3] - 425:8, 10, 12

**Seroquel** [5] - 289:16; 292:11, 19, 23; 293:9

**Seroquil** [1] - 331:9

**SEROQUIL** [1] - 331:9

**served** [1] - 277:10

**service** [2] - 277:17; 405:3

**Services** [2] - 402:10; 415:24

**services** [2] - 305:5; 404:25

**SESSION** [1] - 374:1

**session** [7] - 423:5; 424:25; 430:3, 15-16, 19; 463:15

**sessions** [5] - 436:9; 454:15, 18; 463:23; 466:3

**set** [7] - 307:1, 5, 7; 385:10; 461:20; 497:2; 499:10

**setting** [1] - 298:1

**seven** [6] - 255:3, 8; 331:19; 349:14, 20; 370:2

**Seven** [1] - 349:22

**several** [3] - 239:16, 19; 333:13

**severe** [1] - 339:21

**sex** [1] - 457:3

**sexual** [46] - 250:16; 256:16; 273:10, 15; 280:25; 300:18; 368:10; 370:15; 405:16; 418:13, 20; 419:18; 420:3; 421:13, 19; 422:1, 4, 14; 424:6, 16; 427:16, 21, 24; 428:15, 20; 430:2, 7; 441:13, 22; 442:1, 10; 443:1, 13, 20; 444:9, 15; 447:5; 467:9; 469:15; 476:13; 481:20, 23; 502:12; 503:18; 505:15

**sexually** [22] - 345:9; 421:7; 444:2, 5; 446:8;

**447**:13; 448:3; 455:19, 21; 456:23; 464:13, 20; 466:20; 468:5, 25; 470:3, 7; 476:2; 481:12; 505:1, 20; 506:14

**SH** [1] - 262:6

**shadow** [1] - 474:25

**Shaheda** [1] - 262:4

**SHAHEDA** [1] - 262:5

**Shame** [3] - 442:6

**shank** [1] - 453:4

**share** [1] - 243:21

**shared** [4] - 267:7; 268:2; 298:15, 17

**sharpness** [1] - 297:2

**sheriff** [5] - 397:24; 472:7, 9; 478:22; 479:3

**sheriff's** [6] - 245:15; 248:17; 369:10, 16; 472:15; 500:18

**Sheriff's** [8] - 472:4, 11; 474:1, 12, 16; 475:4; 477:13

**shifts** [1] - 468:19

**shirt** [5] - 410:3-5, 20

**shirts** [1] - 410:1

**shocked** [7] - 250:2, 5, 7; 354:13, 17, 19

**shocking** [1] - 354:15

**shortly** [2] - 246:5; 255:14

**shoulders** [1] - 383:24

**Show** [2] - 286:7

**show** [31] - 258:10; 287:16; 289:10; 292:22; 307:11; 310:4, 21; 311:20; 312:4, 13; 314:1, 23; 324:8; 330:2; 332:21; 343:6; 375:4; 381:21; 385:14; 391:23; 420:6; 422:22; 432:16; 434:23; 437:23; 438:11; 440:6; 445:8; 476:22; 479:18; 503:9

**showed** [3] - 317:8; 321:20; 462:5

**showing** [1] - 481:13

**shown** [6] - 308:15, 24; 335:1, 14; 454:14; 490:4

**shows** [3] - 310:25; 313:3; 317:9

**sick** [2] - 287:14, 20

**side** [3] - 388:3; 452:9

**sidebar** [10] - 268:8; 286:12; 287:1; 290:2; 291:1; 338:18; 339:1; 343:1; 449:5; 450:1

**Sidebar** [4] - 247:1, 17; 269:1, 18

**sides** [4] - 326:17-19; 388:2

**sign** [4] - 293:6; 327:2; 387:9; 407:20

**signature** [4] - 382:14; 386:12, 16, 21

**signed** [3] - 331:5; 387:3; 407:15, 24; 408:7

**significant** [4] - 260:9, 12, 19, 21

**significantly** [1] - 365:4

**similar** [10] - 281:13; 358:17; 360:18; 363:10; 371:8; 394:1; 399:25; 431:17; 443:12; 501:13

**sincere** [1] - 458:8

**single** [4] - 353:12, 16; 360:11; 365:8

**sit** [9] - 237:23; 242:18; 271:16, 20; 274:14; 276:14; 364:18; 400:11; 468:8

**sitting** [3] - 363:13; 367:2; 509:18

**situation** [10] - 345:11, 14; 387:24; 396:17, 21; 397:12; 398:8, 17; 444:10; 463:17

**situations** [5] - 296:1; 320:21; 443:2, 9, 14

**six** [5] - 293:7, 24; 445:18; 447:18

**slow** [5] - 280:6; 283:12; 359:5, 14; 505:7

**Slow** [2] - 260:16; 359:13

**slowly** [5] - 233:21; 260:16; 346:9; 415:9; 470:22

**social** [13] - 298:19; 371:2; 416:2, 10, 13, 15-16; 451:17, 22; 453:6, 13; 459:16; 466:19

27

someone [5] - 306:5; 405:15; 440:12; 501:17; 505:12
Someone [1] - 504:12
sometime [2] - 263:20; 264:18
Sometime [3] - 264:17; 301:14; 411:21
sometimes [5] - 275:20; 304:16; 329:1; 442:2; 443:13
Sometimes [3] - 299:16; 317:23; 329:1
Somewhat [1] - 444:24
soon [2] - 418:7; 460:11
sooner [1] - 487:22
sorry [33] - 238:19; 242:8; 244:16; 260:15; 270:14; 278:23; 280:7; 281:11; 285:6; 290:1; 306:1; 323:6; 329:13; 334:3; 344:14; 349:20; 351:2; 356:11; 362:6; 379:14; 400:3; 401:3, 25; 406:20; 418:19; 423:21; 427:22; 428:17; 438:9; 441:17, 19; 463:24; 488:19
sort [2] - 322:9, 11
sounded [1] - 479:2
sounds [1] - 326:14
SPATT [1] - 232:10
Spatt [4] - 445:14; 456:19; 457:5, 20
Spatt's [1] - 278:13
speaking [10] - 241:21; 363:3; 365:23; 403:7, 11; 409:25; 465:2; 473:18; 486:11; 502:7
Specific [2] - 507:24
specific [9] - 245:22; 248:10; 319:4; 341:8; 343:11; 352:9; 365:13; 405:14; 482:25
Specifically [1] - 280:16
specifically [13] - 248:21; 276:25; 300:17; 319:1; 390:1; 403:24; 413:15; 456:25; 467:15; 469:18; 492:12; 503:5; 506:16
speculate [1] - 411:24

speed [2] - 359:7, 12
spell [12] - 233:20; 266:25; 289:17, 20, 23-24; 326:8; 331:12; 346:8; 415:8, 12; 470:22
spelled [1] - 489:16
spoken [11] - 265:13; 426:17; 432:4, 25; 433:5; 439:8; 461:22; 483:15, 19; 491:24; 506:16
staff [40] - 253:2; 255:17; 273:10; 304:16; 315:16; 316:25; 317:2; 318:20; 319:1, 5, 11; 320:25; 321:14; 345:8; 370:14; 383:21; 398:21; 401:24; 402:2, 4; 405:5, 17, 20; 418:1, 14; 419:7, 10; 427:16, 21, 23; 429:8; 431:13; 460:8; 476:9; 481:21; 504:25; 505:15; 508:19
staffed [1] - 314:15
stand [7] - 233:15; 318:16; 346:2; 384:1; 432:21; 470:15
standard [3] - 296:4, 6; 440:12
standards [1] - 295:3
standing [3] - 318:11; 321:20; 414:24
stands [3] - 269:15; 364:25; 365:4
staplers [1] - 452:11
start [5] - 260:17; 278:14; 283:16; 402:11; 451:23
started [6] - 293:20; 383:25; 402:15; 406:7; 452:1; 473:22
Starting [3] - 278:17; 294:11
starting [2] - 234:6; 280:2
starts [2] - 293:1; 436:25
State [3] - 299:24; 403:2; 456:17
state [7] - 233:20; 343:5; 346:8; 366:20; 415:8; 470:21; 475:8
statement [2] - 413:23; 486:9

STATES [2] - 232:1, 10
states [1] - 390:9
States [2] - 232:5; 294:7
station [7] - 313:1, 17, 24; 314:7; 315:6; 316:8
stationed [5] - 249:8; 297:14; 310:22; 315:4
status [4] - 493:13, 16; 494:8, 23
stay [3] - 340:17; 345:19; 459:14
staying [1] - 299:15
stenography [1] - 232:24
step [3] - 317:19; 414:19; 470:12
stepping [2] - 313:15; 314:6
steps [7] - 312:8; 355:1; 368:9; 370:14; 405:14; 414:20; 479:15
sticker [1] - 288:18
still [19] - 250:23; 251:2; 252:20; 253:3, 7, 24; 261:19, 22; 274:14; 360:21; 365:24; 368:5; 390:3; 411:8; 446:8; 447:3, 16; 506:25; 510:16
stomach [1] - 292:7
stood [1] - 384:1
stop [4] - 261:8; 342:10, 12; 495:20
story [3] - 443:23; 454:24
street [1] - 283:22
stressful [2] - 442:25; 443:8
stricken [1] - 468:13
strictly [1] - 291:10
Strike [4] - 239:7; 318:7; 466:25; 497:17
strike [3] - 342:8; 468:10
strongly [2] - 437:18; 439:5
stuff [2] - 291:7; 303:8
subject [4] - 257:8, 16; 263:14; 431:21
submitted [2] - 436:19; 437:6

subpoena [4] - 277:10, 13; 471:6; 510:13
subsequent [1] - 380:1
Subsequent [1] - 380:17
Substance [1] - 402:2
substance [11] - 280:23; 353:19, 23; 401:23; 402:15; 403:1; 405:4; 416:18; 451:17; 458:2, 9
SUFFOLK [1] - 232:7
Suffolk [35] - 232:17; 244:7; 248:7; 260:10, 20; 262:1; 275:17; 282:24; 285:17; 287:11; 289:11; 294:4; 298:9; 302:10; 323:14; 326:5; 333:2, 18, 21, 25; 344:16, 21; 347:13; 374:10, 16; 402:10; 415:24; 417:1; 451:23; 462:18; 472:4, 14
suggest [1] - 509:17
suggestion [1] - 278:13
Suicidal [1] - 453:15
suicidal [7] - 416:7; 434:13; 436:2, 10, 15, 23; 437:18
suicide [16] - 434:6, 9; 435:6, 8; 437:1, 6, 10; 439:5; 459:11, 14, 19; 460:1, 10, 16, 21
suite [2] - 313:22; 314:8
Suite [2] - 232:14, 21
sum [3] - 280:23; 353:19, 22
summary [2] - 265:10, 14
summer [1] - 444:25
summon [1] - 483:23
superiors [1] - 237:21
supervise [2] - 306:2; 348:6, 9; 405:4
supervised [1] - 266:21
supervises [1] - 305:16
supervising [1] - 402:5
supervision [2] - 320:11; 363:1
supervisor [42] -

261:25; 262:4, 12; 263:13; 270:6, 11, 17, 20; 271:3; 305:12, 21; 331:6, 17; 337:25; 349:1; 366:12, 15; 402:7; 404:19, 22; 405:23; 406:4, 10; 408:24; 409:2, 4; 410:7; 418:8, 11, 16; 419:24; 425:22; 426:1, 3, 21; 427:3; 453:19, 22; 454:1; 470:5; 493:23

**supervisors** [3] - 256:1; 265:2, 5

**supplies** [1] - 254:13

**supporting** [1] - 477:6

**supportive** [2] - 362:4

**Supportive** [1] - 454:5

**suppose** [2] - 358:15; 412:20

**supposed** [3] - 368:10; 409:23; 410:9

**Supreme** [2] - 299:24; 456:17

**surgeon** [1] - 294:8

**surprise** [3] - 249:24; 376:2; 377:25

**surprised** [4] - 377:20; 378:1, 10, 19

**surroundings** [1] - 452:17

**SUSAN** [1] - 232:17

**suspend** [6] - 303:11, 18; 319:20, 22; 320:1; 410:12

**suspended** [2] - 372:16, 19

**Suspended** [1] - 372:17

**suspicious** [2] - 362:3, 5

**sustain** [1] - 469:3

**Sustained** [32] - 239:6; 240:18, 25; 250:12; 255:1; 256:24; 274:19, 25; 275:5; 304:2; 306:19; 318:7, 23; 331:25; 332:4, 8; 333:9, 24; 335:12; 336:11; 337:12; 341:20, 25; 389:22; 394:23; 413:25; 434:2; 445:6; 462:21; 466:24; 469:17; 506:22

**sustained** [1] - 301:21

**swore** [3] - 364:2; 488:7; 491:12

**sworn** [10] - 233:18; 346:6, 23; 415:4; 470:19; 471:13; 476:19; 477:8, 17; 478:4

**synopsis** [1] - 493:17

### T

**T-shirt** [4] - 410:3, 20

**T-shirts** [1] - 410:1

**table** [1] - 384:7

**tangentially** [1] - 474:22

**TATRAULT** [1] - 335:18

**Tatrault** [5] - 335:18, 20, 23; 336:3, 9

**team** [18] - 255:3, 8, 12; 256:6; 257:3, 9, 17; 270:21; 271:9; 331:19; 349:14, 21-22, 24; 350:2; 370:2; 371:5; 372:12

**Team** [1] - 255:9

**technically** [2] - 334:17; 416:16

**Technology** [1] - 294:16

**telephone** [8] - 461:1, 4, 9; 473:2, 8, 25; 474:11; 503:18

**ten** [1] - 252:7

**tenderness** [3] - 326:15, 17, 25

**term** [2] - 304:20; 328:2

**terms** [4] - 298:3; 302:22; 408:23; 484:6

**Terry** [6] - 474:3, 8, 18; 475:3, 10; 477:23

**TERRY** [1] - 474:9

**Terry-Clarke** [5] - 474:3, 18; 475:3, 10; 477:23

**test** [1] - 260:22

**testified** [31] - 233:19; 241:9; 245:21; 257:24; 266:16; 267:3; 273:3; 287:10; 319:19, 24; 321:6, 17; 322:20; 323:16, 19; 334:9, 25; 336:12; 337:1, 4; 346:6; 355:23; 376:21; 385:6; 387:23; 391:12; 410:19; 414:2; 415:4;

469:18; 470:19

**testify** [4] - 278:3, 10; 282:22; 291:6

**testimony** [34] - 235:22; 239:8; 248:8, 12; 251:17; 257:19; 272:14; 276:12; 342:8; 346:23; 347:9; 354:11, 20; 363:24; 364:2; 378:12, 20; 380:15; 424:18; 431:20; 441:9, 11; 464:19; 471:13, 23; 474:10; 477:25; 485:13; 487:9, 11; 488:4; 491:7, 9; 493:3

**THE** [391] - 232:10; 233:3, 5, 7, 15, 20, 22-25; 238:2; 239:6; 240:11, 18, 25; 241:19; 242:8; 243:4; 246:8; 247:4, 7, 12, 15; 249:7; 250:12; 251:12, 19; 254:21; 255:1, 7, 9, 12-13, 19-20, 23, 25; 256:2, 24; 257:6, 11, 21; 258:11; 259:22; 260:2, 4, 13, 15-16, 18; 261:4, 11, 17; 262:6; 266:25; 268:9; 269:10; 270:14; 271:6; 273:1, 13; 274:2, 19, 25; 275:5, 13, 15-17, 24; 276:23; 277:2, 21, 24; 280:6; 282:8, 13, 20; 283:2, 4, 10; 285:5, 7, 13-14, 22, 24; 286:2, 7, 10, 12; 287:2, 6, 21; 288:1, 6, 10, 14, 20; 289:2, 4, 6, 17-18, 20-23, 25; 290:3; 291:19; 294:24; 299:18-21; 301:21; 304:2, 8; 306:19; 307:4, 11, 16, 23; 308:2, 9, 11, 13, 15, 17, 19, 22, 24; 309:1, 4, 7, 9, 13, 15, 18, 25; 310:5, 7, 15, 17, 23, 25; 311:4, 6, 10, 13, 15, 21; 312:4, 7, 9, 20; 313:8; 318:5, 7, 23; 319:8, 15; 323:4, 11; 324:10; 325:8, 12, 16, 24; 326:24; 328:10; 330:3, 18, 21, 24; 331:12, 25; 332:4, 8, 13; 333:9, 12, 15, 18, 20-21, 23-24; 334:3;

335:12; 336:7, 11; 337:12, 16, 20; 338:11, 13, 19; 339:2, 10, 12, 16, 20, 25; 340:6, 12, 17; 341:20, 25; 342:9, 12-13, 15; 343:9, 16; 345:17, 19, 21-24; 346:8, 10-11; 347:1, 11; 349:19, 22; 351:24; 354:8; 355:15; 357:23; 358:4; 359:5, 8, 13; 362:23; 363:2; 365:11; 367:9; 372:19, 22; 374:4, 9, 18; 375:6, 12, 25; 376:4, 8, 12, 14; 378:2, 6; 379:12, 14; 381:23, 25; 382:17, 19; 387:16, 18; 389:3, 22; 392:12, 14; 394:23; 397:14; 400:3, 9, 14, 21; 401:3, 25; 402:2; 403:19; 409:20; 413:25; 414:19, 21, 24; 415:7, 10, 12-14; 417:4; 418:19, 22; 420:25; 421:2; 423:12, 14, 17-18, 20-21; 426:10; 427:18; 428:2, 6, 9-10; 432:5, 8, 11-13, 19, 21; 434:2, 17; 435:17, 20, 22; 438:23, 25; 439:22; 440:18-21; 441:17, 20, 24; 442:16, 18, 21; 445:6, 25; 446:2; 448:15, 25; 449:2; 450:9; 453:2; 462:13, 21; 466:24; 467:25; 468:7, 12, 22; 469:3, 17; 470:12, 21, 23-24; 474:6, 20, 22; 476:24; 478:8, 10, 17; 480:7, 9; 482:23; 488:18; 489:13, 17; 494:17, 19; 498:19; 501:5; 504:6, 8, 11-12; 505:5, 9-10; 506:22; 508:25; 510:5, 8, 12, 18; 511:1, 5, 10, 17, 19, 22, 24; 512:3, 6

**their's** [1] - 410:7

**themselves** [2] - 443:22

**theory** [3] - 283:18; 483:17

**therapist** [2] - 417:1, 5

**therapy** [4] - 403:5;

29

453:25; 459:7; 463:15

**therefore** [1] - 397:15

**they've** [1] - 343:4

**thinking** [3] - 356:3; 366:14; 380:22

**third** [2] - 250:7; 356:8

**third-party** [1] - 356:8

**thirty** [1] - 365:5

**thousands** [1] - 324:6

**three** [27] - 264:10; 309:1, 3; 315:9, 21, 23; 316:1; 329:23; 355:17, 22; 356:4, 6; 363:24; 367:3, 19; 378:15; 380:10, 20; 404:3; 433:20; 434:4, 16; 454:14; 481:10; 509:24; 510:1

**throughout** [4] - 310:21; 349:8; 417:18; 466:3

**thyroid** [2] - 260:22

**tier** [1] - 424:6

**title** [3] - 305:14; 348:3; 472:7

**today** [26] - 237:23; 271:16, 20; 274:14; 275:3; 276:14; 282:6, 17, 22; 297:17; 323:2; 324:3, 5; 325:3; 335:3; 355:20, 22; 364:18; 378:24; 400:11; 401:9; 413:22; 414:5; 471:21; 480:12; 505:13

**together** [2] - 256:7; 506:9

**Tomorrow** [1] - 509:3

**tone** [6] - 361:24; 362:1, 3-4, 6

**tones** [1] - 283:16

**tongue** [1] - 296:23

**Tony** [4] - 492:1, 4, 7, 15

**took** [25] - 278:24; 335:7; 355:5, 9; 356:9, 17; 357:10; 361:9, 11; 366:13; 386:8; 391:22; 393:4, 10, 15; 404:2; 411:1; 414:12; 425:7, 12; 433:8; 448:9; 463:4; 479:15; 498:20

**toothbrushes** [1] - 453:4

**top** [2] - 329:18; 392:18

**total** [3] - 293:24; 336:20; 348:12

**touch** [3] - 327:4; 384:8; 487:20

**touched** [5] - 252:22; 423:25; 424:10; 464:24; 466:11

**touching** [10] - 250:18; 252:2; 253:8; 421:13, 19; 422:1, 4, 14; 424:12; 430:2

**touchy** [2] - 383:23; 408:13

**touchy-feely** [1] - 408:13

**towards** [1] - 315:3

**traffic** [1] - 316:14

**train** [1] - 269:14

**trained** [3] - 436:23; 453:24; 469:19

**training** [5] - 368:9; 452:2, 6, 15; 470:7

**TRANSCRIPT** [1] - 232:9

**Transcript** [1] - 232:25

**transferred** [3] - 287:10; 316:4; 402:18

**treat** [3] - 321:24; 322:13; 417:21

**treated** [10] - 295:14; 300:4; 318:3; 339:23; 417:18; 441:13, 21; 481:7, 14

**treating** [1] - 259:13

**treatment** [28] - 302:23; 303:4, 7; 321:18; 322:8, 18; 339:7, 15; 341:7; 401:24; 402:2, 16; 405:5; 416:21, 24; 417:9, 14, 17; 443:24; 450:6; 458:3, 8; 459:8; 461:8, 17; 463:11

**trial** [3] - 279:4; 510:16; 512:8

**TRIAL** [1] - 232:9

**Trial** [1] - 233:1

**tried** [1] - 488:21

**trouble** [1] - 359:9

**truck** [3] - 452:16, 20

**true** [22] - 252:19; 258:9; 261:9; 305:18; 314:17; 341:7, 14, 18,

23; 342:4; 343:14; 344:8; 345:4, 7; 365:9; 403:13, 17; 447:8; 461:24; 462:1, 3

**True** [1] - 258:8

**truly** [1] - 459:6

**truth** [14] - 252:13; 254:6, 8; 358:10, 13; 360:22; 364:3, 5-6; 465:10; 488:7, 9; 491:12

**try** [9] - 295:9; 299:14; 317:11, 15; 391:6, 9; 468:16; 488:15; 489:6

**trying** [4] - 241:13; 269:7; 287:17; 374:22

**Tuesday** [4] - 278:23; 279:20; 282:5, 18

**turn** [2] - 427:3; 487:22

**turned** [7] - 265:24; 345:4; 483:3; 497:12, 19; 500:17; 507:22

**twenty** [1] - 365:5

**Two** [5] - 267:21; 309:8; 320:6; 457:21; 509:25

**two** [49] - 250:15; 253:16; 254:5; 266:16, 23; 267:18; 294:20; 296:2; 299:15; 303:11, 15, 22-23; 304:4; 307:22, 24; 315:10; 316:12; 320:4; 343:4; 358:16; 360:18; 361:14; 363:9; 388:13; 389:12, 18; 419:2; 430:11; 431:13; 432:14; 451:10; 486:13; 487:6, 12, 17; 488:1, 16, 22; 489:5; 496:4; 500:24; 505:6, 14; 506:9, 13

**two-week** [1] - 496:4

**type** [25] - 254:17; 263:10; 265:11, 15; 266:13; 271:24; 272:2; 273:15; 291:4; 295:25; 296:14; 368:9; 379:23; 380:4, 16; 381:7, 10, 12; 397:11; 428:15, 19, 24; 467:14; 476:13; 499:17

**typed** [1] - 382:12

**typical** [1] - 292:15

U

**ulcer** [5] - 327:8; 329:3, 8, 17

**ultimate** [1] - 460:12

**ultrasound** [1] - 326:11

**Um-hmm** [2] - 456:20; 460:3

**uncertain** [1] - 329:10

**uncle** [2] - 444:16; 457:2

**uncles** [1] - 444:6

**uncomfortable** [1] - 295:7

**Under** [1] - 504:23

**under** [16] - 240:21; 245:18; 295:20; 346:23; 355:23; 362:25; 374:23; 411:5; 416:21, 23; 427:24; 428:13; 436:25; 453:13; 488:4; 491:9

**underactive** [1] - 260:23

**underneath** [3] - 266:17; 348:13; 352:4

**understood** [6] - 297:5; 357:19; 358:5; 396:3; 426:24; 476:12

**underway** [6] - 244:1, 14, 18, 24; 245:8

**unethical** [1] - 273:14

**unfolds** [1] - 511:3

**unit** [123] - 248:24; 249:1, 4, 8-9; 252:25; 255:4, 14, 16, 22; 256:6, 8, 12, 21; 257:4; 264:24; 265:3, 12; 266:11, 17; 267:4; 270:11, 17, 22; 271:3, 10; 294:22; 297:15; 300:5, 8; 301:11; 302:22; 303:7, 24; 304:6; 305:8-10; 308:12, 18, 23; 309:12, 17, 20; 310:3, 11-12, 22; 315:18; 316:1, 17; 317:1; 321:7; 322:2, 6, 8, 13, 17; 323:21; 331:20; 334:1, 5, 15, 21; 341:12; 344:5; 347:22; 348:1, 3, 19, 22-23; 349:12; 350:11, 15, 17; 351:7; 352:4; 368:13; 370:3, 6, 8; 379:11, 15, 24; 380:5,

12; 381:8; 399:14, 22;
402:19; 409:15, 18, 24;
412:7; 419:2, 8;
428:15, 19; 476:6;
480:21; 481:4, 12, 21;
487:20; 502:13; 504:25;
505:16, 21; 506:11, 15,
18; 507:11, 19, 23;
508:4, 15, 19, 21
**UNITED** [2] - 232:1, 10
**United** [2] - 232:5;
294:7
**units** [1] - 255:16
**unity** [2] - 372:13;
476:3
**University** [1] -
451:13
**unkind** [1] - 509:12
**unlikely** [1] - 260:22
**unofficial** [1] -
432:19
**unpleasant** [1] -
509:12
**unspecified** [1] -
384:9
**unusual** [1] - 453:24
**up** [50] - 236:10;
243:16; 251:2; 254:14;
268:10; 274:13; 281:21;
294:8; 310:3, 24;
312:20; 313:18; 314:7;
315:13; 316:20; 317:9,
14; 325:16; 332:18;
333:16; 336:18; 338:19;
358:13; 359:8, 11;
361:1; 362:13; 370:22;
379:13; 384:1, 11;
410:6, 8; 413:17;
431:21; 437:5; 461:20;
463:1; 474:23, 25;
481:24; 487:22; 490:4;
497:2; 499:10; 509:11,
13
**update** [2] - 493:20;
510:10
**upset** [5] - 292:7;
389:20; 455:9; 460:18;
464:14

---

### V

**V-A-L-L-O-N-E** [1] -
270:18
**V-E-L-A-S-Q-U-E-Z** [1]
- 351:25
**vagina** [1] - 476:10
**vaginal** [1] - 339:23

**Vaguely** [1] - 264:13
**Vallone** [3] - 270:12,
18, 25
**valuable** [1] - 321:4
**various** [1] - 456:4
**Velasquez** [24] -
351:22; 352:3, 8-9, 23;
353:1; 354:5; 357:19,
21, 25; 358:5; 381:16;
383:2, 9; 384:18;
385:3; 386:20; 388:14,
18; 389:1, 7, 9;
407:18; 408:3
**venue** [1] - 490:3
**verify** [2] - 288:7;
331:6
**vertebral** [1] - 326:17
**Veterans** [1] - 232:19
**victims** [6] - 441:13,
21; 442:1, 10; 443:1,
13
**view** [4] - 313:15;
314:5; 315:3; 509:20
**VINCENT** [2] - 233:17;
513:6
**Vincent** [1] - 233:22
**violating** [1] - 321:14
**violation** [2] -
375:17; 428:22
**virtually** [1] - 486:13
**visit** [2] - 485:10;
491:18
**visited** [4] - 493:1, 4,
6, 8
**visiting** [3] - 485:16;
495:20; 496:7
**visitors** [1] - 247:4
**voice** [2] - 312:20;
379:13
**volume** [1] - 505:7
**vomiting** [1] - 326:10
**vulnerable** [2] -
444:20; 469:15

---

### W

**W-H-I-T-E** [1] - 271:7
**W-R-I-G-H-T** [1] -
470:23
**Wait** [2] - 260:13;
282:13
**wait** [5] - 312:22;
313:5; 393:14; 510:1,
19
**waited** [1] - 393:11

**waiting** [5] - 312:22;
313:6; 318:12; 408:11;
486:3
**walk** [2] - 279:9; 317:4
**walking** [1] - 316:12
**wall** [6] - 312:22;
313:4, 18; 314:6;
318:12
**wants** [2] - 325:14;
394:9
**warden** [7] - 265:20,
23, 25; 266:4, 7, 10,
14
**warned** [1] - 297:4
**warrant** [7] - 375:16,
18, 22, 24; 511:8, 10;
512:2
**warranted** [4] -
303:19; 319:23, 25;
321:3
**watch** [15] - 296:22;
434:6, 9; 435:6, 8;
437:1; 459:11, 14, 19;
460:1, 10, 16, 21;
509:9
**weapons** [1] - 297:1
**Wednesday** [1] - 299:8
**week** [15] - 244:25;
278:7; 417:8; 422:11;
436:19; 437:18; 487:7,
13, 17; 488:1, 16, 22;
489:5, 20; 496:4
**weekend** [1] - 510:3
**weeks** [16] - 264:10;
346:19; 354:23; 355:17,
22; 356:4, 6; 363:24;
367:19; 378:15; 380:10,
20; 414:10; 445:18;
447:18; 486:13
**weight** [2] - 260:9, 19
**well-modulated** [1] -
283:16
**whatsoever** [1] - 291:5
**whereabouts** [3] -
492:16; 510:11
**whereas** [1] - 236:19
**White** [11] - 271:4, 7,
9, 13; 331:5, 15, 17,
19, 22; 332:1, 5
**whole** [6] - 342:8;
343:2; 358:13; 361:1;
447:13; 448:3
**wife** [1] - 254:14
**willing** [4] - 498:20,
22; 499:9, 15

**wish** [1] - 378:6
**withdraw** [1] - 406:21
**withdrawal** [1] -
287:15
**withdrawn** [2] - 294:2;
301:6
**witness** [16] - 233:11;
291:6, 11; 301:22;
312:8; 318:16; 345:25;
346:5; 375:7; 414:20;
415:3; 470:13, 18;
477:1
**WITNESS** [41] - 233:22,
24; 255:13, 20, 25;
256:3; 260:15, 18;
275:15, 17; 285:14;
289:4, 18, 21, 25;
299:19, 21; 333:20, 23;
342:13; 345:21, 23;
346:10; 379:14; 402:2;
415:10, 13; 418:22;
423:18, 21; 428:9;
432:6, 11, 13; 440:19,
21; 468:22; 470:23;
504:12; 505:9; 511:5
**witness's** [1] - 239:8
**witnesses** [2] - 247:6;
475:2
**Witnesses** [1] - 513:3
**woman** [1] - 313:23
**women** [12] - 316:25;
360:18, 22; 455:10;
465:9; 466:6; 467:23;
468:5, 25; 505:14;
506:13, 20
**women's** [1] - 316:22
**word** [6] - 269:8;
353:12, 16; 360:11;
425:17; 464:22
**words** [8] - 235:4;
236:7; 295:6; 422:3;
427:10; 447:18; 465:1
**worker** [13] - 371:3;
416:2, 11, 13, 15, 17;
424:2; 451:17; 453:6,
13; 459:16; 466:12, 19
**worrying** [1] - 457:9
**Wright** [11] - 470:15,
23; 471:4; 482:10;
483:3; 489:19, 22;
493:4; 496:13; 499:19;
500:9
**WRIGHT** [2] - 470:17;
514:8
**writ** [4] - 299:8, 17,
21, 23

**Writ** [1] - 299:19
**WRIT** [1] - 299:20
**write** [11] - 283:18; 398:5; 413:18; 425:4; 430:18; 445:16; 446:10; 454:24; 457:14, 20; 458:21
**writing** [5] - 389:11; 412:19; 435:15; 454:23; 459:5
**written** [19] - 234:20, 25; 241:6; 265:10, 14; 295:11; 303:1; 318:20, 25; 319:4, 10; 324:17; 326:3; 331:4, 15; 420:13; 463:22; 495:16
**wrote** [38] - 236:14; 383:3; 386:5; 390:3; 393:1, 9, 17; 394:25; 395:5, 21; 397:7; 408:8; 412:17, 21; 420:20; 421:25; 423:23; 426:12, 17, 20; 437:17; 445:1, 4, 14; 446:5; 447:3, 8, 12, 18; 448:12; 450:4; 457:12; 458:23; 459:4; 465:2; 495:12

---

**Y**

---

**Yaphank** [1] - 401:24
**year** [7] - 264:16; 294:19; 417:10, 19; 433:10, 12; 451:10
**years** [9] - 294:20; 347:25; 367:3, 25; 368:2; 404:3; 421:8; 472:22
**yesterday** [3] - 275:6; 278:23; 432:20
**YORK** [1] - 232:1
**York** [9] - 232:6, 14, 19, 22; 294:16; 299:24; 403:2
**yourself** [14] - 236:1; 261:25; 267:4; 356:21; 363:17; 371:19; 372:9; 382:12; 385:6; 407:18; 408:23; 411:1; 420:21; 454:25
**yourselves** [6] - 307:14; 373:2; 448:18, 20; 509:7; 510:5

---

**Z**

---

**zebra** [4] - 308:16;

309:5; 311:25; 314:2
**ZWILLING** [2] - 232:18; 247:9
**Zwilling's** [1] - 247:15