948

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                  :
ROCHELLE RAMOS,
                                       07-CV-1250
        Plaintiff,

            -against-             :
                                       United States Courthouse
                                       Central Islip, New York
COUNTY OF SUFFOLK, et al

        Defendants.               :
                                       November 18, 2009
- - - - - - - - - - - - - - - X   9:30 a.m.

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ARTHUR D. SPATT
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Plaintiff:        JON L. NORINSBERG, ESQ.
                          BENNITTA JOSEPH, ESQ.
                          225 Broadway, Suite 2700
                          New York, New York 10007


For the Defendant:        CHRISTINE MALAFI
                          Suffolk County Attorney
                          H. Lee Dennison Bldg.
                          P.O. Box 6100
                          Veterans Memorial Highway
                          Hauppauge, New York 11788
                          BY:  SUSAN A. FLYNN, ESQ.
                               ARLENE S. ZWILLING, ESQ.
                          Assistant County Attorneys


Court Reporter:           Perry Auerbach
                          100 Federal Plaza
                          Central Islip, New York 11722
                          (631) 712-6103

Proceedings recorded by mechanical stenography.
Transcript produced by computer.

Rickenbacker - Direct/Joseph

949

1          (The following occurred out of the presence of

2    the jury.)

3          THE COURT:  Another subpoenaed record came in

4    this morning.  Do you want to pick it up?

5          MR. NORINSBERG:  Yes, your Honor, thank you.

6          THE CLERK:  Jury entering.

7          (Whereupon, the jury entered the courtroom.)

8          THE COURT:  Good morning, members of the jury.

9          THE JURY:  Good morning.

10          THE COURT:  Please be seated.

11          Thanks again for your very diligent conduct,

12    your punctuality and I've noticed how attentive you have

13    been to the trial, which is greatly appreciated.

14          You may proceed, Ms. Joseph.

15          MS. JOSEPH:  The plaintiff calls Lowrita

16    Rickenbacker.

17

18    **LOWRITA RICKENBACKER**,

19                call as a witness, having been first

20                duly sworn, was examined and testified

21                as follows:

22          THE CLERK:  Please state your name and spell

23    your first name and last name slowly for the record.

24          THE WITNESS:  My name is Lowrita Rickenbacker.

25          THE COURT:  Do you want to have a seat and speak

Rickenbacker - Direct/Joseph

950

1    into the microphone, please.

2            THE WITNESS:  My name is Lowrita Rickenbacker.

3    I live in 30 Wallace --

4            THE COURT:  No.  How do you spell your name?

5            THE WITNESS:  L-O-W-R-I-T-A.  Rickenbacker,

6    R-I-C-K-E-N-B-A-C-K-E-R.

7            THE COURT:  You may proceed.

8

9    DIRECT EXAMINATION

10   BY MS. JOSEPH:

11   Q.   Good morning, Ms. Rickenbacker.

12            Where do you live?

13   A.   At 30 Wallace Street, Freeport, New York.

14   Q.   Are you married?

15   A.   I'm married, but I'm separated.

16   Q.   Do you have any children?

17   A.   I have five wonderful children.  My oldest is 25,

18   Natasha.

19            THE COURT:  I can't what you're saying.

20   A.   My oldest is 25.  Her name is Natasha.

21            THE COURT:  You say you have five children and

22   your oldest is 25.

23            THE WITNESS:  Yes, sir.

24            My second oldest is 23.  Her name is Sonya.  My

25   third oldest is Felicia.  She's 21.  My fourth oldest is

Rickenbacker - Direct/Joseph

951

1    19.  His name is Duane.  And my last child name is Maya.

2    She's 17.

3    Q.   What are your children doing now?  Do they live with

4    you?

5    A.   No.  My son is in New York with my brother.  My

6    oldest daughter works for an airline in Atlanta, Georgia.

7    My second oldest is a stay-at-home mom.  She has two

8    children.  My third oldest is currently -- she was

9    currently going to school for fashion merchandising.  She

10   was in her third year.  My fourth oldest son is in BOCES

11   in Dix Hills.  He's studying -- a technical school.  He's

12   studying to be a barber.  And my 17 year old Maya is in

13   high school.

14   Q.   Are you a little nervous, Ms. Rickenbacker?

15   A.   Yeah, I'm upset.

16   Q.   Just take your time and we'll go through things

17   slowly.

18        Tell the jury a little bit about yourself.  Tell

19   us about your educational background.

20   A.   I have a GED and some college.  I have horticulture

21   technology, and I have a certificate in paralegal studies.

22   Q.   And tell them about your work history.

23   A.   I worked for Newsday early in my marriage.  The

24   latter years of my employment I worked for Friendly Home

25   Realty as a foreclosure specialist and subsidized housing

Rickenbacker - Direct/Joseph

952

 1  specialist.

 2  Q.    Are you currently working now?

 3  A.    I'm currently unemployed but proceeding to be

 4  gainfully employed in the future.

 5  Q.    Directing your attention to the year of 2005, did you

 6  ever make complaints against a man named Gary Feinberg?

 7  A.    Yes, I did.

 8  Q.    And what were those complaints?

 9  A.    That Gary Feinberg was touching me inappropriately

10  during his examinations at the Riverhead jail.

11  Q.    When did this inappropriate touching begin?

12  A.    I would say February 2005.

13  Q.    And when did it end?

14  A.    January 2006.

15  Q.    And during this period of time, about how often did

16  Gary Feinberg touch you inappropriately?

17  A.    A lot of times.  It's too many times actually to give

18  an accounting.

19  Q.    Directing your attention to the first time in

20  February of 2005, you mentioned that this was at the jail

21  facility?

22  A.    Yes, it was.

23  Q.    Which facility was that?

24  A.    Riverhead.

25  Q.    And why were you at Riverhead?

Rickenbacker - Direct/Joseph

953

1   A.   I had a federal violation for violation of probation,

2   and I had a possession of a forged instrument.

3   Q.   And for clarification, is Riverhead the same as

4   Suffolk County jail?

5   A.   Yes, it is.

6   Q.   Now, was that the first time that you've been

7   incarcerated?

8   A.   No.  I've made mistakes in my life.

9   Q.   Focusing your attention back to Gary Feinberg.

10          Where did you come into contact with him in

11   February of 2005?

12   A.   In the medical unit at the Riverhead jail.

13   Q.   Okay.  Please just speak up and into the microphone.

14   I want to make sure the jury hears you.

15   A.   At the medical unit at the Riverhead jail.

16   Q.   And why were you in medical?

17   A.   I had a back injury in which I had to have a

18   discectomy and I had to have a -- a bone that had broken

19   off and it was lodged between my sciatic nerve and my

20   vertebrae and I had that removed, and I have been having

21   sciatic nerve damage ever since.

22          I have a permeating pain that goes through my

23   hip, around my buttocks and down to my -- and it's a

24   constant pain when I'm going through a situation with my

25   injury.

Rickenbacker - Direct/Joseph

1    Q.    Now, did Mr. Feinberg examine you in medical that day

2    in February of 2005?

3    A.    Yes, he did.

4    Q.    Before the examination began, was the door to the

5    examination room open or closed?

6    A.    It was closed.

7    Q.    Before the examination began, was there anyone else

8    inside the examination room?

9    A.    No.

10   Q.    Please tell the jury about that exam.

11           MS. FLYNN:  Objection.

12           THE COURT:  Objection to what?

13           MS. FLYNN:  May we have a sidebar, Judge?

14           THE COURT:  All right.  Come up.

15           (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Rickenbacker - Direct/Joseph

955

1          (Whereupon, the following occurred at sidebar.)

2          MS. FLYNN:  Her statement's already in evidence

3     and this is just inflammatory to the jury.

4          THE COURT:  What's just inflammatory?

5          MS. FLYNN:  Her testimony about what happened.

6          THE COURT:  I didn't hear what happened in

7     detail yet and I'm waiting to hear it.

8          That objection is overruled.

9          MS. FLYNN:  All right, Judge.

10          THE COURT:  I'll let her go into great detail.

11          MS. FLYNN:  Thank you, Judge.

12          (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Rickenbacker - Direct/Joseph

956

1          (Whereupon, the following occurred in open

2     court.)

3     BY MS. JOSEPH:

4     Q.   Okay, Ms. Rickenbacker, if you can just please

5     continue, please describe for the jury what took place in

6     that examination with Gary Feinberg?

7     A.   I came in for an examination.  Gary Feinberg, he

8     asked me to lie back on the table.  So I laid down on the

9     table and he started to, like, push my stomach, you know,

10    and, like, pushed me in the chest in different areas and

11    asked me how did I feel.  And then as he was checking my

12    breasts, he would sweep across my nipples like this with

13    his thumbs.

14    Q.   Indicating a circular motion?

15    A.   Yes.

16          So I laid there.  He would tell me to, okay,

17    like, lift up my leg and he would push it in and pull my

18    leg out.  Lift my other leg and push it in and pull my leg

19    out.  Then he would ask me to get on my all fours on top

20    of the examining table.  He would start from behind my

21    neck and worked his way down to my shoulders and like

22    massaging motion, and then he would come down, like, to my

23    mid back and then he would again put his hand around me

24    and sweep my nipple with his thumbs.

25          At that point my nipples would become erected

PERRY AUERBACH, RPR, CSR
Official Court Reporter

Rickenbacker - Direct/Joseph

1    and he would then continue to work down to my lower back

2    and asked me how does that feel, how does this feel, how

3    does that feel?  When he would get down to where my

4    buttocks is, I'm on all fours, he would do, like, a

5    sweeping motion to the sides of my buttocks like this and

6    then he would take his hand and touch me, like, go in

7    between my legs like to the front of my vagina and sweep

8    through back to my ankles, and he'd just come back and ask

9    me how does that feel.  And he keeps touching me that way.

10           That's about it.

11   Q.   And you mentioned at some point Gary Feinberg asked

12   you to lay down on the examination table?

13   A.   Okay.  When I was laying on the examination table,

14   like, when he was checking my front, my hands would be

15   along the sides holding onto the table because the table

16   is about maybe that wide, so I would hold on.  And as I

17   was holding on I would feel his -- him grinding on my --

18   like, my knuckles, and I would take my hands and take them

19   and put them in front of me like this.

20   Q.   Indicating for the record, a crossing motion across

21   your chest.

22   A.   He would take my wrists and fold both my hands along

23   the side of the table.  I would feel his penis, like, on

24   my hands.  So I would move my hands and he would take my

25   hands back, put them back on the side of the table.

Rickenbacker - Direct/Joseph

958

1   Q.   When you said you felt his penis on your hands, how

2   did you know that it was his penis?

3   A.   Because it was erect, it was hard on my hand.  You

4   can feel it on the back of your hand.  He was, like,

5   grinding it on my hand.

6   Q.   And when you testified that you tried to move your

7   hands away and he would put them back down, describe for

8   the jury how he would hold you to do this.

9   A.   How he would hold my hands?

10  Q.   Exactly.

11  A.   He would grab my wrists, both sides, and he would

12  uncross them and set them back down to the sides of the

13  table.

14  Q.   What was going through your mind when he was doing

15  these things during the exam?

16  A.   I was just laying there.  I just laid there.  I

17  didn't know what to do.  He's a doctor.

18  Q.   When you say he was a doctor, at that point in time

19  were you under the impression that he was a doctor?

20  A.   That's what they told me he was.

21  Q.   Did you later come to find out what his actual title

22  was?

23  A.   A physician assistant.

24  Q.   So when you were in the room, did he ever say

25  anything to you besides how does it feel?

Rickenbacker - Direct/Joseph

1    A.    No.  He just kept touching me.

2    Q.    Do you need a moment?

3            (Pause.)

4            I'm going to continue, okay?

5    A.    Yes.

6    Q.    When he first touched you inappropriately in this

7    exam, did you express any concerns to Gary Feinberg?

8    A.    The first exam?

9    Q.    Right.  The first time that he did it.

10   A.    No, I didn't say anything.

11   Q.    When you left that day, did you say anything to

12   anyone?

13   A.    That day, no, I didn't say anything that day.

14   Q.    Why not?

15   A.    Because I just felt uncomfortable.  I didn't realize

16   at that time that something was wrong with that.  I just

17   felt uncomfortable, but you know what I'm saying, he's a

18   doctor.  I thought that maybe that was a part of the

19   examination, you know.  I didn't know at that time -- that

20   day, I did not know.

21   Q.    Did there come a time when you became more certain

22   that what he was doing was inappropriate?

23   A.    Yes.  Because --

24   Q.    Tell us about that exam.  Why were you in medical

25   that day?

**Rickenbacker - Direct/Joseph**

960

1    A.    My back again for examination.  And this time, like I

2    mentioned before, the same way he was touching me, at this

3    time I was on all fours, and he came from behind, like he

4    was right here, come up here and he said, you are so sexy.

5    So then I turned around, like, I couldn't believe what I

6    was hearing and when I turned to look at his face, he

7    kissed me, like, on my lips?  Then I -- then I knew that

8    the previous examination was inappropriate touching.  It

9    wasn't until he did that that I knew now for sure that

10   this was not -- you know, this wasn't appropriate.

11          THE COURT:  When did this happen?

12          THE WITNESS:  It was in 2005.  I believe it was

13   like February, something like that, June.

14   Q.    Now, how did you react when he kissed you during that

15   examination in June of 2005?

16   A.    I was like, oh, my God.  I didn't say anything.  I

17   was like, oh, my God, to myself.  I didn't know what to

18   say.  I was, like, stunned, like, what do you say, you're

19   in jail, like, what do you say?

20   Q.    Did you remain in the examination room after he

21   kissed you?

22   A.    No.  I just got up and I said thank you and I left.

23   I said I had enough, and I left.

24   Q.    Now, in addition to the inappropriate touching you

25   just described, did Gary Feinberg touch you

Rickenbacker - Direct/Joseph

1    inappropriately in any other way?

2    A.    Yes.

3    Q.    Turning your attention to sometime after June 2005,

4    tell us what happened in that examination.

5    A.    This examination I came in and he reached over, like,

6    on the counter, where, like, you know, gauze and different

7    surgical things and he picked up a packet, it was like a

8    gel.

9    Q.    Now, just so the jury -- I don't want to cut you off,

10   but just so the jury understands, when he's reaching over

11   for the gauze, where are you in the room?

12   A.    I'm laying back again on the examination table.

13   Q.    What are you wearing at this point?

14   A.    I had my greens on, but they dressed the women in

15   baggy greens.  The bottom part, he pulled out my legs

16   straight up, laying flat, and he gets the gel, he opened

17   it and he puts it on his 2 fingers, and he lifts my hands

18   up like this with his hand, and he, like, massages my

19   clitoris and said, like, how does that feel.  And I just

20   laid there.  I didn't say anything.  I didn't even know

21   what to say at this point.

22   Q.    When he touched you on your vagina, was he wearing

23   any gloves?

24   A.    No.  He was not wearing any gloves.

25   Q.    Once again, why were you in the medical unit on that

Rickenbacker - Direct/Joseph

962

1    specific day?

2    A.    For my back.

3          THE COURT:  When was this?

4          THE WITNESS:  It was sometime in I think around

5    August, because it was --

6          THE COURT:  Of 2005?

7          THE WITNESS:  Yes, sir.

8    Q.    Now, during the time that Gary was touching you

9    inappropriately, you testified that it started in February

10   of 2005 and continued to January of 2006, did you ever

11   tell anyone at the jail what was going on?

12   A.    Yes, I told my therapist, Carol Manderino.

13   Q.    When did you first tell Carol Manderino?

14   A.    June, around June.

15   Q.    And --

16         THE COURT:  I'm sorry, I didn't hear that.

17         THE WITNESS:  June, sir.  June.

18         THE COURT:  In June of 2005?

19         THE WITNESS:  June 2005.

20   Q.    And what did you tell her?

21   A.    I told her that I wanted to tell her something, but I

22   didn't know how to tell her.  So I said to her, Carol -- I

23   was having a therapy session and I was, like, Carol,

24   there's something I want to tell you.  She said, what is

25   it?  I said I'm being touched inappropriately and I don't

## Rickenbacker - Direct/Joseph

963

1    like it.  She said, by who?  I didn't want to tell her.  I

2    didn't say the name.  I just said, forget it, forget it.

3    I didn't know how to tell her that.

4           So she kept on saying, it's okay.  You can tell

5    me.  Tell me.  And I was, like, no, forget it, forget it.

6    So we went on to talk about other issues, you know, in my

7    life and what's going on with me prior to my legal

8    situation.

9    Q.    Did there come a time when you told Carol Manderino

10   who the person was?

11   A.    The next visit.

12   Q.    When you say the next visit, was that a week later?

13   A.    About a week.

14   Q.    Was that also in June of 2005?

15   A.    Yes.

16   Q.    Tell us about that conversation.

17   A.    I said to Carol, I said, Carol -- we came in and we

18   talked.  We always, like, pray first.  And we prayed and

19   we talked and I said Carol, like, really fast, I just

20   dropped it on her.  I said, Carol, Gary Feinberg was the

21   one that was touching me.  And she just looked at me,

22   like, are you serious?  I said, yeah.  I told her -- she

23   says, when did this happen and how does he touch you?  So

24   I described like I described to you previously what was

25   going on in medical and she was, like, I can't believe it.

Rickenbacker - Direct/Joseph

964

1    I just can't believe it.

2         So she said that she would contact her

3    supervisor -- well, first she said -- she was, like, blown

4    away.  I don't even know how to report something like

5    this.  She said that she would contact the supervisor and

6    she would tell the supervisor.

7    Q.   Do you know if she contacted her supervisor?

8    A.   Well, I believed that she said she would and so I

9    believed that that's what she did.

10   Q.   Did you ever at any point in your conversations with

11   Carol tell her that the touching that Gary did was

12   consensual?

13   A.   Never.  I wasn't there for that.  I was there because

14   I was in pain.  My leg was hurting.  When I go to use the

15   bathroom I got a sharp pain around my anus.  I was not

16   there to consent to Gary touching me.

17   Q.   Was Carol Manderino ever able to help you?

18   A.   No.

19        MS. FLYNN:  Objection.

20        THE COURT:  Overruled.

21   A.   Does that mean answer?

22   Q.   Yes, you can answer.

23   A.   No.  Not that I know of.

24   Q.   Did she suggest anything that you can do to get out

25   of this situation where Gary was touching you

Rickenbacker - Direct/Joseph

965

1    inappropriately?

2    A.    Well --

3                MS. FLYNN:  Objection.

4                THE COURT:  Overruled.

5    A.    Actually after we -- supposedly she spoke to her

6    supervisor and Gary was still being seen -- I was still

7    being seen by Gary Feinberg, she -- I had a federal hold

8    on my violation of probation so she said that, I can get

9    you into a program and that would get you out of the

10   facility and plus it will be good for you to get treatment

11   anyway from the County.  But at the time I had a hold for

12   probation violation so she wrote my judge.

13   Q.    And which judge did she write?

14   A.    Judge Spatt.

15   Q.    And how many letters did she write?

16   A.    I believe that it was two letters.

17   Q.    After you told Carol Manderino in June of 2005, did

18   you report what Gary was doing to anyone else at the

19   facility?

20   A.    Yes.  Internal security.

21   Q.    And do you know who specifically in internal security

22   that you spoke to?

23   A.    Sergeant Lundquist and Officer Olivencia.

24   Q.    When did you meet with Sergeant Lundquist and Officer

25   Olivencia?

Rickenbacker - Direct/Joseph

966

 1    A.    It would have to be, like, in August.

 2    Q.    When you say it would have to be in August, why does

 3    August 2005 stand out for you?

 4    A.    Because in August of 2005 is around the time that I

 5    was -- shortly after I was put in suicide watch.

 6    Q.    Okay.  Let me stop you right there.  Let me make

 7    myself more clear.

 8              Prior to that meeting in August of 2005 with

 9    Lundquist, had you had any other contact with him before

10    that?

11    A.    Yes, I had.

12    Q.    What was that?

13    A.    I had seen Lundquist and Olivencia because they were

14    trying to get me to cooperate with the law enforcement

15    agencies against crime in the community, guns, drugs,

16    fraud.

17    Q.    And what law enforcement agencies are you talking

18    about?

19    A.    I spoke to Secret Service.

20    Q.    And when did you speak to Secret Service about the

21    guns and the drugs and the --

22    A.    No.  It wasn't guns.  The Secret Service was about

23    fraud.

24    Q.    When did you speak to them?

25    A.    I believe it was around that time.  A little earlier.

Rickenbacker - Direct/Joseph

967

1    Q.    Now, the meeting in August of 2005, who initiated

2    that meeting?  Was it you or was it Sergeant Lundquist?

3    A.    No, it was Sergeant Lundquist.

4    Q.    And tell us what was discussed in that meeting.

5    A.    Well, they wanted an update, see if I had any more

6    information, if I was going to be willing to do the

7    cooperation.  And I told them that I didn't have anything,

8    and that I did -- what I did have was that -- what was

9    happening with Gary Feinberg over in their medical

10   department.

11   Q.    What specifically did you tell Sergeant Lundquist

12   with respect to Gary Feinberg?

13   A.    I said, Sergeant Lundquist, Gary has been touching me

14   inappropriately and, you know, I need your help.  He was

15   like, oh, come on, Rita, come on, Rita.  I don't want to

16   deal with that.  I don't want to deal with that.  And I

17   would say to him, like, if you don't believe me you can

18   put a camera.  I said, every time I go up for an

19   examination he does this.  If you can just put a camera

20   inside the examination room you can see it for yourself.

21   You can see it for yourself.  You can see it.  You know,

22   but he was, like, come on, Rita, I don't want to do it.  I

23   don't want to deal with.  It's not something I want to

24   deal with.

25   Q.    When Sergeant Lundquist -- did Sergeant Lundquist

Rickenbacker - Direct/Joseph

968

1    express any concerns about putting the camera in the

2    examination room?

3    A.   Yes?  He said, he also said if he put the camera it

4    would be a violation of some type of privacy right.

5    Q.   When you suggested putting a camera in the

6    examination room, were you concerned about your privacy

7    rights?

8    A.   No.  I figured if he put it in there then he could

9    see what was going and he could stop it.

10   Q.   At any time after you told Sergeant Lundquist Gary

11   Feinberg was touching you inappropriately, did he take a

12   report?

13   A.   No.

14   Q.   Did he ask you any specific questions about what Gary

15   was doing?

16   A.   No.

17   Q.   What about Olivencia, did he take a report?

18   A.   Officer Olivencia just sat there the whole time.

19   Q.   Did he ask you anything, any questions about the

20   incidents to see if you were telling the truth, Officer

21   Olivencia?

22            MS. FLYNN:  Objection.

23            THE COURT:  Sustained.

24   Q.   At any point during that meeting after you told

25   Sergeant Lundquist and Officer Olivencia that Gary was

Rickenbacker - Direct/Joseph

969

1    touching you inappropriately, did Sergeant Lundquist pick

2    up the phone and call anyone on your behalf that could

3    help you with the Gary situation?

4            MS. FLYNN:  Objection.

5            THE COURT:  Sustained.

6    Q.    What, if anything, about Sergeant Lundquist do after

7    you told him about the Gary Feinberg situation?

8            MS. FLYNN:  Objection.

9            THE COURT:  If you know.

10   A.    Nothing.  He did nothing.

11   Q.    And as you sit here today, are you aware of whether

12   Sergeant Lundquist or Officer Olivencia did anything with

13   respect to your claims that Gary Feinberg was touching you

14   inappropriately?

15   A.    Am I aware that they did nothing?

16   Q.    Are you aware if they did anything as you sit here

17   today?

18   A.    They didn't do anything, because if they did, then he

19   wouldn't be allowed to keep touching me for several months

20   afterwards.

21   Q.    After you told Carol Manderino, you told Sergeant

22   Lundquist, Olivencia, did you tell anyone else?

23   A.    I told Mrs. McCarrick.

24   Q.    Officer McCarrick?

25   A.    Officer McCarrick.

Rickenbacker - Direct/Joseph

970

1    Q.   Officer McCarrick.

2         When did you tell Officer McCarrick?

3    A.   It was around -- between the 18th and, like, the 22nd

4    of August.

5    Q.   Was that 2005?

6    A.   2005, right.

7    Q.   Where were you when you told Officer McCarrick?

8    A.   I was in the rehabilitation department at the

9    Riverhead jail.  We have, like, a group therapy and prayer

10   group, Bible studies, women, I was in one of those groups.

11   Q.   What was Officer McCarrick doing in that group?

12   A.   She was the officer that oversees the programs.

13   Q.   Describe the circumstances that led up to the

14   conversation where you told -- strike that.

15        At some point during the conversation -- strike

16   that.

17        At some point, did you -- during the session,

18   did you ask Officer McCarrick to make a phone call?

19   A.   Yes, I did.

20        MS. FLYNN:  Objection.

21        THE COURT:  Overruled.

22   Q.   And what was her response?

23   A.   She said sure, I can.

24   Q.   And why did you want to make a phone call?

25   A.   Because I was upset.

Rickenbacker - Direct/Joseph

1  Q.   Who did you call?

2  A.   I called Christopher Dooley and I called him and I

3  told him that -- he had been calling Sheriff's department

4  for me trying to report to somebody in the front office.

5  And I told him, you got to come up here.  You got to do

6  something because --

7          THE COURT:  I'm sorry, who did you call?

8          THE WITNESS:  Christopher Dooley.

9          THE COURT:  Who is he?

10         THE WITNESS:  He's my friend.

11         THE COURT:  Pardon?

12         THE WITNESS:  He's my friend.

13         THE COURT:  Was he an inmate?

14         THE WITNESS:  No.  He was on the outside.

15         THE COURT:  Pardon?

16         THE WITNESS:  He was on the outside.

17         THE COURT:  An outside person?

18         THE WITNESS:  Yes, civilian.

19         THE COURT:  He was not a correction officer?

20         THE WITNESS:  No.

21  Q.   So you mentioned earlier that you were upset when you

22  were making the phone call?

23  A.   Yeah, I was upset and I called Chris and I'm, like,

24  Chris, nothing is happening.  I'm, like, would you call

25  again.  He's, like, I've been calling.  And then I asked

Rickenbacker - Direct/Joseph

1    him could he come up, maybe if he showed up at the

2    Sheriff's department to speak to someone it would -- you

3    know, to report it.  And I started to cry.  It was time

4    for me to hang up now because the program was over.

5              And when I started to cry, Ms. McCarrick said to

6    me, Rickenbacker, have a seat on the back pew of the

7    chapel, because we have services in the chapel, so while

8    she dismissed the other inmates she wanted to speak with

9    me.  So she dismissed everybody and it was her and I in

10   the chapel.  She sat down next to me.  She said, why are

11   you crying?  What's going on with you?  And I told her

12   about Gary and how he was touching me.  And then she just

13   looked at me and then she said to me, if I was you, I

14   wouldn't tell anybody else that story.

15   Q.   Did she say anything else after she said that?

16   A.   No.  She got up and she went to the phone.  She told

17   me to continue to sit there, she went to the phone and the

18   next you know, a sergeant came in and they was talking

19   about they're putting me on suicide watch.  So at that

20   point I was like --

21   Q.   Let me stop you right there.

22             How long had you known of Officer McCarrick

23   prior to this day when you told her about Gary Feinberg?

24   A.   For a while.  Known her for a while.

25   Q.   And how long had she been supervising these sessions?

Rickenbacker - Direct/Joseph

973

1   A.   Well, they rotate.  Everybody in the rehab department

2   they get, it depends on who's working that day, they sit

3   in to make sure everything is okay with the inmates, so

4   run the program.

5   Q.   Had she ever expressed to you any concerns about your

6   mental state?

7   A.   No.  Never.

8   Q.   Had she ever placed you on suicide watch before you

9   told her about Gary Feinberg?

10  A.   No.

11  Q.   Had anyone else at Suffolk ever placed you on suicide

12  watch prior to that?

13  A.   No.

14  Q.   So after you told Officer McCarrick what Gary did,

15  and she comes back and says -- you're going to be on a

16  suicide watch, how did you respond?

17  A.   Why?  Why?

18  Q.   What did she say?

19  A.   She says, because I'm placing you on -- she wouldn't

20  give you a reason, they didn't me a reason.  They're,

21  like, that's where you're going.  I said, why am I going

22  to have to do that?  She said, you're going to suicide

23  watch.  And she did the paperwork.  They never gave me any

24  reason why.  It was, like, you're going and that's that.

25           Then I was saying, why do I have to go?  And she

Rickenbacker - Direct/Joseph

974

1   says to me, like, again, if I were, you know, you

2   shouldn't be telling -- you shouldn't be telling the story

3   or something like that, to that effect.  I don't know.

4   She was putting me in suicide watch.

5   Q.   At some point during that conversation did you ask to

6   speak to her supervisor?

7   A.   The supervisor was there.  He was saying -- he was

8   signing off on the paperwork.  And I was saying, why?  He

9   walked out, they don't allow to you do that.  You can't

10  have the right to speak to the supervisor.  They're the

11  final authority.  Whoever you're dealing with at the time

12  in the jail, they're the final authority on everything,

13  like you can't --

14  Q.   Please describe what happened to you when you were

15  placed on suicide watch.

16           MS. FLYNN:  Objection.

17           THE COURT:  Sustained.

18  Q.   After you had the conversation with Officer McCarrick

19  and she said that she was going to place you on suicide

20  watch, where were you physically taken?

21  A.   I was taken to the women's clothing room and I was

22  stripped of all of my clothing.

23           MS. FLYNN:  Objection.

24           THE COURT:  Yes.  Sustained.

25           MS. JOSEPH:  May I approach, your Honor?

Rickenbacker - Direct/Joseph

975

1              THE COURT:  Yes.

2              (Continued on next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rickenbacker - Direct/Joseph

976

1          (Whereupon, the following occurred at sidebar.)

2          MS. JOSEPH:  Judge, may we know the basis of the

3     objection.

4          THE COURT:  Yes.  We're not trying her case.

5     We're trying the case of Rochelle Ramos.  We're not

6     interested in whether she was on a suicide watch.  We

7     heard that she's in, and her troubles there are not really

8     relevant.

9          MS. JOSEPH:  Your Honor, it is relevant to rebut

10    their claim that she didn't do enough to report this to

11    the people at the jail.

12          It is our position that she was very careful

13    about who she reported to because she did not want to be

14    retaliated against and we want her to explain to the jury

15    what she went through after going into suicide watch,

16    describe why she was so hesitant.  It's very vital.

17          It's not for damages.  It's going to show her

18    state of mind and why she was extremely hesitant,

19    extremely careful about who she reported it to.

20          And I anticipate during opposing counsel's

21    cross-examination they are going to cross her extensively

22    on why she didn't tell this person, why she didn't file

23    this report, to show the jury just how scary the situation

24    was for her and it's extremely important and relevant.

25          THE COURT:  First of all, she did testify that

Rickenbacker - Direct/Joseph

977

1   she did tell at least three people that I just heard.  So

2   who else was she supposed to tell?

3           MS. JOSEPH:  Exactly.  But there's still the

4   cross on that.  And the jury, in order to fully understand

5   her state of mind, has to know how scary the situation is

6   for her.

7           It's not going to damages.  It goes specifically

8   to rebut their claim that, you know, this was just a cake

9   walk, you just walk out and tell anybody and there will be

10  no reprimand.

11          THE COURT:  Then I would permit you to lead her

12  by saying the following question, when you were on suicide

13  watch did this in any way affect your not telling anybody

14  else about this.

15          MS. JOSEPH:  Okay.

16          THE COURT:  Then I'll permit that.  And without

17  going into details about what the suicide watch was.

18          MS. JOSEPH:  Okay.

19          THE COURT:  All right.

20          (Continued on next page.)

21

22

23

24

25

Rickenbacker - Direct/Joseph

978

1          (Whereupon, the following occurred in open

2     court.)

3     BY MS. JOSEPH:

4     Q.    Ms. Rickenbacker, without going into the details of

5     what happened to you on your suicide watch, did this have

6     an impact on who you reached out to and told at the

7     prison?

8     A.    I was afraid at this point because I knew that I

9     wasn't suicidal.  I didn't have suicidal tendencies, and

10    that I felt that it was retaliation for me saying that

11    Gary touched me.  And I trusted Ms. McCarrick, thinking

12    she was going to help me and then she turned around and

13    put me in a 23-hour segregation, like, for no reason,

14    like, I didn't do anything wrong.  And I couldn't

15    understand that and I was afraid that -- I was afraid.  I

16    didn't know what to do at this point about that situation.

17    I was embarrassed because I was paraded around the

18    building with no clothes.

19          MS. FLYNN:  Objection, your Honor.

20          THE COURT:  Overruled.

21          Well, all right.  You say that because you were

22    put on this suicide watch that that made you fearful and

23    it prevented you from telling anyone else about your

24    experience?

25          THE WITNESS:  Yes.

Rickenbacker - Direct/Joseph

979

1    THE COURT:  Who would you tell in addition to

2  who you told already?

3    THE WITNESS:  I don't know, but I probably would

4  have tried even harder, maybe stop the warden in the

5  hallway.  I don't know.  But at that point I knew that I

6  couldn't talk about it anymore because I didn't know what

7  would happen to me.

8  Q.    So after you were placed on suicide watch, did there

9  come a time when you attempted to tell anyone else while

10  you were at Suffolk?

11  A.    Yes.

12  Q.    When was this?

13  A.    Months later.  Like in November, around.

14  Q.    And where were you?

15  A.    I was again in the chapel and we had, like, a prayer

16  service with, like, a local church, they had a prison

17  ministry, and I wrote a prayer and I put it in the prayer

18  box for, like, God or somebody to help me.  And then I

19  wrote a letter to the missionary and I said to him,

20  please, when you leave, could you just read this and not

21  inside the facility.

22  Q.    Lowrita, I just want to make sure the jury hears what

23  you said.

24    THE COURT:  I didn't hear what she said.

25    What happened in the chapel?

Rickenbacker - Direct/Joseph

980

1           THE WITNESS:  I wrote a prayer and I put it in

2   the prayer box.

3           THE COURT:  What did the prayer say?

4           THE WITNESS:  I was asking God to help me.  And

5   then I wrote a letter, a small letter to the missionary,

6   the church missionary that was there giving the service,

7   and I said to her -- and I placed it in her hand and I

8   said to her, please, could you just wait until you leave

9   to read it, and she said, sure.  She put it in her pocket.

10          THE COURT:  What did the letter say?

11          MS. JOSEPH:  Your Honor, may I approach the

12  witness with what's been previously marked as Plaintiff's

13  61 for identification purpose.

14          THE COURT:  What number is it?

15          MS. JOSEPH:  Plaintiff's 61.

16          THE COURT:  51.

17          MS. JOSEPH:  61.

18          THE COURT:  There's already a 51 in evidence.

19          MS. JOSEPH:  61.

20          THE COURT:  61?

21          MS. JOSEPH:  Yes.

22          THE COURT:  Okay.

23          MS. JOSEPH:  Let the record reflect I'm showing

24  opposing counsel a copy of P-61.

25          (Document handed to the witness.)

Rickenbacker - Voir Dire/Flynn

981

1   Q.   Ms. Rickenbacker, I'm handing you a copy of

2   Plaintiff's 61.

3            Do you recognize that?

4   A.   Yes.

5   Q.   What is it?

6   A.   It's the note that I wrote the reverend and my name

7   and inmate number and location is on it.

8   Q.   And when did you write this note?

9   A.   November of 2005.

10  Q.   And what was your state of mind when you wrote this

11  note?

12            MS. FLYNN:  Objection, your Honor.

13            THE COURT:  Sustained.

14            MS. JOSEPH:  Your Honor, I offer P-61 into

15  evidence.

16            THE COURT:  Any objection?

17            MS. FLYNN:  May I have a voir dire, your Honor?

18            THE COURT:  Surely.

19

20  VOIR DIRE EXAMINATION

21  BY MS. FLYNN:

22  Q.   Ms. Rickenbacker, there's no date on this note,

23  correct?

24  A.   Yes.

25  Q.   And what kind of paper did you write it on?

Rickenbacker - Voir Dire/Flynn

982

1   A.   A small prayer slip.

2   Q.   A small prayer slip?

3   A.   Yeah, we have it in the department.  They supply the

4   papers, it's cut like this and you're supposed to write

5   your prayer on it and put it on the box and the church

6   will pray over it for you.  And then I wrote a second one

7   and I folded it up and I put it -- when the lady came, I

8   grabbed her hand and I put it in her hand and I said to

9   her, would you please read this when you leave and help

10  me.

11  Q.   It's addressed to a Reverend Davis, is that the

12  minister that was there?

13        THE COURT:  Addressed to who?

14        MS. FLYNN:  Reverend Davis, D-A-V-I-S.

15  Q.   Where did you keep in piece of paper?

16  A.   What do you mean, where did I keep it?

17        MS. JOSEPH:  Objection.

18  Q.   Why do you have a copy of it?  Where did you keep it?

19  A.   I didn't keep it.

20        THE COURT:  Overruled.

21  A.   Ask my lawyer.  She'll tell you why she got it from.

22  Q.   I'm asking you.

23  A.   I didn't keep this piece of paper.

24  Q.   Do you know where your lawyers got it from?

25  A.   I believe from Reverend Davis.

Rickenbacker - Direct/Joseph

983

1      MS. FLYNN:  I have no other questions.

2      I have no objection, your Honor.

3      THE COURT:  Plaintiff's Exhibit 61 in evidence.

4      (Plaintiff's Exhibit 61 in evidence.)

5

6   EXAMINATION (Continued.)

7   BY MS. JOSEPH:

8   Q.   Lowrita, could you please read the note to the jury?

9   A.   Reverend Davis, could you please help me.  I'm being

10  sexually assaulted by the doctor here every day at

11  Riverhead correctional facility.  I --

12      THE COURT:  Excuse me.  Do you want to read the

13  note slower and louder so we'll all be able to hear it?

14      THE WITNESS:  Okay.

15      THE COURT:  All right.  Go ahead.

16  A.   Reverend Davis, could you please help me.  I'm being

17  sexually assaulted by the doctor here at Riverhead

18  correctional facility.  I reported it to security and

19  nothing has been done.  Please report this to someone on

20  the outside.  Please.

21  Q.   After you gave the reverend this letter, did the

22  situation with respect to Gary Feinberg change?

23      MS. FLYNN:  Objection.

24      THE COURT:  Overruled.

25  A.   No.

Rickenbacker - Direct/Joseph

984

1        MS. JOSEPH:  Your Honor, may I approach?

2        Approaching the witness with what's been --

3        THE COURT:  You can approach anytime.  You don't

4    have to have my permission.

5        MS. JOSEPH:  Sorry, your Honor, just being extra

6    formal.

7        THE COURT:  Lawyers ask that because in many

8    courts they have to get permission to approach the

9    witness.  I never believed in that.  When I tried cases as

10   a lawyer, I didn't like asking permission every time I

11   wanted to give the witness a note.  Where did that come

12   from?  Must have come from England.

13       MS. JOSEPH:  Approaching the witness with what's

14   in evidence as Defense Exhibit Z and what's been marked as

15   PD-61.

16       THE COURT:  I'm sorry, I can't hear you.  B for

17   baker?

18       MS. JOSEPH:  Z for zebra, already in evidence

19   and PD-61 for identifying purposes.  Showing it to

20   opposing counsel.

21       THE COURT:  I'm sorry, I didn't get the second

22   exhibit.

23       MS. JOSEPH:  PD-61.

24       THE COURT:  That's a Plaintiff's Exhibit?

25       MS. JOSEPH:  A joint exhibit.

Rickenbacker - Direct/Joseph

985

1    Q.   Ms. Rickenbacker, do you recognize this?

2    A.   Yes.

3              THE COURT:  What's this?

4              MS. JOSEPH:  Sorry, your Honor, PD-61.

5    A.   Yes, I do.

6    Q.   What is it?

7    A.   It's the door to the examination room.

8    Q.   Where?

9    A.   At the Riverhead jail.

10   Q.   Is it an accurate representation of the door to the

11   examination room at the Riverhead jail?

12   A.   Yes, it is.

13             MS. JOSEPH:  Your Honor --

14             THE COURT:  Is this a photograph?  Is it a

15   photograph?

16             THE WITNESS:  Is the door a photograph?

17             THE COURT:  What is that, a drawing, a painting?

18             THE WITNESS:  It's a photograph.

19             THE COURT:  Photograph, okay.

20             MS. JOSEPH:  Your Honor, I offer PD-61 into

21   evidence.

22             THE COURT:  Any objection?

23             MS. FLYNN:  No objection.

24             THE COURT:  Plaintiff's Exhibit PD, Peter dog,

25   61 in evidence.

**Rickenbacker - Direct/Joseph**

986

1          (Plaintiff Exhibit PD-61 in evidence.)

2          MS. JOSEPH:  May the witness step down from the

3     witness stand to better illustrate her testimony to the

4     jury?

5          THE COURT:  Yes.

6     Q.   Ms. Rickenbacker, why don't you come over here, stand

7     by here.

8          Now, I'm showing you what was previously marked

9     as Defense Exhibit Z.  It's already in evidence.  If you

10    recognize --

11         THE COURT:  Defendant's Exhibit what?

12         MS. JOSEPH:  Z.  Z as in zebra.

13         THE COURT:  Z as in zebra?

14         MS. JOSEPH:  Yes, your Honor.

15    Q.   Do you recognize this photograph?

16    A.   Yes, I recognize the photograph.

17    Q.   And what do you recognize it to be?

18    A.   It's the picture of the medical.  This is the nurse's

19    station.  And the hallway.

20    Q.   Now, can you tell in this photograph where the

21    inmates would stand before being medically examined?

22    A.   You have to stand behind this sign, from the sign

23    back.

24         THE COURT:  You have to keep your voice up.

25    A.   You have to stand behind this red sign, not in front.

**Rickenbacker - Direct/Joseph**

987

1   You have to stand from the sign back.

2   Q.   Okay.  When you say the sign, is it the sign that

3   says stand quietly, back to the wall?

4   A.   Yes.

5   Q.   Is this where the inmates would stand?

6   A.   Yes.

7   Q.   Okay.  And are you able to tell from this photograph

8   where the examination rooms are?

9   A.   I believe this is -- back here, that's one there and

10  then there's another one right here.

11  Q.   Okay.  Focusing your attention on this area right

12  here, what appears to be --

13  A.   Indent.

14  Q.   -- an indent, what's in this area?

15  A.   I believe it's a television up here and it is a chair

16  where the officer sits.

17           MS. JOSEPH:  Your Honor, I'd just like to mark a

18  T and a V on this exhibit.

19           THE COURT:  Sure.  You have something that shows

20  up?

21  Q.   Now, you mentioned this is where the officer usually

22  sits.

23           Did you ever see officers watching television

24  while you were down here?

25           MS. FLYNN:  Objection.

Rickenbacker - Direct/Joseph

988

1          THE COURT:  Sustained as to form.

2     Q.   What, if anything, would you see correction officers

3     doing with respect to the television when you were down in

4     the examination unit?

5     A.   Watching.  They watched TV.

6     Q.   I'm now going to show you what's in evidence as

7     PD-61.

8          Is this an accurate representation of the

9     medical -- the door to a medical examination room?

10    A.   Yes, it is.

11    Q.   Okay.  Now, what's this right here that I'm pointing

12    to, this white square area?

13         THE COURT:  In the middle of the photograph?

14    Q.   In the middle of the photograph.

15         MS. JOSEPH:  Thank you, your Honor.

16    A.   It's a window, but it's a screen that you can pull

17    down from the other side.

18    Q.   Now, when you were in the medical examination room

19    with Gary Feinberg and he was examining you, was this

20    screen up or down?

21    A.   Down.

22    Q.   And is this an accurate representation of what the

23    door in the medical examination room looks like when it's

24    closed with the screen down?

25    A.   Yes.

Rickenbacker - Direct/Joseph

989

1    Q.    Nothing further.  You can return to your seat.  Thank

2    you.

3              I now want to focus your attention on February

4    7th of 2006.

5              Did there come a time when you were questioned

6    about Gary Feinberg on that day?

7    A.    I was just going for a minute -- could you say that

8    again.

9    Q.    That's okay.  I'll start over.

10             THE COURT:  You have to get closer to the

11   microphone, Ms. Rickenbacker.

12   Q.    I want to focus your attention on February 7th of

13   2006.

14             Did there come a time that day when you were

15   questioned about Gary Feinberg?

16   A.    February 2006?

17   Q.    February 7th of 2006.

18   A.    Yes.

19   Q.    And who questioned you?

20   A.    Well, I spoke to two groups of people.  I spoke to

21   Internal Affairs.

22             THE COURT:  Who?

23   A.    Internal Affairs of the Sheriff's department and then

24   CIB, which is criminal investigation bureau.

25   Q.    How did you learn that day on February 7th that these

Rickenbacker - Direct/Joseph

990

1    departments wanted to speak to you?

2    A.    They just called me down from the floor, I was on the

3    fifth floor female section and they call your name.  They

4    didn't say what you're going for, they just call your name

5    and say go down to the lobby.

6              So I got on the elevator and went down to the

7    lobby.  It was a group of us lined up against the wall for

8    the -- to go to speak to the investigator, I guess.

9    Q.    Prior to you being called down that day, were you

10   aware that any investigation was taking place against Gary

11   Feinberg from IAB or CIB?

12   A.    No.

13   Q.    You mentioned there was a group of women lined up

14   against the wall.

15             Did you speak to any of them?

16   A.    Briefly, because you're really not supposed to be

17   speaking or talking a lot.

18   Q.    What, if anything, did you learn as a result of these

19   conversations?

20   A.    That they were inappropriately touched by Gary

21   Feinberg also.

22   Q.    Do you recall speaking to any woman specifically by

23   name?

24   A.    Yeah, Linda Kennedy.

25   Q.    And what did you learn from her?

Rickenbacker - Direct/Joseph

991

1    A.   That she had came in on an arrest and she was getting

2    an examination and that he touched her inappropriately.

3              MS. FLYNN:  Objection.

4              THE COURT:  Yes.  Sustained.

5    Q.   Well, as a result of speaking with Linda Kennedy,

6    what was your emotional state after that conversation?

7              MS. FLYNN:  Objection.

8              THE COURT:  Sustained.

9    Q.   Did you file a lawsuit against the city for what Gary

10   Feinberg did to you?

11   A.   Yes, I did.

12   Q.   Is that lawsuit still pending?

13   A.   Yes, it is.

14   Q.   After you spoke with Internal Affairs, what happened

15   to you at the jail?

16   A.   I was placed in --

17             MS. FLYNN:  Objection.

18             THE COURT:  Overruled.

19   A.   I was placed in a 23-hour segregation.  I was

20   mistreated.  They didn't feed me regularly.  They came

21   by -- officers came by calling me a snitch bitch.

22             MS. FLYNN:  Objection, your Honor.  And move to

23   strike.

24             THE COURT:  Overruled.

25   A.   Calling me snitch bitch, calling me sluts, whores,

Rickenbacker - Direct/Joseph

1    convicts, and a whole host of other things.  I was denied

2    medical attention for my back, medication had stopped, and

3    it was just terrible.  Showers, I was denied showers.

4    Q.    Lowrita, are you familiar with a grievance process?

5    A.    Yes, I am.

6    Q.    Back in 2005, did you ever file one against Gary

7    Feinberg?

8    A.    No, I did not.

9    Q.    Why not?

10   A.    I didn't, because the filing, something that was that

11   confidential I was afraid of what could happen to me if I

12   did, because the grievance process is not confidential.

13   And when you file a grievance they usually take it to the

14   person that you filed against and show it to them.  And I

15   was afraid to do that.

16   Q.    Let's go through the people that you actually did

17   tell about Gary Feinberg.

18         Why did you tell Carol Manderino?

19   A.    Because she's my therapist and I thought that she

20   could help me.

21   Q.    Why did you tell Sergeant Lundquist and Officer

22   Olivencia?

23              MS. FLYNN:  Objection.

24              THE COURT:  Overruled.

25   A.    I told Olivencia and Lundquist because they were

Rickenbacker - Direct/Joseph

1   internal security.  And being that they were helping,

2   like, crimes that was being committed in the community and

3   they help with crimes that's being committed inside the

4   facility, I thought that would be the perfect place to

5   address this issue and then hopefully that by telling them

6   they would investigate and find the facts to be true and

7   do something about Gary touching me inappropriately.

8   Q.    Why did you tell Officer McCarrick?

9   A.    That was -- at the time I was in the midst of my

10  emotions, I just got off the phone and she seemed very

11  sincere about -- concerned about, you know, me, because

12  she was, like, what's wrong, are you okay, and I really

13  thought, you know, if I told her maybe that she would make

14  a difference.  Being I tried every other avenue and

15  failed, I thought maybe this would be the person that

16  would do something about it.

17  Q.    And why did you tell the pastor?

18  A.    Well, that was my last -- that was my -- that was my

19  last chance.  I didn't know who else.  I was, like, I was

20  just so -- I was praying and they was talking about the

21  love of God and how, you know, and I just thought maybe,

22  maybe if I could just tell her, maybe she could do

23  something from the outside because people on the inside

24  wasn't trying to help me at all.

25                MS. JOSEPH:  Your Honor, approaching the witness

Rickenbacker - Direct/Joseph

994

1    with what's already in evidence as Plaintiff's Exhibit 8.

2              (Document handed to the witness.)

3    Q.    You testified earlier that after you told --

4              THE COURT:   This is 8 for identification or in

5    evidence?

6              MS. JOSEPH:   In evidence, your Honor,

7    Plaintiff's 8.

8    Q.    You testified earlier that after you told Internal

9    Affairs about Gary Feinberg, correction officers started

10   calling you names, I won't get into what they said.

11             Do you recognize that document that I'm showing

12   you?

13   A.    Yes.

14   Q.    What is it?

15   A.    It's -- this is a security referral for

16   administrative segregation.

17   Q.    Were you placed under administrative segregation

18   after you told Internal Affairs about Gary Feinberg?

19   A.    Yes.

20   Q.    Did you consent to being placed under administrative

21   segregation?

22   A.    No, I didn't want to be placed in administrative

23   segregation because you were kept in the back and nobody

24   comes back there, and no inmates -- you can't see anybody,

25   so if something was to happen to you back there, what

Rickenbacker - Direct/Joseph

1    could you do.  That's the last place I would want to be

2    placed in administrative segregation.  I would rather be

3    placed in population where there were other people around

4    at all times.

5    Q.    Take a look at that document.  Had you consented --

6    A.    No, I did not.

7    Q.    I want to finish my question.

8          Had you consented to being placed on

9    administrative segregation, would it be indicated on that

10   document?

11   A.    Yes, well, you have to sign.  You have to sign that

12   you seen it, that you were placing yourself in it.

13   Q.    And is your signature on that document?

14   A.    No.

15   Q.    Okay.  You can put it down.

16         I just want to jump and focus on January of 2006

17   and February of 2007.

18         At any point during that timeframe, did you

19   discuss the allegations regarding Gary Feinberg with

20   Officer Lundquist?

21         THE COURT:  With officer who?

22         MS. JOSEPH:  Excuse me, Sergeant Lundquist.

23   A.    Excuse me, January of 2006.

24   Q.    Or February of 2006?

25   A.    No, I did not.

Rickenbacker - Direct/Joseph

1    Q.    In January or February of 2006, did you discuss Gary

2    Feinberg with police Officer Olivencia?

3    A.    No, I did not.

4    Q.    And what about Officer McCarrick, in January of 2006

5    and February of 2006, did you discuss the allegations

6    involving Gary Feinberg with her?

7    A.    No, I did not.

8    Q.    When you were placed on administrative segregation

9    after you spoke with IAB, did you see any of the women

10   that you saw in line that day when you went down before

11   you were questioned by IAB?

12           MS. FLYNN:  Objection.

13           THE COURT:  Just yes or no.

14   A.    Yes.

15   Q.    And to your knowledge, were they receiving treatment

16   similar to the way that you described being treated after

17   you spoke with IAB?

18           MS. FLYNN:  Objection.

19           THE COURT:  Sustained.

20   Q.    Ms. Rickenbacker, I want to go back to the first

21   moment you recall Gary Feinberg crossing the line with you

22   and touching you inappropriately.

23           Describe for the jury how you were feeling

24   physically at that moment.

25           MS. FLYNN:  Objection.

Rickenbacker - Cross/Flynn

1      THE COURT:  Sustained.

2  Q.   You testified that you were going down to be examined

3  because you were suffering from back pain?

4  A.   Yes.

5  Q.   Was your back hurting you at that moment?

6  A.   Yes, it was.

7  Q.   As you laid there in back pain, did you ever invite

8  him at any point to start touching you inappropriately?

9  A.   No.  I was in pain.  I wasn't there for him to do

10  that.  I was there for medical treatment.

11      MS. JOSEPH:  Nothing further.

12      THE COURT:  Cross-examination.

13

14  CROSS-EXAMINATION

15  BY MS. FLYNN:

16  Q.   Good morning.

17  A.   Good morning.

18  Q.   You mentioned before when your counsel questioned you

19  about your employment history, isn't it true that you've

20  been incarcerated more than 30 times?

21  A.   Yes, that's true.

22  Q.   And --

23      THE COURT:  Incarcerated what?

24      MS. FLYNN:  Incarcerated more than 30 times.

25  Q.   And isn't it true that you have also been arrested

Rickenbacker - Cross/Flynn

998

1    more than 40 times?

2    A.    Yes, it is true.

3              MS. JOSEPH:   Objection.

4              THE COURT:   Sustained.   Strike out the answer.

5              The jury is instructed to disregard it.

6    Disregard any arrests.

7    Q.    You testified that the first time that Gary Feinberg

8    touched you was when you were incarcerated in February of

9    2005; is that correct?

10   A.    Yes, ma'am.

11   Q.    And you indicated that it continued until sometime in

12   January 2006; is that correct?

13   A.    Yes, ma'am.

14   Q.    But your incarceration in February of 2005 only

15   lasted 30 days; isn't that right?

16   A.    No, ma'am, it was 54 days and then I came back again

17   in June.

18   Q.    Okay.   So you were released following your admission

19   to the correctional facility -- in February when you say

20   this first started, you were released from Suffolk County

21   custody, correct?

22   A.    I was, yes -- yes or no?

23   Q.    Yes or no.

24   A.    Yes.

25   Q.    So you were out of Suffolk County custody for a

Rickenbacker - Cross/Flynn

999

1   period of time following the incidents in February of 2005

2   when you said Gary Feinberg assaulted you, correct?

3   A.   No.  I didn't understand that.

4   Q.   You say that Gary Feinberg started touching you

5   inappropriately in February of 2005 --

6        MS. JOSEPH:  Objection.

7   Q.   -- is that correct?

8        THE COURT:  Overruled.

9   A.   Yes.

10  Q.   And then you say he start touching you

11  inappropriately again in June of 2005; is that correct?

12  A.   Yes.

13  Q.   But in between those two incarcerations you were out

14  of Suffolk County custody; isn't that correct?

15  A.   Yes, ma'am.

16  Q.   As a matter of fact, you were not in anybody's

17  custody during that time?

18  A.   No.  I was not, ma'am.

19  Q.   And during that time, did you go to the police and

20  tell them that Gary Feinberg had sexually assaulted you

21  while you were at the Suffolk County correctional

22  facility?

23  A.   No.

24  Q.   Did you write any letters to anyone at the Suffolk

25  County correctional facility when you were out of custody

Rickenbacker - Cross/Flynn

1000

1    complaining that Gary Feinberg had been sexually touching

2    you?

3    A.    No, ma'am.  I self-medicated when I got out.

4    Q.    So the answer is no?

5    A.    Yeah.

6    Q.    Did anyone on your behalf go to the police while you

7    were out of custody and tell them that Gary Feinberg had

8    been sexually assaulting you?

9    A.    Did anybody on my behalf?

10   Q.    On your behalf?

11   A.    No.  Not that I know of.

12   Q.    Okay.  Did anybody on your behalf contact the Suffolk

13   County correctional facility while you were out of custody

14   and tell them that you had been sexually assaulted by Gary

15   Feinberg?

16   A.    No.

17   Q.    And can you give the jury an idea about how many

18   times Gary Feinberg did this inappropriate touching?

19   A.    A lot.

20   Q.    What's a lot?

21   A.    Once or twice a month.

22   Q.    And that's from June of 2005 until January of 2006?

23   A.    Yes.

24   Q.    So we're talking more than ten times, more than?

25   A.    If that's what you want to say.

Rickenbacker - Cross/Flynn

1   Q.   Okay.  And what you're telling this jury is that this

2   contact between you and Gary Feinberg happened every time

3   you went down to medical?

4   A.   Every time.

5   Q.   Okay.  Now, when you were told on any of those

6   occasions that you were going to go down to medical, did

7   you refuse to go down to medical?

8   A.   I refused, but you can't refuse to go down to

9   medical.

10   Q.   When you say you refused, did you refuse on a tier to

11   go down to medical?

12   A.   You can't.

13   Q.   Did you try to refuse?

14   A.   You cannot.

15   Q.   I'm asking you, when they told you you were going

16   down to medical on the tier, did you say to anyone on the

17   tier, I am not going down there, Gary Feinberg is sexually

18   assaulting me?

19   A.   No, ma'am.

20   Q.   Yes or no?

21   A.   No, I did not.

22   Q.   Okay.  And when you went down to medical, you

23   indicated that while waiting to see Gary Feinberg, you

24   wait up against the wall in the medical unit; is that

25   correct?

Rickenbacker - Cross/Flynn

1002

1   A.   Yes, ma'am.

2   Q.   And it's fair to say that at that time -- withdrawn.

3        It's fair to say that while you're waiting there

4   to see Gary Feinberg, there are corrections officers

5   stationed in the medical unit; is that correct?

6   A.   Yes, ma'am.

7   Q.   And there are also other inmates waiting to be

8   treated there, correct?

9   A.   Yes, ma'am.

10  Q.   And there is also medical staff in the sense of

11  doctors and nurses in the medical unit?

12  A.   Yes, ma'am.

13  Q.   And in any of those occasions when you saw that you

14  were going to be examined by Gary Feinberg, did you make

15  an outcry and say, I am not going in there, he is sexually

16  assaulting me?

17  A.   Ma'am, that's not --

18  Q.   Yes or no?

19  A.   No, I did not.  You can't do that in the correctional

20  facility.  You'll get a disciplinary for that.

21  Q.   My question is, did you ever, when you saw that you

22  were going into the examination room with Gary Feinberg,

23  say to anyone, I am not going in there, he is sexually

24  assaulting me?

25  A.   No, but I did say to someone that I would like to see

**Rickenbacker - Cross/Flynn**

1   another doctor.

2   Q.   Okay.

3   A.   I did.  You know what they told me?  Would you like

4   to know?

5   Q.   No, I don't, really.  Thank you.

6   A.   Okay.

7   Q.   Now -- by the way, Gary Feinberg doesn't have a baton

8   or a gun, correct?

9   A.   No, ma'am.

10  Q.   And there was a time, as a matter of fact, when Gary

11  Feinberg was examining you where one day you just had

12  enough and you got up and you walked out of that room; is

13  that correct?

14  A.   I jumped up and I said I've had enough.

15  Q.   Okay.  And that was on one occasion, you said, I've

16  had enough, I'm leaving?

17  A.   And he put his hand on my head and he said, you're

18  having a bad day.  He grabbed me by my waist and bumped me

19  like this in my behind.

20  Q.   Did you feel that was disrespectful when he did that

21  to you?

22  A.   Yes, that's when I called security.

23  Q.   Okay.  So it's fair to say that during this period of

24  time there was one time that Gary Feinberg disrespected

25  you; isn't that right?

Rickenbacker - Cross/Flynn

1004

1    A.    Yes.

2    Q.    That was because when you got up to leave the room,

3    he grabbed you by your waist and he bumped into you and he

4    said, what, are you having a bad day, Lowrita; is that

5    right?

6    A.    He said, oh, you're having a bad day.

7    Q.    And you found that disrespectful, right?

8    A.    I found it disrespectful that he grabbed my waistline

9    and he bumped his penis into my behind.

10   Q.    Okay.

11   A.    That's what I found disrespectful.

12   Q.    By the way, what you told this jury is that the first

13   time that you went into that examination room and Gary

14   Feinberg rubbed his fingers over your breasts, you didn't

15   know that that was inappropriate; isn't that correct?

16   A.    No, I didn't.

17   Q.    Thank you.

18   A.    I didn't know that it was inappropriate because the

19   man -- the way the man reached --

20   Q.    Ma'am, please, just answer my questions.

21   A.    No, I didn't know.

22   Q.    Okay.  You said that you told Carol Manderino at that

23   time, your therapist.  She was your therapist, correct?

24   A.    Yes.

25   Q.    Okay.  And you told her about what was going on with

Rickenbacker - Cross/Flynn

1005

1    Gary Feinberg; is that correct?

2    A.    Yes, ma'am.

3    Q.    But this is the same woman who wrote, and you

4    testified to this, two letters to Judge Spatt on your

5    behalf to try to help you; is that correct?

6    A.    Yes, ma'am.

7    Q.    All right.  And you also testified that in August of

8    2005 you met with the Secret Service; is that right?

9    A.    Yes.

10   Q.    And was that one occasion or two occasions?

11   A.    I believe it was one.

12   Q.    Okay.  And how many Secret Service agents were there?

13   A.    One or two.  I couldn't tell because there was other

14   people in the room besides Secret Service agents.  They

15   don't identify themselves.  They just sit down.  It could

16   have been two Secret Service agents, someone from the

17   Sheriff's department, because they don't identify like

18   that.

19   Q.    You met with someone from Secret Service --

20   A.    That's what they said.

21   Q.    Ma'am, please, let me finish my question and then you

22   answer yes or no.

23   A.    All right, ma'am.

24   Q.    In August of 2005, while you were in custody at the

25   Suffolk County correctional facility, you met with the

Rickenbacker - Cross/Flynn

1006

1    Secret Service, correct?

2    A.    Yes, ma'am.

3    Q.    And you sat with them and you spoke with them,

4    correct?

5    A.    Yes, I did.

6    Q.    And you know the Secret Service are employed by the

7    federal government; is that correct?

8    A.    Justice department, ma'am.

9    Q.    All right.  And you never said a word to them about

10   what Gary Feinberg was doing to you; isn't that correct?

11   A.    Why would I?

12   Q.    Ma'am, I asked you to answer me yes or no.

13        Did you say anything to the civil service --

14   Secret Service --

15   A.    No, they weren't there for that, ma'am.  They were

16   there for fraud.

17   Q.    Ms. Rickenbacker, please answer my question yes or

18   no?

19   A.    No, I did not.  Okay, I answered your question,

20   ma'am.

21   Q.    You didn't say anything to the Secret Service?

22   A.    No, I didn't.  I really didn't.

23   Q.    When you were speaking about this Reverend Davis that

24   you wrote the note to in November of 2005, Reverend Davis

25   is not a county employee, correct?

Rickenbacker - Cross/Flynn

1007

1   A.   No, she's not.

2   Q.   Okay.  And your testimony is that after you wrote

3   to -- this note to Reverend Davis and gave it to her,

4   that, as far as you know, she took no action on your

5   behalf; is that correct?

6   A.   That's as far as I know.  I don't know what she did,

7   ma'am.

8   Q.   Please, ma'am, yes or no?

9   A.   Yes.

10           THE COURT:  Ms. Rickenbacker, on

11   cross-examination you're going to be asked questions that

12   are going to call for a yes or a no answer.  So please try

13   to answer yes or no.  There may be some questions that you

14   cannot answer yes or no.  In that event, just say, I can't

15   answer that question yes or no.

16           THE WITNESS:  Okay.

17           THE COURT:  And that, you leave it up to

18   Ms. Flynn to change the question.

19           THE WITNESS:  Okay.  I can't answer that

20   question.

21           THE COURT:  But don't make explanations when the

22   question doesn't call for it.

23           THE WITNESS:  Okay.

24           THE COURT:  That's our procedure on

25   cross-examination.

Rickenbacker - Cross/Flynn

1008

1    THE WITNESS:  Okay, Judge.

2    THE COURT:  Okay?

3    THE WITNESS:  All right.

4    THE COURT:  All right.

5    THE WITNESS:  I can't answer that question yes

6    or no.

7    Q.   Okay.  Now, you spoke before about when Officer

8    McCarrick put you on suicide watch in August of 2005, and

9    you said that when she went to do that, you said something

10   to her, you said, you challenged her.  You said, why are

11   you doing that?  That's not fair; is that correct?

12   A.   I said why.

13   Q.   Okay.  And you questioned what she was doing to you;

14   is that correct?

15   A.   Yes.

16   Q.   And she's a corrections officer; is that correct?

17   A.   Yes.

18   Q.   All right.  So you were willing to challenge a

19   corrections officer who was putting you on suicide watch,

20   but apparently you wouldn't stand up to Gary Feinberg, a

21   physicians assistant in the medical unit; is that correct?

22   MS. JOSEPH:  Objection.

23   A.   I can't answer that.

24   THE COURT:  Sustained.

25   Strike out the answer, if there was one.  The

### Rickenbacker - Cross/Flynn

1009

1    jury is instructed to disregard it.

2    Q.   Are you aware of something called disciplinary

3    segregation?

4    A.   Yes, ma'am.

5    Q.   All right.

6         And if a corrections officer puts you on

7    disciplinary segregation, that's for a disciplinary

8    infraction; is that correct?

9    A.   Yes, it is.

10        MS. JOSEPH:   Objection, your Honor.

11        THE COURT:   Overruled.

12   Q.   And in order to get off disciplinary segregation, you

13   have to have a hearing with other corrections officers; is

14   that correct?

15   A.   Yes, ma'am.

16   Q.   And with a suicide watch, you're aware that the

17   person who ultimately decides whether you go onto suicide

18   watch is someone in mental health; is that correct?

19   A.   No, ma'am.

20   Q.   The corrections officer refers you down to mental

21   health when they put you on a suicide watch; isn't that

22   correct?

23   A.   Yes, ma'am.

24   Q.   Okay.

25        But Officer McCarrick, who you say wanted to

Rickenbacker - Cross/Flynn

1010

1    punish you or keep you quiet about Gary Feinberg, didn't

2    put you in disciplinary segregation, she put you on a

3    suicide watch; is that correct?

4    A.   I can't --

5    Q.   Yes or no?

6    A.   Did she put me --

7    Q.   She put you on a suicide watch; is that correct?

8    A.   Yes, she did.

9    Q.   She didn't put you into disciplinary segregation,

10   didn't she?

11   A.   I thought you had to do something for that.

12   Q.   I'm asking you if she put you --

13   A.   No.

14   Q.   Thank you.

15        Between June of 2005 and January of 2006, how

16   many times did you go to church services with Reverend

17   Davis?

18   A.   I can't even answer that.

19   Q.   All right.  Well, was it more than five times?

20   A.   I can't answer that.

21   Q.   Was it more than once?

22   A.   I can't answer that.

23   Q.   Okay.

24        Was it more than ten times?

25   A.   I can't answer that.

Rickenbacker - Cross/Flynn

1011

1    MS. JOSEPH:  Objection, she said several times.

2    THE COURT:  Counsel is asking questions probing

3  whether she can get an answer.  All right.

4  Q.   You have no idea how many times you went to those

5  church services?

6  A.   Yeah, because the church services they're not the

7  same people all the time, so I can't answer how many times

8  that that lady has been there.

9  Q.   Okay.  I wasn't asking you that.

10  A.   What was you asking?

11    MS. JOSEPH:  Objection.  That's a

12  mischaracterization.

13    THE COURT:  All right.  Please don't argue with

14  the witness.

15    MS. FLYNN:  Yes, your Honor.

16  Q.   From June of 2005 to January of 2006, how many times

17  did you attend church services at the jail?

18  A.   I attend every service I can possibly attend, every

19  therapy group that I can possibly go to because I want to

20  rehabilitate myself and stop going through the vicious

21  cycle of coming to the Riverhead jail, ma'am.

22  Q.   Other than writing that letter to Reverend Davis, did

23  you complain to any of the other clergy that you saw while

24  you were at the jail during that time, yes or no?

25  A.   No.

Rickenbacker - Cross/Flynn

1012

1    Q.    And when you were receiving this therapy in the jail,

2    did you ever mention Gary Feinberg at any time during

3    those therapy sessions, yes or no?

4    A.    Yes.

5    Q.    Who did you mention it to?

6    A.    Carol Manderino.

7    Q.    Okay.

8          Did you go to other therapy sessions in the

9    rehab unit?

10   A.    We don't get to speak like that there.

11   Q.    I'm asking you, did you go to --

12   A.    I go to a group with almost 200 women there.  Did I

13   mention about Gary Feinberg in front of 200 women?

14   Q.    Yes.

15   A.    No, I was embarrassed about the whole situation.

16   Q.    Okay.

17         Now, your attorney asked you before why you

18   didn't file a grievance about Gary Feinberg, and you said

19   that you didn't do it because when you filed grievances,

20   the grievance people would take it and confront the person

21   with the grievance.  In other words, they would confront

22   Gary Feinberg, yes or no?

23         Is that what you testified to?

24   A.    No, I didn't say that.

25   Q.    Okay.

Rickenbacker - Cross/Flynn

1013

1    A.   They wouldn't confront him with it.

2         They would show it to him and go, look what's on

3    the side.  It was a -- okay, look, there's written

4    grievance against you, they would go like this, and show

5    him the grievance.  And that's in an unofficial capacity.

6         So being it's not on official capacity, you set

7    yourself for people to do things to you like you'd never

8    believe, like put you in disciplinary lock, stopping

9    medication, not allowing you visits, a lot of different

10   things also.

11   Q.   But you did tell -- your testimony is you did tell

12   Sergeant Lundquist and Investigator Olivencia; is that

13   correct?

14   A.   Yes, I did.

15   Q.   By the way, after you were placed on suicide watch,

16   the next day you saw Carol Manderino; is that correct?

17   A.   Yes, I did, ma'am.

18   Q.   And you told her that the reason that you had been

19   upset the day before when you were placed on suicide watch

20   was because you hadn't heard from your boyfriend and you

21   were upset; isn't that correct?

22   A.   No.

23        I guess she miswrote it.  Christopher Dooley is

24   not my boyfriend.  He's my friend.  And I finally

25   contacted him --

**Rickenbacker - Cross/Flynn**

1    Q.   Ms. Rickenbacker, please answer my question.

2    A.   No.   That's not correct.

3              THE COURT:   Just hold it a minute, please.

4              We're going to take a 15-minute recess.

5              Please don't discuss the case either among

6    yourselves or with anyone else.   Keep an open mind.

7              Please recess yourselves.

8              (Whereupon, the jury retired from the

9    courtroom.)

10             (Recess taken at this point.)

11             (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rickenbacker - Cross/Flynn

1015

1           (Following a recess.)

2

3           THE CLERK:  Jury entering.

4           (Jury enters the courtroom.)

5           THE COURT:  Please be seated.

6           Sorry for keeping you waiting.  We had a visit

7   from a high school.  We have students from schools come in

8   and we talk to them about federal court, the jury system,

9   and how wonderful it would be if they went to law school.

10  So that's what I just did.

11          You may proceed.

12          MS. FLYNN:  Thank you, your Honor.

13  CROSS-EXAMINATION

14  BY MS. FLYNN:

15  Q.   Ms. Rickenbacker, you mentioned before when your

16  attorney was showing you pictures of the jail medical unit

17  that sometimes the corrections officers would watch TV.

18          Do you remember indicating that?

19  A.   Yes, ma'am.

20  Q.   Are you aware the TVs were not put into the jail

21  medical unit until 2008?

22          MS. JOSEPH:  Objection.

23          THE COURT:  Overruled.

24  A.   I'm supposed to answer that question?

25  Q.   Isn't it true that the TVs were not put in until

Rickenbacker - Cross/Flynn

1    2008?

2    A.    Not from my recollection, ma'am.

3    Q.    And you indicated before that you have a lawsuit

4    pending against the county, and your attorney is

5    Mr. Norinsberg.

6          Is that correct?

7    A.    Yes, ma'am.

8    Q.    When I asked you before about the fact that you

9    questioned Officer McCarrick about why she was putting you

10   on suicide watch, my recollection is you said you don't

11   confront corrections officers.

12         Is that correct?

13   A.    No.

14         I never said that.

15   Q.    Did you indicate that you don't challenge corrections

16   officers?

17   A.    I said why.

18   Q.    When Officer McCarrick told you that she was putting

19   you on suicide watch --

20   A.    Yes, ma'am.

21   Q.    -- you questioned why she was doing that.

22         Is that correct?

23   A.    That's the question.

24         Yes, I did.

25   Q.    You confronted her.

Rickenbacker - Cross/Flynn

1017

1          Is that correct?

2     A.   I didn't think that was confronting her.

3          I just asked her why.

4     Q.   In November of 2006, Ms. Rickenbacker, did you file a

5     federal complaint on your own without a lawyer about your

6     allegations against Gary Feinberg?

7     A.   Yes, I did, ma'am.

8          MS. FLYNN:  Defense Exhibit I, for

9     identification.

10         THE COURT:  I, for item?

11         MS. FLYNN:  I, for item.

12    BY MS. FLYNN:

13    Q.   I'd ask you to look at what's been marked as

14    Defense Exhibit I, for item.

15         (Whereupon, there was a pause in the

16    proceedings.)

17

18    BY MS. FLYNN:

19    Q.   Do you recognize that document?

20    A.   Yes, ma'am.

21    Q.   And is that a document that you, yourself, wrote out?

22    A.   No, ma'am.

23    Q.   Who wrote that out?

24    A.   It's a standard form they have at the jail.

25    Q.   Okay.

Rickenbacker - Cross/Flynn

1018

1           But the information that's in there is

2   information based on your knowledge.

3           Is that correct?

4   A.   It's a standard form, and, yes, I --

5   Q.   Okay.

6           There are pages of typewritten --

7           MS. FLYNN:  Withdrawn.

8   BY MS. FLYNN:

9   Q.   There are numerous pages that are typewritten in

10  there.

11          Correct?

12  A.   Yes.

13  Q.   And that contains information about what you say your

14  allegations are against the county and Gary Feinberg.

15          Is that correct?

16  A.   Yes.

17  Q.   And this was information -- did you type this out?

18  A.   No.

19  Q.   Who typed it out?

20  A.   Clerk at the jail.

21  Q.   And did they type it out based on information that

22  you gave them?

23  A.   Yes.

24  Q.   I'd ask you to look at the second page of the

25  complaint.

### Rickenbacker - Cross/Flynn

1019

1          Do you see where it says paragraph four and then

2     there's a subsection D on the bottom of the page?

3          Do you see that?  You have to answer yes.

4     A.   Yes.

5     Q.   And do you see that it says there, on or about --

6          MS. JOSEPH:  Objection, your Honor.

7          MS. FLYNN:  I'm sorry.

8          I would move this into evidence, your Honor.

9          THE COURT:  Any objection?

10         MS. JOSEPH:  Objection, your Honor.

11         THE COURT:  Can I see it.

12         Over here.

13         (Whereupon, there was a pause in the

14    proceedings.)

15         MS. JOSEPH:  Your Honor, may we approach?

16         THE COURT:  All right.

17         Come up.

18         (Continued on next page.)

19

20

21

22

23

24

25

Rickenbacker - Cross/Flynn

1020

1          (Sidebar.)

2          THE COURT:  You are objecting to putting this in

3    evidence?

4          MS. JOSEPH:  I haven't seen it.

5          THE COURT:  You haven't seen it?

6          MS. JOSEPH:  No.

7          THE COURT:  Okay.

8          MS. JOSEPH:  Was this turned over in discovery?

9          I'm just asking.

10          MS. FLYNN:  I'll have to check the book.

11          I'm not sure if it was.

12          MS. JOSEPH:  Okay.

13          MS. FLYNN:  I believe it was.

14          I'll check.

15          MS. JOSEPH:  Okay.

16          (Whereupon, there was a pause in the

17    proceedings.)

18          MS. FLYNN:  It's in my exhibit book as Exhibit

19    X.

20          THE COURT:  It's in your exhibit book as Exhibit

21    X, for x-ray?

22          MS. FLYNN:  Yes.

23          MS. JOSEPH:  Your Honor, what's the purpose of

24    this?

25          It's inadmissible hearsay.

Rickenbacker - Cross/Flynn

1021

1          THE COURT:  Are you objecting to this?

2          MS. JOSEPH:  Yes.

3          THE COURT:  What's the relevance of this?

4          MS. FLYNN:  Because this is -- first of all,

5     it's a complaint filed with the court, and I would ask the

6     court to take judicial notice of it.

7          And in there she says she didn't tell Carol

8     Manderino she was being sexually abused until January of

9     2006.

10          THE COURT:  I'm certainly going to allow that

11     part in.

12          MS. JOSEPH:  So specifically what paragraph are

13     you referring to?

14          MS. FLYNN:  It's page two, 4 D.

15          MS. JOSEPH:  Is there any other portion that you

16     want to get in?

17          MS. FLYNN:  I'm just going to ask her about

18     that.

19          I ask that the whole thing go into evidence,

20     though.

21          MS. JOSEPH:  I'm sorry.

22          I didn't hear what you just said.

23          THE COURT:  She says she wants to put that in,

24     but she wants to put it in by putting the whole document

25     in.

Rickenbacker - Cross/Flynn

1022

1    Do you object to that?

2    MS. JOSEPH:  Yes, your Honor.

3    It looks like she's just using this to show

4    inconsistency in the D part she referred to.

5    THE COURT:  I'm going to allow only that part to

6    go in.

7    If you object, there's a lot of things in there

8    that help the plaintiff.

9    MS. JOSEPH:  All right.

10    THE COURT:  That's up to you.

11    MS. JOSEPH:  Then the only portion that we would

12    like to exclude is the allegation of loss of personal

13    property and illegal detention.

14    MS. FLYNN:  Your Honor, it's a complaint that's

15    on file --

16    THE COURT:  You want the whole thing in?

17    Do you want the whole thing in?

18    MS. FLYNN:  I want the whole thing in, yes.

19    THE COURT:  I'll give you a choice, either the

20    paragraph that's the inconsistency or the whole thing goes

21    in?

22    MS. JOSEPH:  Okay.

23    The whole thing.

24    THE COURT:  The whole thing.

25    Okay.

Rickenbacker - Cross/Flynn

1023

1     MS. JOSEPH:  You said it was X?

2     MS. FLYNN:  It's X in my book.

3     MS. JOSEPH:  Okay.

4     (Sidebar concluded.)

5     (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rickenbacker - Cross/Flynn

1024

1              (In open court.)

2              THE COURT:  Defense Exhibit I, for item, in

3     evidence.

4              (Whereupon, Defense Exhibit I was received in

5     evidence, as of this date.)

6     BY MS. FLYNN:

7     Q.    And, just to be clear, Ms. Rickenbacker, this is a

8     complaint that you filed in federal court back in November

9     of 2006.

10             Is that correct?

11    A.    Yes.

12    Q.    And I'd ask you to look at page two of your

13    complaint, under Count One, paragraph 4 D.

14    A.    Um-hmm.

15    Q.    And in that paragraph you state that you told Carol

16    Manderino you were being sexually assaulted by

17    Gary Feinberg in January of 2006.

18             MS. JOSEPH:  Objection, your Honor.

19    BY MS. FLYNN:

20    Q.    Isn't that correct?

21    A.    That's what it says here.

22             MS. JOSEPH:  Objection, your Honor.

23             Counsel is misstating the paragraph.

24             THE COURT:  I can't hear you.

25             MS. JOSEPH:  Objection, your Honor.

Rickenbacker - Cross/Flynn

1025

1       The document is in evidence and counsel is using

2   it.  She can read directly from the document.

3              MS. FLYNN:  Okay.

4   BY MS. FLYNN:

5   Q.   I'm reading from page two, count one, paragraph 4 D.

6              On or about the month of January 2006, I

7   revealed to the mental health therapist, Carol Manderino,

8   that I was being sexually assaulted by the physician's

9   assistant Gary Feinberg.

10             That is what that document says, correct?

11  A.   Yes.

12  Q.   Now, Ms. Rickenbacker, you are here today in court

13  testifying because you want the jury to believe that

14  starting in June 2005 you told Carol Manderino that you

15  were being sexually assaulted by Gary Feinberg.

16             Correct?

17  A.   Yes.

18  Q.   And you are testifying here in court today because

19  you want the jury to believe you when you say that you

20  were asking Sergeant Lundquist and Investigator Olivencia

21  and Investigator McCarrick for help with your problem with

22  Gary Feinberg as early as August of 2005 and they did

23  nothing.

24             Is that correct?

25  A.   Yes, ma'am.

Rickenbacker - Cross/Flynn

1026

1    Q.   Well, Ms. Rickenbacker, isn't it true that just this

2    past August, August 6, 2009, you pled guilty to identity

3    theft and forgery in the third degree.

4         Is that correct?

5    A.   I pled guilty to a petit larceny, and criminal

6    impersonation.

7         MS. FLYNN:  Your Honor, I'd like to show the

8    witness what's been marked as Defense Exhibit J for

9    identification.

10   BY MS. FLYNN:

11   Q.   I'm going to show you what's been marked as

12   Defense Exhibit J for identification.

13        Does that refresh your memory?

14   A.   I thought it was pet --

15   Q.   Please let me finish my question.

16   A.   Okay.

17   Q.   Does that refresh your recollection as to whether on

18   August 6, 2009, you pled guilty to identity theft in the

19   third degree and forgery in the third degree.

20        Is that correct?

21   A.   That's correct.

22   Q.   Okay.

23        And those charges arose out of the fact that you

24   went into a store --

25        MS. FLYNN:  Withdrawn.

Rickenbacker - Cross/Flynn

1027

1    BY MS. FLYNN:

2    Q.   And those charges, the identity theft charges, arose

3    out of the fact that on December 20, 2007, you were found

4    to have in your possession eight credit cards, five

5    driver's licenses, and 31 checks in the names of other

6    people.

7              Isn't that correct?

8    A.   I don't remember.

9    Q.   Isn't that correct that on December 20th, 2007, you

10   went into the Babies R Us store.

11             THE COURT:  The what?

12             MS. FLYNN:  Babies R Us.

13             THE COURT:  Babies R Us?

14             MS. FLYNN:  Yes.

15             THE COURT:  Okay.

16   BY MS. FLYNN:

17   Q.   And you returned a stolen baby monitor and got a

18   store credit using the false identity.

19             Isn't that true?

20   A.   No.  That's not true.

21             I returned the baby monitor using my cousin's

22   ID.

23   Q.   Okay.

24   A.   That's what I did.  It wasn't stolen.

25             The object wasn't stolen.  It was that I used my

Rickenbacker - Cross/Flynn

1028

1    cousin's ID, because I didn't have a driver's license

2    ID --

3    Q.    Okay.

4    A.    -- to return it, and that made it a forgery because

5    it was not me who actually doing the return.

6          That's what happened.

7    Q.    Okay.

8          And then you went into the store and you

9    presented the store clerk with a false ID.

10         Is that correct?

11   A.    Yes.

12   Q.    And you got a store credit issued to you under that

13   false identification.

14   A.    Yes, I did.

15   Q.    Is that correct?

16   A.    Yes.

17   Q.    And it's also true that at that time you had eight

18   credit cards and five driver's licenses and 31 checks in

19   the names of other people.

20         Is that correct?

21   A.    That was found in the car.

22         Yes.

23   Q.    That was found in your car?

24   A.    No.

25   Q.    They were your items?

Rickenbacker - Cross/Flynn

1   A.   No.

2          It was found in the car that I was in with

3   codefendant.

4   Q.   You pled guilty to identity theft.

5          Correct?

6   A.   I did.

7          I did the return --

8   Q.   Ma'am, you pled guilty to identity theft.

9   A.   Yes, I did.

10  Q.   And these credit cards and driver's licenses you got

11  in exchange for crack.

12         Isn't that true?

13  A.   Oh, yes.

14         Yes.

15  Q.   Okay.

16  A.   Definitely, I was smoking crack.

17  Q.   And you also pled guilty on August 6, 2009, to the

18  crime of criminal impersonation in the second degree.

19  A.   Yes, I did.

20  Q.   Is that correct?

21  A.   Yes.

22  Q.   And that arose out of the fact that when you were

23  stopped for a traffic violation, you gave the police a

24  false identity.

25         Correct?

**Rickenbacker - Cross/Flynn**

1030

1      A.    Yes.

2            I gave my sister's name.

3      Q.    Okay.  Thank you.

4            And you also pled guilty on March 2, 2000 to the

5      charge of criminal possession of a forged instrument

6      because in January, on January 27th, 2000, you used a

7      forged check in a supermarket.

8            Is that correct?

9      A.    2000, that's too far back.

10           That's nine years ago, ma'am.

11     Q.    You can't remember that you did that.

12     A.    No, no.

13     Q.    I have Defense Exhibit L for identification that I'd

14     like to show you.

15           I'd ask you to look at that.

16           (Whereupon, there was a pause in the

17     proceedings.)

18

19     BY MS. FLYNN:

20     Q.    I ask you if that refreshes your recollection?

21     A.    Yeah.

22           That's when I was on crack.

23     Q.    Okay.

24           And you pled guilty on March 2nd, 2000, to

25     passing a forged check.

Rickenbacker - Cross/Flynn

1031

1        Correct?

2    A.   Yes, ma'am.

3    Q.   And as recently as September 23, 2009, you pled

4    guilty again to the crime of false impersonation.

5        Is that correct?

6    A.   September 23rd, 2009?

7    Q.   Yes.

8    A.   That was an '07 case, yeah.

9        It was two years old.

10   Q.   Okay.

11       And you pled guilty?

12   A.   Yes, I did.

13   Q.   And on that occasion it was once again you were

14   stopped by the police and you gave your sister's name.

15       Correct?

16   A.   Yes.

17   Q.   And you did that because you knew you had a warrant

18   out against you.

19       Is that correct?

20   A.   No.

21       I didn't have a driver's license at the time.

22   Q.   Oh, okay.

23       You didn't have a driver's license?

24   A.   Yes.

25   Q.   And you also pled guilty to false personation arising

Rickenbacker - Cross/Flynn

1032

1    out of an arrest on November 5th, 2008, because at that

2    time, again, when you were pulled over you again

3    identified yourself as your sister, Anita Rickenbacker.

4            Right?

5    A.   Right.

6    Q.   So you tried to use your own sister's name on several

7    occasions to avoid getting arrested.

8            Is that correct?

9    A.   Because I didn't have a driver's license -- yes.

10   Q.   And you wanted to avoid getting arrested?

11   A.   Yes, I did.

12   Q.   From your experience at the jail, Ms. Rickenbacker,

13   you are familiar with something called a writ?

14   A.   Yes.

15           They have them in the law library.

16   Q.   And a writ is something that an inmate can file if

17   they have a complaint about something going on at the

18   jail.

19           Is that correct?

20   A.   No, you can't.

21   Q.   You can file a writ, and you will be taken before a

22   justice of the supreme court.

23           Is that correct?

24   A.   Yes, ma'am.

25   Q.   And the inmate can make that request, to be seen

Rickenbacker - Cross/Flynn

1033

1      before the judge.

2                Is that correct?

3      A.   Yes.

4      Q.   Isn't it true, Ms. Rickenbacker, that you appeared in

5      writ court?

6      A.   Yes.

7      Q.   Before a judge of the supreme court named

8      Arthur Pitts on July 20th, 2005.

9                Is that correct?

10     A.   Yes.

11     Q.   And you didn't say a word to him at that time, a

12     justice of the supreme court of Suffolk County, about what

13     was going on with Gary Feinberg.

14               Is that correct?

15     A.   Yes, ma'am.

16     Q.   And you also appeared before the Honorable Judge

17     Baisley on July 13, 2005 in writ court.

18     A.   Yes, ma'am.

19     Q.   And you also didn't say a word to him, did you?

20     A.   Didn't say a word.

21               Does it show the outcome of my writ?  Because

22     they told me --

23               MS. FLYNN:  Your Honor, I move to strike.

24               THE COURT:  Strike out the answer.

25               The last statement by the witness, the jury is

Rickenbacker - Cross/Flynn

1034

1   instructed to disregard it.

2             Listen to the questions, Ms. Rickenbacker.  Just

3   answer what you are asked.

4             THE WITNESS:  Okay.

5   BY MS. FLYNN:

6   Q.   And then on August 17th, 2005, you were again in

7   front of Judge Pitts, and you again didn't say a word

8   about Gary Feinberg.

9             Is that correct?

10  A.   That's correct, ma'am.

11  Q.   And, finally, on December 21st, 2005, you appeared

12  before a Judge Jones and you never said a word to

13  Judge Jones about the fact that you were being sexually

14  abused by Gary Feinberg.

15            Is that correct?

16  A.   Yes.

17            That's right, ma'am.

18  Q.   Now, we had spoken before that Carol Manderino had

19  written two letters for you to Judge Spatt.

20  A.   Yes.

21  Q.   And around the same time --

22            MS. FLYNN:  Withdrawn.

23  BY MS. FLYNN:

24  Q.   And that was approximately in August or September of

25  2005?

Rickenbacker - Cross/Flynn

1035

1    A.   Can you refresh my memory?

2         Do you have a copy of the letters?

3    Q.   I'm just asking you.

4    A.   I can't give you a date.

5    Q.   Is it fair to say it was during 2005?

6    A.   Yes.

7    Q.   During the time you alleged you were being sexually

8    assaulted by Gary Feinberg?

9    A.   Yes.

10   Q.   And, as a matter of fact, you, yourself, wrote

11   letters to judges during that time.

12        Is that correct?

13   A.   I wrote a letter to Judge Spatt I believe -- I don't

14   know if it was that same time.

15        I think it was afterwards.

16   Q.   Do you recall that you wrote a letter to Judge Spatt

17   prior to January of 2006?

18   A.   I wrote letters to Judge Spatt about -- when he

19   sentenced me --

20   Q.   Ms. Rickenbacker, I'm asking --

21   A.   Yeah, I did.

22        But it was in 2002, something like that.

23   Q.   Do you recall writing a letter to Judge Spatt during

24   2005 when the situation with Gary Feinberg was going on?

25   A.   It's a possibility, a possibility.

Rickenbacker - Cross/Flynn

1036

1    Q.    And in that letter you didn't say anything to

2    Judge Spatt about the fact that Gary Feinberg was sexually

3    assaulting you, did you?

4    A.    I probably wouldn't say anything to Judge Spatt.

5    Q.    Do you recall if you did or you didn't?

6    A.    I can't recall if I did or didn't because I can't

7    see -- you have the letter?

8    Q.    Sure.

9    A.    But I probably wouldn't involve Judge Spatt.

10            MS. FLYNN:  Defense Exhibit M, for Mary, for

11    identification.

12    BY MS. FLYNN:

13    Q.    Do you recognize that letter?

14    A.    I recognize -- can I read it and I can say?

15            Because it's not signed.  I know if I wrote it,

16    I would usually sign it to Judge Spatt.

17            (Whereupon, there was a pause in the

18    proceedings.)

19    A.    Yeah, I think it was.

20            It was a plea for him to help me get a program.

21    Q.    Okay.

22            And it's fair to say that letter was written

23    sometime in 2005.

24    A.    Would have to be, yes, because Carol Manderino's name

25    is on it.

Rickenbacker - Cross/Flynn

1037

1     Q.    Okay.

2           And in that letter, you do not mention anything

3     to Judge Spatt about the fact that you claim you were

4     being sexually abused by Gary Feinberg.

5           Correct?

6     A.    No.

7     Q.    During the same time you also wrote a letter to a

8     state court judge, a Judge Filiberto.

9           Correct?

10    A.    Can you refresh my memory, please?

11    Q.    Ms. Rickenbacker, I'm going to show you two letters

12    that have been marked Defense Exhibit N, for Nancy for

13    identification, and O for orange for identification.

14          (Whereupon, there was a pause in the

15    proceedings.)

16

17    A.    They are pleading for rehabilitation.

18    Q.    Ma'am --

19    A.    I wrote those letters.

20    Q.    Those are your letters?

21    A.    Yes.

22          MS. FLYNN:  I ask that they be put into

23    evidence, your Honor.

24          THE COURT:  Which one?

25          MS. FLYNN:  N, O and M.

Rickenbacker - Cross/Flynn

1038

1      MS. JOSEPH:  Objection.

2      THE COURT:  Pardon?

3      MS. JOSEPH:  Objection, your Honor.

4      THE COURT:  Can I see them, please.

5      (Whereupon, there was a pause in the

6  proceedings.)

7

8      THE COURT:  I'm sustaining the objection to all

9  three.

10  BY MS. FLYNN:

11  Q.   Well, Ms. Rickenbacker, you wrote letters to

12  Judge Spatt, and Judge Filiberto during 2005.

13      Is that correct?

14  A.   Yes, ma'am.

15  Q.   And in those letters, you didn't mention anything

16  about the fact that you were being sexually assaulted by

17  Gary Feinberg.

18      Correct?

19  A.   No.

20  Q.   You did not?

21  A.   Wait, wait.

22  Q.   In those letters, you did not mention that you were

23  being sexually --

24  A.   No.

25  Q.   -- assaulted by Gary Feinberg.

Rickenbacker - Cross/Flynn

1039

```
 1              Correct?
 2   A.    No, I didn't.
 3   Q.    You are also familiar with what's called internal
 4   affairs at the Suffolk County jail.
 5              Is that correct?
 6   A.    It's part of the internal security I believe.
 7   Q.    Well, isn't it true that while you have been
 8   incarcerated at the Suffolk County Correctional Facility,
 9   you have written letters to internal affairs complaining
10   about various things at the jail.
11              Is that correct?
12   A.    I believe I wrote letters to -- I don't know if it's
13   internal affairs, but internal security.
14              I don't think you can write to internal affairs.
15   You give it to security and they would forward it from
16   there, I believe.  Olivencia and Lundquist or the sergeant
17   on the floor.
18              I don't know about that.
19   Q.    I'm going to show you what's been marked for
20   identification as Defense Exhibit P, and ask you to take a
21   look at that.
22              Is that your handwriting?
23   A.    It's my handwriting, yes, ma'am.
24   Q.    Is that a letter that you wrote?
25   A.    This is a --
```

Rickenbacker - Cross/Flynn

1040

1   Q.   I'm just asking you is that a letter that you wrote?

2        Yes or no?

3   A.   Yes.

4   Q.   And you are looking at -- is there a cc on that

5   letter?

6   A.   Yes, it is.

7   Q.   And does it indicate it was cc'd to internal affairs?

8   A.   Newsday, internal affairs --

9   Q.   I'm sorry.

10       Does it indicate --

11  A.   Warden --

12  Q.   It indicates it was cc'd to internal affairs.

13       Yes?

14  A.   Yes.

15  Q.   And that's a letter you wrote?

16  A.   Yes.

17  Q.   And, as a matter of fact, you have written about

18  three letters to internal affairs.

19       Is that correct?

20  A.   If that's what you have in your folder, ma'am, that

21  would be correct.

22  Q.   That would be yes?

23  A.   Yes.

24       If that's what you have, then that's what I

25  wrote.  That's my handwriting.

Rickenbacker - Cross/Flynn

1041

1   Q.   So you were aware in 2005 that you can, in fact,

2   write a letter to IA.

3            Is that correct?

4   A.   Okay --

5   Q.   Yes or no, please.

6   A.   Yes.

7   Q.   And you never wrote IA a letter about your

8   allegations regarding Gary Feinberg.

9            Is that correct?  Yes or no?

10  A.   No, ma'am.

11  Q.   And you are also familiar with something called a

12  grievance procedure.

13           Is that correct?

14  A.   Yes, ma'am.

15  Q.   And you never filed a grievance regarding

16  Gary Feinberg.

17           Isn't that correct?

18  A.   You are right, ma'am.

19  Q.   But you filed grievances about quite a few other

20  things.

21           Isn't that correct?

22  A.   Environmental grievances.

23           Yes, ma'am.

24  Q.   And, as a matter of fact, in July of 2005, you filed

25  a grievance against a corrections officer.

Rickenbacker - Cross/Flynn

1042

1    Isn't that correct?

2    A.    And it was sent --

3    Q.    Please just say yes or no.

4    A.    Oh, yes.  Yes.  Yes.

5    Q.    Thank you.

6          And at that time, you were accusing the

7    corrections officer of calling you names.

8          Is that correct?

9    A.    Yes, ma'am.

10   Q.    And you filed a grievance because of that.

11         Correct?

12   A.    Yes, I did, ma'am.

13   Q.    And during August of 2005, you filed a grievance

14   because you were complaining about insects in the jail.

15         Is that correct?

16   A.    That's what the sergeant told me to do.

17         Yes, ma'am.

18   Q.    And in August of 2005 you filed a grievance because

19   the clanging of the gates inside the jail was interfering

20   with your sleep.

21         Isn't that correct?

22   A.    That's what the sergeant told me --

23   Q.    Please just say yes or no.

24   A.    Yes.

25   Q.    You also filed a grievance in August of 2005, August

**Rickenbacker - Cross/Flynn**

1    5, 2005 with complaints about the plumbing.

2              Is that correct?

3    A.   Yes, ma'am.

4    Q.   And it's fair to say that you filed several other

5    grievances in August of 2005.

6              Is that correct?

7    A.   Yes, ma'am.

8    Q.   In December of 2005, you filed a grievance about the

9    telephone system at the jail.

10             Is that correct?

11   A.   Yes, ma'am.

12   Q.   During 2005 --

13             MS. FLYNN:  Withdrawn.

14             Let me ask you something else.

15   BY MS. FLYNN:

16   Q.   On January 9th, 2006, you also filed a medical

17   grievance form saying that you hadn't been taken to

18   medical.

19             Is that correct?

20   A.   Let me see that.

21   Q.   Yes.

22             I'm going to show you something that's been

23   filed -- I'm sorry -- I'm going to show you something

24   that's been marked for identification Defense Exhibit Q

25   for identification and ask you to look at that and if you

Rickenbacker - Cross/Flynn

1044

1    recognize it.

2    A.   Yeah, this is the nurse gave me a card with my

3    medication --

4    Q.   I'm sorry.

5            So this is a document that you filled out.

6    Correct?

7    A.   Yes.

8            I'll explain to you, you want -- when I need the

9    medication, and you can't see the doctor --

10   Q.   Ms. Rickenbacker --

11           MS. FLYNN:  I move to strike, your Honor.

12           THE COURT:  Motion granted.

13           The jury is instructed to disregard it.

14           Ms. Rickenbacker, listen to the question.  Just

15   answer the questions you are asked.

16           THE WITNESS:  Okay.

17           THE COURT:  Please don't add anything.

18           If Ms. Joseph wants to ask you additional

19   questions, she will have an opportunity to do it.

20           THE WITNESS:  Okay.

21           THE COURT:  Right now, on cross-examination, you

22   have to answer responsively.

23           That's all.

24           THE WITNESS:  All right.

25   A.   So, what was the question?

Rickenbacker - Cross/Flynn

1045

1    Q.   Did you fill out this document?

2    A.   Yes.

3              MS. FLYNN:  I ask that Defense Exhibit Q be

4    moved into evidence.

5              THE COURT:  Any objection?

6              MS. JOSEPH:  Objection, your Honor.

7              THE COURT:  Can I see it.

8              (Whereupon, there was a pause in the

9    proceedings.)

10

11             THE COURT:  Objection overruled.

12             Defense Exhibit Q, for queen, in evidence.

13             (Whereupon, Defense Exhibit Q was received in

14   evidence, as of this date.)

15   BY MS. FLYNN:

16   Q.   And this was a grievance that you filled to go down

17   to the medical unit.

18             Correct?

19   A.   Yes.

20   Q.   And you filed that on January 9, 2006.

21             Is that correct?

22   A.   Yes.

23   Q.   And it doesn't say anything in there about the fact

24   that Gary Feinberg was allegedly sexually assaulting you.

25             Does it?

Rickenbacker - Cross/Flynn

1046

1    A.    No.

2    Q.    And it doesn't say anything on this grievance, I

3    don't want to see Gary Feinberg, does it?

4    A.    No, it does not.

5    Q.    Now, there were quite a few times from June of 2005

6    through February of 2006 that you were not in custody at

7    the Suffolk County Correctional Facility.  You were in

8    custody at the Nassau County Correctional Facility.

9            Is that correct?

10   A.    Yes, ma'am.

11   Q.    And during the time --

12           MS. FLYNN:  Withdrawn.

13   BY MS. FLYNN:

14   Q.    You were in custody in Nassau County at various times

15   during the month of September of 2005.

16           Is that correct?

17   A.    Yes, fall, yeah.

18   Q.    And you were in Nassau County correctional custody

19   during the month of October 2005?

20   A.    Yes, ma'am.

21   Q.    And, as a matter of fact, you were in the Nassau

22   County Correctional Facility in December of 2005, weren't

23   you?

24   A.    If that's what the record states.

25           I can't keep dates like that.

Rickenbacker - Cross/Flynn

1047

1    Q.    Do you recall a period of time in December of 2005

2    where you were in custody at the Nassau County

3    Correctional Facility?

4    A.    It was, yeah, the end of the year.

5    Q.    Thank you.

6          And while you were in custody during those times

7    in Nassau County, you were seen by medical staff.

8          Correct?

9    A.    I was seen by -- a phlebotomist.

10         That's it.

11   Q.    And isn't it true that you never told anyone at the

12   Nassau County Correctional Facility that you were being

13   assaulted by Gary Feinberg.

14         Correct?

15   A.    No.

16         Why would I do that?

17         MS. FLYNN:  Move to strike.

18         THE COURT:  Yes.

19         After the word no, the rest of the answer is

20   stricken as not being responsive.  The jury's instructed

21   to disregard it.

22   BY MS. FLYNN:

23   Q.    While you were in Nassau County custody, you were

24   seen by a social worker.

25         Is that correct?

Rickenbacker - Cross/Flynn

1048

1    A.    I believe it was in January or February, when I

2    alternate housed.

3              I don't remember seeing a social worker previous

4    to that.

5    Q.    Do you remember in 2005 in Nassau County being seen

6    by a psychiatrist?

7    A.    No.

8              MS. JOSEPH:  Objection.

9    A.    I don't remember.

10   Q.    When you --

11             MS. JOSEPH:  Objection.

12             THE COURT:  Pardon?

13             MS. JOSEPH:  Objection, your Honor.

14             THE COURT:  Overruled.

15   BY MS. FLYNN:

16   Q.    But it's fair to say that on those three occasions

17   when you were in Nassau County, out of Suffolk County

18   custody, you never said anything to anyone there about the

19   fact that you say you were being sexually assaulted by

20   Gary Feinberg.

21             Is that correct?

22   A.    No.

23             I didn't say anything.

24   Q.    In December of 2005, when you allege that you were

25   being sexually assaulted by Gary Feinberg, did you file a

Rickenbacker - Cross/Flynn

1049

1    federal lawsuit against the Danbury Federal Correctional

2    Institute because of personal injuries that you said you

3    sustained when you were in their custody?

4            Yes or no?

5    A.   Yes.

6    Q.   So during the time that you allege you were being

7    sexually assaulted by Gary Feinberg, you were filing a

8    federal lawsuit regarding your personal injuries.

9            Is that correct?

10   A.   No.

11   Q.   The lawsuit that you filed against --

12   A.   Before that.

13   Q.   I'm sorry.

14           The lawsuit that you filed against the Danbury

15   Federal Correctional Institute, you filed that on December

16   30, 2005.

17           Isn't that correct?

18   A.   No.

19   Q.   When did you file that lawsuit?

20   A.   I -- originally the law library in Danbury filed that

21   for me, I believe, in 2003, and they filed to the wrong

22   district, the clerk there.

23           And then they -- I just sent the paperwork to

24   the clerks here.  They give you a pro se clerk, Sapienza,

25   somebody like that, and they filed it here for me.

Rickenbacker - Cross/Flynn

1050

1          But the original suit was filed in 2003, I

2    believe.

3    Q.   So you are familiar with the procedure as to how to

4    file a federal lawsuit.

5          Is that correct?

6    A.   No.

7    Q.   Well, Ms. Rickenbacker, I showed you before a

8    document that was your pro se lawsuit against the county.

9    And you filed that in federal court.

10          Correct?

11    A.   Right.

12    Q.   Okay.  Thank you.

13          Now, Ms. Rickenbacker, on June 18, 2002, you

14    pled guilty in this courthouse to a federal class C

15    felony, credit count fraud.

16          Is that correct?

17    A.   Credit card fraud, yes.

18    Q.   And you pled guilty in this courthouse before

19    Magistrate Justice Boyle.

20          Is that correct?

21    A.   No.

22    Q.   Do you remember ever appearing before Judge Boyle for

23    your plea?

24    A.   I pled guilty before Judge Spatt.

25    Q.   Okay.

Rickenbacker - Cross/Flynn

1051

1          And you were represented by an attorney on those

2  charges.

3          Is that correct?

4  A.    Federal defender's office.

5  Q.    And, by the way, when you were in the Suffolk County

6  Correctional Facility from June 2005 until January of

7  2006, you had various criminal charges pending against

8  you.

9          Correct?

10  A.    Yeah, I was in jail.

11  Q.    And you had a lawyer during that time.

12          Correct?

13  A.    What year was this? .

14          2005-2006?

15  Q.    Yes.

16  A.    Yes, uh --

17  Q.    Okay.  Thank you.

18          Now, the federal charges arose out of the fact

19  that you used credit cards that were stolen from patients

20  of the Veteran's Administration Hospital in Northport.

21          Correct?

22  A.    Yes.

23  Q.    And you used those credit cards to make purchases in

24  the amount of approximately $14,000.

25          Isn't that correct?

Rickenbacker - Cross/Flynn

1052

1    A.    Yes.

2    Q.    And those charges also arose out of the fact that you

3    stole the identity of a woman who had employed you as a

4    domestic, and you used her identity to purchase $4,600

5    worth of computer equipment.

6          Isn't that true?

7    A.    Yes.

8    Q.    And you also used one of those stolen credit cards to

9    purchase three leather coats.

10         Isn't that true?

11   A.    Yes.

12   Q.    And you did that by using the stolen identification

13   and ordering one coat over the phone from the company.

14         Correct?  You called up the company and ordered

15   a coat.

16   A.    Yes.

17   Q.    And when they sent you that coat, you called them

18   back and you said it was the wrong size.

19         Correct?

20   A.    Yes.

21   Q.    And then they sent you another coat.

22         Correct?

23   A.    Yes.

24   Q.    And you called them back and said that you never

25   received that second coat, and they sent you a third coat.

**Rickenbacker - Cross/Flynn**

1053

 1              Is that correct?

 2    A.    I don't know about that one.

 3              But that's what the document says?

 4    Q.    Do you recall that happening?

 5    A.    I don't recall them giving me three coats like that,

 6    but...

 7    Q.    Do you remember then selling one of those coats to

 8    your minister?

 9    A.    No.

10    Q.    Now, as you mentioned, Judge Spatt was the judge

11    handling your federal charges.

12              Correct?

13    A.    Yes.

14    Q.    And you appeared before Judge Spatt on October 7,

15    2005 with your attorney.

16              Correct?

17    A.    Yes.

18    Q.    And that was in this courtroom.

19              Correct?

20    A.    Yes.

21    Q.    And there was nobody from Suffolk County Correctional

22    Facility in this courtroom at that time.

23              Correct?

24    A.    Yes.

25    Q.    You were miles away from the Suffolk County

Rickenbacker - Cross/Flynn

1054

1    Correctional Facility.

2            Correct?

3    A.    Yeah, I see where you are going with that.

4    Q.    And you stood in this courtroom, before Judge Spatt,

5    and you never said one word on October 7, 2005 about the

6    fact that, as you claim now, you were being continuously

7    sexually abused by Gary Feinberg.

8            Isn't that correct?

9    A.    No.

10           I did not say anything to Judge Spatt.

11   Q.    And you appeared before Judge Spatt again on December

12   16, 2005.

13           Isn't that correct?

14   A.    Yes.

15   Q.    And on that day, you again appeared with your

16   attorney.

17           Correct?

18   A.    Yes.

19   Q.    And, once again, there was nobody from the

20   Suffolk County Correctional Facility in the courtroom.

21           Is that correct?

22   A.    Yes.

23   Q.    And you stood in front of Judge Spatt and you never

24   said a word about the fact that Gary Feinberg, according

25   to what you want this jury to believe now, was continually

Rickenbacker - Redirect/Joseph

1055

1   sexually abusing you against your will.

2            Is that correct?

3   A.   Yes, he was.

4   Q.   But you never said a word to Judge Spatt about that

5   on December 16, 2005.

6            Isn't that correct?

7   A.   No.

8            I never said anything to Judge Spatt.

9   Q.   Thank you.

10           MS. FLYNN:  I have no further questions.

11           THE COURT:  Redirect?

12           MS. JOSEPH:  Yes, your Honor.

13  REDIRECT EXAMINATION

14  BY MS. JOSEPH:

15  Q.   Earlier in counsel's questioning, she asked you

16  whether you made statements to Carol Manderino about

17  Gary Feinberg.

18           Did you make a complaint to Carol Manderino, in

19  addition to June to what you testified to earlier, did you

20  make a complaint in November of 2005 regarding

21  Gary Feinberg?

22  A.   I spoke to Carol numerous times between June and --

23  all the way up until almost the time I left the facility.

24           So to have any one date would be -- it's

25  impossible.  I can't remember.  I spoke to her quite

Rickenbacker - Redirect/Joseph

1056

1   often.

2        She always asked follow up asking me what's

3   going on?  Am I still seeing him alone, or is he still

4   having him as an assistant, I said yes.

5        So if you give me a date, I couldn't give you

6   exact date, but Carol I spoke to many times all the way up

7   until I got transferred to Nassau.

8   Q.   And when you would ask Carol whether anything was

9   going on, how, if any way, did she react to these

10  questions?

11       MS. FLYNN:  Objection.

12       THE COURT:  Overruled.

13  A.   When I asked -- she asked me how did she react?

14  Q.   With respect to Gary Feinberg when you brought him

15  up.

16  A.   She was just very sad.

17       She was, like, oh, I told my supervisor.  But

18  she was afraid -- I think Carol was also afraid of

19  conflict.  She didn't want -- it was like -- they worked

20  together.

21       And she figured she told the supervisor and he

22  supposed to do what he supposed to do, but she was

23  constantly asking me thinking maybe the supervisor did

24  something.

25       So she would say is it all right now?  You have

Rickenbacker - Redirect/Joseph

1057

1   the physician or is he seeing you with someone else in the

2   room or did he stop or whatever, stuff like that, but

3   nothing ever --

4           MS. FLYNN:  Move to strike, your Honor.

5           THE COURT:  Well, I'm leaving most of that

6   answer in, except she's afraid of conflicts.  That part of

7   it is stricken.

8           The jury is instructed to disregard it.

9   BY MS. JOSEPH:

10  Q.   Was there ever a time when you were speaking to Carol

11  Manderino that you saw Gary Feinberg?

12  A.   Yes.

13          MS. FLYNN:  Objection.

14          THE COURT:  Overruled.

15  BY MS. JOSEPH:

16  Q.   When?

17  A.   One time where I was in office with Carol, and her

18  desk was, like, like this desk here, her door is like

19  where the other -- where the other desk is.  And I'm

20  sitting on this side.  And we are talking.

21          So I happen to look up, and Gary Feinberg --

22  it's like a window.  You see the window in the picture?

23  Hers is the same door, but without a shade.

24          And he was standing like this in the window, and

25  I said, Carol, he's standing looking in the window, and

Rickenbacker - Redirect/Joseph

1058

1   she was at her desk.  She couldn't -- her head's this way.

2   I'm sitting here where I could look through the window and

3   she's saying, I'm not going to lift me head.  Just tell me

4   what he's doing.  And I said, he's standing there like

5   this with his arms folded.

6           That's the only time they -- Carol and I had

7   interaction with Gary Feinberg at that jail.

8   Q.   And what was going through your mind when Carol stood

9   there with her head down?

10          MS. FLYNN:  Objection.

11  A.   I was nervous --

12          MS. FLYNN:  Objection.

13          THE COURT:  Sustained.  Strike out the answer.

14          When you see counsel rise to her feet, she's

15  going to make an objection, so please don't answer until I

16  make a ruling.

17          THE WITNESS:  Okay.

18          THE COURT:  All right?

19          THE WITNESS:  Okay.

20  BY MS. JOSEPH:

21  Q.   Directing your attention to August of 2005, counsel

22  asked you whether Christopher Dudley was your boyfriend at

23  that time.

24          Did you continue to speak to Christopher Dudley

25  after August of 2005?

Rickenbacker - Redirect/Joseph

1059

1   A.   Yes.

2   Q.   And what were you telling Christopher Dudley?

3   A.   I was saying, Chris, did you call?  Did you call and

4   speak to somebody?

5        And he was saying, I'm trying.  I'm trying.

6   That's when I decided to try another avenue.

7   Q.   And turning your attention to January of 2006,

8   focusing once again on Christopher Dudley, did you discuss

9   whether he called the jail facility at that point?

10  A.   Yes.

11       He said he had been calling from the very first

12  moment I told him.  He had got in touch with a few people,

13  but nobody was actually giving him -- they wasn't taking a

14  report.  They wasn't saying anything.

15       Sometimes he would call and he would get, like,

16  they would transfer him to a number and --

17            MS. FLYNN:  Your Honor, I move to strike.

18            THE COURT:  Pardon?

19            MS. FLYNN:  I move to strike.

20            THE COURT:  Motion granted.

21            Strike everything about what Christopher Dudley

22  told the witness.

23            The jury's instructed to disregard it.

24  BY MS. JOSEPH:

25  Q.   Without telling us anything Christopher Dudley said

Rickenbacker - Redirect/Joseph

1060

1    during your conversation in early 2006, what was your

2    understanding of what Christopher Dudley was doing?

3              MS. FLYNN:  Objection.

4              THE COURT:  Overruled.

5    A.   He was trying to make contact with someone at the

6    jail to help me.

7    Q.   Counsel asked you some questions about your period in

8    2005 when you were incarcerated.  You left for a brief

9    time, and then you came back.

10             While you were out of jail during that brief

11   time, she asked you whether you made a complaint against

12   Gary Feinberg.

13             Could you tell the jury why you didn't.

14   A.   When I got released from -- I got released from the

15   jail, like, the same day I started smoking crack again.

16             And I was back on the street, and I didn't tell

17   anybody.  I just didn't think that it -- I don't know.  I

18   just didn't tell anybody.  I just started getting high,

19   immediately.

20   Q.   Counsel also asked you pertaining to your description

21   of how Gary Feinberg would fondle your breasts.

22             She asked you whether -- why you initially

23   didn't think that was inappropriate.

24   A.   Why I initially didn't think it was inappropriate?

25   Q.   Yes, the way he was fondling your breasts initially

Rickenbacker - Redirect/Joseph

1061

1    in 2005.

2    A.    Because I didn't think he would do it as a doctor.

3          Doctors, you know -- if your doctor touches you

4    a certain way, you don't go, and go, oh, he's molesting me

5    or he's touching me wrong.

6          I trust -- you would trust your physician.  You

7    know, the way he was doing it wasn't obviously like

8    prodding it.  He was, like -- you know what I'm saying?  I

9    don't know.  I just didn't think at the time.

10         It wasn't until he kissed me and said that I was

11   sexy that I truly knew.  I didn't think that -- my whole

12   life, I never had a doctor or professional person really

13   do that without me knowing that's what they were going to

14   do.  You know what I'm saying?

15         I never had -- for me to think that would be

16   ludicrous at the time.  It wasn't until he told me that I

17   was sexy and kissed me on my lips that I truly knew then

18   it was a sexual advance.

19   Q.    And defense counsel asked you a lot of questions

20   about your long criminal history, in and out of jail.

21         During that time, were you examined by doctors

22   inside the medical unit?

23   A.    Through my history?  Yes.

24         Yes?

25         MS. FLYNN:  Objection.

Rickenbacker - Redirect/Joseph

1062

1    THE COURT:  Overruled.

2    A.   There was a wonderful doctor there named Judy.  She

3    was excellent.

4         And, yes --

5    Q.   You were examined by doctors, correct?

6    A.   Yes.

7         MS. FLYNN:  Your Honor, I would ask counsel

8    doesn't cut off her own client.

9         THE COURT:  Pardon?

10        MS. FLYNN:  I would ask that counsel doesn't cut

11   off her own client.

12        She interrupted her own client in the middle of

13   an answer.

14        THE COURT:  I wasn't aware of that.

15   BY MS. JOSEPH:

16   Q.   I'm sorry if I cut you off, Lowrita.

17        Was there something else you wanted to say?

18   A.   No.

19        I'm done.

20   Q.   During the time you were examined by all of these

21   other doctors, did you ever claim that any of them had

22   touched you inappropriately?

23   A.   No.

24   Q.   Counsel also questioned you specifically asked you

25   whether Gary Feinberg had a baton or a gun.

Rickenbacker - Redirect/Joseph

1063

1    Do you recall that question?

2    A.   Yes, I do.

3    Q.   Did Gary Feinberg have the power to stop your

4    medication?

5    A.   Yes, he did.

6    Q.   In fact, if you wanted medication at the jail, could

7    you get medication without going down to the medical unit?

8    A.   No, I couldn't.

9    Q.   And during that time, how important was it for you to

10   get your medication?

11   A.   It was very important.

12   Q.   Why?

13   A.   I was having sciatic nerve problems.

14        I needed a muscle relaxer to be able to keep

15   my -- the muscles from constricting, and causing me the

16   pain, and without that, I couldn't even imagine, you know,

17   it was just, like, so much pain.

18        It was just a constant pain, day and night.  You

19   can't sleep.  You can't even -- when you go to the toilet,

20   like you get, like, a sharp pain around your anus because

21   it's like -- I don't know, it's a nerve, and I needed it.

22   I needed my medication.

23        Without it I couldn't -- I couldn't imagine

24   existing.

25   Q.   Well, could you get a family member or a friend to

Rickenbacker - Redirect/Joseph

1064

1     bring the medication you need into the jail?

2     A.    No.

3            It's against the jail's policy.  You can't have

4     any type of medication but from their medical department.

5     Q.    And what medication were you on?

6     A.    I was on Robaxin, which is a muscle relaxer, and I

7     was on Naprosyn, which is a pain reliever and

8     anti-inflammatory.

9     Q.    Counsel also asked you whether when you went down to

10    medical if you ever asked to see another physician.

11           What was your answer at that point during the

12    examination?

13    A.    You don't have a choice.

14           You can request it, but they assign who they

15    want you to see, and that's that.

16           You don't have a choice of who you see.

17    Q.    But at one point during the examination you said,

18    yes, you actually did make the request to see a physician.

19    A.    Yes, I did.

20    Q.    Tell the jury what happened when you made the

21    request.

22    A.    They denied me my right to see someone else.

23           They said, no.  This is who you are going to

24    see.  He's assigned to you.

25           This is the person you have to see.

Rickenbacker - Redirect/Joseph

1065

1       THE COURT:  We are going to take a break.  Lunch

2  has arrived.

3       In the mean time, please don't discuss this case

4  either among yourselves or with anyone else.  Keep an open

5  mind while you are having this delicious lunch.

6       Keep an open mind and don't talk about the case,

7  either among yourselves or with anyone else.  We will

8  recess until 1:30 and have a nice lunch.

9       (Jury leaves the courtroom.)

10

11       THE COURT:  1:30.

12       You will have to return.

13       THE WITNESS:  Okay, Judge Spatt.

14       (Luncheon recess.)

15       (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Rickenbacker - Redirect/Joseph

1066

1   A F T E R N O O N    S E S S I O N

2        THE CLERK:  Jury entering.

3        (Whereupon, the jury entered the courtroom.)

4        THE COURT:  Please be seated, members of the

5   jury.

6        You may proceed, Ms. Joseph.

7   BY MS. JOSEPH:

8   Q.   Ms. Rickenbacker, I just have just a few more

9   questions for you.

10  A.   Okay.

11  Q.   On cross-examination opposing counsel asked you

12  several different times why you didn't make your complaint

13  known to judges in open court.

14       Could you explain to the jury why you did not

15  mention Gary Feinberg's allegation on those occasions?

16  A.   Well, as I think back about it now that -- I believe

17  I should have, but at the time that I did report it I

18  thought that I was reporting it to the people that I

19  needed to report it to, people that worked at the jail.

20  At the time I had situations going on, that situation, and

21  I didn't think like it would be appropriate for me to go

22  into the judicial system and talk to a judge about it when

23  they're not in the facility with me.

24       Now that I see that I could have, now that they

25  raised the question, I should have, maybe I should have

Rickenbacker - Redirect/Joseph

1067

1    talked everywhere.  But at the time -- it's a heavy

2    burden.  I was embarrassed.  It's just, who wants to tell

3    someone something so -- I didn't know what to do.  I just

4    did what I did and if it I could do something, if I could

5    go back in time I would have told everybody I came in

6    contact with.

7              I thought by telling internal security and the

8    people like Carol Manderino, because she was my therapist

9    and I relied on, you know, her judgment, and people inside

10   the jail, that was the appropriate setting.

11             Maybe I should have wrote letters about that or,

12   I don't know, but at the time I didn't, and you know, I

13   don't know what else to say.  I just didn't do it and

14   maybe I should have.

15   Q.   And defense counsel also asked you about the

16   grievances you filed that summer.  You filed grievances

17   about insects, gates, plumbing, telephones, why didn't you

18   file a grievance against Gary Feinberg?

19   A.   Because like said before, the grievance system is not

20   confidential, and also at the time it was supposed to be

21   useful, like environmentally, the grievance system is for

22   environmental situation, if something breaks, they say put

23   in a grievance.  Most of the grievances I put in I spoke

24   to a sergeant, because they walk the floor I think twice a

25   day and I complained to him about it, and he said well,

Rickenbacker - Recross/Flynn

1068

1  I'm going to send in an officer with a grievance, grieve

2  it.  That's what it was used for.

3         I didn't feel that reporting such an incident to

4  the degree the incident was in, the grievance would be

5  appropriate for that.  Because it's not for contact.  It's

6  not confidential.  It's primarily it goes like to a

7  regular officer, and if I report it to internal security

8  who is supposed to be like, they say that internal

9  security is supposed to put good running and safety and

10 order in the facility -- they say it's for the good

11 running order and safety that's what they told me of the

12 facility, this is who I reported it to.

13        I don't know.  I just, I don't know, I see now I

14 made a mistake.  I should have explained every arena that

15 I was in, but I didn't think it would be appropriate.

16        MS. JOSEPH:  Nothing further.

17        THE COURT:  Anything else?

18        MS. FLYNN:  Yes, your Honor.

19

20 RECROSS-EXAMINATION

21 BY MS. FLYNN:

22 Q.   Ms. Rickenbacker, you said that when Gary Feinberg,

23 during the course of his examination, rubbed his fingers

24 on your breasts, that you didn't realize that that wasn't

25 part of regular medical examination.  Is that what you

Rickenbacker - Recross/Flynn

1069

1    said?

2    A.   Yes, I did.

3    Q.   Did you think that it was part of the normal medical

4    examination to get up on all fours on the examination

5    table?

6    A.   Yes, they do that.

7         My other doctor did that, too.

8    Q.   Okay.  I'm going to show you what's been marked as

9    Defendant's Exhibit S for identification and T for

10   identification.  The attorney asked you about grievances

11   and you indicated that grievance were only filed in your

12   opinion because of conditions at the jail.  Is that what

13   you just said?

14   A.   Yeah, environmental situations.

15   Q.   I'm going to ask you to look at what's been marked

16   for identification as Defendant's Exhibit S.

17        THE COURT:  S as in sugar.

18        MS. FLYNN:  S as in sugar, Judge.

19   Q.   And do you recognize that document?  (Handing.)

20   A.   That's an environmental situation, yes.

21   Q.   And is that a grievance that you filled with the

22   Suffolk County sheriff's office?

23   A.   Yes.

24        MS. FLYNN:  I'd ask that it be moved into

25   evidence Defendant's Exhibit S.

Rickenbacker - Recross/Flynn

1070

1     THE COURT:  Any objection?

2     MS. JOSEPH:  No objection.

3     THE COURT:  Defendant's Exhibit S for sugar in

4  evidence.

5          (Defendant's Exhibit S in evidence.)

6     MS. FLYNN:  Thank you.

7  Q.   And this is dated June 20, 2005?

8  A.   Um-hmm.

9  Q.   And this, by the way, is an informal grievance; is

10 that correct?

11 A.   All the grievances start out informally.

12 Q.   Can you read what it says there?

13 A.   On June 25th and 26th on 7 to 3 shift officer

14 violated -- officer violated, minimum standards by

15 refusing,by 7005 --

16     THE COURT:  Excuse me.  You have to get closer

17 to the microphone and speak up.

18 A.   Officer violated the minimum standards, 7005.2.

19 Refusing to allow shower and never cycling the gates.

20 When asking about the shower or opening the cell, he said

21 get the fuck away from here from the sallie port.  As a

22 tier representative, I asked for cleaning supplies and he

23 refused and he violated 700.511.  He refers to us as

24 bitches and assholes.

25 Q.   And I'm going to show what's been marked as

Rickenbacker - Recross/Flynn

1071

1   Defendant's Exhibit T for Thomas for identification.  And

2   it's two pages.

3   A.   On June 25 --

4   Q.   Wait a minute.

5        Do you recognize that document?

6   A.   Yes.

7   Q.   And that document is in your handwriting?

8   A.   Yes.

9   Q.   And that's a formal grievance form?

10  A.   Yes.

11       MS. FLYNN:  And I'd ask that that be marked into

12  evidence.

13       THE COURT:  Any objection?

14       MS. JOSEPH:  No objection.

15       THE COURT:  Defendant's Exhibit T for tiger in

16  evidence.

17       (Defendant Exhibit T in evidence.)

18  Q.   In this formal grievance form you refer to behavior

19  by a corrections officer.  Correct?

20  A.   Yes.

21  Q.   And you say that he's abusing you by referring to you

22  as a bitch and an asshole on numerous occasions, correct?

23  A.   Yes.

24  Q.   And you're talking about the fact that when you tried

25  to go clean the housing area, he told you if you come to

Rickenbacker - Recross/Flynn

1    the fucking gate one more time I'm locking you the fuck

2    in.

3              Correct?

4    A.   Yes.

5    Q.   And in addition, you claim that he's not giving you

6    cleaning supplies.

7              Correct?

8    A.   Yes.

9    Q.   And you asked -- withdrawn.

10             Where it says for the section here, actions

11   requested by the grievant, can you read what it says

12   there?

13   A.   I asked for disciplinary action requested, this

14   behavior embarks upon an Eighth Amendment violation,

15   inmates were put in jail as a punishment not to be

16   punished.

17   Q.   So in this grievance what you were asking for was the

18   disciplinary action be taken against the officer that you

19   said used foul language against you.

20             Correct?

21   A.   Yes, I did, it was not.

22   Q.   Thank you.

23             You were mentioning, when your attorney was

24   asking questions, the reason why you never said anything

25   to any judge that you ever appeared in front of about your

Rickenbacker - Redirect/Joseph

1    allegations of sexual abuse against Gary Feinberg, and you

2    said it was because you thought that you had complained to

3    the right people at the correctional facility.

4         Correct?

5    A.   Yes.

6    Q.   You started complaining at the correctional facility

7    according to you sometime in June of 2005; is that

8    correct?

9    A.   Yes.

10   Q.   By the time you appeared in front of Judge Spatt in

11   October, four months had gone by; is that correct?

12   A.   Yes.

13        MS. FLYNN:  Thank you.

14        MS. JOSEPH:  Just brief, briefly.

15

16   REDIRECT EXAMINATION

17   BY MS. JOSEPH:

18   Q.   These grievances that you filed that counsel referred

19   to, was anything done to the corrections officers?

20   A.   Nothing.

21        MS. FLYNN:  Objection.

22        THE COURT:  Sustained.

23        Strike out the answer.  The jury is instructed

24   to disregard it.

25   Q.   Counsel asked you to read the recommendations made

Rickenbacker - Redirect/Joseph

1074

1    regarding the correction officers.  To your knowledge,

2    were your recommendations followed?

3              MS. FLYNN:  Objection.

4              THE COURT:  I couldn't hear the question.

5    Q.   Counsel asked you to read the section of the

6    grievance where you made recommendations as to what you

7    thought should be done to the correction officer.

8              To your knowledge, were these recommendations

9    filed?

10             MS. FLYNN:  Objection.

11             THE COURT:  Sustained.

12             MS. JOSEPH:  Nothing further.

13             THE COURT:  You may step down.  Please call your

14   next witness.

15             MS. JOSEPH:  Plaintiff calls Pastor Susan Davis.

16             MS. FLYNN:  May we have a sidebar, your Honor?

17             THE COURT:  Yes.

18             (Continued on next page.)

19

20

21

22

23

24

25

Rickenbacker - Redirect/Joseph

1075

1    (Whereupon, the following occurred at sidebar.)

2         MS. FLYNN:  Your Honor, they're calling the

3    reverend that Ms. Rickenbacker said she gave the note to

4    about the alleged sexual abuse.  That's complete

5    bolstering, it's a collateral issue.

6         We're not here to have the jury decide as you

7    said the other day a trial within a trial of whether or

8    not Ms. Rickenbacker actually told this person, and this

9    person is not listed on PTL.  I had no idea that they were

10   going to be calling her.

11        In fact plaintiff's counsel never mentioned to

12   me they were calling her.

13        MS. JOSEPH:  I was planning on calling two

14   witnesses on this issue, Pastor Davis and Pastor Kurtin.

15   Specifically, your Honor -- actually can we do this

16   outside the hearing of the jury.

17        THE COURT:  This is outside the jury.

18        MS. JOSEPH:  I mean can we do this outside the

19   presence of the jury out of the jury box.  I want to refer

20   to the portion that Lowrita gives notice that she informed

21   her pastor about this incident.

22        Counsel did know about this.  But the point is,

23   as far as their claim of bolstering --

24        THE COURT:  Who is refuting the fact that she

25   gave notice to her pastor?  Who is refuting that?

Rickenbacker - Redirect/Joseph

1    MS. JOSEPH:  Your Honor, Lowrita's credibility

2    is definitely an issue.  However, in addition to getting

3    the note, Pastor Davis will testify that she gave that

4    information over to her supervising pastor who I've also

5    called to testify back in November.  And then he called

6    Suffolk and let them know about this incident.

7           THE COURT:  The supervising pastor?

8           MS. JOSEPH:  Yes.

9           THE COURT:  Is he here?

10          MS. JOSEPH:  Yes, he is.

11          THE COURT:  That I will allow you to bring in,

12   the supervising pastor who said he called somebody.  Who

13   did he call?

14          MS. JOSEPH:  He called the assistant to sheriff

15   DiMarco.

16          THE COURT:  That I'll definitely allow.

17          MS. FLYNN:  Is that on PTL?  I never heard

18   anything about this witness.

19          MS. JOSEPH:  Your Honor, Lowrita Rickenbacker

20   specifically testified at her deposition, she specifically

21   talked about the note and that she gave it to a pastor,

22   she mentioned the name of the church, she even provided

23   the address.  If the defense counsel wanted to, they could

24   have investigated.

25          THE COURT:  Excuse me, why didn't you put the

Rickenbacker - Redirect/Joseph

1077

1    name on the list of witnesses.

2              MS. JOSEPH:  I just found out about this talking

3    to Lowrita preparing for trial.

4              MS. ZWILLING:  Excuse me, you were on as much

5    notice as we were.

6              THE COURT:  Excuse me, one lawyer at a time.

7    Overruled, I'm not going to allow Pastor Davis.  That's

8    repetitive and unnecessary, you never gave notice.

9              I will allow the other pastor, you say is going

10   to testify that he called after getting notice about

11   Ms. Rickenbacker, called Suffolk County deputy sheriff or

12   something.

13             MS. JOSEPH:  Right.

14             THE COURT:  I'll allow it.

15             MS. FLYNN:  May ask when it was.

16             MS. JOSEPH:  It was November of 2005.  Pastor

17   Davis will testify to that.  But the key, your Honor,

18   Pastor Davis is the link in all of this because she

19   receives the note.  She was at the facility and she's able

20   to testify specifically which day in the facility that she

21   was there, and she's able to testify that she told her

22   supervising pastor the very next day.  So she's like the

23   link in all of this.

24             THE COURT:  Okay.  I'm going to allow you to put

25   her on just for that purpose, that's all.

Rickenbacker - Redirect/Joseph

1078

1      MS. JOSEPH:  Okay.

2      THE COURT:  Overruled.

3      MS. FLYNN:  I'm sorry, your Honor, may we

4  approach again?

5      THE COURT:  All right.

6      (Whereupon, the following occurred at sidebar.)

7      MS. FLYNN:  This witness was in the courtroom

8  during Lowrita Rickenbacker's testimony, your Honor.

9      I ask that she be prohibited from testifying on

10  that ground.  I didn't know who she was and she was

11  sitting in the back when Ms. Rickenbacker was testifying

12  and so was the other gentleman if that's the other

13  gentleman.

14      THE COURT:  I didn't see that.

15      MS. ZWILLING:  They were here.

16      MS. FLYNN:  They were both here.

17      THE COURT:  I'm not going to preclude her, but

18  you can bring out that she was sitting in the court and

19  nobody brought it to my attention.

20      MS. FLYNN:  I didn't know who she was.

21      THE COURT:  You have to look and see who's in

22  the courtroom.  You can bring that out on

23  cross-examination.

24      It's a limited purpose.

25      I don't want to hear anything else other than

Rickenbacker - Redirect/Joseph

1079

1    she received information from Ms. Rickenbacker and that

2    she submitted this information to the other, who you say

3    she did, that's it.

4              MS. JOSEPH:  Okay.

5              Your Honor, may we approach again for

6    clarification.

7              THE COURT:  Okay.

8              MS. JOSEPH:  This pastor received the original

9    note.  What we put in evidence is the copy.  I just want

10   to put the original note in.

11             THE COURT:  Okay.

12             (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Davis - Direct/Joseph

1080

1          (Whereupon, the following occurred in open

2     court.)

3          THE COURT:  Have a seat, Ms. Joseph.  Please

4     rise.  Raise your right hand.

5

6     **SUSAN DAVIS**,

7          called as a witness, having first

8          duly affirmed, was examined and testified

9          as follows:

10         THE WITNESS:  Your Honor, I affirm the truth.

11         THE COURT:  You can affirm that and you so

12    affirm.

13         THE WITNESS:  I so affirm.

14         THE COURT:  Okay.  Have a seat.  Please state

15    your full name and spell your last name slowly for the

16    record.

17         THE WITNESS:  My name is Susan Davis, D-A-V-I-S.

18         THE COURT:  You may proceed.

19

20    DIRECT EXAMINATION

21    BY MS. JOSEPH:

22    Q.   Ms. Davis, what is your official title?

23    A.   My official title is Pastor Susan Davis.

24    Q.   And how long have you been a pastor?

25    A.   15 years.

**Davis - Direct/Joseph**

1081

1    Q.    Where did you study briefly?

2    A.    I studied at the National Church of God By Faith in

3    Atlanta, Georgia.

4    Q.    As a pastor, do you do ministry work?

5    A.    Yes, I do.

6    Q.    And back in the fall of 2005, were you doing ministry

7    work?

8    A.    Yes.

9    Q.    What type of ministry work do you do?

10   A.    I volunteer at the Riverhead correctional facility.

11   Q.    Do you work with a supervising Pastor?

12   A.    Yes.  Pastor Roy Kurtin.

13         THE COURT:  Roy, R-O-Y.

14         THE WITNESS:  Yes.

15         THE COURT:  Curtis?

16         THE WITNESS:  K-U-R-T-I-N.

17         THE COURT:  Kurtin?

18         THE WITNESS:  Yes.

19   Q.    And what is the name of the program under which you

20   volunteer?

21   A.    It's called Safe Harbor mentoring program.

22   Q.    Now, focussing your attention on November of 2005,

23   were you conducting a workshop or a meeting at the jail

24   facility?

25   A.    Yes.

Davis - Direct/Joseph

1082

1   Q.   When I say jail facility, was it Suffolk County jail?

2   A.   Yes.  It was Suffolk County correctional facility in

3   Riverhead.

4   Q.   During that meeting, did any of the prisoners give

5   you a note?

6   A.   Yes.

7   Q.   Do you have the note that was given to you?

8   A.   Yes, I have it.

9   Q.   And by that I mean the original note?

10  A.   Yes.

11       I have the original note.

12  Q.   Did you bring it with you in court today?

13  A.   Yes, I did.

14  Q.   Could you please produce it.

15       Thank you.

16       MS. JOSEPH:  Your Honor, may I have this marked

17  as Plaintiff's Exhibit 61-B for identification purposes?

18       THE COURT:  Yes.

19       MS. JOSEPH:  And I'd like to move Plaintiff's

20  Exhibit 61-B in evidence.

21       THE COURT:  That's the original note, is it?

22       MS. JOSEPH:  Yes.

23       THE COURT:  The copy of the note that's in

24  evidence as plaintiff's 61.

25       MS. FLYNN:  May I see it?

**Davis - Direct/Joseph**

```
 1              THE COURT:  Sure.

 2              MS. FLYNN:  No objection.

 3              THE COURT:  All right.  Plaintiff's Exhibit 61-B

 4     in evidence.

 5              (Plaintiff Exhibit 61-B in evidence.)

 6     Q.    Now, do you recall specifically what date the note

 7     was given?

 8     A.    It was given November 20th, 2005.

 9     Q.    And why are you certain it was given on November

10     20th, 2005?

11     A.    Because I only minister on a Sunday at the facility.

12     Q.    And do you recall whether the note was given before

13     or after the Thanksgiving holiday?

14     A.    It was before the Thanksgiving holiday.

15     Q.    Now, were you able to review any logs -- strike that.

16              In your dealings with Pastor Kurtin, are any

17     logs kept as far as which inmates are in attendance at

18     which meetings?

19              MS. FLYNN:  Objection.

20              THE COURT:  Yes.  Sustained.

21              THE COURT:  Do you want to get to the subject

22     matter I'm permitting?

23              MS. JOSEPH:  Yes, your Honor.

24     Q.    After receiving this note, what did you do with it?

25     A.    I put it in my pocket and I read it after I got home.
```

1084

1    Q.    And why did you read it after you got home?

2    A.    Because I didn't know what was in the note and it was

3    personal, and they were giving me requests, prayer

4    requests, and I was told by the person that gave it to me

5    to read this when you get home.  So I stuck it in my

6    pocket.

7    Q.    And you said you read the note once you got home?

8    A.    Once I got home I read the note.

9    Q.    And after reading the note, did you do anything with

10   the information?

11   A.    Yes.

12         I called Pastor Kurtin the following morning.

13   Q.    And did you discuss the note with your Pastor?

14   A.    Yes, I did.

15         I read the note to him.

16         MS. JOSEPH:  Nothing further.

17         THE COURT:  Cross-examination.

18         MS. FLYNN:  No questions, your Honor.

19         THE COURT:  You may step down.  Please call your

20   next witness.

21         MS. JOSEPH:  The plaintiff calls Pastor Roy

22   Kurtin.

23

24

25

Kurtin - Direct/Joseph

1085

1    **ROY KURTIN**,

2              called as a witness, having first

3               affirmed, was examined and testified

4               as follows:

5              THE WITNESS:  I affirm.

6              THE COURT:  You can affirm.  Have a seat.

7

8    DIRECT EXAMINATION

9    BY MS. JOSEPH:

10   Q.   Pastor Kurtin, how long have you been a pastor?

11   A.   15 years.

12   Q.   And where did you study?

13   A.   Alliance Theological Seminary.

14   Q.   And where is that?

15   A.   They have a campus in Nyack, and also lower

16   Manhattan.

17   Q.   Directing your attention to November of 2005.  Were

18   you conducting any prison ministries at the Suffolk County

19   jailhouse?

20   A.   I am the executive director of Safe Harbor mentoring

21   program.

22              We are a program that assists men and women

23   coming out of incarceration.

24              THE COURT:  You've got to get closer to the

25   microphone and keep your voice up.

**Kurtin - Direct/Joseph**

1086

1    A.    I am the executive director of Safe Harbor mentoring

2    program.   We have 35 volunteers that go into the jails on

3    weekly basis to minister to the men and women.

4              (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kurtin  -  Direct/Joseph

1087

1    BY MS. JOSEPH:

2    Q.    And back in November of 2005, was Pastor Susan Davis

3    one of your volunteers?

4    A.    She is one of our volunteers.

5    Q.    Did she go to the Suffolk County Jailhouse?

6    A.    Yes.

7    Q.    At some point in November 2005 did she call you

8    regarding information she received at the Suffolk County

9    Jailhouse?

10   A.    Yes, she did.

11   Q.    What did you learn?

12   A.    She called me on a Monday morning after she had gone

13   in on a Sunday to explain to me that she had received a

14   letter that an inmate was sexually -- was allegedly to be

15   sexually molested.

16   Q.    What did you do with this information?

17   A.    I immediately called Mr. Butch Langhorn, the

18   assistant to Chief DiMarco.

19          THE COURT:  You called who?

20          THE WITNESS:  Butch Langhorn, L-A-N-G-H-O-R-N.

21          THE COURT:  What's his first name?

22          THE WITNESS:  Butch, B-U-T-C-H.

23          THE COURT:  Butch?

24          THE WITNESS:  Butch.

25          THE COURT:  Who is he?

Kurtin  -  Direct/Joseph

1088

1      THE WITNESS:  He's the assistant to Sheriff

2  DiMarco.

3  BY MS. JOSEPH:

4  Q.   What was discussed in that conversation?

5  A.   I called Mr. Langhorn to let him know the information

6  that the volunteer had received.

7           He made me aware that he had been aware of a

8  situation that was going on there already.  He was happy

9  that I called him.  He said that he's looking into it.

10  He's aware of the problem.

11  Q.   Specifically what did you tell Mr. Langhorn?

12  A.   I explained to Mr. Langhorn that we had received a

13  note from an inmate saying that she was sexually molested.

14  Q.   How did Mr. Langhorn respond?

15           MS. FLYNN:  Objection.

16           THE COURT:  Overruled.

17  A.   To my surprise, he said he was aware of it.

18  Q.   Did he ask you who the inmate was?

19  A.   I don't recall if that was in the conversation.  I

20  think I was surprised that he was aware of it, so we

21  didn't -- our dialogue was not that long once he said he

22  was aware of it and taking care of it.

23  Q.   Did he ask you who the inmate was being sexually

24  molested by?

25  A.   No.

Kurtin - Cross/Flynn

1089

1 Q.    Did he ask you what type of sexual contact did the

2 inmate allege?

3 A.    No.

4 Q.    After you said that an inmate was alleging sexual

5 abuse, did he ask you any questions to get further

6 information about the incident?

7 A.    He did not.

8        MS. JOSEPH:  Nothing further.

9        THE COURT:  Cross-examination.

10

11 CROSS-EXAMINATION

12 BY MS. FLYNN:

13 Q.    You indicated that you were given this note in

14 November 2005?

15 A.    I was not given the note.  I had a conversation to

16 the volunteer who was given the note.

17 Q.    Did you ever ask to see the note?

18 A.    I did not ask to see the note.

19 Q.    So you've never seen the note?

20 A.    I did not see the note until recently.

21 Q.    And your testimony is that you called and spoke to

22 Mr. Langhorn on what date?

23        MS. JOSEPH:  Objection.

24        THE COURT:  Overruled.

25 A.    I spoke to him on the Monday morning after the 20 or

Kurtin  -  Cross/Flynn

1090

1    21st then of November.

2    Q.    And your testimony is when you spoke to him you did

3    not give him the name of the person who was being the name

4    of the person who was being sexually abused; is that

5    correct?

6    A.    That is correct.

7    Q.    Did you have any information about the assault other

8    than what was in the note that you were given?

9    A.    I had no other information.

10   Q.    And after that conversation with Mr. Laughlin

11   (sic) --

12   A.    Langhorn.

13   Q.    Did you take any further steps regarding this

14   complaint that you had been advised about?

15   A.    I did not, because he said he was taking care of it.

16   Q.    Did you ever follow-up to see if in fact something

17   was done regarding the inmate who made that complaint?

18         Yes or no, sir, please.

19   A.    I did not follow-up because the next month when I

20   went to the Nassau County Jail Ms. Rickenbacker was there.

21   Q.    Did you have any conversation with her at that point?

22   A.    I said:  Oh, you're here.  She said:  I was

23   transferred because of the situation.  That's all I had.

24   Q.    And that was in December 2005?

25   A.    Yes.

Kurtin  -  Cross/Flynn

1091

1   Q.   Between the time that you got information in

2   November, and the time that you saw Ms. Rickenbacker in

3   Nassau in December, did you take any follow-up steps

4   regarding the information that you say you were given?

5   A.   I did not because --

6   Q.   Thank you.

7   A.   Okay.

8   Q.   Did you call the police and tell them that someone

9   told you that they were being sexually assaulted at the

10  Suffolk County correctional facility?

11       Yes or no, please, sir.  Yes or no?

12  A.   No.

13  Q.   Did you go to Newsday and give them a copy of this

14  letter to tell them that there was a story that someone

15  was being sexually assaulted at the Suffolk County

16  correctional facility?

17  A.   No.

18  Q.   Thank you.

19       Other than this one phone call that you say you

20  made, did you take any other steps regarding the fact that

21  someone told you they were being sexually assaulted at the

22  Suffolk County correctional facility?

23  A.   I did not.

24       MS. FLYNN:  I have no further questions.

25       THE COURT:  Anything else?

1     MS. JOSEPH:  Just briefly.

2

3     REDIRECT EXAMINATION

4     BY MR. NORINSBERG:

5     Q.    Pastor, why didn't you follow-up after you received

6     information that the situation was being dealt with?

7     A.    I was assured by Mr. Langhorn that it was taken care

8     of, that he told me he was already aware of it and that

9     steps were being taken to remedy it.

10          MS. JOSEPH:  Nothing further.

11          THE COURT:  Anything else?

12

13    RECROSS-EXAMINATION

14    BY MS. FLYNN:

15    Q.    It's your testimony that you never said the name

16    Lowrita Rickenbacker when you called Mr. Langhorn; is that

17    correct?

18    A.    Yes.

19    Q.    Did you tell him where this sexual assault was

20    supposedly taking place --

21          MS. JOSEPH:  Objection.

22    Q.    Yes or no?

23          MS. JOSEPH: The scope.

24          THE COURT:  Overruled.

25    A.    No.

Kurtin  -  Redirect/Joseph

1          MS. FLYNN:  I have no questions.

2          Thank you.

3          MS. JOSEPH:  Nothing further, your Honor.

4          THE COURT:  You may step down, Pastor.

5          (The witness steps down.)

6          THE COURT:  Please call your next witness.

7          MR. NORINSBERG:  At this time plaintiff calls

8     Investigator Terry Clark to the stand.

9          MS. FLYNN:  Sorry, Judge.  May we have a

10    sidebar?

11         THE COURT:  As soon as Mr. Norinsberg comes in.

12         MS. FLYNN:  Thank you.

13         THE COURT:  Come up.

14         (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1094

1    (The following takes place at sidebar.)

2    MS. FLYNN:  This is another witness that's not

3    on the PTO.

4    THE COURT:  Who is this witness?

5    MS. FLYNN:  She's the corrections officer who

6    took the statement of Ms. Ramos at the Nassau County

7    correctional facility, the statement that's already into

8    evidence.  We had no information that they were going to

9    be calling this witness.

10    THE COURT:  What's this witness for?  Who is

11    examining?

12    MR. NORINSBERG:  I'm examining her.

13    This witness will establish her interview with

14    Ms. Ramos, her observations of Ms. Ramos, Ms. Ramos's

15    demeanor.

16    She will introduce her report and findings

17    relative to the investigation that she was involved with,

18    and it's a link in the chain.

19    THE COURT:  Why didn't you put this witness on

20    the list?

21    MR. NORINSBERG:  I'll tell you why.

22    Up until the time we picked a jury, they were

23    acknowledging that the assault took place.  When they

24    changed their legal position at the start of trial is

25    after we already submitted the JPTO.  This was news to me.

Kurtin  -  Redirect/Joseph

1095

1   Now they made this an issue in the case and now
2   we have to refute their claim that it never happened and
3   that's how we're refuting it.
4   MS. FLYNN:  The issue is not whether I'm
5   refuting it or not.  It's part of their claim.  They have
6   to prove -- and this cannot be a surprise to them -- they
7   have to prove the underlying constitutional violation that
8   Gary Feinberg sexually molested her.
9   It's not my job to agree to that.  That is part
10   of their proof and it can't come as a surprise.  I don't
11   know.  This is the first time again and this is just
12   becoming -- I'm sorry -- it's ridiculous.
13   THE COURT:  I will sustain your objection.
14   Enough.  The other witness I thought was
15   somebody that added to the case.  This, I do not.
16   MR. NORINSBERG:  Just the observation, can she
17   talk about her observation?
18   THE COURT:  She can talk about nothing.  I'm
19   sustaining the objection.  You should have put her name on
20   the list.
21   (Continued on next page.)
22
23
24
25

Ramos  -  Direct/Joseph

1096

1           (The following takes place in open court.)

2           THE COURT:  Please call your next witness.

3           MS. JOSEPH:  Your Honor, the plaintiff calls

4    Rochelle Ramos.

5           THE COURT:  Raise you right hand.

6

7    ROCHELLE RAMOS,

8               called as a witness, having been first

9               duly sworn, was examined and testified

10              as follows:

11

12          THE COURT:  Please be seated.

13          Please state your full name and spell your last

14   name slowly for the record.

15          THE WITNESS:  My name is Rochelle Ramos,

16   R-A-M-O-S.

17          THE COURT:  You may proceed.

18          MS. JOSEPH:  Thank you, your Honor.

19

20   DIRECT EXAMINATION

21   BY MS. JOSEPH:

22   Q.   Good afternoon, Ms. Ramos.

23   A.   Good afternoon.

24   Q.   Are you married?

25   A.   No.

Ramos - Direct/Joseph

1097

1    Q.   Do you have any children?

2    A.   I do.

3         I have two children.  I have two daughters.

4    Jessica is 20 and Erica is 19.

5         They both attend the University of Maryland.

6    Q.   Can you tell the jury a little bit about yourself.

7         What's your educational history?

8    A.   I grew up in Northport, Long Island.

9         THE COURT:  You have to slow down.

10        THE WITNESS:  Sorry.

11        I grew up in Northport, Long Island.

12        THE COURT:  You want us to hear it, right?

13        THE WITNESS:  Yeah.

14        THE COURT:  Then slow down.

15   A.   I grew up in Northport, Long Island.  I graduated

16   from Northport High School in 1983.

17        I got married.  I met and got married to my

18   husband in November of 1985.  I attended Syracuse

19   University.

20   Q.   What did you major in?

21   A.   History.

22   Q.   What about your employment history, could you tell

23   the jury about that?

24   A.   I worked for -- I was a legal recruiter for the

25   better part of 15 years.  I worked for the largest

Ramos  -  Direct/Joseph

1098

1  staffing company in New York City, Robert Half

2  International, which is a publicly traded company.

3        I was hired by their recruiters to open a legal

4  staffing division of their company. I opened the New York

5  office.

6        And shortly thereafter opened 12 other offices

7  around the country.

8        After about seven years I felt that given the

9  amount of time that I spent on the road traveling away

10  from my family, the kids were coming into where they were

11  12, 13 years old where it could be, especially for girls,

12  I thought could be a time when I had to be close.

13        And during my employment at Robert Half I went

14  out and traveled through the offices that I had opened so

15  I really came home from Thursday to Sunday.

16        So my husband and I decided that it would be a

17  good time for me to jump out on my own and start my own

18  company.

19        I worked for a small shop for many years and

20  then I went corporate.  I felt I had a good combination.

21  Q.   What sort of law firms did you work with?

22  A.   I worked with firms that were based in New York City,

23  firms like Breed, Abbott, Morgan; Paul Weiss.  I worked

24  with firms that had branches in New York; Jones, Day,

25  Evans and Paul, Shaw Pittman.  I also worked with firms in

Ramos  -  Direct/Joseph

1099

1    the Washington, D.C. area and the Boston area who were

2    interested in opening branches in the New York area and

3    had been referred to me by my New York clients.

4            I also did New York start-ups of firms in D.C.

5    and Boston.

6    Q.   Are you currently employed?

7    A.   I am not.

8    Q.   Turning your attention to December 29, 2005, were you

9    being housed at the Suffolk County Jailhouse?

10   A.   I was.

11   Q.   Why were you in jail?

12   A.   Violation of probation.

13   Q.   Did you have a medical problem that day?

14   A.   I did.

15           I had a very bad stomachache for about a day and

16   a half.

17   Q.   Were you examined by a doctor?

18   A.   I was.

19   Q.   Where were you examined by a doctor?

20   A.   In Suffolk County Jail, I guess, in the medical area.

21   Q.   Tell us about that examination.

22   A.   I went to the medical area.  I was brought in to an

23   exam room where there was a man and a woman and they were

24   talking.

25   Q.   I'm talking about the first exam that you had at

1100

1    Suffolk County.

2           You mentioned you had a stomachache?

3    A.    Yeah.  Okay.  I went.  I'm sorry.  It was a while

4    ago.

5    Q.    I understand.  Just take your time.

6    A.    Okay.  I went to the medical unit and I saw a doctor,

7    an older gentleman.

8    Q.    Dr. Roginsky?

9    A.    Okay.

10          He examined me very briefly and said that he

11   wanted to send me to the hospital to have tests.

12   Q.    As a result were you taken to the Suffolk County

13   medical unit -- Central Suffolk Hospital?

14   A.    I was.

15   Q.    I'm getting mixed up too.  It's not just you.

16          How did you get there?

17   A.    I was escorted by two gentleman in the Sheriff's

18   Department.

19   Q.    Corrections officers?

20   A.    I believe so.

21   Q.    Once you got to Central Suffolk Hospital, were you

22   examined?

23   A.    I was.

24   Q.    Describe that exam.  What did they do?

25   A.    Basically they brought me to a private emergency type

Ramos  -  Direct/Joseph

1101

1   room and I had a brief examination by a doctor.  And I

2   don't know if it was an MRI, it was like a full body kind

3   of taking pictures.

4          And a couple hours later they came back and they

5   explained to me and the people from the Sheriff's

6   Department that they felt that I had an umbilical hernia

7   and that it needed to be surgically repaired.

8   Q.   Did there come a time when you returned back to the

9   Suffolk County Jailhouse?

10  A.   Yes.

11  Q.   And was that about 5:00?

12  A.   Yeah, sometimes after, because the people changed to

13  the next shift.

14  Q.   How did you get back to the Suffolk County Jailhouse?

15  A.   In a sheriff's car.

16  Q.   Once you got back to the jailhouse, were you examined

17  again?

18  A.   I was.

19  Q.   Did you ask to be examined?

20  A.   No.

21  Q.   Did they explain why you had to be examined?

22          MS. FLYNN:  Objection.

23          THE COURT:  Overruled.

24  Q.   Did they explain why you had to be examined?

25  A.   They just said that was the rules.  Everyone coming

Ramos  -  Direct/Joseph

1102

1   and going from the jail came and went through the medical

2   division.

3   Q.   Were you taken to an examination room at the Suffolk

4   County Jailhouse?

5   A.   Yes.

6   Q.   And when you got to the room was anyone inside the

7   medical examination room?

8   A.   There was a man and a woman.

9   Q.   Let's focus on this man.

10          Had you seen him before?

11  A.   No.

12  Q.   Did you later come to learn the name of this man?

13  A.   Gary Feinberg.

14  Q.   Now, did Mr. Feinberg examine you?

15  A.   He did.

16  Q.   Before he examined you, what happened to the woman

17  that was in the room?

18  A.   Well, they were talking and I thought she was

19  speaking in French so I introduced myself in French.

20  Q.   What did you say?

21  A.   I just told them -- I told them what my name is.  I

22  probably know five words and used them all then.

23          He suggested that I not speak to him like that.

24  He found that that made him excited.

25  Q.   What was going through your mind when he made that

Ramos  -  Direct/Joseph

1    comment?

2    A.   I don't know.  I just thought maybe he was kidding

3    around.  Nothing really was odd.  I just thought he was

4    being nice.  But then the girl left right after.

5    Q.   And the door to the examination room, did it remain

6    opened or closed after the door left?

7    A.   Excuse me.

8    Q.   I'm sorry.  The door -- let me rephrase that.

9         The door to the examination room, did it remain

10   opened or closed after the girl left?

11   A.   No.  He shut the door after she left.

12   Q.   Once the female left the room, did Mr. Feinberg say

13   anything to you?

14        MS. FLYNN:  Your Honor, may we approach?

15        THE COURT:  All right.  Come up.

16        (Continued on next page.)

17

18

19

20

21

22

23

24

25

Ramos  -  Direct/Joseph

1104

1          (The following takes place at sidebar.)

2          MS. FLYNN:  May I take the exhibits off of the

3     witness table?  She seems --

4          THE COURT:  You could have asked that in front

5     of everybody.

6          MS. FLYNN:  I'm sorry.

7          THE COURT:  You don't need a sidebar.  Yes, you

8     can take them off.

9          MS. FLYNN:  Thank you.

10          (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ramos - Direct/Joseph

1105

1    (The following takes place in open court.)

2    BY MS. JOSEPH:

3    Q.   We were talking about the beginning of the

4    examination.

5        Once this woman left the examination room, what

6    did Gary Feinberg say to you?

7    A.   Well, he wanted to explain to me the different

8    aspects of what they said was wrong at the hospital.

9        He was sitting at his desk at that time and he

10   had two or three books out.  And I was sitting on the

11   examining table.

12       And he was starting to explain to me that they

13   said it was a hernia.  He thought it was from my

14   esophagus.  He had different ideas.

15       So he said, why don't you come around so I can

16   show you the pictures.  Maybe you could understand it

17   better.

18       I got up off the examination table, I came

19   around to the front of his desk and he was talking and

20   pointing.

21   Q.   Did you remain in front of his desk during the entire

22   examination or did you move somewhere?

23   A.   Well, no.

24       Shortly after I came to the front of his desk

25   and he was pointing and explaining and I could see and

1106

1    understand what he was saying, he said to me why don't you

2    come around, come closer, so you can understand.

3         And that made me feel comfortable because I

4    could see and understand from where I was standing.

5         I was nervous.  I was in jail.  I wanted to be

6    compliant, so I came around.  But he was staring at me and

7    made this eye to eye contact that, you know, I've never

8    really been in that situation before where a doctor is

9    waiting for you to get comfortable and explain to you

10   something and staring at me and speaking in a slow

11   whispery kind of breathy manner that made me not feel

12   comfortable.

13        But I did come around to the side of his desk

14   and did what he asked me to do.

15   Q.   Now, at some point did he finish explaining and using

16   the book to explain your condition?

17   A.   Yes.

18        He said he wanted to examine me, to listen to my

19   bowel signs, listen to my chest.

20   Q.   Where did he tell you to go to begin the examination?

21   A.   Sit on the table.

22   Q.   Tell the jury what happened once you sat on the

23   examination table?

24   A.   Well, I guess, because I had a stomach problem he

25   attempted to assist me to get up on the table.  And so in

1107

1    getting up or while I was getting up he attempted to help

2    me with his hands.  And I'm not sure which came first or

3    second because it just was fast, and I can't remember

4    that, but I can say that when he put his hands on my back,

5    his hands were low, like the top of your pants, by my tail

6    bone, and his hand was just there too long and it was too

7    soft.

8            Doctors are usually abrupt, quick.  They never

9    have enough time.  He had all the time and he went slow

10   and that was the beginning.  To me it was just odd.

11   Q.   You said when he helped you back his hand was too

12   soft.

13           Specifically where was he touching you when he

14   helped you lie down on the table?

15   A.   At that point he was touching me.  He had his hand on

16   my lower back but he was like right in my waistband.

17   Q.   When you say it was too soft, what do you mean?

18   A.   I guess I always felt that doctors are abrupt and

19   they are -- even if they want to help you lean back, it's

20   a real quick crisp kind of thing.

21           This wasn't.  It was slow.  He was staring at

22   me, waiting for me to look directly into his eyes and he

23   was like licking his lips.  It was disgusting.

24   Q.   What happened after he helped you lay back on the

25   examination table?

Ramos  -  Direct/Joseph

1108

1    A.    I remember at one point he started with the

2    stethoscope as if he was going to listen to my chest and

3    my heart.

4            But, really, I don't remember feeling the

5    stethoscope because usually with the stethoscope they'll

6    say it's cold or they do something like this with the

7    stethoscope.  It wasn't like that.  I remember his hand

8    being -- cupping my chest and holding it long.

9    Q.    Now, had you had a breast exam before this?

10   A.    Yeah.

11   Q.    Was this anything like a breast exam you experienced

12   before?

13   A.    I have to say every breast exam I had I thought was

14   quite mechanical and I didn't feel embarrassed and

15   uncomfortable other than your typical feeling.

16           But this was -- I feel funny to say, but it

17   seemed it was very sensual.  He was holding it to feel it.

18   He wasn't squeezing it for lumps.

19   Q.    Where did he touch you after he helped you lay down

20   and he was cupping your breast?

21           What did he do next during the exam?

22   A.    He wanted to listen to the bowel signs.  He put his

23   hand on top of my abdomen and he reached in with his hand

24   into my pants and he stopped when his hand was on top of

25   my pubic bone, like right on top of my private area.

1109

1    Q.    The stethoscope, were you able to feel the surface of

2    the stethoscope?

3    A.    No.

4          I remember thinking that's weird, I don't feel

5    the cold.  I didn't see him rub it.

6          Doctors think they're funny, they say it's going

7    to be cold and they rub it.  Those things stick out in my

8    mind in an exam and it wasn't like that.  I didn't feel

9    the stethoscope.

10         At that point I started to cry and he kind of

11   stopped and he asked me if he was hurting me and he didn't

12   stop.

13   Q.    When you say he didn't stop, did he touch you

14   anywhere else?

15   A.    He put his fingers inside me.

16   Q.    When you say inside you, could you be more specific

17   with the jury?

18   A.    He put his hands inside my vagina.

19   Q.    Could you describe how he did this?

20   A.    Fast.  He went like a knife, fast.  He was not -- it

21   was very aggressive.

22   Q.    What did it feel like to you?

23   A.    All I kept thinking was his fingernails feel like

24   razor blades.  They were so sharp.  They were just sharp.

25   They felt like razor blades and it was fast.

Ramos  -  Direct/Joseph

1110

1      But somebody yelled.  The CO on the other side

2   of the door asked if they were through with Ramos yet and

3   he did *ssh*, like this to me, *ssh* (indicating), and I was

4   already shushed because I was looking down at the floor

5   and I was really upset.

6      I was crying and I was thinking; oh, my God,

7   maybe he's done and they're next.  I couldn't facilitate

8   what was happening.

9      All I knew is that the hairs on my neck were

10  standing up and I was like no spit in my mouth.  I knew it

11  was bad.

12  Q.   Did you remain on your back during the entire

13  examination?

14  A.   No.

15  Q.   Describe for the jury how your position changed

16  during the exam?

17  A.   He wants me to roll on my side because again he was

18  listening to the bowel signs and things like that.

19      I wasn't sure if that was supposed to be from

20  the front or back.

21      At one point he rolled me onto my side and my

22  arm, if you could picture, I was laying on the table like

23  this and he was standing over me and all of a sudden --

24  and this stuck out in my mind so clearly is that I kept

25  feeling something on my elbow.  I just figured it was his

Ramos  -  Direct/Joseph

1111

1   belt buckle but it was warm and it was like -- it's very

2   embarrassing for me to say this but it was like -- I

3   didn't realize that was him and he was excited and he was

4   the whole time he was rubbing up against me and obviously

5   having pleasure.

6           But he rolled me to my side and I remember

7   seeing the stethoscope but I don't remember feeling it.

8           You know, when a doctor examines you and they

9   put the thing in their ears and they're like ssh and they

10  look to listen, you're wondering what they're looking at.

11  Q.   Did you see the stethoscope portion in his ears?

12  A.   I don't remember seeing that and I don't remember

13  usually the way they hold it between their fingers.  I

14  don't remember seeing that.

15  Q.   When you were laying on your side, did he touch you

16  anywhere else?

17  A.   He put his hand right in the crack of my back side.

18  Q.   What did that feel like when he did that to you?

19  A.   If I wasn't sure something weird was happening I was

20  definitely sure something weird was happening.

21          His hands were sweaty and hot and he stuck his

22  hands inside my butt and that was really bad.  That hurt

23  really bad.  I shot up so fast that I scared the crap out

24  of him because he said oh, my God, did I hurt you.

25          All I could think about is he keeps trying to

Ramos - Direct/Joseph

1112

1    act like a doctor, but is this how a doctor acts.  I mean,

2    I could be in jail, I could be wherever, educated, not

3    educate, that's not right.  That's not right.

4    Q.   When you say he kept trying to act like a doctor,

5    what was he saying to you?

6    A.   He was explaining to me, you know, when you have good

7    bowel signs you'll hear a hollow kind of a knocking and

8    when you don't, when there's a blockage, things are not

9    moving.  So, therefore, you don't hear the echo.

10        I'm thinking to myself, first of all, I don't

11   even remember why I was here, what hurt.  Second of all,

12   he wants me to think this is normal and the whole time

13   he's still rubbing against me.

14   Q.   Just so we're clear, you had been examined by two

15   other doctors that day?

16   A.   Medical doctors from the jail and the doctor in the

17   emergency room at the hospital in Riverhead.  Neither one

18   of them went anywhere near that.  And neither one of

19   them -- I mean, this guy who I found out was not a doctor,

20   was a physician's assistant, made it very clear he thought

21   I was very sexy and very pretty and at the end of the exam

22   kissed me and I remember closing my teeth and feeling like

23   that fleshy, but he bit me.  He didn't make me bleed.  He

24   was angry.  He wasn't -- I remember thinking if this is

25   making him angry, why is he doing it.  He bit me because I

Ramos  -  Direct/Joseph

1113

1    wouldn't open my mouth.  I went like that (indicating).

2    And it was just disgusting.  I was hysterical.

3            And he talked about two prescriptions; Prilosec,

4    which is an anti-acid; and Bentyl to stop the cramps and

5    he asked me if I was comfortable where I was being housed.

6            And I thought to myself oh, my God, I was locked

7    in 23 hours a day and I would have done anything to get

8    out of there and now I would have done anything to go back

9    into that lock in at that particular moment.

10            The walk back to my cell was awful, laughing at

11    me, asking me if I had a good time.  It was really

12    humiliating.  It was really humiliating.

13   Q.   When he was doing these things to you, did you cry

14   out for help any time?

15   A.   Never said a word.  All I did was stare down and look

16   at his shoes and think to myself; my God, these shoes,

17   they were so scuffed and worn away.

18            I know that sounds like a silly detail but your

19   mind tries to go anywhere but where it is and what's

20   happening, so I didn't say a word.  I just want to hurry

21   up and go back to my cell.

22   Q.   Once the exam ended, were you taken back to your

23   cell?

24   A.   Um-hum.

25   Q.   Did you tell any of the COs what happened who took

Ramos  -  Direct/Joseph

1114

1    you back?

2    A.    By that time it was probably after 8:00 at night.

3    Q.    Turning your attention to December 30 of 2009, the

4    following day, did there come a time when you were

5    transported to Nassau County?

6    A.    Yes.

7    Q.    And how were you taken to Nassau?

8    A.    Nassau County came to pick me up very early the next

9    morning.

10   Q.    Why were you being taken to Nassau?

11   A.    I assumed that I was going back because the judge was

12   going to try to release me before the holiday ended.

13         It was sometime after Christmas.  I thought I

14   was going home for New Year's.  So I was really excited.

15   Q.    So when you arrived at Nassau, were you able to see

16   the judge?

17   A.    Nope.  I sat all day.

18   Q.    What happened?

19   A.    I don't know.

20         Judge Brown had an emergency in his family.  I

21   think his mother was very ill, and what not, and the

22   CO came in and said that she was sorry, that he had an

23   emergency, and he had to get off the bench and that they

24   would give me a rescheduled date.  And I completely

25   flipped out.

Ramos - Direct/Joseph

1    Q.    Why did you flip out?

2    A.    Flipped out because I knew one thing.  That meant I

3    was going back to Suffolk and I had to go through the

4    medical area because that's what they told me.  This is a

5    routine and you can ask any CO in that jail will tell you

6    I never gave them a hard time.  I did and went where I was

7    supposed to go and I just completely started screaming to

8    the point where they stopped, jumped back, looked at me

9    and went and got -- all I remember seeing is corporeals,

10   sergeants, stripes coming and saying calm down, it's okay,

11   relax, relax.

12          They went out.  They spoke to the judge.  The

13   judge -- they spoke to somebody because they came back

14   almost immediately and told me you are not going back.

15   Q.    Well, did you tell them what happened to you at

16   Suffolk?

17   A.    Yep.

18   Q.    And where were you taken if you weren't taken back to

19   Suffolk?

20   A.    I was taken to the offices, the sheriffs bureau of

21   investigation which is in East Meadow next to the Nassau

22   jail and I was spoken to.

23          There were a couple of investigators.  I think

24   there were two men, one woman, and I explained to them

25   what happened.  I was there for hours and actually had the

Ramos  -  Direct/Joseph

1116

1    psychiatrist from the jail come over from Nassau.  They

2    brought over my medication.  They did anything possible to

3    calm me down so they could get a statement.

4            But at some point during the middle they brought

5    me through like a tunnel which I never went outside but I

6    went to the Nassau County Medical Center so I guess they

7    used the tunnels underneath and brought me under and I was

8    examined by an older Caribbean doctor.

9            And the female CO or investigator, excuse me,

10   stayed in the room with me because there was no way I was

11   staying in a room alone.

12           MS. FLYNN:  Objection, your Honor, move to

13   strike.  This is not responsive to any question.

14           THE COURT:  No.  Motion denied.

15   A.   She stayed with me.  She spoke to him and told him

16   what the judge wanted.  The bottom line is he examined me.

17   He put my legs up into stirrups.

18           MS. FLYNN:  Objection, your Honor.

19           THE COURT:  Overruled.

20           THE WITNESS:  What does that mean?

21   BY MS. JOSEPH:

22   Q.   You can continue.

23           You were talking about the examination that took

24   place after the incident.

25   A.   Yes.

Ramos  -  Direct/Joseph

1117

1    He put my legs up into stirrups and there was a

2    big lamp and he had glasses and gloves on and a

3    stethoscope and he put the light and then he used what was

4    like -- I don't know what you call that thing.  It slides

5    inside you to do a vaginal open and they opened it up,

6    like a clamp, and I jumped back.  It was just way too

7    sore.

8    He stopped, took it out, and he put like a gel

9    and then he put it back in and I can't say that it was

10   more comfortable than it was before but I heard him saying

11   that there was --

12            MS. FLYNN:  Objection.

13            THE COURT:  Sustained.

14   BY MS. JOSEPH:

15   Q.   As a result did they do anything else to you during

16   this medical examination?

17   A.   I don't believe so.

18   Q.   As a result of the medical examination did they find

19   any injuries?

20            MS. FLYNN:  Objection.

21            THE COURT:  I didn't hear the question.

22   BY MS. JOSEPH:

23   Q.   As a result of the medical examination did you learn

24   what your injuries were?

25            MS. FLYNN:  Objection, your Honor.

Ramos - Direct/Joseph

1118

1      THE COURT:  Just yes or no.

2  A.    Yes.

3  Q.    And what was your injury?

4      MS. FLYNN:  Objection.

5      THE COURT:  Sustained.

6  BY MS. JOSEPH:

7  Q.    Describe your injury?

8      MS. FLYNN:  Objection.

9      THE COURT:  Overruled.

10  A.    I had severe pain on the right side of my vaginal

11  wall.  I had trouble going to the bathroom.  It burned.  I

12  had to put gloves on to try to open myself up.  And pardon

13  the graphic nature of what I'm saying, you wear gloves to

14  open myself up so that when I did urinate it didn't go --

15      MS. FLYNN:  Objection, your Honor.  I move to

16  strike.

17      THE COURT:  Motion denied.

18  BY MS. JOSEPH:

19  Q.    Were you given any medication as a result of this

20  irritation that you had?

21  A.    He gave me some kind of I think it was either

22  bacitracin or some kind of a clear jelly-like substance.

23  Q.    Could you please describe for the jury what sort of

24  impact this incident with Gary Feinberg has had on you?

25  A.    Well, I don't think it's any secret I have had

Ramos  -  Direct/Joseph

1119

1    anxiety issues in the past.  I mean, it's an open record.

2    I have panic attacks and posttraumatic stress.  For the

3    most part I have been able to function.  I'm completely

4    unemployed.  I'm on disability.

5        Just to me, as a woman, he stole something from

6    me that it doesn't matter what anybody hear says or gives

7    me.  It doesn't matter because what he stole nobody in

8    this room could ever give back to me.

9        I have the loss of intimacy, the fear of being

10   taken advantage of.  Whether or not it was in a jail or I

11   wasn't in jail, you know I know the difference between

12   right and wrong and I made mistakes and I have been

13   arrested.  You can say 5, 10, 20 times.  What he stole I

14   don't know how to get back.  The last two-and-a-half,

15   three years, have been so awful that I'm sure that you

16   people all know it's been difficult to even get here.

17       That's not who I was.  I was a woman that had

18   everything going for me.  And, again, I have struggles.

19   I'm an addict.  I'm in recovery, not recovered.  I have

20   used crack.  I have been through things in life that have

21   been up and down.  But this has taken me to a place in my

22   life that I just can't turn around.  You can't send me to

23   rehab and I'll be better.  There's no pill.  It's like,

24   you know, I've been alone since this happened.  I have

25   zero relationships.  If you hug me, squeeze me, pull me,

**Ramos  -  Cross/Flynn**

1120

1    it sends me to a spot that I can't get out of.  The only

2    way I feel better is to make myself feel worse.

3              So I don't know what to say how my life has

4    changed.  In every way it's changed.  It's just really

5    crappy.

6              MS. JOSEPH:  Nothing further.

7              THE COURT:  Cross-examination.

8

9    CROSS-EXAMINATION

10   BY MS. FLYNN:

11   Q.   Good afternoon.

12   A.   Good afternoon.

13   Q.   You indicated before that at some time you were

14   employed as was described as a headhunter?

15   A.   Yes.

16   Q.   And you worked for a lot of different companies,

17   large companies?

18   A.   Yes.

19   Q.   Did you bring any proof to show this jury about the

20   fact that at any time in your life you've been gainfully

21   employed?

22   A.   No, I did not.

23             MS. JOSEPH:  Objection, your Honor.

24             THE COURT:  Overruled.

25

Ramos  -  Cross/Flynn

1121

1    BY MS. FLYNN:

2    Q.    When you went back in the evening to the Suffolk

3    County Jail and you went back into the examination room

4    where Gary Feinberg was, did you observe that there was

5    another doctor there in the room?

6    A.    I'm sorry, could you repeat that.

7    Q.    When you went back to the Suffolk County Jail and

8    were examined by Gary Feinberg when you first walked into

9    the room, did you observe that there was another doctor in

10   the room?

11   A.    I don't recall.

12   Q.    You indicated just now in front of the jury that Gary

13   Feinberg closed the door to the examination room?

14   A.    I did say that, yes.

15   Q.    Do you recall Ms. Ramos coming to my office for a

16   deposition on May 6, 2008?

17   A.    Yes.

18   Q.    Do you recall being placed under oath?

19   A.    Yes, I do.

20           MS. FLYNN:  I apologize, your Honor.

21           (Pause in proceedings.)

22   BY MS. FLYNN:

23   Q.    Page 80, line 19:

24           "QUESTION:  Did Gary close that door?

25           "ANSWER:  I don't know. "

**Ramos  -  Cross/Flynn**

1122

1    THE COURT:  I'm sorry, I didn't hear a word you

2    said.

3                 MS. FLYNN:  I'm sorry, Judge.

4                 THE COURT:  You're mumbling.  Keep your voice

5    up.

6                 MS. FLYNN:  I'm sorry.

7    Q.   Page 80, line 19:

8                 "QUESTION:  Had Gary closed that door?

9                 "ANSWER:  I don't know."

10             Do you remember being asked that question and

11   giving that answer?

12   A.   Whatever it says in that document I would say that if

13   I said that then yes.

14   Q.   And do you remember giving a statement to the Nassau

15   County Sheriff's Department right after you advised them

16   of the fact that you were claiming that Gary Feinberg had

17   assaulted you?

18   A.   Yes, I do remember that.

19   Q.   And isn't it true that in that statement you never

20   mentioned anything about Gary Feinberg putting anything in

21   your rectal area; isn't that true?

22   A.   I don't recall.

23   Q.   Isn't it true that there's nothing in that statement

24   about Gary Feinberg cupping your chest?

25   A.   I don't recall 100 percent what the statement said,

**Ramos - Cross/Flynn**

1123

1    but the statement was shortly thereafter so I would have

2    to --

3            MS. JOSEPH:  Objection.

4            THE COURT:  Overruled.

5    BY MS. FLYNN:

6    Q.    And is there anything in that statement about

7    Gary Feinberg biting you?

8    A.    I don't recall.

9    Q.    Now, when you were first admitted or when you first

10   entered the Suffolk County correctional facility which was

11   about December 22nd, 2005?

12   A.    Okay.

13   Q.    Is that correct?

14   A.    I don't recall.

15           THE COURT:  You said December 22nd?

16           MS. FLYNN:  Yes.  2005.

17   BY MS. FLYNN:

18   Q.    You had just come from the Nassau County Correctional

19   Facility, correct?

20   A.    Correct.

21   Q.    And when you got to the Suffolk County correctional

22   facility were you seen by a woman, a therapist at the

23   Suffolk County correctional facility?

24   A.    I'm not.  It's going back some time.  I can't recall.

25   Q.    Do you remember seeing a woman who is located in the

Ramos  -  Cross/Flynn

1124

1    medical unit near the psychiatrist?

2    A.    In the mental health area?

3    Q.    Yes.

4    A.    I believe so.

5    Q.    You told that woman that you were supposed to have a

6    court date that date and you thought you were going to be

7    released, you were going to see Judge Brown and you

8    thought you were going to be released?

9    A.    I really don't recall what the conversation was.  I'm

10   sorry.

11   Q.    Was it your impression when you were at the Suffolk

12   County facility that you were scheduled to be released

13   from custody shortly?

14   A.    I think I had hoped.  I don't know if I thought for

15   sure.  I certainly hoped.

16   Q.    Didn't you just tell the jury on direct examination

17   that you expected to be released from custody when you saw

18   Judge Brown?

19   A.    I said I had hoped that I could go home for the

20   holidays.

21   Q.    You told the therapist at the Suffolk County

22   correctional facility that you were going through

23   withdrawals?

24   A.    I really don't recall that conversation.

25   Q.    Did you also tell that therapist that you had

Ramos  -  Cross/Flynn

1125

1    cooperated with the FBI?

2    A.   I'm sorry.

3         MS. JOSEPH:  Objection.

4         THE COURT:  Overruled.

5    A.   I really don't recall that conversation.

6         I remember seeing somebody in that area and we

7    had discussion about medication and different things, but

8    I can't clarify that.  I'm sorry.

9    Q.   Well, while you were at the Nassau County

10   Correctional Facility, did you cooperate with the Nassau

11   County Correctional Facility in any way?

12   A.   Yes.

13   Q.   Were you an informant for them?

14   A.   I don't know what that means.

15   Q.   Did you cooperate with them by giving them

16   information about drugs?

17   A.   They asked me questions about certain things that

18   were going on in the dorm.  Whatever information, if I had

19   it, I was happy to give it to them.  I don't know if that

20   would be an informant.

21   Q.   Did this happen while you were at the Nassau County

22   correctional facility prior to the time you came to the

23   Suffolk County correctional facility?

24   A.   Yes.

25   Q.   When you were in the Nassau County Correctional

Ramos  -  Cross/Flynn

1126

1   Facility in December did you meet somebody named Lowrita

2   Rickenbacker?

3   A.   Say that one more time.

4   Q.   When you were in the Suffolk County correctional

5   facility in December -- withdrawn.

6        When you were in the Nassau County correctional

7   facility in December, did you meet someone named Lowrita

8   Rickenbacker?

9   A.   I do not recall meeting her, but I had been told that

10  we did pass through each other in the bull pen being

11  transported, but I really have no recollection of meeting

12  her.

13  Q.   That would be in December 2005?

14  A.   It sounds about right.

15  Q.   In Nassau?

16  A.   Yes.

17  Q.   This statement that you gave regarding what you say

18  happened with you and Gary Feinberg, the statement that

19  you gave to Nassau, you swore to that statement; is that

20  correct?

21  A.   I believe so.

22  Q.   And you gave a statement to someone from Suffolk,

23  Investigator Starke, correct?

24  A.   I remember, yeah.  I gave statements, absolutely.

25  Q.   You swore those statements were true?

**Ramos  -  Cross/Flynn**

1127

 1    A.    I did.

 2    Q.    And have you ever given a false sworn written

 3    statement to any law enforcement agency?

 4    A.    Have I ever what?

 5    Q.    Have you ever given a false sworn statement to a law

 6    enforcement agency?

 7    A.    Not to the best of my knowledge.

 8    Q.    Do you remember reporting on Monday, July 22nd, 2009,

 9    to the Nassau County police that you were the victim of

10    physical force robbery by an unknown black male and then

11    later on recanting that statement?

12          MS. JOSEPH:  Your Honor, may we approach?

13          THE COURT:  Come up.

14          (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

**Ramos  -  Cross/Flynn**

1128

1       (The following takes place at sidebar.)

2       MS. JOSEPH:  Counsel is trying to back door

3  arrest incidents and your Honor ruled any type of arrest

4  was not admissible.

5       The only things that were admissible were

6  convictions.  The point that she's bringing out, I assume

7  she's bringing out on credibility that she made a false

8  claim to the police or something like that.

9       MS. FLYNN:  Yes.

10       THE COURT:  I'll allow that.  Yes.

11       (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ramos - Cross/Flynn

1129

1      (The following takes place in open court.)

2   BY MS. FLYNN:

3   Q.   Ms. Ramos, isn't it true that on Monday, July 22nd,

4   2009, you reported to the police that you were the victim

5   of a physical force robbery by an unknown black male; is

6   that correct?

7   A.   Yes.

8   Q.   And you went to the police station and you signed a

9   statement to the effect; is that correct?

10  A.   I believe so.

11  Q.   And you were advised that filing a false statement

12  was against the penal law, correct?

13  A.   Yes.

14  Q.   And you signed that statement, correct?

15  A.   I believe so.

16  Q.   And you signed that statement because you had

17  actually left your pocketbook behind in a medical office

18  when you attempted to break into that medical office; is

19  that correct?

20           MR. NORINSBERG:  Objection.

21           MS. JOSEPH:  Objection, your Honor.

22           THE COURT:  Sustained.

23           MS. JOSEPH:  Can we approach or move to strike

24  this.  This is in violation --

25           THE COURT:  Strike what?  There's no answer.  So

**Ramos  -  Cross/Flynn**

1130

1    there's nothing to strike.

2           MS. JOSEPH:  The line of questioning.

3           THE COURT:  I don't strike questions because

4    questions are not evidence.

5           The jury knows that unanswered questions are to

6    be ignored.  The only evidence is the answered questions.

7    BY MS. FLYNN:

8    Q.   Isn't it true, Ms. Ramos, that later that day you

9    advised the police that you had in fact lied in that

10   statement and that there had been no robbery; is that

11   correct?

12          MS. JOSEPH:  Objection, your Honor.  It's on the

13   same basis as before.  This is in violation of your

14   Honor's motion.

15          THE COURT:  No, it's not.  It's precisely in

16   accord with my ruling.

17          Overruled.

18          MS. FLYNN:  Thank you, your Honor.

19   BY MS. FLYNN:

20   Q.   You've been arrested before your incident with

21   Gary Feinberg; is that correct?

22   A.   Yes.

23          MS. JOSEPH:  Objection.

24          THE COURT:  Sustained.

25          MS. JOSEPH:  Move to strike the response, your

1    Honor.

2                THE COURT:  Move to strike what?

3                MS. JOSEPH:  The response.

4                THE COURT:  There was a response?

5                MS. JOSEPH:  Yes.

6                THE COURT:  I didn't hear it.  If there was, I

7    grant your motion to strike the response.  The jury, if

8    you heard it, disregard it.

9                MS. FLYNN:  I'm sorry, judge, may we approach?

10               THE COURT:  It's not necessary.  I told you I'm

11   not permitting arrests.

12               MS. FLYNN:  Judge, I'm sorry.  You indicated in

13   terms of damages you were going to allow arrests.  I'm

14   sorry.

15               THE COURT:  Members of the jury, we're going to

16   take a 15 minute recess.

17               Please don't discuss the case.  Keep an open

18   mind.  Please recess yourselves.

19               (The jury is excused.)

20               THE COURT:  Yes, I recall now that on the

21   subject of damages and emotional distress, yes.

22               MS. JOSEPH:  Your Honor, you were very

23   consistent with your ruling on arrests and underlying

24   facts for arrests.

25               You said that was not to be admitted, that you

Ramos   -   Cross/Flynn

1132

1    did not believe arrests should come in.

2         There was an issue that was left to the side

3    regarding the plaintiff's mental history that you said you

4    would reserve judgment on that with respect to damages and

5    you said with respect to that, that may come in because it

6    goes to damages.

7         However, as far as arrests, you were very

8    consistent on that issue.  You said if there was no

9    convictions, then the underlying facts, the arrests, all

10   of that shouldn't come in.  You were very consistent.

11        THE COURT:  We're talk about two different

12   subjects.

13        Of course arrests are not admissible with

14   respect to liability or any other matter.

15        But they are depending upon the type of arrests

16   and what happened are admissible with respect to emotional

17   distress.

18        Once a plaintiff claims damages for emotional

19   distress, her entire life is an open book and there's a

20   waiver of any kind of objection to any kind of incident

21   that might cause emotional distress in my view.

22        MS. JOSEPH:  Your Honor, you actually specified

23   that arrests, because they're mere accusations, wouldn't

24   come in, but incarcerations would.

25        At that point we asked defense counsel what

Ramos  -  Cross/Flynn

1133

1    specific arrests slash incarcerations they intended on

2    bringing in and there really wasn't much of an offer of

3    proof at that point.

4           Now although they were specifically asked so we

5    could address it, they did not specifically bring it in

6    during the motion.  You said no arrests come in.  You said

7    only convictions come in and you would allow that.

8           THE COURT:  If I said that, I was in error.  And

9    I don't think I said that arrests don't come in as far as

10   emotional distress is concerned.

11          MS. JOSEPH:  Actually more specifically, your

12   Honor, when we asked opposing counsel what arrests they

13   planned on bringing in they were not responsive.  They did

14   not --

15          THE COURT:  Now they're going to bring it in and

16   I'm going to allow it on the issue of emotional distress,

17   yes.

18          There's no doubt that arrests cause emotional

19   distress, because I assume you're claiming emotional

20   distress.

21          MS. JOSEPH:  Yes, your Honor.

22          THE COURT:  It's probably your main item of

23   damage, correct?

24          MS. JOSEPH:  Correct.

25          THE COURT:  I'm allowing it.

1    Anything else at this time?

2         MS. FLYNN:  I just want to make sure what I can

3    ask her about her arrests.

4         THE COURT:  Go ahead.

5         MS. FLYNN:  She was arrested five times before

6    the arrest for which he was in jail when this incident

7    happened and she's been arrested twice since then.

8         THE COURT:  I'll let you bring it out.

9         MS. FLYNN:  Thank you.

10        MS. JOSEPH:  Are all of those within the 10

11   years?

12        THE COURT:  10 years has nothing to do with it.

13   10 years is under Rule 609 for convictions.  This is not

14   admissible on the issue of convictions or credibility.

15   It's solely on the issue of damages.

16        For example, you're going to claim and make a

17   closing argument or Mr. Norinsberg is going to make a

18   closing argument that there's been tremendous emotional

19   distress here and ask the jury for a lot of money I

20   assume.

21        MS. JOSEPH:  Well, your Honor --

22        THE COURT:  Excuse me.  And defense counsel has

23   a right to say we did not cause all of the emotional

24   distress that this plaintiff has suffered from.  She has

25   suffered a lot of emotional distress before this and after

Ramos  -  Cross/Flynn

1135

1   this that has nothing to do with this case and you cannot

2   compensate her for that.

3         MS. JOSEPH:  Your Honor, I understand that.

4         I respectfully request the vein in which

5   opposing counsel is asking the question is for

6   impeachment.

7         THE COURT:  You make your objection when she

8   does it and I'll decide that.  I'm going to allow it.

9         Anything else at this time?

10        MS. FLYNN:  No.

11        THE COURT:  Not hearing anything, we're going to

12   take a recess.

13        (Recess taken.)

14        (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

Ramos - Cross/Flynn

1136

1        (Following a recess.)

2

3            THE CLERK:  Jury entering.

4            (Jury enters the courtroom.)

5            THE COURT:  Please be seated, members of the

6    jury.

7            You may proceed.

8            MS. FLYNN:  Thank you, your Honor.

9    BY MS. FLYNN:

10   Q.    Ms. Ramos, I just want to go back to the incident

11   with Gary Feinberg.

12           While you were in the room with Gary Feinberg,

13   Gary told you that he could help you if you were a good

14   girl and he could help you get your medication.

15           Is that correct?

16   A.    Yes.

17   Q.    And he told you that if you were a smart girl, he

18   could make things more comfortable for you.

19           Is that correct?

20   A.    Yes.

21   Q.    And you had a conversation with him where you told

22   him that you hated jail, and it was really dark and you

23   were really hungry.

24           Correct?

25   A.    I might have.

Ramos - Cross/Flynn

1137

1    Q.    Okay.

2          But he asked you if he could help you make it

3    better.

4          Is that correct?

5    A.    I'm not -- I don't recall that.

6    Q.    All right.

7          Do you remember at your deposition being asked

8    these questions and giving these answers, page 83, line 9:

9          Was he doing this while you --

10          THE COURT:  Question?

11   BY MS. FLYNN:

12   Q.    Question:  Was he doing this while you were still

13   lying on your back?

14          Answer:  Yes.

15          Question:  At that point, what did he do next?

16          Answer:  He was talking really, really slow.  He

17   was asking me if I liked being in jail.  I told him I

18   hated it.  I told him it was really dark.  I was really

19   hungry.  I really didn't feel good.

20          He asked me if I liked being locked up 23 hours

21   a day.  I said no.  He asked me if I would like him to

22   make it better.  I asked him what he meant, and the whole

23   time his body was moving weird on my arm --

24          THE COURT:  I don't know where the question

25   ended.

Ramos - Cross/Flynn

1138

1      This is all a question?

2      MS. FLYNN:  No.

3      This is the answer.

4      THE COURT:  You have to say question and answer.

5      MS. FLYNN:  Okay.

6      THE COURT:  If someone looked at this record six

7   months from now, they wouldn't know where the answer

8   started or the question ended, would they, unless you say,

9   question and answer.

10      MS. FLYNN:  I'll start again, your Honor.

11  BY MS. FLYNN:

12  Q.   Question:  At that point what did he do next?

13      Answer:  He was talking really, really slow.  He

14  was asking me if I liked being in jail.  I told him I

15  hated it.  I told him it was really dark.  I was really

16  hungry.  I really didn't feel good.

17      He asked me if I liked being locked up 23 hours

18  a day.  I said no.  He asked me if I would like him to

19  make it better.  I asked him what he meant.  The whole

20  time his body was moving weird on my arm, and his hands,

21  one hand was, like, rubbing on my stomach and the other

22  hand was inside me.

23      And do you recall being asked that question and

24  giving that answer?

25  A.   Yes.

Ramos - Cross/Flynn

1139

1   Q.   And when you left the exam room, you didn't say

2   anything to anybody at the Suffolk County jail about what

3   had happened to you.

4           Is that correct?

5   A.   That's correct.

6   Q.   And you were picked up the next morning by two women

7   corrections officers from the Nassau County Correctional

8   Facility.

9           Is that correct?

10  A.   I was picked up by Nassau County, yeah.

11  Q.   And those were two women?

12  A.   I'm not sure.

13  Q.   And they picked you up in a suburban?

14  A.   I can't recall.

15  Q.   But you didn't say anything to those women, or

16  corrections officers, about what had happened to you at

17  the jail on the ride from Riverhead into East Meadow.

18          Isn't that correct?

19  A.   That's correct.

20  Q.   And that was fairly early in the morning?

21  A.   Yes.

22  Q.   And then you were at the courthouse in Nassau County.

23          Is that correct?

24  A.   Yes.

25  Q.   And you waited at that courthouse until about 3:30.

Ramos - Cross/Flynn

1140

1              Is that correct?

2    A.    I waited all day.

3    Q.    And you didn't say anything to anyone there about

4    what Gary Feinberg had did to you -- done to you.

5              Is that correct?

6    A.    I didn't say anything.

7    Q.    And the only time that you said something was when

8    they told you that you were going back to Suffolk County.

9              Is that correct?

10   A.    Yes.

11   Q.    Prior to ever meeting Gary Feinberg, you have been

12   arrested.

13             Correct?

14   A.    Yes.

15             THE COURT:  I want to tell the jury about these

16   arrests.

17             Arrests have nothing to do with liability in

18   this case.  Arrests are merely accusations.  Arrests have

19   nothing to do with the credibility of this witness.

20   Arrests have nothing to do with liability on the part of

21   the county or the Suffolk County Correctional Facility, or

22   the Suffolk County Sheriff's Department.

23             The only reason I'm allowing this in is on the

24   issue of damages.  In the event you should find a verdict

25   in favor of the plaintiff against the County of Suffolk,

Ramos - Cross/Flynn

1141

1    one of the items of damages are emotional distress

2    allegedly caused by this incident.

3            The defense has a right to show that there are

4    other instances in her life, the life of the plaintiff,

5    that also caused emotional distress.  That's part of the

6    issue of damages.  It has nothing to do with liability.

7            So disregard it as far as liability, any

8    arrests.  It means nothing, except on the issue of

9    emotional distress.

10           You may proceed.

11           MS. FLYNN:  Thank you, your Honor.

12   BY MS. FLYNN:

13   Q.   You have been -- you were arrested prior to meeting

14   Gary Feinberg.

15           Is that correct?

16   A.   Yes.

17   Q.   And you were arrested on five occasions.

18           Is that correct?

19   A.   I have been arrested before.

20   Q.   And you have been arrested on five occasions.

21           Is that correct?

22   A.   I don't recall how many times.

23           But I have been arrested before.

24           MS. JOSEPH:  Your Honor, we can stipulate to the

25   five arrests, just to move things along.

Ramos - Cross/Flynn

1142

1    THE COURT:  Thank you, very much, but counsel

2    doesn't have to.

3         Do you want to accept that stipulation?

4         MS. FLYNN:  That's fine, your Honor.

5         THE COURT:  Okay.

6    BY MS. FLYNN:

7    Q.   Is it fair to say that you were incarcerated in the

8    Nassau County Correctional Facility on October 29, 2005,

9    and that was the incarceration leading up to your being

10   transferred to the Suffolk County Correctional Facility in

11   December of 2005?

12   A.   Yes.

13   Q.   And had you ever been incarcerated prior to October

14   29, 2005?

15   A.   I think so.

16   Q.   And --

17   A.   Not sure.

18   Q.   And how many times had you been incarcerated before

19   October 29, 2005?

20   A.   I really wouldn't be able to say how many times.

21        I just know I -- have been in trouble -- I've

22   had problems before.

23   Q.   Well, have you been incarcerated more than once?

24   A.   Pardon me?

25   Q.   Have you been incarcerated more than one other time?

Ramos - Cross/Flynn

1143

1    A.    I believe so.

2    Q.    Have you been incarcerated more than five other

3    times?

4    A.    I'm not sure about how many other times.

5    Q.    And could you recall where you have been incarcerated

6    other than the incarceration in October at the Nassau

7    County Correctional Facility?

8    A.    I have been to Nassau County Jail and I have been to

9    Suffolk County jail.

10           That's it.

11   Q.    And since the incident that you alleged happened on

12   December 29th, 2005 with Gary Feinberg, you have been

13   arrested on two more occasions.

14           Correct?

15   A.    I'm not sure how many times.

16           I'm really not sure.

17   Q.    Could it have been more than two?

18   A.    It could have been more.

19           If I remembered, I would tell you how many.  I

20   just don't remember.

21   Q.    Well, do you recall being arrested on September 12,

22   2009?

23   A.    I was arrested in September.  Yes.

24   Q.    Do you recall being arrested in June of 2009?

25   A.    Yes.

1    Q.   Were you arrested on more occasions than that since

2    your incident with Gary Feinberg?

3    A.   I don't believe so.

4    Q.   On May 31, 2005, were you admitted to

5    North Shore Hospital for an overdose of drugs?

6    A.   I went to North Shore Hospital.

7    Q.   And that was because you had overdosed on drugs.

8         Correct?

9    A.   I don't recall why.

10        I just remember that I did go to the hospital.

11   Q.   Well, they put you into ICU.

12        Correct?

13   A.   I don't recall.

14        It was how many -- a long time ago.

15   Q.   We are talking about May of 2005.

16   A.   Okay.

17   Q.   I'm going to show you what's been marked as

18   Defense Exhibit U for identification.

19        I just ask you to look at this.

20        (Whereupon, there was a pause in the

21   proceedings.)

22   A.   Okay.

23   Q.   And does that refresh your recollection that on May

24   31st, 2005, you were admitted to the North Shore

25   University Hospital at Plainview for an overdose?

Ramos - Cross/Flynn

1145

1    A.    Yes.

2    Q.    And is that true?

3    A.    Yes.

4    Q.    And, Ms. Ramos, do you recall being treated at a

5    facility called The Watershed?

6    A.    Yes.

7    Q.    And that's a substance abuse facility?

8    A.    It's a MICA program.

9    Q.    I'm sorry?

10   A.    It's a MICA program.

11   Q.    A MICA program?

12   A.    Um-hmm.

13   Q.    And you went to The Watershed treatment facility on

14   three separate occasions.

15         Is that correct?

16   A.    If that's what the records indicate.

17         I have been there more than once.

18   Q.    Okay.

19         Well, do you recall being there in March of --

20         MS. FLYNN:  Withdrawn.

21   BY MS. FLYNN:

22   Q.    Do you recall being admitted there on March 26, 2002,

23   and remaining there until April 1st, 2002?

24   A.    Okay.

25   Q.    Do you recall that?

Ramos - Cross/Flynn

1146

1           Is that a yes?

2    A.   Yes.

3    Q.   And you went there because you had a cocaine

4    dependency.

5           Is that true?

6    A.   Yes.

7    Q.   And you also went there because you had general

8    anxiety disorder?

9    A.   Yes.

10   Q.   And you were suffering from a major depression.

11          Correct?

12   A.   That's correct.

13   Q.   And at the time that you were admitted to that

14   facility, in March of 2002, you were using approximately

15   $1,500 to $2,000 worth of cocaine a day.

16          Is that correct?

17   A.   I was definitely using cocaine.

18          Yes.

19   Q.   Well, when you went to The Watershed facility, you

20   went there for treatment.

21          Correct?

22   A.   Yes.

23   Q.   And in order to get good treatment, it was important

24   to tell the physicians and the clinicians there the truth

25   about your condition.

Ramos - Cross/Flynn

1147

1    Correct?

2  A.    Correct.

3  Q.    Do you recall telling them that you were using

4  approximately $1,500 to $2,000 worth of cocaine a day?

5          MS. JOSEPH:  Objection, your Honor.

6          THE COURT:  Overruled.

7          Again, members of the jury, this has nothing to

8  do with credibility.  It has nothing to do with liability

9  or what happened allegedly with Gary Feinberg or any of

10 the other issues and liability.

11         This is only with respect to damages.  The

12 plaintiff, if she prevails, is entitled to damages for

13 emotional distress from this incident, and for

14 humiliation, as I will explain to you.

15         On the other hand, the defendants are entitled

16 to show other incidents in the life of the plaintiff that

17 could also have caused emotional distress.

18 BY MS. FLYNN:

19 Q.    Do you recall telling them at The Watershed that you

20 were using $1,500 to $2,000 worth of cocaine a day prior

21 to your admission?

22 A.    I told them I used cocaine.

23         I don't recall putting a dollar amount.

24 Q.    And do you recall telling them that you were also

25 taking approximately 20 pills of Darvon, or Darvocet prior

Ramos - Cross/Flynn

1148

1    to your admission?

2    A.    I was definitely taking pills.

3    Q.    And do you recall telling them there that you were

4    taking approximately five pills of OxyContin prior to your

5    admission there per day?

6    A.    Okay.

7    Q.    Is that a yes?

8    A.    I told them that I was using different substances.

9          I can't recall how much of each item I told them

10   I used.  But I put myself there voluntarily.  So there

11   were addiction issues.

12   Q.    Did you tell the clinicians at The Watershed that

13   back in 2002 you were involved in a court case with your

14   husband because your husband was going to court to get

15   your children by claiming that you were incompetent?

16         MS. JOSEPH:  Objection, your Honor.

17         THE COURT:  Overruled.

18   A.    I'm sorry.

19         You were asking me a question?  Could you repeat

20   that?

21         I'm sorry.

22   Q.    Yes.

23         Did you tell the clinicians at The Watershed

24   that your husband was trying to get your children by going

25   to court claiming you were incompetent?

PAUL J. LOMBARDI, RMR, FCRR
Official Court Reporter

Ramos - Cross/Flynn

1149

1   A.   My husband and I were in a court battle.

2        Yes.

3   Q.   And he was going to court trying to get custody of

4   your children by claiming you were incompetent.

5        Correct?

6   A.   He was definitely fighting for custody of the kids.

7   Q.   I'm asking you, was he claiming that you were

8   incompetent?

9   A.   I don't recall that.

10  Q.   And you also told them at that admission that you had

11  been using the cocaine on a daily basis for the seven

12  months prior to your admission.

13       Correct?

14  A.   I definitely was using a chem -- I was using

15  different chemicals before I went there.

16       That's why I went there.

17  Q.   And you told The Watershed personnel during your

18  admission in 2002 that you had a history of anxiety for

19  ten years.

20       Correct?

21  A.   I have had anxiety issues.

22  Q.   And you had a history of Vicodin dependence.

23       Correct?

24  A.   That's correct.

25  Q.   And you also told them you had a history of panic

Ramos - Cross/Flynn

1150

1    attacks.

2              Is that correct?

3    A.    That's correct.

4              THE COURT:  Of what?

5              MS. FLYNN:  Panic attacks.

6              THE COURT:  I still don't know what you said.

7              MS. FLYNN:  Panic attacks.

8              THE COURT:  Panic?

9              MS. FLYNN:  Yes, your Honor.

10   BY MS. FLYNN:

11   Q.    And you also told the personnel at The Watershed

12   during your first admission in March of '02, that you had

13   been sexually abused by your brother when you were a

14   teenager.

15             Is that correct?

16   A.    That's correct.

17   Q.    And you also told them that you were the subject of

18   physical and verbal abuse by your mother.

19             Correct?

20   A.    Correct.

21   Q.    And that your husband had physically abused both your

22   children.

23             Is that correct?

24   A.    I don't remember that.

25   Q.    And then, Ms. Ramos, you were admitted again to

PAUL J. LOMBARDI, RMR, FCRR
Official Court Reporter

Ramos - Cross/Flynn

1151

1    The Watershed in October of 2002.

2              Correct?

3    A.    I voluntarily entered there on two separate

4    occasions.

5              I'm not -- I don't recall the third, but I

6    certainly wouldn't deny it.

7    Q.    Okay.

8              And is it fair to say that when you went there,

9    you again went there because you had a cocaine addiction

10   at that point?

11             MS. JOSEPH:   Just to specify when, your Honor.

12             THE COURT:   Overruled.

13             MS. FLYNN:   I'll make it clearer.

14   BY MS. FLYNN:

15   Q.    When you went to The Watershed on October 18, 2002

16   for an admission, you advised them at that point that you

17   were smoking $7 to $800 in cocaine a day.

18             Correct?

19   A.    Okay.

20             Yes.

21   Q.    Is that correct?

22   A.    Okay.

23   Q.    And you also informed them that you had just come out

24   of South Oaks Hospital where you had been treated as a

25   patient.

Ramos - Cross/Flynn

1152

1    Correct?

2    A.    Correct.

3    Q.    And by that admission in October of 2002, you had

4    lost custody of your children.

5    Is that correct?

6    A.    Correct.

7    Q.    And, again, you mentioned the same complaints to the

8    clinicians there about the sexual abuse by your brother,

9    and the physical and verbal abuse by your mom.

10    Correct?

11    A.    Correct.

12    Q.    And you went for a third time to The Watershed and

13    that was in July of 2005.

14    Correct?

15    A.    Correct.

16    Q.    And at that point you were snorting and --

17    MS. FLYNN:  Withdrawn.

18    BY MS. FLYNN:

19    Q.    You told them that you had been snorting and smoking

20    cocaine daily for the previous seven months prior to your

21    admission.

22    Correct?

23    A.    Correct.

24    Q.    And you also advised them that you were abusing

25    Valium and Vicodin and Percocet.

Ramos - Cross/Flynn

1        Correct?

2   A.   Correct.

3   Q.   And that was in July of 2005?

4   A.   Okay.

5   Q.   Did you also tell them that you were occasionally

6   experiencing hallucinations?

7   A.   I -- I really don't recall.

8   Q.   Have you ever told any health care providers that you

9   experience hallucinations?

10  A.   Yes.

11  Q.   And that was prior to December 29, 2005.

12       Correct?

13  A.   Yes.

14  Q.   When you were incarcerated at the Nassau County

15  Correctional Facility prior to being transferred to

16  Suffolk, you filed what's known as sick call requests.

17       Correct?

18       THE COURT:  What?

19       MS. FLYNN:  Sick call requests.

20  BY MS. FLYNN:

21  Q.   Is that correct?

22       THE COURT:  You have to keep your voice up.

23       You are fading away.

24       MS. FLYNN:  Sorry, Judge.

25       THE COURT:  Now, you have no trouble hearing me,

Ramos - Cross/Flynn

1154

1    do you?

2              MS. FLYNN:  No.

3              THE COURT:  Nobody ever does.

4    BY MS. FLYNN:

5    Q.   When you were at the Nassau County Correctional

6    Facility prior to being transferred to Suffolk, you filed

7    some sick call requests.

8              Correct?

9    A.   Correct.

10   Q.   And on October 19, 2005, you filed sick call requests

11   because you were very depressed and you couldn't sleep.

12             Correct?

13   A.   Correct.

14   Q.   And on December 19, 2005, you filed another sick call

15   request because you were depressed and you couldn't sleep.

16             Correct?

17   A.   Correct.

18   Q.   And on 12/21/05, before you went to Suffolk County,

19   you filed another sick call request because you were

20   depressed and hearing voices and couldn't sleep.

21             Is that correct?

22   A.   Correct.

23   Q.   Have you ever been diagnosed as being bipolar?

24   A.   Yes.

25   Q.   And you had an accident, car accident when you were

Ramos - Cross/Flynn

1155

1    26?

2    A.    I was hit by a drunk driver.

3              I was a pedestrian.  I was hit by a Bronco.

4              MS. FLYNN:  Move to strike, your Honor.

5              THE COURT:  You are moving to strike the answer

6    as not responsive?

7              MS. FLYNN:  Yes.

8              THE COURT:  Motion granted.  Strike the answer

9    as nonresponsive.

10             The jury is instructed to disregard the answer.

11   BY MS. FLYNN:

12   Q.    Yes or no, please.

13             You were in a car accident when you were 26?

14   A.    Well, I wasn't in a car.

15   Q.    Okay.

16   A.    That's why I'm confused by your question.

17   Q.    You are right.

18             You were a pedestrian who was hit by a car when

19   you were 26?

20   A.    Yes.

21   Q.    And is it fair to say that the panic and the

22   posttraumatic stress from that accident never stopped?

23   A.    It would be fair to say that it didn't stop.

24   Q.    Thank you.

25             MS. FLYNN:  I have no other questions.

1156

1    MS. JOSEPH:  Just brief redirect, your Honor.

2    THE COURT:  Surely.

3  REDIRECT EXAMINATION

4  BY MS. JOSEPH:

5  Q.   On cross-examination, defense counsel asked you

6  questions about the statement that you gave just after the

7  incident.

8         She asked you whether you had made any statement

9  regarding Gary Feinberg of putting his hand in your butt.

10         Reading from what's been already in evidence at

11  Plaintiff Exhibit 49, I felt my pants elastic waistband

12  pop.  Then I felt his hot sweaty hand go into the crack of

13  my ass.

14         Do you remember giving that -- making that

15  statement right after the exam?

16  A.   Yes.

17  Q.   Right after the incident, I apologize.

18  A.   Yes.

19  Q.   Defense counsel also asked you, suggested that you

20  made no mention of Mr. Feinberg grabbing your breast.

21         Reading again from the statement that you gave

22  right after the incident, he then rolled me on my other

23  side facing him.  He put the stethoscope up my shirt while

24  he squeezed my breast with his fingers on the same hand.

25  A.   I remember that.

Ramos - Redirect/Joseph

1157

1    Q.    Defense counsel asked you why you didn't say

2    anything --

3                MS. JOSEPH:   Withdrawn.

4                Let me rephrase.

5    BY MS. JOSEPH:

6    Q.    After the incident you were transferred to Nassau by

7    two female corrections officers and you didn't mention the

8    Gary Feinberg assault to them.

9                Could you explain to the jury why you didn't say

10   anything?

11   A.    My thought was that I was going to see my judge.

12               We had been -- I had been with the same judge

13   for two years.  He knew me.  I had a certain amount of

14   trust for him, and I just figured I would tell the judge.

15               And when they said that I wasn't going to see

16   the judge I panicked because I knew I was going to go back

17   to the Suffolk County jail and he was going to be there.

18               So that's why at that time I had no other

19   choice.

20   Q.    And when you say you had no other choice, at that

21   time who did you tell?

22   A.    I told the COs that were getting ready to transport

23   me back to Suffolk.

24   Q.    And you admitted on cross-examination occasionally

25   because of your mental condition you do at times

Ramos - Redirect/Joseph

1158

1    experience hallucinations.

2           The incident with Gary Feinberg, was that a

3    hallucination?

4    A.    There's no way I hallucinated that.

5    Q.    Could you please tell the jury why that was not a

6    hallucination.

7    A.    On that day that I was in that room, I experienced

8    something that -- a hallucination for something for me in

9    the past was where I thought somebody said something about

10   me or I thought somebody was talking about me.  This

11   wasn't about what I thought somebody was saying.

12          This was about somebody touching me and

13   violating my body, because I was an inmate and thought I

14   would be too afraid to say something.

15          This was somebody who left scars inside my

16   vagina that took months and months to heal.  This was not

17   a -- I did not hallucinate this.

18          MS. JOSEPH:  Thank you, Ms. Ramos.

19          MS. FLYNN:  I move to strike, your Honor.

20          THE COURT:  Motion denied.

21          MS. FLYNN:  I have no other questions.

22   Thank you.

23          THE COURT:  You may step down.

24          THE WITNESS:  Thank you, your Honor.

25          THE COURT:  Please call your next witness.

Ramos - Redirect/Joseph

1159

1          MR. NORINSBERG:  At this time, the plaintiff

2     rests.

3          THE COURT:  You want to come up, counsel.

4          (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Sidebar.)

2        THE COURT:  Are you putting on any witnesses?

3        MS. FLYNN:  I'm going to now.

4        Yes, your Honor.  I just have one witness.  The

5    sergeant's still here, right?

6        THE COURT:  We can conclude that witness before

7    4:45?

8        MS. FLYNN:  I just have one witness who's here

9    now.

10       But I'll have a witness tomorrow.

11       THE COURT:  You have a witness tomorrow.

12       Okay.

13       MS. ZWILLING:  Possibly two.

14       THE COURT:  Then I'll take the motions now.

15       MR. NORINSBERG:  I'd like to know who these

16   witnesses are.

17       We have one witness listed.  They listed them as

18   a grievance coordinator.

19       MS. FLYNN:  They are the two witnesses in

20   rebuttal answering the two witnesses I didn't expect you

21   were calling.

22       MR. NORINSBERG:  Who are they so we know for the

23   record?

24       MS. ZWILLING:  I guess Mr. Langhorn and probably

25   just someone to certify some records, a records custodian.

Ramos - Redirect/Joseph

1161

 1          THE COURT:  The question that I have now is, you

 2    don't have these witnesses here?

 3          MS. FLYNN:  No.

 4          THE COURT:  So we can't conclude today.

 5          Otherwise, I was going to put the jury over

 6    until Monday, have the charge conference tomorrow, and

 7    then summations and charge on Monday.

 8          Now I'm going to have to bring them back just

 9    for a short time.  You can't do it this afternoon, right?

10          MS. ZWILLING:  We have to pull records, Judge.

11          It's in response to the completely unexpected

12    testimony.

13          THE COURT:  The witnesses aren't here?

14          MS. ZWILLING:  The witnesses aren't here, and

15    they have to gather the records.

16          MS. FLYNN:  One record.

17          THE COURT:  Then I'm going to excuse the jury

18    until tomorrow at 9:30.

19          We'll hear motions today.

20          MS. FLYNN:  All right.

21          THE COURT:  And we'll have to excuse the jury

22    early tomorrow and then go over the charge tomorrow.

23          I didn't want to bring them back just for an

24    hour.

25          MS. FLYNN:  I know.

**Ramos - Redirect/Joseph**

```
1              THE COURT:  But I have no choice.

2              You cannot go ahead with it today?

3              MS. FLYNN:  No.

4              I don't have the witnesses.

5              THE COURT:  All right.

6              MS. ZWILLING:  Thank you, Judge.

7              (Sidebar concluded.)

8              (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ramos - Redirect/Joseph

1163

 1              (In open court.)

 2              THE COURT:  Members of the jury, the plaintiff

 3      has rested.

 4              I am advised that the defendants may have one or

 5      two witnesses.  They are not prepared to go ahead this

 6      afternoon.  I am going to have to go over certain law with

 7      the lawyers right now.

 8              So we are going to have to recess now until

 9      tomorrow morning at 9:30.  It probably will be a very

10      short day tomorrow.  Sorry about that.  But I have no

11      choice other than to bring you back.

12              What will happen, when both sides rest, I will

13      have to go over the law with the lawyers, the law that I'm

14      going to give you in my instructions.  That takes a number

15      of hours.  So you will be excused early tomorrow.

16              You will go over until Monday.  Monday is the

17      22nd -- no, 23rd.  Monday is the 23rd.  So on Monday, we

18      will have summations and there will be three.  The

19      plaintiff will have the first main closing argument,

20      followed by the defendant's only closing argument, and a

21      brief rebuttal by the plaintiff.

22              And then, if there's time, I will start my

23      instructions.  They will take a number of hours, and I

24      will go over my charge and the verdict sheet and then you

25      will start your deliberations.

1164

1    You will deliberate until 4:45 because we have

2  to leave at that time because one of you takes public

3  transportation.  However, if you want to stay later, you

4  simply send me a note through your foreperson whom you

5  will select, and I will stay later.

6    Otherwise, if you don't reach a verdict by

7  Monday, come back on Tuesday morning at 9:30 and start all

8  over again.  You will be under no time constraints

9  whatsoever.  Take all the time you need.  That's when you

10  start talking for the first time about the case.

11    We will, of course, continue to supply lunch at

12  the expense of the United States District Court.  I hope

13  lunch has been satisfactory.  If not, try something else.

14  Anything you want, you can order.

15    So now we are going to recess until tomorrow

16  morning at 9:30.  As I said, it will probably be a short

17  day.  In the mean time, please don't discuss the case with

18  anybody, either among yourselves or with anybody else.

19  Don't read Newsday or watch Channel 12.  By this time, you

20  must have piled up Newsday up to the ceiling.

21    We will recess until 9:30.  Have a nice evening.

22    (Jury leaves the courtroom.)

23

24    THE COURT:  Motions at the end of the

25  plaintiff's case.

1165

1    MS. ZWILLING:  Your Honor, I'm ready to proceed

2  on behalf of the defendants if plaintiffs are not making

3  any motions at this time.

4    THE COURT:  Pardon?

5    MS. ZWILLING:  I'm ready to proceed on behalf of

6  the defendant if the plaintiff is not making a motion at

7  this time.

8    THE COURT:  I don't hear the plaintiffs making

9  any motions.

10    MR. NORINSBERG:  This case is full of factual

11  issues that the court had identified in denying summary

12  judgment.

13    Those factual issues clearly must be resolved by

14  the jury.  I don't see any basis in law whatsoever for

15  their even making this application, but I do not

16  affirmatively have an application to make because I don't

17  believe these are legal issues in this case.

18    These are factual issues and it's up to the jury

19  to decide those issues.

20    THE COURT:  Does the defense want to make any

21  motions?

22    MS. ZWILLING:  Yes, Judge.

23    THE COURT:  Go ahead.

24    MS. ZWILLING:  Your Honor, perhaps the best way

25  to go about this is to begin with the procedural defense.

1166

1      THE COURT:  To begin with what?

2      MS. ZWILLING:  The procedural type defense.

3      The defendant's first motion here would be to

4   dismiss the entire case for the plaintiff's failure to

5   comply with 42 USC, Section 1997, commonly known as the

6   Prisoner Litigation Reform Act prior to instituting this

7   action.

8      The PLRA, as it's commonly called, requires all

9   prisoners to file a formal grievance with respect to any

10  complaints about jail incidents or conditions prior to

11  bringing an action.  And the plaintiff did not file any

12  grievance with respect to this matter prior to bringing

13  the action.  The PLRA applies to virtually every

14  conceivable type of claim a prisoner may make, including

15  such things as excessive force and alleged sexual abuse.

16     It is not satisfied by the informal making of

17  complaints, and the courts have held that among the

18  informal types of complaints that do not satisfy the PLRA

19  as a matter of law, are such complaints as complaints to

20  internal affairs, or to the sheriff or to the warden.

21     As a matter of law, none of those informal type

22  complaints satisfy the PLRA.  Only a formal grievance

23  does.  And, again, no formal grievance was filed by the

24  plaintiff regarding this incident, either at the

25  Suffolk County facility or at the Nassau County facility,

1167

 1    when she returned there.

 2             The PLRA applies even when the inmate has left

 3    custody.  They still must comply before bringing the

 4    lawsuit.  The two cases which we rely on for that

 5    proposition are **Sharif v Coombe**.

 6             THE COURT:  I don't know how to spell either one

 7    of those names.

 8             MS. ZWILLING:  I will be glad to spell them for

 9    the court, Judge.

10             THE COURT:  It would be different if you said

11    DiMaggio v Gehrig.  I would know how to spell that.

12             But I don't know how to spell this.

13             MS. ZWILLING:  Sharif is S-H-A-R-I-F-F v Coombe,

14    C-O-O-M-B-E.

15             The citation for that is 2009 WL, for Westlaw,

16    243941.  We are also relying on the case of **Finger, common**

17    **spelling, v McFinnis**, M-C-F-I-N-N-I-S.  The citation for

18    that case is 2004 WL, again for Westlaw, 1367506.  And we

19    are also relying on the case of **Macias, M-A-C-I-A-S v**

20    **Zenk**, Z-E-N-K, citation is 495 F.3d, 37.

21             And **Macias** stands for the proposition, as held

22    by the Second Circuit, that the PLRA is not satisfied by

23    the filing of informal grievances.  It must be the

24    completion of not only an actual grievance form, but the

25    plaintiff must have followed it through all levels of

1168

1    appeal, if that grievance is denied, in order to satisfy

2    the administrative remedies available prior to the

3    bringing of the lawsuit.

4         Again, Judge, plaintiff here filed no grievance.

5    Regardless of how we may feel about the facts of the case,

6    her failure to do so is a complete defense, a complete

7    obstacle to her bringing this action.

8         That would be our first motion.

9         THE COURT:  What about that?

10        MR. NORINSBERG:  I would just note initially

11   they moved for summary judgment.

12        They never once raised this issue, and the

13   reason they never raised it is because it has no

14   application to a 1983 case such as this.  If they had any

15   legitimate basis for getting this dismissed on that

16   ground, one would assume that that would have been part of

17   the original motion.  It was not.

18        A complaint was filed -- this wasn't a formal

19   grievance.  It was a sworn complaint through the Nassau

20   County Sheriff's Office directed to Suffolk County.  An

21   internal affairs investigation was conducted and it was

22   substantiated.  I don't know what more procedural devices

23   the plaintiff could have availed herself of.

24        There were criminal charges instituted also

25   which would have been pursued, but for the fact that

1    Mr. Feinberg took his own life.

2            So I think that this is really a completely

3    baseless argument.  It has no application, whatsoever.

4    The county knows it has no application.  That's why they

5    never made this argument before.

6            And I would just ask the court to reject this

7    argument out of hand.

8            MS. ZWILLING:  Judge, the plaintiff has known

9    about our defense since the very beginning of the case.

10           The first affirmative defense stated in our

11   answer that this inmate claim is barred by the provisions

12   of 42 USC, Section 1997 in our answer.

13           Moreover, Judge, the PLRA is not, strictly

14   speaking, an affirmative defense to be established by the

15   defendant in defense.  It is a condition precedent to

16   suit, much like a notice of claim, the satisfaction of

17   which the plaintiff must prove in order to proceed with

18   the action.

19           Counsel's contention that it does not apply to

20   Section 1983 cases is patently incorrect.  The

21   Supreme Court, itself, has repeatedly applied it to

22   Section 1983 cases, and the Second Circuit has held, and

23   we have litigated this issue there, that informal

24   complaints, specifically such things as reports to

25   internal affairs, or reports of a crime to the district

1170

1    attorney, do not suffice to satisfy the PLRA.

2          If the jail has a formal grievance procedure and

3    we all know that this one does because we have had chapter

4    and verse about the procedure, the inmate must pick up

5    that form, fill out their grievance on that form, submit

6    the grievance and, if it is denied, appeal it and keep on

7    appealing it until they have exhausted all remedies.

8          The plaintiff here has not filed a grievance.

9    Counsel does not suggest otherwise.  Their only contrary

10   argument is that there was an internal affairs

11   investigation.  There were criminal charges.

12         Judge, those sorts of things do not suffice

13   under the PLRA.

14         THE COURT:  I, frankly, have to look at the

15   cases you have cited.  I'm not familiar with them.

16         So at this point I'm going to reserve decision.

17         MS. ZWILLING:  Judge, with respect to our PLRA

18   defense, if the court permits us, we may also be -- would

19   like to submit some additional authority.

20         THE COURT:  Sure.

21         MS. ZWILLING:  I'll continue, if I may, with the

22   remainder of our motions.

23         We have motions -- a motion to dismiss for

24   failure to establish a prima facie case, and basically

25   there are three categories of these and I can deal with

1    them sequentially.

2            The first of these is that the plaintiff has

3    failed to prove a prima facie case of a constitutional

4    violation.  The first reason we submit that she has -- I'm

5    sorry, your Honor?

6            I thought you said something, Judge.

7            THE COURT:  No, I didn't.

8            MS. ZWILLING:  Our first basis is that we

9    believe that the plaintiff has not made out a prima facie

10   case that she was sexually abused.

11           THE COURT:  Just one minute.

12           MS. ZWILLING:  Sure.

13           (Whereupon, there was a pause in the

14   proceedings.)

15

16           THE COURT:  You may proceed.

17           MS. JOSEPH:  Thank you, your Honor.

18           As I said, the first basis that we contend that

19   the plaintiff failed to prove a prima facie case is that

20   we cannot believe she has adduced sufficient evidence that

21   she was sexually abused by Gary Feinberg to get to the

22   jury.

23           That is our first application, Judge.

24           THE COURT:  That she didn't prove she was

25   sexually abused?

1    MS. ZWILLING:  That she didn't prove sufficient

2    evidence that she was.

3    MR. NORINSBERG:  Your Honor, we just heard

4    testimony from Ms. Ramos that Mr. Feinberg inserted

5    fingers into her vagina, inserted fingers into her rectum,

6    grabbed her breast, grinded an erection into her hand.

7    What else would we have to show to establish a

8    sexual assault?  I don't think that is a legitimate

9    argument to make.

10    THE COURT:  That motion is denied.

11    MS. ZWILLING:  The next motion to dismiss for

12    failure to prove a prima facie case is that plaintiff did

13    not submit any evidence that Gary Feinberg acted under

14    color of law, which, as we know, is an essential element

15    for a claim of a constitutional violation under

16    Section 1983.

17    To act under color of law, Judge, and I think

18    this goes without saying, is that a plaintiff has to show

19    that the act to which she was subjected was made possible

20    only by virtue of the violator's position, and that may be

21    the case where there is sexual contact and the alleged

22    violator is a jailer or a police officer or a correction

23    officer because, in that case, there is an inherent power

24    and balance between the alleged victim and the alleged

25    abuser.  And the alleged abuser is the jailer.  He's the

1173

1    person who holds the keys to that individual's freedom.

2              We respectfully submit, Judge, that that is not

3    the case with a medical provider.  And in that regard I

4    point out that we have done quite a bit of research on

5    this and we haven't been able to locate any situation

6    where this case -- where the issue of whether or not a

7    medical provider's act of alleged sexual abuse are or are

8    not taken under color of law.

9              And, for that reason, I do wish to point out,

10   although it's parenthetical, that if Gary Feinberg were in

11   this courtroom and were he the defendant, he would

12   probably be entitled to qualified immunity on that basis.

13             But just to bring it back, Judge, it is our

14   position that where a medical provider engages in

15   impermissible sexual conduct, a medical provider who, as

16   we know, carries no baton or no weapon, that act,

17   regrettable as it may be, reprehensible as it may be, and

18   even, possibly, tortious under state law and criminal, is

19   simply not an action taken under color of law for

20   Section 1983 purposes.

21             As I said, for color of law to exist, the action

22   has to be made possible by the wrongdoer's position.  I

23   assume the plaintiff's comeback is going to be, well,

24   that's what placed Gary Feinberg in physical proximity to

25   the plaintiff.

1174

1        But, clearly, color of law requires more than

2   physical proximity.  We know that if the janitor in the

3   jail had assaulted an inmate, he's not acting under color

4   of law.  The truck driver from the department of public

5   works kidnaps a child while he's driving along his route

6   some day, he's not acting under color of law, even if he

7   would not have been -- had not encountered the child had

8   he not been working at that point.

9        It requires something more than proximity.  It

10  requires the creation of some sort of relationship between

11  the plaintiff and the alleged abuser that makes the action

12  possible.  And we submit that where the alleged abuser is

13  a medical provider, there is no such relationship and no

14  color of law for that reason.

15        MR. NORINSBERG:  Your Honor, the Second Circuit

16  stated, unequivocally, that a jail has an affirmative duty

17  to protect inmates in its custody.

18        Our claim is against the municipality,

19  County of Suffolk, for knowing about this particular

20  employee, for having five different complaints made before

21  the incident, and for failing to properly respond to it.

22        There's no question that this satisfies the

23  elements of 1983 in every respect.  The argument that

24  counsel's making, if it would be applicable at all, would

25  be applicable only to Mr. Feinberg if he were being sued

1175

1   under 1983 in his individual capacity.

2          But even if that were the case, which it's not,

3   even if that were the case, I don't think there's any

4   question that he would be operating under authority and

5   color of law, given the extent that he's operating in a

6   law enforcement environment, a jail, a correctional

7   facility, with supervision by jail employees, working

8   under that rubric.

9          I think there's no question that that would

10  satisfy a color of law, and what's telling about the

11  argument made by defense counsel is they acknowledge they

12  haven't found any case law on this at all because it's an

13  argument, to me, that's completely counter to common sense

14  and logic in a jail setting.

15          MS. ZWILLING:  Judge, it may be contrary to

16  common sense in Mr. Norinsberg's view, but there can be no

17  Monell liability absent an underlying constitutional

18  violation.

19          There is but one single constitutional violation

20  alleged in the complaint, and there has been one single

21  violation tried before this court, and that alleged

22  violation is the asserted abuse by Gary Feinberg.  If that

23  constitutional violation could not have been said to occur

24  because Mr. Feinberg's actions were not under color of

25  law, then there can be no Monell liability.

PAUL J. LOMBARDI, RMR, FCRR
Official Court Reporter

1    And, again, there may be some state law duty to
2    protect, what have you, but there can be no Monell
3    liability where there is no violation of a constitutional
4    right carried out under color of law.
5        THE COURT:  The court finds that the actions of
6    Gary Feinberg were under color of law.
7        He was the physician's assistant at the
8    Suffolk County Correctional Facility medical unit.  The
9    inmates had to be examined by him.  He was working under
10   his power and authority in accordance with his job.  It's
11   absolutely under color of law in my view.
12       And your inference that if he was individually
13   sued he might be entitled to qualified immunity I take
14   great umbrage at that.  If ever there was a violation of
15   clearly established rights, it's by a doctor violating a
16   patient.  His Hippocratic oath and the equivalent of a
17   physician's assistant prohibits anything like that, in
18   addition to violating the law and the criminal law and the
19   code of decency.
20       So your motion to dismiss because Gary Feinberg
21   didn't act under color of law is denied.
22       MS. ZWILLING:  And, Judge, for the record, I'm
23   not suggesting that his actions, if they occurred, were
24   anything but indecent and unethical and immoral.
25       THE COURT:  Okay.

1177

1       MS. ZWILLING:  Judge, the next category of our

2  motions is, based on the notion that the plaintiff has

3  shown no evidence of a causal link between any asserted

4  Monell policy and the alleged constitutional violation

5  being Gary Feinberg's sexual abuse.

6       Rather than waste a lot of time arguing why the

7  plaintiff didn't show various policies, and since they

8  have never told us what their Monell policy is, I would

9  think that we would all appreciate it if at this point the

10  plaintiff tells us what their Monell policy is, so that I

11  can limit my motions to why we believe they have not given

12  prima facie evidence as to the policy they intend to ask

13  the jury find.

14       MR. NORINSBERG:  It seems to me we have been

15  having this discussion over and over again.

16       Regardless of how many times I state on the

17  record what our claims are, it doesn't seem to resonate

18  with the defendants.  However, I'll state it again.

19       We have two principal Monell claims.  One is a

20  failure to train.  Specifically, the failure to train the

21  employees in the jail facility how to properly respond to

22  complaints of sexual abuse by inmates.

23       It's our contention that if they had been

24  properly trained about their duties and responsibilities,

25  that everyone, starting from Carol Manderino, to Nancy

1  Kugler, to Sergeant Lundquist, to Investigator Olivencia,

2  to Ms. McCarrick --

3          THE COURT:  To slow down.

4          MR. NORINSBERG:  All of the individuals that

5  Ms. --

6          THE COURT:  Did you ever hear of that correction

7  officer, slow down?

8          MR. NORINSBERG:  We'll slow down.

9          All of the individuals that were notified of

10 Mr. Feinberg's misconduct but failed to take any action,

11 all of them testified that they had received no training,

12 whatsoever, regarding how to respond to a complaint of a

13 sexual assault by a staff member.

14         Not only did they say that they had no training,

15 they also said that there were no written guidelines,

16 whatsoever, as to how to respond to this situation, or how

17 to handle this situation.  They couldn't even determine

18 what would be the proper form to use to report this type

19 of an allegation.

20         So our position is, so it's crystal clear on the

21 record, that there was a deficiency, a gross deficiency in

22 training, and that training was -- that failure to train

23 was directly responsible for the -- this assault happening

24 on Ms. Ramos.  Because if this incident had been properly

25 investigated and reported on the five previous occasions

1   prior to Ms. Ramos, then this clearly would have resulted

2   in Mr. Feinberg being removed from that position, and he

3   wouldn't have been allowed to have any contact with female

4   inmates.

5           So that's our first claim.  It's failure to

6   train.

7           Our second claim is deliberate indifference to

8   claims made by women inmates regarding sexual abuse.  And

9   this is an umbrella category.  It includes the failure to

10  respond which I had talked about earlier.

11          But it also includes a general disregard of

12  complaints that are being made by these women inmates.  We

13  submitted evidence, first in the form of Ms. Rickenbacker,

14  that multiple times there were complaints made, there was

15  a complete disregard, no response, whatsoever, to any of

16  these complaints.

17          But we didn't just show Ms. Rickenbacker in this

18  case.  We showed that with Ms. Ramos and her complaint

19  there was absolutely no meaningful investigation taken of

20  this.  The investigator said that he didn't feel the need

21  to investigate or speak to Mr. Feinberg.

22          He did absolutely nothing about this.  He didn't

23  speak to Ms. Ramos.  He didn't interview Mr. Feinberg.  He

24  didn't do anything on this case until February 3rd when a

25  civilian from the outside called and made a complaint

1180

 1    about a second inmate and then all of a sudden he finally

 2    took some action and interviewed inmates.

 3           But the record will reflect that for the six

 4    weeks or so he was doing this investigation, he literally

 5    did nothing in terms of finding out what actually

 6    happened.

 7           The third instance and the third evidentiary

 8    basis in support of our claim is that the post-incident

 9    evidence which the court admitted with respect to

10    Ms. Kennedy's claim, Ms. Kennedy complained to five

11    different employees at the jail.  She brought this to the

12    attention of people in security.  She brought it to the

13    attention of people in the medical staff.

14           And we know what happened in the aftermath of

15    this complaint.  It made its way up to Dr. Geraci, the

16    head of the medical unit, and Ms. Kugler.  They had a

17    meeting on January 20th, 2006.

18           And what did they decide to do?  Absolutely

19    nothing, nothing.

20           (Continued on next page.)

21

22

23

24

25

1    MR. NORINSBERG:  (Continuing.)

2         They didn't report this to Internal Affairs.

3    They didn't report it to internal security.  They didn't

4    report it to the Sheriff's department.  They did

5    absolutely nothing.

6         And the only time that this came into being, the

7    only reason why all of this came out, was finally when

8    there's a second allegation made and when Internal Affairs

9    learns of the second allegation and the interviews were

10   done on February 6th, that's what finally led to this

11   arrest of Gary Feinberg.

12        But the people in the jail medical unit did

13   nothing in response to these claims of -- whatsoever.

14        So it's our position that these three different

15   scenarios, first, Ms. Rickenbacker's complaints; second,

16   Ms. Ramos complaint; third, Ms. Kennedy's complaint, that

17   these are three different pieces or components of our

18   claim that support an inference that there was an

19   unwritten policy of disregarding inmate complaints

20   regarding sexual assaults by staff members.

21        MS. ZWILLING:  Judge, first of all, this case

22   hinges on what the county could have done prior to the

23   alleged sexual assault of Ms. Ramos.

24        What happened subsequently may conceivably be

25   some evidence of a policy existing before.  But unless

1182

1   plaintiff proves that a policy in place at the time of the

2   alleged attack was the moving force behind that attack,

3   what the County did or didn't do afterward is not a basis

4   upon which the plaintiff can urge the jury to impose

5   liability on the County.

6           And the reason I asked Mr. Norinsberg what his

7   Monell policy is is because he keeps mixing apples and

8   oranges together and I'd like to separate that for the

9   Court.

10          We know he has this failure to train policy.

11  Then he talks about the County is liable for being

12  deliberately indifferent.

13          Well, Judge, the County can only be liable for a

14  policy or custom undertaken with a certain state of mind.

15  There is no such basis of a Monell liability for

16  deliberate indifference.  Deliberate indifference refers

17  not to the policy, but to the state of mind.  Deliberate

18  indifference is a state of mind and that state of mind

19  must generate the policy.

20          In other words, if the County acted deliberately

21  indifferent and negligently or even recklessly, if it

22  wasn't so active in the execution of a policy, that's

23  irrelevant.

24          So perhaps he has a failure to train claim here,

25  but there's no claim that the County was deliberately

1183

1    indifferent.  They can be deliberately indifferent and

2    having a policy but they have to have a policy.  There's

3    no separate cause of action for deliberate indifference.

4         Now, with respect to the alleged failures to

5    accept complaints and respond to them, this is to some

6    extent mutually inconsistent.

7         The plaintiff can't argue that they didn't take

8    the complaints and didn't investigate them.  Because if

9    they didn't take them, of course they can't investigate.

10   Which in no way excuses the failure to investigate, but

11   they both can't be possible.  It's one or the other.

12        Now, our first -- the first theory upon which we

13   believe the plaintiff has failed to demonstrate a causal

14   link between the asserted policy and the constitutional

15   violation, I would suggest the Court look to City of

16   Canton v. Harris, which is 109 SCT 1197, which is probably

17   the single-most important case that sets out the

18   parameters of a failure to train and failure to supervise

19   claim.

20        And Canton says that the first input, the very

21   first thing the Court needs to look at in determining

22   whether the plaintiff has made out a claim of a failure to

23   supervise is, A, in the Supreme Court's words, direct

24   causal link between the policy and the alleged

25   constitutional violation.

1184

1    Not some possible cause and effect relationship.

2    Not a derivative second cause.  But a direct causal link,

3    the very moving force connection between the policy and

4    the constitutional violation that Monell speaks of.

5    Now, we first contend that the alleged causal

6    link is deficient here on legal grounds, purely legal

7    grounds.  We know that there's no respondeat superior with

8    liability of a municipality under Section 1983.  And

9    Monell's liability is limited to certain specified

10   policies.

11   Now, City of Canton and the cases that interpret

12   it have permitted the imposition of liability for a

13   municipality's failure to train or supervise the employee

14   who commits the constitutional violation.  That's not what

15   the plaintiff seeks to do here.

16   The plaintiff is not alleging that the County

17   failed to train or supervise Gary Feinberg.  And again, it

18   is the sexual abuse by Gary Feinberg that is the only

19   constitutional violation which plaintiff chose to allege

20   in the complaint and the only constitutional violation

21   that the plaintiff chose to present to this jury.

22   And that is extremely significant, Judge,

23   because we don't believe that the courts permit the

24   imposition of Monell liability in the manner plaintiff

25   seeks to impose it here.

1    The plaintiff here is not alleging that the

2    County failed to train or supervise the person who

3    committed the constitutional violation which would be a

4    direct causal link.  They are presenting this heretofore

5    unheard of theory that as a result of the county's alleged

6    failure to train and supervise other persons, their

7    insufficiencies caused a third person to commit a

8    constitutional violation.  No direct causal link, Judge.

9    A secondary, speculative link at best and from a factual

10   sense and one that has not been permitted by the courts.

11   The courts again permit the imposition of

12   liability for failing to properly manage the

13   constitutional violator.  There is no basis upon which the

14   Court should extend itself to hold out there can be

15   liability for failure to train certain employees who as a

16   result of their actions may be said to have caused someone

17   else to violate the constitutional right.

18   And in that regard, I would draw the Court's

19   attention to some language from City of Canton, which I

20   think is very illustrative with respect to indirect

21   attenuated change of causation.  In a footnote, footnote

22   nine, the Court quotes the Supreme Court's decision --

23   THE COURT:  Footnotes?  I don't accept

24   footnotes.

25   MS. ZWILLING:  Not even the Supreme Court's,

1186

1    Judge?

2              THE COURT:  You know what I think of footnotes,

3    don't you?

4              MS. ZWILLING:  Understood, Judge.

5              THE COURT:  You know about that, right?

6              MS. ZWILLING:  I do, Judge.  I'm familiar with

7    your rule.  Let's forget the footnote.

8              THE COURT:  Very disturbing, footnotes.  Here

9    you're reading, everything is fine and all of a sudden you

10   see this -- first of all, most of the time I can't even

11   see the number, then I have to go from the reading, which

12   you know takes some concentration, and then go underneath

13   near the bottom of the page, interrupt my line of thought?

14   No way.

15             MS. ZWILLING:  Okay, Judge.

16             Aside from the footnote, they are quoting the

17   Supreme Court's earlier decision in the Tutle, T-U-T-L-E,

18   case, and I'm just looking through this now to find the

19   citation, it's Oklahoma City v. Tutle, which is 105

20   Supreme Court 2427.

21             And the Supreme Court observed there with

22   respect to attenuated and secondary claims of causation,

23   "obviously if one retreats far enough from a

24   constitutional violation, some municipal policy can be

25   identified behind almost any harm inflicted by a municipal

1  official.  For example, a police officer would never have

2  killed Tutle if Oklahoma City did not have a policy of

3  establishing a police force.  But Monell must be taken to

4  require proof of a city policy different in kind from this

5  latter example before a claim can be sent to a jury on the

6  theory that a particular violation was caused by the

7  municipal policy."

8          What this makes clear, Judge, is that again the

9  causal link, as said by the Supreme Court in Canton, must

10  be a direct causal link.  There is no authority upon which

11  the Court can impose liability on the theory urged by the

12  plaintiff, which is that the County's failure to train and

13  supervise certain officials caused another person to

14  commit a constitutional violation.

15          MR. NORINSBERG:  We are operating in this

16  courtroom under a Second Circuit case law authority that's

17  directly on point and I stated this a few times, I want to

18  just quote the Villante case for the record, because

19  clearly the legal framework set out by the Second Circuit

20  is the framework --

21          THE COURT:  What case is that?

22          MR. NORINSBERG:  Villante versus Department

23  of --

24          THE COURT:  How do you spell it?

25          MR. NORINSBERG:  V-I-L-L-A-N-T-E, versus the

1188

1     Department of Corrections of the City of New York, 786

2     F. 2d (516) Second Circuit 1986.

3              It says, "the behavior of subordinate prison

4     officials may evidence a failure to train or supervise

5     sufficiently egregious to amount to gross negligence or

6     deliberate indifference on the part of their superiors and

7     the municipality."  That's at page 519.

8              The same page says, "municipalities have an

9     affirmative duty to protect those held in their custody.

10    Therefore, liability may be based on the grossly negligent

11    or deliberately indifferent failure of custodial officers

12    to protect an inmate."

13             That's precisely what we're arguing here,

14    your Honor.  We're arguing that the multiple opportunities

15    where the defendant's employees knew about the complaints

16    about Gary Feinberg and did nothing violate the

17    obligations of the affirmative duty that the Second

18    Circuit recognized, and I will add parenthetically that at

19    least two of the people that knew beforehand were clearly

20    high level supervisors.  Ms. Kugler was a supervisor of

21    nine different people mental health unit.  Sergeant

22    Lundquist was the commanding officer in the gang

23    intelligent unit and was part of internal security

24    himself.  So I feel that the arguments that are being made

25    are being made in the abstract.

1   The actual factual context within which we're

2   operating within directly follows the roadmap laid out by

3   the Second Circuit and that's how we started this case.

4   That's been the theory all along.  That was the basis why

5   the Court denied summary judgment and said this must go to

6   the jury.  That was the evidence we presented during the

7   trial consistent with that ruling and that's what the jury

8   is clearly going to decide.

9          So I feel like we are clearly within the legal

10  framework that's been set out by the Second Circuit and in

11  the multiple other cases that I have cited and that I have

12  in my requests to charge that stand for the same

13  proposition.

14         So I respectfully ask the Court to deny that

15  motion out of hand as well.

16         MS. ZWILLING:  Judge, Villante, which was

17  decided in 1986, has not been the law since the Supreme

18  Court's 1989 decision in Canton which sets out the

19  framework for a failure to train, a failure to supervise

20  claim.

21         It's the Supreme Court's 1989 decision that

22  controls, not the Second Circuit's earlier decision.

23         And with respect to the plaintiff's reference of

24  people being supervisors here, there's no municipal

25  liability based on the acts the supervisors.  Policy

1190

1    makers, yes, but even the plaintiff is not urging that

2    they are a policy maker.  In any event, Judge, that, to

3    sum up, is one of the bases of our motion that liability

4    under Monell cannot be premised on a failure to train

5    employees who supposedly caused a different employee to

6    commit a constitutional violation.

7              THE COURT:  Well, this case presents such clear

8    Monell liability, I have rarely seen anything like it.

9              First of all, the policy, custom and practice of

10   the Suffolk County correctional facility and the Suffolk

11   County Sheriff's department, which reaches all the way up

12   to the sheriff mentioned in this case, the sheriff's

13   assistant, who are policy makers, is not to investigate

14   inmate -- female inmates' complaints.

15             The policy, the custom, the practice of the

16   Suffolk County correctional facility, the Suffolk County

17   Sheriff's department, the sheriff and the assistant to the

18   sheriff is not to investigate female inmates' complaints

19   of sexual misconduct by probably anybody, but certainly

20   this physician's assistant.

21             I was listening carefully.  I don't know if

22   anybody even questioned this man.  They just paid no

23   attention.  Not only pay no attention, but there's

24   evidence they called them names when they make complaints.

25             So there's a policy that the plaintiff has

1   attempted to prove of no investigation of female inmates'

2   complaints in the Suffolk County correctional facility.

3           The evidence is clear about that.  The

4   complaints prior to the situation with Rochelle Ramos of

5   other people being sexually abused and nothing being done

6   is also clear.

7           The reports were made to the jail health clinic

8   administrator, the medical unit administrator, Dr. Geraci.

9   He's in charge.  He's a policy maker.  Also to the

10  administrator of the health clinic, I believe that was --

11  the deputy administrator was Rick Kaufman or his superior,

12  David Bloomberg.  Everybody was told about these things.

13  There were never any rules or guidelines of any kind to

14  handle this situation.

15          No regulations when Dr. Geraci was told about

16  this.  He didn't ask either Sergeant Campo or Lieutenant

17  Nolan to investigate the matter.  Just leave it alone,

18  that's all.  It will go away.

19          Richard Kaufman, who was the Suffolk County

20  Department of Health clinic coordinator, he had no

21  training, he said.  It was not his responsibility to do

22  anything, he said.

23          Carol Manderino, the psychiatric social worker

24  for the Suffolk County Department of Health at the

25  facility, was never trained to notify a superior if an

1192

1   inmate claimed sexual abuse.  She said so.  I was never

2   trained to do anything about that.  Slipshod.

3            James Wright, the deputy sheriff investigator

4   for Suffolk County sheriff's office, never even

5   interviewed Gary Feinberg at all.  He never asked what

6   happened.  He never went to the jail medical unit, even

7   though Internal Affairs apparently made a conclusion that

8   Ms. Ramos' allegations were founded.  And he testified

9   that the sheriff himself, here we have the top policy

10  maker, the sheriff himself wanted an investigation by CIB.

11           Investigator Robert Starke, a deputy sheriff,

12  said that Sheriff DiMarco told him to take over the

13  investigation.  So the top policy maker again is in this.

14           MS. ZWILLING:  Judge, I think we're --

15           THE COURT:  Please don't interrupt.

16           MS. ZWILLING:  I'm sorry, your Honor.  I thought

17  that you were finished.

18           THE COURT:  And then the pastor Roy Kurtin you

19  heard today, called Butch Langhorn, the assistant to

20  Sheriff DiMarco, and told him about this.

21           So that's the first cause of action in my view.

22  It's a Monell policy, custom and practice not to

23  interview, not to investigate inmates' allegations of

24  sexual abuse.

25           The second, of course, is training.  There's a

1    total lack of training.  Shouldn't they have said, you got

2    to be very careful.  We know these inmates can say all

3    kinds of crazy things, but when they say they've been

4    sexually abused by a doctor or a doctor's assistant,

5    you've got to go into that, because they're at the mercy

6    of a doctor or a doctor's assistant.  They're in a very

7    exposed, tenuous position, and subject to that.

8              So I think there's two causes of action.  The

9    plaintiff has made out a prima facie case of, one, Monell

10   policy, practice, custom not to investigate female

11   inmates.  And two, lack of training on that subject, which

12   a jury could find because of the previous complaints that

13   led to this act of sexual abuse against Ms. Ramos.

14             Therefore, I'm denying.

15             You wanted to say something else?

16             MS. ZWILLING:  Yes, Judge.  I thank your Honor

17   for parsing out the two different claims there, because I

18   think the plaintiff has intentionally tried to slough them

19   together.

20             There is a possible complaint of a failure to

21   investigate and also there's the claim of failure to

22   train.

23             The standards for the two of those claims are

24   entirely different.

25             On failure to investigate claim, the plaintiff

1194

1  needs to show that there was a widespread practice of

2  ignoring claims.  On a failure to train claim, they have

3  to focus on deficiencies in the training program.  They

4  can't slough a little from column A and column B together

5  and make a pile high enough.  They've got to prove the

6  entirety of either one of those claims.

7          My motion, Judge, or the last aspect of it was

8  only this, that there is no authority for the imposition

9  of Monell liability for the failure to train anyone other

10 than the constitutional violator.  There is no authority

11 upon which Monell liability may be imposed for a

12 derivative failure to train.

13         THE COURT:  Have you concluded your argument?

14         MS. ZWILLING:  I have concluded that aspect.

15         THE COURT:  Your Rule 50 motion for judgment as

16 a matter of law discussing plaintiff's case is denied

17 except for the first motion that you made.  I have to look

18 into that.

19         MS. ZWILLING:  Your Honor, if I may, I wasn't

20 finished.  I do have some other grounds.  I was simply

21 finished with that aspect.

22         THE COURT:  Okay, go ahead.

23         MS. ZWILLING:  It is also our position that

24 there's been no evidence that any policy that would have

25 caused employees to inadequately investigate -- that might

1    cause employees to conduct inadequate investigations could

2    have led to the plaintiff's constitutional rights being

3    violated.

4              To the extent that Ms. Ramos' attempts to ground

5    her Monell claim on the alleged policy of failure to

6    respond to complaints, it's critical that -- it's not very

7    clear, Judge.  It does not seem that anybody ever claimed

8    prior to the alleged assault on the plaintiff that they

9    were subjected to involuntary sexual abuse.

10             I believe that the most that can be said for the

11   plaintiff's version of the facts is that prior to the

12   alleged attack on the plaintiff, Lowrita Rickenbacker

13   reported the claim of consensual conduct with Gary

14   Feinberg.  Now, consensual conduct between a medical staff

15   and an inmate is, to say the least, it's reprehensible,

16   it's inexcusable, it's unethical.  I'm not going to

17   suggest it's not, but it's not a constitutional violation.

18             That's critical because for a policy of failing

19   to address complaints, for that to suffice under Monell

20   and Canton, it has to be a policy of failing to address

21   constitutional violations.  Not a policy of failing to

22   address complaints, not a policy of disregarding the best

23   interest of the inmates, but a policy of disregarding

24   complaints of constitutional violations.

25             So any claim that the plaintiff might make that

1196

1    a policy of failing to respond, we believe should be

2    dismissed as a matter of law.

3           To the extent that there was no report of

4    involuntary sexual conduct before December 29th, it is our

5    position that there can be no evidence of a policy in

6    existence at that time of a failure to investigate.  And

7    for that reason plaintiff should not be permitted to get a

8    claim to the jury.

9           MR. NORINSBERG:  Very briefly.

10          Ms. Rickenbacker just testified today that she

11   never said it was consensual.  She never told that to

12   Manderino.  When she reported it to Lundquist, reported it

13   to Olivencia, reported it to McCarrick, it was always as

14   inappropriate sexual touching.  It was never complained of

15   as a consensual act.

16          So that might be their defense to argue that but

17   that's not what our testimony has been through

18   Ms. Rickenbacker.

19          The jury is free to credit the testimony of

20   Ms. Rickenbacker and reject the testimony offered by the

21   defendants.

22          And on that basis, Judge, I would ask you to

23   deny the motion on that ground as well.

24          MS. ZWILLING:  Judge, when asked on

25   cross-examination, are you sure when you reported the

1   alleged his sexual abuse, Ms. Rickenbacker conceded she

2   did not know if it was in 2005 or 2006.

3           THE COURT:  There is an issue of fact at best as

4   to whether the conduct to Ms. Rickenbacker was consensual.

5   She just testified this morning that it wasn't consensual.

6   And the jury could find that very easily.  So I don't know

7   where you're going to have a motion decided in your favor

8   based upon that testimony.

9           If that's your motion, again, denied.

10          MS. ZWILLING:  We also contend that there's been

11  no evidence adduced by the plaintiff that any of the

12  proffered policies played a role in prompting Gary

13  Feinberg to sexually abuse --

14          THE COURT:  I'm sorry, I didn't hear that.

15          MS. ZWILLING:  There's been to evidence adduced

16  by the plaintiff that any of the supposed policies played

17  a role in prompting Gary Feinberg to abuse her.

18          THE COURT:  No.  It would play a role in getting

19  rid of Gary Feinberg.

20          MS. ZWILLING:  That may or may not be true,

21  Judge, but it's got to be the moving force behind the

22  constitutional violation.

23          It is our position that to show some connection

24  between the alleged policy and the constitutional

25  violation, the plaintiff would have to show that Gary

1198

1   Feinberg was emboldened by the policy of inadequate

2   investigation to --

3             THE COURT:  I don't know where you got that

4   from.

5             MS. ZWILLING:  Well, judge, if he doesn't know

6   it's going to happen.

7             THE COURT:  Sounds good.

8             MS. ZWILLING:  Precisely, Judge.

9             If the policies didn't lead him to believe that

10  he could get away with it, then they could not have been

11  the cause of his acts.

12            And there's no proof whatsoever that his

13  misconduct, that he knew that it wouldn't be reported or

14  investigated.  It's possible, but a verdict can't be based

15  upon possibility.

16            It's also possible that he believed other

17  employees would have reported his misconduct but he felt

18  nobody would believe the inmates so he didn't care or he

19  didn't care that he was going to be reported and fired

20  because he was leaving his job the following week, or he

21  thought his union would protect him of any complaints.

22  There's no evidence of any of these things, we don't have

23  to prove it, Judge.  We're the defendants.

24            My point is only that there isn't any evidence

25  adduced by the plaintiff to show that these policies

1   played any role in Gary Feinberg deciding to commit these

2   intentional acts which he is alleged to have committed.

3   And again, proximity, opportunity is not enough.  It has

4   to be the moving force.

5               THE COURT:  Have you concluded?

6               MS. ZWILLING:  That aspect of our motion, Judge.

7               THE COURT:  Denied.

8               Next.

9               MS. ZWILLING:  With respect to the failure to

10  train claim, your Honor, the City of Canton case makes

11  plain that a plaintiff has to show that municipal policy

12  makers actually disregarded a risk of future violations,

13  and we believe that there has been no evidence adduced by

14  the plaintiff to that effect.

15              THE COURT:  Is this another motion?

16              MS. ZWILLING:  Yes, Judge.

17              THE COURT:  Denied.

18              I think that I'm going to make a record here.

19              MS. ZWILLING:  I think that I'm making a record,

20  Judge.  This is already five times longer than I've ever

21  gone on in a Rule 50.

22              We also contend that the plaintiff failed to

23  prove a prima facie case because they put on no showing

24  that -- no evidence by which the jury could determine that

25  the programs of training and supervision were deficient.

1      There's been no evidence put before the jury

2  which they could utilize to rate a program of jail

3  administration or Department of Health administration as

4  good, bad, outstanding or terrible.

5      The proper way to run a jail or a Department of

6  Health services is not something within the knowledge of a

7  layperson.  A layperson has no knowledge as to what the

8  proper standards and practices are to run those sorts of

9  agencies.

10      And plaintiff never called any expert to give

11  evidence as to what those standards are and to point out

12  what the County did which -- in failing to come up to

13  those standards.

14      Now, they put on supervisor and corrections

15  personnel and medical personnel and never once asked them

16  what are the national standards in their profession?

17  What's required by national standards in terms of training

18  and reporting and supervision?  Plaintiff's attorneys

19  didn't pull out the usual national standards and

20  guidelines books for the administration of agencies and

21  questioned them as to whether the County complied with

22  those standards.

23      That's something which I know is easily done

24  because I have used those standard books all the time in

25  cross-examining law enforcement experts in these cases.

1        Again, no evidence as to what the proper

2   standard was and how the County failed to come up to that

3   standard.

4        Now, the plaintiff did adduce some evidence

5   about what the program was and then cast out some innuendo

6   that it was not what it should be, and Mr. Norinsberg

7   suggested that, in his opinion, the jail medical unit were

8   improperly run, but he's not an expert, he's not a

9   witness.  And his view on how a sheriff should run a law

10  enforcement agency or how the Commissioner should run the

11  Department of Health, is not a basis upon which the jury

12  could conclude that the announcement of the policy makers

13  or managers are deficient.

14       Now, the plaintiff did adduce some evidence that

15  some but not all of the persons who got the complaint

16  didn't know how to respond.  But they gave us no evidence

17  whether that was because they were poorly trained or

18  because they ignored their training or they forget what

19  the rules were.  We don't know what the source of their

20  confusion is.  They have to show that the failure to

21  respond was due to the inadequacies of the training.

22       But again, Judge, Canton makes clear that a

23  plaintiff can't even suffice by showing that individual

24  employees were improperly trained or managed.  Canton says

25  exactly that, that the plaintiff can't get their case to

1   the jury by showing improper training or supervision of

2   individual employees.  They must demonstrate the

3   deficiencies in the program itself, and the plaintiff

4   hasn't done that.

5           In the absence of any evidence presented by the

6   plaintiff as to what the good and proper practices are for

7   running a law enforcement agency or a Department of

8   Health, it is our position that the plaintiff is not

9   entitled to have the jury substitute their own judgment

10  for professional standards and determine that they

11  disliked the County's practices.

12          THE COURT:  Have you concluded that phase?

13          MS. ZWILLING:  That phase, Judge, yes.

14          THE COURT:  The plaintiff doesn't need an expert

15  in this case.  The plaintiff doesn't need national

16  standards in this case.

17          It's the clearest, most simple Monell that I

18  have ever heard.

19          There's no policy to respond to a female inmate

20  who says that she was sexually abused by the physician's

21  assistant.  They did nothing.  They didn't know what to do

22  or couldn't care less.  If ever there was a policy that

23  was clear, it was that.

24          You didn't have to show what the good and proper

25  standards are.  Everybody knows what the good and proper

1203

1    standards are, that when a female inmate complains about

2    being sexually abused, you have to do something about it.

3    And their policy is to do nothing but shuttle it off from

4    division to division, from the internal security, to the

5    CIB, to the Internal Affairs.  I don't know who else.  And

6    end up doing nothing.  That's what I heard.  So no expert

7    is needed.  It's common sense.

8             Denied.

9             Anything else?

10            MS. ZWILLING:  I'm wrapping up, Judge.  Just a

11   quick glance over my notes.

12            That would conclude our Rule 50 motion, Judge.

13            THE COURT:  Okay.  The only portion of your

14   motion I have reserved decision on is your failure to

15   exhaust.

16            No formal grievance was filed.  You say this is

17   under the Prisoner Litigation Reform Act, right?

18            MS. ZWILLING:  Yes, it's 42?

19            THE COURT:  That's what I'm going to look into.

20            MS. ZWILLING:  Thank you, Judge.

21            THE COURT:  That decision's reserved.

22            Anything else at this time?

23            Tomorrow morning at 9:30.

24            You'll have your witnesses here?

25            MS. FLYNN:  Yes, your Honor.

1204

1    THE COURT:  You, I'm talking to.

2    MS. FLYNN:  Yes.

3    THE COURT:  Okay.

4    (Whereupon, court recessed for the day until

5    Thursday, November 19, 2009 at 9:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1205

1

2                    I N D E X:

3    LOWRITA RICKENBACKER                        949

4    DIRECT EXAMINATION                          950

5    BY MS. JOSEPH

6    VOIR DIRE EXAMINATION                       981

7    CROSS-EXAMINATION                           997

8    BY MS. FLYNN

9    CROSS-EXAMINATION                          1015

10   BY MS. FLYNN

11   REDIRECT EXAMINATION                       1055

12   BY MS. JOSEPH

13   RECROSS-EXAMINATION                        1068

14   BY MS. FLYNN

15   REDIRECT EXAMINATION                       1073

16   BY MS. JOSEPH

17

18   SUSAN DAVIS                                1080

19   DIRECT EXAMINATION                         1080

20   BY MS. JOSEPH

21

22   ROY KURTIN                                 1085

23   DIRECT EXAMINATION                         1085

24   BY MS. JOSEPH

25

1206

```
 1    CROSS-EXAMINATION                            1089

 2    BY MS. FLYNN

 3    REDIRECT EXAMINATION                         1092

 4    BY MR. NORINSBERG

 5    RECROSS-EXAMINATION                          1092

 6    BY MS. FLYNN

 7

 8    ROCHELLE RAMOS                               1096

 9    DIRECT EXAMINATION                           1096

10    BY MS. JOSEPH

11    CROSS-EXAMINATION                            1120

12    BY MS. FLYNN

13    REDIRECT EXAMINATION                         1156

14    BY MS. JOSEPH

15

16                  E X H I B I T S:

17    Plaintiff's Exhibit 61 in evidence          983

18    Plaintiff Exhibit PD-61 in evidence         986

19    Defense Exhibit I was received in evidence  1024

20    Defense Exhibit Q was received in evidence  1045

21    Plaintiff Exhibit 61-B in evidence          1083

22    Defendant's Exhibit S in evidence           1070

23    Defendant Exhibit T in evidence             1071

24

25
```

## $

**$1,500** [3] - 1146:15; 1147:4, 20
**$14,000** [1] - 1051:24
**$2,000** [3] - 1146:15; 1147:4, 20
**$4,600** [1] - 1052:4
**$800** [1] - 1151:17

## '

**'02** [1] - 1150:12
**'07** [1] - 1031:8

## 0

**07-CV-1250** [1] - 948:4

## 1

**10** [4] - 1119:13; 1134:10, 12
**100** [2] - 948:22; 1122:25
**10007** [1] - 948:14
**1015** [1] - 1205:9
**1024** [1] - 1206:19
**1045** [1] - 1206:20
**105** [1] - 1186:19
**1055** [1] - 1205:11
**1068** [1] - 1205:13
**1070** [1] - 1206:22
**1071** [1] - 1206:23
**1073** [1] - 1205:15
**1080** [2] - 1205:18
**1083** [1] - 1206:21
**1085** [2] - 1205:22
**1089** [1] - 1206:1
**109** [1] - 1183:16
**1092** [2] - 1206:3, 5
**1096** [2] - 1206:8
**1120** [1] - 1206:11
**1156** [1] - 1206:13
**11722** [1] - 948:23
**11788** [1] - 948:18
**1197** [1] - 1183:16
**12** [4] - 1098:6, 11; 1143:21; 1164:19
**12/21/05** [1] - 1154:18
**13** [2] - 1033:17; 1098:11
**1367506** [1] - 1167:18
**15** [4] - 1080:25; 1085:11; 1097:25; 1131:16
**15-minute** [1] - 1014:4
**16** [2] - 1054:12; 1055:5
**17** [2] - 951:2, 12
**17th** [1] - 1034:6
**18** [3] - 948:8; 1050:13; 1151:15
**18th** [1] - 970:3
**19** [7] - 951:1; 1097:4; 1121:23; 1122:7; 1154:10, 14; 1204:5
**1983** [9] - 1097:16; 1168:14; 1169:20, 22; 1172:16; 1173:20; 1174:23; 1175:1; 1184:8
**1985** [1] - 1097:18
**1986** [2] - 1188:2; 1189:17
**1989** [2] - 1189:18, 21
**1997** [2] - 1166:5; 1169:12
**1:30** [2] - 1065:8, 11
**1st** [1] - 1145:23

## 2

**2** [2] - 961:17; 1030:4
**20** [6] - 1027:3; 1070:7; 1089:25; 1097:4; 1119:13; 1147:25
**200** [2] - 1012:12
**2000** [4] - 1030:4, 6, 9, 24
**2002** [10] - 1035:22; 1050:13; 1145:22; 1146:14; 1148:13; 1149:18; 1151:1, 15; 1152:3
**2003** [2] - 1049:21; 1050:1
**2004** [1] - 1167:18
**2005** [102] - 952:5, 12, 20; 953:11; 954:2; 960:12, 15; 961:3; 962:6, 10, 18-19; 963:14; 965:17; 966:3, 8; 967:1; 970:5; 981:9; 992:6; 998:9, 14; 999:1, 5, 11; 1000:22; 1005:8, 24; 1006:24; 1008:8; 1010:15; 1011:16; 1025:14, 22; 1033:8, 17; 1034:6, 11, 25; 1035:5, 24; 1036:23; 1038:12; 1041:1, 24; 1042:13, 18, 25; 1043:1, 5, 8, 12; 1046:5, 15, 19, 22; 1047:1; 1048:5, 24; 1049:16; 1051:6; 1053:15; 1054:5, 12; 1055:5, 20; 1058:21, 25; 1060:8; 1061:1; 1070:7; 1073:7; 1077:16; 1081:6, 22; 1083:8, 10; 1085:17; 1087:2, 7; 1089:14; 1090:24; 1099:8; 1123:11, 16; 1126:13; 1142:8, 11, 14, 19; 1143:12; 1144:4, 15, 24; 1152:13; 1153:3, 11; 1154:10, 14; 1197:2
**200** [2] - 1012:12
**2000** [4] - 1030:4, 6, 9, 24
**2005-2006** [1] - 1051:14
**2006** [30] - 952:14; 962:10; 989:4, 13, 16-17; 995:16, 23-24; 996:1, 4-5; 998:12; 1000:22; 1010:15; 1011:16; 1017:4; 1021:9; 1024:9, 17; 1025:6; 1035:17; 1043:16; 1045:20; 1046:6; 1051:7; 1059:7; 1060:1; 1180:17; 1197:2
**2007** [3] - 995:17; 1027:3, 9
**2008** [4] - 1015:21; 1016:1; 1032:1; 1121:16
**2009** [13] - 948:8; 1026:2, 18; 1029:17; 1031:3, 6; 1114:3; 1127:8; 1129:4; 1143:22, 24; 1167:15; 1204:5
**20th** [5] - 1027:9; 1033:8; 1083:8, 10; 1180:17
**21** [1] - 950:25
**21st** [2] - 1034:11; 1090:1
**225** [1] - 948:14
**22nd** [6] - 970:3; 1123:11, 15; 1127:8; 1129:3; 1163:17
**23** [5] - 950:24; 1031:3; 1113:7; 1137:20; 1138:17
**23-hour** [2] - 978:13; 991:19
**23rd** [3] - 1031:6; 1163:17
**2427** [1] - 1186:20
**243941** [1] - 1167:16
**25** [4] - 950:17, 20, 22; 1071:3

2

**25th** [1] - 1070:13
**26** [4] - 1145:22; 1155:1, 13, 19
**26th** [1] - 1070:13
**2700** [1] - 948:14
**27th** [1] - 1030:6
**29** [5] - 1099:8; 1142:8, 14, 19; 1153:11
**29th** [2] - 1143:12; 1196:4
**2d** [1] - 1188:2
**2nd** [1] - 1030:24

---

**3**

**3** [1] - 1070:13
**30** [7] - 950:3, 13; 997:20, 24; 998:15; 1049:16; 1114:3
**31** [3] - 1027:5; 1028:18; 1144:4
**31st** [1] - 1144:24
**35** [1] - 1086:2
**37** [1] - 1167:20
**3:30** [1] - 1139:25
**3rd** [1] - 1179:24

---

**4**

**4** [3] - 1021:14; 1024:13; 1025:5
**40** [1] - 998:1
**42** [3] - 1166:5; 1169:12; 1203:18
**49** [1] - 1156:11
**495** [1] - 1167:20
**4:45** [2] - 1160:7; 1164:1

---

**5**

**5** [2] - 1043:1; 1119:13
**50** [3] - 1194:15; 1199:21; 1203:12
**51** [2] - 980:16, 18
**516** [1] - 1188:2

**519** [1] - 1188:7
**54** [1] - 998:16
**5:00** [1] - 1101:11
**5th** [1] - 1032:1

---

**6**

**6** [4] - 1026:2, 18; 1029:17; 1121:16
**609** [1] - 1134:13
**61** [11] - 980:13, 15, 17, 19-20; 981:2; 983:3; 985:25; 1082:24; 1206:17
**61-B** [5] - 1082:17, 20; 1083:3, 5; 1206:21
**6100** [1] - 948:17
**631** [1] - 948:23
**6th** [1] - 1181:10

---

**7**

**7** [4] - 1053:14; 1054:5; 1070:13; 1151:17
**700.511** [1] - 1070:23
**7005** [1] - 1070:15
**7005.2** [1] - 1070:18
**712-6103** [1] - 948:23
**786** [1] - 1188:1
**7th** [4] - 989:4, 12, 17, 25

---

**8**

**8** [3] - 994:1, 4, 7
**80** [2] - 1121:23; 1122:7
**83** [1] - 1137:8
**8:00** [1] - 1114:2

---

**9**

**9** [2] - 1045:20; 1137:8
**949** [1] - 1205:3

**950** [1] - 1205:4
**981** [1] - 1205:6
**983** [1] - 1206:17
**986** [1] - 1206:18
**997** [1] - 1205:7
**9:30** [8] - 948:9; 1161:18; 1163:9; 1164:7, 16, 21; 1203:23; 1204:5
**9th** [1] - 1043:16

---

**A**

**Abbott** [1] - 1098:23
**abdomen** [1] - 1108:23
**abrupt** [2] - 1107:8, 18
**absence** [1] - 1202:5
**absent** [1] - 1175:17
**Absolutely** [1] - 1180:18
**absolutely** [5] - 1126:24; 1176:11; 1179:19, 22; 1181:5
**abstract** [1] - 1188:25
**abuse** [21] - 1073:1; 1075:4; 1089:5; 1145:7; 1150:18; 1152:8; 1166:15; 1173:7; 1175:22; 1177:5, 22; 1179:8; 1184:18; 1192:1, 24; 1193:13; 1195:9; 1197:1, 13, 17
**abused** [14] - 1021:8; 1034:14; 1037:4; 1054:7; 1090:4; 1150:13, 21; 1171:10, 21, 25; 1191:5; 1193:4; 1202:20; 1203:2
**abuser** [4] - 1172:25; 1174:11
**abusing** [3] - 1055:1; 1071:21; 1152:24
**accept** [3] - 1142:3;

1183:5; 1185:23
**accord** [1] - 1130:16
**accordance** [1] - 1176:10
**according** [2] - 1054:24; 1073:7
**accounting** [1] - 952:18
**accurate** [3] - 985:10; 988:8, 22
**accusations** [2] - 1132:23; 1140:18
**accusing** [1] - 1042:6
**acid** [1] - 1113:4
**acknowledge** [1] - 1175:11
**acknowledging** [1] - 1094:23
**acted** [2] - 1172:13; 1182:20
**acting** [2] - 1174:3, 6
**active** [1] - 1182:22
**acts** [4] - 1112:1; 1189:25; 1198:11; 1199:2
**add** [2] - 1044:17; 1188:18
**added** [1] - 1095:15
**addict** [1] - 1119:19
**addiction** [2] - 1148:11; 1151:9
**addition** [6] - 960:24; 979:1; 1055:19; 1072:5; 1076:2; 1176:18
**additional** [2] - 1044:18; 1170:19
**address** [6] - 993:5; 1076:23; 1133:5; 1195:19, 22
**addressed** [1] - 982:11
**Addressed** [1] - 982:13
**adduce** [2] - 1201:4, 14

**adduced** [5] - 1171:20; 1197:11, 15; 1198:25; 1199:13

**Administration** [1] - 1051:20

**administration** [3] - 1200:3, 20

**administrative** [8] - 994:16, 20, 22; 995:2, 9; 996:8; 1168:2

**administrator** [4] - 1191:8, 10

**admissible** [5] - 1128:4; 1132:13, 16; 1134:14

**admission** [11] - 998:18; 1147:21; 1148:1, 5; 1149:10, 12, 18; 1150:12; 1151:16; 1152:3, 21

**admitted** [9] - 1123:9; 1131:25; 1144:4, 24; 1145:22; 1146:13; 1150:25; 1157:24; 1180:9

**advance** [1] - 1061:18

**advantage** [1] - 1119:10

**advised** [7] - 1090:14; 1122:15; 1129:11; 1130:9; 1151:16; 1152:24; 1163:4

**Affairs** [9] - 989:21, 23; 991:14; 994:9, 18; 1181:2, 8; 1192:7; 1203:5

**affairs** [12] - 1039:4, 9, 13-14; 1040:7, 12, 18; 1166:20; 1168:21; 1169:25; 1170:10

**affect** [1] - 977:13

**affirm** [6] - 1080:10-13; 1085:5

**affirmatively** [1] -

1165:16

**affirmed** [2] - 1080:8; 1085:3

**afraid** [9] - 978:8, 15; 992:11, 15; 1056:18; 1057:6; 1158:14

**aftermath** [1] - 1180:14

**afternoon** [6] - 1096:22; 1120:11; 1161:9; 1163:6

**afterwards** [2] - 969:20; 1035:15

**agencies** [4] - 966:15, 17; 1200:9, 20

**agency** [4] - 1127:3, 6; 1201:10; 1202:7

**agents** [3] - 1005:12, 14, 16

**aggressive** [1] - 1109:21

**ago** [3] - 1030:10; 1100:4; 1144:14

**agree** [1] - 1095:9

**ahead** [6] - 983:15; 1134:4; 1162:2; 1163:5; 1165:23; 1194:22

**airline** [1] - 951:6

**al** [1] - 948:7

**allegation** [5] - 1022:12; 1066:15; 1178:19; 1181:8

**allegations** [8] - 995:19; 996:5; 1017:6; 1018:14; 1041:8; 1073:1; 1192:8, 23

**allege** [4] - 1048:24; 1049:6; 1089:2; 1184:19

**alleged** [26] - 1035:7; 1075:4; 1143:11; 1166:15; 1172:21,

24-25; 1173:7; 1174:11; 1175:20; 1177:4; 1181:23; 1182:2; 1183:4, 24; 1184:5; 1185:5; 1195:5, 8, 12; 1197:1, 24; 1199:2

**allegedly** [4] - 1045:24; 1087:14; 1141:2; 1147:9

**alleging** [3] - 1089:4; 1184:16; 1185:1

**Alliance** [1] - 1085:13

**allow** [15] - 974:9; 1021:10; 1022:5; 1070:19; 1076:11, 16; 1077:7, 9, 14, 24; 1128:10; 1131:13; 1133:7, 16; 1135:8

**allowed** [2] - 969:19; 1179:3

**allowing** [3] - 1013:9; 1133:25; 1140:23

**almost** [4] - 1012:12; 1055:23; 1115:14; 1186:25

**alone** [4] - 1056:3; 1116:11; 1119:24; 1191:17

**alternate** [1] - 1048:2

**Amendment** [1] - 1072:14

**amount** [5] - 1051:24; 1098:9; 1147:23; 1157:13; 1188:5

**angry** [2] - 1112:24

**Anita** [1] - 1032:3

**ankles** [1] - 957:8

**announcement** [1] - 1201:12

**ANSWER** [2] - 1121:25; 1122:9

**answered** [2] - 1006:19; 1130:6

**answering** [1] - 1160:20

**answers** [1] - 1137:8

**anti** [2] - 1064:8; 1113:4

**anti-acid** [1] - 1113:4

**anti-inflammatory** [1] - 1064:8

**anticipate** [1] - 976:20

**anus** [2] - 964:15; 1063:20

**anxiety** [4] - 1119:1; 1146:8; 1149:18, 21

**anytime** [1] - 984:3

**anyway** [1] - 965:11

**apologize** [2] - 1121:20; 1156:17

**appeal** [2] - 1168:1; 1170:6

**appealing** [1] - 1170:7

**APPEARANCES** [1] - 948:12

**appeared** [8] - 1033:4, 16; 1034:11; 1053:14; 1054:11, 15; 1072:25; 1073:10

**appearing** [1] - 1050:22

**apples** [1] - 1182:7

**applicable** [2] - 1174:24

**application** [6] - 1165:15; 1168:14; 1169:3; 1171:23

**applied** [1] - 1169:21

**applies** [2] - 1166:13; 1167:2

**apply** [1] - 1169:19

**appreciate** [1] - 1177:9

**appreciated** [1] - 949:13

**approach** [12] - 974:25; 980:11;

984:1, 3, 8; 1019:15; 1078:4; 1079:5; 1103:14; 1127:12; 1129:23; 1131:9

**approaching** [1] - 993:25

**Approaching** [2] - 984:2, 13

**appropriate** [5] - 960:10; 1066:21; 1067:10; 1068:5, 15

**April** [1] - 1145:23

**area** [14] - 987:11, 14; 988:12; 1071:25; 1099:1, 20, 22; 1108:25; 1115:4; 1122:21; 1124:2; 1125:6

**areas** [1] - 956:10

**arena** [1] - 1068:14

**argue** [3] - 1011:13; 1183:7; 1196:16

**arguing** [3] - 1177:6; 1188:13

**argument** [13] - 1134:17; 1163:19; 1169:3, 5, 7; 1170:10; 1172:9; 1174:23; 1175:11, 13; 1194:13

**arguments** [1] - 1188:24

**arising** [1] - 1031:25

**ARLENE** [1] - 948:19

**arm** [3] - 1110:22; 1137:23; 1138:20

**arms** [1] - 1058:5

**arose** [5] - 1026:23; 1027:2; 1029:22; 1051:18; 1052:2

**arrest** [6] - 991:1; 1032:1; 1128:3; 1134:6; 1181:11

**arrested** [18] - 997:25; 1032:7, 10; 1119:13; 1130:20;

1134:5, 7; 1140:12; 1141:13, 17, 19-20, 23; 1143:13, 21, 23-24; 1144:1

**Arrests** [4] - 1140:17, 20

**arrests** [20] - 998:6; 1131:11, 13, 23-24; 1132:1, 7, 9, 13, 15, 23; 1133:1, 6, 9, 12, 18; 1134:3; 1140:16; 1141:8, 25

**arrived** [2] - 1065:2; 1114:15

**ARTHUR** [1] - 948:10

**Arthur** [1] - 1033:8

**Aside** [1] - 1186:16

**aspect** [4] - 1194:7, 14, 21; 1199:6

**aspects** [1] - 1105:8

**ass** [1] - 1156:13

**assault** [9] - 1090:7; 1092:19; 1094:23; 1157:8; 1172:8; 1178:13, 23; 1181:23; 1195:8

**assaulted** [20] - 983:10, 17; 999:2, 20; 1000:14; 1024:16; 1025:8, 15; 1035:8; 1038:16, 25; 1047:13; 1048:19, 25; 1049:7; 1091:9, 15, 21; 1122:17; 1174:3

**assaulting** [6] - 1000:8; 1001:18; 1002:16, 24; 1036:3; 1045:24

**assaults** [1] - 1181:20

**asserted** [3] - 1175:22; 1177:3; 1183:14

**asshole** [1] - 1071:22

**assholes** [1] - 1070:24

**assign** [1] - 1064:14

**assigned** [1] - 1064:24

**assist** [1] - 1106:25

**assistant** [17] - 958:23; 1008:21; 1025:9; 1056:4; 1076:14; 1087:18; 1088:1; 1112:20; 1176:7, 17; 1190:13, 17, 20; 1192:19; 1193:4, 6; 1202:21

**Assistant** [1] - 948:20

**assists** [1] - 1085:22

**assume** [5] - 1128:6; 1133:19; 1134:20; 1168:16; 1173:23

**assumed** [1] - 1114:11

**assured** [1] - 1092:7

**Atlanta** [2] - 951:6; 1081:3

**attack** [3] - 1182:2; 1195:12

**attacks** [4] - 1119:2; 1150:1, 5, 7

**attempted** [5] - 979:9; 1106:25; 1107:1; 1129:18; 1191:1

**attempts** [1] - 1195:4

**attend** [4] - 1011:17; 1097:5

**attendance** [1] - 1083:17

**attended** [1] - 1097:18

**attention** [20] - 952:5, 19; 953:9; 961:3; 987:11; 989:3, 12; 992:2; 1058:21; 1059:7; 1078:19; 1081:22; 1085:17; 1099:8; 1114:3; 1180:12; 1185:19; 1190:23

**attentive** [1] - 949:12

**attenuated** [2] - 1185:21; 1186:22

**Attorney** [1] - 948:16

**attorney** [9] - 1012:17; 1015:16; 1016:4; 1051:1; 1053:15; 1054:16; 1069:10; 1072:23; 1170:1

**Attorneys** [1] - 948:20

**attorneys** [1] - 1200:18

**Auerbach** [1] - 948:22

**August** [25] - 962:5; 966:1-4, 8; 967:1; 970:4; 1005:7, 24; 1008:8; 1025:22; 1026:2, 18; 1029:17; 1034:6, 24; 1042:13, 18, 25; 1043:5; 1058:21, 25

**authority** [9] - 974:11; 1170:19; 1175:4; 1176:10; 1187:10, 16; 1194:8, 10

**available** [1] - 1168:2

**availed** [1] - 1168:23

**avenue** [2] - 993:14; 1059:6

**avoid** [2] - 1032:7, 10

**aware** [16] - 969:11, 15-16; 990:10; 1009:2, 16; 1015:20; 1041:1; 1062:14; 1088:7, 10, 17, 20, 22; 1092:8

**awful** [2] - 1113:10; 1119:15

---

**B**

**B-U-T-C-H** [1] - 1087:22

**Babies** [3] - 1027:10, 12

**baby** [2] - 1027:17, 21

**bacitracin** [1] - 1118:22

**background** [1] - 951:19

**bad** [8] - 1003:18; 1004:4, 6; 1099:15; 1110:11; 1111:22; 1200:4

**baggy** [1] - 961:15

**Baisley** [1] - 1033:17

**baker** [1] - 984:17

**balance** [1] - 1172:24

**barber** [1] - 951:12

**barred** [1] - 1169:11

**based** [8] - 1018:2, 21; 1098:22; 1177:2; 1188:10; 1189:25; 1197:8; 1198:14

**baseless** [1] - 1169:3

**bases** [1] - 1190:3

**basis** [16] - 976:2; 1086:3; 1130:13; 1149:11; 1165:14; 1168:15; 1171:8, 18; 1173:12; 1180:8; 1182:3, 15; 1185:13; 1189:4; 1196:22; 1201:11

**bathroom** [2] - 964:15; 1118:11

**baton** [3] - 1003:7; 1062:25; 1173:16

**battle** [1] - 1149:1

**became** [1] - 959:21

**become** [1] - 956:25

**becoming** [1] - 1095:12

**BEFORE** [1] - 948:10

**beforehand** [1] - 1188:19

**began** [2] - 954:4, 7

**begin** [4] - 952:11;

1106:20; 1165:25; 1166:1

**beginning** [3] - 1105:3; 1107:10; 1169:9

**behalf** [9] - 969:2; 1000:6, 9-10, 12; 1005:5; 1007:5; 1165:2, 5

**behavior** [3] - 1071:18; 1072:14; 1188:3

**behind** [10] - 956:20; 960:3; 986:22, 25; 1003:19; 1004:9; 1129:17; 1182:2; 1186:25; 1197:21

**belt** [1] - 1111:1

**bench** [1] - 1114:23

**BENNITTA** [1] - 948:13

**Bentyl** [1] - 1113:4

**best** [5] - 1127:7; 1165:24; 1185:9; 1195:22; 1197:3

**better** [8] - 986:3; 1097:25; 1105:17; 1119:23; 1120:2; 1137:3, 22; 1138:19

**Between** [2] - 1010:15; 1091:1

**between** [16] - 953:19; 957:7; 970:3; 999:13; 1001:2; 1055:22; 1111:13; 1119:11; 1172:24; 1174:10; 1177:3; 1183:14, 24; 1184:3; 1195:14; 1197:24

**Bible** [1] - 970:10

**big** [1] - 1117:2

**bipolar** [1] - 1154:23

**bit** [5] - 951:18; 1097:6; 1112:23, 25; 1173:4

**bitch** [3] - 991:21,

25; 1071:22

**bitches** [1] - 1070:24

**biting** [1] - 1123:7

**black** [2] - 1127:10; 1129:5

**blades** [2] - 1109:24

**Bldg** [1] - 948:17

**bleed** [1] - 1112:23

**blockage** [1] - 1112:8

**Bloomberg** [1] - 1191:12

**blown** [1] - 964:3

**BOCES** [1] - 951:10

**body** [4] - 1101:2; 1137:23; 1138:20; 1158:13

**bolstering** [2] - 1075:5, 23

**bone** [3] - 953:18; 1107:6; 1108:25

**book** [6] - 1020:10, 18, 20; 1023:2; 1106:16; 1132:19

**books** [3] - 1105:10; 1200:20, 24

**Boston** [2] - 1099:1, 5

**bottom** [4] - 961:15; 1019:2; 1116:16; 1186:13

**bowel** [4] - 1106:19; 1108:22; 1110:18; 1112:7

**Box** [1] - 948:17

**box** [4] - 979:18; 980:2; 982:5; 1075:19

**boyfriend** [3] - 1013:20, 24; 1058:22

**Boyle** [2] - 1050:19, 22

**branches** [2] - 1098:24; 1099:2

**break** [2] - 1065:1; 1129:18

**breaks** [1] - 1067:22

**breast** [7] - 1108:9,

11, 13, 20; 1156:20, 24; 1172:6

**breasts** [5] - 956:12; 1004:14; 1060:21, 25; 1068:24

**breathy** [1] - 1106:11

**Breed** [1] - 1098:23

**brief** [6] - 1060:8, 10; 1073:14; 1101:1; 1156:1; 1163:21

**Briefly** [1] - 990:16

**briefly** [5] - 1073:14; 1081:1; 1092:1; 1100:10; 1196:9

**bring** [13] - 1064:1; 1076:11; 1078:18, 22; 1082:12; 1120:19; 1133:5, 15; 1134:8; 1161:8, 23; 1163:11; 1173:13

**bringing** [9] - 1128:6; 1133:2, 13; 1166:11; 1167:3; 1168:3, 7

**Broadway** [1] - 948:14

**broken** [1] - 953:18

**Bronco** [1] - 1155:3

**brother** [3] - 951:5; 1150:13; 1152:8

**brought** [9] - 1056:14; 1078:19; 1099:22; 1100:25; 1116:2, 4, 7; 1180:11

**Brown** [3] - 1114:20; 1124:7, 18

**buckle** [1] - 1111:1

**building** [1] - 978:18

**bull** [1] - 1126:10

**bumped** [3] - 1003:18; 1004:3, 9

**burden** [1] - 1067:2

**bureau** [2] - 989:24; 1115:20

**burned** [1] - 1118:11

**but..** [1] - 1053:6

6

**Butch** [6] - 1087:17, 20, 22-24; 1192:19
**butt** [2] - 1111:22; 1156:9
**buttocks** [3] - 953:23; 957:4
**BY** [87] - 948:19; 950:10; 956:3; 978:3; 981:21; 983:7; 997:15; 1015:14; 1017:12, 18; 1018:8; 1024:6, 19; 1025:4; 1026:10; 1027:1, 16; 1030:19; 1034:5, 23; 1036:12; 1038:10; 1043:15; 1045:15; 1046:13; 1047:22; 1048:15; 1055:14; 1057:9, 15; 1058:20; 1059:24; 1062:15; 1066:7; 1068:21; 1073:17; 1080:21; 1085:9; 1087:1; 1088:3; 1089:12; 1092:4, 14; 1096:21; 1105:2; 1116:21; 1117:14, 22; 1118:6, 18; 1120:10; 1121:1, 22; 1123:5, 17; 1129:2; 1130:7, 19; 1136:9; 1137:11; 1138:11; 1141:12; 1142:6; 1145:21; 1147:18; 1150:10; 1151:14; 1152:18; 1153:20; 1154:4; 1155:11; 1156:4; 1157:5; 1205:5, 8, 10, 12, 14, 16, 20, 24; 1206:2, 4, 6, 10, 12, 14

---

**C**

---

**C-O-O-M-B-E** [1] - 1167:14
**cake** [1] - 977:8

**calm** [2] - 1115:10; 1116:3
**camera** [5] - 967:18; 968:1, 3, 5
**Campo** [1] - 1191:16
**campus** [1] - 1085:15
**cannot** [7] - 1001:14; 1007:14; 1095:6; 1135:1; 1162:2; 1171:20; 1190:4
**Canton** [10] - 1183:16, 20; 1184:11; 1185:19; 1187:9; 1189:18; 1195:20; 1199:10; 1201:22, 24
**capacity** [3] - 1013:5; 1175:1
**car** [8] - 1028:21, 23; 1029:2; 1101:15; 1154:25; 1155:13, 18
**card** [2] - 1044:2; 1050:17
**cards** [6] - 1027:4; 1028:18; 1029:10; 1051:19, 23; 1052:8
**care** [7] - 1088:22; 1090:15; 1092:7; 1153:8; 1198:18; 1202:22
**careful** [3] - 976:12, 19; 1193:2
**carefully** [1] - 1190:21
**Caribbean** [1] - 1116:8
**Carol** [37] - 962:12, 22-23; 963:9, 17, 19-20; 964:11, 17; 965:17; 969:21; 992:18; 1004:22; 1012:6; 1013:16; 1021:7; 1024:15; 1025:7, 14; 1034:18; 1036:24; 1055:16, 18, 22; 1056:6, 8, 18; 1057:10, 17, 25;

1058:6, 8; 1067:8; 1177:25; 1191:23
**carried** [1] - 1176:4
**carries** [1] - 1173:16
**cases** [8] - 984:9; 1167:4; 1169:20, 22; 1170:15; 1184:11; 1189:11; 1200:25
**cast** [1] - 1201:5
**categories** [1] - 1170:25
**category** [2] - 1177:1; 1179:9
**causal** [9] - 1177:3; 1183:13, 24; 1184:2, 5; 1185:4, 8; 1187:9
**causation** [2] - 1185:21; 1186:22
**caused** [9] - 1141:2, 5; 1147:17; 1185:7, 16; 1187:6, 13; 1190:5; 1194:25
**causes** [1] - 1193:8
**causing** [1] - 1063:15
**cc** [1] - 1040:4
**cc'd** [2] - 1040:7, 12
**ceiling** [1] - 1164:20
**cell** [4] - 1070:20; 1113:10, 21, 23
**Center** [1] - 1116:6
**Central** [4] - 948:6, 23; 1100:13, 21
**certain** [10] - 959:21; 1061:4; 1083:9; 1125:17; 1157:13; 1163:6; 1182:14; 1184:9; 1185:15; 1187:13
**certainly** [4] - 1021:10; 1124:15; 1151:6; 1190:19
**certificate** [1] - 951:21
**certify** [1] - 1160:25
**chain** [1] - 1094:18
**chair** [1] - 987:15

**challenge** [2] - 1008:18; 1016:15
**challenged** [1] - 1008:10
**chance** [1] - 993:19
**change** [3] - 983:22; 1007:18; 1185:21
**changed** [5] - 1094:24; 1101:12; 1110:15; 1120:4
**Channel** [1] - 1164:19
**chapel** [5] - 972:7, 10; 979:15, 25
**chapter** [1] - 1170:3
**charge** [7] - 1030:5; 1161:6, 22; 1163:24; 1189:12; 1191:9
**charges** [10] - 1026:23; 1027:2; 1051:2, 7, 18; 1052:2; 1053:11; 1168:24; 1170:11
**check** [4] - 1020:10, 14; 1030:7, 25
**checking** [2] - 956:11; 957:14
**checks** [2] - 1027:5; 1028:18
**chem** [1] - 1149:14
**chemicals** [1] - 1149:15
**chest** [6] - 956:10; 957:21; 1106:19; 1108:2, 8; 1122:24
**Chief** [1] - 1087:18
**child** [3] - 951:1; 1174:5, 7
**children** [12] - 950:16, 21; 951:3, 8; 1097:1, 3; 1148:15, 24; 1149:4; 1150:22; 1152:4
**choice** [7] - 1022:19; 1064:13, 16; 1157:19; 1162:1; 1163:11
**chose** [2] - 1184:19,

21

**Chris** [3] - 971:23; 1059:3

**CHRISTINE** [1] - 948:16

**Christmas** [1] - 1114:13

**Christopher** [10] - 971:2, 8; 1013:23; 1058:22, 24; 1059:2, 8, 21, 25; 1060:2

**church** [8] - 979:16; 980:6; 982:5; 1010:16; 1011:5, 17; 1076:22

**Church** [1] - 1081:2

**CIB** [4] - 989:24; 990:11; 1192:10; 1203:5

**Circuit** [9] - 1167:22; 1169:22; 1174:15; 1187:16, 19; 1188:2, 18; 1189:3, 10

**Circuit's** [1] - 1189:22

**circular** [1] - 956:14

**circumstances** [1] - 970:13

**citation** [4] - 1167:15, 17, 20; 1186:19

**cited** [2] - 1170:15; 1189:11

**City** [9] - 1098:1, 22; 1183:15; 1184:11; 1185:19; 1186:19; 1187:2; 1188:1; 1199:10

**city** [2] - 991:9; 1187:4

**civil** [1] - 1006:13

**civilian** [2] - 971:18; 1179:25

**claimed** [2] - 1192:1; 1195:7

**claiming** [6] - 1122:16; 1133:19;

1148:15, 25; 1149:4, 7

**clamp** [1] - 1117:6

**clanging** [1] - 1042:19

**clarification** [2] - 953:3; 1079:6

**clarify** [1] - 1125:8

**Clark** [1] - 1093:8

**class** [1] - 1050:14

**clean** [1] - 1071:25

**cleaning** [2] - 1070:22; 1072:6

**clear** [13] - 966:7; 1024:7; 1112:14, 20; 1118:22; 1178:20; 1187:8; 1190:7; 1191:3, 6; 1195:7; 1201:22; 1202:23

**clearer** [1] - 1151:13

**clearest** [1] - 1202:17

**clearly** [9] - 1110:24; 1165:13; 1174:1; 1176:15; 1179:1; 1187:19; 1188:19; 1189:8

**clergy** [1] - 1011:23

**clerk** [3] - 1028:9; 1049:22, 24

**CLERK** [5] - 949:6, 22; 1015:3; 1066:2; 1136:3

**Clerk** [1] - 1018:20

**clerks** [1] - 1049:24

**client** [3] - 1062:8, 11

**clients** [1] - 1099:3

**clinic** [3] - 1191:7, 10, 20

**clinicians** [4] - 1146:24; 1148:12, 23; 1152:8

**clitoris** [1] - 961:19

**close** [2] - 1098:12; 1121:24

**closed** [7] - 954:5;

988:24; 1103:6, 10; 1121:13; 1122:8

**closer** [4] - 989:10; 1070:16; 1085:24; 1106:2

**closing** [5] - 1112:22; 1134:17; 1163:19

**clothes** [1] - 978:18

**clothing** [2] - 974:21

**CO** [4] - 1110:1; 1114:22; 1115:5; 1116:9

**coat** [6] - 1052:13, 15, 17, 21, 25

**coats** [3] - 1052:9; 1053:5, 7

**cocaine** [10] - 1146:3, 15, 17; 1147:4, 20, 22; 1149:11; 1151:9, 17; 1152:20

**code** [1] - 1176:19

**codefendant** [1] - 1029:3

**cold** [3] - 1108:6; 1109:5, 7

**collateral** [1] - 1075:5

**college** [1] - 951:20

**color** [16] - 1172:14, 17; 1173:8, 19, 21; 1174:1, 3, 6, 14; 1175:5, 10, 24; 1176:4, 6, 11, 21

**column** [2] - 1194:4

**combination** [1] - 1098:20

**comeback** [1] - 1173:23

**comfortable** [6] - 1106:3, 9, 12; 1113:5; 1117:10; 1136:18

**coming** [6] - 1011:21; 1085:23; 1098:10; 1101:25; 1115:10; 1121:15

**commanding** [1] - 1188:22

**comment** [1] - 1103:1

**Commissioner** [1] - 1201:10

**commit** [4] - 1185:7; 1187:14; 1190:6; 1199:1

**commits** [1] - 1184:14

**committed** [4] - 993:2; 1185:3; 1199:2

**common** [4] - 1167:16; 1175:13, 16; 1203:7

**commonly** [2] - 1166:5, 8

**community** [2] - 966:15; 993:2

**companies** [2] - 1120:16

**company** [6] - 1052:13; 1098:1, 4, 18

**compensate** [1] - 1135:2

**complain** [1] - 1011:23

**complained** [4] - 1067:25; 1073:2; 1180:10; 1196:14

**complaining** [4] - 1000:1; 1039:9; 1042:14; 1073:6

**complains** [1] - 1203:1

**complaint** [25] - 1017:5; 1018:25; 1021:5; 1022:14; 1024:8, 13; 1032:17; 1055:18, 20; 1060:11; 1066:12; 1090:14, 17; 1168:18; 1175:20; 1178:12; 1179:18, 25; 1180:15; 1181:16; 1184:20; 1193:20;

1201:15

**complaints** [32] - 952:6, 8; 1043:1; 1152:7; 1166:10, 17-19, 22; 1169:24; 1174:20; 1177:22; 1179:12, 14, 16; 1181:15, 19; 1183:5, 8; 1188:15; 1190:14, 18, 24; 1191:2, 4; 1193:12; 1195:6, 19, 22, 24; 1198:21

**complete** [4] - 1075:4; 1168:6; 1179:15

**completely** [6] - 1114:24; 1115:7; 1119:3; 1161:11; 1169:2; 1175:13

**completion** [1] - 1167:24

**compliant** [1] - 1106:6

**complied** [1] - 1200:21

**comply** [2] - 1166:5; 1167:3

**components** [1] - 1181:17

**computer** [2] - 948:25; 1052:5

**conceded** [1] - 1197:1

**conceivable** [1] - 1166:14

**conceivably** [1] - 1181:24

**concentration** [1] - 1186:12

**concerned** [3] - 968:6; 993:11; 1133:10

**concerns** [3] - 959:7; 968:1; 973:5

**conclude** [4] - 1160:6; 1161:4;

1201:12; 1203:12

**concluded** [6] - 1023:4; 1162:7; 1194:13; 1199:5; 1202:12

**conclusion** [1] - 1192:7

**condition** [4] - 1106:16; 1146:25; 1157:25; 1169:15

**conditions** [2] - 1069:12; 1166:10

**conduct** [7] - 949:11; 1173:15; 1195:1, 13-14; 1196:4; 1197:4

**conducted** [1] - 1168:21

**conducting** [2] - 1081:23; 1085:18

**conference** [1] - 1161:6

**confidential** [4] - 992:11; 1067:20; 1068:6

**conflict** [1] - 1056:19

**conflicts** [1] - 1057:6

**confront** [4] - 1012:20; 1013:1; 1016:11

**confronted** [1] - 1016:25

**confronting** [1] - 1017:2

**confused** [1] - 1155:16

**confusion** [1] - 1201:20

**connection** [2] - 1184:3; 1197:23

**consensual** [7] - 964:12; 1195:13; 1196:11, 15; 1197:4

**consent** [2] - 964:16; 994:20

**consented** [2] - 995:5, 8

**constant** [2] - 953:24; 1063:18

**constantly** [1] - 1056:23

**constitutional** [28] - 1095:7; 1171:3; 1172:15; 1175:17, 19, 23; 1176:3; 1177:4; 1183:14, 25; 1184:4, 14, 19-20; 1185:3, 8, 13, 17; 1186:24; 1187:14; 1190:6; 1194:10; 1195:2, 17, 21, 24; 1197:22, 24

**constraints** [1] - 1164:8

**constricting** [1] - 1063:15

**contact** [13] - 953:10; 964:2, 5; 966:9; 1000:12; 1001:2; 1060:5; 1067:6; 1068:5; 1089:1; 1106:7; 1172:21; 1179:3

**contacted** [2] - 964:7; 1013:25

**contains** [1] - 1018:13

**contend** [4] - 1171:18; 1184:5; 1197:10; 1199:22

**contention** [2] - 1169:19; 1177:23

**context** [1] - 1189:1

**continually** [1] - 1054:25

**continue** [8] - 956:5; 957:1; 959:4; 972:17; 1058:24; 1116:22; 1164:11; 1170:21

**continued** [2] - 962:10; 998:11

**Continued** [22] - 954:15; 955:12; 975:2; 977:20; 983:6;

1014:11; 1019:18; 1023:5; 1065:15; 1074:18; 1079:12; 1086:4; 1093:14; 1095:21; 1103:16; 1104:10; 1127:14; 1128:11; 1135:14; 1159:4; 1162:8; 1180:20

**Continuing** [1] - 1181:1

**continuously** [1] - 1054:6

**contrary** [2] - 1170:9; 1175:15

**controls** [1] - 1189:22

**conversation** [16] - 963:16; 970:14; 974:5, 18; 991:6; 1060:1; 1088:4, 19; 1089:15; 1090:10, 21; 1124:9, 24; 1125:5; 1136:21

**conversations** [2] - 964:10; 990:19

**convictions** [5] - 1128:6; 1132:9; 1133:7; 1134:13

**convicts** [1] - 992:1

**Coombe** [2] - 1167:5, 13

**cooperate** [3] - 966:14; 1125:10, 15

**cooperated** [1] - 1125:1

**cooperation** [1] - 967:7

**coordinator** [2] - 1160:18; 1191:20

**copy** [7] - 980:24; 981:1; 982:18; 1035:2; 1079:9; 1082:23; 1091:13

**corporate** [1] - 1098:20

**corporeals** [1] -

9

1115:9

**correction** [7] - 971:19; 988:2; 994:9; 1074:1, 7; 1172:22; 1178:6

**Correctional** [24] - 1039:8; 1046:7, 22; 1047:3, 12; 1049:1, 15; 1051:6; 1053:21; 1054:1, 20; 1123:18; 1125:10, 25; 1139:7; 1140:21; 1142:8, 10; 1143:7; 1153:15; 1154:5; 1176:8

**correctional** [29] - 983:11, 18; 998:19; 999:21, 25; 1000:13; 1002:19; 1005:25; 1046:18; 1073:3, 6; 1081:10; 1082:2; 1091:10, 16, 22; 1094:7; 1123:10, 21, 23; 1124:22; 1125:22; 1126:4, 6; 1175:6; 1190:10, 16; 1191:2

**Corrections** [2] - 1100:19; 1188:1

**corrections** [18] - 1002:4; 1008:16, 19; 1009:6, 13, 20; 1015:17; 1016:11, 15; 1041:25; 1042:7; 1071:19; 1073:19; 1094:5; 1139:7, 16; 1157:7; 1200:14

**COs** [2] - 1113:25; 1157:22

**counsel's** [3] - 976:20; 1055:15; 1174:24

**Counsel's** [1] - 1169:19

**Count** [1] - 1024:13

**count** [2] - 1025:5; 1050:15

**counter** [2] - 961:6;

1175:13

**country** [1] - 1098:7

**COUNTY** [1] - 948:7

**county** [7] - 1006:25; 1016:4; 1018:14; 1050:8; 1140:21; 1169:4; 1181:22

**County** [111] - 948:16, 20; 953:4; 965:11; 998:20, 25; 999:14, 21, 25; 1000:13; 1005:25; 1033:12; 1039:4, 8; 1046:7, 14, 18, 22; 1047:2, 7, 12, 23; 1048:5, 17; 1051:5; 1053:21, 25; 1054:20; 1069:22; 1077:11; 1082:1; 1085:18; 1087:5, 8; 1090:20; 1091:10, 15, 22; 1094:6; 1099:9, 20; 1100:1, 12; 1101:9, 14; 1102:4; 1114:5, 8; 1116:6; 1121:3, 7; 1122:15; 1123:10, 18, 21, 23; 1124:12, 21; 1125:9, 11, 21, 23, 25; 1126:4, 6; 1127:9; 1139:2, 7, 10, 22; 1140:8, 21-22, 25; 1142:8, 10; 1143:7-9; 1153:14; 1154:5, 18; 1157:17; 1166:25; 1168:20; 1174:19; 1176:8; 1182:3, 5, 11, 13, 20, 25; 1184:16; 1185:2; 1190:10, 16; 1191:2, 19, 24; 1192:4; 1200:12, 21; 1201:2

**County's** [2] - 1187:12; 1202:11

**county's** [1] - 1185:5

**couple** [2] - 1101:4;

1115:23

**court** [38] - 956:2; 978:2; 1015:8; 1021:5; 1024:1, 8; 1025:12, 18; 1032:22; 1033:5, 7, 12, 17; 1037:8; 1050:9; 1066:13; 1078:18; 1080:2; 1082:12; 1096:1; 1105:1; 1124:6; 1129:1; 1148:13, 25; 1149:1, 3; 1163:1; 1165:11; 1167:9; 1169:6; 1170:18; 1175:21; 1176:5; 1180:9; 1204:4

**Court** [14] - 948:22; 1164:12; 1169:21; 1182:9; 1183:15, 21; 1185:14, 22; 1186:20; 1187:9, 11; 1189:5, 14

**courthouse** [4] - 1050:14, 18; 1139:22, 25

**Courthouse** [1] - 948:6

**courtroom** [15] - 949:7; 1014:9; 1015:4; 1053:18, 22; 1054:4, 20; 1065:9; 1066:3; 1078:7, 22; 1136:4; 1164:22; 1173:11; 1187:16

**courts** [5] - 984:8; 1166:17; 1184:23; 1185:10

**cousin's** [2] - 1027:21; 1028:1

**crack** [7] - 1029:11, 16; 1030:22; 1060:15; 1111:17; 1119:20; 1156:12

**cramps** [1] - 1113:4

**crap** [1] - 1111:23

**crappy** [1] - 1120:5

**crazy** [1] - 1193:3

**creation** [1] - 1174:10

**credibility** [5] - 1076:1; 1128:7; 1134:14; 1140:19; 1147:8

**credit** [10] - 1027:4, 18; 1028:12, 18; 1029:10; 1050:15; 1051:19, 23; 1052:8; 1196:19

**Credit** [1] - 1050:17

**crime** [4] - 966:15; 1029:18; 1031:4; 1169:25

**crimes** [2] - 993:2

**criminal** [10] - 989:24; 1026:5; 1029:18; 1030:5; 1051:7; 1061:20; 1168:24; 1170:11; 1173:18; 1176:18

**crisp** [1] - 1107:20

**critical** [2] - 1195:6, 18

**cross** [12] - 976:21; 977:4; 1007:11, 25; 1044:21; 1066:11; 1078:23; 1156:5; 1157:24; 1196:25; 1200:25

**Cross** [4] - 997:12; 1084:17; 1089:9; 1120:7

**CROSS** [8] - 997:14; 1015:13; 1089:11; 1120:9; 1205:7, 9; 1206:1, 11

**cross-examination** [9] - 976:21; 1007:11, 25; 1044:21; 1066:11; 1078:23; 1156:5; 1157:24; 1196:25

**Cross-examination** [4] - 997:12; 1084:17;

1089:9; 1120:7

**CROSS-EXAMINATION** [8] - 997:14; 1015:13; 1089:11; 1120:9; 1205:7, 9; 1206:1, 11

**cross-examining** [1] - 1200:25

**crossing** [2] - 957:20; 996:21

**cry** [4] - 972:3, 5; 1109:10; 1113:13

**crying** [2] - 972:11; 1110:6

**crystal** [1] - 1178:20

**cupping** [3] - 1108:8, 20; 1122:24

**Curtis** [1] - 1081:15

**custodial** [1] - 1188:11

**custodian** [1] - 1160:25

**custody** [25] - 998:21, 25; 999:14, 17, 25; 1000:7, 13; 1005:24; 1046:6, 8, 14, 18; 1047:2, 6, 23; 1048:18; 1049:3; 1124:13, 17; 1149:3, 6; 1152:4; 1167:3; 1174:17; 1188:9

**custom** [5] - 1182:14; 1190:9, 15; 1192:22; 1193:10

**cut** [5] - 961:9; 982:4; 1062:8, 10, 16

**cycle** [1] - 1011:21

**cycling** [1] - 1070:19

---

**D**

**D-A-V-I-S** [2] - 982:14; 1080:17

**D.C** [2] - 1099:1, 4

**daily** [2] - 1149:11; 1152:20

**damage** [2] - 953:21;

1133:23

**damages** [13] - 976:17; 977:7; 1131:13, 21; 1132:4, 6, 18; 1134:15; 1140:24; 1141:1, 6; 1147:11

**Danbury** [3] - 1049:1, 14, 20

**dark** [3] - 1136:22; 1137:18; 1138:15

**Darvocet** [1] - 1147:25

**Darvon** [1] - 1147:25

**dates** [1] - 1046:25

**daughter** [1] - 951:6

**daughters** [1] - 1097:3

**David** [1] - 1191:12

**Davis** [20] - 982:11, 14, 25; 983:9, 16; 1006:23; 1007:3; 1010:17; 1011:22; 1074:15; 1075:14; 1076:3; 1077:7, 17-18; 1080:17, 22-23; 1087:2

**DAVIS** [2] - 1080:6; 1205:18

**days** [2] - 998:15

**deal** [5] - 967:16, 23-24; 1170:25

**dealing** [1] - 974:11

**dealings** [1] - 1083:16

**dealt** [1] - 1092:6

**December** [25] - 1027:3, 9; 1034:11; 1043:8; 1046:22; 1047:1; 1048:24; 1049:15; 1054:11; 1055:5; 1090:24; 1091:3; 1099:8; 1114:3; 1123:11, 15; 1126:1, 5, 7, 13; 1142:11; 1143:12;

1153:11; 1154:14; 1196:4

**decency** [1] - 1176:19

**decide** [5] - 1075:6; 1135:8; 1165:19; 1180:18; 1189:8

**decided** [4] - 1059:6; 1098:16; 1189:17; 1197:7

**decides** [1] - 1009:17

**deciding** [1] - 1199:1

**decision** [7] - 1170:16; 1185:22; 1186:17; 1189:18, 21-22; 1203:14

**decision's** [1] - 1203:21

**Defendant's** [9] - 986:11; 1069:9, 16, 25; 1070:3, 5; 1071:1, 15; 1206:22

**defendant's** [3] - 1163:20; 1166:3; 1188:15

**defender's** [1] - 1051:4

**Defense** [21] - 984:14; 986:9; 1017:8, 14; 1024:2, 4; 1026:8, 12; 1030:13; 1036:10; 1037:12; 1039:20; 1043:24; 1045:3, 12-13; 1144:18; 1156:19; 1157:1; 1206:19

**defense** [18] - 1061:19; 1067:15; 1076:23; 1132:25; 1134:22; 1141:3; 1156:5; 1165:20, 25; 1166:2; 1168:6; 1169:9, 14-15; 1170:18; 1175:11; 1196:16

**deficiencies** [2] -

1194:3; 1202:3

**deficiency** [2] - 1178:21

**deficient** [3] - 1184:6; 1199:25; 1201:13

**definitely** [7] - 1076:2, 16; 1111:20; 1146:17; 1148:2; 1149:6, 14

**Definitely** [1] - 1029:16

**degree** [5] - 1026:3, 19; 1029:18; 1068:4

**Deliberate** [2] - 1182:16

**deliberate** [5] - 1164:1; 1179:7; 1182:16; 1183:3; 1188:6

**deliberately** [5] - 1182:12, 20, 25; 1183:1; 1188:11

**deliberations** [1] - 1163:25

**delicious** [1] - 1065:5

**demeanor** [1] - 1094:15

**demonstrate** [2] - 1183:13; 1202:2

**denied** [13] - 992:1, 3; 1064:22; 1116:14; 1118:17; 1158:20; 1168:1; 1170:6; 1172:10; 1176:21; 1189:5; 1194:16; 1197:9

**Denied** [3] - 1199:7, 17; 1203:8

**Dennison** [1] - 948:17

**deny** [3] - 1151:6; 1189:14; 1196:23

**denying** [2] - 1165:11; 1193:14

**department** [14] - 967:10; 970:8; 971:3;

972:2; 973:1; 982:3; 989:23; 1005:17; 1006:8; 1064:4; 1174:4; 1181:4; 1190:11, 17

**Department** [12] - 1100:18; 1101:6; 1122:15; 1140:22; 1187:22; 1188:1; 1191:20, 24; 1200:3, 5; 1201:11; 1202:7

**departments** [1] - 990:1

**dependence** [1] - 1149:22

**dependency** [1] - 1146:4

**deposition** [3] - 1076:20; 1121:16; 1137:7

**depressed** [3] - 1154:11, 15, 20

**depression** [1] - 1146:10

**deputy** [4] - 1077:11; 1191:11; 1192:3, 11

**derivative** [2] - 1184:2; 1194:12

**describe** [6] - 956:5; 958:7; 974:14; 976:16; 1109:19; 1118:23

**Describe** [5] - 970:13; 996:23; 1100:24; 1110:15; 1118:7

**described** [5] - 960:25; 963:24; 996:16; 1120:14

**description** [1] - 1060:20

**desk** [9] - 1057:18; 1058:1; 1105:9, 19, 21, 24; 1106:13

**detail** [3] - 955:7, 10; 1113:18

**details** [2] - 977:17; 978:4

**detention** [1] - 1022:13

**determine** [3] - 1178:17; 1199:24; 1202:10

**determining** [1] - 1183:21

**devices** [1] - 1168:22

**diagnosed** [1] - 1154:23

**dialogue** [1] - 1088:21

**difference** [2] - 993:14; 1119:11

**different** [21] - 956:10; 961:6; 1013:9; 1066:12; 1105:7, 14; 1120:16; 1125:7; 1132:11; 1148:8; 1149:15; 1167:10; 1174:20; 1180:11; 1181:14, 17; 1187:4; 1188:21; 1190:5; 1193:17, 24

**difficult** [1] - 1119:16

**diligent** [1] - 949:11

**DiMaggio** [1] - 1167:11

**DiMarco** [5] - 1076:15; 1087:18; 1088:2; 1192:12, 20

**dire** [1] - 981:17

**DIRE** [2] - 981:20; 1205:6

**DIRECT** [8] - 950:9; 1080:20; 1085:8; 1096:20; 1205:4, 19, 23; 1206:9

**direct** [6] - 1124:16; 1183:23; 1184:2; 1185:4, 8; 1187:10

**directed** [1] - 1168:20

**Directing** [4] - 952:5, 19; 1058:21; 1085:17

**directly** [5] - 1025:2; 1107:22; 1178:23; 1187:17; 1189:2

**director** [2] - 1085:20; 1086:1

**disability** [1] - 1119:4

**discectomy** [1] - 953:18

**disciplinary** [10] - 1002:20; 1009:2, 7, 12; 1010:2, 9; 1013:8; 1072:13, 18

**discovery** [1] - 1020:8

**discuss** [9] - 995:19; 996:1, 5; 1014:5; 1059:8; 1065:3; 1084:13; 1131:17; 1164:17

**discussed** [2] - 967:4; 1088:4

**discussing** [1] - 1194:16

**discussion** [2] - 1125:7; 1177:15

**disgusting** [2] - 1107:23; 1113:2

**disliked** [1] - 1202:11

**dismiss** [4] - 1166:4; 1170:23; 1172:11; 1176:20

**dismissed** [4] - 972:8; 1168:15; 1196:2

**disorder** [1] - 1146:8

**disregard** [13] - 998:5; 1009:1; 1034:1; 1044:13; 1047:21; 1057:8; 1059:23; 1073:24; 1131:8; 1141:7; 1155:10; 1179:11, 15

**Disregard** [1] - 998:6

**disregarded** [1] - 1199:12

**disregarding** [3] -

1181:19; 1195:22

**disrespected** [1] - 1003:24

**disrespectful** [4] - 1003:20; 1004:7, 11

**distress** [16] - 1131:21; 1132:17, 19, 21; 1133:10, 16, 19-20; 1134:19, 24-25; 1141:1, 5, 9; 1147:13, 17

**DISTRICT** [3] - 948:1, 11

**district** [2] - 1049:22; 1169:25

**District** [1] - 1164:12

**disturbing** [1] - 1186:8

**division** [4] - 1098:4; 1102:2; 1203:4

**Dix** [1] - 951:11

**doctor's** [2] - 1193:4, 6

**doctors** [7] - 1002:11; 1061:21; 1062:5, 21; 1107:18; 1112:15

**Doctors** [3] - 1061:3; 1107:8; 1109:6

**document** [18] - 994:11; 995:5, 10, 13; 1017:19, 21; 1021:24; 1025:1, 10; 1044:5; 1045:1; 1050:8; 1053:3; 1069:19; 1071:5, 7; 1122:12

**Document** [2] - 980:25; 994:2

**dog** [1] - 985:24

**dollar** [1] - 1147:23

**domestic** [1] - 1052:4

**done** [15] - 983:19; 1062:19; 1073:19; 1074:7; 1090:17; 1110:7; 1113:7;

1140:4; 1173:4; 1181:10, 22; 1191:5; 1200:23; 1202:4

**Dooley** [3] - 971:2, 8; 1013:23

**door** [18] - 954:4; 985:7, 10, 16; 988:9, 23; 1057:18, 23; 1103:5, 8-9, 11; 1110:2; 1121:13, 24; 1122:8; 1128:2

**dorm** [1] - 1125:18

**doubt** [1] - 1133:18

**Dr** [4] - 1100:8; 1180:15; 1191:8, 15

**draw** [1] - 1185:18

**drawing** [1] - 985:17

**dressed** [1] - 961:14

**driver's** [7] - 1027:5; 1028:1, 18; 1029:10; 1031:21, 23; 1032:9

**driving** [1] - 1174:5

**dropped** [1] - 963:20

**drugs** [5] - 966:15, 21; 1125:16; 1144:5, 7

**drunk** [1] - 1155:2

**Duane** [1] - 951:1

**Dudley** [7] - 1058:22, 24; 1059:2, 8, 21, 25; 1060:2

**due** [1] - 1201:21

**duly** [3] - 949:20; 1080:8; 1096:9

**duties** [1] - 1177:24

**duty** [4] - 1174:16; 1176:1; 1188:9, 17

---

**E**

**early** [7] - 951:23; 1025:22; 1060:1; 1114:8; 1139:20; 1161:22; 1163:15

**ears** [2] - 1111:9, 11

**easily** [2] - 1197:6; 1200:23

**East** [2] - 1115:21; 1139:17

**echo** [1] - 1112:9

**educate** [1] - 1112:3

**educated** [1] - 1112:2

**educational** [2] - 951:19; 1097:7

**effect** [4] - 974:3; 1129:9; 1184:1; 1199:14

**egregious** [1] - 1188:5

**eight** [2] - 1027:4; 1028:17

**Eighth** [1] - 1072:14

**either** [10] - 1014:5; 1022:19; 1065:4, 7; 1118:21; 1164:18; 1166:24; 1167:6; 1191:16; 1194:6

**elastic** [1] - 1156:11

**elbow** [1] - 1110:25

**element** [1] - 1172:14

**elements** [1] - 1174:23

**elevator** [1] - 990:6

**embarks** [1] - 1072:14

**embarrassed** [4] - 978:17; 1012:15; 1067:2; 1108:14

**embarrassing** [1] - 1111:2

**emboldened** [1] - 1198:1

**emergency** [4] - 1100:25; 1112:17; 1114:20, 23

**emotional** [17] - 991:6; 1131:21; 1132:16, 18, 21; 1133:10, 16, 18-19; 1134:18, 23, 25; 1141:1, 5, 9; 1147:13, 17

**emotions** [1] - 993:10

**employed** [6] - 952:4; 1006:6; 1052:3; 1099:6; 1120:14, 21

**employee** [4] - 1006:25; 1174:20; 1184:13; 1190:5

**employees** [11] - 1175:7; 1177:21; 1180:11; 1185:15; 1188:15; 1190:5; 1194:25; 1195:1; 1198:17; 1201:24; 1202:2

**employment** [4] - 951:24; 997:19; 1097:22; 1098:13

**encountered** [1] - 1174:7

**end** [5] - 952:13; 1047:4; 1112:21; 1164:24; 1203:6

**ended** [4] - 1113:22; 1114:12; 1137:25; 1138:8

**enforcement** [8] - 966:14, 17; 1127:3, 6; 1175:6; 1200:25; 1201:10; 1202:7

**engages** [1] - 1173:14

**England** [1] - 984:12

**entered** [4] - 949:7; 1066:3; 1123:10; 1151:3

**entering** [4] - 949:6; 1015:3; 1066:2; 1136:3

**enters** [2] - 1015:4; 1136:4

**entire** [4] - 1105:21; 1110:12; 1132:19; 1166:4

**entirely** [1] - 1193:24

**entirety** [1] - 1194:6

**entitled** [5] -

1147:12, 15; 1173:12; 1176:13; 1202:9

**environment** [1] - 1175:6

**Environmental** [1] - 1041:22

**environmental** [3] - 1067:22; 1069:14, 20

**environmentally** [1] - 1067:21

**equipment** [1] - 1052:5

**equivalent** [1] - 1176:16

**erect** [1] - 958:3

**erected** [1] - 956:25

**erection** [1] - 1172:6

**Erica** [1] - 1097:4

**error** [1] - 1133:8

**escorted** [1] - 1100:17

**esophagus** [1] - 1105:14

**especially** [1] - 1098:11

**ESQ** [4] - 948:13, 19

**essential** [1] - 1172:14

**establish** [3] - 1094:13; 1170:24; 1172:7

**established** [2] - 1169:14; 1176:15

**establishing** [1] - 1187:3

**et** [1] - 948:7

**Evans** [1] - 1098:25

**evening** [2] - 1121:2; 1164:21

**event** [3] - 1007:14; 1140:24; 1190:2

**everywhere** [1] - 1067:1

**evidentiary** [1] - 1180:7

**exact** [1] - 1056:6

**Exactly** [2] - 958:10; 977:3

**exactly** [1] - 1201:25

**exam** [18] - 954:10; 958:15; 959:7, 24; 1099:23, 25; 1100:24; 1108:9, 11, 13, 21; 1109:8; 1110:16; 1112:21; 1113:22; 1139:1; 1156:15

**EXAMINATION** [31] - 950:9; 981:20; 983:6; 997:14; 1015:13; 1055:13; 1068:20; 1073:16; 1080:20; 1085:8; 1089:11; 1092:3, 13; 1096:20; 1120:9; 1156:3; 1205:4, 6-7, 9, 11, 13, 15, 19, 23; 1206:1, 3, 5, 9, 11, 13

**examination** [70] - 954:4, 7-8; 956:6; 957:12; 959:19; 960:1, 8, 15, 20; 961:4, 12; 967:19; 968:2, 6; 976:21; 985:7, 11; 987:8; 988:4, 9, 18, 23; 991:2; 997:12; 1002:22; 1004:13; 1007:11, 25; 1044:21; 1064:12, 17; 1066:11; 1068:23, 25; 1069:4; 1078:23; 1084:17; 1089:9; 1099:21; 1101:1; 1102:3, 7; 1103:5, 9; 1105:4, 18, 22; 1106:20, 23; 1107:25; 1110:13; 1116:23; 1117:16, 18, 23; 1120:7; 1121:3, 13; 1124:16; 1156:5; 1157:24; 1196:25

**examinations** [1] -

**examine** [3] - 954:1; 1102:14; 1106:18

**examined** [24] - 949:20; 986:21; 997:2; 1002:14; 1061:21; 1062:5, 20; 1080:8; 1085:3; 1096:9; 1099:17, 19; 1100:10, 22; 1101:16, 19, 21, 24; 1102:16; 1112:14; 1116:8, 16; 1121:8; 1176:9

**examines** [1] - 1111:8

**examining** [7] - 956:20; 988:19; 1003:11; 1094:11; 1105:11; 1200:25

**example** [3] - 1134:16; 1187:1, 5

**excellent** [1] - 1062:3

**except** [3] - 1057:6; 1141:8; 1194:17

**excessive** [1] - 1166:15

**exchange** [1] - 1029:11

**excited** [3] - 1102:24; 1111:3; 1114:14

**exclude** [1] - 1022:12

**excuse** [3] - 1116:9; 1161:17, 21

**Excuse** [9] - 983:12; 995:22; 1070:16; 1076:25; 1077:4, 6; 1103:7; 1134:22

**excused** [2] - 1131:19; 1163:15

**excuses** [1] - 1183:10

**execution** [1] - 1182:22

**executive** [2] - 1085:20; 1086:1

**exhaust** [1] - 1203:15

**exhausted** [1] - 1170:7

**exhibits** [1] - 1104:2

**exist** [1] - 1173:21

**existence** [1] - 1196:6

**existing** [2] - 1063:24; 1181:25

**expect** [1] - 1160:20

**expected** [1] - 1124:17

**expense** [1] - 1164:12

**experience** [4] - 978:24; 1032:12; 1153:9; 1158:1

**experienced** [2] - 1108:11; 1158:7

**experiencing** [1] - 1153:6

**expert** [4] - 1200:10; 1201:8; 1202:14; 1203:6

**experts** [1] - 1200:25

**explain** [12] - 976:14; 1044:8; 1066:14; 1087:13; 1101:21, 24; 1105:7, 12; 1106:9, 16; 1147:14; 1157:9

**explained** [4] - 1068:14; 1088:12; 1101:5; 1115:24

**explaining** [3] - 1105:25; 1106:15; 1112:6

**explanations** [1] - 1007:21

**exposed** [1] - 1193:7

**express** [2] - 959:7; 968:1

**expressed** [1] - 973:5

**extend** [1] - 1185:14

**extensively** [1] - 976:21

**extent** [4] - 1175:5; 1183:6; 1195:4;

1196:3

**extra** [1] - 984:5

**extremely** [4] - 976:18, 24; 1184:22

**eye** [2] - 1106:7

**eyes** [1] - 1107:22

---

**F**

**F.3d** [1] - 1167:20

**face** [1] - 960:6

**facie** [8] - 1170:24; 1171:3, 9, 19; 1172:12; 1177:12; 1193:9; 1199:23

**facilitate** [1] - 1110:7

**Facility** [22] - 1039:8; 1046:7, 22; 1047:3, 12; 1051:6; 1053:22; 1054:1, 20; 1123:19; 1125:10; 1126:1; 1139:8; 1140:21; 1142:8, 10; 1143:7; 1153:15; 1154:6; 1176:8

**facility** [54] - 952:21, 23; 965:10, 19; 979:21; 983:11, 18; 993:4; 998:19; 999:22, 25; 1000:13; 1002:20; 1005:25; 1055:23; 1059:9; 1066:23; 1068:10, 12; 1073:3, 6; 1077:19; 1081:10, 24; 1082:1; 1083:11; 1091:10, 16, 22; 1094:7; 1123:10, 22-23; 1124:12, 22; 1125:22; 1126:5, 7; 1145:5, 7, 13; 1146:14, 19; 1166:25; 1175:7; 1177:21; 1190:10, 16; 1191:2, 25

**facing** [1] - 1156:23

**factual** [5] - 1165:10, 13, 18; 1185:9;

1189:1

**fading** [1] - 1153:23

**failed** [9] - 993:15; 1171:3, 19; 1178:10; 1183:13; 1184:17; 1185:2; 1199:22; 1201:2

**failing** [7] - 1174:21; 1185:12; 1195:18, 20-21; 1196:1; 1200:12

**failure** [35] - 1166:4; 1168:6; 1170:24; 1172:12; 1177:20; 1178:22; 1179:5, 9; 1182:10, 24; 1183:10, 18, 22; 1184:13; 1185:6, 15; 1187:12; 1188:4, 11; 1189:19; 1190:4; 1193:20, 25; 1194:2, 9, 12; 1195:5; 1196:6; 1199:9; 1201:20; 1203:14

**failures** [1] - 1183:4

**fair** [12] - 1002:2; 1003:23; 1008:11; 1035:5; 1036:22; 1043:4; 1048:16; 1142:7; 1151:8; 1155:21, 23

**fairly** [1] - 1139:20

**Faith** [1] - 1081:2

**fall** [2] - 1046:17; 1081:6

**false** [10] - 1027:18; 1028:9, 13; 1029:24; 1031:4, 25; 1127:2, 5; 1128:7; 1129:11

**familiar** [7] - 992:4; 1032:13; 1039:3; 1041:11; 1050:3; 1170:15; 1186:6

**family** [3] - 1063:25; 1098:10; 1114:20

**far** [9] - 1007:4, 6;

1030:9; 1075:23; 1083:17; 1132:7; 1133:9; 1141:7; 1186:23

**fashion** [1] - 951:9

**fast** [5] - 963:19; 1107:3; 1109:20, 25; 1111:23

**Fast** [1] - 1109:20

**favor** [2] - 1140:25; 1197:7

**FBI** [1] - 1125:1

**fear** [1] - 1119:9

**fearful** [1] - 978:22

**February** [24] - 952:12, 20; 953:11; 954:2; 960:13; 962:9; 989:3, 12, 16-17, 25; 995:17, 24; 996:1, 5; 998:8, 14, 19; 999:1, 5; 1046:6; 1048:1; 1179:24; 1181:10

**Federal** [4] - 948:22; 1049:1, 15; 1051:4

**federal** [13] - 953:1; 965:7; 1006:7; 1015:8; 1017:5; 1024:8; 1049:1, 8; 1050:4, 9, 14; 1051:18; 1053:11

**feed** [1] - 991:20

**feet** [1] - 1058:14

**Feinberg** [149] - 952:6, 9, 16; 953:9; 954:1; 956:6; 957:11; 959:7; 960:25; 963:20; 965:7; 967:9, 12; 968:11; 969:7, 13; 972:23; 973:9; 983:22; 988:19; 989:6, 15; 990:11, 21; 991:10; 992:7, 17; 994:9, 18; 995:19; 996:2, 6, 21; 998:7; 999:2, 4, 20; 1000:1, 7, 15, 18;

1001:2, 17, 23; 1002:4, 14, 22; 1003:7, 11, 24; 1004:14; 1005:1; 1006:10; 1008:20; 1010:1; 1012:2, 13, 18, 22; 1017:6; 1018:14; 1024:17; 1025:9, 15, 22; 1033:13; 1034:8, 14; 1035:8, 24; 1036:2; 1037:4; 1038:17, 25; 1041:8, 16; 1045:24; 1046:3; 1047:13; 1048:20, 25; 1049:7; 1054:7, 24; 1055:17, 21; 1056:14; 1057:11, 21; 1058:7; 1060:12, 21; 1062:25; 1063:3; 1067:18; 1068:22; 1073:1; 1095:8; 1102:13; 1103:12; 1105:6; 1118:24; 1121:4, 8, 13; 1122:16, 20, 24; 1123:7; 1126:18; 1130:21; 1136:11; 1140:4, 11; 1141:14; 1143:12; 1144:2; 1147:9; 1156:9, 20; 1157:8; 1158:2; 1169:1; 1171:21; 1172:4, 13; 1173:10, 24; 1174:25; 1175:22; 1176:6, 20; 1179:2, 21, 23; 1181:11; 1184:17; 1188:16; 1192:5; 1195:14; 1197:13, 17, 19; 1198:1; 1199:1

**Feinberg's** [4] - 1066:15; 1175:24; 1177:5; 1178:10

**Felicia** [1] - 950:25

**felony** [1] - 1050:15

**felt** [12] - 958:1;

959:15, 17; 978:10; 1098:8, 20; 1101:6; 1107:18; 1109:25; 1156:11; 1198:17

**female** [11] - 990:3; 1103:12; 1116:9; 1157:7; 1179:3; 1190:14, 18; 1191:1; 1193:10; 1202:19; 1203:1

**few** [5] - 1041:19; 1046:5; 1059:12; 1066:8; 1187:17

**fifth** [1] - 990:3

**fighting** [1] - 1149:6

**figured** [4] - 968:8; 1056:21; 1110:25; 1157:14

**file** [15] - 976:22; 991:9; 992:6, 13; 1012:18; 1017:4; 1022:15; 1032:16, 21; 1048:25; 1049:19; 1050:4; 1067:18; 1166:9, 11

**filed** [39] - 992:14; 1012:19; 1021:5; 1024:8; 1041:15, 19, 24; 1042:10, 13, 18, 25; 1043:4, 8, 16, 23; 1045:20; 1049:11, 14-15, 20-21, 25; 1050:1, 9; 1067:16; 1069:11; 1073:18; 1074:9; 1153:16; 1154:6, 10, 14, 19; 1166:23; 1168:4, 18; 1170:8; 1203:16

**Filiberto** [2] - 1037:8; 1038:12

**filing** [4] - 992:10; 1049:7; 1129:11; 1167:23

**fill** [2] - 1045:1; 1170:5

**filled** [3] - 1044:5;

1045:16; 1069:21

**final** [2] - 974:11

**findings** [1] - 1094:16

**fine** [2] - 1142:4; 1186:9

**Finger** [1] - 1167:16

**fingernails** [1] - 1109:23

**fingers** [8] - 961:17; 1004:14; 1068:23; 1109:15; 1111:13; 1156:24; 1172:5

**finish** [4] - 995:7; 1005:21; 1026:15; 1106:15

**finished** [3] - 1192:17; 1194:20

**fired** [1] - 1198:19

**firms** [6] - 1098:21-25; 1099:4

**five** [16] - 950:17, 21; 1010:19; 1027:4; 1028:18; 1102:22; 1134:5; 1141:17, 20, 25; 1143:2; 1148:4; 1174:20; 1178:25; 1180:10; 1199:20

**flat** [1] - 961:16

**fleshy** [1] - 1112:23

**flip** [1] - 1115:1

**flipped** [1] - 1114:25

**Flipped** [1] - 1115:2

**floor** [5] - 990:2; 1039:17; 1067:24; 1110:4

**FLYNN** [211] - 948:19; 954:11, 13; 955:2, 5, 9, 11; 964:19; 965:3; 968:22; 969:4, 8; 970:20; 974:16, 23; 978:19; 981:12, 17, 21; 982:14; 983:1, 23; 985:23; 987:25; 991:3, 7, 17, 22; 992:23; 996:12, 18,

25; 997:15, 24; 1011:15; 1015:12, 14; 1017:8, 11-12, 18; 1018:7; 1019:7; 1020:10, 13, 18, 22; 1021:4, 14, 17; 1022:14, 18; 1023:2; 1024:6, 19; 1025:3; 1026:7, 10, 25; 1027:1, 12, 14, 16; 1030:19; 1033:23; 1034:5, 22-23; 1036:10, 12; 1037:22, 25; 1038:10; 1043:13, 15; 1044:11; 1045:3, 15; 1046:12; 1047:17, 22; 1048:15; 1055:10; 1056:11; 1057:4, 13; 1058:10, 12; 1059:17, 19; 1060:3; 1061:25; 1062:7, 10; 1068:18, 21; 1069:18, 24; 1070:6; 1071:11; 1073:13, 21; 1074:3, 10, 16; 1075:2; 1076:17; 1077:15; 1078:3, 7, 16, 20; 1082:25; 1083:2, 19; 1084:18; 1088:15; 1089:12; 1091:24; 1092:14; 1093:1, 9, 12; 1094:2, 5; 1095:4; 1101:22; 1103:14; 1104:2, 6, 9; 1116:12, 18; 1117:12, 20, 25; 1118:4, 8, 15; 1120:10; 1121:1, 20, 22; 1122:3, 6; 1123:5, 16-17; 1128:9; 1129:2; 1130:7, 18-19; 1131:9, 12; 1134:2, 5, 9, 1135:10; 1136:8; 1137:11; 1138:2, 5, 10-11;

1141:11; 1142:4, 6; 1145:20; 1147:18; 1150:5, 7, 9-10; 1151:13; 1152:17; 1153:19, 24; 1154:2, 4; 1155:4, 7, 11, 25; 1158:19, 21; 1160:3, 8, 19; 1161:3, 16, 20, 25; 1162:3; 1203:25; 1204:2; 1205:8, 10, 14; 1206:2, 6, 12

**Flynn** [1] - 1007:18

**focus** [5] - 989:3, 12; 995:16; 1102:9; 1194:3

**focusing** [1] - 1059:8

**Focusing** [2] - 953:9; 987:11

**focussing** [1] - 1081:22

**fold** [1] - 957:22

**folded** [2] - 982:7; 1058:5

**folder** [1] - 1040:20

**follow** [5] - 1056:2; 1090:16, 19; 1091:3; 1092:5

**follow-up** [4] - 1090:16, 19; 1091:3; 1092:5

**followed** [3] - 1074:2; 1163:20; 1167:25

**following** [20] - 949:1; 955:1; 956:1; 976:1; 977:12; 978:1; 998:18; 999:1; 1075:1; 1078:6; 1080:1; 1084:12; 1094:1; 1096:1; 1104:1; 1105:1; 1114:4; 1128:1; 1129:1; 1198:20

**Following** [2] - 1015:1; 1136:1

**follows** [5] - 949:21; 1080:9; 1085:4; 1096:10; 1189:2

**fondle** [1] - 1060:21

**fondling** [1] - 1060:25

**footnote** [4] - 1185:21; 1186:7, 16

**Footnotes** [1] - 1185:23

**footnotes** [3] - 1185:24; 1186:2, 8

**force** [8] - 1127:10; 1129:5; 1166:15; 1182:2; 1184:3; 1187:3; 1197:21; 1199:4

**foreclosure** [1] - 951:25

**foreperson** [1] - 1164:4

**forged** [4] - 953:2; 1030:5, 7, 25

**forgery** [3] - 1026:3, 19; 1028:4

**forget** [6] - 963:2, 5; 1186:7; 1201:18

**form** [11] - 988:1; 1017:24; 1018:4; 1043:17; 1071:9, 18; 1167:24; 1170:5; 1178:18; 1179:13

**formal** [9] - 984:6; 1071:9, 18; 1166:9, 22-23; 1168:18; 1170:2; 1203:16

**forward** [1] - 1039:15

**foul** [1] - 1072:19

**founded** [1] - 1192:8

**fours** [4] - 956:19; 957:4; 960:3; 1069:4

**fourth** [2] - 950:25; 951:10

**framework** [4] - 1187:19; 1189:10, 19

**frankly** [1] - 1170:14

**fraud** [5] - 966:16,

23; 1006:16; 1050:15, 17

**free** [1] - 1196:19
**freedom** [1] - 1173:1
**Freeport** [1] - 950:13
**French** [2] - 1102:19
**friend** [4] - 971:10, 12; 1013:24; 1063:25
**Friendly** [1] - 951:24
**front** [16] - 957:7, 14, 19; 971:4; 986:25; 1012:13; 1034:7; 1054:23; 1072:25; 1073:10; 1104:4; 1105:19, 21, 24; 1110:20; 1121:12
**fuck** [2] - 1070:21; 1072:1
**fucking** [1] - 1072:1
**full** [4] - 1080:15; 1096:13; 1101:2; 1165:10
**fully** [1] - 977:4
**function** [1] - 1119:3
**funny** [2] - 1108:16; 1109:6
**future** [2] - 952:4; 1199:12

---

**G**

**gainfully** [2] - 952:4; 1120:20
**gang** [1] - 1188:22
**Gary** [158] - 952:6, 9, 16; 953:9; 956:6; 957:11; 959:7; 960:25; 962:8; 963:20; 964:11, 16, 25; 965:6, 18; 967:9, 12-13; 968:10, 14, 25; 969:3, 7, 13; 972:12, 23; 973:9, 14; 978:11; 983:22; 988:19; 989:6, 15; 990:10, 20; 991:9; 992:6, 17; 993:7;

994:9, 18; 995:19; 996:1, 6, 21; 998:7; 999:2, 4, 20; 1000:1, 7, 14, 18; 1001:2, 17, 23; 1002:4, 14, 22; 1003:7, 10, 24; 1004:13; 1005:1; 1006:10; 1008:20; 1010:1; 1012:2, 13, 18, 22; 1017:6; 1018:14; 1024:17; 1025:9, 15, 22; 1033:13; 1034:8, 14; 1035:8, 24; 1036:2; 1037:4; 1038:17, 25; 1041:8, 16; 1045:24; 1046:3; 1047:13; 1048:20, 25; 1049:7; 1054:7, 24; 1055:17, 21; 1056:14; 1057:11, 21; 1058:7; 1060:12, 21; 1062:25; 1063:3; 1066:15; 1067:18; 1068:22; 1073:1; 1095:8; 1102:13; 1105:6; 1118:24; 1121:4, 8, 12, 24; 1122:8, 16, 20, 24; 1123:7; 1126:18; 1130:21; 1136:11-13; 1140:4, 11; 1141:14; 1143:12; 1144:2; 1147:9; 1156:9; 1157:8; 1158:2; 1171:21; 1172:13; 1173:10, 24; 1175:22; 1176:6, 20; 1177:5; 1181:11; 1184:17; 1188:16; 1192:5; 1195:13; 1197:12, 17, 19, 25; 1199:1
**gate** [1] - 1072:1
**gates** [3] - 1042:19; 1067:17; 1070:19
**gather** [1] - 1161:15
**gauze** [2] - 961:6, 11

**GED** [1] - 951:20
**Gehrig** [1] - 1167:11
**gel** [3] - 961:8, 16; 1117:8
**general** [2] - 1146:7; 1179:11
**generate** [1] - 1182:19
**gentleman** [4] - 1078:12; 1100:7, 17
**Georgia** [2] - 951:6; 1081:3
**Geraci** [3] - 1180:15; 1191:8, 15
**girl** [4] - 1103:4, 10; 1136:14, 17
**girls** [1] - 1098:11
**given** [16] - 1082:7; 1083:7-9, 12; 1089:13, 15-16; 1090:8; 1091:4; 1098:8; 1118:19; 1127:2, 5; 1175:5; 1177:11
**glad** [1] - 1167:8
**glance** [1] - 1203:11
**glasses** [1] - 1117:2
**gloves** [5] - 961:23; 1117:2; 1118:12
**God** [10] - 960:16; 979:18; 980:4; 993:21; 1081:2; 1110:6; 1111:24; 1113:6, 16
**government** [1] - 1006:7
**grab** [1] - 958:11
**grabbed** [5] - 982:8; 1003:18; 1004:3, 8; 1172:6
**grabbing** [1] - 1156:20
**graduated** [1] - 1097:15
**grant** [1] - 1131:7
**granted** [3] -

1044:12; 1059:20; 1155:8
**graphic** [1] - 1118:13
**great** [2] - 955:10; 1176:14
**greatly** [1] - 949:13
**greens** [2] - 961:14
**grew** [3] - 1097:8, 11, 15
**grievance** [46] - 992:4, 12-13; 1012:18, 20-21; 1013:4; 1041:12, 15, 25; 1042:10, 13, 18, 25; 1043:8, 17; 1045:16; 1046:2; 1067:18, 21, 23; 1068:1, 4; 1069:11, 21; 1070:9; 1071:9, 18; 1072:17; 1074:6; 1160:18; 1166:9, 12, 22-23; 1167:24; 1168:1, 4, 19; 1170:2, 5-6, 8; 1203:16
**grievances** [11] - 1012:19; 1041:19, 22; 1043:5; 1067:16, 23; 1069:10; 1070:11; 1073:18; 1167:23
**grievant** [1] - 1072:11
**grieve** [1] - 1068:1
**grinded** [1] - 1172:6
**grinding** [2] - 957:17; 958:5
**gross** [2] - 1178:21; 1188:5
**grossly** [1] - 1188:10
**ground** [4] - 1078:10; 1168:16; 1195:4; 1196:23
**grounds** [3] - 1184:6; 1194:20
**group** [7] - 970:9-11; 990:7, 13; 1011:19;

1012:12

**groups** [2] - 970:10; 989:20

**guess** [7] - 990:8; 1013:23; 1099:20; 1106:24; 1107:18; 1116:6; 1160:24

**guidelines** [3] - 1178:15; 1191:13; 1200:20

**guilty** [14] - 1026:2, 5, 18; 1029:4, 8, 17; 1030:4, 24; 1031:4, 11, 25; 1050:14, 18, 24

**gun** [2] - 1003:8; 1062:25

**guns** [3] - 966:15, 21

**guy** [1] - 1112:19

---

**H**

---

**hairs** [1] - 1110:9

**Half** [2] - 1098:1, 13

**half** [2] - 1099:16; 1119:14

**hallucinate** [1] - 1158:17

**hallucinated** [1] - 1158:4

**hallucination** [3] - 1158:3, 6, 8

**hallucinations** [3] - 1153:6, 9; 1158:1

**hallway** [2] - 979:5; 986:19

**hand** [29] - 956:23; 957:6; 958:3-5; 961:18; 980:7; 982:8; 1003:17; 1080:4; 1096:5; 1107:6, 11, 15; 1108:7, 23-24; 1111:17; 1138:21; 1147:15; 1156:9, 12, 24; 1169:7; 1172:6; 1189:15

**handed** [2] - 980:25;

994:2

**Handing** [1] - 1069:19

**handing** [1] - 981:1

**handle** [2] - 1178:17; 1191:14

**handling** [1] - 1053:11

**hands** [17] - 957:14, 18, 22, 24-25; 958:1, 7, 9; 961:17; 1107:2, 4-5; 1109:18; 1111:21; 1138:20

**handwriting** [4] - 1039:22; 1040:25; 1071:7

**hang** [1] - 972:4

**happy** [2] - 1088:8; 1125:19

**Harbor** [3] - 1081:21; 1085:20; 1086:1

**hard** [2] - 958:3; 1115:6

**harder** [1] - 979:4

**harm** [1] - 1186:25

**Harris** [1] - 1183:16

**hated** [3] - 1136:22; 1137:18; 1138:15

**Hauppauge** [1] - 948:18

**head** [4] - 1003:17; 1058:3, 9; 1180:16

**head's** [1] - 1058:1

**headhunter** [1] - 1120:14

**heal** [1] - 1158:16

**Health** [6] - 1191:20, 24; 1200:3, 6; 1201:11; 1202:8

**health** [8] - 1009:18, 21; 1025:7; 1124:2; 1153:8; 1188:21; 1191:7, 10

**heard** [10] - 976:7; 977:1; 1013:20; 1076:17; 1117:10; 1131:8; 1172:3;

1192:19; 1202:18; 1203:6

**hearing** [6] - 960:6; 1009:13; 1075:16; 1135:11; 1153:25; 1154:20

**hears** [2] - 953:14; 979:22

**hearsay** [1] - 1020:25

**heart** [1] - 1108:3

**heavy** [1] - 1067:1

**held** [4] - 1166:17; 1167:21; 1169:22; 1188:9

**help** [23] - 964:17; 967:14; 969:3; 978:12; 979:18; 980:4; 982:9; 983:9, 16; 992:20; 993:3, 24; 1005:5; 1022:8; 1025:21; 1036:20; 1060:6; 1107:1, 19; 1113:14; 1136:13; 1137:2

**helped** [4] - 1107:11, 14, 24; 1108:19

**helping** [1] - 993:1

**heretofore** [1] - 1185:4

**hernia** [2] - 1101:6; 1105:13

**herself** [1] - 1168:23

**hesitant** [2] - 976:16, 18

**High** [1] - 1097:16

**high** [5] - 951:13; 1015:7; 1060:18; 1188:20; 1194:5

**Highway** [1] - 948:18

**Hills** [1] - 951:11

**himself** [3] - 1188:24; 1192:9

**hinges** [1] - 1181:22

**hip** [1] - 953:23

**Hippocratic** [1] - 1176:16

**hired** [1] - 1098:3

**history** [10] - 951:22; 997:19; 1061:20, 23; 1097:7, 22; 1132:3; 1149:18, 22, 25

**History** [1] - 1097:21

**hit** [3] - 1155:2, 18

**hmm** [3] - 1024:14; 1070:8; 1145:12

**hold** [8] - 957:16; 958:8; 965:7, 11; 1014:3; 1111:13; 1185:14

**holding** [4] - 957:15, 17; 1108:8, 17

**holds** [1] - 1173:1

**holiday** [3] - 1083:13; 1114:12

**holidays** [1] - 1124:20

**hollow** [1] - 1112:7

**home** [9] - 951:7; 1083:25; 1084:1, 5, 7-8; 1098:15; 1114:14; 1124:19

**Home** [1] - 951:24

**Honor's** [1] - 1130:14

**HONORABLE** [1] - 948:10

**Honorable** [1] - 1033:16

**hope** [1] - 1164:12

**hoped** [3] - 1124:14, 19

**hopefully** [1] - 993:5

**horticulture** [1] - 951:20

**hospital** [4] - 1100:11; 1105:8; 1112:17; 1144:10

**Hospital** [7] - 1051:20; 1100:13, 21; 1144:5, 25; 1151:24

**host** [1] - 992:1

**hot** [2] - 1111:21; 1156:12

**hour** [1] - 1161:24

**hours** [7] - 1101:4; 1113:7; 1115:25; 1137:20; 1138:17; 1163:15, 23

**housed** [3] - 1048:2; 1099:9; 1113:5

**housing** [2] - 951:25; 1071:25

**hug** [1] - 1119:25

**hum** [1] - 1113:24

**humiliating** [2] - 1113:12

**humiliation** [1] - 1147:14

**hungry** [3] - 1136:23; 1137:19; 1138:16

**hurry** [1] - 1113:20

**hurt** [3] - 1111:22, 24; 1112:11

**hurting** [3] - 964:14; 997:5; 1109:11

**husband** [7] - 1097:18; 1098:16; 1148:14, 24; 1149:1; 1150:21

**hysterical** [1] - 1113:2

**I**

**IA** [2] - 1041:2, 7

**IAB** [4] - 990:11; 996:9, 11, 17

**ICU** [1] - 1144:11

**ID** [4] - 1027:22; 1028:1, 9

**idea** [3] - 1000:17; 1011:4; 1075:9

**ideas** [1] - 1105:14

**identification** [20] - 980:13; 994:4; 1017:9; 1026:9, 12; 1028:13; 1030:13; 1036:11; 1037:13; 1039:20; 1043:24; 1052:12; 1069:9, 16; 1071:1; 1082:17;

1144:18

**identified** [3] - 1032:3; 1165:11; 1186:25

**identify** [2] - 1005:15, 17

**identifying** [1] - 984:19

**identity** [9] - 1026:2, 18; 1027:2, 18; 1029:4, 8, 24; 1052:3

**ignored** [2] - 1130:6; 1201:18

**ignoring** [1] - 1194:2

**ill** [1] - 1114:21

**illegal** [1] - 1022:13

**illustrate** [1] - 986:3

**illustrative** [1] - 1185:20

**imagine** [2] - 1063:16, 23

**immediately** [3] - 1060:19; 1087:17; 1115:14

**immoral** [1] - 1176:24

**immunity** [2] - 1173:12; 1176:13

**impact** [2] - 978:6; 1118:24

**impeachment** [1] - 1135:6

**impermissible** [1] - 1173:15

**impersonation** [3] - 1026:6; 1029:18; 1031:4

**important** [5] - 976:24; 1063:9, 11; 1146:23; 1183:17

**impose** [3] - 1182:4; 1184:25; 1187:11

**imposed** [1] - 1194:11

**imposition** [4] - 1184:12, 24; 1185:11; 1194:8

**impossible** [1] - 1055:25

**impression** [2] - 958:19; 1124:11

**improper** [1] - 1202:1

**improperly** [2] - 1201:8, 24

**inadequacies** [1] - 1201:21

**inadequate** [2] - 1195:1; 1198:1

**inadequately** [1] - 1194:25

**inadmissible** [1] - 1020:25

**inappropriate** [10] - 952:11; 959:22; 960:8, 24; 1000:18; 1004:15, 18; 1060:23; 1196:14

**inappropriately** [19] - 952:9, 16; 959:6; 961:1; 962:9, 25; 965:1; 967:14; 968:11; 969:1, 14; 990:20; 991:2; 993:7; 996:22; 997:8; 999:5, 11; 1062:22

**Incarcerated** [2] - 997:23

**incarcerated** [13] - 953:7; 997:20; 998:8; 1039:8; 1060:8; 1142:7, 13, 18, 23, 25; 1143:2, 5; 1153:14

**incarceration** [4] - 998:14; 1085:23; 1142:9; 1143:6

**incarcerations** [3] - 999:13; 1132:24; 1133:1

**incident** [24] - 1068:3; 1075:21; 1076:6; 1089:6; 1116:24; 1118:24;

1130:20; 1132:20; 1134:6; 1136:10; 1141:2; 1143:11; 1144:2; 1147:13; 1156:7, 17, 22; 1157:6; 1158:2; 1166:24; 1174:21; 1178:24; 1180:8

**incidents** [5] - 968:20; 999:1; 1128:3; 1147:16; 1166:10

**includes** [2] - 1179:9, 11

**including** [1] - 1166:14

**incompetent** [4] - 1148:15, 25; 1149:4, 8

**inconsistency** [2] - 1022:4, 20

**inconsistent** [1] - 1183:6

**incorrect** [1] - 1169:20

**indecent** [1] - 1176:24

**Indent** [1] - 987:13

**indent** [1] - 987:14

**indicate** [4] - 1016:15; 1040:7, 10; 1145:16

**indicated** [9] - 995:9; 998:11; 1001:23; 1016:3; 1069:11; 1089:13; 1120:13; 1121:12; 1131:12

**indicates** [1] - 1040:12

**Indicating** [2] - 956:14; 957:20

**indicating** [2] - 1015:18; 1110:3

**indicating)** [1] - 1113:1

**indifference** [6] -

1179:7; 1182:16, 18; 1183:3; 1188:6

**indifferent** [5] - 1182:12, 21; 1183:1; 1188:11

**indirect** [1] - 1185:20

**individual's** [1] - 1173:1

**individually** [1] - 1176:12

**individuals** [2] - 1178:4, 9

**inexcusable** [1] - 1195:16

**inference** [2] - 1176:12; 1181:18

**inflammatory** [3] - 955:3; 1064:8

**inflicted** [1] - 1186:25

**informal** [6] - 1070:9; 1166:16, 18, 21; 1167:23; 1169:23

**informally** [1] - 1070:11

**informant** [2] - 1125:13, 20

**informed** [2] - 1075:20; 1151:23

**infraction** [1] - 1009:8

**inherent** [1] - 1172:23

**initiated** [1] - 967:1

**injuries** [4] - 1049:2, 8; 1117:19, 24

**injury** [4] - 953:17, 25; 1118:3, 7

**inmate** [24] - 971:13; 981:7; 1032:16, 25; 1087:14; 1088:13, 18, 23; 1089:2, 4; 1090:17; 1158:13; 1167:2; 1169:11; 1170:4; 1174:3; 1180:1; 1181:19; 1188:12; 1190:14;

1192:1; 1195:15; 1202:19; 1203:1

**inmates** [19] - 972:8; 973:3; 986:21; 987:5; 994:24; 1002:7; 1072:15; 1083:17; 1174:17; 1176:9; 1177:22; 1179:4, 8, 12; 1180:2; 1193:2, 11; 1195:23; 1198:18

**inmates'** [4] - 1190:14, 18; 1191:1; 1192:23

**innuendo** [1] - 1201:5

**input** [1] - 1183:20

**insects** [2] - 1042:14; 1067:17

**inserted** [2] - 1172:4

**inside** [16] - 954:8; 967:20; 979:21; 993:3, 23; 1042:19; 1061:22; 1067:9; 1102:6; 1109:15, 18; 1111:22; 1117:5; 1138:22; 1158:15

**instance** [1] - 1180:7

**instances** [1] - 1141:4

**Institute** [2] - 1049:2, 15

**instituted** [1] - 1168:24

**instituting** [1] - 1166:6

**instructed** [9] - 998:5; 1009:1; 1034:1; 1044:13; 1047:20; 1057:8; 1059:23; 1073:23; 1155:10

**instructions** [2] - 1163:14, 23

**instrument** [2] - 953:2; 1030:5

**insufficiencies** [1] - 1185:7

**intelligent** [1] - 1188:23

**intend** [1] - 1177:12

**intended** [1] - 1133:1

**intentional** [1] - 1199:2

**intentionally** [1] - 1193:18

**interaction** [1] - 1058:7

**interest** [1] - 1195:23

**interested** [2] - 976:6; 1099:2

**interfering** [1] - 1042:19

**Internal** [10] - 965:20; 989:21, 23; 991:14; 994:8, 18; 1181:2, 8; 1192:7; 1203:5

**internal** [22] - 965:21; 993:1; 1039:3, 6, 9, 13-14; 1040:7, 12, 18; 1067:7; 1068:7; 1166:20; 1168:21; 1169:25; 1170:10; 1181:3; 1188:23; 1203:4

**International** [1] - 1098:2

**interpret** [1] - 1184:11

**interrupt** [2] - 1186:13; 1192:15

**interrupted** [1] - 1062:12

**interview** [3] - 1094:13; 1179:23; 1192:23

**interviewed** [2] - 1180:2; 1192:5

**interviews** [1] - 1181:9

**intimacy** [1] - 1119:9

**introduce** [1] -

1094:16

**introduced** [1] - 1102:19

**investigate** [14] - 993:6; 1179:21; 1183:8-10; 1190:13, 18; 1191:17; 1192:23; 1193:10, 21, 25; 1194:25; 1196:6

**investigated** [3] - 1076:24; 1178:25; 1198:14

**investigation** [12] - 989:24; 990:10; 1094:17; 1115:21; 1168:21; 1170:11; 1179:19; 1180:4; 1191:1; 1192:10, 13; 1198:2

**investigations** [1] - 1195:1

**Investigator** [7] - 1013:12; 1025:20; 1093:8; 1126:23; 1178:1; 1192:11

**investigator** [4] - 990:8; 1116:9; 1179:20; 1192:3

**investigators** [1] - 1115:23

**invite** [1] - 997:7

**involuntary** [2] - 1195:9; 1196:4

**involve** [1] - 1036:9

**involved** [2] - 1094:17; 1148:13

**involving** [1] - 996:6

**irrelevant** [1] - 1182:23

**irritation** [1] - 1118:20

**Island** [3] - 1097:8, 11, 15

**Islip** [2] - 948:6, 23

**issue** [18] - 993:5; 1075:5, 14; 1076:2;

1095:1, 4; 1132:2, 8; 1133:16; 1134:14; 1140:24; 1141:6, 8; 1168:12; 1169:23; 1173:6; 1197:3

**issued** [1] - 1028:12

**issues** [10] - 963:6; 1119:1; 1147:10; 1148:11; 1149:21; 1165:11, 13, 17

**item** [6] - 1017:10, 14; 1024:2; 1133:22; 1148:9

**items** [2] - 1028:25; 1141:1

**itself** [3] - 1169:21; 1185:14; 1202:3

---

**J**

**Jail** [5] - 1090:20; 1099:20; 1121:3, 7; 1143:8

**jail** [77] - 952:10, 20; 953:4, 12, 15; 960:19; 962:11; 970:9; 974:12; 976:11; 985:9, 11; 991:15; 1011:17, 21, 24; 1012:1; 1015:16, 20; 1017:24; 1018:20; 1032:12, 18; 1039:4, 10; 1042:14, 19; 1043:9; 1051:10; 1058:7; 1059:9; 1060:6, 10, 15; 1061:20; 1063:6; 1064:1; 1066:19; 1067:10; 1069:12; 1072:15; 1081:23; 1082:1; 1099:11; 1102:1; 1106:5; 1112:2, 16; 1115:5, 22; 1116:1; 1119:10; 1134:6; 1136:22; 1137:17; 1138:14; 1139:2, 17; 1143:9;

1157:17; 1166:10; 1170:2; 1174:3, 16; 1175:6, 14; 1177:21; 1180:11; 1181:12; 1191:7; 1192:6; 1200:2, 5; 1201:7

**jail's** [1] - 1064:3

**jailer** [2] - 1172:22, 25

**jailhouse** [2] - 1085:19; 1101:16

**Jailhouse** [6] - 1087:5, 9; 1099:9; 1101:9, 14; 1102:4

**jails** [1] - 1086:2

**James** [1] - 1192:3

**janitor** [1] - 1174:2

**January** [22] - 952:14; 962:10; 995:16, 23; 996:1, 4; 998:12; 1000:22; 1010:15; 1011:16; 1021:8; 1024:17; 1025:6; 1030:6; 1035:17; 1043:16; 1045:20; 1048:1; 1051:6; 1059:7; 1180:17

**jelly** [1] - 1118:22

**jelly-like** [1] - 1118:22

**Jessica** [1] - 1097:4

**job** [3] - 1095:9; 1176:10; 1198:20

**joint** [1] - 984:25

**JON** [1] - 948:13

**Jones** [3] - 1034:12; 1098:24

**Joseph** [4] - 949:14; 1044:18; 1066:6; 1080:3

**JOSEPH** [166] - 948:13; 949:15; 950:10; 956:3; 974:25; 976:2, 9; 977:3, 15, 18; 978:3;

980:11, 15, 17, 19, 21, 23; 981:14; 982:17; 983:7; 984:1, 5, 13, 18, 23, 25; 985:4, 13, 20; 986:2, 12, 14; 987:17; 988:15; 993:25; 994:6; 995:22; 997:11; 998:3; 999:6; 1008:22; 1009:10; 1011:1, 11; 1015:22; 1019:6, 10, 15; 1020:4, 6, 8, 12, 15, 23; 1021:2, 12, 15, 21; 1022:2, 9, 11, 22; 1023:1, 3; 1024:18, 22, 25; 1038:1, 3; 1045:6; 1048:8, 11, 13; 1055:12, 14; 1057:9, 15; 1058:20; 1059:24; 1062:15; 1066:7; 1068:16; 1070:2; 1071:14; 1073:14, 17; 1074:12, 15; 1075:13, 18; 1076:1, 8, 10, 14, 19; 1077:2, 13, 16; 1078:1; 1079:4, 8; 1080:21; 1082:16, 19, 22; 1083:23; 1084:16, 21; 1085:9; 1087:1; 1088:3; 1089:8, 23; 1092:1, 10, 21, 23; 1093:3; 1096:3, 18, 21; 1105:2; 1116:21; 1117:14, 22; 1118:6, 18; 1120:6, 23; 1123:3; 1125:3; 1127:12; 1128:2; 1129:21, 23; 1130:2, 12, 23, 25; 1131:3, 5, 22; 1132:22; 1133:11, 21, 24; 1134:10, 21; 1135:3; 1141:24; 1147:5;

1148:16; 1151:11; 1156:1, 4; 1157:3, 5; 1158:18; 1171:17; 1205:5, 12, 16, 20, 24; 1206:10, 14

**JPTO** [1] - 1094:25

**judgment** [7] - 1067:9; 1132:4; 1165:12; 1168:11; 1189:5; 1194:15; 1202:9

**judicial** [2] - 1021:6; 1066:22

**Judy** [1] - 1062:2

**July** [7] - 1033:8, 17; 1041:24; 1127:8; 1129:3; 1152:13; 1153:3

**jump** [2] - 995:16; 1098:17

**jumped** [3] - 1003:14; 1115:8; 1117:6

**June** [27] - 960:13, 15; 961:3; 962:14, 17-19; 963:14; 965:17; 998:17; 999:11; 1000:22; 1010:15; 1011:16; 1025:14; 1046:5; 1050:13; 1051:6; 1055:19, 22; 1070:7, 13; 1071:3; 1073:7; 1143:24

**JURY** [1] - 949:9

**jury's** [2] - 1047:20; 1059:23

**justice** [2] - 1032:22; 1033:12

**Justice** [2] - 1006:8; 1050:19

---

**K**

**K-U-R-T-I-N** [1] - 1081:16

**Kaufman** [2] -

**Keep** [5] - 1014:6; 1065:4, 6; 1122:4; 1131:17

**keep** [13] - 969:19; 982:15, 18-19, 23; 986:24; 1010:1; 1046:25; 1063:14; 1085:25; 1153:22; 1170:6

**keeping** [1] - 1015:6

**keeps** [3] - 957:9; 1111:25; 1182:7

**Kennedy** [3] - 990:24; 991:5; 1180:10

**Kennedy's** [2] - 1180:10; 1181:16

**kept** [7] - 959:1; 963:4; 994:23; 1083:17; 1109:23; 1110:24; 1112:4

**key** [1] - 1077:17

**keys** [1] - 1173:1

**kidding** [1] - 1103:2

**kidnaps** [1] - 1174:5

**kids** [2] - 1098:10; 1149:6

**killed** [1] - 1187:2

**kind** [12] - 981:25; 1101:2; 1106:11; 1107:20; 1109:10; 1112:7; 1118:21; 1132:20; 1187:4; 1191:13

**kinds** [1] - 1193:3

**kissed** [6] - 960:7, 14, 21; 1061:10, 17; 1112:22

**knife** [1] - 1109:20

**knocking** [1] - 1112:7

**knowing** [2] - 1061:13; 1174:19

**knowledge** [7] - 996:15; 1018:2; 1074:1, 8; 1127:7;

1200:6

**known** [5] - 972:22; 1066:13; 1153:16; 1166:5; 1169:8

**Known** [1] - 972:24

**knows** [3] - 1130:5; 1169:4; 1202:25

**knuckles** [1] - 957:18

**Kugler** [3] - 1178:1; 1180:16; 1188:20

**KURTIN** [2] - 1085:1; 1205:22

**Kurtin** [8] - 1075:14; 1081:12, 17; 1083:16; 1084:12, 22; 1085:10; 1192:18

---

## L

**L-A-N-G-H-O-R-N** [1] - 1087:20

**L-O-W-R-I-T-A** [1] - 950:5

**lack** [2] - 1193:1, 11

**lady** [2] - 982:7; 1011:8

**laid** [6] - 956:8, 16; 958:16; 961:20; 997:7; 1189:2

**lamp** [1] - 1117:2

**Langhorn** [12] - 1087:17, 20; 1088:5, 11-12, 14; 1089:22; 1090:12; 1092:7, 16; 1160:24; 1192:19

**language** [2] - 1072:19; 1185:19

**larceny** [1] - 1026:5

**large** [1] - 1120:17

**largest** [1] - 1097:25

**last** [10] - 949:23; 951:1; 993:18; 995:1; 1033:25; 1080:15; 1096:13; 1119:14; 1194:7

**lasted** [1] - 998:15

**latter** [2] - 951:24;

1187:5

**laughing** [1] - 1113:10

**Laughlin** [1] - 1090:10

**lawsuit** [12] - 991:9, 12; 1016:3; 1049:1, 8, 11, 14, 19; 1050:4, 8; 1167:4; 1168:3

**lawyer** [5] - 982:21; 984:10; 1017:5; 1051:11; 1077:6

**Lawyers** [1] - 984:7

**lawyers** [3] - 982:24; 1163:7, 13

**lay** [3] - 957:12; 1107:24; 1108:19

**laying** [6] - 957:13; 958:16; 961:12, 16; 1110:22; 1111:15

**layperson** [2] - 1200:7

**lead** [2] - 977:11; 1198:9

**leading** [1] - 1142:9

**lean** [1] - 1107:19

**learn** [6] - 989:25; 990:18, 25; 1087:11; 1102:12; 1117:23

**learns** [1] - 1181:9

**least** [3] - 977:1; 1188:19; 1195:15

**leather** [1] - 1052:9

**leave** [7] - 979:20; 980:8; 982:9; 1004:2; 1007:17; 1164:2; 1191:17

**leaves** [2] - 1065:9; 1164:22

**leaving** [3] - 1003:16; 1057:5; 1198:20

**led** [4] - 970:13; 1181:10; 1193:13; 1195:2

**Lee** [1] - 948:17

**left** [16] - 959:11; 960:22; 1055:23; 1060:8; 1103:4, 6, 10-12; 1105:5; 1129:17; 1132:2; 1139:1; 1158:15; 1167:2

**leg** [5] - 956:17; 964:14

**legal** [9] - 963:7; 1094:24; 1097:24; 1098:3; 1165:17; 1184:6; 1187:19; 1189:9

**legitimate** [2] - 1168:15; 1172:8

**legs** [4] - 957:7; 961:15; 1116:17; 1117:1

**less** [1] - 1202:22

**letters** [18] - 965:15; 999:24; 1005:4; 1034:19; 1035:2, 11, 18; 1037:11, 19-20; 1038:11, 15, 22; 1039:9, 12; 1040:18; 1067:11

**level** [1] - 1188:20

**levels** [1] - 1167:25

**liability** [25] - 1132:14; 1140:17, 20; 1141:6; 1147:8, 10; 1175:17, 25; 1176:3; 1182:5, 15; 1184:8, 12, 24; 1185:12, 15; 1187:11; 1188:10; 1189:25; 1190:3, 8; 1194:9, 11

**liable** [2] - 1182:11, 13

**library** [2] - 1032:15; 1049:20

**license** [4] - 1028:1; 1031:21, 23; 1032:9

**licenses** [3] - 1027:5; 1028:18; 1029:10

22

licking [1] - 1107:23
lie [2] - 956:8; 1107:14
lied [1] - 1130:9
Lieutenant [1] - 1191:16
life [12] - 953:8; 963:7; 1061:12; 1119:20, 22; 1120:3, 20; 1132:19; 1141:4; 1147:16; 1169:1
lift [2] - 956:17; 1058:3
Lift [1] - 956:18
lifts [1] - 961:17
light [1] - 1117:3
limit [1] - 1177:11
limited [2] - 1078:24; 1184:9
Linda [2] - 990:24; 991:5
line [8] - 996:10, 21; 1116:16; 1121:23; 1122:7; 1130:2; 1137:8; 1186:13
lined [2] - 990:7, 13
link [13] - 1077:18, 23; 1094:18; 1177:3; 1183:14, 24; 1184:2, 6; 1185:4, 8-9; 1187:9
lips [3] - 960:7; 1061:17; 1107:23
list [3] - 1077:1; 1094:20; 1095:20
listed [3] - 1075:9; 1160:17
Listen [1] - 1034:2
listen [6] - 1044:14; 1106:18; 1108:2, 22; 1111:10
listening [2] - 1110:18; 1190:21
literally [1] - 1180:4
litigated [1] - 1169:23
Litigation [2] -

1166:6; 1203:17
live [3] - 950:3, 12; 951:3
lobby [2] - 990:5, 7
local [1] - 979:16
locate [1] - 1173:5
located [1] - 1123:25
location [1] - 981:7
lock [2] - 1013:8; 1113:9
locked [3] - 1113:6; 1137:20; 1138:17
locking [1] - 1072:1
lodged [1] - 953:19
logic [1] - 1175:14
logs [2] - 1083:15, 17
looking [6] - 1040:4; 1057:25; 1088:9; 1110:4; 1111:10; 1186:18
looks [2] - 988:23; 1022:3
loss [2] - 1022:12; 1119:9
lost [1] - 1152:4
louder [1] - 983:13
love [1] - 993:21
low [1] - 1107:5
lower [3] - 957:1; 1085:15; 1107:16
Lowrita [16] - 949:15, 24; 950:2; 979:22; 983:8; 992:4; 1004:4; 1062:16; 1075:20; 1076:19; 1077:3; 1078:8; 1092:16; 1126:1, 7; 1195:12
LOWRITA [2] - 949:18; 1205:3
Lowrita's [1] - 1076:1
ludicrous [1] - 1061:16
lumps [1] - 1108:18
Lunch [1] - 1065:1

lunch [4] - 1065:5, 8; 1164:11, 13
Luncheon [1] - 1065:14
Lundquist [26] - 965:23; 966:9, 13; 967:2, 11, 13, 25; 968:10, 25; 969:1, 6, 12, 22; 992:21, 25; 995:20, 22; 1013:12; 1025:20; 1039:16; 1178:1; 1188:22; 1196:12
lying [1] - 1137:13

## M

M-C-F-I-N-N-I-S [1] - 1167:17
Ma'am [6] - 1002:17; 1004:20; 1005:21; 1006:12; 1029:8; 1037:18
ma'am [57] - 998:10, 13, 16; 999:15, 18; 1000:3; 1001:19; 1002:1, 6, 9, 12; 1003:9; 1005:2, 6, 23; 1006:2, 8, 15, 20; 1007:7; 1009:4, 15, 19, 23; 1011:21; 1013:17; 1015:19; 1016:2, 7, 20; 1017:7, 20, 22; 1025:25; 1030:10; 1031:2; 1032:24; 1033:15, 18; 1034:10, 17; 1038:14; 1039:23; 1040:20; 1041:10, 14, 18, 23; 1042:9, 12, 17; 1043:3, 7, 11; 1046:10, 20
Macias [2] - 1167:19, 21
MACIAS [1] - 1167:19
Magistrate [1] - 1050:19

main [2] - 1133:22; 1163:19
major [2] - 1097:20; 1146:10
maker [4] - 1190:2; 1191:9; 1192:10, 13
makers [4] - 1190:1, 13; 1199:12; 1201:12
MALAFI [1] - 948:16
male [2] - 1127:10; 1129:5
man [8] - 952:6; 1004:19; 1099:23; 1102:8, 12; 1190:22
manage [1] - 1185:12
managed [1] - 1201:24
managers [1] - 1201:13
Manderino [22] - 962:12; 963:9; 964:17; 965:17; 969:21; 992:18; 1004:22; 1012:6; 1013:16; 1021:8; 1024:16; 1025:7, 14; 1034:18; 1055:16, 18; 1057:11; 1067:8; 1177:25; 1191:23; 1196:12
Manderino's [1] - 1036:24
Manhattan [1] - 1085:16
manner [2] - 1106:11; 1184:24
March [6] - 1030:4, 24; 1145:19, 22; 1146:14; 1150:12
mark [1] - 987:17
marked [15] - 980:12; 984:14; 986:8; 1017:13; 1026:8, 11; 1037:12; 1039:19; 1043:24; 1069:8, 15; 1070:25;

1071:11; 1082:16; 1144:17

**marriage** [1] - 951:23

**married** [5] - 950:14; 1096:24; 1097:17

**Mary** [1] - 1036:10

**Maryland** [1] - 1097:5

**massages** [1] - 961:18

**massaging** [1] - 956:22

**matter** [16] - 999:16; 1003:10; 1035:10; 1040:17; 1041:24; 1046:21; 1083:22; 1119:6; 1132:14; 1166:12, 19, 21; 1191:17; 1194:16; 1196:2

**Maya** [2] - 951:1, 12

**McCarrick** [22] - 969:23-25; 970:1, 7, 11, 18; 972:5, 22; 973:14; 974:18; 978:11; 993:8; 996:4; 1008:8; 1009:25; 1016:9, 18; 1025:21; 1178:2; 1196:13

**McFinnis** [1] - 1167:17

**Meadow** [2] - 1115:21; 1139:17

**mean** [11] - 964:21; 982:16; 1065:3; 1075:18; 1082:9; 1107:17; 1112:1, 19; 1116:20; 1119:1; 1164:17

**meaningful** [1] - 1179:19

**means** [2] - 1125:14; 1141:8

**meant** [3] - 1115:2; 1137:22; 1138:19

**mechanical** [2] - 948:24; 1108:14

**Medical** [2] - 1112:16; 1116:6

**medical** [67] - 953:12, 15-16; 954:1; 959:24; 961:25; 963:25; 967:9; 986:18; 988:9, 18, 23; 992:2; 997:10; 1001:3, 6-7, 9, 11, 16, 22, 24; 1002:5, 10-11; 1008:21; 1015:16, 21; 1043:16, 18; 1045:17; 1047:7; 1061:22; 1063:7; 1064:4, 10; 1068:25; 1069:3; 1099:13, 20, 22; 1100:6, 13; 1102:1, 7; 1115:4; 1117:16, 18, 23; 1124:1; 1129:17; 1173:3, 7, 14-15; 1174:13; 1176:8; 1180:13, 16; 1181:12; 1191:8; 1192:6; 1195:14; 1200:15; 1201:7

**medically** [1] - 986:21

**medicated** [1] - 1000:3

**medication** [16] - 992:2; 1013:9; 1044:3, 9; 1063:4, 6-7, 10, 22; 1064:1, 4-5; 1116:2; 1118:19; 1125:7; 1136:14

**meet** [3] - 965:24; 1126:1, 7

**meeting** [12] - 966:8; 967:1, 4; 968:24; 1081:23; 1082:4; 1126:9, 11; 1140:11; 1141:13; 1180:17

**meetings** [1] - 1083:18

**member** [2] -

1063:25; 1178:13

**members** [5] - 949:8; 1066:4; 1136:5; 1147:7; 1181:20

**Members** [2] - 1131:15; 1163:2

**Memorial** [1] - 948:18

**memory** [3] - 1026:13; 1035:1; 1037:10

**men** [3] - 1085:22; 1086:3; 1115:24

**mental** [8] - 973:6; 1009:18, 20; 1025:7; 1124:2; 1132:3; 1157:25; 1188:21

**mention** [9] - 1012:2, 5, 13; 1037:2; 1038:15, 22; 1066:15; 1156:20; 1157:7

**mentioned** [15] - 952:20; 957:11; 960:2; 971:21; 987:21; 990:13; 997:18; 1015:15; 1053:10; 1075:11; 1076:22; 1100:2; 1122:20; 1152:7; 1190:12

**mentioning** [1] - 1072:23

**mentoring** [3] - 1081:21; 1085:20; 1086:1

**merchandising** [1] - 951:9

**mercy** [1] - 1193:5

**mere** [1] - 1132:23

**merely** [1] - 1140:18

**met** [4] - 1005:8, 19, 25; 1097:17

**MICA** [3] - 1145:8, 10

**microphone** [5] - 950:1; 953:13; 989:11; 1070:17;

1085:25

**mid** [1] - 956:23

**middle** [4] - 988:13; 1062:12; 1116:4

**midst** [1] - 993:9

**might** [6] - 1132:21; 1136:25; 1176:13; 1194:25; 1195:25; 1196:16

**miles** [1] - 1053:25

**mind** [17] - 958:14; 976:18; 977:5; 981:10; 1014:6; 1058:8; 1065:5; 1102:25; 1109:8; 1110:24; 1113:19; 1131:18; 1182:14, 17

**minimum** [2] - 1070:14, 18

**minister** [4] - 982:12; 1053:8; 1083:11; 1086:3

**ministries** [1] - 1085:18

**ministry** [4] - 979:17; 1081:4, 6, 9

**minute** [5] - 989:7; 1014:3; 1071:4; 1131:16; 1171:11

**mischaracterization** [1] - 1011:12

**misconduct** [4] - 1178:10; 1190:19; 1198:13, 17

**missionary** [3] - 979:19; 980:5

**misstating** [1] - 1024:23

**mistake** [1] - 1068:14

**mistakes** [2] - 953:8; 1119:12

**mistreated** [1] - 991:20

**miswrote** [1] - 1013:23

**mixed** [1] - 1100:15

mixing [1] - 1182:7
molested [4] - 1087:15; 1088:13, 24; 1095:8
molesting [1] - 1061:4
mom [2] - 951:7; 1152:9
moment [6] - 959:2; 996:21, 24; 997:5; 1059:12; 1113:9
Monday [11] - 1087:12; 1089:25; 1127:8; 1129:3; 1161:6; 1163:16; 1164:7
Monell [21] - 1175:17, 25; 1176:2; 1177:4, 8, 10, 19; 1182:7, 15; 1184:4, 24; 1187:3; 1190:4, 8; 1192:22; 1193:9; 1194:9, 11; 1195:5, 19; 1202:17
Monell's [1] - 1184:9
money [1] - 1134:19
monitor [2] - 1027:17, 21
month [5] - 1000:21; 1025:6; 1046:15, 19; 1090:19
months [7] - 969:19; 1073:11; 1138:7; 1149:12; 1152:20; 1158:16
Months [1] - 979:13
Moreover [1] - 1169:13
Morgan [1] - 1098:23
morning [17] - 949:4, 8-9; 950:11; 997:16; 1084:12; 1087:12; 1089:25; 1114:9; 1139:6, 20; 1163:9; 1164:7, 16; 1197:5; 1203:23

Most [1] - 1067:23
most [6] - 1057:5; 1119:3; 1183:17; 1186:10; 1195:10; 1202:17
mother [2] - 1114:21; 1150:18
motion [27] - 956:14, 22; 957:5, 20; 1130:14; 1131:7; 1133:6; 1165:6; 1166:3; 1168:8, 17; 1170:23; 1172:10; 1176:20; 1189:15; 1190:3; 1194:7, 15, 17; 1196:23; 1197:7, 9; 1199:6, 15; 1203:12, 14
Motion [6] - 1044:12; 1059:20; 1116:14; 1118:17; 1155:8; 1158:20
motions [9] - 1160:14; 1161:19; 1165:3, 9, 21; 1170:22; 1177:2, 11
Motions [1] - 1164:24
mouth [2] - 1110:10; 1113:1
Move [5] - 1047:17; 1057:4; 1130:25; 1131:2; 1155:4
move [15] - 957:24; 958:6; 991:22; 1019:8; 1033:23; 1044:11; 1059:17, 19; 1082:19; 1105:22; 1116:12; 1118:15; 1129:23; 1141:25; 1158:19
moved [3] - 1045:4; 1069:24; 1168:11
moving [8] - 1112:9; 1137:23; 1138:20; 1155:5; 1182:2; 1184:3; 1197:21;

1199:4
MRI [1] - 1101:2
multiple [3] - 1179:14; 1188:14; 1189:11
mumbling [1] - 1122:4
municipal [5] - 1186:24; 1187:7; 1189:24; 1199:11
municipalities [1] - 1188:8
municipality [3] - 1174:18; 1184:8; 1188:7
municipality's [1] - 1184:13
muscle [2] - 1063:14; 1064:6
muscles [1] - 1063:15
Must [1] - 984:12
must [12] - 1164:20; 1165:13; 1167:3, 23, 25; 1169:17; 1170:4; 1182:19; 1187:3, 9; 1189:5; 1202:2
mutually [1] - 1183:6

## N

name [35] - 949:22-24; 950:2, 4, 20, 24; 951:1; 963:2; 981:6; 990:3, 23; 1030:2; 1031:14; 1032:6; 1036:24; 1076:22; 1077:1; 1080:15, 17; 1081:19; 1087:21; 1090:3; 1092:15; 1095:19; 1096:13-15; 1102:12, 21
named [5] - 952:6; 1033:7; 1062:2; 1126:1, 7
names [6] - 994:10; 1027:5; 1028:19;

1042:7; 1167:7; 1190:24
Nancy [2] - 1037:12; 1177:25
Naprosyn [1] - 1064:7
Nassau [43] - 1046:8, 14, 18, 21; 1047:2, 7, 12, 23; 1048:5, 17; 1056:7; 1090:20; 1091:3; 1094:6; 1114:5, 7-8, 10, 15; 1115:21; 1116:1, 6; 1122:14; 1123:18; 1125:9, 21, 25; 1126:6, 15, 19; 1127:9; 1139:7, 10, 22; 1142:8; 1143:6, 8; 1153:14; 1154:5; 1157:6; 1166:25; 1168:19
Natasha [2] - 950:18, 20
National [1] - 1081:2
national [4] - 1200:16, 19; 1202:15
nature [1] - 1118:13
near [3] - 1112:18; 1124:1; 1186:13
necessary [1] - 1131:10
neck [2] - 956:21; 1110:9
need [9] - 959:2; 967:14; 1044:8; 1064:1; 1104:7; 1164:9; 1179:20; 1202:14
needed [6] - 1063:14, 21-22; 1066:19; 1101:7; 1203:7
needs [2] - 1183:21; 1194:1
negligence [1] - 1188:5

25

**negligent** [1] - 1188:10

**negligently** [1] - 1182:21

**nerve** [4] - 953:19, 21; 1063:13, 21

**nervous** [3] - 951:14; 1058:11; 1106:5

**Never** [3] - 964:13; 973:7; 1113:15

**never** [47] - 973:23; 984:9; 1006:9; 1013:7; 1016:14; 1034:12; 1041:7, 15; 1047:11; 1048:18; 1052:24; 1055:4, 23; 1055:4, 8; 1061:12, 15; 1070:19; 1072:24; 1075:11; 1076:17; 1077:8; 1089:19; 1092:15; 1095:2; 1106:7; 1107:8; 1115:6; 1116:5; 1122:19; 1155:22; 1168:12; 1169:5; 1177:8; 1187:1; 1191:13, 25; 1192:1, 4-6; 1196:11, 14; 1200:10, 15

**NEW** [1] - 948:1

**New** [16] - 948:6, 14, 18, 23; 950:13; 951:5; 1098:1, 4, 22, 24; 1099:2-4; 1114:14; 1188:1

**news** [1] - 1094:25

**Newsday** [5] - 951:23; 1040:8; 1091:13; 1164:19

**nice** [3] - 1065:8; 1103:4; 1164:21

**night** [2] - 1063:18; 1114:2

**nine** [3] - 1030:10; 1185:22; 1188:21

**nipple** [1] - 956:24

**nipples** [2] - 956:12, 25

**nobody** [7] - 994:23; 1053:21; 1054:19; 1059:13; 1078:19; 1119:7; 1198:18

**Nobody** [1] - 1154:3

**Nolan** [1] - 1191:17

**none** [1] - 1166:21

**nonresponsive** [1] - 1155:9

**Norinsberg** [5] - 1016:5; 1093:11; 1134:17; 1182:6; 1201:6

**NORINSBERG** [24] - 948:13; 949:5; 1092:4; 1093:7; 1094:12, 21; 1095:16; 1129:20; 1159:1; 1160:15, 22; 1165:10; 1168:10; 1172:3; 1174:15; 1177:14; 1178:4, 8; 1181:1; 1187:15, 22, 25; 1196:9; 1206:4

**Norinsberg's** [1] - 1175:16

**normal** [2] - 1069:3; 1112:12

**North** [3] - 1144:5, 24

**Northport** [5] - 1051:20; 1097:8, 11, 15

**note** [41] - 981:6, 8, 11, 22; 983:8, 13; 984:11; 1006:24; 1007:3; 1075:3; 1076:3, 21; 1077:19; 1079:9; 1082:5, 7, 9, 11, 21, 23; 1083:6, 12, 24; 1084:2, 7-9, 13, 15; 1088:13; 1089:13, 15-20; 1090:8; 1164:4;

1168:10

**notes** [1] - 1203:11

**Nothing** [12] - 969:10; 989:1; 997:11; 1068:16; 1073:20; 1074:12; 1084:16; 1089:8; 1092:10; 1093:3; 1103:3; 1120:6

**nothing** [29] - 969:10, 15; 971:24; 983:19; 1025:23; 1057:3; 1095:18; 1122:23; 1130:1; 1134:12; 1135:1; 1140:17, 19-20; 1141:6, 8; 1147:7; 1179:22; 1180:5, 19; 1181:5, 13; 1188:16; 1191:5; 1202:21; 1203:3, 6

**notice** [7] - 1021:6; 1075:20, 25; 1077:5, 8, 10; 1169:16

**noticed** [1] - 949:12

**notified** [1] - 1178:9

**notify** [1] - 1191:25

**notion** [1] - 1177:2

**November** [21] - 948:8; 979:13; 981:9; 1006:24; 1017:4; 1024:8; 1032:1; 1055:20; 1076:5; 1077:16; 1081:22; 1083:8; 1085:17; 1087:2, 7; 1089:14; 1090:1; 1091:2; 1097:18; 1204:5

**number** [6] - 980:14; 981:7; 1059:16; 1163:14, 23; 1186:11

**numerous** [3] - 1018:9; 1055:22; 1071:22

**nurse** [1] - 1044:2

**nurse's** [1] - 986:18

**nurses** [1] - 1002:11

**Nyack** [1] - 1085:15

**O**

**Oaks** [1] - 1151:24

**oath** [2] - 1121:18; 1176:16

**object** [3] - 1022:1, 7; 1027:25

**objecting** [2] - 1020:2; 1021:1

**obligations** [1] - 1188:17

**observation** [2] - 1095:16

**observations** [1] - 1094:14

**observe** [2] - 1121:4, 9

**observed** [1] - 1186:21

**obstacle** [1] - 1168:7

**obviously** [3] - 1061:7; 1111:4; 1186:23

**occasion** [3] - 1003:15; 1005:10; 1031:13

**occasionally** [2] - 1153:5; 1157:24

**occasions** [14] - 1001:6; 1002:13; 1005:10; 1032:7; 1048:16; 1066:15; 1071:22; 1141:17, 20; 1143:13; 1144:1; 1145:14; 1151:4; 1178:25

**occur** [1] - 1175:23

**occurred** [9] - 949:1; 955:1; 956:1; 976:1; 978:1; 1075:1; 1078:6; 1080:1; 1176:23

**October** [12] - 1046:19; 1053:14;

1054:5; 1073:11; 1142:8, 13, 19; 1143:6; 1151:1, 15; 1152:3; 1154:10
**odd** [2] - 1103:3; 1107:10
**OF** [3] - 948:1, 7, 10
**offer** [3] - 981:14; 985:20; 1133:2
**offered** [1] - 1196:20
**office** [9] - 971:4; 1051:4; 1057:17; 1069:22; 1098:5; 1121:15; 1129:17; 1192:4
**Office** [1] - 1168:20
**Officer** [26] - 965:23; 968:18, 20, 25; 969:12, 24-25; 970:1, 7, 11, 18; 972:22; 973:14; 974:18; 992:21; 993:8; 995:20; 996:2, 4; 1008:7; 1009:25; 1016:9, 18; 1070:18
**officer** [24] - 970:12; 971:19; 987:16, 21; 995:21; 1008:16, 19; 1009:6, 20; 1041:25; 1042:7; 1068:1, 7; 1070:13; 1071:19; 1072:18; 1074:7; 1094:5; 1172:22; 1178:7; 1187:1; 1188:22
**officers** [16] - 987:23; 988:2; 991:21; 994:9; 1002:4; 1009:13; 1015:17; 1016:11, 16; 1073:19; 1074:1; 1100:19; 1139:7, 16; 1157:7; 1188:11
**offices** [3] - 1098:6, 14; 1115:20
**official** [4] - 1013:6;

1080:22; 1187:1
**officials** [2] - 1187:13; 1188:4
**often** [2] - 952:15; 1056:1
**Oklahoma** [2] - 1186:19; 1187:2
**old** [3] - 951:12; 1031:9; 1098:11
**older** [2] - 1100:7; 1116:8
**oldest** [10] - 950:17, 20, 22, 24-25; 951:6-8, 10
**Olivencia** [17] - 965:23, 25; 966:13; 968:17, 21, 25; 969:12, 22; 992:22, 25; 996:2; 1013:12; 1025:20; 1039:16; 1178:1; 1196:13
**Once** [9] - 961:25; 1000:21; 1084:8; 1100:21; 1101:16; 1103:12; 1105:5; 1113:22; 1132:18
**once** [11] - 1010:21; 1031:13; 1054:19; 1059:8; 1084:7; 1088:21; 1106:22; 1142:23; 1145:17; 1168:12; 1200:15
**open** [21] - 954:5; 956:1; 978:1; 1014:6; 1024:1; 1065:4, 6; 1066:13; 1080:1; 1096:1; 1098:3; 1105:1; 1113:1; 1117:5; 1118:12, 14; 1119:1; 1129:1; 1131:17; 1132:19; 1163:1
**opened** [7] - 961:16; 1098:4, 6, 14; 1103:6, 10; 1117:5
**opening** [2] -

1070:20; 1099:2
**operating** [4] - 1175:4; 1187:15; 1189:2
**opinion** [2] - 1069:12; 1201:7
**opportunities** [1] - 1188:14
**opportunity** [2] - 1044:19; 1199:3
**opposing** [6] - 976:20; 980:24; 984:20; 1066:11; 1133:12; 1135:5
**orange** [1] - 1037:13
**oranges** [1] - 1182:8
**order** [8] - 977:4; 1009:12; 1068:10; 1146:23; 1164:14; 1168:1; 1169:17
**ordered** [1] - 1052:14
**ordering** [1] - 1052:13
**original** [7] - 1050:1; 1079:8, 10; 1082:9, 11, 21; 1168:17
**originally** [1] - 1049:20
**Otherwise** [2] - 1161:5; 1164:6
**otherwise** [1] - 1170:9
**outcome** [1] - 1033:21
**outcry** [1] - 1002:15
**outside** [10] - 971:14, 16-17; 983:20; 993:23; 1075:16-18; 1116:5; 1179:25
**outstanding** [1] - 1200:4
**overdose** [2] - 1144:5, 25
**overdosed** [1] - 1144:7

**Overruled** [32] - 964:20; 965:4; 970:21; 978:20; 982:20; 983:24; 991:18, 24; 992:24; 999:8; 1009:11; 1015:23; 1048:14; 1056:12; 1057:14; 1060:4; 1062:1; 1077:7; 1078:2; 1088:16; 1089:24; 1092:24; 1101:23; 1116:19; 1118:9; 1120:24; 1123:4; 1125:4; 1130:17; 1147:6; 1148:17; 1151:12
**overruled** [2] - 955:8; 1045:11
**oversees** [1] - 970:12
**own** [9] - 1017:5; 1032:6; 1062:8, 11-12; 1098:17; 1169:1; 1202:9
**OxyContin** [1] - 1148:4

---

**P**

**P-61** [2] - 980:24; 981:14
**P.O** [1] - 948:17
**packet** [1] - 961:7
**paid** [1] - 1190:22
**pain** [13] - 953:22, 24; 964:14; 997:3, 7, 9; 1063:16-18, 20; 1064:7; 1118:10
**painting** [1] - 985:17
**Panic** [3] - 1150:5, 7
**panic** [3] - 1119:2; 1149:25; 1155:21
**panicked** [1] - 1157:16
**pants** [3] - 1107:5; 1108:24; 1156:11
**paper** [3] - 981:25;

982:15, 23
**papers** [1] - 982:4
**paperwork** [3] - 973:23; 974:8; 1049:23
**paraded** [1] - 978:17
**paragraph** [7] - 1019:1; 1021:12; 1022:20; 1024:13, 15, 23; 1025:5
**paralegal** [1] - 951:21
**parameters** [1] - 1183:18
**Pardon** [8] - 971:11, 15; 1038:2; 1048:12; 1059:18; 1062:9; 1142:24; 1165:4
**pardon** [1] - 1118:12
**parenthetical** [1] - 1173:10
**parenthetically** [1] - 1188:18
**parsing** [1] - 1193:17
**part** [18] - 959:18; 961:15; 1021:11; 1022:4; 1039:6; 1057:6; 1068:25; 1069:3; 1095:5, 9; 1097:25; 1119:3; 1140:20; 1141:5; 1168:16; 1188:6, 23
**particular** [3] - 1113:9; 1174:19; 1187:6
**pass** [1] - 1126:10
**passing** [1] - 1030:25
**past** [3] - 1026:2; 1119:1; 1158:9
**Pastor** [18] - 1074:15; 1075:14; 1076:3; 1077:7, 16, 18; 1080:23; 1081:11; 1083:16; 1084:12, 21; 1085:10; 1087:2; 1092:5; 1093:4
**pastor** [14] - 993:17;

1075:21, 25; 1076:4, 7, 12, 21; 1077:9, 22; 1079:8; 1080:24; 1081:4; 1085:10; 1192:18
**patently** [1] - 1169:20
**patient** [2] - 1151:25; 1176:16
**patients** [1] - 1051:19
**Paul** [2] - 1098:23, 25
**Pause** [2] - 959:3; 1121:21
**pause** [10] - 1017:15; 1019:13; 1020:16; 1030:16; 1036:17; 1037:14; 1038:5; 1045:8; 1144:20; 1171:13
**PD** [1] - 985:24
**PD-61** [8] - 984:15, 19, 23; 985:4, 20; 986:1; 988:7; 1206:18
**pedestrian** [2] - 1155:3, 18
**pen** [1] - 1126:10
**penal** [1] - 1129:12
**pending** [3] - 991:12; 1016:4; 1051:7
**penis** [4] - 957:23; 958:1; 1004:9
**per** [1] - 1148:5
**percent** [1] - 1122:25
**Percocet** [1] - 1152:25
**perfect** [1] - 993:4
**perhaps** [2] - 1165:24; 1182:24
**period** [5] - 952:15; 999:1; 1003:23; 1047:1; 1060:7
**permeating** [1] - 953:22
**permission** [3] - 984:4, 8, 10
**permit** [4] - 977:11,

16; 1184:23; 1185:11
**permits** [1] - 1170:18
**permitted** [3] - 1184:12; 1185:10; 1196:7
**permitting** [2] - 1083:22; 1131:11
**Perry** [1] - 948:22
**personation** [1] - 1031:25
**personnel** [4] - 1149:17; 1150:11; 1200:15
**persons** [2] - 1185:6; 1201:15
**pertaining** [1] - 1060:20
**pet** [1] - 1026:14
**Peter** [1] - 985:24
**petit** [1] - 1026:5
**pew** [1] - 972:6
**phase** [2] - 1202:12
**phlebotomist** [1] - 1047:9
**phone** [9] - 969:2; 970:18, 24; 971:22; 972:16; 993:10; 1052:13; 1091:19
**photograph** [10] - 985:14-16, 18; 986:15, 20; 987:7; 988:13
**Photograph** [1] - 985:19
**physical** [6] - 1127:10; 1129:5; 1150:18; 1152:9; 1173:24; 1174:2
**physically** [3] - 974:20; 996:24; 1150:21
**physician** [5] - 958:23; 1057:1; 1061:6; 1064:10, 18
**physician's** [6] - 1025:8; 1112:20;

1176:7, 17; 1190:20; 1202:20
**physicians** [2] - 1008:21; 1146:24
**pick** [4] - 949:4; 969:1; 1114:8; 1170:4
**picked** [5] - 961:7; 1094:22; 1139:6, 10, 13
**picture** [3] - 986:18; 1057:22; 1110:22
**pictures** [3] - 1015:16; 1101:3; 1105:16
**piece** [2] - 982:15, 23
**pieces** [1] - 1181:17
**pile** [1] - 1194:5
**piled** [1] - 1164:20
**pill** [1] - 1119:23
**pills** [3] - 1147:25; 1148:2, 4
**Pittman** [1] - 1098:25
**Pitts** [2] - 1033:8; 1034:7
**place** [16] - 956:5; 974:19; 990:10; 993:4; 995:1; 1092:20; 1094:1, 23; 1096:1; 1104:1; 1105:1; 1116:24; 1119:21; 1128:1; 1129:1; 1182:1
**placed** [18] - 973:8, 11; 974:15; 979:8; 980:7; 991:16, 19; 994:17, 20, 22; 995:2, 8; 996:8; 1013:15, 19; 1121:18; 1173:24
**placing** [2] - 973:19; 995:12
**plain** [1] - 1199:11
**Plaintiff's** [14] - 980:12, 15; 981:2; 983:3; 984:24;

985:24; 994:1, 7; 1082:17, 19; 1083:3; 1200:18; 1206:17

**plaintiff's** [10] - 1075:11; 1082:24; 1132:3; 1164:25; 1166:4; 1173:23; 1189:23; 1194:16; 1195:2, 11

**plaintiffs** [2] - 1165:2, 8

**Plainview** [1] - 1144:25

**planned** [1] - 1133:13

**planning** [1] - 1075:13

**play** [1] - 1197:18

**played** [3] - 1197:12, 16; 1199:1

**Plaza** [1] - 948:22

**plea** [2] - 1036:20; 1050:23

**pleading** [1] - 1037:17

**pleasure** [1] - 1111:5

**pled** [14] - 1026:2, 5, 18; 1029:4, 8, 17; 1030:4, 24; 1031:3, 11, 25; 1050:14, 18, 24

**PLRA** [10] - 1166:8, 13, 18, 22; 1167:2, 22; 1169:13; 1170:1, 13, 17

**plumbing** [2] - 1043:1; 1067:17

**plus** [1] - 965:10

**pocket** [3] - 980:9; 1083:25; 1084:6

**pocketbook** [1] - 1129:17

**point** [46] - 956:25; 957:11; 958:18; 961:13, 21; 964:10; 968:24; 970:15, 17; 972:20; 974:5; 978:8,

16; 979:5; 995:18; 997:8; 1014:10; 1059:9; 1064:11, 17; 1075:22; 1087:7; 1090:21; 1106:15; 1107:15; 1108:1; 1109:10; 1110:21; 1115:8; 1116:4; 1128:6; 1132:25; 1133:3; 1137:15; 1138:12; 1151:10, 16; 1152:16; 1170:16; 1173:4, 9; 1174:8; 1177:9; 1187:17; 1198:24; 1200:11

**pointing** [3] - 988:11; 1105:20, 25

**police** [14] - 996:2; 999:19; 1000:6; 1029:23; 1031:14; 1091:8; 1127:9; 1128:8; 1129:4, 8; 1130:9; 1172:22; 1187:1, 3

**policies** [6] - 1177:7; 1184:10; 1197:12, 16; 1198:9, 25

**policy** [49] - 1064:3; 1177:4, 8, 10, 12; 1181:19, 25; 1182:1, 7, 10, 14, 17, 19, 22; 1183:2, 14, 24; 1184:3; 1186:24; 1187:2, 4, 7; 1190:2, 9, 13, 15, 25; 1191:9; 1192:9, 13, 22; 1193:10; 1194:24; 1195:5, 18, 20-23; 1196:1, 5; 1197:24; 1198:1; 1199:11; 1201:12; 1202:19, 22; 1203:3

**Policy** [1] - 1189:25

**poorly** [1] - 1201:17

**pop** [1] - 1156:12

**population** [1] -

995:3

**port** [1] - 1070:21

**portion** [5] - 1021:15; 1022:11; 1075:20; 1111:11; 1203:13

**position** [14] - 976:12; 1094:24; 1110:15; 1172:20; 1173:14, 22; 1178:20; 1179:2; 1181:14; 1193:7; 1194:23; 1196:5; 1197:23; 1202:8

**possession** [3] - 953:2; 1027:4; 1030:5

**possibility** [3] - 1035:25; 1198:15

**possible** [9] - 1116:2; 1172:19; 1173:22; 1174:12; 1183:11; 1184:1; 1193:20; 1198:14, 16

**Possibly** [1] - 1160:13

**possibly** [3] - 1011:18; 1173:18

**post** [1] - 1180:8

**post-incident** [1] - 1180:8

**posttraumatic** [2] - 1119:2; 1155:22

**power** [3] - 1063:3; 1172:23; 1176:10

**practice** [5] - 1190:9, 15; 1192:22; 1193:10; 1194:1

**practices** [3] - 1200:8; 1202:6, 11

**pray** [2] - 963:18; 982:6

**prayed** [1] - 963:18

**prayer** [11] - 970:9; 979:15, 17; 980:1-3; 982:1, 5; 1084:3

**praying** [1] - 993:20

**precedent** [1] - 1169:15

**Precisely** [1] - 1198:8

**precisely** [2] - 1130:15; 1188:13

**preclude** [1] - 1078:17

**premised** [1] - 1190:4

**prepared** [1] - 1163:5

**preparing** [1] - 1077:3

**prescriptions** [1] - 1113:3

**presence** [2] - 949:1; 1075:19

**present** [1] - 1184:21

**presented** [3] - 1028:9; 1189:6; 1202:5

**presenting** [1] - 1185:4

**presents** [1] - 1190:7

**pretty** [1] - 1112:21

**prevails** [1] - 1147:12

**prevented** [1] - 978:23

**previous** [5] - 960:8; 1048:3; 1152:20; 1178:25; 1193:12

**previously** [3] - 963:24; 980:12; 986:8

**Prilosec** [1] - 1113:3

**prima** [8] - 1170:24; 1171:3, 9, 19; 1172:12; 1177:12; 1193:9; 1199:23

**primarily** [1] - 1068:6

**principal** [1] - 1177:19

**prison** [4] - 978:7; 979:16; 1085:18; 1188:3

**Prisoner** [2] - 1166:6; 1203:17

**prisoner** [1] - 1166:14

**prisoners** [2] - 1082:4; 1166:9

**privacy** [2] - 968:4, 6

**private** [2] - 1100:25; 1108:25

**pro** [2] - 1049:24; 1050:8

**probation** [4] - 953:1; 965:8, 12; 1099:12

**probing** [1] - 1011:2

**problem** [4] - 1025:21; 1088:10; 1099:13; 1106:24

**problems** [2] - 1063:13; 1142:22

**procedural** [3] - 1165:25; 1166:2; 1168:22

**procedure** [5] - 1007:24; 1041:12; 1050:3; 1170:2, 4

**proceed** [12] - 949:14; 950:7; 1015:11; 1066:6; 1080:18; 1096:17; 1136:7; 1141:10; 1165:1, 5; 1169:17; 1171:16

**proceeding** [1] - 952:3

**proceedings** [11] - 1017:16; 1019:14; 1020:17; 1030:17; 1036:18; 1037:15; 1038:6; 1045:9; 1121:21; 1144:21; 1171:14

**Proceedings** [1] - 948:24

**process** [2] - 992:4, 12

**prodding** [1] - 1061:8

**produce** [1] - 1082:14

**produced** [1] - 948:25

**profession** [1] - 1200:16

**professional** [2] - 1061:12; 1202:10

**proffered** [1] - 1197:12

**program** [16] - 965:9; 972:4; 973:4; 1036:20; 1081:19, 21; 1085:21; 1086:2; 1145:8, 10-11; 1194:3; 1200:2; 1201:5; 1202:3

**programs** [2] - 970:12; 1199:25

**prohibited** [1] - 1078:9

**prohibits** [1] - 1176:17

**prompting** [2] - 1197:12, 17

**proof** [5] - 1095:10; 1120:19; 1133:3; 1187:4; 1198:12

**proper** [7] - 1178:18; 1200:5, 8; 1201:1; 1202:6, 24

**properly** [5] - 1174:21; 1177:21, 24; 1178:24; 1185:12

**property** [1] - 1022:13

**proposition** [3] - 1167:5, 21; 1189:13

**protect** [5] - 1174:17; 1176:2; 1188:9, 12; 1198:21

**prove** [12] - 1095:6; 1169:17; 1171:3, 19, 24; 1172:1, 12; 1191:1; 1194:5; 1198:23; 1199:23

**proves** [1] - 1182:1

**provided** [1] - 1076:22

**provider** [4] - 1173:3, 14-15; 1174:13

**provider's** [1] - 1173:7

**providers** [1] - 1153:8

**provisions** [1] - 1169:11

**proximity** [4] - 1173:24; 1174:2, 9; 1199:3

**psychiatric** [1] - 1191:23

**psychiatrist** [3] - 1048:6; 1116:1; 1124:1

**PTL** [2] - 1075:9; 1076:17

**PTO** [1] - 1094:3

**pubic** [1] - 1108:25

**public** [2] - 1164:2; 1174:4

**publicly** [1] - 1098:2

**pull** [6] - 956:17; 988:16; 1119:25; 1161:10; 1200:19

**pulled** [2] - 961:15; 1032:2

**punctuality** [1] - 949:12

**punish** [1] - 1010:1

**punished** [1] - 1072:16

**punishment** [1] - 1072:15

**purchase** [2] - 1052:4, 9

**purchases** [1] - 1051:23

**purely** [1] - 1184:6

**purpose** [4] - 980:13; 1020:23; 1077:25; 1078:24

**purposes** [3] - 984:19; 1082:17; 1173:20

**pursued** [1] - 1168:25

**push** [3] - 956:9, 17

**pushed** [1] - 956:10

**put** [63] - 956:23; 957:19, 25; 958:7; 966:5; 967:18; 968:3, 8; 978:13, 22; 979:17; 980:1, 9; 982:5, 7-8; 995:15; 1003:17; 1008:8; 1009:21; 1010:2, 6-7, 9, 12; 1013:8; 1015:20, 25; 1021:23; 1037:22; 1067:22; 1068:9; 1072:15; 1076:25; 1077:24; 1079:9; 1083:25; 1094:19; 1095:19; 1107:4; 1108:22; 1109:15, 18; 1111:9, 17; 1116:17; 1117:1, 3, 8-9; 1118:12; 1144:11; 1148:10; 1156:23; 1161:5; 1199:23; 1200:1, 14

**puts** [2] - 961:17; 1009:6

**putting** [13] - 968:1, 5; 972:19; 974:4; 1008:19; 1016:9, 18; 1020:2; 1021:24; 1122:20; 1147:23; 1156:9; 1160:2

**Q**

**qualified** [2] - 1173:12; 1176:13

**queen** [1] - 1045:12

**QUESTION** [2] - 1121:24; 1122:8

**questioned** [11] - 989:5, 15, 19; 996:11; 997:18; 1008:13; 1016:9, 21; 1062:24; 1190:22; 1200:21

**questioning** [2] - 1055:15; 1130:2

**questions** [29] - 968:14, 19; 983:1; 1004:20; 1007:11, 13; 1011:2; 1034:2; 1044:15, 19; 1055:10; 1056:10; 1060:7; 1061:19; 1066:9; 1072:24; 1084:18; 1089:5; 1091:24; 1093:1; 1125:17; 1130:3-6; 1137:8; 1155:25; 1156:6; 1158:21

**quick** [3] - 1107:8, 20; 1203:11

**quiet** [1] - 1010:1

**quietly** [1] - 987:3

**quite** [5] - 1041:19; 1046:5; 1055:25; 1108:14; 1173:4

**quote** [1] - 1187:18

**quotes** [1] - 1185:22

**quoting** [1] - 1186:16

---

**R**

**R-A-M-O-S** [1] - 1096:16

**R-I-C-K-E-N-B-A-C-K-E-R** [1] - 950:6

**R-O-Y** [1] - 1081:13

**Raise** [2] - 1080:4; 1096:5

**raised** [3] - 1066:25; 1168:12

**Ramos** [24] - 976:5; 1094:6, 14; 1096:4, 15, 22; 1110:2; 1121:15; 1129:3; 1130:8; 1136:10; 1145:4; 1150:25; 1158:18; 1172:4; 1178:24; 1179:1, 18, 23; 1181:16, 23; 1191:4; 1193:13

**RAMOS** [3] - 948:3; 1096:7; 1206:8

**Ramos'** [2] - 1192:8; 1195:4

**Ramos's** [1] - 1094:14

**rarely** [1] - 1190:8

**rate** [1] - 1200:2

**Rather** [1] - 1177:6

**rather** [1] - 995:2

**ray** [1] - 1020:21

**razor** [2] - 1109:24

**reach** [1] - 1164:6

**reached** [4] - 961:5; 978:6; 1004:19; 1108:23

**reaches** [1] - 1190:11

**reaching** [1] - 961:10

**react** [3] - 960:14; 1056:9, 13

**reading** [4] - 1025:5; 1084:9; 1186:9, 11

**Reading** [2] - 1156:10, 21

**ready** [3] - 1157:22; 1165:1, 5

**real** [1] - 1107:20

**realize** [3] - 959:15; 1068:24; 1111:3

**Realty** [1] - 951:25

**reason** [14] - 973:20, 24; 978:13; 1013:18; 1072:24; 1140:23; 1168:13; 1171:4; 1173:9; 1174:14; 1181:7; 1182:6; 1196:7

**rebut** [2] - 976:9; 977:8

**rebuttal** [2] - 1160:20; 1163:21

**recanting** [1] - 1127:11

**receives** [1] - 1077:19

**receiving** [3] - 996:15; 1012:1; 1083:24

**recently** [2] - 1031:3;

1089:20

**recess** [12] - 1014:4, 7; 1015:1; 1065:8, 14; 1131:16, 18; 1135:12; 1136:1; 1163:8; 1164:15, 21

**Recess** [2] - 1014:10; 1135:13

**recessed** [1] - 1204:4

**recklessly** [1] - 1182:21

**recognize** [13] - 981:3; 985:1; 986:10, 15-17; 994:11; 1017:19; 1036:13; 1044:1; 1069:19; 1071:5

**recognized** [1] - 1188:18

**recollection** [6] - 1016:2, 10; 1026:17; 1030:20; 1126:11; 1144:23

**recommendations** [4] - 1073:25; 1074:2, 6, 8

**record** [18] - 949:3, 23; 957:20; 980:23; 1046:24; 1080:16; 1096:14; 1119:1; 1138:6; 1160:23; 1161:16; 1176:22; 1177:17; 1178:21; 1180:3; 1187:18; 1199:18

**recorded** [1] - 948:24

**records** [5] - 1145:16; 1160:25; 1161:10, 15

**recovered** [1] - 1119:19

**recovery** [1] - 1119:19

**RECROSS** [4] - 1068:20; 1092:13; 1205:13; 1206:5

**RECROSS-EXAMINATION** [4] - 1068:20; 1092:13; 1205:13; 1206:5

**recruiter** [1] - 1097:24

**recruiters** [1] - 1098:3

**rectal** [1] - 1122:21

**rectum** [1] - 1172:5

**red** [1] - 986:25

**redirect** [1] - 1156:1

**Redirect** [1] - 1055:11

**REDIRECT** [8] - 1055:13; 1073:16; 1092:3; 1156:3; 1205:11, 15; 1206:3, 13

**refer** [2] - 1071:18; 1075:19

**reference** [1] - 1189:23

**referral** [1] - 994:15

**referred** [3] - 1022:4; 1073:18; 1099:3

**referring** [2] - 1021:13; 1071:21

**refers** [3] - 1009:20; 1070:23; 1182:16

**reflect** [2] - 980:23; 1180:3

**Reform** [2] - 1166:6; 1203:17

**refresh** [5] - 1026:13, 17; 1035:1; 1037:10; 1144:23

**refreshes** [1] - 1030:20

**refuse** [4] - 1001:7, 10, 13

**refused** [3] - 1001:8, 10; 1070:23

**Refusing** [1] - 1070:19

**refusing,by** [1] -

1070:15

**refute** [1] - 1095:2

**refuting** [4] - 1075:24; 1095:3, 5

**regard** [2] - 1173:3; 1185:18

**regarding** [18] - 995:19; 1041:8, 15; 1049:8; 1055:20; 1074:1; 1087:8; 1090:13, 17; 1091:4, 20; 1126:17; 1132:3; 1156:9; 1166:24; 1178:12; 1179:8; 1181:20

**Regardless** [2] - 1168:5; 1177:16

**regrettable** [1] - 1173:17

**regular** [2] - 1068:7, 25

**regularly** [1] - 991:20

**regulations** [1] - 1191:15

**rehab** [3] - 973:1; 1012:9; 1119:23

**rehabilitate** [1] - 1011:20

**rehabilitation** [2] - 970:8; 1037:17

**reject** [2] - 1169:6; 1196:20

**relationship** [3] - 1174:10, 13; 1184:1

**relationships** [1] - 1119:25

**relative** [1] - 1094:17

**relax** [2] - 1115:11

**relaxer** [2] - 1063:14; 1064:6

**release** [1] - 1114:12

**released** [8] - 998:18, 20; 1060:14; 1124:7, 12, 17

**relevance** [1] - 1021:3

**relevant** [3] - 976:8, 24

**relied** [1] - 1067:9

**reliever** [1] - 1064:7

**rely** [1] - 1167:4

**relying** [2] - 1167:16, 19

**remain** [5] - 960:20; 1103:5, 9; 1105:21; 1110:12

**remainder** [1] - 1170:22

**remaining** [1] - 1145:23

**remedies** [2] - 1168:2; 1170:7

**remedy** [1] - 1092:9

**remember** [36] - 1015:18; 1027:8; 1030:11; 1048:3, 5, 9; 1050:22; 1053:7; 1055:25; 1107:3; 1108:1, 4, 7; 1109:4; 1111:6, 12, 14; 1112:11, 22, 24; 1115:9; 1122:10, 14, 18; 1123:25; 1125:6; 1126:24; 1127:8; 1137:7; 1143:20; 1144:10; 1150:24; 1156:14, 25

**remembered** [1] - 1143:19

**removed** [2] - 953:20; 1179:2

**repaired** [1] - 1101:7

**repeat** [2] - 1121:6; 1148:19

**repeatedly** [1] - 1169:21

**repetitive** [1] - 1077:8

**rephrase** [2] - 1103:8; 1157:4

**report** [19] - 964:4; 965:18; 968:12, 17;

971:4; 972:3; 976:10, 23; 983:19; 1059:14; 1066:17, 19; 1068:7; 1094:16; 1178:18; 1181:2-4; 1196:3

**reported** [14] - 976:13, 19; 983:18; 1068:12; 1129:4; 1178:25; 1195:13; 1196:12, 25; 1198:13, 17, 19

**Reporter** [1] - 948:22

**reporting** [4] - 1066:18; 1068:3; 1127:8; 1200:18

**reports** [3] - 1169:24; 1191:7

**reprehensible** [2] - 1173:17; 1195:15

**representation** [3] - 985:10; 988:8, 22

**representative** [1] - 1070:22

**represented** [1] - 1051:1

**reprimand** [1] - 977:10

**request** [7] - 1032:25; 1064:14, 18, 21; 1135:4; 1154:15, 19

**requested** [2] - 1072:11, 13

**requests** [7] - 1084:3; 1153:16, 19; 1154:7, 10; 1189:12

**require** [1] - 1187:4

**required** [1] - 1200:17

**requires** [4] - 1166:8; 1174:1, 9

**rescheduled** [1] - 1114:24

**research** [1] - 1173:4

**reserve** [2] - 1132:4; 1170:16

**reserved** [2] - 1203:14, 21

**resolved** [1] - 1165:13

**resonate** [1] - 1177:17

**respect** [20] - 967:12; 969:13; 983:22; 988:3; 1056:14; 1132:4, 14, 16; 1147:11; 1166:9, 12; 1170:17; 1174:23; 1180:9; 1183:4; 1185:20; 1186:22; 1189:23; 1199:9

**respectfully** [3] - 1135:4; 1173:2; 1189:14

**respond** [13] - 973:16; 1088:14; 1174:21; 1177:21; 1178:12, 16; 1179:10; 1183:5; 1195:6; 1196:1; 1201:16, 21; 1202:19

**respondeat** [1] - 1184:7

**response** [8] - 970:22; 1130:25; 1131:3, 7; 1161:11; 1179:15; 1181:13

**responsibilities** [1] - 1177:24

**responsibility** [1] - 1191:21

**responsible** [1] - 1178:23

**responsive** [4] - 1047:20; 1116:13; 1133:13; 1155:6

**responsively** [1] - 1044:22

**rest** [2] - 1047:19; 1163:12

**rested** [1] - 1163:3

**rests** [1] - 1159:2

**result** [9] - 990:18; 991:5; 1100:12; 1117:15, 18, 23; 1118:19; 1185:5, 16
**resulted** [1] - 1179:1
**retaliated** [1] - 976:14
**retaliation** [1] - 978:10
**retired** [1] - 1014:8
**retreats** [1] - 1186:23
**return** [5] - 989:1; 1028:4; 1029:7; 1065:12
**returned** [4] - 1027:17, 21; 1101:8; 1167:1
**revealed** [1] - 1025:7
**reverend** [3] - 981:6; 983:21; 1075:3
**Reverend** [10] - 982:11, 14, 25; 983:9, 16; 1006:23; 1007:3; 1010:16; 1011:22
**review** [1] - 1083:15
**Richard** [1] - 1191:19
**Rick** [1] - 1191:11
**Rickenbacker** [55] - 949:16, 24; 950:2, 5, 11; 951:14; 956:4; 972:6; 978:4; 981:1, 22; 985:1; 986:6; 989:11; 996:20; 1006:17; 1007:10; 1014:1; 1015:15; 1017:4; 1024:7; 1025:12; 1026:1; 1032:3, 12; 1033:4; 1034:2; 1035:20; 1037:11; 1038:11; 1044:10, 14; 1050:7, 13; 1066:8; 1068:22; 1075:3, 8; 1076:19; 1077:11; 1078:11; 1079:1; 1090:20;

1091:2; 1092:16; 1126:2, 8; 1179:13, 17; 1195:12; 1196:10, 18, 20; 1197:1, 4
**RICKENBACKER** [2] - 949:18; 1205:3
**Rickenbacker's** [2] - 1078:8; 1181:15
**rid** [1] - 1197:19
**ride** [1] - 1139:17
**ridiculous** [1] - 1095:12
**rights** [3] - 968:7; 1176:15; 1195:2
**rise** [2] - 1058:14; 1080:4
**risk** [1] - 1199:12
**Rita** [3] - 967:15, 22
**Riverhead** [16] - 952:10, 24-25; 953:3, 12, 15; 970:9; 983:11, 17; 985:9, 11; 1011:21; 1081:10; 1082:3; 1112:17; 1139:17
**road** [1] - 1098:9
**roadmap** [1] - 1189:2
**Robaxin** [1] - 1064:6
**robbery** [3] - 1127:10; 1129:5; 1130:10
**Robert** [3] - 1098:1, 13; 1192:11
**ROCHELLE** [3] - 948:3; 1096:7; 1206:8
**Rochelle** [4] - 976:5; 1096:4, 15; 1191:4
**Roginsky** [1] - 1100:8
**role** [4] - 1197:12, 17-18; 1199:1
**roll** [1] - 1110:17
**rolled** [3] - 1110:21; 1111:6; 1156:22
**room** [42] - 954:5, 8; 958:24; 960:20; 961:11; 967:20;

968:2, 6; 974:21; 985:7, 11; 988:9, 18, 23; 1002:22; 1003:12; 1004:2, 13; 1005:14; 1057:2; 1099:23; 1101:1; 1102:3, 6-7, 17; 1103:5, 9, 12; 1105:5; 1112:17; 1116:10; 1119:8; 1121:3, 5, 9-10, 13; 1136:12; 1139:1; 1158:7
**rooms** [1] - 987:8
**rotate** [1] - 973:1
**route** [1] - 1174:5
**routine** [1] - 1115:5
**ROY** [2] - 1085:1; 1205:22
**Roy** [4] - 1081:12; 1084:21; 1192:18
**rub** [2] - 1109:5, 7
**rubbed** [2] - 1004:14; 1068:23
**rubbing** [3] - 1111:4; 1112:13; 1138:21
**rubric** [1] - 1175:8
**rule** [1] - 1186:7
**Rule** [4] - 1134:13; 1194:15; 1199:21; 1203:12
**ruled** [1] - 1128:3
**rules** [3] - 1101:25; 1191:13; 1201:19
**ruling** [4] - 1058:16; 1130:16; 1131:23; 1189:7
**run** [6] - 973:4; 1200:5, 8; 1201:8
**running** [3] - 1068:9, 11; 1202:7

---

**S**

---

**sad** [1] - 1056:16
**Safe** [3] - 1081:21; 1085:20; 1086:1
**safety** [2] - 1068:9,

11
**sallie** [1] - 1070:21
**Sapienza** [1] - 1049:24
**sat** [5] - 968:18; 972:10; 1006:3; 1106:22; 1114:17
**satisfaction** [1] - 1169:16
**satisfactory** [1] - 1164:13
**satisfied** [2] - 1166:16; 1167:22
**satisfies** [1] - 1174:22
**satisfy** [5] - 1166:18, 22; 1168:1; 1170:1; 1175:10
**saw** [9] - 996:10; 1002:13, 21; 1011:23; 1013:16; 1057:11; 1091:2; 1100:6; 1124:17
**scared** [1] - 1111:23
**scars** [1] - 1158:15
**scary** [2] - 976:23; 977:5
**scenarios** [1] - 1181:15
**scheduled** [1] - 1124:12
**School** [1] - 1097:16
**school** [5] - 951:9, 11, 13; 1015:7, 9
**schools** [1] - 1015:7
**sciatic** [3] - 953:19, 21; 1063:13
**scope** [1] - 1092:23
**screaming** [1] - 1115:7
**screen** [3] - 988:16, 20, 24
**SCT** [1] - 1183:16
**scuffed** [1] - 1113:17
**se** [2] - 1049:24; 1050:8
**seat** [6] - 949:25;

972:6; 989:1; 1080:3, 14; 1085:6

**seated** [5] - 949:10; 1015:5; 1066:4; 1096:12; 1136:5

**second** [15] - 950:24; 951:7; 982:6; 984:21; 1018:24; 1029:18; 1052:25; 1107:3; 1179:7; 1180:1; 1181:8, 15; 1184:2; 1192:25

**Second** [11] - 1112:11; 1167:22; 1169:22; 1174:15; 1187:16, 19; 1188:2, 17; 1189:3, 10, 22

**secondary** [2] - 1185:9; 1186:22

**secret** [1] - 1118:25

**Secret** [12] - 966:19, 22; 1005:8, 12, 14, 16, 19; 1006:1, 6, 14, 21

**Section** [7] - 1166:5; 1169:12, 20, 22; 1172:16; 1173:20; 1184:8

**section** [3] - 990:3; 1072:10; 1074:5

**security** [16] - 965:20; 983:18; 993:1; 994:15; 1003:22; 1039:6, 13, 15; 1067:7; 1068:7, 9; 1180:12; 1181:3; 1188:23; 1203:4

**seeing** [9] - 1048:3; 1056:3; 1057:1; 1111:7, 12, 14; 1115:9; 1123:25; 1125:6

**seeks** [2] - 1184:15, 25

**seem** [2] - 1177:17; 1195:7

**segregation** [14] - 978:13; 991:19; 994:16, 21, 23; 995:2, 9; 996:8; 1009:3, 7, 12; 1010:2, 9

**select** [1] - 1164:5

**self** [1] - 1000:3

**self-medicated** [1] - 1000:3

**selling** [1] - 1053:7

**Seminary** [1] - 1085:13

**send** [4] - 1068:1; 1100:11; 1119:22; 1164:4

**sends** [1] - 1120:1

**sense** [5] - 1002:10; 1175:13, 16; 1185:10; 1203:7

**sensual** [1] - 1108:17

**sent** [6] - 1042:2; 1049:23; 1052:17, 21, 25; 1187:5

**sentenced** [1] - 1035:19

**separate** [4] - 1145:14; 1151:3; 1182:8; 1183:3

**separated** [1] - 950:15

**September** [6] - 1031:3, 6; 1034:24; 1046:15; 1143:21, 23

**sequentially** [1] - 1171:1

**sergeant** [5] - 972:18; 1039:16; 1042:16, 22; 1067:24

**Sergeant** [21] - 965:23; 967:2, 11, 13, 25; 968:10, 25; 969:1, 6, 12, 21; 992:21; 995:22; 1013:12; 1025:20; 1178:1; 1188:21;

1191:16

**sergeant's** [1] - 1160:5

**sergeants** [1] - 1115:10

**serious** [1] - 963:22

**Service** [12] - 966:19, 22; 1005:8, 12, 14, 16, 19; 1006:1, 6, 14, 21

**service** [4] - 979:16; 980:6; 1006:13; 1011:18

**services** [6] - 972:7; 1010:16; 1011:5, 17; 1200:6

**session** [2] - 962:23; 970:17

**sessions** [3] - 972:25; 1012:3, 8

**set** [4] - 958:12; 1013:6; 1187:19; 1189:10

**sets** [2] - 1183:17; 1189:18

**setting** [2] - 1067:10; 1175:14

**seven** [3] - 1098:8; 1149:11; 1152:20

**several** [5] - 969:19; 1011:1; 1032:6; 1043:4; 1066:12

**severe** [1] - 1118:10

**sexual** [27] - 1061:18; 1073:1; 1075:4; 1089:1, 4; 1092:19; 1152:8; 1166:15; 1172:8, 21; 1173:7, 15; 1177:5, 22; 1178:13; 1179:8; 1181:20, 23; 1184:18; 1190:19; 1192:1, 24; 1193:13; 1195:9; 1196:4, 14; 1197:1

**sexually** [43] - 983:10, 17; 999:20;

1000:1, 8, 14; 1001:17; 1002:15, 23; 1021:8; 1024:16; 1025:8, 15; 1034:13; 1035:7; 1036:2; 1037:4; 1038:16, 23; 1045:24; 1048:19, 25; 1049:7; 1054:7; 1055:1; 1087:14; 1088:13, 23; 1090:4; 1091:9, 15, 21; 1095:8; 1150:13; 1171:10, 21, 25; 1191:5; 1193:4; 1197:13; 1202:20; 1203:2

**sexy** [4] - 960:4; 1061:11, 17; 1112:21

**shade** [1] - 1057:23

**Sharif** [2] - 1167:5, 13

**SHARIFF** [1] - 1167:13

**sharp** [4] - 964:15; 1063:20; 1109:24

**Shaw** [1] - 1098:25

**sheet** [1] - 1163:24

**Sheriff** [3] - 1088:1; 1192:12, 20

**sheriff** [11] - 1076:14; 1077:11; 1166:20; 1190:12, 17-18; 1192:3, 9-11; 1201:9

**Sheriff's** [12] - 971:3; 972:2; 989:23; 1005:17; 1100:17; 1101:5; 1122:15; 1140:22; 1168:20; 1181:4; 1190:11, 17

**sheriff's** [4] - 1069:22; 1101:15; 1190:12; 1192:4

**sheriffs** [1] - 1115:20

**shift** [2] - 1070:13; 1101:13

**shirt** [1] - 1156:23
**shoes** [2] - 1113:16
**shop** [1] - 1098:19
**Shore** [3] - 1144:5, 24
**short** [3] - 1161:9; 1163:10; 1164:16
**Shortly** [1] - 1105:24
**shortly** [4] - 966:5; 1098:6; 1123:1; 1124:13
**shot** [1] - 1111:23
**shoulders** [1] - 956:21
**show** [33] - 976:17, 23; 988:6; 992:14; 1013:2, 4; 1022:3; 1026:7, 11; 1030:14; 1033:21; 1037:11; 1039:19; 1043:22; 1069:8; 1070:25; 1105:16; 1120:19; 1141:3; 1144:17; 1147:16; 1172:7, 18; 1177:7; 1179:17; 1194:1; 1197:23, 25; 1198:25; 1199:11; 1201:20; 1202:24
**showed** [3] - 972:1; 1050:7; 1179:18
**shower** [2] - 1070:19
**Showers** [1] - 992:3
**showers** [1] - 992:3
**Showing** [1] - 984:19
**showing** [7] - 980:23; 986:8; 994:11; 1015:16; 1199:23; 1201:23; 1202:1
**shown** [1] - 1177:3
**shows** [1] - 987:19
**shushed** [1] - 1110:4
**shut** [1] - 1103:11
**shuttle** [1] - 1203:3
**sic** [1] - 1090:11
**sick** [5] - 1153:16;

1154:7, 10, 14, 19
**Sick** [1] - 1153:19
**side** [15] - 957:23, 25; 988:17; 1013:3; 1057:20; 1106:13; 1110:1, 17, 21; 1111:6, 15, 17; 1118:10; 1132:2; 1156:23
**Sidebar** [4] - 1020:1; 1023:4; 1160:1; 1162:7
**sidebar** [11] - 954:13; 955:1; 976:1; 1074:16; 1075:1; 1078:6; 1093:10; 1094:1; 1104:1, 7; 1128:1
**sides** [5] - 957:5, 15; 958:11; 1163:12
**sign** [9] - 986:22, 25; 987:1; 995:11; 1036:16
**signature** [1] - 995:13
**signed** [4] - 1036:15; 1129:8, 14, 16
**significant** [1] - 1184:22
**signing** [1] - 974:8
**signs** [4] - 1106:19; 1108:22; 1110:18; 1112:7
**silly** [1] - 1113:18
**similar** [1] - 996:16
**simple** [1] - 1202:17
**simply** [3] - 1164:4; 1173:19; 1194:20
**sincere** [1] - 993:11
**single** [3] - 1175:19; 1183:17
**single-most** [1] - 1183:17
**sister** [1] - 1032:3
**sister's** [3] - 1030:2; 1031:14; 1032:6

**sit** [5] - 969:11, 16; 972:17; 973:2; 1005:15
**Sit** [1] - 1106:21
**sits** [2] - 987:16, 22
**sitting** [6] - 1057:20; 1058:2; 1078:11, 18; 1105:9
**situation** [23] - 953:24; 963:8; 964:25; 969:3, 7; 976:23; 977:5; 978:16; 983:22; 1012:15; 1035:24; 1066:20; 1067:22; 1069:20; 1088:8; 1090:23; 1092:6; 1106:8; 1173:5; 1178:16; 1191:4, 14
**situations** [2] - 1066:20; 1069:14
**six** [2] - 1138:6; 1180:3
**size** [1] - 1052:18
**slash** [1] - 1133:1
**sleep** [5] - 1042:20; 1063:19; 1154:11, 15, 20
**slides** [1] - 1117:4
**slip** [2] - 982:1
**Slipshod** [1] - 1192:2
**slough** [2] - 1193:18; 1194:4
**slow** [10] - 1097:9, 14; 1106:10; 1107:9, 21; 1137:16; 1138:13; 1178:3, 7
**slower** [1] - 983:13
**slowly** [4] - 949:23; 951:17; 1080:15; 1096:14
**sluts** [1] - 991:25
**small** [4] - 980:5; 982:1; 1098:19
**smart** [1] - 1136:17
**smoking** [4] -

1029:16; 1060:15; 1151:17; 1152:19
**snitch** [2] - 991:21, 25
**snorting** [2] - 1152:16, 19
**social** [3] - 1047:24; 1048:3; 1191:23
**soft** [3] - 1107:7, 12, 17
**solely** [1] - 1134:15
**someone** [18] - 972:2; 983:19; 1002:25; 1005:16, 19; 1009:18; 1057:1; 1060:5; 1064:22; 1067:3; 1091:8, 14, 21; 1126:7, 22; 1138:6; 1160:25; 1185:16
**sometime** [6] - 961:3; 962:4; 998:11; 1036:23; 1073:7; 1114:13
**Sometimes** [1] - 1059:15
**sometimes** [2] - 1015:17; 1101:12
**somewhere** [1] - 1105:22
**son** [2] - 951:5, 10
**Sonya** [1] - 950:24
**soon** [1] - 1093:11
**sore** [1] - 1117:7
**sorry** [33] - 962:16; 971:7; 984:16, 21; 1019:7; 1021:21; 1040:9; 1043:23; 1044:4; 1049:13; 1062:16; 1078:3; 1095:12; 1100:3; 1103:8; 1104:6; 1114:22; 1121:6; 1122:1, 3, 6; 1124:10; 1125:2, 8; 1131:9, 12, 14;

1145:9; 1148:18, 21; 1171:5; 1192:16; 1197:14

**Sorry** [7] - 984:5; 985:4; 1015:6; 1093:9; 1097:10; 1153:24; 1163:10

**sort** [3] - 1098:21; 1118:23; 1174:10

**sorts** [2] - 1170:12; 1200:8

**Sounds** [1] - 1198:7

**sounds** [2] - 1113:18; 1126:14

**source** [1] - 1201:19

**South** [1] - 1151:24

**Spatt** [24] - 965:14; 1005:4; 1034:19; 1035:13, 16, 18, 23; 1036:2, 4, 9, 16; 1037:3; 1038:12; 1050:24; 1053:10, 14; 1054:4, 10-11, 23; 1055:4, 8; 1065:13; 1073:10

**SPATT** [1] - 948:10

**speaking** [8] - 990:17, 22; 991:5; 1006:23; 1057:10; 1102:19; 1106:10; 1169:14

**speaks** [1] - 1184:4

**specialist** [2] - 951:25; 952:1

**specific** [4] - 962:1; 968:14; 1109:16; 1133:1

**specifically** [14] - 965:21; 967:11; 977:7; 990:22; 1021:12; 1062:24; 1076:20; 1077:20; 1083:6; 1133:4, 11; 1169:24

**Specifically** [4] - 1075:15; 1088:11;

1107:13; 1177:20

**specified** [2] - 1132:22; 1184:9

**specify** [1] - 1151:11

**speculative** [1] - 1185:9

**spell** [9] - 949:22; 950:4; 1080:15; 1096:13; 1167:6, 8, 11-12; 1187:24

**spelling** [1] - 1167:17

**spent** [1] - 1098:9

**spit** [1] - 1110:10

**spoken** [2] - 1034:18; 1115:22

**spot** [1] - 1120:1

**square** [1] - 988:12

**squeeze** [1] - 1119:25

**squeezed** [1] - 1156:24

**squeezing** [1] - 1108:18

**ssh** [3] - 1110:3; 1111:9

**staff** [6] - 1002:10; 1047:7; 1178:13; 1180:13; 1181:20; 1195:14

**staffing** [2] - 1098:1, 4

**stand** [12] - 966:3; 986:3, 6, 21-22, 25; 987:1, 3, 5; 1008:20; 1093:8; 1189:12

**standard** [5] - 1017:24; 1018:4; 1200:24; 1201:2

**standards** [14] - 1070:14, 18; 1193:23; 1200:8, 11, 13, 16-17, 19, 22; 1202:10, 16, 25; 1203:1

**standing** [6] - 1057:24; 1058:4; 1106:4; 1110:10, 23

**stands** [1] - 1167:21

**stare** [1] - 1113:15

**staring** [3] - 1106:6, 10; 1107:21

**Starke** [2] - 1126:23; 1192:11

**start** [13] - 956:20; 989:9; 997:8; 999:10; 1070:11; 1094:24; 1098:17; 1099:4; 1138:10; 1163:22, 25; 1164:7, 10

**start-ups** [1] - 1099:4

**started** [15] - 956:9; 962:9; 972:3, 5; 994:9; 998:20; 999:4; 1060:15, 18; 1073:6; 1108:1; 1109:10; 1115:7; 1138:8; 1189:3

**starting** [3] - 1025:14; 1105:12; 1177:25

**state** [18] - 949:22; 973:6; 976:18; 977:5; 981:10; 991:6; 1024:15; 1037:8; 1080:14; 1096:13; 1173:18; 1176:1; 1177:16, 18; 1182:14, 17

**statement's** [1] - 955:2

**STATES** [2] - 948:1, 11

**states** [1] - 1046:24

**States** [2] - 948:6; 1164:12

**station** [2] - 986:19; 1129:8

**stationed** [1] - 1002:5

**stay** [3] - 951:7; 1164:3, 5

**stay-at-home** [1] - 951:7

**stayed** [2] - 1116:10,

15

**staying** [1] - 1116:11

**stenography** [1] - 948:24

**step** [5] - 986:2; 1074:13; 1084:19; 1093:4; 1158:23

**steps** [5] - 1090:13; 1091:3, 20; 1092:9; 1093:5

**stethoscope** [11] - 1108:2, 5, 7; 1109:1, 9; 1111:7, 11; 1117:3; 1156:23

**stick** [1] - 1109:7

**still** [11] - 965:6; 977:3; 991:12; 1056:3; 1112:13; 1137:12; 1150:6; 1160:5; 1167:3

**stipulate** [1] - 1141:24

**stipulation** [1] - 1142:3

**stirrups** [2] - 1116:17; 1117:1

**stole** [4] - 1052:3; 1119:5, 7, 13

**stolen** [6] - 1027:17, 24-25; 1051:19; 1052:8, 12

**stomach** [3] - 956:9; 1106:24; 1138:21

**stomachache** [2] - 1099:15; 1100:2

**stood** [3] - 1054:4, 23; 1058:8

**stop** [11] - 966:6; 968:9; 972:21; 979:4; 1011:20; 1057:2; 1063:3; 1109:12; 1113:4; 1155:23

**stopped** [8] - 992:2; 1029:23; 1031:14; 1108:24; 1109:11; 1115:8; 1117:8;

1155:22

**stopping** [1] - 1013:8
**store** [6] - 1026:24; 1027:10, 18; 1028:8, 12
**story** [3] - 972:14; 974:2; 1091:14
**straight** [1] - 961:16
**Street** [1] - 950:13
**street** [1] - 1060:16
**stress** [2] - 1119:2; 1155:22
**stricken** [2] - 1047:20; 1057:7
**strictly** [1] - 1169:13
**Strike** [8] - 998:4; 1008:25; 1033:24; 1058:13; 1059:21; 1073:23; 1129:25; 1155:8
**strike** [21] - 970:14; 991:23; 1033:23; 1044:11; 1047:17; 1057:4; 1059:17, 19; 1083:15; 1116:13; 1118:16; 1129:23; 1130:1, 3, 25; 1131:2, 7; 1155:4; 1158:19
**stripes** [1] - 1115:10
**stripped** [1] - 974:22
**struggles** [1] - 1119:18
**stuck** [3] - 1084:5; 1110:24; 1111:21
**students** [1] - 1015:7
**studied** [1] - 1081:2
**studies** [2] - 951:21; 970:10
**study** [2] - 1081:1; 1085:12
**studying** [2] - 951:11
**stuff** [1] - 1057:2
**stunned** [1] - 960:18
**subject** [5] - 1083:21; 1131:21;

1150:17; 1193:7, 11
**subjected** [2] - 1172:19; 1195:9
**subjects** [1] - 1132:12
**submit** [6] - 1170:5, 19; 1171:4; 1172:13; 1173:2; 1174:12
**submitted** [3] - 1079:2; 1094:25; 1179:13
**subordinate** [1] - 1188:3
**subpoenaed** [1] - 949:3
**subsection** [1] - 1019:2
**subsequently** [1] - 1181:24
**subsidized** [1] - 951:25
**substance** [2] - 1118:22; 1145:7
**substances** [1] - 1148:8
**substantiated** [1] - 1168:22
**substitute** [1] - 1202:9
**suburban** [1] - 1139:13
**sudden** [3] - 1110:23; 1180:1; 1186:9
**sued** [2] - 1174:25; 1176:13
**suffered** [2] - 1134:24
**suffering** [2] - 997:3; 1146:10
**suffice** [4] - 1170:1, 12; 1195:19; 1201:23
**sufficient** [2] - 1171:20; 1172:1
**sufficiently** [1] - 1188:5
**SUFFOLK** [1] - 948:7
**Suffolk** [77] - 948:16;

953:4; 973:11; 979:10; 998:20, 25; 999:14, 21, 24; 1000:12; 1005:25; 1033:12; 1039:4, 8; 1046:7; 1048:17; 1051:5; 1053:21, 25; 1054:20; 1069:22; 1076:6; 1077:11; 1082:1; 1085:18; 1087:5, 8; 1091:10, 15, 22; 1099:9, 20; 1100:1, 12-13, 21; 1101:9, 14; 1102:3; 1115:3, 16, 19; 1121:2, 7; 1123:10, 21, 23; 1124:11, 21; 1125:23; 1126:4, 22; 1139:2; 1140:8, 21-22, 25; 1142:10; 1143:9; 1153:16; 1154:6, 18; 1157:17, 23; 1166:25; 1168:20; 1174:19; 1176:8; 1190:10, 16; 1191:2, 19, 24; 1192:4
**sugar** [3] - 1069:17; 1070:3
**suggest** [4] - 964:24; 1170:9; 1183:15; 1195:17
**suggested** [4] - 968:5; 1102:23; 1156:19; 1201:7
**suggesting** [1] - 1176:23
**suicidal** [2] - 978:9
**suicide** [27] - 966:5; 972:19; 973:8, 11, 16, 22; 974:4, 15, 19; 976:6, 15; 977:12, 17; 978:5, 22; 979:8; 1008:8, 19; 1009:16, 21; 1010:3, 7; 1013:15, 19; 1016:10, 19

**suit** [2] - 1050:1; 1169:16
**Suite** [1] - 948:14
**sum** [1] - 1190:3
**summary** [3] - 1165:11; 1168:11; 1189:5
**summations** [2] - 1161:7; 1163:18
**summer** [1] - 1067:16
**Sunday** [3] - 1083:11; 1087:13; 1098:15
**superior** [3] - 1184:7; 1191:11, 25
**superiors** [1] - 1188:6
**supermarket** [1] - 1030:7
**supervise** [9] - 1183:18, 23; 1184:13, 17; 1185:2, 6; 1187:13; 1188:4; 1189:19
**supervising** [6] - 972:25; 1076:4, 7, 12; 1077:22; 1081:11
**supervision** [4] - 1175:7; 1199:25; 1200:18; 1202:1
**supervisor** [13] - 964:3, 5-7; 965:6; 974:6, 10; 1056:17, 21, 23; 1188:20; 1200:14
**supervisors** [3] - 1188:20; 1189:24
**supplies** [2] - 1070:22; 1072:6
**supply** [2] - 982:3; 1164:11
**support** [2] - 1180:8; 1181:18
**supposed** [13] - 977:2; 982:4; 990:16; 1015:24; 1056:22; 1067:20; 1068:8;

1110:19; 1115:7; 1124:5; 1197:16

**supposedly** [3] - 965:5; 1092:20; 1190:5

**Supreme** [10] - 1169:21; 1183:23; 1185:22, 25; 1186:17, 20-21; 1187:9; 1189:17, 21

**supreme** [3] - 1032:22; 1033:7, 12

**Surely** [2] - 981:18; 1156:2

**surface** [1] - 1109:1

**surgical** [1] - 961:7

**surgically** [1] - 1101:7

**surprise** [3] - 1088:17; 1095:6, 10

**surprised** [1] - 1088:20

**Susan** [4] - 1074:15; 1080:17, 23; 1087:2

**SUSAN** [3] - 948:19; 1080:6; 1205:18

**sustain** [1] - 1095:13

**Sustained** [20] - 968:23; 969:5; 974:17, 24; 981:13; 988:1; 991:4, 8; 996:19; 997:1; 998:4; 1008:24; 1058:13; 1073:22; 1074:11; 1083:20; 1117:13; 1118:5; 1129:22; 1130:24

**sustained** [1] - 1049:3

**sustaining** [2] - 1038:8; 1095:19

**sweaty** [2] - 1111:21; 1156:12

**sweep** [3] - 956:12, 24; 957:7

**sweeping** [1] - 957:5

**swore** [2] - 1126:19, 25

**sworn** [5] - 949:20; 1096:9; 1127:2, 5; 1168:19

**Syracuse** [1] - 1097:18

**system** [5] - 1015:8; 1043:9; 1066:22; 1067:19, 21

---

**T**

**table** [21] - 956:8, 20; 957:12, 15, 23, 25; 958:13; 961:12; 1069:5; 1104:3; 1105:11, 18; 1106:21, 23, 25; 1107:14, 25; 1110:22

**tail** [1] - 1107:5

**talks** [1] - 1182:11

**technical** [1] - 951:11

**technology** [1] - 951:21

**teenager** [1] - 1150:14

**teeth** [1] - 1112:22

**telephone** [1] - 1043:9

**telephones** [1] - 1067:17

**television** [3] - 987:15, 23; 988:3

**ten** [3] - 1000:24; 1010:24; 1149:19

**tendencies** [1] - 978:9

**tenuous** [1] - 1193:7

**terms** [3] - 1131:13; 1180:5; 1200:17

**terrible** [2] - 992:3; 1200:4

**Terry** [1] - 1093:8

**testified** [19] - 949:20; 958:6; 962:9; 994:3, 8; 997:2;

998:7; 1005:4, 7; 1012:23; 1055:19; 1076:20; 1080:8; 1085:3; 1096:9; 1178:11; 1192:8; 1196:10; 1197:5

**testify** [7] - 976:25; 1076:3, 5; 1077:10, 17, 20

**testifying** [4] - 1025:13, 18; 1078:9, 11

**tests** [1] - 1100:11

**Thanksgiving** [2] - 1083:13

**theft** [5] - 1026:3, 18; 1027:2; 1029:4, 8

**themselves** [1] - 1005:15

**Theological** [1] - 1085:13

**theory** [5] - 1183:12; 1185:5; 1187:6, 11; 1189:4

**therapist** [9] - 962:12; 992:19; 1004:23; 1025:7; 1067:8; 1123:22; 1124:21, 25

**therapy** [6] - 962:23; 970:9; 1011:19; 1012:1, 3, 8

**thereafter** [2] - 1098:6; 1123:1

**Therefore** [2] - 1188:10; 1193:14

**therefore** [1] - 1112:9

**they've** [1] - 1193:3

**They've** [1] - 1194:5

**thinking** [7] - 978:11; 1056:23; 1109:4, 23; 1110:6; 1112:10, 24

**third** [13] - 950:25; 951:8, 10; 1026:3, 19; 1052:25; 1151:5; 1152:12; 1180:7;

1181:16; 1185:7

**Thomas** [1] - 1071:1

**thumbs** [2] - 956:13, 24

**Thursday** [2] - 1098:15; 1204:5

**tier** [4] - 1001:10, 16-17; 1070:22

**tiger** [1] - 1071:15

**timeframe** [1] - 995:18

**title** [3] - 958:21; 1080:22

**today** [10] - 969:11, 17; 1025:12, 18; 1082:12; 1161:4, 19; 1162:2; 1192:19; 1196:10

**together** [4] - 1056:20; 1182:8; 1193:19; 1194:4

**toilet** [1] - 1063:19

**Tomorrow** [1] - 1203:23

**tomorrow** [10] - 1160:10; 1161:6, 18, 22; 1163:9, 15; 1164:15

**took** [10] - 956:5; 1007:4; 1094:6, 23; 1113:25; 1116:23; 1117:8; 1158:16; 1169:1; 1180:2

**top** [7] - 956:19; 1107:5; 1108:23-25; 1192:9, 13

**tortious** [1] - 1173:18

**total** [1] - 1193:1

**touch** [8] - 952:16; 957:6; 960:25; 963:23; 1059:12; 1108:19; 1109:13; 1111:15

**touched** [8] - 959:6; 961:22; 962:25; 978:11; 990:20;

991:2; 998:8; 1062:22

**touches** [1] - 1061:3

**touching** [30] - 952:9, 11; 957:9; 959:1; 960:2, 8, 24; 962:8; 963:21; 964:11, 16, 25; 967:13; 968:11; 969:1, 13, 19; 972:12; 993:7; 996:22; 997:8; 999:4, 10; 1000:1, 18; 1061:5; 1107:13, 15; 1158:12; 1196:14

**traded** [1] - 1098:2

**traffic** [1] - 1029:23

**train** [21] - 1177:20; 1178:22; 1179:6; 1182:10, 24; 1183:18; 1184:13, 17; 1185:2, 6, 15; 1187:12; 1188:4; 1189:19; 1190:4; 1193:22; 1194:2, 9, 12; 1199:10

**trained** [5] - 1177:24; 1191:25; 1192:2; 1201:17, 24

**training** [14] - 1178:11, 14, 22; 1191:21; 1192:25; 1193:1, 11; 1194:3; 1199:25; 1200:17; 1201:18, 21; 1202:1

**TRANSCRIPT** [1] - 948:10

**Transcript** [1] - 948:25

**transfer** [1] - 1059:16

**transferred** [6] - 1056:7; 1090:23; 1142:10; 1153:15; 1154:6; 1157:6

**transport** [1] - 1157:22

**transportation** [1] -

1164:3

**transported** [2] - 1114:5; 1126:11

**traveled** [1] - 1098:14

**traveling** [1] - 1098:9

**treated** [4] - 996:16; 1002:8; 1145:4; 1151:24

**treatment** [6] - 965:10; 996:15; 997:10; 1145:13; 1146:20, 23

**tremendous** [1] - 1134:18

**tried** [8] - 958:6; 979:4; 984:9; 993:14; 1032:6; 1071:24; 1175:21; 1193:18

**tries** [1] - 1113:19

**trouble** [3] - 1118:11; 1142:21; 1153:25

**troubles** [1] - 976:7

**truck** [1] - 1174:4

**true** [25] - 993:6; 997:19, 21, 25; 998:2; 1015:25; 1026:1; 1027:19; 1028:17; 1029:12; 1033:4; 1039:7; 1047:11; 1052:6, 10; 1122:19, 21, 23; 1126:25; 1129:3; 1130:8; 1145:2; 1146:5; 1197:20

**truly** [2] - 1061:11, 17

**trust** [3] - 1061:6; 1157:14

**trusted** [1] - 978:11

**truth** [3] - 968:20; 1080:10; 1146:24

**try** [7] - 1001:13; 1005:5; 1007:12; 1059:6; 1114:12; 1118:12; 1164:13

**trying** [13] - 966:14;

971:4; 976:4; 993:24; 1059:5; 1060:5; 1111:25; 1112:4; 1128:2; 1148:24; 1149:3

**Tuesday** [1] - 1164:7

**tunnel** [1] - 1116:5

**tunnels** [1] - 1116:7

**turn** [1] - 1119:22

**turned** [4] - 960:5; 978:12; 1020:8

**turning** [1] - 1059:7

**Turning** [3] - 961:3; 1099:8; 1114:3

**Tutle** [3] - 1186:17, 19; 1187:2

**TUTLE** [1] - 1186:17

**TV** [2] - 988:5; 1015:17

**TVs** [2] - 1015:20, 25

**twice** [3] - 1000:21; 1067:24; 1134:7

**two-and-a-half** [1] - 1119:14

**type** [13] - 968:4; 1018:17, 21; 1064:4; 1081:9; 1089:1; 1100:25; 1128:3; 1132:15; 1166:2, 14, 21; 1178:18

**typed** [1] - 1018:19

**types** [1] - 1166:18

**typewritten** [2] - 1018:6, 9

**typical** [1] - 1108:15

---

**U**

---

**ultimately** [1] - 1009:17

**Um-hmm** [3] - 1024:14; 1070:8; 1145:12

**Um-hum** [1] - 1113:24

**umbilical** [1] - 1101:6

**umbrage** [1] -

1176:14

**umbrella** [1] - 1179:9

**unanswered** [1] - 1130:5

**uncomfortable** [3] - 959:15, 17; 1108:15

**uncross** [1] - 958:12

**under** [33] - 958:19; 994:17, 20; 1024:13; 1028:12; 1081:19; 1116:7; 1121:18; 1134:13; 1164:8; 1170:13; 1172:13, 15, 17; 1173:8, 18-19; 1174:3, 6; 1175:1, 4, 8, 24; 1176:4, 6, 9, 11, 21; 1184:8; 1187:16; 1190:4; 1195:19; 1203:17

**underlying** [4] - 1095:7; 1131:23; 1132:9; 1175:17

**underneath** [2] - 1116:7; 1186:12

**Understood** [1] - 1186:4

**undertaken** [1] - 1182:14

**unemployed** [2] - 952:3; 1119:4

**unequivocally** [1] - 1174:16

**unethical** [2] - 1176:24; 1195:16

**unexpected** [1] - 1161:11

**unheard** [1] - 1185:5

**union** [1] - 1198:21

**unit** [25] - 953:12, 15; 961:25; 988:4; 1001:24; 1002:5, 11; 1008:21; 1012:9; 1015:16, 21; 1045:17; 1061:22; 1063:7; 1100:6, 13; 1124:1; 1176:8; 1180:16;

1181:12; 1188:21, 23; 1191:8; 1192:6; 1201:7

**UNITED** [2] - 948:1, 11

**United** [2] - 948:6; 1164:12

**University** [3] - 1097:5, 19; 1144:25

**unknown** [2] - 1127:10; 1129:5

**unless** [2] - 1138:8; 1181:25

**unnecessary** [1] - 1077:8

**unofficial** [1] - 1013:5

**unwritten** [1] - 1181:19

**update** [1] - 967:5

**ups** [1] - 1099:4

**upset** [7] - 951:15; 970:25; 971:21, 23; 1013:19, 21; 1110:5

**urge** [1] - 1182:4

**urged** [1] - 1187:11

**urging** [1] - 1190:1

**urinate** [1] - 1118:14

**USC** [2] - 1166:5; 1169:12

**useful** [1] - 1067:21

**usual** [1] - 1200:19

**utilize** [1] - 1200:2

---

**V**

**vagina** [5] - 957:7; 961:22; 1109:18; 1158:16; 1172:5

**vaginal** [2] - 1117:5; 1118:10

**Valium** [1] - 1152:25

**various** [4] - 1039:10; 1046:14; 1051:7; 1177:7

**vein** [1] - 1135:4

**verbal** [2] - 1150:18; 1152:9

**verdict** [4] - 1140:24; 1163:24; 1164:6; 1198:14

**verse** [1] - 1170:4

**version** [1] - 1195:11

**versus** [2] - 1187:22, 25

**vertebrae** [1] - 953:20

**Veteran's** [1] - 1051:20

**Veterans** [1] - 948:18

**vicious** [1] - 1011:20

**Vicodin** [2] - 1149:22; 1152:25

**victim** [3] - 1127:9; 1129:4; 1172:24

**view** [5] - 1132:21; 1175:16; 1176:11; 1192:21; 1201:9

**Villante** [3] - 1187:18, 22; 1189:16

**VILLANTE** [1] - 1187:25

**violate** [2] - 1185:17; 1188:16

**violated** [5] - 1070:14, 18, 23; 1195:3

**violating** [3] - 1158:13; 1176:15, 18

**Violation** [1] - 1099:12

**violation** [35] - 953:1; 965:8, 12; 968:4; 1029:23; 1072:14; 1095:7; 1129:24; 1130:13; 1171:4; 1172:15; 1175:18, 21-23; 1176:3, 14; 1177:4; 1183:15, 25; 1184:4, 14, 19-20; 1185:3, 8; 1186:24; 1187:6, 14; 1190:6; 1195:17; 1197:22, 25

**violations** [3] - 1195:21, 24; 1199:12

**violator** [3] - 1172:22; 1185:13; 1194:10

**violator's** [1] - 1172:20

**virtually** [1] - 1166:13

**virtue** [1] - 1172:20

**visit** [3] - 963:11; 1015:6

**visits** [1] - 1013:9

**vital** [1] - 976:16

**voice** [4] - 986:24; 1085:25; 1122:4; 1153:22

**voices** [1] - 1154:20

**voir** [1] - 981:17

**VOIR** [2] - 981:20; 1205:6

**voluntarily** [2] - 1148:10; 1151:3

**volunteer** [4] - 1081:10, 20; 1088:6; 1089:16

**volunteers** [3] - 1086:2; 1087:3

---

**W**

**waist** [2] - 1003:18; 1004:3

**waistband** [2] - 1107:16; 1156:11

**waistline** [1] - 1004:8

**wait** [3] - 980:8; 1001:24; 1038:21

**Wait** [2] - 1038:21; 1071:4

**waited** [2] - 1139:25; 1140:2

**waiting** [7] - 955:7; 1001:23; 1002:3, 7; 1015:6; 1106:9; 1107:22

**waiver** [1] - 1132:20

**walk** [4] - 977:9;

1067:24; 1113:10

**walked** [3] - 974:9; 1003:12; 1121:8

**wall** [5] - 987:3; 990:7, 14; 1001:24; 1118:11

**Wallace** [2] - 950:3, 13

**wants** [6] - 1021:23; 1044:18; 1067:2; 1110:17; 1112:12

**warden** [2] - 979:4; 1166:20

**Warden** [1] - 1040:11

**warm** [1] - 1111:1

**warrant** [1] - 1031:17

**Washington** [1] - 1099:1

**waste** [1] - 1177:6

**watch** [29] - 966:5; 972:19; 973:8, 12, 16, 23; 974:4, 15, 20; 976:6, 15; 977:13, 17; 978:5, 22; 979:8; 1008:8, 19; 1009:16, 18, 21; 1010:3, 7; 1013:15, 19; 1015:17; 1016:10, 19; 1164:19

**watched** [1] - 988:5

**watching** [1] - 987:23

**Watching** [1] - 988:5

**Watershed** [11] - 1145:5, 13; 1146:19; 1147:19; 1148:12, 23; 1149:17; 1150:11; 1151:1, 15; 1152:12

**weapon** [1] - 1173:16

**wear** [1] - 1118:13

**wearing** [3] - 961:13, 22, 24

**week** [3] - 963:12; 1198:20

**weekly** [1] - 1086:3

**weeks** [1] - 1180:4

**weird** [5] - 1109:4;

1111:19; 1137:23; 1138:20

**Weiss** [1] - 1098:23

**Westlaw** [2] - 1167:15, 18

**whatsoever** [8] - 1164:9; 1165:14; 1169:3; 1178:12, 16; 1179:15; 1181:13; 1198:12

**whispery** [1] - 1106:11

**white** [1] - 988:12

**whole** [16] - 968:18; 992:1; 1012:15; 1021:19, 24; 1022:16-18, 20, 23-24; 1061:11; 1111:4; 1112:12; 1137:22; 1138:19

**whores** [1] - 991:25

**wide** [1] - 957:16

**widespread** [1] - 1194:1

**willing** [2] - 967:6; 1008:18

**window** [6] - 988:16; 1057:22, 24-25; 1058:2

**wish** [1] - 1173:9

**withdrawals** [1] - 1124:23

**Withdrawn** [8] - 1018:7; 1026:25; 1034:22; 1043:13; 1046:12; 1145:20; 1152:17; 1157:3

**withdrawn** [3] - 1002:2; 1072:9; 1126:5

**WITNESS** [52] - 949:24; 950:2, 5, 23; 960:12; 962:4, 7, 17, 19; 971:8, 10, 12, 14, 16, 18, 20; 978:25; 979:3; 980:1,

4; 983:14; 985:16, 18; 1007:16, 19, 23; 1008:1, 3, 5; 1034:4; 1044:16, 20, 24; 1058:17, 19; 1065:13; 1080:10, 13, 17; 1081:14, 16, 18; 1085:5; 1087:20, 22, 24; 1088:1; 1096:15; 1097:10, 13; 1116:20; 1158:24

**WL** [2] - 1167:15, 18

**woman** [13] - 990:22; 1005:3; 1052:3; 1099:23; 1102:8, 16; 1105:5; 1115:24; 1119:5, 17; 1123:22, 25; 1124:5

**women** [13] - 961:14; 970:10; 990:13; 996:9; 1012:12; 1085:22; 1086:3; 1139:6, 11, 15; 1179:8, 12

**women's** [1] - 974:21

**wonderful** [3] - 950:17; 1015:9; 1062:2

**wondering** [1] - 1111:10

**word** [13] - 1006:9; 1033:11, 19-20; 1034:7, 12; 1047:19; 1054:5, 24; 1055:4; 1113:15, 20; 1122:1

**words** [4] - 1012:21; 1102:22; 1182:20; 1183:23

**worker** [3] - 1047:24; 1048:3; 1191:23

**works** [2] - 951:6; 1174:5

**workshop** [1] - 1081:23

**worn** [1] - 1113:17

**worse** [1] - 1120:2

**worth** [4] - 1052:5; 1146:15; 1147:4, 20

**wrapping** [1] - 1203:10

**Wright** [1] - 1192:3

**wrists** [2] - 957:22; 958:11

**writ** [6] - 1032:13, 16, 21; 1033:5, 17, 21

**write** [8] - 965:13, 15; 981:8, 25; 982:4; 999:24; 1039:14; 1041:2

**writing** [2] - 1011:22; 1035:23

**written** [7] - 1013:3; 1034:19; 1036:22; 1039:9; 1040:17; 1127:2; 1178:15

**wrongdoer's** [1] - 1173:22

**wrote** [28] - 965:12; 979:17, 19; 980:1, 5; 981:6, 10; 982:6; 1005:3; 1006:24; 1007:2; 1017:21, 23; 1035:10, 13, 16, 18; 1036:15; 1037:7, 19; 1038:11; 1039:12, 24; 1040:1, 15, 25; 1041:7; 1067:11

**X**

**x-ray** [1] - 1020:21

**Y**

**year** [5] - 951:10, 12; 952:5; 1047:4; 1051:13

**Year's** [1] - 1114:14

**years** [15] - 951:24; 1030:10; 1031:9; 1080:25; 1085:11; 1097:25; 1098:8, 11,

19; 1119:15; 1134:11-13; 1149:19; 1157:13

**yelled** [1] - 1110:1

**YORK** [1] - 948:1

**York** [15] - 948:6, 14, 18, 23; 950:13; 951:5; 1098:1, 4, 22, 24; 1099:2-4; 1188:1

**yourself** [9] - 951:18; 967:20; 995:12; 1013:7; 1017:21; 1032:3; 1035:10; 1097:6

**yourselves** [6] - 1014:6; 1065:4, 7; 1131:18; 1164:18

**Z**

**zebra** [3] - 984:18; 986:12

**Zenk** [1] - 1167:20

**ZENK** [1] - 1167:20

**zero** [1] - 1119:25

**ZWILLING** [51] - 948:19; 1077:4; 1078:15; 1160:13, 24; 1161:10, 14; 1162:6; 1165:1, 5, 22, 24; 1166:2; 1167:8, 13; 1169:8; 1170:17, 21; 1171:8, 12; 1172:1, 11; 1175:15; 1176:22; 1177:1; 1181:21; 1185:25; 1186:4, 6, 15; 1189:16; 1192:14, 16; 1193:16; 1194:14, 19, 23; 1196:24; 1197:10, 15, 20; 1198:5, 8; 1199:6, 9, 16, 19; 1202:13; 1203:10, 18, 20